# IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

_____

RICHARD ARJUN KAUL, MD

Petitioner-Plaintiff

v.

JAMES PAUL OETKEN, ET AL

Respondent-Defendants.

_____

District Court Case No. 21-CV-06992-JPO

**NOTICE OF INTERLOCUTORY APPEAL**

DATED: AUGUST 25, 2025　　_____

　　　　　　　　　　　　　　RICHARD ARJUN KAUL, MD

41 CALLA AVENUE
FLORAL PARK, NY
914 250 8413
drrichardkaul@gmail.com

## THE KAUL CASES AS REFERENCED WITHIN

**K1:** KAUL v CHRISTIE: 16-CV-02364 (S.D.N.Y.)

**K11-7:** KAUL/BASCH v ICE ET AL: 21-CV-06992 (S.D.N.Y.)

**K11-27:** KAUL v FEDERATION ET AL: 25-CV-01676 (S.D.T.-HOUSTON)

**K11-28:** KAUL v OETKEN ET AL: 25-CV-00147 (DISTRICT NORTH DAKOTA)

## **PRELIMINARY STATEMENT + STATEMENT OF FACTS**

In the many offenses/violations/crimes committed by/through/within the

'**Revocation-Cover-Up-Conspiracy**' by **The Kaul Cases** Defendants  against Plaintiff

Kaul's life/liberty/property/reputation and his human/civil/constitutional by

judges/lawyers in a period from 2012 to 2025 (state administrative-state medical

boards/state courts/appellate state courts/bankruptcy courts/district courts),

some of the most egregious were committed by the Defendants in the underlying

cases (**APPENDIX A + APPENDIX B**), with the latter consisting of four admittedly

corrupt Defendants, one being a district court judge and the other three (3)

lawyers. Not surprisingly, what motivated the admitted offenses/violation/crimes

of these Defendants was money.


This case is an example of the extreme illegal tactics (September 12, 2022 to

present) implemented by **The Kaul Cases** Defendants to attempt to have

eliminated (jail/death) Plaintiff Kaul in order to prevent him from exposing their

crimes. Where one might argue that the **"cover-is worse than the crime"** as the

initiating crime (2005-2014) was a massive NJ license revocation related violation

of Plaintiff Kaul's right to life/liberty/property/reputation and his

human/civil/constitutional rights, but that the 'cover-up' (2012-Present)  was and

continues to be a criminal 'Fraud on the Court' and

violation/degradation/perversion of the fundamental principles and apparatus of

justice itself. It would not be unreasonable to claim that the lawyers and judges

involved in this case have been undoubtedly corrupted by **The Kaul Cases**

Defendants and despite Plaintiff Kaul's repeated requests for their financial

holdings, no information has been submitted, the reason being their irrefutable

state of corruption.


## VIOLATON OF THE LAW OF THE SUPREME COURT OF THE UNITED STASTES

In a case replete with corrupt lawyers and judges, it is an impossible

to expect that these individuals would uphold/respect or indeed to not

consciously/willfully violate the law. And so, in the corrupted courts/law offices in

which the Defendants conduct their well-rehearsed and almost perfect

'detection-proof' **"patterns of racketeering"** they and their comrades have spent

many decades in the commission of criminal schemes, that were briefly

interspersed with knowingly absurd/frivolous/false arguments and opinions they

planned to submit for their clients . The district court judges, or at least some of

them, still holding an immutable faith in their un-democratic life-time tenure,

would issue knowingly false opinions with no basis in fact/law, the falsity of which

they left to the appellate courts to 'fix' or in some cases to not 'fix' but simply 'rubber-stamp', realizing the hurdle to have the case inspected by the Supreme Court of the United States.

On June 27, 2024, in <u>SEC v Jarkesy: 22-859</u> (**APPENDIX-C**), the Court held that whenever a proceeding is conducted to deprive a person of his life/liberty/property/reputation, the jury-right protection of the Seventh Amendment must be in place as must an article III judge if the dispute concerns private rights. The NJ 2014 jury-less article III judge $475,000 'fine' imposing revocation was and remains illegal, an illegality/violation further perpetuated against Plaintiff Kaul by Defendant Oetken's quid pro quo bribery related scheme with the Defendants to: **(i)** prohibit discovery (August 19, 2021 to September 12, 2022); **(ii)** to then dismiss the case with prejudice and issue a knowingly illegal 'injunction' that purported to prevent Plaintiff Kaul from filing any further cases in the United States District Court without his permission; **(iii)** to then threaten Plaintiff Kaul with contempt if he did not dismiss cases that had been admitted by independent judges in other district courts whom were provided a copy of Defendant Oetken's 'injunction' (Plaintiff Kaul did not dismiss any cases, but the judges did under threat/intimidation/harassment). These illegal threats caused

Plaintiff Kaul to sue Defendant Oetken on three (3) occasions (**APPENDIX D**), cases

in which his non-denial of the allegations /facts did cause their admittance

pursuant to Rule 8(b)(6). However, compounding his guilt were his January 6,

2025 'ADMISSIONS OF FACT'.


But the criminality perpetrated by Defendant Oetken in the period commencing

on August 19, 2021, did commit an outrageous turn on May 8, 2025, when

Defendant Oetken, in full knowledge of the illegality of his September 12, 2022

purported 'injunction', did issue an order for a June 17, 2025 'contempt' hearing.

In response Plaintiff Kaul sent letters to judicial and governmental regulators

informing them of the conflicted illegality of the proposed hearing. On May 8,

2025 Defendant Oetken was a Defendant in K11-23, but was conveniently

dismissed from the case on June 12, 2025 (the case had been filed on October 9,

2024), but on June 16, 2025, Defendant Oetken was sued by Plaintiff Kaul in K11-

28 and immediately noticed as to his Defendant status. Thus, when he illegally

conducted the purported 'contempt' hearing on June 17, 2025, not only was he

conflicted but he had admitted to his offenses/violations/crimes and knew he did

not have the authority to conduct such a hearing. Due to the illegality of the

hearing, Plaintiff Kaul informed the Court that he not would participate in a

patently illegal hearing, a participation that would have caused him to become a member of and incur the liability of the '**Revocation-Cover-Up-Conspiracy'.**

As if the facts of conducting bribery quid pro quo related schemes of racketeering within the Southern District of New York were insufficient to satisfy Defendant-Respondent Oetken's criminal addiction, there was conducted a scheme by the Defendants that attacked the fundamental integrity of the judicial process, and if repeated elsewhere and with frequency would  decimate the foundation of modern-day American jurisprudence. The rules and regulations of judicial conduct require that the records of judicial proceedings are contemporaneously recorded and <u>timely</u> documented in the relevant legal records, for the purposes of amongst other things appeal, objection, clarification and re-consideration.

But that is exactly what DID NOT HAPPEN on June 17, 2025 in K11-7. The Defendants, recognizing that Plaintiff Kaul would have ten (10) days to file for interlocutory relief, did not make any entry onto the docket until approximately August 21, 2025, sixty-five (65) days after the purported 'contempt' hearing. The purpose of the delay was an attempt to deceive Plaintiff Kaul into believing Defendants non-publication to the docket did evidence that no hearing had been

conducted, when in fact one had, but more specifically to attempt to deceive him

that there existed no basis for interlocutory appeal. In fact, on June 26, 2026, in

K11-27, Counsel for Defendants Christie/Solomon claimed to the administrative

judge that a hearing had been conducted, which Plaintiff Kaul in reviewing the

K11-7 docket found to be a false statement, and consequently filed a June 27,

2025 '… REPLY TO DEENDANTS CHRISTIE/SOLOMON MOTION TO STAY AT D.E. 36'

(**APPENDIX E**) which substantiated the falsity.


However, all of the above facts from August 19, 2021 to the present became

subjugate to the fact that on June 27, 2025, in <u>Trump v CASA: 24A884</u>, the

Supreme Court held that:


**"Under the Court's well-established precedent, see Grupo Mexicano, 527 U. S.,**

**at 319, because universal injunctions lack a founding-era forebear, <u>federal</u>**

**<u>courts lack authority to issue them</u>. Pp. 19–21."**


The tool of the universal nationwide injunction lacked any substantiation in the

1789 Judiciary Act, the Constitution or the equitable remedies offered by courts

of equity at the time of the Republic's Founding. Nor indeed was there any

analogous  form of relief available in the High Court of Chancery in England at the time of the founding. Thus nationwide/universal injunctions had never been legal, a fact known to Defendant Oetken and **The Kaul Cases** Defendants on September 12, 2022, but a fact that did not prevent them from subsequently and persistently violating the law and Plaintiff Kaul's human/civil/constitutional rights.

The entry of the September 12, 2022 injunction was illegal and constitutes a 'Fraud on the Court' that no judge in the SDNY did attempt to prevent pursuant to his/her obligations under Section 1986 of the 1871 Civil Rights Act. Similarly, no district judge in any of the other district courts in which Plaintiff Kaul filed cases did cause to be enforced the fact that **"federal courts lack authority to issue them"** (**APPENDIX F**). And then on May 8, 2025, Defendant Oetken entered a knowingly illegal order scheduling a knowingly illegal June 16, 2025 purported contempt hearing against Plaintiff Kaul (**APPENDIX G),** a hearing that was illegally conducted and then followed by an August 21, 2025 letter to Defendant Oetken enquiring as to when he was going to enter his knowingly illegal order (**APPENDIX H**).

The events from at least September 12, 2022 to August 21, 2025 were/are a decidedly series of criminal events perpetrated by criminals within the '**Revocation-Cover-Up-Conspiracy'** (2005-2025). However, as striking as the offenses/violations/crimes within the '**Revocation-Cover-Up-Conspiracy'** has been the derogation by all district judges except three (3) (U.S.D.J. Beth Bloom-S.D.F./Richard Myers-E.D.N.C./Alfred Bennett-S.D.T-Houston) of their sworn oaths, as if the swearing and the oaths had never existed.

But in this case, and as evidence of the Defendants knowingness of their guilt, is the tawdriness of their most recent tactic of omitting to submit a timely note of the June 16, 2025 hearing to the docket. The purpose of this scheme was to attempt to deceive Plaintiff Kaul into believing no hearing had been conducted and to cause either no timely filing of an interlocutory appeal or a filing past the ten (10) day limit. Secret court proceedings more akin with criminal dictatorships, or criminal actors within a democratic state.

**THE KAUL CASES VIOLATIONS RELATED CLAIM CONCLUSIVE FACTS (2016-2025)**

And so, in this case, Respondent-Defendant Oetken violated Plaintiff Kaul's human/civil/constitutional rights on September 12, 2022 with the knowingly

illegal issuing in K11-7 of a nationwide injunction that prevented him from filing any other cases in any court in America without his permission (**Exhibit I**). However, in knowing of the illegality of the September 12, 2022 'injunction, he did, starting in 2023, commence threatening to hold Plaintiff Kaul in contempt when he filed cases in other jurisdictions in which independent judges, having been provided a copy by Plaintiff Kaul of Defendant Oetken's illegal 'injunction', did agree to admit the cases, issue discovery orders and set cases for trial (**Exhibit J**). All of these efforts by other district court judges did not come to fruition consequent to threats levied at these judges by Defendants counsel, Defendant Oetken and his political masters. And thus, the full truth of the racketeering offenses/violations/crimes **The Kaul Cases** Defendants was prevented from a complete democratic exposition. However, **The Kaul Cases** Defendants obstruction of justice did not prevent the emergence of a substantial claim conclusive mass evidence/facts consequent to Rule 8(b)(6). A mass of thousands of facts that **The Kaul Cases** Defendants nondenial of which did cause their admittance for all purposes pursuant to Rule 8(b)(6), and that includes Defendant Oetken (**APPENDIX M**).

## APPEAL IN U.S.C.A. FOR THE FIFTH CIRCUIT (K11-27)

Evidencing the nullity (1781 Judicature Act prohibition of authority of federal

district courts re: issuance of nationwide injunctions/September 12, 2022 bribery

related quid pro quo/January 6, 2025 admissions of fact/June 27, 2025 SCOTUS

opinion in Trump v CASA: 24A884) of Respondent-Oetken's September 12, 2022

purported injunction, the U.S.C.A. for the 5th Circuit and courts within it are

permitting and facilitating (grant of IFP) the litigation of K11-27 by Petitioner-

Plaintiff Kaul, with full knowledge of all events surrounding Respondent-

Defendant Oetken's September 12, 2022 injunction related events (September

12, 2022 to the Present) (**APPENDIX N).**

# **AFFIDAVITS**

Petitioner-Plaintiff Kaul did, absent any discovery, gather a series of affidavits (**APPENDIX S**) probative to the proof of the '**Revocation-Cover-Up-Conspiracy'**, affidavits that were submitted in K11-7 and repeatedly brought to the attention of Respondent-Defendant Oetken. This corpus of highly incriminating evidence was sufficient to order discovery and substantiate a trial, but it was evidence ignored by Respondent-Defendant Oetken, who sought to suppress the evidence with his knowingly illegal September 12, 2022 injunction.

# ARGUMENT

Respondent-Defendant Oetken did knowingly and illegally violate and continues

to violate the law and Plaintiff Kaul's human/civil/constitutional rights in the

period from September 12, 2022 to June 16, 2025, by respectively issuing a

knowingly illegal nationwide injunction (**APPENDIX I**) and then using that illegal

injunction to obstruct justice in other districts (**APPENDIX K**). And to then further

violate Plaintiff Kaul's human/civil/constitutional rights and have conducted a

knowingly illegal 'contempt' hearing on June 17, 2025 (**APPENDIX H**) based on the

illegal September 12, 2022 illegal injunction. It should be further noted that the

first time the transcript of that hearing appeared on the federal court docket was

on August 21, 2025 (**APPENDIX H**). Evident in the transcript is the fact that the

K11-7/K11-27 Defendants' strategy has DWINDLED FROM submitting well-

reasoned and well legally/factually supported arguments that undermine their

admissions of fact, their Rule 8(b)(6) failure to deny any of the allegations/facts

within **The Kaul Cases** (2016-2025) and more presciently, their objection to the

holding in the June 27, 2025 SCOTUS opinion in Trump v CASA that: **"Under the**

**Court's well-established precedent, see Grupo Mexicano, 527 U. S., at 319,**

**because universal injunctions lack a founding-era forebear, federal courts lack**

**authority to issue them. Pp. 19–21."** TO gangster-like tactics of person-snatching

and threats of extortion whereby they would aim to keep Petitioner-Plaintiff Kaul

**"incarcerated"** (one of the most frequently used words in their seemingly

rehearsed pleas to Respondent-Defendant Oetken) until he capitulated to their

gangster-like demands. To Petitioner-Plaintiff Kaul this is not surprising since it

was New Jersey's well-known version of mafia-like gangsterism, under the

tutelage of Defendant Christie, that created the criminal conditions that

permitted, facilitated and effectuated the illegal 2014 jury-less article III judge

free $475,000 'fine' imposing NJ license revocation. Pure racketeering that

they/their lawyers continued into the chambers and court of Respondent-

Defendant Oetken.


And lending towards the criminality of these actions (2012-2025) were the

Section 1986 inactions or preventions of every other judge in the Southern

District of New York, all of whom had been informed of his

offenses/violations/crimes, but did nothing to prevent his violations/crimes,

despite being noticed of his Admissions of Fact. An example of one such letter is

contained in (**APPENDIX O**). The June 27, 2025 SCOTUS opinion in Trump v CASA:

24A884, unequivocally established that the 1781 Judicature Act did not confer

any power on the federal district courts to issue nationwide injunctions, as such

powers did not exist in English law. And since the enactment of the 1781

Judicature Act there has been no change in the law that renders such authority to

district courts. A fact known to Defendant-Respondent Oetken on September 12,

2022, and a fact substantiating his knowing illegality of his September 12, 2022

injunction, that he then attempted to and did in fact, in collusion/conspiracy with

**The Kaul Cases** Defendants, enforce across state lines and district courts within

the United States using intimidation/harassment/threats/bribes (**APPENDIX J**).

These acts did/do constitute the knowing commission of further wrongdoing and

crime (wire fraud/extortion/intimidation) and a continuation of **The Kaul Cases**

Defendants **"pattern of racketeering"** in which the United States District Court

was further converted into **"racketeering enterprise"**. The lowest courts/lowest

paid judges in any court system are arguably no more perfect a cover for the

perpetration of **"patterns of racketeering"**, where no lawyer dare speak the truth

of such crimes; and almost all if not every Propria Persona Plaintiff remains either

oblivious to the court conducted felonies or if he/she does know, is incapacitated

by either fear or an absence of the technical/life-experience knowledge of how to

expose and dismantle those who abuse power. In all truth, **The Kaul Cases**

Defendants and their aiders/abettors should be ashamed of themselves for not

having the courage to face Petitioner-Plaintiff Kaul in court and with dignity, deny

or admit their crimes. None of these individuals had any hesitation in publicly

'grand-standing' in the media in 2012-2014 when within the '**Revocation-Cover-**

**Up-Conspiracy'**, they were metaphorically 'banging their chests' at having

destroyed the then lives of Petitioner-Plaintiff Kaul and his family. And for what?

For his 2005 invention and successful performance of the percutaneous spinal

fusion procedure, a procedure that revolutionized the field of spine surgery:

https://www.youtube.com/watch?v=JX4bnRPPucI

https://www.youtube.com/watch?v=guwx5kuBiEg

https://www.youtube.com/watch?v=oxaV5IJuZ7c

https://www.youtube.com/watch?v=Zu50ik2l2Sc

And a procedure that became the standard of care over a decade ago and has

helped millions of people globally within debilitating spinal pain. And so, because

he helped the world, he was persecuted by an envious and ill-hearted cabal of

greedy self-professed 'healers'. The Sanhedrin of modern-day America.


From approximately mid 2023, Defendant Oetken obstructed/violated Plaintiff

Kaul's Constitutional right to due process in multiple district courts that had set

dates for discovery/trial (**APPENDIX P**) all the while knowing that his injunction

was admittedly procured through bribery and had that under the law had never

had the authority to issue nationwide injunctions. However, despite knowing this

and the fact of his bribery related quid pro quo Respondent-Defendant Oetken,

under constant duress from **The Kaul Cases** Defendants, continued to threaten

Plaintiff Kaul with knowingly illegal contempt hearings and orders in order to

satisfy his part of the quid pro quo scheme that he had entered into with **The Kaul**

**Cases** Defendants in K11-7 in approximately late 2021 (**APPENDIX Q**).


## PETITIONER-PLAINTIFF KAUL'S PETITION TO THE SUPREME COURT OF THE UNITED STATES

Consequent to Respondent-Defendant Oetken's continued **"pattern of**

**racketeering"** within the United States District Court, Petitioner-Plaintiff Kaul did,

on May 27, 2025, seek the intervention of the Supreme Court of the United States

in the form of a writ of prohibition to Respondent-Plaintiff Oetken, that sought to

invalidate his September 12, 2022 nationwide injunction (**APPENDIX L**). Exactly

one month later on June 27, 2025, the Supreme Court of the United States

published its opinion in <u>Trump v CASA</u>, an opinion that was originally scheduled

for publication in September 2025.

The definitiveness of the illegality of Respondent-Defendant Oetken's September

12, 2022 purported injunction as evidenced in the June 27, 2025 SCOTUS

publication in Trump v CASA did result in some of the K11-7/K11-27 Defendants

(Allstate/FSMB/Christie/Solomon/Heary) most recent tactic of obstruction. A

tactic in which to omit from the docket any information regarding the June 16,

2025 hearing including the transcript until August 21, 2025, and a tactic

conducted in conspiracy and collusion with counsel for **The Kaul Cases**

Defendants in order to attempt to deceive Plaintiff-Petitioner Kaul into believing

no hearing had been conducted and thus there was nothing to appeal. The

purpose of this being to attempt to prevent any appeal of Respondent-Defendant

Oetken's four (4) years-worth of illegal injunction related activities that

commenced on or around August 19, 2021, and specifically the June 17, 2025

hearing. The transcript of that hearing is replete with knowing falsehoods and was

conducted by a conflicted Respondent-Defendant Oetken.


A 'birds-eye' view of the proceeding was that of a group of racketeers, all of

whom have admitted pursuant to Rule 8(b)(6) to the facts of their guilt and the

guilt itself, submitting false testimony to an individual cloaked as a jurist who has

himself admitted pursuant to Rule 8(b)(6) to the commission of a series of

offenses/violations/crimes (**APPENDIX Q**) conducted in conspiracy with the guilty

Defendants testifying before him for the purpose of furthering a knowingly illegal

injunction, an instrument that on June 27, 2025 the Supreme Court held that

district courts had never had the authority to issue since the 1781 founding of the

American Republic. Not one element of this criminal 'Fraud on the Court' scenario

was legal but all of it was entirely consistent with and in furtherance of the

'**Revocation-Cover-Up-Conspiracy'** (2005-2025).


Finally, Respondent-Defendant Oetken's failure to adhere to and be guided by the

June 27, 2024 SCOTUS ruling in **SEC v Jarkesy: 22-859**, (**APPENDIX C**) which as

applied to the 2014 NJ jury-less article III judge free $475,000 'fine' imposing

license revocation of Plaintiff Kaul's license was/is further evidence of his

admitted state of corruptness. A state that substantiates a need for the

interlocutory intervention of the United States Court of Appeals of the Second

Circuit and if so required the Supreme Court of the United States, whose law and

the rights of the public he and The Kaul Cases Defendants continue to so

flagrantly violate, in order to further their self-enrichment through an illegal

exploitation of the federal bench of a power that was never bequeathed to it by

the 1781 Judicature Act.

That a district judge has acted in the manner as has Respondent-Defendant

Oetken and remains on the bench without being prevented pursuant to Section

1986 from perpetuating his known and admitted crimes by any person in the

Southern District of New York, does evidence the pervasiveness and long-history

of such crime within that court. A pervasiveness that if the exposure of which was

partially achieved by Petitioner-Plaintiff Kaul, a Propria Persona In-Forma Pauperis

Plaintiff, could not then but be completely 'outed' by any national investigatory

and or prosecutorial agency.

# **RELIEF**

Based on the illegality of every action, text entry and or order entered by Respondent-Defendant Oetken since September 12, 2022, Petitioner-Plaintiff Kaul requests the following relief:

**1**. A nullification of every action, text and or order entered onto any and all dockets within the United States District Court by Respondent-Defendant Oetken in the period commencing on August 2021 in any matter pertaining/relating/associating with Petitioner-Plaintiff Kaul to any degree and or association.

**2.** An investigative referral to the Washington D.C. Public Integrity Unit of the United States Department of Justice.

**3.** A referral to the Washington, DC based United States Attorney.

**4.** A referral to the Senate Judiciary Committee.

**5.** A referral to the Supreme Court of the United States.

**6.** A referral to the offices of every United States Attorney.

**7.** A referral to the New York State Attorney Grievance Committee with a recommendation for revocation of Respondent-Oetken's New York State law license.

## <u>PROPOSAL OF SETTLEMENT DISCUSSIONS</u>

Commencing in May 2012, one month after the illegal April 2, 2012 suspension of

Petitioner-Plaintiff Kaul's NJ license, he proposed a settlement be enacted

between himself and **The Kaul Cases** Defendant, New Jersey Board of Medical

Examiners. And on May 9, 2012 a settlement was indeed agreed upon. However,

that settlement was discarded by **The Kaul Cases** Defendant Christie, who

ordered his then AG, Jeffrey Chiesa and Director of Consumer Affairs to

permanently suspend-revoke Petitioner-Plaintiff's license based on false charges

that he had violated the agreement. On June 13, 2012, Christie/Chiesa/Kanefsky

stood and watched in a large conference room on the 4th floor of the Richard J.

Hughes Justice Complex in Trenton, NJ, with the entire staff of the Office of the NJ

AG, as the twenty-two men plus state medical board with their heads held low in

shame carried out Christie's orders.

From June 13, 2012, and despite the grave injustice committed against Petitioner-

Plaintiff Kaul, he continued for the next four (4) years to propose offers of

settlement, all of which were rejected. Thus Petitioner-Plaintiff was left with no

option but to commence litigation, which he did by filing K1 on February 22, 2016

in the Southern District of New York, having been a resident of New York since

1989 and having obtained his training in the State of New York (**APPENDIX R**).

From February 22, 2016 onwards and throughout **The Kaul Cases**, Petitioner-Plaintiff Kaul repeatedly and consistently proposed there be conducted settlement discussions, all of which were either ignored and or rejected (2016-2025). And in this period every discovery/trial order was violated by **The Kaul Cases** Defendants. And so now they plead with Respondent-Defendant Oetken to have Petitioner-Plaintiff Kaul held in contempt and jailed till he agrees to relinquish all his human/civil/constitutional rights, his right to life/liberty/property and his right to be compensated for the offenses/violations/crimes committed against him by **The Kaul Cases** Defendants (2005-2025). The Defendants plea to Respondent-Defendant Oetken has an underlying racist/discriminatory tone in the fact that counsel for Defendant Heary falsely claims that Petitioner-Plaintiff Kaul received his post-graduate training in the UK, when in fact it was in the US (**APPENDIX R**), which was also the place in which in 2005 he invented and successfully performed the first percutaneous spinal fusion. A procedure for which he should have been lauded instead of persecuted.

Respondent-Defendant Oetken should have either permitted discovery and based on that either ordered settlement or trial, as did several other district judges, and not permitted himself to become entangled in the '**Revocation-Cover-Up-Conspiracy**'.

Regardless, Petitioner-Plaintiff Kaul does submit that he is willing to consider

discussions as to the settlement of monetary/other compensation for the ongoing

and **"new"** injuries to his life/liberty/property/reputation and

human/civil/constitutional rights

DATED: AUGUST 25, 2025                    _____
                                                        RICHARD ARJUN KAUL, MD

# APPENDIX A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SDNY

2021 SEP 13  PM 1:4

RICHARD ARJUN KAUL, MD;
DAVID BASCH, MD;
JANE DOE; JOHN DOE.

v.

INTERCONTINENTAL EXCHANGE; GEICO;
TD BANK; ALLSTATE INSURANCE COMPANY;
FEDERATION STATE MEDICAL BOARDS; ARTHUR HENGERER
(in his personal and official capacity);
CHRISTOPHER J. CHRISTIE; DANIEL STOLZ;
ATLANTIC HEALTH SYSTEM; ROBERT HEARY;
PHILIP MURPHY (in his personal and official capacity)
GURBIR GREWAL (in his personal and official capacity)
RIVKIN RADLER LAW FIRM; MAX GERSENOFF;
JANE DOE; JOHN DOE.

CIVIL ACTION
21-CV-06992 (JPO)
AMENDED COMPLAINT

SUBMITTED PURSUANT
TO RULE 15(a)(1)(A)

2

KAUL V. ICE
K11-7

## Parties

## Plaintiffs

1. RICHARD ARJUN KAUL, MD – 440c Somerset Drive, Pearl River, NY 10965: 862 881 9702: DRRICHARDKAUL@GMAIL.COM (**Exhibit 1**).
2. DAVID BASCH, MD – 90 S Sparta Ave, Sparta, NJ 07871: 201 396 0346: dbbortho@yahoo.com (**Exhibit 1**).

## Defendants

1. INTERCONTINENTAL EXCHANGE – 11 Wall Street, New York, NY 10005 (**Exhibit 2**).
2. GEICO INSURANCE COMPANY – 5260 Western Avenue, Chevy Chase, MD 20815 (**Exhibit 2**).
3. TD BANK - 1701 Marlton Pike East, Suite 200, Cherry Hill, NJ 08003 (**Exhibit 2**).
4. ALLSTATE INSURANCE COMPANY – Attention Thomas Wilson, 2775 Sanders Road, Northbrook, Illinois 60062 (**Exhibit 2**).
5. FEDERATION STATE MEDICAL BOARDS - 400 Fuller Wiser Rd, Suite 300, Euless, TX 76039 (**Exhibit 2**).
6. ARTHUR HENGERER – 2365 S CLINTON AVENUE, ROCHESTER, NY 14618 (**Exhibit 2**).
7. CHRISTOPHER J. CHRISTIE – 2nd Floor, 36th Street Capital, Maple Avenue/Dehart Street, Morristown, NJ 07960 (**Exhibit 2**).
8. DANIEL STOLZ – 60 Christy Drive, Warren, NJ 07059-6833 (**Exhibit 2**).
9. ATLANTIC HEALTH SYSTEM – 475 South Street, Morristown, NJ 07960-6459 (**Exhibit 2**).
10. ROBERT HEARY – 1 Bay Avenue, Suite 5, Montclair, NJ 07042 (**Exhibit 2**).
11. PHILIP MURPHY – c/o NJ AG, 25 Market Street, Trenton, NJ 08611 (**Exhibit 2**).
12. GURBIR GREWAL – c/o Securities + Exchange Commission, 100 F St NE, Washington, DC 20549 (**Exhibit 2**).
13. RIVKIN RADLER LAW FIRM – 477 Madison Avenue, Suite 410, NY, NY 10022
14. MAX GERSENOFF – 477 Madison Avenue, Suite 410, NY, NY 10022

## Co-conspirators

The identities and roles in the scheme/s are stated in (**Exhibit 3**).

### The State of New Jersey
1. Executive members
2. Legislative members
3. Judicial members – eg. Jay Howard Solomon/Stuart Rabner/Kenneth Grispin/Mark Ciarrocca/Jeffrey Beachem/Dennis Carey

### The District of New Jersey-Newark:

1. Judicial members.

**Politicians**:
1. Jeffrey Chiesa
2. Cory Booker
3. Steven Sweeney
4. Charles E. Schumer
5. Mitch McConnell
6. Philip Murphy
7. Scott Rumana

**Lawyers**:
1. Lewis Stein
2. Kenneth Hollenbeck
3. Joseph Gorrell
4. Michael Keating
5. William Roeder
6. William Fiore
7. Joseph McCarthy
8. Eric Kanefsky
9. John Hoyt
10. Paul Fishman
11. John Dilorio
12. Joshua Raymond
13. Scott Rever
14. John Robertelli
15. Thomas Manahan
16. Doreen Hafner
17. Eric Katz
18. Gurbir Grewal
19. Robert McGuire
20. Abbot Brown

**Physicians**:
1. Steven Lomazow
2. Gregory Przybylski
3. Frank Moore
4. Peter Carmel
5. William Mitchell
6. Peter Staats
7. Marc Cohen
8. Christopher Wolfla
9. Andrew Kaufman
10. Thomas Peterson

**Hospital/Insurance/Banking Exe utives/Others:**

1. Richard Crist
2. Divyesh Kothari
3. James Gonzalez
4. Lindy Washburn
5. Robert Garrett
6. Brian Gragnolati
7. Bharat Masrani
8. Warren Buffet

## Preliminary Statement

1. K11-7 is about the corruption of United States of America by global publicly traded for-profit corporations, through the ruthless exploitation of the American public, medical profession/legal professions and state/federal politicians, and through the perpetration of massive schemes of racketeering, that have caused, and continue to cause the wrongful deaths/incarceration of millions of innocent Americans (**Exhibit 4**). Within the United States at this point in time there are approximately two thousand (2000) unsafe convictions of principally ethnic minority physicians, orchestrated by the insurance industry, in collusion/conspiracy with rogue state/federal investigators/prosecutors. These facts are detrimental to share value.

2. K11-7 exposes the inner machinations of these schemes and seeks to: **(i)** effectuate regulatory and political reformation; **(ii)** to cause the perpetrators of such tyranny to be monetarily penalized; **(iii)** to re-distribute their wealth amongst the victims of their tyrannical corporate greed.

# Jurisdiction + Venue

### 3.    Jurisdiction:

General:

28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of Kaul's Constitutional rights and U.S.C. § 1964(a)(b)(c)(d) and 1962.

U.S.C. § 337 – Plaintiff's allegations allege violations of an Act of Congress regulating commerce and monopolies.

28 U.S.C. § 1332(d)(2)(A) – Plaintiff is a citizen of a different state to certain Defendants and the aggregate amount in controversy exceeds seventy-five thousand dollars ($75,000).

Personal:

The Court has personal jurisdiction over all Defendants, as each Defendant has transacted business , maintained substantial contacts, and/or committed acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including this District. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to a court of general jurisdiction in New York.

### 4.    Venue:

28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated

7

# Evidence

5. **Tacit admissions**:

Defendants Christie/TD/Allstate/AHS/Heary/Geico have, pursuant to F.R.E. 801(d)(2)(b), have admitted to the RICO and Section 1983 claims (**Exhibit 5**).

6. **Defendant Geico's "pattern" within the United States District Court**:

Since 2008/2009, Defendant Geico has filed almost identical and knowingly fraudulent claims against physicians to whom it owes money, in the willful commission of mail/wire fraud/obstruction of justice. Below are just four (4) examples:

1. Geico v Kaul: 13-CV-02597 – U.S.D.C.-D.N.J. (**Exhibit 12**).

2. Geico v Specialty Medical Services: 14-CV-08015 – U.S.D.C.-D.N.J. (**Exhibit 12**).

3. Geico v Kosiborod: 16-CV-04662 – U.S.D.C.-D.N.J (**Exhibit 12**).

4. Geico v Basch: 19-CV-13948 – U.S.D.C.-D.N.J. (**Exhibit 12**).

8

## The Slaving-Nazi-COVID-Insurance Axis

7. In K11-2 Kaul exposed the motivation and method for the adding and abetting of the perpetration of the slaving industry and Holocaust, by the insurance industry, of which Defendants Allstate/Geico are members (**Exhibit 6**). In 2021, the insurance industry controls the pharmaceutical industry, and is the principal financial beneficiary of the billions of dollars generated from forced mass global vaccination programs, that violate fundamental human rights and the Nuremberg Code. The insurance industry holds substantial controlling shares in Pfizer (USA) and Astra Zeneca (UK) and are continuing the same **"pattern of racketeering"** that commenced in the 1600s with the Trans-Atlantic slaving trade, and which involved the commission of the RICO predicate act of murder, through the United States, a colony that the British Empire/Insurance Industry converted into a **"racketeering enterprise"** for the purpose of profit.

8. The forced/coerced mass vaccination programs/passports are the chains and whips of the COVID enslavement program, the strings of which are being pulled by the British controlled insurance industry. Dominion never ended. It simply switched hats.

9. In K11-2, the Defendants and the Court devoted inordinate page space to Kaul's exposition of the insurance industry's four hundred (400) year-long genocide, and in doing so, did betray their conviction of the absolute truth of the matter.

10. In K11-7, Kaul identifies how, in 2021, the **"pattern"**, like the COVID-19 virus, has mutated into a purported mission to save humanity, the calling card of which is a supposed **"vaccine"**. The vaccine is more than useless, as it was the cause of the viral mutation, as Kaul explained it would be (**Exhibit 7**).

9

## Statement of Fact

11. The relevant facts are incorporated into the legal claims.

12. However, the most salient and irrefutable facts of the Defendants' guilt are found within their ill-conceived schemes to have Kaul kidnapped and to commit securities fraud for five-plus-years. These facts, in conjunction with the perjury/obstruction of justice/mail fraud/wire fraud/kickbacks/honest services fraud/extortion/bank fraud/bankruptcy fraud/racketeering/conspiracy/public corruption/judicial corruption/false imprisonment/false arrest committed by **The Kaul Cases** Defendants from 2008/2009 to 2021, are deemed admitted pursuant to F.R.E. 801(d)(2)(b), because they have not, nor could they be, denied.

13. The facts in **The Kaul Cases** are irrefutable proof of: **(i)** Corporate corruption/tyranny; **(ii)** Political corruption/tyranny; **(iii)** Judicial corruption/tyranny; **(iv)** Medical corruption/tyranny.

# Legal Claims

## Violation of Sarbanes-Oxley Act
## As to Defendants Allstate/TD/Geico

14. On February 22, 2016, Kaul filed suit against the Defendants in the United States District Court for the Southern District of New York (K1). The claim for monetary damages was $28, 000 trillion + (**Exhibit 8**), a figure in excess of ten percent (10%) of the market capitalization of all three Defendants, and thus the law required the case be disclosed in SEC filings, Forms 10K/13K, and in the corporations' accounts.

15. The Defendants conspired with their lawyers and accountants to file knowingly false returns/accounts, with the recognition that this crime did constitute a violation of Sarbanes-Oxley and was represented a willful commission of securities fraud on the global equities market.

16. From 2016 to the present, the Defendants continued to fail to report their liability, a liability that continues with K11-1/K11-3/K11-7.

17. On November 22, 2018, Kaul sent letters to the top ten corporate shareholders of Defendants Allstate/TD/Geico, creating a record in which the shareholders are foreclosed from asserting plausible deniability of the Defendants crimes. A number of these entities withdrew their positions. Kaul sent a subsequent letter on August 18, 2020 (**Exhibit 9**).

18. The key provisions of the Sarbanes-Oxley Act are:
(1) **SOX Section 302: Corporate Responsibility for Financial Reports** – (a) CEO and CFO must review all financial reports; (b) Financial report does not contain any misrepresentations; (c) Information in the final report is **"fairly represented";** (d) CEO and CFO are responsible for the internal accounting controls; (e) CEO and CFO must report any deficiencies in internal accounting controls, or any fraud involving the management of the audit committee; (f) CEO and CFO must indicate any material changes in internal accounting controls.
(2) **SOX Section 401: Disclosures in Periodic Reports** – All financial statements and their requirement to be accurate and presented in a manner that does not contain incorrect statements or admit to state material information. Such financial statements should also include all material off-balance sheet liabilities, obligations and transactions.
(3) **SOX Section 404: Management Assessment of Internal Controls** – All annual financial reports must include an Internal Control Report stating that management is responsible for an "adequate" internal control structure, and an assessment by management of the effectiveness of the control structure. Any shortcomings in these controls must also be reported. In addition, registered external auditors must attest to the accuracy of the

company management assertion that internal accounting controls are in place, operational and effective.

(4) **SOX Section 409: Real Time Issuer Disclosures** – Companies are required to disclose on an almost real-time basis information concerning material changes in its financial condition or operations.

(5) **SOX Section 802: Criminal Penalties for Altering Documents** – This section specifies the penalties for knowingly altering documents in an ongoing legal investigation, audit, or bankruptcy proceeding.

(6) **SOX Section 806: Protection for Employees of Publicly Traded Companies Who Provide Evidence of Fraud** – This section deals with whistleblower protection.

(7) **SOX Section 902: Attempts & Conspiracies to Commit Fraud** Offenses – It is a crime for any person to corruptly alter, destroy, mutilate, or conceal any document with the intent to impair the object's integrity or availability for use in an official proceeding.

(8) **SOX Section 906: Corporate Responsibility for Financial Reports** – Section 906 address criminal penalties for certifying a misleading or fraudulent financial report. Under SOX 906, penalties can be upwards of $5 million in fines and 20 years in prison.

19. The Defendants knowingly/willfully violated every SOX provision, to a criminal standard. The violation caused a massive and ongoing injury to Kaul's prosecutorial and due process rights, in that he was illegally deprived of incriminatory evidence regarding the securities fraud, that Kaul would have submitted as further evidence of the Defendants **"pattern of racketeering"** through the commission of the RICO predicate act of securities fraud.

20. The Defendants violation of SOX did violate Kaul's rights, and caused further injury to his economic standing, reputation and ability to become 'un-imprisoned' and regain his livelihood, for this, all Defendants are liable.

## RICO 1
## Association-In-Fact Enterprise: State of New Jersey-NYSE-SEC
## Defendant Persons: Allstate/TD/Geico/ICE/Christie
## RICO Predicate Acts: Securities fraud/mail fraud/wire fraud/money laundering

### Overview:

21. In a time period commencing in approximately 2009, the Defendants did conspire to commit, and did commit a knowingly illegal "pattern of racketeering" and did convert the NYSE/SEC/State of New Jersey (executive/legislative/judicial) into an association-in-fact enterprise, through and under cover of which they perpetrated thousands of the RICO predicate acts of mail fraud/wire fraud/securities fraud/money laundering, purposed to advance their political/economic agenda. Specifically, Defendant Christie sought to raise monies for gubernatorial and presidential campaigns, while Defendants Allstate/TD/Geico/ICE sought to increase executive compensation and share price. The

Defendants **"State of New-NYSE-SEC" ("SNS Scheme")** scheme involved an intersection of the worlds of medicine/business/law/politics, and commenced in 2009, with the purpose of, amongst other things: **(i)** having Kaul's medical license revoked; **(ii)** eradicating all debt owed to Kaul by insurance carriers (approx. \$45 million); **(iii)** destroying Kaul's reputation; **(iv)** eliminating any future financial liability to Kaul; **(v)** causing Kaul to enter a state of poverty/homelessness; **(vi)** attempting to cause Kaul to be jailed/deported/killed; **(vii)** intimidating other minimally invasive spine surgeons into not performing minimally invasive spine surgery, in order to divert a greater percentage of the public's insurance premiums into corporate/executive compensation.

22. The Defendants have colluded and conspired to orchestrate both their underlying **"SNS Scheme"** and the subsequent, and multiple schemes to conceal and provide cover for the **"SNS Scheme"**. The concealment has been perpetrated through massive schemes of corruption of state/federal politicians/judges, in an attempt to prevent Kaul from exposing the Defendants decades-long schemes of judicial/public corruption.

23. In 2005, Kaul invented and successfully performed the first outpatient minimally invasive spine surgery, at a NJ surgical center that had credentialed him to perform the procedure, and under the authority of his state medical license; a license issued in 1996 by the State of New Jersey for both medicine and **surgery**. The state argued in proceedings from April 2 to June 28, 2013 that Kaul was not licensed to perform surgery. In this proceeding the Defendants and the state committed massive fraud, as evidenced in **'The Solomon Critique'** (K1-D.E. 225) + **'The Solomon Critique 2'** (K1-D.E. 299-18).

24. From 2006 to approximately 2009, Kaul was subjected to rule-of-reason antitrust violations by, amongst others, Defendants Heary/AHS, who wanted to eliminate the threat of Kaul's rapidly expanding minimally invasive spine surgery practice. In furtherance of this scheme, the Defendants did engage in multiple quid pro quo schemes with Defendant Christie, in which they funneled bribes into his political campaign, purposed to have him use state power to have the medical board revoke Kaul's license. Kaul's license was illegally suspended/revoked on April 2, 2012/March 24, 2014, and the Defendants then, with knowing illegality, did use the US mail/wires to transmit this fraudulent notice globally to all governmental agencies, including all state medical boards/National Practitioners Data Bank/DEA/FBI.

25. From 2012 to 2020, the Defendants/co-conspirators did conspire to commit, and did commit bankruptcy fraud and insurance fraud, by defrauding Kaul's medical malpractice carriers of millions of dollars through the submission and fraudulent judicial adjudication of false claims, as pled in K11-4.

26. Commencing in 2016, the Defendants/co-conspirators did extend their **"pattern of racketeering"** into the NYSE, through an ongoing commission of the predicate acts of securities fraud, in that they submitted false SEC filings/accounts, that defrauded, and continue to defraud the global equities market. Based on this knowingly false

13

information, the Defendants did perpetrate millions of trades with unsuspecting investors, concealing from them the massive risk associated with the purchase of these fraudulent equities. In conjunction with these crimes, the Defendants/co-conspirators did not disclose to the market that its profits are the product of crimes, as detailed in **The Kaul Cases**, but yet willfully and with knowledge of its illegality, did launder the proceeds of these crimes through the NYSE.

27. From 2006 to the present, the overarching theme of the Defendants/co-conspirators crimes, has been the commission of increasingly more serious crimes, in an attempt to conceal their prior crimes, malfeasance and misconduct. What commenced in 2006 with the professional jealousy of Kaul's competitors, of which Defendant Heary was a 'ring-leader', is in 2021, a multitude of felonies that include, amongst others: **(i)** bankruptcy fraud; **(ii)** securities fraud; **(iii)** mail fraud; **(iv)** wire fraud; **(v)** perjury: **(vi)** bribery; **(vii)** obstruction of justice; **(viii)** public/judicial corruption; **(ix)** civil rights violations; **(x)** evidence tampering; **(xi)** witness tampering; **(xii)** false imprisonment; **(xiii)** false prosecution: **(xiv)** insurance fraud; **(xv)** kickbacks; **(xvi)** human rights violations; **(xvii)** retaliation; **(xviii)** false seizure of property; **(xix)** honest services fraud; **(xx)** racketeering; **(xxi)** conspiracy; **(xxii)** market manipulation/money laundering.

**ICE**:

28. From 2016 to the present, Defendant ICE knew or should have known that Defendants Allstate/TD/Geico committed securities fraud, in willfully, and with knowledge of its illegality, failing to report to the market and the SEC its liability in **The Kaul Cases**.

29. Defendant ICE was motivated to wilful ignorance and did fail to cross reference court records with the filings of Defendants Allstate/TD/Geico.

30. Defendant ICE, in recognizing that its profits were tied to those of Defendants Allstate/TD/Geico, did tacitly conspire with these Defendants to perpetrate a knowingly illegal scheme of securities fraud concealment, that artificially manipulated the market, and was purposed to prevent a decrease in its share price.

31. Defendant ICE used the US mail and wires to exchange information with Defendants Allstate/TD/Geico, in furtherance of the **"SNS Scheme"**, in recognition of the illegality of the scheme and the manipulation of the market that would be caused by such a fraud.

32. Defendant ICE did conspire with and did commit a **"pattern of racketeering"** by aiding and abetting the laundering of the criminal proceeds of Defendants Allstate/TD/Geico through the apparatus of the **"SNS Association-In-Fact Enterprise"**, the principal purpose of which was to increase insurance industry executive profit and share price, at the expense, and through the exploitation of Kaul and thousands of other physicians, many of whom remain falsely imprisoned.

33. Defendant ICE, although having reported regulatory/litigation risks in its SEC filings, did willfully and knowingly fail to specifically identify the securities fraud crimes of Defendants Allstate/Geico/TD, and is thus liable for not just these crimes, but for those from which the criminal proceeds originated in administrative/state/bankruptcy/federal courts within the geographic boundaries of the State of New Jersey, in a period that commenced in at least, if not before, Defendant Christie's first term as governor.

34. Defendant ICE recognizes that because it both trades on the NYSE and engages in commerce with global exchanges, which affects the value of those exchanges, that its participation in the **"SNS Scheme"** caused it to become a conduit to these exchanges of market valuations that it knew, or ought to have known were false, and were the product of crime.

35. Defendant ICE used the US mail/wires to globally transmit knowingly fraudulent information about the market valuations of Defendants Allstate/TD/Geico, in that it omitted any specific reference within its SEC filings to the legal liability ($28,000 trillion +) to the global equities market of **The Kaul Cases**.

36. Defendant ICE, in propagating this knowingly fraudulent information to the global equities market, did recognize its role in false equity evaluations and the creation of a 'bubble market'

37. Defendant ICE's Indian headquarters is Hyderabad (Kaul's birthplace), and it is cognizant of the fact that the Indian stock market is currently reported as being in a 'bubble' by the Reserve Bank of India.

38. Defendant ICE recognizes that the false evaluations of the NYSE are responsible for the Indian 'bubble', and that the false evaluations of the NYSE are a consequence of the Defendants financial crimes.

### Christie:

39. From 2000, the year that Defendant Christie was appointed the US Attorney for the District of New Jersey, he has abused state power and converted state/federal agencies into **"racketeering enterprises"**, through which he has conducted a **"pattern of racketeering"** purposed to further the economic/political agendas of himself and those individuals with whom he engaged in quid pro quo schemes of bribery and public corruption.

40. Commencing in or around 2008/2009, Defendant Christie entered into knowingly illegal conspiracies with Defendants Allstate/TD/Geico, in which they methodically planned schemes to eliminate Kaul, through the abuse of governmental power. The Defendants conspired with state/federal investigative/prosecutorial authorities to file criminal

15

indictments against Kaul. These investigations ceased when Kaul filed K1 on February 22, 2016.

41. From 2009 to 2017, he converted the executive/legislative/judicial branches of the State of New Jersey into a **"racketeering enterprise"**, that he used against Kaul, in an attempt to have him jailed/deported/seriously injured/killed, in order to eliminate: **(i)** the debt owed to him by the insurance industry; **(ii)** future liability to Kaul by the insurance industry; **(iii)** the threat that Kaul's minimally invasive spine surgery practice posed to **The Kaul Cases** physician/hospital Defendants, from whom, along with Defendants Allstate/TD/Geico, Defendant Christie had received bribes.

42. Defendant Christie believed that he would become the 2016 President of the United States, that Kaul would be eliminated, and the crimes of **The Kaul Cases** Defendants would go undetected, and that Kaul would not commence litigation in 2016.

43. However, when Kaul did commence litigation, Defendant Christie, in collusion/conspiracy with **The Kaul Cases** Defendants and certain judges within the United States District Court, did perpetrate a massive scheme of obstruction of justice, that violated Kaul's human rights, and was intended to prevent Kaul from exposing the crimes, and to obviate the obligation of Defendants Allstate/TD/Geico (Berkshire Hathaway) to report the $28,000 trillion + in their SEC filings.

44. In the perpetration of the **"SNS Scheme"**, Defendant Christie did use the US mail/wires to transmit information with **The Kaul Cases** Defendants regarding the bankruptcy and securities fraud, as it pertained detrimentally to the share price of Defendants Allstate/TD/Geico.

45. In aiding and abetting the **"SNS Scheme"**, Defendant Christie did fully recognize its illegality and the international criminal consequences of his participation in the defrauding of the global equities market.

46. Defendant Christie, nonetheless, did persist in the perpetration of the scheme out of fear that if the $28,000 trillion + liability were disclosed to the global equities market, it would cause shareholder litigation, that would expose the massive crimes committed by **The Kaul Cases** Defendants within the executive/legislative/judicial branches of the State of New Jersey, the United States District Court and the United States Bankruptcy Court (2006 to Present).

47. Defendant Christie was also motivated to aid and abet the securities/bankruptcy fraud, as he had been bribed with shares from Defendants Allstate/Geico, as part of the quid pro quo scheme in which he ordered the medical board to revoke Kaul's license.

48. Defendant Christie maintains a controlling position within the **"SNS Association-In-Fact Enterprise"** from which he continues to illegally profit, the profits of which he launders

16

through the enterprise his political lobbying/law business, that currently provide cover for his **"ongoing"** schemes of bribery and public corruption.

### Allstate/Geico:

49. Kaul commenced suit against Defendant Allstate on February 22, 2016 in K1, in which Kaul seeks $28,000 trillion + in monetary damages. Allstate's market capitalization was approximately $33 billion, and thus it was obligated to report the claims in its SEC filings. It did not.

50. Defendant Allstate, in recognizing the immense civil/criminal consequences of disclosure, and the damage to its reputation within the global equities market, did conspire with Defendant ICE in its withholding of this information.

51. Defendant ICE was motivated to participate in the **"NSS Scheme"** as its share price and corporate profits were linked to those of Defendant Allstate, and it recognized that exposure to the global equities market of the $28,000 trillion + liability had the potential to bankrupt Defendant Allstate.

52. Defendants ICE/Allstate did use the US mail/wires and face-to-face meetings to exchange information about the **"NSS Scheme"**. Within the corpus of communication, Defendants ICE/Allstate concluded that the risk of Kaul exposing a securities fraud violation was minimal compared to the risk of bankruptcy if **The Kaul Cases** were exposed to the global equities market.

53. Defendant Allstate, in recognizing that Defendant ICE would not report its false filings to the SEC/DOJ, did continue to fraudulently trade millions of shares from 2016 onwards, in the knowledge of its illegality, and that it would cause false market valuations, market manipulations and investors to be defrauded.

54. Defendant Allstate reaped illegal profits from the **"NSS Scheme"**, that it funneled as bribes to certain judges within the United States District Court (K11-3) and certain state/federal politicians (K11-1), in order to control the **"racketeering enterprise"** into which **The Kaul Cases** Defendants had converted certain courts (district/appellate) within the United States District Court.

55. Defendant Allstate, through a **"pattern of racketeering",** and in conspiracy/collusion with **The Kaul Cases** Defendants, did in a period commencing in approximately 2008/2009, convert into **"racketeering enterprises"** the State of New Jersey, the United States District Court, the United States Bankruptcy Court and the New York Stock Exchange and state/federal investigative/prosecutorial authorities, all purposed to eliminate Kaul and then to provide cover for their crimes, when their Kaul elimination scheme failed (2008/9 to 2021).

17

**TD:**

56. On February 22, 2016, with the filing of K1, Kaul did expose the crimes of Defendant TD, and their role in the revocation of Kaul's license and the knowingly illegal use of state/bankruptcy courts within the geographic boundaries of the State of New Jersey to bankrupt Kaul's corporations.

57. Defendant TD commenced conspiring with Defendants Christie/Allstate/Geico in or around 2010, in a series of quid pro quo schemes, in which Defendant TD received regulatory favors from Defendant Christie in return for arbitrarily foreclosing on Kaul's personal/commercial loans.

58. Defendants Allstate/Geico had bribed Defendant Christie to eliminate Kaul, and Defendant Christie's quid pro quo with Defendant TD, was purposed to deprive Kaul of monies to litigate the licensing case against the State of New Jersey, and to bankrupt his corporations in order to facilitate the elimination of debt ($45 million) owed to Kaul by the insurance industry.

59. Defendant TD, in recognizing the immense civil/criminal liability of **The Kaul Cases**, did conspire with Defendant ICE to conceal the litigation from the global equities market, and did submit false SEC filings and accounts from 2016 to 2021, in the belief that Kaul would not expose its prior crimes, as **The Kaul Cases** Defendants had bribed certain judges within the United States District Court and the United States Bankruptcy Court.

60. From 2016 onwards Defendant TD did use the US mail/wires and engage in face-to-face meetings with Defendants ICE/Allstate/Geico/Christie, in furtherance of the **"NSS Scheme"**. At these meetings, and within these communications, the Defendants did discuss and conclude that the risk of Kaul exposing their securities fraud violation was substantially outweighed by the risk of disclosing the $28,000 trillion + liability to the global equities market.

61. In conspiring with **The Kaul Cases** Defendants, Defendant TD did recognize the illegality of their failure to disclose and did follow the advice of counsel in failing to disclose.

62. Defendant TD's counsel did conspire/collude with counsel for **The Kaul Cases** Defendants in furtherance of the **"NSS Scheme"**, for the purpose of concealing their prior crimes, which involved massive schemes of judicial/public corruption, at the center of which was Defendant Christie, his presidential ambitions and the commercial agendas of corporations/persons from whom Defendant Christie had received bribes.

63. Defendant TD, in willfully committing securities fraud and defrauding the global equities market of their right to honest services, did perpetrate such a scheme with the premeditated purpose of violating Kaul's litigation rights, in that it stymied his 'whistleblowing' on the crimes of **The Kaul Cases** Defendants.

64. Defendants Allstate/TD/Geico did recognize that disclosure to the global equities market would cause investors to withdraw their stock position, as occurred with K11-2 Defendant Boston Partners, after Kaul informed them in November 2018 of the pending litigation in K1/K2.

65. Defendants Allstate/TD/Geico did recognize that a disclosure of the $28,000 trillion + liability would cause massive shareholder litigation and damaging publicity regarding their schemes of judicial/public corruption, and that this litigation/publicity would augment Kaul's prosecution rights.

66. Defendants TD/Allstate/Geico knowing and willful violation of the Sarbanes-Oxley Act was purposed to provide cover for their previous crimes against Kaul (bribery/mail fraud/wire fraud/judicial corruption/public corruption/civil rights violations/perjury/kickbacks/false arrest/false imprisonment/obstruction of justice/illegal seizure of assets/money laundering/bankruptcy fraud/bank fraud), and were purposed to, and did in fact, violate Kaul's prosecutorial rights.

### RICO 2
### Association-In-Fact Enterprise: United States Bankruptcy Court-NYSE-State of New Jersey Defendant Persons: Allstate/TD/Geico/Stolz
### RICO Predicate Acts: bankruptcy fraud/mail fraud/wire fraud/public corruption/bank fraud/securities fraud/money laundering

#### Overview:

67. In a period commencing in approximately 2008/2009, Defendants Allstate/Geico/TD did commence conspiring to commit, and did commit a **"pattern of racketeering"** through the enterprise of the executive/legislative/judicial branches of the State of New Jersey and did, in 2013, extend and amplify this **"pattern of racketeering"** into the U.S.B.C., and did, in 2016, extend and amplify this **"pattern of racketeering"** into the NYSE, to form an association-in-fact enterprise, the **"State of New Jersey-United States Bankruptcy Court-New York Stock Exchang e Association-In-Fact Enterprise" ("SUN-Association-In-Fact Enterprise").**

68. The Defendant Persons, that orchestrated, controlled, aided and abetted, and that did either occupy or effect controlling positions within the enterprises were Defendants Stolz/Allstate/TD/Geico.

69. The co-conspirators and specifically, K11-3 Defendant/U.S.B.J. John Sherwood, did aid and abet the Defendants perpetration of their **"SUN Scheme"** through a **"pattern of racketeering"** that involved the commission of the RICO predicate acts of mail fraud/wire fraud/perjury/obstruction of justice/kickbacks/judicial corruption/public corruption/money laundering/bankruptcy fraud/bank fraud/securities fraud, and was

19

committed, knowingly/willfully, and with knowledge of its illegality, through a purposeful conversion of the State of New Jersey/U.S.B.C./NYSE into **"racketeering enterprises"**, the principal purpose of which was to increase executive/corporate profit and compensation for Defendants Stolz and Christie (political campaign donations/other bribes).

70. The Defendants did use the US mail/wires and conduct face-to-face meetings in New York, for the purpose of devising, planning and executing the knowingly illegal **"SUN Scheme"**.

71. The Defendants, in the initial planning of their criminal enterprise did not anticipate that in 2016, Kaul would commence litigation, or that the damages sought would be in excess of ten percent (10%) of their market capitalization. In fact, the Defendants believed that Kaul would be deported/jailed/killed, and on May 27, 2021, the Defendants, in a state of desperation, did perpetrate a final scheme in which Kaul was illegally arrested/imprisoned, with the intention of having him permanently injured or killed in the Mercer County jail in Trenton, New Jersey. The scheme failed, and Kaul filed suit on June 15, 2021 against K11-9 Defendants Christopher J. Christie/Philip Murphy/Doreen Hafner/Gurbir Grewal/Robert McGuire.

72. Defendants Allstate/TD/Geico, in recognizing their $28,000 trillion + liability, did conspire with Defendant ICE, in the concealment of this information from the global equities market, in which Defendants Allstate/TD/Geico (Berkshire Hathaway) trade. In 2012, Defendant Allstate extended its operations into India, while simultaneously conducting, in collusion/conspiracy with American state/federal investigative/prosecutorial authorities, policies of racially targeting Indian physicians for license revocation and imprisonment (**Exhibit 4**).

## Defendants Allstate/Geico:

73. In June 2013, Defendant TD, in furtherance of the Defendants **"racketeering schemes"** (2008/2008-2021) caused Kaul's corporations to file for Chapter 11 bankruptcy. On July 21, 2014 the Chapter 11 was converted to a Chapter 7, because of the illegal revocation of Kaul's license on March 24, 2014. Defendant Stolz and his now deceased law partner, Robert Wasserman, were assigned as the trustee.

74. In a period that commenced in approximately July 2014, Defendants Allstate/Geico did enter into a conspiracy with Defendant Stolz, in which Defendant Stolz agreed to accept bribes from Defendants Allstate/Geico in return for not pursuing the $45 million owed to Kaul by Defendants Allstate/Geico and others within the insurance industry, as irrefutably pled in K4.

75. Defendants Allstate/Geico did use the US mail/wires and face-to-face meetings with Defendant Stolz to exchange information regarding the perpetration of the **"SUN**

**Scheme"**, the purpose of which was to increase share price and compensation to their executives and Defendant Stolz.

76. During these communications, Defendants Allstate/Geico and Stolz did consider the money laundering risk posed by the investment of the proceeds of their crimes into the NYSE. The Defendants calculated that the risk was minimal, as Kaul would be eliminated, and any person who had knowledge of the crime would not disclose, out of fear of retaliation of a criminal indictment from Defendant Christie.

77. Defendants Allstate/Geico/Stolz calculated that their illegal scheme would cause an elevation of share price, the false basis of which would be concealed from the global investment community.

78. Subsequent to Kaul's filing of K1, the Defendants did conspire to not report the case in their SEC filings, in order to provide cover for, amongst other things, their crime of bankruptcy/creditors fraud. However, in doing so, they commenced committing securities fraud, a crime that they have undoubtedly committed before, but in this case, a crime that commenced in 2016, and is ongoing in 2021.

79. On May 27, 2021, the Defendants attempted to have Kaul seriously injured or killed (K11-9).

### Defendant Stolz:

80. Defendant Stolz, a lawyer, knew that in conspiring to commit and committing the RICO predicate acts of bankruptcy fraud/securities fraud/mail fraud/wire fraud, through a **"pattern of racketeering"** in which he converted the United States Bankruptcy Court into a **"racketeering enterprise"**, for a period commencing on July 21, 2014, he has incurred international criminal liability, and has defrauded the global equities market of its right to honest services.

81. Kaul has exposed the crimes of Defendant Stolz, who from 2018 conspired with corrupted judges in the District of New Jersey to prevent Kaul from prosecuting his claims against Defendant Stolz. The tactics used by Defendant Stolz included having Defendant/U/S.B.J. John Sherwood enter an order in February 2020, that sought to bar Kaul from prosecuting Defendant Stolz for his crimes. Defendant Sherwood, as plausibly and irrefutably pled in K11-3, did accept bribes from Defendants Allstate/Geico, in return for entering judgements adverse to Kaul/creditors in the bankruptcy proceedings (July 21, 2014 to July 31, 2020).

82. When Kaul commenced litigation against Defendant Stolz in 2018, Defendant Stolz and his lawyer, Scott Rever, desperate to prevent their prosecution by Kaul, did threaten to expose the names of state/federal politicians and judges, who had either

participated/facilitated his bankruptcy fraud in Kaul's case, or had received bribes from Defendants Allstate/Geico in cases involving other physicians/healthcare providers.

83. From 2016 to the present, Defendant Stolz, with knowledge of Defendants Allstate/TD/Geico's securities fraud crimes, has failed to report the crimes to regulators or the global equities market, as he recognizes that to report would expose his crime of bankruptcy fraud, and the crimes/malfeasance of all of **The Kaul Cases** Defendants, extending back to 2006.

84. Defendant Stolz has knowledge that Defendants Allstate/TD/Geico did conspire with Defendant ICE to conceal from the global equities market, their $28,000 trillion + liability, and did conspire with the SEC to have K11-9 Defendant, Gurbir Grewal, transferred on June 29, 2021 from the Office of the NJ AG to the securities fraud enforcement division, after Kaul had sued him in K11-9, and K11-2 Defendant, Boston Partners, had admitted to withdrawing its position in Allstate, after Kaul they received a letter from Kaul in November 2018.

## Defendant TD:

85. In approximately 2010, Defendant TD commenced conspiring against Kaul with Defendants Allstate/Geico/Christie, in a scheme to eliminate Kaul through the destruction of his career/livelihood/reputation/economic standing.

86. In furtherance of this scheme, Defendant TD used the US mail/wires to transmit information regarding its devising/implementation/execution, in the knowledge that such transmission constituted the crimes of mail/wire fraud.

87. However, Defendant TD did not believe that Kaul would expose its crimes, as it received information from Defendants Christie/Allstate/Geico that Kaul would be eliminated.

88. Defendant TD entered into a series of quid pro quo schemes with Defendants Allstate/Geico/Christie, in which they conducted a **"pattern of racketeering"** through the American banking system and state/bankruptcy courts within the geographic boundaries of the State of New Jersey, through the commission of the RICO predicate acts of mail fraud/wire fraud/bankruptcy fraud/bank fraud.

89. Defendant TD, in converting into an association-in-fact **"racketeering enterprise"**, the executive/legislative/judicial branches of the State of New Jersey/United States Bankruptcy Court/NYSE, did know of the immense civil/criminal liability that such crime, if exposed, would cause to them and their shareholders.

90. In approximately late 2013/2014, Defendant TD, in collusion/conspiracy with Defendants Allstate/Geico/Christie, did file a knowingly false banking fraud claim against Kaul, with www.checksystems.com. The purpose and effect of this fraud was to prevent

22

Kaul's access to banking services, cause a deterioration in his credit score and prevent him from funding litigation. Defendant TD did not anticipate that Kaul would sue them in 2016, nor that he would expose their securities fraud violation (2016 to present).

91. During the bankruptcy proceedings (June 17, 2013 to July 31, 2020), Defendant TD, with knowledge of the illegality of the revocation of Kaul's license, and the **"racketeering schemes"** perpetrated by, amongst others, Defendants Allstate/Geico/Christie that caused the revocation/subsequent legal cases against Kaul, did conspire with its counsel to not report the bankruptcy fraud to authorities. The reason for not reporting was that Defendant TD did not want exposed its prior crimes and involvement in **The Kaul Cases** Defendants scheme to eliminate Kaul (livelihood/reputation/assets/freedom/human rights).

92. Defendant TD conspired with Defendants Stolz/Allstate/Geico and **The Kaul Cases** Defendant, DiIorio, to threaten Kaul that unless he signed over title to the real estate in which his surgical center was located, despite it belonging to a corporation not part of the Chapter 11 proceeding, that Kaul's ex-wife would be sued by Defendant Stolz.

93. In a period from 2016 onwards, Defendant TD conspired with its lawyers/accountants to defraud the global equities market of its right to honest services, through the submission of false SEC filings and accounting reports. Defendant TD perpetrated these crimes, in the belief, and with the intention to violate Kaul's prosecutorial rights, and in an attempt to prevent Kaul from exposing their crimes, that include those associated with the purchase of Commerce Bank in 2007, in which they bribed multiple NJ state politicians in a 'pay-to-play' scheme, in order to complete the purchase.

## RICO 3
## Association-In-Fact Enterprise: State of New Jersey-United States District Court
## Defendant Persons: Christie/AHS/Heary
## RICO Predicate Acts: mail fraud/wire fraud/bribery/obstruction of justice /public
## corruption/money laundering

### Overview:

94. In a period commencing in approximately 2006, Defendants Christie/AHS/Heary commenced conspiring to commit, and did commit, a **"pattern of racketeering"** through the association-in-fact enterprise of the legislative/executive/judicial branches of the State of New Jersey and the United States District Court, the **"SU Association-In-Fact Enterprise"**, in furtherance of the **"SU Scheme"**, through the commission of the RICO predicate acts of mail fraud/wire fraud/bribery/public corruption/obstruction of justice/perjury/kickbacks/bank fraud/investor fraud. The motivation for the **"SU Scheme"** was: **(i)** to increase the Defendants economic/political power within the American legal/medical/business/political sectors of industry, at the expense of Kaul, free standing surgical centers and non-neurosurgical minimally invasive spine surgeons;

23

(ii) to use the United States District Court to provide cover for the Defendants crimes within the legislative/executive/judicial branches of the State of New Jersey.

### Christie:

95. In 2000, when Defendant Christie was appointed the US Attorney for the District of New Jersey, he commenced abusing state prosecutorial power for advancement of his personal/political/economic agendas and used this power to threaten persons with criminal prosecution in order to coerce them into funneling money into his political campaigns and off-shore bank accounts/trusts. Defendant Christie used this money to occupy the governor's office in 2009/2013 and abused the power of the governor's office to extort further money from persons with threats of criminal prosecution, and did engage in massive schemes of bribery, in which monies were funneled into his political campaigns/off-shore bank accounts by, amongst others, Defendants AHS/Heary. The bribes from Defendants AHS/Heary were part of a series of quid pro quo schemes, purposed to have eliminated Kaul/free standing surgical centers/billing codes for outpatient spine surgery and to have introduced legislation that prevented the issuance of state licenses for physician owned surgical centers and downgraded the RVU of billing codes for spine surgery in free standing physician owned surgical centers. These illegally conducted tactics were part of an overall strategy perpetrated by for-profit healthcare corporations, such as Defendants AHS/Allstate/Geico, to illegally monopolize, through both per se/rule of reason violations, the American healthcare market. At the heart of this conspiracy lies the **"HIPIC-FC"** and related to this is the **"Hospital-Insurance-Pharmaceutical-Industry-Complex-US Government Cartel"** the **"HIPIC-USC".** These two cartels operate to eliminate physicians through license revocation/incarceration/suicide/death, in order to increase the corporations' profits/share price, by reducing the amount of patient care provided, by reducing the number of physicians.

96. Defendant Christie, in his capacity as the US Attorney, and through his association with his brother, did come to understand the mechanics of the securities market, and was involved with securities fraud cases. ICE came into existence in 2000, the year Defendant Christie became US Attorney, and in 2021 it has a market capitalization of $68 billion.

97. Bribery: Defendant Christie's relationship with bribers, bribery and quid pro quo schemes extends back to his early political/legal career in Morris County, New Jersey. Without corruption his career would have stalled at the NJ municipal court level. In a time period from 2008 to 2016, Defendants AHS/Heary funneled bribes to Defendant Christie, using as cover, his political campaign account and law/public relation/political lobbying firms with whom Defendant Christie conducted illegal transactions, in which he used the public treasury to funnel state contracts to these firms in return for bribes. The monies (bribes) flowed from Defendants AHS/Heary to Defendant Christie, and the

24

public's money (kickbacks) flowed from Defendant Christie to Defendants AHS/Heary ($3.1 million state 'salary').

98. Mail Fraud/Wire Fraud: In a period from 2008 to 2021 Defendant Christie/counsel did, with knowledge of its illegality, use the US mail/wires to exchange information with Defendants AHS/Heary/counsel in furtherance of the **"SU Scheme"**, for the purpose of illegal market monopolization (2008-2014) and then to provide them cover in the United States District Court against Kaul's prosecution of their crimes (2016-2021).

99. Obstruction of Justice: In a period from 2012 to 2021, Defendant Christie did conspire to commit, and did commit an obstruction/violation of Kaul's right to justice by, through and as a consequence of his control of the executive/judicial/legislative branches of the State of New Jersey. This period of obstruction (2012-2017) resulted in some of the injuries detailed in (**Exhibit 10**). Defendant Christie conspired with Defendants Stolz/Allstate/Geico/TD to obstruct Kaul's right to justice in the United States Bankruptcy Court (2013 to 2020), and this period of obstruction resulted in injury exacerbation and further injuries detailed in (**Exhibit 10**). Defendant Christie/counsel conspired with **The Kaul Cases** Defendants/counsel (2016-2021) to obstruct/violate Kaul's prosecutorial rights in the United States District Court, in order to prevent Kaul from further exposing their crimes in the State of New Jersey and the United States Bankruptcy Court.

100. Public Corruption: In a period from 2008 to 2021, Defendant Christie abused his political power and public office to engage in acts of public corruption with private actors (persons/corporations), state/federal judges, medical boards and NJ state police to: **(i)** eliminate Kaul (deportation/jail/killed); **(ii)** to order state judges/courts to obstruct Kaul's right to justice/enter multi-million dollar judgments against him; **(iii)** to obstruct Kaul's right to justice in the United States Bankruptcy Court; **(iv)** to violate Kaul's prosecutorial rights in the United States District Court; **(v)** conspire with the SEC to have K11-9 Defendant Grewal transferred to the enforcement division of the SEC on June 29, 2021, to attempt to quash a securities fraud prosecution of Defendants Allstate/TD/Geico.

## AHS:

101. Mail/Wire Fraud: In a period from approximately 2008/2009 to 2014, Defendant AHS did with knowledge of its illegality, use the US mail/wires to conspire with, amongst others, Defendant Christie, regarding the perpetration of the first half of the **"SU Scheme"**, that being the revocation of Kaul's license, the destruction of his economic standing/reputation and elimination, be it by jail/deportation/death. From 2016 to 2021, Defendant AHS/counsel did, with knowledge of its illegality, use the US mail/wires to conspire with **The Kaul Cases** Defendants/counsel, regarding the perpetration of the second half of the **"SU Scheme"**, that being the corruption of judges within the United States District Court to obstruct justice by violating Kaul's prosecutorial rights, in order

25

to prevent him further exposing the crimes committed in the first half of the "**SU Scheme**", and the securities fraud violations of Defendants Allstate/TD/Geico. Defendant AHS shareholding in these corporations has increased since the filing of K1, on February 22, 2016, as is the case with many other Defendants.

102.     Bribery: In a period from 2008/2009, Defendant AHS did engage in a series of quid pro quo schemes with Defendant Christie, in which they converted the executive/legislative/judicial branches of the State of New Jersey into a "**racketeering enterprise**", through which they conducted a "**pattern of racketeering**", in which they conspired to commit, and did commit with knowing illegality, the RICO predicate acts of bribery/public corruption.

**Heary**:

103.     Mail/Wire Fraud: In a period from approximately 2008/2009 to 2014, Defendant Heary did with knowledge of its illegality, use the US mail/wires to conspire with, amongst others, Defendant Christie, regarding the perpetration of the first half of the "**SU Scheme**", that being the revocation of Kaul's license, the destruction of his economic standing/reputation and elimination, be it by jail/deportation/death. From 2016 to 2021, Defendant AHS/counsel did, with knowledge of its illegality, use the US mail/wires to conspire with **The Kaul Cases** Defendants/counsel, regarding the perpetration of the second half of the "**SU Scheme**", that being the corruption of judges within the United States District Court to obstruct justice by violating Kaul's prosecutorial rights, in order to prevent him further exposing the crimes committed in the first half of the "**SU Scheme**", and the securities fraud violations of Defendants Allstate/TD/Geico. Defendant Heary's shareholding in these corporations has increased since the filing of K1, on February 22, 2016, as is the case with many other Defendants.

104.     Bribery/Public Corruption: In a period from 2008/2009, Defendant Heary did engage in a series of quid pro quo schemes with Defendant Christie, in which they converted the executive/legislative/judicial branches of the State of New Jersey into a "**racketeering enterprise**", through which they conducted a "**pattern of racketeering**", in which they conspired to commit, and did commit with knowing illegality, the RICO predicate acts of bribery/public corruption.

## RICO 4
## Association-In-Fact Enterprise: State of New Jersey-United States District Court-United States Bankruptcy Court-NYSE
## Defendant Persons: Allstate/Geico/FSM &Christie
## RICO Predicate Acts: mail fraud/wire fraud/bribery/obstruction of justice /public corruption/money laundering

### Overview:

105.    In a period that commenced in approximately 2008/2009, the Defendants did conspire to commit, and did commit, with knowledge of its illegality, a **"pattern of racketeering"**, through the commission of the RICO predicate acts of mail fraud/wire fraud/bribery/obstruction of justice/public corruption, by converting the executive/legislative/judicial branches of the State of New Jersey, the United States Bankruptcy Court and the United States district Court into an association-in-fact racketeering enterprise, the **"SUUN Association-In-Fact Enterprise"**, through which the Defendants perpetrated the **"SUUN Scheme"**, the purpose of which was: **(i)** to eliminate Kaul; **(ii)** have Defendant Christie become the 2016 US President; **(iii)** prevent Kaul from further exposing their crimes, and the securities fraud/bank fraud/bankruptcy fraud of Defendants Allstate/TD/Geico.

106.    Central to the perpetration of the **"SUUN Scheme"** was the **"Hospital-Insurance-Pharmaceutical-Industry-Complex" ("HIPIC-FC") (Exhibit 11)** and their monopolization/control of all elements of American medicine by for-profit public/private corporations, whose shared economic mission is the maximization of corporate profit and share price, through the exploitation of the American public (denial of care) and medical profession (license suspension/revocation/incarceration) achieved through their corrupt control of the executive/legislative/judicial branches of state/federal government.

### Christie:

107.    Mail/wire fraud: In a period commencing from approximately 2008/2009 to 2016 Defendant Christie did use the US mail wires in a knowing illegal manner, to exchange information with Defendants Allstate/Geico regarding the perpetration of the first half of the **"SUUN Scheme"** to revoke Kaul's license, destroy his economic standing/reputation and have him eliminated (jail/deportation/killed). From 2016 to 2021, Defendant Christie/counsel did use the US mail/wires in a knowingly illegal manner, to exchange information with Defendants Allstate/Geico/FSMB regarding the second half of the "**SUUN Scheme"** to obstruct his efforts to procure a license anywhere in the world and to violate his prosecutorial rights/obstruct justice by corrupting judges within the United States District Court, in an attempt to prevent Kaul from further exposing their crimes, and the securities fraud/bankruptcy fraud/bank fraud crimes of, amongst others, Defendant Allstate/TD/Geico/Boston Partners (K11-2)/State Street

27

Capital (K11-2)/Stolz. Defendant Christie received substantial shares from Defendants Allstate/TD/Geico as part of the quid pro quo schemes of bribery, to eliminate Kaul.

108.    Bribery: In a period from 2008/2009 to 2016, Defendant Christie did enter into a series of quid pro quo schemes with Defendants Allstate/Geico, in which he received bribes under cover of political campaign donations and shares, and monies transferred into multiple tax free off-shore havens, including Israel, the latter having occurred with monies received from, by and through entities associated with Sheldon Adelson and his corporations. An element of these monies pertained to his trafficking of chemical weapon components to Syrian rebel forces between 2012-2013. Adelson sought to destabilize the region, blame Assad, and thus provide pretext for further Israeli incursion into Arab territories. In a period from 2016 to 2021, Defendant Christie/counsel did corrupt judges within the United States District Court in quid pro quo schemes purposed to violate Kaul's prosecutorial rights and prevent him from exposing the crimes of **The Kaul Cases** Defendants, including their securities fraud/bankruptcy fraud/bank fraud crimes, either through direct or vicarious liability, pursuant to RICO.

109.    Obstruction of justice/public corruption: In a period from 2008/2009 to 2016, Defendant Christie conspired to commit, and did commit, in collusion/conspiracy with **The Kaul Cases** Defendants, and as part of the first half of the **"SUUN Scheme"**, an ongoing scheme to violate Kaul's right to justice within administrative/state/bankruptcy/federal courts within the geographic boundaries of the State of New Jersey, based on multiple quid pro quo schemes in which **The Kaul Cases** Defendants funneled bribes to Defendant Christie to have Kaul eliminated. In a period from 2016 to 2021, Defendant Christie/counsel did corrupt judges within the United States District Court to violate Kaul's prosecutorial rights in order to obstruct justice and prevent Kaul from exposing the Defendants decades-long schemes of corruption of American state/federal politicians/judges/legislators and the **"FC"**, and the ongoing securities fraud and bankruptcy fraud/bank fraud.

110.    Money laundering: In a period from 2008/2009 to 2017, Defendant Christie did launder the proceeds of his **"SUUN Scheme"** related criminal activity, in the same places that he laundered the proceeds of his many other criminal enterprises, those being: **(i)** his family; **(ii)** the NYSE; **(iii)** off-shore trusts/banks; **(iv)** his law/political lobbying firm; **(v)** his lawyers; **(vi)** his accountants; **(vii)** his public relation personnel (Mercury); **(viii)** investments in Defendants Allstate/TD/Geico/AHS/HUMC (K11-2); **(ix)** real estate holdings.

## Allstate/Geico:

111.    Mail fraud/wire fraud: In a period from 2008/2009, Defendants Allstate/Geico did, with a knowing illegality, use the US mail/wires to exchange information with Defendant FSMB, in furtherance of both the fist half of the **"SUUN Scheme"** and in continued furtherance of the decades-long **"HIPIC-FC"** scheme (1986-Present). In these communications, Defendants Allstate/Geico conspired with Defendant FSMB to globally disseminate information regarding Kaul's elimination, in order to prevent him exposing their crimes. From 2016 to 2021, Defendants Allstate/Geico/counsel did, with a knowing

illegality, use the US mail/wires to exchange information with Defendant FSMB/counsel and all **The Kaul Cases** Defendants/counsel, in furtherance of the second half of the **"SUUN Scheme"** to violate Kaul's prosecutorial rights in the United States District Court through judicial corruption; in order to prevent him exposing the Defendants prior crimes (2008/2009-2016) in the executive/legislative/judicial branches of the State of New Jersey and the United States Bankruptcy Court, in addition to attempting to conceal their securities fraud crimes in the NYSE (2016-2021).

112. Bribery: Defendants Allstate/Geico have, since 1986, participated in an illegal bribery-based scheme of racketeering with Defendant FSMB, the **"HIPIC-FC"** scheme, purposed to monopolize the entire American healthcare system, a monopolization made possible by the corruption/control of the American judiciary and body politic, and facilitated in 2010 by Citizens United. From 2008/2009 to 2016 Defendants Allstate/Geico/FSMB perpetrated a massive series of crimes against Kaul, though the conduction of a **"pattern of racketeering"** through the **"SUUN Association-In-Fact Enterprise"** and in furtherance of the first half of **"SUUN Scheme"** and the entire **"HIPIC-FC"** scheme.

113. Obstruction of justice/public corruption: From 2008/2009 to 2016, Defendants Allstate/Geico did with knowing illegality, use the US mail/wires to exchange information with Defendant FSMB, regarding the **"SUUN Scheme"** to eliminate Kaul. From 2016 to 2021, Defendants Allstate/Geico/counsel did with knowing illegality use the US mail/wires to conspire to commit, and commit corruption of judges within the United States District Court, to violate Kaul's prosecutorial rights and obstruct justice, in order to prevent Kaul from further exposing the Defendants prior crimes (2008/2009-2016) in the executive/legislative/judicial branches of the State of New Jersey and the United States Bankruptcy Court, in addition to attempting to conceal their securities fraud crimes in the NYSE (2016-2021).

114. Money laundering: Defendants Allstate/Geico did launder and continue to launder the proceeds of their crimes (2008/2009-2021) through the NYSE and global investment community, including the sovereign funds of many other nations, and exchanges, including the London, Shanghai and Bombay Stock Exchanges. Defendants Allstate/Geico continue to fail to disclose to international markets their ongoing commission of securities fraud (2016-Present), and the liability this continues to cause to private/sovereign funds currently invested/investing in these Defendants. Defendants Allstate/Geico have not disclosed the **$28,000 trillion +** liability in any filings, anywhere in the world, at any point in time after 2016.

## FSM B

115. Mail fraud/wire fraud: In a period from 2008/2009 to 2016, Defendant FSMB did, with knowing illegality, use the US mail/wires to exchange information with Defendants Allstate/Geico regarding the first half of the **"SUUN Scheme"** pertaining to the elimination of Kaul. From 2016 to the present, Defendant FSMB did similarly use the US mail/wires to conspire with **The Kaul Cases** Defendants/counsel to commit acts of corruption of judges/senators within the United States District Court/US Government, purposed to violate Kaul's prosecutorial rights and obstruct justice, in order to prevent

Kaul from further exposing **The Kaul Cases** Defendants crimes (2008/2009 to 2016), in addition to attempting to conceal their securities fraud crimes (2016-Present). From 2014 to 2021, Defendant FSMB, in collusion/conspiracy with and through the **"FC"**, did conspire with **The Kaul Cases** Defendants/counsel to attempt to obstruct Kaul from procuring a medical license anywhere in the world, in order to violate his prosecutorial rights by restricting his access to capital, to prevent him from exposing the crimes (2008/2009 to 2021) of **The Kaul Cases** Defendants (mail fraud/wire fraud/perjury/extortion/kickbacks/obstruction of justice/public corruption/evidence tampering/witness tampering/securities fraud/bankruptcy fraud/bank fraud/money laundering/judicial corruption/kidnapping/manslaughter/chemical weapon trafficking).

116. Bribery: Since 1986, Defendant FSMB has conducted ongoing schemes of bribery with for-profit corporations **("HIPIC-FC")**, in furtherance of their scheme to monopolize all elements of American medicine, from the business of regulation to healthcare commerce. Defendants Allstate/Geico bribed, and continue to bribe Defendant FSMB, to have Kaul eliminated from the market (2012/2014) and to attempt to prevent his re-entry, in order to deny him access to capital, to attempt to prevent Kaul from prosecuting them in the United States District Court. From 2016 to 2021, Defendant FSMB has bribed judges/senators within the United States District Court/US Government, in order to violate Kaul's prosecutorial rights and obstruct justice, in order to prevent Kaul from further exposing **The Kaul Cases** Defendants crimes (2008/2009 to 2016), in addition to attempting to conceal their securities fraud crimes (2016-Present).

117. Obstruction of justice/public corruption: From 2016 to 2021, Defendant FSMB, by, through and with the **"FC"**, and in collusion/conspiracy with **The Kaul Cases** Defendants, did bribe judges/senators within the United States District Court/US Government to pervert the course of justice, and violate Kaul's prosecutorial rights, in order to prevent him from further exposing the crimes of **The Kaul Cases** Defendants.

118. Money laundering: Since 1986, Defendant FSMB, has generated millions of dollars from its **"pattern of racketeering"** within American medicine, through the exploitation of the American public and medical profession. The criminal proceeds have been laundered through investments in corporations publicly traded on the NYSE, including Defendants Allstate/Geico and other health insurance companies including third-party carriers commercially allied with state/federal governments. The proceed are also laundered through law/political lobbying/public relation firms that funnel bribes to state/federal judges/executives/legislators, in exchange for judgments/legislation that further the political/economic agendas of Defendant FSMB and all corporations involved in commerce with the **"HIPIC-FC-Association-In-Fact Enterprise"**.

### RICO 5
**Association-In-Fact Enterprise: State of New Jersey-United States Bankruptcy Court-United States District Court**
**Defendant Persons: Christie/Murphy/Grewal/Allstate/Geico**
**RICO Predicate Acts: kidnapping/mail fraud/wire fraud/bribery/obstruction of justice /public corruption**

**Overview:**

119.     In a period from February 22, 2016 to February 24, 2021, **The Kaul Cases** Defendants did conduct a **"pattern of racketeering"** within the association-in-fact enterprise of the State of New Jersey-United States Bankruptcy Court-United States District Court, and did convert it into a **"racketeering enterprise"**, through which they perpetrated the RICO predicate acts of kidnapping/mail fraud/wire fraud/bribery/obstruction of justice/public corruption/judicial corruption, in order to prevent Kaul from further exposing their crimes prior to the crime of having Kaul kidnapped on May 27, 2021. The scheme functioned in that it caused all cases filed by Kaul, except K11-1/K11-3, to be transferred to the District of New Jersey-Newark. However, the courts in K11-1/K11-3 have refused, in collusion/conspiracy with **The Kaul Cases** Defendants to issue summonses.

**Christie:**

120.     Kidnapping: On May 27, 2021, Defendant Christie was served at his law office in Morristown, with a summons and complaint in K11-2. Shortly thereafter, Defendant Christie did, with knowing illegality, conspire with Defendants Murphy/Grewal/Allstate/Geico to have Kaul kidnapped on May 28, 2021 by nine (9) armed individuals (K11-9), who purported to be NJ state police. No warrants were produced, and Kaul was forcibly detained against his will, and rapidly removed to a local police station, where he was chained to a bench. He was then forcibly transferred to another police station and told that he was to be transferred to the Mercer County Jail in Trenton, NJ. Kaul's repeated requests for a warrant were ignored. The events surrounding the kidnapping are detailed in K11-9. This RICO predicate act was committed in order to have Kaul jailed/injured/killed in order to cause him to become unable to continue the prosecution of K11-2, to prevent him from further exposing the crimes of **The Kaul Cases** Defendants, including those of securities fraud.

121.     Mail/wire fraud: In a period from May 27, 2021 to the present, Defendant Christie, with knowing illegality did use the US mail/wires to exchange information with Defendants Murphy/Grewal/Allstate/Geico regarding the planning/execution and unexpected consequences of the 'Kaul Kidnapping Scheme. When the scheme failed, the Defendants, realizing that Kaul would file suit, did use the US mail/wires to conspire with judges/senators in the United States District Court/US Government to violate Kaul's prosecutorial rights by obstructing justice through venue transfer from the Southern District of New York to the District of New Jersey, where the case was dismissed, in an attempt to prevent Kaul from further exposing the crimes of **The Kaul Cases** Defendants (2008/2009 to 2021).

122.     Bribery: In a period from 2008/2009 to 2016, Defendant Christie did engage in multiple quid pro quo schemes of bribery with Defendants Allstate/Geico, in which he abused state power to further the economic/political agendas of, amongst others, himself and these corporate Defendants, the principal purposes of which were to have elected as the 2016 US President and to increase share value/executive compensation

31

of Defendants Allstate/Geico, through the knowing/willful exploitation of the American public and medical profession. During his tenure as NJ Governor (2009-2017) Defendant Christie abused state power to have incarcerated many innocent physicians (principally ethnic minorities) to whom the insurance industry owed money for the provision of clinical services. These false prosecutions/convictions were perpetrated by his Attorney General, and in NJ state courts corrupted by Defendants Allstate/Geico.

123.    Obstruction of justice/public corruption: Defendants Christie, in conspiring to have Kaul kidnapped, did attempt to violate Kaul's prosecutorial rights and obstruct justice in the United States District Court, in order to prevent Kaul from exposing the massive crimes of **The Kaul Cases** Defendants, of amongst other things, judicial/political corruption.

**Murphy:**

124.    Kidnapping: Defendant Murphy, prior to becoming the NJ Governor was the US Ambassador to Germany, and prior to that was a partner at Goldman-Sachs, a corporation that holds shares in Allstate/Geico, the dividends from which Defendant Murphy continues to profit. Defendant Murphy, recognizing that there were no legitimate means of contesting Kaul's right to continue prosecuting **The Kaul Cases** Defendants, did conspire with Defendants Christie/Grewal/Allstate/Geico to have Kaul eliminated on May 28, 2021, be it by either severe injury and or death, in order to prevent him from further exposing the crimes of **The Kaul Cases** Defendants, including the securities fraud violations. Defendant Murphy, in perpetrating the 'Kaul Kidnapping Scheme', did recognize its illegality and violation of Kaul's basic human rights, but persisted nonetheless, because of the immense civil/criminal liability posed to **The Kaul Cases** Defendants.

125.    Mail/wire fraud: Defendant Murphy, in conspiring to perpetrate the 'Kaul Kidnapping Scheme' did, with knowledge of its illegality, use the US mail/wires to exchange information with Defendants Christie/Grewal/Allstate/Geico, about both the execution and the unintended consequences, including the filing/publicization of K11-9.

126.    Bribery: Defendant Murphy continues to receive bribes from Defendants Allstate/Geico, under cover of dividends/shares from Goldman-Sachs, and has not, since becoming the NJ Governor, relinquished his or his family's holdings in the corporation, in accordance with NJ law pertaining to state official conflicts of interest.

127.    Obstruction of justice/public corruption: Defendant Murphy, in conspiring to have Kaul kidnapped, did attempt to violate Kaul's prosecutorial rights and obstruct justice in the United States District Court, in order to prevent Kaul from exposing the massive crimes of **The Kaul Cases** Defendants, of amongst other things, judicial/political corruption. Defendant Murphy, in furtherance of this scheme to obstruct justice, did in a period from June 15, 2021, conspire with judges/senators in the United States District Court/US Government to have K11-9 transferred from the Southern District of New York to the District of New Jersey, and then dismissed.

**Grewal:**

128.    Kidnapping: On May 27, 2021, Defendant Grewal did conspire with Defendants Murphy/Christie/Allstate/Geico to have Kaul kidnapped on May 28, 2021, with the purpose of having him incarcerated in the Mercer County jail in Trenton, over the Memorial Day Weekend, in order to haver him either seriously injured or killed. When the 'Kaul Kidnapping Scheme' commenced on May 28, 2021 at approximately 2:30 pm EST, Defendant Grewal remained in constant contact with the kidnappers, and did, at approximately 7 pm EST, learn that the scheme had publicly failed. Defendant Grewal, in the planning and execution of the scheme, did know that its principal purpose was to have Kaul eliminated, in order to prevent him further exposing the serious and massive crimes (2008/2009-2021) of **The Kaul Cases** Defendants.

129.    Mail/wire fraud: Defendant Grewal, in the planning, perpetration and 'damage control' phases of the 'Kaul Kidnapping Scheme' did, with a knowing illegality, use the US mail/wires to exchange information with Defendants Christie/Murphy/Allstate/Geico, and in these exchanges the Defendants revealed their opinion that the scheme would be successful, and Kaul would be mentally and or physically unable to continue his prosecution of **The Kaul Cases** Defendants. Also in these exchanges, were frantic emails that evidenced their fear of public exposure when they learned that the scheme had failed, particularly as it related to the political careers of Defendants Murphy and Grewal.

130.    Bribery: Defendant Grewal made the decision to participate in the 'Kaul Kidnapping Scheme' believing that it would be successful. However, when it failed and Kaul sued him on June 15, 2021 (K11-9), he panicked and was transferred to the enforcement division of the SEC, in the belief that it would shield him from Kaul's prosecution. The transfer was the bribe, part of the quid pro quo with the other Defendants, in which they attempted to purchase the silence of Defendant Grewal, while placing him in a position with a perception that it would prevent exposure of the securities fraud crimes of Defendants Allstate/TD/Geico (Berkshire Hathaway).

131.    Obstruction of justice/public corruption: Defendant Grewal was appointed the NJ AG in 2017 by Defendant Murphy. He, as with Defendant Murphy, took orders from the insurance industry, in the filing of indictments and or license revocation actions against physicians to whom the insurance industry owed monies. Many of these false cases were brought on fabricated and meaningless claims regarding the prescription of pain-relieving medications. Defendant Grewal participated with Defendants Allstate/Geico/Murphy/Christie in schemes of public corruption and abused state power to violate the Constitutional rights of these physicians, and in the process caused an obstruction of justice, all purposed to further the economic/political agendas of Defendants Christie/Murphy/Allstate/Geico, through the exploitation of the American public and medical profession. Defendant Grewal, in the commission of these RICO predicate acts, did recognize that he, a public servant, was converting the State of New Jersey into a **"racketeering enterprise"** to serve the interests of corrupt corporations/politicians/judges.

**Allstate/Geico:**

33

132.     Kidnapping: From 2006 to 2016, Defendant Allstate employed a multi-pronged strategy to attempt to eliminate Kaul, that included: (i) denial of certification for patient clinical care; (ii) denial of payment after Kaul provided clinical care; (iii) contesting Kaul at every fee arbitration; (iv) disseminate falsehoods to lawyers/doctors/surgical centers/hospitals to attempt to destroy Kaul's reputation, and make it impossible for him to work; (v) file fraudulent lawsuits against Kaul in corrupted NJ state/federal courts when Kaul wins the arbitration hearings; (vi) order the state medical board to revoke Kaul's license; (vii) have the state AG and US Attorney/FBI initiate far-reaching investigations purposed to alienate Kaul, have him incarcerated and seize his assets and those of his family; (viii) have him indicted on false tax charges; (ix) conspire with his ex-wife to have him jailed on unpaid child support charges; (x) prevent him access to banking services; (xi) bribing judges/senators in federal court/government to obstruct/dismiss all cases filed by Kaul; (xii) scheming to have Kaul **KIDNAPPED**/deported/jailed/seriously injured/killed.

133.     Mail/wire fraud: Defendants Allstate/Geico, in the planning/execution/'damage control' phases of the 'Kaul Kidnapping Scheme', did, with knowledge of its illegality, use the US mail/wires to exchange information with Defendants Murphy/Christie/Grewal

134.     Bribery: In conspiring to commit the RICO predicate act of kidnapping, Defendants Allstate/Geico did funnel bribes to Defendants Christie/Murphy/Grewal, as part of a quid pro quo scheme, in which Defendants Christie/Murphy/Grewal sold, without the public's permission, state power to Defendants Allstate/Geico, in furtherance of their efforts to eliminate Kaul, and prevent him from further exposing their crimes.

135.     Obstruction of justice/public corruption: In having Kaul kidnapped, **The Kaul Cases** Defendants did attempt to violate his prosecutorial rights in the United States District Court, in the belief that he would either be unwilling or unable to continue the prosecution of his claims, and did in the process, attempt to cause a knowingly illegal obstruction of justice within the United States District Court. Defendants Allstate/Geico, in coopting a state police agency into the commission of the crimes of kidnapping/mail fraud/wire fraud to obstruct justice in the United States District Court, did simultaneously: (i) convert the State of New Jersey into a **"racketeering enterprise"** through which the Defendants, being aided/abetted by the state police, did conduct a **"pattern of racketeering"** through the commission of RICO predicate acts; (ii) convert the United States District Court into a **"racketeering enterprise"** through which the State of New Jersey, being aided and abetted by the Defendants/NJ state police, did conduct a **"pattern of racketeering"** through the commission of the RICO predicate acts of obstruction of justice/kidnapping/mail fraud/wire fraud/bribery, all purposed to eliminate Kaul and prevent him from further exposing their corporate decimating crimes.

## RICO 6

## Association-In-Fact Enterprise: State of New Jersey-State of New York-NYSE ("SSN Association-In-Fact Enterprise)
## Defendant Persons: Allstate/Geico/FSM  Heng erer
## RICO Predicate Acts: Bribery/Mail Fraud/Wire Fraud/Obstruction of Justice/Conspiracy

### Overview:

In a period that commenced in late 2020, the Defendants did conspire to, and did conduct a knowingly illegal **"pattern of racketeering"** through the **"SSN Association-In-Fact Enterprise"**, through the commission of the RICO predicate acts of mail fraud/wire fraud/obstruction of justice/conspiracy, the purpose of which was to prevent Kaul from obtaining a physician license in the State of New York, in an attempt to stymie his economic resurgence, in the belief that such a scheme would mitigate the exposure of their crimes from 2008 onwards, amongst which are bribery/public corruption/evidence tampering/witness tampering/bankruptcy fraud/bank fraud/mail fraud/wire fraud/judicial corruption/perjury/kickbacks/securities fraud.

In the commission of obstructing Kaul's efforts to obtain a license in the State of New York (October 2020 to July 2021), the Defendants did conspire to and did use a multitude of frauds to attempt to deceive, delay and deny Kaul's application, by using the US wires to propagate knowingly false information that there existed a question of so called **"moral character"**, and failed to produce any state policy regarding the regulation of any process of character assessment. Kaul made multiple requests for such a policy, but none was provided, and instead, the Defendants conspired with an individual by the name of **"Vincent Vollaro"** to attempt, on June 17, 2021, to engage me in a non-recorded phone call, in which he would **"explain the process"** to me. The call did not occur, but its purpose was to fabricate evidence to bolster their false position regarding moral character.

On July 14, 2021, consequent to Kaul having sent letters to every member of the NY State Government regarding the state's liability for the crimes of **The Kaul Cases** Defendants, the Defendants did conspire with **"Vollaro"** to use the US wires to transmit a knowingly fraudulent document, in which **"Vollaro"** asserts that a **"subcommittee"** of the state medical board had purportedly found there existed a **"question"** regarding moral character. Kaul's requests for a copy of the transcript and signed opinion of the supposed subcommittee were ignored and then denied.

On August 27, 2021, Kaul filed a petition (Kaul v Zucker/Hengerer: 101019-2021) in the New York Supreme Court (Borough of New York) (**Exhibit 13**), that seeks to compel Defendant Hengerer to produce the purported **"subcommittee"** opinion. To date no physician/member of the New York State Medical Board has confirmed participating in any evaluation of Kaul's application.

35

**Hengerer:**

Defendant Hengerer is a board director on Defendant FSMB, with whom he engages in commerce related to the business of so called "**physician discipline**", and in the perpetration of this scheme he does abuse the authority as the Chairman of the Board for Professional Medical Conduct, to eliminate physicians targeted by Defendants Allstate/Geico, to whom the Defendants owe money.

Defendant Hengerer, cognizant of the illegality of his participation in the "**HIPIC-FC**" scheme, has persisted in his unlawful use of the US mail/wires to propagate the scheme to both eliminate physicians and prevent Kaul, an individual suing entities from whom he receives bribes, from properly participating in the relevant market, an offense that Defendant Hengerer recognizes is violative of antitrust law and Kaul's constitutional/human rights.

Defendant Hengerer, despite knowing the penalties associated with his violation of law and of Kaul's rights, was motivated to commit the crimes because of the economic benefit that inured to him, and because of his recognition that Kaul's pioneering minimally invasive outpatient spine surgery, did pose a substantial threat to the business of American hospitals and the American Hospital Association. Defendant Hengerer was paid to be a surgical chairman at Strong Memorial Hospital in Rochester, NY for many decades.

In a period from May 13, 2021, Defendant Hengerer, despite being noticed on multiple occasions by Kaul that he was participating in a "**pattern of racketeering**" did continue with his knowingly unlawful conduct (**Exhibit 14**).

**FSM B/Allstate/Geico:**

The introduction of the HCQIA in 1986 foreshadowed and created the conditions that spawned the "**HIPIC-FC**", a scheme that Defendants Allstate/Geico/FSMB have used to convert American healthcare into a massive "**racketeering enterprise**" purposed simply for profit at the expense of the American public/medical profession, the singular goal of which is to increase share price at the cost of human life. The American Hospital Association shares the same exploitative business vision, and on February 22, 2018, a CNBC story published a ProPublica list of hospitals that receive vast sums of money from corporations doing business in the healthcare sector, and Strong Memorial Hospital is on the list (**Exhibit 16**). Hospital based medical mistakes are the third leading cause of deaths in America (**Exhibit 17**).

Defendants FSMB/Allstate/Geico did conspire with Defendant Hengerer to use the New York State physician licensing apparatus to conduct a "**pattern of racketeering**" and did recognize that in committing these crimes, did convert the State of New York into a "**racketeering enterprise**", the principal purpose of which was to mitigate any further exposure to the global equities market/international regulators of their crimes of securities fraud crimes (**Exhibit 15**).

36

Defendants Allstate/TD/Berkshire Hathaway-Geico and their counsel do know that on September 7, 2021, a release was published to the world-wide-web entitled: "**United States Securities And Exchange Commission Alerted To Securities Fraud Crimes Of Three Titans Of North American Finance**", and that the release was disseminated to the CEOs/CFOs of the S/P 500. On September 7, 2021 Defendant Allstate's share price was 134, and on September 11, 2021 it was less than 132.

In this period, Defendants Allstate/TD/Berkshire Hathaway-Geico did use the US wires to transmit knowingly false information to their shareholders/global investment community that violates section 10(b) of the Securities/Exchange Act, in that they failed to inform the market of a pending action in the Indian High Court (K11-5) and attempted to frame this Court's denial without prejudice of Kaul's Summary Judgment motion, as evidence of their lack of guilt.

The Defendants ongoing crimes constitute an **"ongoing open-ended pattern of racketeering"** being conducted in collusion/conspiracy with Defendant Hengerer through the **"SSN Association-In-Fact Enterprise"**, that continues to violate Kaul's constitutional/human rights, in that he continues to be deprived (2012-Present) of his right to a livelihood, his right/duty to support his children and his right to freedom. The Defendants, in knowledge of their immense civil/criminal liabilities in multiple international jurisdictions, did on May 27, 2021, attempt to have Kaul seriously injured/killed.

Pursuant to RICO's doctrine of vicarious liability, all of **The Kaul Cases** Defendants have incurred, and will continue to incur liability of the aforementioned crimes, and any further ones that any of the Defendants might commit.

## Violation of Civil Rights
## Symbiosis of State/Private Actors

### 136.    **Applicable state function tests**:

1. The Symbiotic Test
2. The Joint Participation Doctrine
3. The State Command and Encouragement Test
4. The Pervasive Entwinement Test
5. The Public Function Test

### 137.    **Facts of test confirmation**:

The above pled facts regarding: **(i)** the exchange between private and state actors, of monies and information pertaining to **"patterns of racketeering"** conducted through the executive/legislative/judicial branches of the State of New Jersey, the United States District Court and the United States Bankruptcy Court; **(ii)** the purchasing by private actors of state functions through schemes of judicial/political bribery; **(iii)** the funding by the State of New

Jersey of legal defenses of private actors in **The Kaul Cases,** do confirm the intertwinement, for the purposes of section 1983 claims, of the state actor status of the private actors/defendants, and that the crimes committed against Kaul by the private actors/defendants, are the crimes of the State.

## Section 1983 claim
## Violation of 1st/2nd/4th/5TH/6th/8TH/14TH Amendments

138.    The Law:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

### 139.    The Facts:

In a period from 2008/2009 to the present, the Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive Kaul of his constitutional rights pursuant to the 1st/2nd/4th/5th/6th/8th/14th amendments, and that these violations did illegally deprive Kaul of: (i) his property; (ii) his right to due process; (iii) his right to freedom of speech; (iv) his right to an impartial tribunal; (v) his prosecutorial rights; (vi) his right to equal protection; (vii) his liberty and a decade of his life. These injuries were perpetrated by private/state/federal actors, and through the State of New Jersey, the United States Bankruptcy Court, the United States District Court and the NYSE. The commercial nexus between Defendants Allstate/TD/Geico and Defendant ICE, and the complicity of Defendant ICE in the securities fraud violations of Defendants Allstate/TD/Geico,
does confer state-actor liability on Defendant ICE with regards to the violations of Kaul's constitutional rights.

**The Kaul Cases** Defendants were, and are motivated to commit, and continue to commit these violations of Kaul's human rights, in order to prevent Kaul from exposing their crimes, including those of defrauding the global equities market.

Kaul's injuries (**Exhibit 10**).

### UN Human Rights Violation

### The United Nations Universal Declaration of Human Rights

140.    **The Kaul Cases** Defendants have knowingly/willfully abused the power of the
American State to violate Kaul's human rights as enshrined in the Universal Declaration
of Human Rights (**Exhibit 2**).

141.    **BASCH CLAIM**

**RICO**

### Association-In-Fact Enterprise: State of New Jersey-Rivkin Radler-United States District Court ("SRU Association-In-Fact Enterprise"/"SRU Scheme") Defendant Persons: Geico/Rivkin Radler/Gersenoff RICO Predicate Acts: mail fraud/wire fraud/bribery/public corruption

**Overview**:

142.    In a period that commenced in or about 2008/2009, Defendants Geico/Rivkin
Radler/Gersenoff did conspire to conduct, and did with a knowing illegality, conduct a
**"pattern of racketeering"** through the **"SRU Association-In-Fact Enterprise"**, through
the commission of the RICO predicate acts of mail fraud/wire fraud/bribery/public
corruption, in the perpetration of the **"SRU Scheme"** under cover of the State of New
Jersey and the United States District Court. The scheme is purposed to exploit the
medical expertise of Plaintiff Basch and defraud him of his property, by illegally using
the power of the United States District Court, in order to increase corporate/executive
compensation and share price

143.    The **"SRU Scheme"** is purposed to increase Defendant Geico's executive
compensation/share price, and Defendant Rivkin Radler/Gersenoff's 'legal fees', at the
expense, and through the grave exploitation of the American public and medical
profession. The Defendants have been aided and abetted in their scheme by corrupted
judges within the United States District Court for the District of New Jersey/corrupted
politicians within both the state/federal governments/corrupted media outlets, the role
of the latter entity being to digitally disseminate slanderous/libelous information about
the person/s against whom they file suit.

144.    Defendant Geico has perpetrated, and continues to perpetrate this scheme, at
the heart of which lies the same **"pattern"** of fraud, and it is this: There exists within
New Jersey a no-fault arbitration system that adjudicates claims filed by physicians and
other health related professionals, against auto-insurance carriers for compensation
regarding care life-saving care delivered to their clients, who have sustained injuries in
car accidents. If a physician prevails in these arbitrations, members of this sector of the
insurance industry then file knowingly fraudulent lawsuits in state/federal court within
the geographic boundaries of the State of New Jersey, seeking to re-litigate their losses
in state sanctioned arbitration forums, to whose jurisdiction they submitted.

39

145.    In the arbitration proceedings the Defendants scheme to intentionally omit the arguments they subsequently submit in state/federal courts, as they recognize that the physician has no legal costs in the arbitration (paid by losing insurance carrier), but that state/federal courts actions will require the physician to retain a lawyer at his own enormous cost. Within the subsequent state/federal court actions, the Defendants conspire to file, and do file knowingly false, **evidentially un-supported** RICO claims, in which they seek not only monetary amounts far in excess of what they paid the physician, but injunctions to stop the physician ever treating any of their injured clients. This is their **"open-ended pattern of racketeering"**, one in which they have converted the United States District Court into a massive **"racketeering enterprise"** not dissimilar to the one they have created within American state/federal governments, and the NYSE/SEC.

146.    As a consequence of the Defendants **"racketeering"**, Plaintiff Basch has sustained, and continues to sustain substantial and irreparable injury to his reputation and finances and has no other recourse than to bring suit in this Court. The Defendants have corrupted the judges/court within the District of New Jersey (K11-1/K11-3), and thus Plaintiff Basch, in exercising his Constitutional right to due process/impartial tribunal is afforded the right to vindicate his rights in any court within the United States District Court, other than the District of New Jersey.

<u>Geico</u>:
147.    <u>Mail Fraud/Wire Fraud</u>: In a period from 2008/2009 to 2021, Defendant Geico did, with a knowing illegality, and in collusion/conspiracy with judges in the District of New Jersey/Defendant Rivkin Radler/Gersenoff use the US mail/wires in furtherance of the **"SRU Scheme"** and through a **"pattern of racketeering"** whose continuity is **"open-ended"** and has knowingly and respectively converted the United States District Court and it's judges into a **"racketeering enterprise"** and aiders/abettors of the Defendants decade-plus-long crime. Defendant Geico launders the process of its criminal enterprise through the NYSE and members of the S/P 500, a fact they conceal from the global equities market.

148.    <u>Bribery/Public Corruption</u>: In a period from 2008.2009 to 2021, Defendant Geico, in collusion and conspiracy with Defendants Rivkin Radler/Gersenoff, did use the US mail and wires to conspire to commit, and did commit the RICO predicate acts of bribery/public corruption, in funneling bribes to judges within the District of New Jersey in a series of quid pro quo schemes, in which corrupted judges did enter order/judgements adverse to Plaintiff Basch and other physicians, while entering orders/judgments advantageous to Defendant Geico. In the commission of these crimes, Defendants Geico/Rivkin/Radler did know the illegality of their misconduct and did know the severe civil/criminal penalties associated with such felonious conduct. The Defendants corruption of the United States District Court has violated and continues to violate the Constitutional right of Plaintiff Basch to due process/impartial tribunal/equal protection, when life/liberty/property are at stake, as they are here. Defendant Geico has also violated the right of Plaintiff Basch to independent counsel, in that the

Defendants continue to conspire to coerce his counsel into having Plaintiff Basch concede to the Defendants fraudulent claims.

## Rivkin Radler:

149. Mail Fraud/Wire Fraud: In a period from 2008/2009 to 2021, the law firm of Rivkin Radler has conducted and continues to conduct massive schemes of mail and wire fraud, in which, on a weekly basis, it uses, with a knowing illegality, the US mail/wires to exchange fraudulent information with members of the NJ state/federal judiciary and governments, in furtherance of its multiple **"ongoing"** illegal schemes, that do provide the basis for this complaint. Defendant Rivkin Radler is a central cog in the Defendants **"pattern of racketeering"** conducted in **"enterprises"** and association-in-fact enterprises over a decades-plus-long period in which it has used the cover of its law firm/attorney-client privilege to perpetrate a massive criminal enterprise, in collusion/conspiracy with the State of New Jersey and the United States District Court. Defendant Rivkin Radler has used and continues to use this criminal enterprise to inflict intentional harm on the economic standing and reputation of Plaintiff Basch, harm for which he now seeks recompense.

150. Bribery/Public Corruption: Defendant Rivkin Radler has within the last two (2) decades, if not longer, perpetrated massive schemes of judicial/public corruption, in which it has both acted as a conduit of bribes from corporations to state/federal politicians/judges, monies that it has disguised as 'legal fees' and 'political campaign donations', **and** a progenitor of bribes/favors to corrupted judges, to whose family members it provides 'no show' jobs. It has conducted these illegal schemes with impunity, as it knows its corporate masters control the investigative/prosecutorial arms of state/federal government. Defendant Rivkin Radlker has employed and continues to employ this scheme against Plaintiff Basch, to violate his Constitutional right to due process/impartial tribunal/equal protection, in its pursuit of profit through the exploitation of the medical expertise and economic welfare of Plaintiff Basch. Defendant Rivkin Radler has conducted these illegal schemes of bribery/public corruption with knowledge of their illegality.

## Gersenoff:

151. Mail Fraud/Wire Fraud: Defendant Gersenoff, in a period from 2008/2009 to 2021, has used, with a knowing illegality, the US mail/wires to exchange information with **The Kaul Cases** Defendants and Defendants Rivkin Radler, regarding the planning and execution of the multiple **"racketeering schemes"**, including the **"SRU Scheme"**, in which Defendant Gersenoff acknowledged that Defendant Geico's strategy was to file knowingly false RICO claims against physicians to whom Defendant Geico owed monies and against whom Defendant Geico had lost in state sanctioned arbitration hearings. Defendant Gersenoff acknowledged that these filings did constitute the crimes of mail/wire fraud but stated that because Defendant Geico had corrupted the judges/prosecutors/politicians in the District of New Jersey, their crimes would remain

41

un-investigated and un-prosecuted, and that all lawyers in the District of New Jersey had either been corrupted or were too fearful to file racketeering claims against Defendant Geico. Defendant Gersenoff admitted during one phone call, that Defendant Geico controlled the entire judicial/prosecutorial apparatus within the District of New Jersey. Defendant Gersenoff's 'Fraud on the Court' scheme has caused and continues to cause injury and violation to the Constitutional rights/economic standing/reputation of Plaintiff Basch, for which he now seeks recompense in this Court.

152.     Bribery: Defendant Gersenoff has, within the last two (2) decades, conducted a **"pattern of racketeering"** with knowing illegality, through the enterprise of the law firm of Defendant Rivkin Radler, by aiding and abetting, and using the attorney-client privilege as cover for the crime of trafficking bribes from Defendant Geico to state/federal politicians/judges, in furtherance of massive quid pro quo schemes, that have exploited, and continue to exploit the American public and medical profession in pursuit of corporate/shareholder profit. For these ongoing/willful injuries, Plaintiff Basch seeks recompense.

# Relief

153.     Please see (**Exhibit 7**).

## Certification

We, the Plaintiffs, do certify that the above statements are true and accurate to the best of our knowledge, and that if it is proved that we knowingly and willfully misrepresented the facts, then we will be subject to punishment.


_____
RICHARD ARJUN KAUL, MD

_____
DAVID BASCH, MD

DATED: September 13, 2021

44

# APPENDIX B

# K11-30
# KAUL v OETKEN

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

RICHARD ARJUN KAUL, MD;
JANE DOE; JOHN DOE.

Plaintiff

v.

JAMES PAUL OETKEN
(PERSONAL AND OFFICIAL CAPACITY)
EDWARD SPONZILLI; PAUL E. DWYER;
DANIEL M. STOLZ; DAVID J. D'ALOIA;
JAY W, BROWN; EDWARD G. SPONZILLI.
JANE DOE; JOHN DOE.

Defendants.

CIVIL ACTION  NO.:

COMPLAINT

---

# PARTIES

## PLAINTIFF

RICHARD ARJUN KAUL, MD – 41 CALLA AVENUE, FLORAL PARK, NY 11001
DRRICHARDKAUL@GMAIL.COM **("PLAINTIFF KAUL") –** 914 250 84313

## DEFENDANT

JAMES PAUL OETKEN, ESQ – ROOM 706, 40 FOLEY SQUARE, NY, NY 10007 ("**DEFENDANT OETKEN"**)

EDWARD G. SPONZILLI - 400 CROSSING BLVD,.8th FLOOR NORRIS McAUGHLIN, P.A. BRIDGEWATER NJ 08807-5933 **("DEFENDANT SPONZILLI")**

PAUL E. DWYER – METRO EAST OFFICE PARK, WARWICK, RI 02886 **("DEFENDANT DWYER")**

DANIEL M. STOLZ – GENOVA BURNS, 494 MAYOR KENNETH A. GIBSON BLVD, NEWARK, NJ 07102 ("**DEFENDANT STOLZ")**

DAVID J. D'ALOIA – SAIBER LAW FIRM, 132 WEST 31 ST STREET, 9TH FLOOR, NY, NY 10001 **("DEFENDANT D'ALOIA")**

JAY W, BROWN – BALLAD SPAHR, LLP 1909 K STREET, NW  SUITE 12th FLOOR WASHINGTON, DC 20006-1157 – 202 661 7698 **("DEFENDANT BROWN")**

# RELEVANT/REFERENCED CASES OF 'THE KAUL CASES'

**K1:** KAUL v CHRISTIE: 16-CV-02364 – CLOSED

**K11-7**: KAUL v. ICE ET AL: 21-CV-6992 – CLOSED

**K11-14**: KAUL v. FEDERATION ET AL: 23-CV-22325 – CLOSED

**K11-18:** KAUL v OETKEN: 24-CV-00185-CLOSED

**K11-20:** KAUL v FEDERATION STATE MEDICAL BOARDS: 24-CV-03180-CLOSED

**K11-23:** KAUL v OETKEN: 24-CV-00621 – OPEN BUT DEFENDANT OETKEN DISMISSED

**K11-27**: KAUL v FEDERATION STATE MEDICAL BOARDS: 25-CV-01676 – OPEN

**K11-28**: KAUL v NORTH DAKOTA MEDICAL BOARD ET AL: 25-CV-00147-CLOSED

# JURISDICTION + VENUE

**General:**

**1.** 28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of Plaintiff Kaul's Constitutional rights and U.S.C. § 1964(a)(b)(c)(d) and 1962.

U.S.C. § 1337 – Plaintiff's allegations allege violations of an Act of Congress regulating commerce and monopolies.

**Personal:**

**2.** The Court has personal jurisdiction over Defendants Oetken/Sponzilli/Dwyer/Stolz/Brown/D'Aloia as they have transacted business, maintained substantial contacts and/or committed acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district.

**3.** Additionally, the Defendants RICO violations/offenses/crimes have caused  and  continue to cause injury to Plaintiff Kaul's life/liberty/property in every state in the United States including the State of New York.

**4.** Defendants scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including the Southern District of New York. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to a court of general jurisdiction in Dakota.

**Venue:**

**6.** 28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and

(2) <u>a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated</u>.

**7.** Defendant Oetken's K11-7 September 12, 2022 purported and knowingly illegal 'injunction'

**See hyperlink:**

**https://www.drrichardkaul.com/_files/ugd/7d05d1_1f1f9cebc0134fe5835a33640aa2ed67.pdf**)

and his K11-20 October 2, 2024, threat to hold Plaintiff Kaul in contempt if by October 16, 2024, Plaintiff Kaul did not dismiss K11-20, <u>AND</u> the K11-20 Defendants filing on October 3, 2024 of Defendant Oetken's October 2, 2024 threatening 'ORDER' **See hyperlink:**

**https://www.drrichardkaul.com/_files/ugd/7d05d1_6328d6d06c8f46d9a7aaec22370b981b.pdf**

do constitute a substantial and ongoing injury and violation of Plaintiff Kaul's human/civil/constitutional right to vindicate and or secure his right to his life/liberty/property/reputation <u>WITHIN</u> the jurisdiction of the S.D.N.Y.

# PRELIMINARY STATEMENT

Before any of the Defendants/Readers/Judges advance into the textual substance of the case, Plaintiff Kaul respectfully asserts that (**Exhibit 1**) should be read/reviewed, as it constitutes the foundation that will forever expose/substantiate the criminality possessed by the Defendants not just in their illegally conspired issuance of a knowingly illegal nationwide injunction (September 12, 2022 in K11-7), but then for a period from September 12, 2022 to the present in the knowingly illegal exploitation of the authority/jurisdiction of the S.D.N.Y. in the violation of the independent authority/jurisdiction of other district courts (S.D.F./E.D.N.C./S.D.T.) in using the knowingly illegal injunction in schemes of harassment/intimidation/bribing/coercing of other district judges into dismissing cases of **The Kaul Cases** that those judges, fully aware of the illegal September 12, 2022 'injunction' did admit the cases and enter discovery/trial orders. Defendants Oetken/Sponzilli/Dwyer/Stolz/D'Aloia/Brown magnified the deprivation of Plaintiff Kaul's right to life/liberty/property/reputation by at least three (3) years, when if they had not illegally interfered in K11-14/K11-15/K11-17/K11-18/K11-19/K11-20 (2022-2025), it is likely that remediation/rectification/compensation would have commenced to the four thousand eight hundred and sixty-six (4,866) ongoing days-worth to Plaintiff Kaul's life/liberty/property/reputation.

**8.** Not surprisingly the world's finest and most expert purveyors of corruption and certain types of lawyerly-like sophisticated courtroom crime are those whose lives and careers have been intertwined/immersed in ostensibly professional relationships of legal and judicial assistance with those who have found themselves on the so called 'wrong-side' of the law. They say, **"the company you keep is the company that keeps you"** and that there are no better masters of lawlessness than masters of law, that it is only the deepest knowledge of light that permits the darkest perception of dark.

**9.** The Defendants are indeed masters of the legal art and have admirably demonstrated such within **The Kaul Cases.** However, for men of admitted guilt, constrained by the taut of truth, they have maneuvered with forced restriction, but as best as can be expected on the girded

legal landscape of the United States District Court. The Defendants claustrophobic maneuverability has inevitably been associated with strategic error forcing them into increasingly reckless, but unavoidable acts/patterns of ever-expanding criminality drawing more and more people into the '**Revocation-Cover-Up-Conspiracy'** (2005-2025).

**10.** The Defendants corrupt, controlling and extortionate relationship with Defendant James Paul Oetken is a central feature of a sub-conspiracy of the '**Revocation-Cover-Up-Conspiracy'** that has been and continues to be perpetrated within K11-7 (May 10, 2023 to present) by **The Kaul Cases** Defendants, including the K11-30 Defendants.

**11.** In essence this sub-conspiracy of the '**Revocation-Cover-Up-Conspiracy'** involved its principal perpetrators (Defendants Allstate/Christie/Solomon/Heary/Stolz) requesting, then persuading, then coercing, then bribing and then threatening Defendant Oetken (2023-2025) to threaten Plaintiff Kaul with holding him in contempt unless he dismissed cases he filed in other district courts. Cases that had been admitted by the district judges with full knowledge of Defendant Oetken's purported September 12, 2022 'injunction'.

**12.** The Defendants motivation for the perpetration of this sub-conspiracy pertains to their efforts to prevent Plaintiff Kaul from further exposing both their offenses/violations/crimes and those of **The Kaul Cases** and others.

**13.** The specific facts of this K11-7 based sub-conspiracy of the '**Revocation-Cover-Up-Conspiracy'** , that was/is perpetrated within the S.D.N.Y. are set forth below in the 'STATEMENT OF FACT' section. And as to the issue of immunity, it almost goes without saying that absolutely none exists for Defendant Oetken or any of the Defendants, as the subject matter/admissions of fact/state of fact of the K11-30 claims are those of a conspiracy of crime and willful constitutional violations committed against the life/liberty/property/reputation and human/civil/constitutional rights of Plaintiff Kaul. The most recent example being the knowingly illegal attempt to schedule a conflicted June 16, 2025 contempt hearing in K11-7. And then of

8

course the scheduling of a knowingly illegal September 12, 2022 purported 'injunction' in K11-7, that the June 27, 2025 SCOTUS opinion on **Trump v CASA** held that district courts from the founding of the Republic NEVER had the authority to issue nation wide injunctions. Plaintiff Kaul was correct as to the illegality of Defendant Oetken's purported 'injunction' from the moment it was issued. It was, as Plaintiff Kaul consistently asserted a 'Fraud on the Court', and in every district court in which the case was dismissed on the fraudulently 'injunction' will, pursuant to the doctrine of "Fraud on the Court' be compelled to re-try the case/s/.

# STATEMENT OF FACT

**14.** The factual foundation of **The Kaul Cases**, of which K11-30 is one, commenced in 2005, when Plaintiff Kaul invented and successfully performed the first percutaneous spinal fusion, a procedure that revolutionized the field of spine surgery, became the standard of care approximately a decade ago and has helped millions of people worldwide with debilitating spinal pain.

**15**. The invention brought Plaintiff Kaul professional and commercial success, that unfortunately caused immense professional jealousy amongst his market competitors in the spine surgery field, who unable to fairly compete due to lack of the necessary surgical skills did resort to committing offenses/violations/crimes against Plaintiff Kaul. In approximately 2008, they entered into a bribery related quid pro quo scheme with Defendant Christie, the then governor of New Jersey, in which in return for bribes he abused gubernatorial power and ordered the state medical board to manufacture a knowingly false license revocation case against Plaintiff Kaul. The purpose was to cause a theft of his intellectual property and eliminate him from the market, thus increasing their profits and wealth.

**16. The Kaul Cases** Defendants caused the license suspension proceedings to commence on April 2, 2012 and the final revocation occurred on March 24, 2014. **The Kaul Cases** Defendant, James Howard Solomon, acted as the administrative law judge and recommended revocation in a proceeding that was a massive fraud, as the evidence/admissions (**Exhibit 11**) now irrefutably prove.

**17**. On February 22, 2016, Plaintiff Kaul filed K1 and from that commencement date he filed a series of cases, **The Kaul Cases**, in the United States District Court, but due to **The Kaul Cases** Defendants corruption/harassment/mafia-like intimidation of certain judges within the United States District Court, the cases were either stayed or dismissed, and no discovery or trials were

conducted. Plaintiff Kaul, however, did not relent and persisted in his efforts to hold accountable **The Kaul Cases** Defendants.

**18**. On August 19, 2021, Plaintiff Kaul filed K11-7 in the S.D.N.Y. and the case was immediately assigned to Defendant Oetken, who issued no discovery order but only summons. By February 2022, all briefing had been submitted and the K11-7 Defendants were seeking dismissal and the entry of a nationwide injunction preventing Plaintiff Kaul from filing any other cases in any other district courts without first obtaining Defendant Oetken's permission.

**19.** On September 12, 2022 Defendant Oetken granted the K11-7 Defendants motions for dismissal/injunction, and entered into the record his knowingly fraudulent dismissal/injunction. Plaintiff Kaul, recognizing the illegality of the dismissal/injunction, as there existed absolutely no factual/legal bases on which to grant the motions, did, on September 14, 2022, file an in-person request with the Clerk of the Court for the disclosure/production of Defendant Oetken's financial holdings/records and all ex parte communications pursuant to the Rules 144/455 and the Courthouse and Transparency Act of 2022.

**20.** As of July 28, 2025 none of the requested financial information has ever been produced despite the submission of a request in K11-23 (**Exhibit 2**). And on October 6, 2022, filed a motion for Defendant Oetken's disqualification (**Exhibit 3**), a motion that was not adjudicated until August 13, 2023, and then only because the district judge in K11-14, knowing the illegality of Defendant Oetken's September 12, 2022 'injunction' refused to dismiss K11-14 unless Defendant Oetken resolved the pending disqualification motion. The motion was summarily denied, but Defendant Oetken's failure to deny any of the highly incriminating facts did cause their admission and further corroboration of crimes to which he has since admitted, including but not limited to bribery related quid pro quo schemes perpetrated in the SDNY.

**21**. The magistrate judge's failure to grant Plaintiff Kaul's enforcement motion in K11-23 (**Exhibit 2**) and Defendant Oetken's failure to produce the financial information as required by

law did and do constitute a further admission of his bribery related quid pro quo not only with the K11-7 Defendants, but with multiple other principally corporate entities that have appeared before him. Defendant Oetken was sponsored by **The Kaul Cases** Defendant Charles E. Schumer and appointed by President Barack Obama.

**DEFENDANT OETKEN'S THREATS OF CONTEMPT**

**22.** Plaintiff Kaul, having established that the K11-7 Defendant Oetken issued September 12, 2022 purported 'injunction' was the product of crime and thus a 'Fraud on the Court', did proceed to file other cases in the United States District Court, and in the period from September 12, 2022 to July 27, 2025 did file further cases seeking to expose the truth of the offenses/violations/crimes (2005-2025) committed against the life/liberty/property and human/civil/constitutional rights of Plaintiff Kaul by **The Kaul Cases** Defendants. In the filing of these cases, Plaintiff Kaul submitted to the court every document related to the purported 'injunction', a copy of the 'injunction', and with this knowledge the cases were admitted by the district judges and discovery orders entered.

**23.** In every case, **The Kaul Cases** Defendants, but particularly Defendants Christie/Solomon/Heary/Allstate/FSMB did request/harass/bribe/threaten Defendant Oetken into threatening Plaintiff Kaul with contempt of he did not dismiss the case. Plaintiff Kaul did not dismiss any of the cases, and on October 9, 2024 sued Defendant Oetken in K11-23 (**Exhibit 4**) and on January 6, 2025, he procured admissions of fact from Defendant Oetken (**Exhibit 5**).

**24.** As Plaintiff Kaul progressively filed cases, each one proceeded further towards discovery and trial, but **The Kaul Cases** Defendants violated every discovery order, claiming that Defendant Oetken's September 12, 2022 purported 'injunction' insulated them from discovery. In fact, in K11-20, on December 9, 2024 the district judge entered a 'SCHEDULING ORDER' (**Exhibit 6**), but it was violated by the K11-20 Defendants.

**25.** In the period from the January 7, 2025 dismissal of K11-20, a dismissal based on Defendant Oetken's K11-7 purported 'injunction', up to the April 11, 2025 issuance in K11-27 (filed April 9, 2025) of a July 9, 2025 Rule 16 conference, Defendant Oetken did, on May 8, 2025, publish to the K11-7 docket, a docket officially closed in October 2022 and never officially re-opened, an order (**Exhibit 7**) scheduling a knowingly illegal contempt hearing on June 17, 2025 for Plaintiff Kaul as to his alleged violations of Defendant Oetken's knowingly illegal September 12, 2022 K11-7 'injunction'.

**26.** Defendant Oetken, despite then being a Defendant in K11-23 and knowingly conflicted, a conflicted-ness known by all the lawyers who filed motions seeking to have him conduct a contempt hearing, did nonetheless schedule the knowingly illegal hearing. Evident in this scenario and the current planned re-attempt to conduct some Plaintiff Kaul eliminating scheme, is the fact that Defendant Oetken is for whatever reason so thoroughly compromised, both personally/professionally by **The Kaul Cases** Defendants, that there is no order they issue that he will or cannot refuse to obey.

**27.** The situation is of this magnitude for no judge would so compromise his life/career unless the consequences of non-compliance with **The Kaul Cases** Defendants mafia-like threats involved the threat of serious bodily injury and or death. It would be wiser/safer for Defendant Oetken to relinquish his career and save his life.

**28.** However, in response to Defendant Oetken's May 8, 2025 order re: the June 17, 2025 proposed hearing, Plaintiff Kaul did distribute notices to all relevant federal and judicial authorities/persons as to the illegality of Defendant Oetken's proposed June 17, 2025 hearing, and the illegality of any products of that hearing. The effect of these notices was to cause Defendant Oetken to not conduct the proposed June 17, 2025 hearing, a conflicted hearing that Plaintiff Kaul's non-attendance of which Defendant Oetken was explicitly informed.

**29.** And indeed, as reflected by the docket, no hearing was conducted, although on June 26, 2025 Defendant Lipman did misrepresent to in K11-27 that a hearing had been conducted (**Exhibit 8**). This lie was shown to be such by a filing submitted by Plaintiff Kaul on June 27, 2025 (**Exhibit 9**), but of note is the fact that the magistrate judge in K11-27 took no action against Defendant Lipman upon being noticed of his knowing fraud. Defendant Lipman was one of the lawyers who filed motions in K11-7 compelling a knowingly conflicted Defendant Oetken to schedule a contempt hearing, an act, the illegality of which Defendant Oetken could not have but known.

**30.** Compounding **The Kaul Cases** Defendants corruption within the Southern District of Texas in K11-27, was the fact that the magistrate judge (Richard W. Bennett) entered no sanctions or disciplinary orders against Defendant Lipman's June 26, 2025 violation of Plaintiff Kaul's civil rights, thus causing himself, pursuant to Section 1986 of the Civil Rights Act to become as liable for Defendant Lipman's violations of Plaintiff Kaul's human/civil/constitutional rights as if he had directly violated them himself.

**31.** These events caused Plaintiff Kaul to file complaints against Defendant Lipman and U.S.M.J. Bennett with the Texas/Pennsylvania State Bars. With the rising crescendo of these events in district courts in New York and Texas, and the failure/public humiliation of **The Kaul Cases** Defendants contempt hearing scheme, in conjunction with the New York State Attorney Grievance Committee's referral of Defendant Oetken to the disciplinary council of the United States Court of Appeals for the Second Circuit, **The Kaul Cases** Defendants reacted with anger towards Defendant Oetken.

**32.** The Kaul contempt/jailing scheme had failed and so there was conducted a meeting to discuss the options, bearing in mind that on June 27, 2025 the Supreme Court of the United States, in Trump v CASA, had held that district courts did not and never did have the authority to issue nationwide injunctions, a ruling that subsequent to that in Jarkesy v SEC: 22-859 (June 27, 2024), which rendered illegal Plaintiff Kaul's 2014 NJ jury-less article III judge free $475,000

'fine' imposing license revocation (ordered by **The Kaul Cases** Defendant, James Howard Solomon), then rendered illegal the September 12, 2022 purported K11-7 Defendant Oetken issued purported 'injunction'. The illegality of the NJ 2012/2014 license suspension/revocation did cause and continues to cause illegal ongoing**/"new"** injury to Plaintiff Kaul's life/liberty/property/reputation (4,863 days-worth: April 2, 2012 to July 26, 2025).

**33.** The enormity of the magnitude of the illegal ongoing injustice committed against the life/liberty/property/reputation and human/civil/constitutional rights of Plaintiff Kaul haunts **The Kaul Cases** Defendants day and night, and there is nothing they will not attempt to cause the elimination of Plaintiff Kaul.

**34.** Defendant Oetken remains subjugated to **The Kaul Cases** Defendants and for reasons, some known and some not, he has no option but to follow their orders. The scheme now underway will involve a soon to be filed motion by Defendant Heary's recently admitted lawyer who will seek to illegally re-use the fraudulent K11-7 docket in a further perpetration of the criminal conspiracy that has been conducted by Defendant Oetken and his co-defendants/conspirators since August 19, 2021 in the S.D.N.Y. in K11-7, the filing date of the case. A date never to be forgotten and forever regretted on the calendar of the Defendants notorious tactics in the '**Revocation-Cover-Up-Conspiracy'**.

# LEGAL CLAIMS

# RICO

**Association-In-Fact-Enterprise: OETKEN CHAMBERS-NORRIS MCLAUGHLIN-**

**MCELVANEY-SAIBER-GENOVA BURNS ("ONMSG-AIF-ENTERPRISE")**

**Defendants: Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli**

**Co-conspirators: Christie/Heary/Allstate/FSMB**

**RICO Predicate Acts: Wire Fraud/Bribery/Public Corruption/**

**Conspiracy/Extortion/Public Corruption/Threats**

**Overview**:

**35.** In a period commencing on or about January 22, 2025, Defendants

Oetken/Dwyer/Stolz/D'Aloia/Sponzilli, did form a sub-conspiracy within the '**Revocation-Cover-**

**Up-Conspiracy**' (2005-2025) that for the purposes of this Complaint and forthwith within **The**

**Kaul Cases** is identified as the '**Kaul Contempt Elimination Conspiracy'**, the elements of which

are described below:

**a**. Nature and Purpose – The '**Kaul Contempt Elimination Conspiracy'** was conceived of by the

Defendants/others in a period commencing in or around mid 2023, and was prompted by the

fact that Plaintiff Kaul had established the illegality of Defendant Oetken's September 12, 2022

purported 'injunction' in K11-7. And consequently was continuing to file and prosecute **The**

**Kaul Cases** in other district courts in the United States District Court that willingly and with

knowledge of Defendant Oetken's purported 'injunction' admited the cases. **The Kaul Cases**

Defendants and their lawyers, Defendants Dwyer/Stolz/D'Aloia/Sponzilli, in recognizing that

they could not directly and using legal methods prevent independent district judges from

adjudicating the cases, did create then '**Kaul Contempt Elimination Conspiracy',** in or around

16

mid 2023, with the initial purpose of having Defendant Oetken threaten Plaintiff Kaul with contempt if he did not dismiss the cases by a certain date. The Defendants did exchange information during their face-face meetings in their law offices and Defendant Oetken's chambers at the SDNY, and during these criminally purposed meetings that were conducted over the US wires, it was agreed upon that the issuance of contempt orders, although knowingly illegal, would cause Plaintiff Kaul to dismiss the cases.

The '**Kaul Contempt Elimination Conspiracy'** is a criminal racketeering conspiracy, conducted through the **"Oetken-Norris-McElvaney-Saiber-Genova- Association-In-Fact-Enterprise" ("ONMSG-AIF-ENTERPRISE")**, through which the Defendants/co-conspirators have perpetrated **"patterns of racketeering"** through the commission of the RICO predicate acts of, amongst other things, wire fraud/conspiracy/extortion/bribery/public corruption/threats, the purpose of which has been to cause a contempt related elimination of Plaintiff Kaul through jail and or death, under the 'cover' of the purported authority/jurisdiction of the Southern District of New York and Defendants law firms in the commission of a knowingly illegal and blatant criminal conspiracy, in which Defendants knew/know there exists nothing but evidence of criminal violations of the law and of Plaintiff Kaul's human/civil/constitutional rights. One sentence speaks the case.

**b.** Structure – The association-in-fact function of the **"ONMSG-AIF-ENTERPRISE"** stems from the manner of its genesis from a judge, a law chamber, lawyers and law firms who were caused to coalesce in their criminal conspiracy by a case, K11-7, filed in the Office of the Clerk of the Court in the United States District Court for the Southern District of New York on August 19, 2021. The case, involving undoubtedly high net-worth members of the medical, legal, political and business worlds was assigned to Defendant Oetken, a jurist whose practice involved instructing that such cases be diverted to his chambers for 'first refusal'. K11-7 was indeed funneled into Defendant Oetken's remit and was not refused, but admitted into his court with case number 21-CV-06992-JPO, a case absent an overseeing magistrate judge, but one, if legitimately tried would have required the assistance of a magistrate judge in the

administration of a not unexpected high work volume. Defendant Oetken and the Defendants, recognizing the 'value' of the case and the value of a dismissal and nationwide injunction, wanted no 'loose lips' and or 'prying eyes' on the crimes they knew they were about to commit, and so the associational element of the structure had to be constructed in silence and secrecy.

The perpetration of the crimes within the '**Revocation-Cover-Up-Conspiracy**' used the 'cover' of Defendants chambers/court and law offices, in order to attempt to maintain absolute secrecy. However, beneath the façade of seemingly legitimate legal authority, there was being conducted a criminal **"pattern of racketeering"** in which the structure of the channels of communication and transfer of bribes involved both on-shore and off-shore exchanges between publicly traded corporations, banks, financial institutions and a multitude of accounts and other entities of expense associated with parties associated up to the third-degree with the Defendants and their co-conspirators.

The structure, the forensic specifics of it and the nexus of exchange of information and material/non-material benefits and bribes is entirely traceable with the application of retrogression and retro/cross functional interlinking neural network AI models, even if deleted. Detection, pattern recognition and liability analysis are conducted by off-site frames and the recency of the facts of the '**Kaul Contempt Elimination Conspiracy'** and the relative recency of those of the '**Revocation-Cover-Up-Conspiracy**' will render depositions a simple confirmation process of digital fact. As to the non-digital communications and face-face conversations, the retroactive reconstruction modalities of AI based off the digital data will recreate those non-digital forms of communication with an accuracy sufficient for the inquisitor to simply 'fill in the gaps' and have the Defendants admit or deny their truth. The 'fishing expedition' days of yonder-years are rapidly disappearing in the early morning ocean mist of digital clarity.

c. Function – The principal purpose of the **"ONMSG-AIF-ENTERPRISE"** was and is to facilitate the perpetration of both the **Revocation-Cover-Up-Conspiracy**' and specifically the '**Kaul Contempt Elimination Conspiracy'** in secrecy and under 'cover' of the seeming authority and

jurisdiction of the district court and Defendants law firms, knowing that claims of attorney-client and judicial privilege would provide some initial protection against detection and exposure of the criminality of their schemes to have Plaintiff Kaul jailed and or killed. It would not be inaccurate to state that in or around 2021 (May 27, 2021 kidnapping) the subject matter of **The Kaul Cases** morphed from that pertaining to an illegal 2014 NJ license revocation to a scenario of judicial assisted assassination, in which the assassins were those with JD and MBA suffixes. In essence the **"ONMSG-AIF-ENTERPRISE"** was an illegally functioning but legally constituted 'hit machine'. A rogue element of the legal system.

## RICO Predicate Acts:

**36. Wire Fraud –** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint (**Exhibit 5**) and the January 6, 2025 admissions of fact (**Exhibit 6**), and are included in this Complaint as if set forth and pled within the Complaint.

**37. Bribery -** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**38. Public Corruption -** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**39. <u>Conspiracy</u>** - In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**40. <u>Extortion</u>** - In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**41. <u>Public Corruption</u>** - In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**42. <u>Threats</u>** - In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**43.** Defendant Allstate was the initiator of the scheme consequent to its long and obsessively practiced history of corruption of the political and judicial bodies of both state and federal government. Defendant Allstate's corruption and corrosion of the fabric of American society commenced in earnest in the late 1970s with the encouragement of Associate Justice Lewis F. Powell Jr, with the 1971 publication of the **"Powell Memorandum"** entitled **"Attack On**

**America Free Enterprise System"**. A critical summary by Senator Whitehouse of the destructive effects of Powell's pernicious philosophy is included (**Exhibit 10**), a philosophy that found traction in the 2010 decision in Citizen's United.

## Defendants Dwyer/Stolz/D'Aloia/Brown/Sponzilli Direct And Vicarious Liability

**44**. Pursuant to <u>United States v. Coonan, 938 F. 2d 1553 (2nd Circuit 1991</u>) and <u>Salinas v United States, 522 U.S. 52 (1997)</u>, and Plaintiff Kaul's aphorism of **"the crime of one becomes the crime of all"**, the liability of every offense/violation/crime committed and admitted by Defendant Oetken becomes the liability of Defendants Dwyer/Stolz/D'Aloia/Brown/Sponzilli as if they had actually/directly committed the crimes themselves. Thus, Defendant Oetken's Rule 8(b)(6) admissions as set forth in his January 6, 2025 'ADMISSIONS OF MATERIAL FACT' (**Exhibit 6**) and as admitted by his failure to deny the allegations/facts set forth in the October 9, 2024 K11-23 Complaint (**Exhibit 5**), a copy of which was served on him on October 16, 2024 in his chambers in the S.D.N.Y., the chambers constituting an element of the **"ONMSG-AIF-ENTERPRISE",** are the facts, the admissions of which now constitute the guilt of Defendants Dwyer/Stolz/D'Aloia/Brown/Sponzilli of the within levied racketeering/section 1983 charges.

21

# SECTION 1983

## Defendants: Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli

**45**. Section 1983 of the Civil Rights Act, originally known as the Ku Klux Klan Act of 1871, provides a legal mechanism whereby a person whose human/civil/constitutional rights are violated by a person or persons in which one of the individuals (Defendant Oetken) is a 'state actor' and has acted/communicated in concert with 'non-state actors' (Dwyer/Stolz/D'Aloia/Brown/Sponzilli), the acting/communicating/concerting of which converts the 'non-state actors' into 'state actors', who as a consequence then assume all the violation liabilities of the 'state actors' as if they were originally 'state actors' and had never been 'non-state actors'.

**47.** Thus, the following life/liberty/property rights and constitutional rights of Plaintiff Kaul were violated and continue to remain violated by Defendants Oetken/ Dwyer/Stolz/D'Aloia/Brown/Sponzilli.

48. All of the below deprivations/violations were perpetrated by/through/within the '**Revocation-Cover-Up-Conspiracy'** (2005-2025) and pursuant to RICO's doctrine of vicarious liability (see above), the liability of all the offenses/violations/crimes of the **Revocation-Cover-Up-Conspiracy'** of any Defendant becomes the liability of all Defendants regardless of when they entered or claimed to have departed the '**Revocation-Cover-Up-Conspiracy'.** Not dissimilar to the mafia's mantra of 'one way in, one way out'. Keeps things organized in the world of organized crime, of which Defendants' chambers/law offices are the most 'organized' of the 'organized'. No better 'cloak of crime' than that of the priest's habit/dog-collar or the black robe of the bench/JD insignia. In fact, and it must be stated that just as with the Catholic Church, the plague of judicial corruption is not unique to the S.D.N.Y. or Defendants Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli, but is a nationwide scourge that needs aggressive eradication of the principal perpetrators and elimination of the crime/corruption

coercing concept of so called 'life tenure'. An ongoing example of the immense human tragedy of this travesty is detailed in an appeal to the U.S.C.A. for the 5th Circuit by an innocent Indian physician wrongly incarcerated for twenty-one (21) years by a conflicted/corrupt district judge in the Eastern District of Louisiana (**Exhibit 12**).

**49**. Occasionally the power of the federal bench releases a deceiving aroma of omnipotence that the wiser, experienced and more spiritually attuned judicial souls recognize as forewarnings of a fall; a recognition they meet with humility and a re-realization that the bench demands its occupants protect the rights of the innocent, the weak, the afflicted, the poor, but most importantly the rights of the law. For the law is supreme and no one, neither judge nor president nor convicted criminal is above the law. It is never a wasted effort to be brought back to the initiating ideas and principles that undergird what for many in the world of law was once their raison d'etre.

Regardless, the facts/law do substantiate that:

**50.** In a period from 2008/2009 to the present, **The Kaul** Defendants, as 'state actors' did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the First Amendment of the United States Constitution.

**51**. In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as 'state actors' did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the Second Amendment of the United States Constitution.

**52.** In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the Fourth Amendment of the United States Constitution.

**53.** In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the <u>Fifth Amendment</u> of the United States Constitution.

**54.** In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the <u>Sixth Amendment</u> of the United States Constitution.

**55.** In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the <u>Eight Amendment</u> of the United States Constitution.

**56.** In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Kaul Plaintiff of his constitutional rights pursuant to the <u>Fourteenth Amendment</u> of the United States Constitution.

**57.** These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of his <u>livelihood</u>.

**58.** These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>business real estate</u>.

**59.** These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>personal real estate</u>.

**60**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his life earnings.

**61**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his pensions.

**62.** These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his financial investments.

**63**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his professional licenses.

**64**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his accounts receivable.

**65**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to due process.

**66**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to free speech.

**67.** These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to impartial tribunals/judges/courts.

**68.** These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to prosecute his claims.

**69**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to equal protection under the law.

**70**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to liberty.

**71.** These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of eleven (11) years of his life.

**72.** These deprivations/violations/injuries were willfully/maliciously perpetrated by private actors within/through/with the assistance of the executive/judicial apparatus of the American State.

**73**. These deprivations/violations/injuries were willfully/maliciously perpetrated by private actors within/through/with the assistance of the United States Bankruptcy Court.

**74.** These deprivations/violations/injuries were willfully/maliciously perpetrated by private actors within/through/with the assistance of the United States District Court.

**75**. These deprivations/violations/injuries were willfully/maliciously perpetrated by private actors within/through/with the assistance of the New York Stock Exchange.

**76**. These deprivations/violations/injuries were willfully/maliciously perpetrated by state actors within/through/with the assistance of the executive/judicial apparatus of the American State.

**77**. These deprivations/violations/injuries were willfully/maliciously perpetrated by state actors within/through/with the assistance of the United States Bankruptcy Court.

**78**. These deprivations/violations/injuries were willfully/maliciously perpetrated by state actors within/through/with the assistance of the <u>United States District Court</u>.

**79**. These deprivations/violations/injuries were willfully/maliciously perpetrated by state actors within/through/with the assistance of the <u>New York Stock Exchange</u>.

**80**. The commercial/communications nexus between state and private actors within **The Kaul Cases**, critical to the perpetration of the within pled schemes confers 'state actor' liability on all private actors as to the deprivations/violations/injuries caused to Plaintiff Kaul's <u>human/constitutional rights</u>.

**81**. The commercial/communications nexus between state and private actors within **The Kaul Cases**, critical to the perpetration of the within pled schemes confers 'state actor' liability on all private actors as to the deprivations/violations/injuries caused to all Plaintiff Kaul's <u>property rights</u>, as stated above.

**82**. **The Kaul Cases** Defendants were and are motivated to commit and continue to commit these deprivations/violations/injuries to Plaintiff Kaul's <u>human/constitutional/property rights</u>.

**83**. The motivation is based on **The Kaul Cases** Defendants scheme to prevent Plaintiff Kaul from exposing their crimes, including those of <u>defrauding the global equities market</u>.

## CONCLUSION AND RELIEF

Had Plaintiff Kaul not invented  and successfully performed the first percutaneous spinal fusion in 2005, an element of his life path, it can be safely assumed, would not have found its way into the Southern District of New York or in fact any district courts of the United States District Court. An act of inventive spark in 2005 caused, to use a California analogy, a nationwide legal inferno in 2025, that has been 'fanned' and fueled by corrupt lawyers, corrupt judges, corrupt insurance executives, corrupt politicians and a corrupt media. And in the twenty (20) years of the ' '**Revocation-Cover-Up-Conspiracy'**, Plaintiff Kaul came to wonder when truth had departed to seek more conducive and deserving climes in other enclaves of the planet. But even in those moments, Plaintiff Kaul, being uninformed of the **"Powell Memorandum"** and the philosophical forces from which it emanated, had no idea that courts, those 'church-like' places of supposed sanctity, solemnity and irreproachability had at some tragic point in American history become reservoirs, generators and conduits for the criminal enterprises of certain wealthy/powerful sectors and persons of the corporate and political elements of the fundamental fabric of America. The words republic and democracy became 'shells' of their former selves and a dictatorial admixture of corporate theocracy and political fundamentalism seeped in to the crevices of the American experiment, proving right the European naysayers of the 16/17/18 hundreds that the experiment would fail not because of a genuine desire to make it work, but because of the **"Selfish Gene"** that history has arguably shown contributes to human survival. Darwin (1859-Royal College) foretold it and Dawkins (1976-Oxford) reframed and genetically refocused it.

But the church accepted the wickedness of its lost way, and underwent massive global reforms orchestrated from the Vatican by God's earthly emissary. Catholic judges/politicians occupy a not unsubstantial part of the American judiciary and political bodies, and are thus no strangers to reform. Just as reform was imposed on the Catholic Church in America, a reformation in which its members willingly cooperated, so must there be a reformation of the American Court, and as Plaintiff Kaul has argued, is arguing and will continue to argue, the starting point is the

application and enforcement of the Seventh Amendment related principles/holdings of the Supreme Court of the United States in <u>SEC v Jarkesy: 22-859</u> (June 27, 2024) as to the requirement of a jury and an article III judge when a deprivation of a person's life/liberty/property/reputation is at stake. These illegal conditions engulfed the illegal 2014 NJ jury-less article III judge free $475,000 'fine' imposing revocation of Plaintiff Kaul's NJ medical license, an illegal revocation that was caused because of the anti-competitive violations/human rights violations perpetrated by **The Kaul Cases** Defendants against Plaintiff Kaul because of his 2005 percutaneous spinal fusion invention.

Defendants Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli are guilty of the within charges, the facts of which were committed and perpetrated through the judicial apparatus of the S.D.N.Y., converting it into a **"racketeering enterprise"** and Defendants Oetken/ Dwyer/Stolz/D'Aloia/Brown/Sponzilli into a law degree enabled racketeers.

## THE IMMEDIATE AND PERMANENT CLOSURE OF THE K11-17 DOCKET

But what renders this entire scenario of unmitigated mafia-like crime as evidence of a massive ongoing criminal conspiracy is the fact that Defendant Oetken, despite having been sued in K11-18/K11-23/K11-28 and admitting to the facts of his offenses/violations/crimes on January 6, 2025 in K11-23, and being referred by the NYS State Bar to the disciplinary committee of the U.S.C.A. for the Second Circuit, continues to perpetrate the '**Revocation-Cover-Up-Conspiracy'** by not only permitting lawyers to make appearances on a docket that was officially closed in October 2022 and never re-opened, but to illegally enter orders/hearings himself that are purposed to attempt to prevent him from administrative/civil/criminal prosecutions in other matters and jurisdictions. The June 27, 2025 decision by SCOTUS in <u>Trump v CASA</u>  (**Exhibit 1**) proves that his September 12, 2022 purported 'injunction' was illegal not only for being the admitted product of bribery, but because, as set forth in the SCOTUS June 27, 2025 opinion, it had never been permitted by the law in the history of the Republic, and was thus illegal, a 'Fraud on the Court' as I have been claiming almost for the moment it was issued.  Defendant

Oetken, and thus **The Kaul Cases** Defendants offenses/violations/crimes violated Plaintiff Kaul's rights in K11-10-SDNY/K11-14-SDF/K11-15-SDF/K11-17-EDNC/K11-20-SDT (2023-2025) causing further compensable injuries/damages to my life/liberty/property/reputation and human/civil/constitutional rights. <u>If any further lawyers/Defendant Oetken make any entries on the K11-7, they will be sued by Plaintiff Kaul for violating his human/civil/constitutional rights and will liable for further monetary injuries</u> **AND** Complaints will continue to be filed with the NYS Attorney Grievance Committee/others until compliance with the law/orders in all courts across the country is achieved or law licenses, law careers and liberty are lost.

A lawyer/judge who has conspired with his client to commit/perpetuate crime, the '**Revocation-Cover-Up-Conspiracy'** is a criminal and there exist no privileges that protect any element, however old, of that conglomeration of racketeering/anti-trust/public corruption crime woven over decades under cover of court and law.

Defendant Oetken's continued perpetration of a criminal conspiracy in the S.D.N.Y. and the notification of this fact to the court, the judges and the staff does, pursuant to Section 1986 cause them to become liable to suit. In prior years/times, this type of corruption might have gone un-investigated and undisciplined consequent to the amalgamation of lawyers/judges/politicians across the political spectrum. That exists no more and Defendant Oetken must be removed from the bench, a dismissal, the proceedings of which will expose corruption already in the sights of DOGE.

Plaintiff Kaul asserts that based in the above evidence/facts/law/argument the **K11-7 docket is immediately closed with orders to the Clerk of the Court to permit no further filings**, and that Defendants Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli are referred to the NY/PA/NJ/DC state bars.

Plaintiff Kaul also requests the immediate entry a Rule 26 conference and a Rule 16 conference scheduled within a month.

Plaintiff Kaul demands CONSEQUENTIAL/COMPENSATORY/PUNITIVE damages from Defendants Dwyer/Stolz/D'Aloia/Brown/Sponzilli and Defendant Oetken in his personal capacity.

Plaintiff Kaul demands a public apology from all Defendants and the immediate reinstatement of his illegally revoked New Jersey medical license.

In certify that the above statements are true and accurate to the best of my knowledge.

DATED: JULY 27, 2025

_____

RICHARD ARJUN KAUL, MD

# APPENDIX C

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SECURITIES AND EXCHANGE COMMISSION *v.* JARKESY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 22–859.   Argued November 29, 2023—Decided June 27, 2024

In the aftermath of the Wall Street Crash of 1929, Congress passed a suite of laws designed to combat securities fraud and increase market transparency.  Three such statues are relevant: The Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940.  These Acts respectively govern the registration of securities, the trading of securities, and the activities of investment advisers.  Although each regulates different aspects of the securities markets, their pertinent provisions—collectively referred to by regulators as "the antifraud provisions," App. to Pet. for Cert. 73a, 202a—target the same basic behavior: misrepresenting or concealing material facts.

To enforce these Acts, Congress created the Securities and Exchange Commission.  The SEC may bring an enforcement action in one of two forums.  It can file suit in federal court, or it can adjudicate the matter itself.  The forum the SEC selects dictates certain aspects of the litigation.  In federal court, a jury finds the facts, an Article III judge presides, and the Federal Rules of Evidence and the ordinary rules of discovery govern the litigation.  But when the SEC adjudicates the matter in-house, there are no juries.  The Commission presides while its Division of Enforcement prosecutes the case.  The Commission or its delegee—typically an Administrative Law Judge—also finds facts and decides discovery disputes, and the SEC's Rules of Practice govern.

One remedy for securities violations is civil penalties.  Originally, the SEC could only obtain civil penalties from unregistered investment advisers in federal court.  Then, in 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act.  The Act authorized the SEC to impose such penalties through its own in-house

Syllabus

proceedings.

Shortly after passage of the Dodd-Frank Act, the SEC initiated an enforcement action for civil penalties against investment adviser George Jarkesy, Jr., and his firm, Patriot28, LLC for alleged violations of the "antifraud provisions" contained in the federal securities laws. The SEC opted to adjudicate the matter in-house. As relevant, the final order determined that Jarkesy and Patriot28 had committed securities violations and levied a civil penalty of $300,000. Jarkesy and Patriot28 petitioned for judicial review. The Fifth Circuit vacated the order on the ground that adjudicating the matter in-house violated the defendants' Seventh Amendment right to a jury trial.

*Held*: When the SEC seeks civil penalties against a defendant for securities fraud, the Seventh Amendment entitles the defendant to a jury trial. Pp. 6–27.

(a) The question presented by this case—whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties for securities fraud—is straightforward. Following the analysis set forth in *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, and *Tull* v. *United States*, 481 U. S. 412, this action implicates the Seventh Amendment because the SEC's antifraud provisions replicate common law fraud. And the "public rights" exception to Article III jurisdiction does not apply, because the present action does not fall within any of the distinctive areas involving governmental prerogatives where the Court has concluded that a matter may be resolved outside of an Article III court, without a jury.

(b) The Court first explains why this action implicates the Seventh Amendment.

(1) The right to trial by jury is "of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right" has always been and "should be scrutinized with the utmost care." *Dimick* v. *Schiedt*, 293 U. S. 474, 486. When the British attempted to evade American juries by siphoning adjudications to juryless admiralty, vice admiralty, and chancery courts, the Americans protested and eventually cited the British practice as a justification for declaring Independence. In the Revolution's aftermath, concerns that the proposed Constitution lacked a provision guaranteeing a jury trial right in civil cases was perhaps the "most success[ful]" critique leveled against the document during the ratification debates. The Federalist No. 83, p. 495. To fix that flaw, the Framers promptly adopted the Seventh Amendment. Ever since, "every encroachment upon [the jury trial right] has been watched with great jealousy." *Parsons* v. *Bedford*, 3 Pet. 433, 446. Pp. 7–8.

(2) The Seventh Amendment guarantees that in "[s]uits at common law . . . the right of trial by jury shall be preserved." The right

Syllabus

itself is not limited to the "common-law forms of action recognized"
when the Seventh Amendment was ratified.  *Curtis* v. *Loether*, 415
U. S. 189, 193.  Rather, it "embrace[s] all suits which are not of equity
or admiralty jurisdiction, whatever may be the peculiar form which
they may assume."  *Parsons*, 3 Pet., at 447.  That includes statutory
claims that are "legal in nature."  *Granfinanciera*, 492 U. S., at 53.
To determine whether a suit is legal in nature, courts must consider
whether the cause of action resembles common law causes of action,
and whether the remedy is the sort that was traditionally obtained in
a court of law.  Of these factors, the remedy is the more important.
And in this case, the remedy is all but dispositive.  For respondents'
alleged fraud, the SEC seeks civil penalties, a form of monetary relief.
Such relief is legal in nature when it is designed to punish or deter the
wrongdoer rather than solely to "restore the status quo."  *Tull*, 481
U. S., at 422.  The Acts condition the availability and size of the civil
penalties available to the SEC based on considerations such as culpa-
bility, deterrence, and recidivism.  See §§77h–1; 78u–2, 80b–3.  These
factors go beyond restoring the status quo and so are legal in nature.
The SEC is also not obligated to use civil penalties to compensate vic-
tims.  SEC civil penalties are thus "a type of remedy at common law
that could only be enforced in courts of law."  *Tull*, 481 U. S., at 422.
This suit implicates the Seventh Amendment right and a defendant
would be entitled to a jury on these claims.

The close relationship between federal securities fraud and common
law fraud confirms that conclusion.  Both target the same basic con-
duct: misrepresenting or concealing material facts.  By using "fraud"
and other common law terms of art when it drafted the federal securi-
ties laws, Congress incorporated common law fraud prohibitions into
those laws.  This Court therefore often considers common law fraud
principles when interpreting federal securities law.  See, *e.g., Dura
Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 343–344.  While fed-
eral securities fraud and common law fraud are not identical, the close
relationship between the two confirms that this action is "legal in na-
ture."  *Granfinanciera*, 492 U. S., at 53.  Pp. 8–13.

(c) Because the claims at issue here implicate the Seventh Amend-
ment, a jury trial is required unless the "public rights" exception ap-
plies.  Under this exception, Congress may assign the matter for deci-
sion to an agency without a jury, consistent with the Seventh
Amendment.  For the reasons below, the exception does not apply.
Pp. 13–27.

(1) The Constitution prevents Congress from "withdraw[ing] from
judicial cognizance any matter which, from its nature, is the subject of
a suit at the common law."  *Murray's Lessee* v. *Hoboken Land & Im-
provement Co.*, 18 How. 272, 284.  Once such a suit "is brought within

the bounds of federal jurisdiction," an Article III court must decide it, with a jury if the Seventh Amendment applies. *Stern* v. *Marshall*, 564 U. S. 462, 484. On that basis, this Court has repeatedly explained that matters concerning private rights may not be removed from Article III courts. See, *e.g., Murray's Lessee,* 18 How., at 284. If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory. *Stern*, 564 U. S., at 484.

The Court also recognizes a class of cases concerning "public rights." Such matters "historically could have been determined exclusively by [the executive and legislative] branches." *Id.,* at 493 (internal quotation marks omitted). No involvement by an Article III court in the initial adjudication of public rights claims is necessary. Certain categories that have been recognized as falling within the exception include matters concerning: the collection of revenue; aspects of customs law; immigration law; relations with Indian tribes; the administration of public lands; and the granting of public benefits. The Court's opinions governing this exception have not always spoken in precise terms. But "even with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 69, n. 23 (plurality opinion). Pp. 13–18.

(2) In *Granfinanciera*, this Court previously considered whether the Seventh Amendment guarantees the right to a jury trial "in the face of Congress' decision to allow a non-Article III tribunal to adjudicate" a statutory "fraud claim." 492 U. S., at 37, 50. The issue was whether Congress's designation of fraudulent conveyance actions as "core [bankruptcy] proceedings" authorized non-Article III bankruptcy judges to hear them without juries. *Id.*, at 50. The Court held that the designation was not permissible, even under the public rights exception. To determine whether the claim implicated the Seventh Amendment, the Court applied the principles distilled in *Tull.* Surveying English cases and considering the remedy these suits provided, the Court concluded that fraudulent conveyance actions were "quintessentially suits at common law." *Granfinanciera*, 492 U. S., at 56. Because these actions were akin to "suits at common law" and were not "closely intertwined" with the bankruptcy process, the Court held that the public rights exception did not apply, and a jury was required. *Id.,* at 54, 56. Pp. 19–20.

(3) *Granfinanciera* effectively decides this case. The action here was brought under the "anti-fraud provisions" of the federal securities laws and provide civil penalties that can "only be enforced in courts of law." *Tull*, 481 U. S., at 422. They target the same basic conduct as

Syllabus

common law fraud, employ the same terms of art, and operate pursuant to similar legal principles. In short, this action involves a "matter[ ] of private rather than public right." *Granfinanciera*, 492 U. S., at 56. Pp. 20–21.

(4) The SEC claims that the public rights exception applies because Congress created "new statutory obligations, impose[d] civil penalties for their violation, and then commit[ted] to an administrative agency the function of deciding whether a violation ha[d] in fact occurred." Brief for Petitioner 21. *Granfinanciera* does away with much of the SEC's argument. Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal." 492 U. S., at 52. The SEC's argument that *Granfinanciera* does not apply because the Government is the party bringing this action also fails. What matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled. *Northern Pipeline Constr. Co.*, 458 U. S., at 69 n. 23 (plurality opinion). Pp. 21–22.

(5) The Court's opinion in *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, is not to the contrary. The litigation in that case arose under the Occupational Health and Safety Act. Facing agency enforcement actions, two employers alleged that the agency's adjudicatory authority violated the Seventh Amendment. See *id.,* at 448–449. The Court concluded that Congress could assign the OSH Act adjudications to an agency because the claims involved "a new cause of action, and remedies therefor, unknown to the common law." *Id.,* at 461. The cases *Atlas Roofing* relied upon applied the "public rights" exception to actions that were "'not . . . suit[s] at common law or in the nature of such . . . suit[s].'" *Id.,* at 453. *Atlas Roofing* therefore does not apply here, where the statutory claim is "'in the nature of'" a common law suit. *Id.,* at 453. Later rulings also foreclose reading *Atlas Roofing* as the SEC does. This Court clarified in *Tull* that the Seventh Amendment does apply to novel statutory regimes, so long as the statutory claims are akin to common law claims. See 481 U. S., at 421–423. And the Court has explained that the public rights exception does not apply automatically whenever Congress assigns a matter to an agency for adjudication. See *Granfinanciera*, 492 U. S., at 52. Pp. 22–27.

The Court does not reach the remaining issues in this case.

34 F. 4th 446, affirmed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. GORSUCH, J., filed a concurring opinion, in which THOMAS, J., joined. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined.

Cite as: 603 U. S. ____ (2024)     1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 22–859

––––––––––

## SECURITIES AND EXCHANGE COMMISSION, PETITIONER *v.* GEORGE R. JARKESY, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2024]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In 2013, the Securities and Exchange Commission initiated an enforcement action against respondents George Jarkesy, Jr., and Patriot28, LLC, seeking civil penalties for alleged securities fraud. The SEC chose to adjudicate the matter in-house before one of its administrative law judges, rather than in federal court where respondents could have proceeded before a jury. We consider whether the Seventh Amendment permits the SEC to compel respondents to defend themselves before the agency rather than before a jury in federal court.

I

A

In the aftermath of the Wall Street Crash of 1929, Congress passed a suite of laws designed to combat securities fraud and increase market transparency. Three such statues are relevant here: The Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. 48 Stat. 74, 15 U. S. C. §§77a *et seq.*; 48 Stat.

Opinion of the Court

881, 78a *et seq.*; 54 Stat. 847, 80b–1 *et seq.* These Acts respectively govern the registration of securities, the trading of securities, and the activities of investment advisers. Their protections are mutually reinforcing and often overlap. See *Lorenzo* v. *SEC*, 587 U. S. 71, 80 (2019). Although each regulates different aspects of the securities markets, their pertinent provisions—collectively referred to by regulators as "the antifraud provisions," App. to Pet. for Cert. 73a, 202a—target the same basic behavior: misrepresenting or concealing material facts.

The three antifraud provisions are Section 17(a) of the Securities Act, Section 10(b) of the Securities Exchange Act, and Section 206 of the Investment Advisers Act. Section 17(a) prohibits regulated individuals from "obtain[ing] money or property by means of any untrue statement of a material fact," as well as causing certain omissions of material fact. 15 U. S. C. §77q(a)(2). As implemented by Rule 10b–5, Section 10(b) prohibits using "any device, scheme, or artifice to defraud," making "untrue statement[s] of . . . material fact," causing certain material omissions, and "engag[ing] in any act . . . which operates or would operate as a fraud." 17 CFR §240.10b–5 (2023); see 15 U. S. C. §78j(b). And finally, Section 206(b), as implemented by Rule 206(4)–8, prohibits investment advisers from making "any untrue statement of a material fact" or engaging in "fraudulent, deceptive, or manipulative" acts with respect to investors or prospective investors. 17 CFR §§275.206(4)–8(a)(1), (2); see 15 U. S. C. §80b–6(4).

To enforce these Acts, Congress created the SEC. The SEC may bring an enforcement action in one of two forums. First, the Commission can adjudicate the matter itself. See §§77h–1, 78u–2, 78u–3, 80b–3. Alternatively, it can file a suit in federal court. See §§77t, 78u, 80b–9. The SEC's choice of forum dictates two aspects of the litigation: The procedural protections enjoyed by the defendant, and the remedies available to the SEC.

Opinion of the Court

Procedurally, these forums differ in who presides and makes legal determinations, what evidentiary and discovery rules apply, and who finds facts. Most pertinently, in federal court a jury finds the facts, depending on the nature of the claim. See U. S. Const., Amdt. 7. In addition, a life-tenured, salary-protected Article III judge presides, see Art. III, §1, and the litigation is governed by the Federal Rules of Evidence and the ordinary rules of discovery.

Conversely, when the SEC adjudicates the matter in-house, there are no juries. Instead, the Commission presides and finds facts while its Division of Enforcement prosecutes the case. The Commission may also delegate its role as judge and factfinder to one of its members or to an administrative law judge (ALJ) that it employs. See 15 U. S. C. §78d–1. In these proceedings, the Commission or its delegee decides discovery disputes, see, *e.g.*, 17 CFR §201.232(b), and the SEC's Rules of Practice govern, see 17 CFR §201.100 *et seq.* The Commission or its delegee also determines the scope and form of permissible evidence and may admit hearsay and other testimony that would be inadmissible in federal court. See §§201.320, 201.326.

When a Commission member or an ALJ presides, the full Commission can review that official's findings and conclusions, but it is not obligated to do so. See §201.360; 15 U. S. C. §78d–1. Judicial review is also available once the proceedings have concluded. See §§77i(a), 78y(a)(1), 80b–13(a). But such review is deferential. By law, a reviewing court must treat the agency's factual findings as "conclusive" if sufficiently supported by the record, *e.g.*, §78y(a)(4); see *Richardson* v. *Perales*, 402 U. S. 389, 401 (1971), even when they rest on evidence that could not have been admitted in federal court.

The remedy at issue in this case, civil penalties, also originally depended upon the forum chosen by the SEC. Except in cases against registered entities, the SEC could obtain civil penalties only in federal court. See Insider Trading

Opinion of the Court

Sanctions Act of 1984, §2, 98 Stat. 1264; Securities Enforcement Remedies and Penny Stock Reform Act of 1990, §§101, 201–202, 104 Stat. 932–933, 935–938.  That is no longer so. In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), 124 Stat. 1376.  That Act "ma[de] the SEC's authority in administrative penalty proceedings coextensive with its authority to seek penalties in Federal court."  H. R. Rep. No. 111–687, p. 78 (2010).  In other words, the SEC may now seek civil penalties in federal court, or it may impose them through its own in-house proceedings.  See Dodd-Frank Act, §929P(a), 124 Stat. 1862–1864 (codified in relevant part as amended at 15 U. S. C. §§77h–1(g), 78u–2(a), 80b–3(i)(1)).

Civil penalties rank among the SEC's most potent enforcement tools.  These penalties consist of fines of up to $725,000 per violation.  See §§77h–1(g), 78u–2, 80b–3(i). And the SEC may levy these penalties even when no investor has actually suffered financial loss.  See *SEC* v. *Blavin*, 760 F. 2d 706, 711 (CA6 1985) (*per curiam*).

B

Shortly after passage of the Dodd-Frank Act, the SEC began investigating Jarkesy and Patriot28 for securities fraud.  Between 2007 and 2010, Jarkesy launched two investment funds, raising about $24 million from 120 "accredited" investors—a class of investors that includes, for example, financial institutions, certain investment professionals, and high net worth individuals.  App. to Pet. for Cert. 72a–73a, 110a, n. 72; see 17 CFR §230.501.  Patriot28, which Jarkesy managed, served as the funds' investment adviser. According to the SEC, Jarkesy and Patriot28 misled investors in at least three ways: (1) by misrepresenting the investment strategies that Jarkesy and Patriot28 employed, (2) by lying about the identity of the funds' auditor and prime broker, and (3) by inflating the funds' claimed value

so that Jarkesy and Patriot28 could collect larger management fees. App. to Pet. for Cert. 80a–86a, 95a–105a. The SEC initiated an enforcement action, contending that these actions violated the antifraud provisions of the Securities Act, the Securities Exchange Act, and the Investment Advisers Act, and sought civil penalties and other remedies.

Relying on the new authority conferred by the Dodd-Frank Act, the SEC opted to adjudicate the matter itself rather than in federal court. In 2014, the presiding ALJ issued an initial decision. *Id.*, at 155a–225a. The SEC reviewed the decision and then released its final order in 2020. *Id.*, at 71a–154a. The final order levied a civil penalty of $300,000 against Jarkesy and Patriot28, directed them to cease and desist committing or causing violations of the antifraud provisions, ordered Patriot28 to disgorge earnings, and prohibited Jarkesy from participating in the securities industry and in offerings of penny stocks. *Id.*, at 152a–154a.

Jarkesy and Patriot28 petitioned for judicial review. 34 F. 4th 446, 450 (CA5 2022). A divided panel of the Fifth Circuit granted their petition and vacated the final order. *Id.*, at 449–450. Applying a two-part test from *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33 (1989), the panel held that the agency's decision to adjudicate the matter in-house violated Jarkesy's and Patriot28's Seventh Amendment right to a jury trial. 34 F. 4th, at 451. First, the panel determined that because these SEC antifraud claims were "akin to [a] traditional action[] in debt," a jury trial would be required if this case were brought in an Article III court. *Id.*, at 454; see *id.*, at 453–455. It then considered whether the "public rights" exception applied. That exception permits Congress, under certain circumstances, to assign an action to an agency tribunal without a jury, consistent with the Seventh Amendment. See *id.*, at 455–459. The panel concluded that the exception did not apply, and that therefore the case should have been brought in federal court,

where a jury could have found the facts pertinent to the defendants' fraud liability. Based on this Seventh Amendment violation, the panel vacated the final order. *Id.*, at 459.

It also identified two further constitutional problems. First, it determined that Congress had violated the nondelegation doctrine by authorizing the SEC, without adequate guidance, to choose whether to litigate this action in an Article III court or to adjudicate the matter itself. See *id.*, at 459–463. The panel also found that the insulation of the SEC ALJs from executive supervision with two layers of for-cause removal protections violated the separation of powers. See *id.*, at 463–466. Judge Davis dissented. *Id.*, at 466–479. The Fifth Circuit denied rehearing en banc, 51 F. 4th 644 (2022), and we granted certiorari, 600 U. S. ___ (2023).

## II

This case poses a straightforward question: whether the Seventh Amendment entitles a defendant to a jury trial when the SEC seeks civil penalties against him for securities fraud. Our analysis of this question follows the approach set forth in *Granfinanciera* and *Tull* v. *United States*, 481 U. S. 412 (1987). The threshold issue is whether this action implicates the Seventh Amendment. It does. The SEC's antifraud provisions replicate common law fraud, and it is well established that common law claims must be heard by a jury.

Since this case does implicate the Seventh Amendment, we next consider whether the "public rights" exception to Article III jurisdiction applies. This exception has been held to permit Congress to assign certain matters to agencies for adjudication even though such proceedings would not afford the right to a jury trial. The exception does not apply here because the present action does not fall within

any of the distinctive areas involving governmental prerogatives where the Court has concluded that a matter may be resolved outside of an Article III court, without a jury. The Seventh Amendment therefore applies and a jury is required. Since the answer to the jury trial question resolves this case, we do not reach the nondelegation or removal issues.

### A

We first explain why this action implicates the Seventh Amendment.

### 1

The right to trial by jury is "of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right" has always been and "should be scrutinized with the utmost care." *Dimick* v. *Schiedt*, 293 U. S. 474, 486 (1935). Commentators recognized the right as "the glory of the English law," 3 W. Blackstone, Commentaries on the Laws of England 379 (8th ed. 1778) (Blackstone), and it was prized by the American colonists. When the English began evading American juries by siphoning adjudications to juryless admiralty, vice admiralty, and chancery courts, Americans condemned Parliament for "subvert[ing] the rights and liberties of the colonists." Resolutions of the Stamp Act Congress, Art. VIII (Oct. 19, 1765), reprinted in Sources of Our Liberties 270, 271 (R. Perry & J. Cooper eds. 1959). Representatives gathered at the First Continental Congress demanded that Parliament respect the "great and inestimable privilege of being tried by their peers of the vicinage, according to the [common] law." 1 Journals of the Continental Congress, 1774–1789, p. 69 (Oct. 14, 1774) (W. Ford ed. 1904). And when the English continued to try Americans without juries, the Founders cited the practice as a justification for

severing our ties to England.  See Declaration of Independence ¶20; see generally *Erlinger* v. *United States*, 602 U. S. ___, ___–___ (2024).

In the Revolution's aftermath, perhaps the "most success[ful]" critique leveled against the proposed Constitution was its "want of a . . . provision for the trial by jury in civil cases."  The Federalist No. 83, p. 495 (C. Rossiter ed. 1961) (A. Hamilton) (emphasis deleted).  The Framers promptly adopted the Seventh Amendment to fix that flaw.  In so doing, they "embedded" the right in the Constitution, securing it "against the passing demands of expediency or convenience." *Reid* v. *Covert*, 354 U. S. 1, 10 (1957) (plurality opinion).  Since then, "every encroachment upon it has been watched with great jealousy." *Parsons* v. *Bedford*, 3 Pet. 433, 446 (1830).

### 2

By its text, the Seventh Amendment guarantees that in "[s]uits at common law, . . . the right of trial by jury shall be preserved."  In construing this language, we have noted that the right is not limited to the "common-law forms of action recognized" when the Seventh Amendment was ratified. *Curtis* v. *Loether*, 415 U. S. 189, 193 (1974).  As Justice Story explained, the Framers used the term "common law" in the Amendment "in contradistinction to equity, and admiralty, and maritime jurisprudence." *Parsons*, 3 Pet., at 446.  The Amendment therefore "embrace[s] all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume." *Id.*, at 447.

The Seventh Amendment extends to a particular statutory claim if the claim is "legal in nature." *Granfinanciera*, 492 U. S., at 53.  As we made clear in *Tull*, whether that claim is statutory is immaterial to this analysis.  See 481 U. S., at 414–415, 417–425.  In that case, the Government sued a real estate developer for civil penalties in federal

Opinion of the Court

court. The developer responded by invoking his right to a jury trial. Although the cause of action arose under the Clean Water Act, the Court surveyed early cases to show that the statutory nature of the claim was not legally relevant. "Actions by the Government to recover civil penalties under statutory provisions," we explained, "historically ha[d] been viewed as [a] type of action in debt requiring trial by jury." *Id.*, at 418–419. To determine whether a suit is legal in nature, we directed courts to consider the cause of action and the remedy it provides. Since some causes of action sound in both law and equity, we concluded that the remedy was the "more important" consideration. *Id.*, at 421 (brackets and internal quotation marks omitted); see *id.*, at 418–421.

In this case, the remedy is all but dispositive. For respondents' alleged fraud, the SEC seeks civil penalties, a form of monetary relief. While monetary relief can be legal or equitable, money damages are the prototypical common law remedy. See *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 255 (1993). What determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to "restore the status quo." *Tull*, 481 U. S., at 422. As we have previously explained, "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." *Austin* v. *United States*, 509 U. S. 602, 610 (1993) (internal quotation marks omitted). And while courts of equity could order a defendant to return unjustly obtained funds, only courts of law issued monetary penalties to "punish culpable individuals." *Tull*, 481 U. S., at 422. Applying these principles, we have recognized that "civil penalt[ies are] a type of remedy at common law that could only be enforced in courts of law." *Ibid.* The same is true here.

To start, the Securities Exchange Act and the Investment

Opinion of the Court

Advisers Act condition the availability of civil penalties on six statutory factors: (1) whether the alleged misconduct involved fraud, deceit, manipulation, or deliberate or reckless disregard for regulatory requirements, (2) whether it caused harm, (3) whether it resulted in unjust enrichment, accounting for any restitution made, (4) whether the defendant had previously violated securities laws or regulations, or had previously committed certain crimes, (5) the need for deterrence, and (6) other "matters as justice may require." §§78u–2(c), 80b–3(i)(3). Of these, several concern culpability, deterrence, and recidivism. Because they tie the availability of civil penalties to the perceived need to punish the defendant rather than to restore the victim, such considerations are legal rather than equitable.

The same is true of the criteria that determine the size of the available remedy. The Securities Act, the Securities Exchange Act, and the Investment Advisers Act establish three "tiers" of civil penalties. See §§77h–1(g)(2), 78u–2(b), 80b–3(i)(2). Violating a federal securities law or regulation exposes a defendant to a first tier penalty. A second tier penalty may be ordered if the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard for regulatory requirements. Finally, if those acts also resulted in substantial gains to the defendant or losses to another, or created a "significant risk" of the latter, the defendant is subject to a third tier penalty. Each successive tier authorizes a larger monetary sanction. See *ibid.*

Like the considerations that determine the availability of civil penalties in the first place, the criteria that divide these tiers are also legal in nature. Each tier conditions the available penalty on the culpability of the defendant and the need for deterrence, not the size of the harm that must be remedied. Indeed, showing that a victim suffered harm is not even required to advance a defendant from one tier to the next. Since nothing in this analysis turns on "restor[ing] the status quo," *Tull*, 481 U. S., at 422, these factors

Opinion of the Court

show that these civil penalties are designed to be punitive.

The final proof that this remedy is punitive is that the SEC is not obligated to return any money to victims. See *id.*, at 422–423. Although the SEC can choose to compensate injured shareholders from the civil penalties it collects, see 15 U. S. C. §7246(a), it admits that it is not required to do so, see App. to Pet. for Cert. 124a, n. 116 (citing 17 CFR §201.1100). Such a penalty by definition does not "restore the status quo" and can make no pretense of being equitable. *Tull*, 481 U. S., at 422.

In sum, the civil penalties in this case are designed to punish and deter, not to compensate. They are therefore "a type of remedy at common law that could only be enforced in courts of law." *Ibid.* That conclusion effectively decides that this suit implicates the Seventh Amendment right, and that a defendant would be entitled to a jury on these claims. See *id.*, at 421–423.

The close relationship between the causes of action in this case and common law fraud confirms that conclusion. Both target the same basic conduct: misrepresenting or concealing material facts. Compare 15 U. S. C. §§77q(a)(2), 78j(b), 80b–6(4); 17 CFR §§240.10b–5(b), 275.206(4)–8(a)(1), with Restatement (Third) of Torts: Liability for Economic Harm, §§9, 13 (2018); see also, *e.g.*, *Pauwels* v. *Deloitte LLP*, 83 F. 4th 171, 189–190 (CA2 2023) (identifying the elements of common law fraud under New York law); *Conroy* v. *Regents of Univ. of Cal.*, 45 Cal. 4th 1244, 1254–1255, 203 P. 3d 1127, 1135 (2009) (same for California law); *Wesdem, L.L.C.* v. *Illinois Tool Works, Inc.*, 70 F. 4th 285, 291 (CA5 2023) (same for Texas law). That is no accident. Congress deliberately used "fraud" and other common law terms of art in the Securities Act, the Securities Exchange Act, and the Investment Advisers Act. *E.g.*, 15 U. S. C. §77q(a)(3) (prohibiting any practice "which operates . . . as a fraud"). In so doing, Congress incorporated prohibitions from common law fraud into federal securities law. The SEC has followed

suit in rulemakings. Rule 10b–5, for example, prohibits "any device, scheme, or artifice to defraud," and "engag[ing] in any act . . . which operates or would operate as a fraud." 17 CFR §§240.10b–5(a), (c).

Congress's decision to draw upon common law fraud created an enduring link between federal securities fraud and its common law "ancestor." *Foster* v. *Wilson*, 504 F. 3d 1046, 1050 (CA9 2007). "[W]hen Congress transplants a common-law term, the old soil comes with it." *United States* v. *Hansen*, 599 U. S. 762, 778 (2023) (internal quotation marks omitted). Our precedents therefore often consider common law fraud principles when interpreting federal securities law. *E.g.*, *Dura Pharmaceuticals, Inc.* v. *Broudo*, 544 U. S. 336, 343–344 (2005) (evaluating pleading requirements in light of the "common-law roots of the securities fraud action"); *Schreiber* v. *Burlington Northern, Inc.*, 472 U. S. 1, 7 (1985) ("The meaning the Court has given the term 'manipulative' [in §10b of the Securities Exchange Act] is consistent with the use of the term at common law . . . ." (footnote omitted)); *Chiarella* v. *United States*, 445 U. S. 222, 227–229 (1980) (explaining that insider trading liability under Rule 10b–5 is rooted in the common law duty of disclosure); *Basic Inc.* v. *Levinson*, 485 U. S. 224, 253 (1988) (White, J., concurring in part and dissenting in part) ("In general, the case law developed in this Court with respect to §10(b) and Rule 10b–5 has been based on doctrines with which we, as judges, are familiar: common-law doctrines of fraud and deceit.").

That is not to say that federal securities fraud and common law fraud are identical. In some respects, federal securities fraud is narrower. For example, federal securities law does not "convert every common-law fraud that happens to involve securities into a violation." *SEC* v. *Zandford*, 535 U. S. 813, 820 (2002). It only targets certain subject matter and certain disclosures. In other respects,

federal securities fraud is broader. For example, federal securities fraud employs the burden of proof typical in civil cases, while its common law analogue traditionally used a more stringent standard. See *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 387–390 (1983). Courts have also not typically interpreted federal securities fraud to require a showing of harm to be actionable by the SEC. See, *e.g.*, *Blavin*, 760 F. 2d, at 711; *SEC* v. *Life Partners Holdings, Inc.*, 854 F. 3d 765, 779 (CA5 2017). Nevertheless, the close relationship between federal securities fraud and common law fraud confirms that this action is "legal in nature." *Granfinanciera*, 492 U. S., at 53.

## B

### 1

Although the claims at issue here implicate the Seventh Amendment, the Government and the dissent argue that a jury trial is not required because the "public rights" exception applies. Under this exception, Congress may assign the matter for decision to an agency without a jury, consistent with the Seventh Amendment. But this case does not fall within the exception, so Congress may not avoid a jury trial by preventing the case from being heard before an Article III tribunal.

The Constitution prohibits Congress from "withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856). Once such a suit "is brought within the bounds of federal jurisdiction," an Article III court must decide it, with a jury if the Seventh Amendment applies. *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011). These propositions are critical to maintaining the proper role of the Judiciary in the Constitution: "Under 'the basic concept of separation of powers . . . that flow[s] from the scheme of a tripartite government' adopted in the Constitution, 'the judicial Power of

14                    SEC *v.* JARKESY

Opinion of the Court

the United States'" cannot be shared with the other branches. *Id.*, at 483 (quoting *United States* v. *Nixon*, 418 U. S. 683, 704 (1974); alteration in original). Or, as Alexander Hamilton wrote in The Federalist Papers, "'there is no liberty if the power of judging be not separated from the legislative and executive powers.'" The Federalist No. 78, at 466 (quoting 1 Montesquieu, The Spirit of Laws 181 (10th ed. 1773)).

On that basis, we have repeatedly explained that matters concerning private rights may not be removed from Article III courts. *Murray's Lessee*, 18 How., at 284; *Granfinanciera*, 492 U. S., at 51–52; *Stern*, 564 U. S., at 484. A hallmark that we have looked to in determining if a suit concerns private rights is whether it "is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789.'" *Id.*, at 484 (quoting *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 90 (1982) (Rehnquist, J., concurring in judgment)). If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights, and adjudication by an Article III court is mandatory. *Stern*, 564 U. S., at 484.

At the same time, our precedent has also recognized a class of cases concerning what we have called "public rights." Such matters "historically could have been determined exclusively by [the executive and legislative] branches," *id.*, at 493 (internal quotation marks omitted), even when they were "presented in such form that the judicial power [wa]s capable of acting on them," *Murray's Lessee*, 18 How., at 284. In contrast to common law claims, no involvement by an Article III court in the initial adjudication is necessary in such a case.

The decision that first recognized the public rights exception was *Murray's Lessee*. In that case, a federal customs collector failed to deliver public funds to the Treasury, so the Government issued a "warrant of distress" to compel him to produce the withheld sum. 18 How., at 274–275.

Pursuant to the warrant, the Government eventually seized and sold a plot of the collector's land. *Id.*, at 274. Plaintiffs later attacked the purchaser's title, arguing that the initial seizure was void because the Government had audited the collector's account and issued the warrant itself without judicial involvement. *Id.*, at 275.

The Court upheld the sale. It explained that pursuant to its power to collect revenue, the Government could rely on "summary proceedings" to compel its officers to "pay such balances of the public money" into the Treasury "as may be in their hands." *Id.*, at 281, 285. Indeed, the Court observed, there was an unbroken tradition—long predating the founding—of using these kinds of proceedings to "enforce payment of balances due from receivers of the revenue." *Id.*, at 278; see *id.*, at 281. In light of this historical practice, the Government could issue a valid warrant without intruding on the domain of the Judiciary. See *id.*, at 280–282. The challenge to the sale thus lacked merit.

This principle extends beyond cases involving the collection of revenue. In *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320 (1909), we considered the imposition of a monetary penalty on a steamship company. Pursuant to its plenary power over immigration, Congress had excluded immigration by aliens afflicted with "loathsome or dangerous contagious diseases," and it authorized customs collectors to enforce the prohibition with fines. *Id.*, at 331–334. When a steamship company challenged the penalty under Article III, we upheld it. Congress's power over foreign commerce, we explained, was so total that no party had a "'vested right'" to import anything into the country. *Id.*, at 335 (quoting *Buttfield* v. *Stranahan*, 192 U. S. 470, 493 (1904)). By the same token, Congress could also prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury. See *Oceanic Steam Navigation Co.*, 214 U. S., at

16                    SEC *v.* JARKESY

Opinion of the Court

339–340.[1]

In *Ex parte Bakelite Corp.*, we upheld a law authorizing the President to impose tariffs on goods imported by "unfair methods of competition." 279 U. S. 438, 446 (1929). The law permitted him to set whatever tariff was necessary, subject to a statutory cap, to produce fair competition. If the President was "satisfied the unfairness [was] extreme," the law even authorized him to "exclude[]" foreign goods entirely. *Ibid.* Because the political branches had traditionally held exclusive power over this field and had exercised

_____

[1] The dissent asserts that *Oceanic Steam Navigation* stands for the proposition that the public rights exception applies to any exercise of power granted to Congress. *Post*, at 10–11 (opinion of SOTOMAYOR, J). It must be reading from a different case than we are. *Oceanic Steam Navigation* expressly confines its analysis to the exercise of Congress's power over *foreign* commerce. 214 U. S., at 339 ("It is insisted that the decisions just stated and the legislative practices referred to are inapposite here, because they all relate to subjects peculiarly within the authority of the legislative department of the Government, and which, from the necessity of things, required the concession that administrative officers should have the authority to enforce designated penalties without resort to the courts. But over no conceivable subject is the legislative power of Congress more complete than it is over that with which the act we are now considering deals."); *id.*, at 334 (explaining that the statute "rest[s] . . . upon the authority of Congress over *foreign* commerce and its right to control the coming of aliens into the United States" (emphasis added)); *id.*, at 340 (citing "the authority of Congress over the right to bring aliens into the United States"); see *id.*, at 339 (discussing congressional power over "the valuation of imported merchandise," "'importers,'" and "tariff[s]" (quoting *Bartlett* v. *Kane*, 16 How. 263, 274 (1854)); 214 U. S., at 334 (expressly acknowledging and avoiding comment on "'limitations'" of Congress's "'interstate commerce'" power because this case concerns instead Congress's exercise of its "'plenary power in respect to the exclusion of merchandise brought from *foreign* countries'" (quoting *Buttfield* v. *Stranahan*, 192 U. S. 470, 492 (1904); emphasis added). Nowhere does *Oceanic Steam Navigation* say that the public rights exception applies to cases concerning the securities markets or interstate commerce more broadly. The rules the dissent purports to locate in *Oceanic Steam Navigation* are therefore wholly inapposite.

Opinion of the Court

it, we explained that the assessment of tariffs did not implicate Article III. *Id.*, at 458, 460–461.

This Court has since held that certain other historic categories of adjudications fall within the exception, including relations with Indian tribes, see *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162, 174 (2011), the administration of public lands, *Crowell* v. *Benson*, 285 U. S. 22, 51 (1932), and the granting of public benefits such as payments to veterans, *ibid.*, pensions, *ibid.*, and patent rights, *United States* v. *Duell*, 172 U. S. 576, 582–583 (1899).

Our opinions governing the public rights exception have not always spoken in precise terms. This is an "area of frequently arcane distinctions and confusing precedents." *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 583 (1985) (internal quotation marks omitted). The Court "has not 'definitively explained' the distinction between public and private rights," and we do not claim to do so today. *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S. 325, 334 (2018).

Nevertheless, since *Murray's Lessee*, this Court has typically evaluated the legal basis for the assertion of the doctrine with care. The public rights exception is, after all, an *exception*. It has no textual basis in the Constitution and must therefore derive instead from background legal principles. *Murray's Lessee* itself, for example, took pains to justify the application of the exception in that particular instance by explaining that it flowed from centuries-old rules concerning revenue collection by a sovereign. See 18 How., at 281–285. Without such close attention to the basis for each asserted application of the doctrine, the exception would swallow the rule.[2]

─────────
[2] The dissent would brush away these careful distinctions and unfurl a new rule: that whenever Congress passes a statute "entitl[ing] the Government to civil penalties," the defendant's right to a jury and a neutral Article III adjudicator disappears. See *post*, at 2 (opinion of SOTOMAYOR, J.). It bases this rule not in the constitutional text (where it would find

18                           SEC *v.* JARKESY

Opinion of the Court

From the beginning we have emphasized one point: "To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider congress can . . . withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee*, 18 How., at 284. We have never embraced the proposition that "practical" considerations alone can justify extending the scope of the public rights exception to such matters. *Stern*, 564 U. S., at 501. "[E]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts." *Northern Pipeline Constr. Co.*, 458 U. S., at 69, n. 23 (plurality opinion) (citing *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 548–549, and n. 21 (1962) (plurality opinion)). And for good reason: "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside

───────────

no foothold), nor in the ratification history (where again it would find no support), nor in a careful, category-by-category analysis of underlying legal principles of the sort performed by *Murray's Lessee* (which it does not attempt), nor even in a case-specific functional analysis (also not attempted). Instead, the dissent extrapolates from the outcomes in cases concerning unrelated applications of the public rights exception and from one opinion, *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S. 442 (1977). The result is to blur the distinctions our cases have drawn in favor of the legally unsound principle that just because the Government may extract civil penalties in administrative tribunals in some contexts, it must always be able to do so in all contexts.

The dissent also appeals to practice, ignoring that the statute Jarkesy and Patriot28 have been prosecuted under is barely over a decade old. It is also unclear how practice could transmute a private right into a public one, or how the absence of legal challenges brought by one generation could waive the individual rights of the next. Practice may be probative when it reflects the settled institutional understandings of the branches. That case is far weaker when the rights of individuals are directly at stake.

Opinion of the Court

Article III." *Stern*, 564 U. S., at 484.

2

This is not the first time we have considered whether the Seventh Amendment guarantees the right to a jury trial "in the face of Congress' decision to allow a non-Article III tribunal to adjudicate" a statutory "fraud claim." 492 U. S., at 37, 50. We did so in *Granfinanciera*, and the principles identified in that case largely resolve this one.

*Granfinanciera* involved a statutory action for fraudulent conveyance. As codified in the Bankruptcy Code, the claim permitted a trustee to void a transfer or obligation made by the debtor before bankruptcy if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation." 11 U. S. C. §548(a)(2)(A) (1982 ed., Supp. V). Actions for fraudulent conveyance were well known at common law. 492 U. S., at 43. Even when Congress added these claims to the Bankruptcy Code in 1978, see 92 Stat. 2600, it preserved parties' rights to a trial by jury, 492 U. S., at 49–50. In 1984, however, Congress designated fraudulent conveyance actions "core [bankruptcy] proceedings" and authorized non-Article III bankruptcy judges to hear them without juries. *Id.*, at 50.

The issue in *Granfinanciera* was whether this designation was permissible under the public rights exception. *Ibid.* We explained that it was not. Although Congress had assigned fraudulent conveyance claims to bankruptcy courts, that assignment was not dispositive. See *id.*, at 52. What mattered, we explained, was the substance of the suit. "[T]raditional legal claims" must be decided by courts, "whether they originate in a newly fashioned regulatory scheme or possess a long line of common-law forebears." *Ibid.* To determine whether the claim implicated the Seventh Amendment, the Court applied the principles distilled in *Tull*. We examined whether the matter was "from [its] nature subject to 'a suit at common law.'" 492 U. S., at 56

20                    SEC *v.* JARKESY

Opinion of the Court

(some internal quotation marks omitted); see *id.*, at 43–50. A survey of English cases showed that "actions to recover . . . fraudulent transfers were often brought at law in late 18th-century England." *Id.*, at 43. The remedy the trustee sought was also one "traditionally provided by law courts." *Id.*, at 49. Fraudulent conveyance actions were thus "quintessentially suits at common law." *Id.*, at 56.

We also considered whether these actions were "closely intertwined" with the bankruptcy regime. *Id.*, at 54. Some bankruptcy claims, such as "creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res," *id.*, at 56, are highly interdependent and require coordination. Resolving such claims fairly is only possible if they are all submitted at once to a single adjudicator. Otherwise, parties with lower priority claims can rush to the courthouse to seek payment before higher priority claims exhaust the estate, and an orderly disposition of a bankruptcy is impossible. Other claims, though, can be brought in standalone suits, because they are neither prioritized nor subordinated to related claims. Since fraudulent conveyance actions fall into that latter category, we concluded that these actions were not "closely intertwined" with the bankruptcy process. *Id.*, at 54. We also noted that Congress had already authorized jury trials for certain bankruptcy matters, demonstrating that jury trials were not generally "incompatible" with the overall regime. *Id.*, at 61–62 (internal quotation marks omitted).

We accordingly concluded that fraudulent conveyance actions were akin to "suits at common law" and were not inseparable from the bankruptcy process. *Id.*, at 54, 56. The public rights exception therefore did not apply, and a jury was required.

3

*Granfinanciera* effectively decides this case. Even when an action "originate[s] in a newly fashioned regulatory

scheme," what matters is the substance of the action, not where Congress has assigned it. *Id.*, at 52. And in this case, the substance points in only one direction.

According to the SEC, these are actions under the "anti-fraud provisions of the federal securities laws" for "fraudulent conduct." App. to Pet. for Cert. 72a–73a (opinion of the Commission). They provide civil penalties, a punitive remedy that we have recognized "could only be enforced in courts of law." *Tull*, 481 U. S., at 422. And they target the same basic conduct as common law fraud, employ the same terms of art, and operate pursuant to similar legal principles. See *supra*, at 10–12. In short, this action involves a "matter[] of private rather than public right." *Granfinanciera*, 492 U. S., at 56. Therefore, "Congress may not 'withdraw'" it "'from judicial cognizance.'" *Stern*, 564 U. S., at 484 (quoting *Murray's Lessee*, 18 How., at 284).

#### 4

Notwithstanding *Granfinanciera*, the SEC contends the public rights exception still applies in this case because Congress created "new statutory obligations, impose[d] civil penalties for their violation, and then commit[ted] to an administrative agency the function of deciding whether a violation ha[d] in fact occurred." Brief for Petitioner 21 (internal quotation marks omitted).

The foregoing from *Granfinanciera* already does away with much of the SEC's argument. Congress cannot "conjure away the Seventh Amendment by mandating that traditional legal claims be . . . taken to an administrative tribunal." 492 U. S., at 52. Nor does the fact that the SEC action "originate[d] in a newly fashioned regulatory scheme" permit Congress to siphon this action away from an Article III court. *Ibid.* The constructive fraud claim in *Granfinanciera* was also statutory, see *id.*, at 37, but we nevertheless explained that the public rights exception did not apply. Again, if the action resembles a traditional legal

Opinion of the Court

claim, its statutory origins are not dispositive. See *id.*, at 52, 56.

The SEC's sole remaining basis for distinguishing *Granfinanciera* is that the Government is the party prosecuting this action. See Brief for Petitioner 26–28; see also Tr. of Oral Arg. 25 (Principal Deputy Solicitor General) (the "critical distinction" in the public rights analysis is "enforcement by the executive"); *id.*, at 26 (identifying as "the constitutionally relevant distinction" that "this is something that has been assigned to a federal agency to enforce"). But we have never held that "the presence of the United States as a proper party to the proceeding is . . . sufficient" by itself to trigger the exception. *Northern Pipeline Constr. Co.*, 458 U. S., at 69, n. 23 (plurality opinion). Again, what matters is the substance of the suit, not where it is brought, who brings it, or how it is labeled. See *ibid.* The object of this SEC action is to regulate transactions between private individuals interacting in a pre-existing market. To do so, the Government has created claims whose causes of action are modeled on common law fraud and that provide a type of remedy available only in law courts. This is a common law suit in all but name. And such suits typically must be adjudicated in Article III courts.

5

The principal case on which the SEC and the dissent rely is *Atlas Roofing Co.* v. *Occupational Safety and Health Review Commission*, 430 U. S. 442 (1977). Because the public rights exception as construed in *Atlas Roofing* does not extend to these civil penalty suits for fraud, that case does not control. And for that same reason, we need not reach the suggestion made by Jarkesy and Patriot28 that *Tull* and *Granfinanciera* effectively overruled *Atlas Roofing* to the extent that case construed the public rights exception to allow the adjudication of civil penalty suits in administrative

Opinion of the Court

tribunals.[3]

The litigation in *Atlas Roofing* arose under the Occupational Safety and Health Act of 1970 (OSH Act), a federal regulatory regime created to promote safe working conditions. *Id.*, at 444–445. The Act authorized the Secretary of Labor to promulgate safety regulations, and it empowered the Occupational Safety and Health Review Commission (OSHRC) to adjudicate alleged violations. *Id.*, at 445–446. If a party violated the regulations, the agency could impose civil penalties. *Id.*, at 446.

Unlike the claims in *Granfinanciera* and this action, the OSH Act did not borrow its cause of action from the common law. Rather, it simply commanded that "[e]ach employer . . . shall comply with occupational safety and health standards promulgated under this chapter." 84 Stat. 1593, 29 U. S. C. §654(a)(2) (1976 ed.). These standards bring no common law soil with them. Cf. *Hansen*, 599 U. S., at 778. Rather than reiterate common law terms of art, they instead resembled a detailed building code. For example, the OSH Act regulations directed that a ground trench wall of "Solid Rock, Shale, or Cemented Sand and Gravels" could be constructed at a 90 degree angle to the ground. 29 CFR §1926.652, Table P–1 (1976); see *Atlas Roofing*, 430 U. S., at 447 (discussing Table P–1). But a wall of "Compacted Angular Gravels" needed to be sloped at 63 degrees, and a wall of "Well Rounded Loose Sand" at 26 degrees. §1926.652, Table P–1. The purpose of this regime was not to enable the Federal Government to bring or adjudicate

───────────

[3] The dissent chides us for "leav[ing] open the possibility that *Granfinanciera* might have overruled *Atlas Roofing*." *Post*, at 25, n. 8 (opinion of SOTOMAYOR, J.). But the author of *Atlas Roofing* certainly thought that *Granfinanciera* may have done so. See *Granfinanciera*, 492 U. S., at 79 (White, J., dissenting) ("Perhaps . . . *Atlas Roofing* is no longer good law after today's decision."); see also *id.*, at 71, n. 1 (*Granfinanciera* "can be read as overruling or severely limiting" *Atlas Roofing*).

claims that traced their ancestry to the common law. Rather, Congress stated that it intended the agency to "develop[] innovative methods, techniques, and approaches for dealing with occupational safety and health problems." 29 U. S. C. §651(b)(5) (1976 ed.). In both concept and execution, the Act was self-consciously novel.

Facing enforcement actions, two employers alleged that the adjudicatory authority of the OSHRC violated the Seventh Amendment. See *Atlas Roofing*, 430 U. S., at 448–449. The Court rejected the challenge, concluding that "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment[]." *Id.*, at 455. As the Court explained, the case involved "a new cause of action, and remedies therefor, unknown to the common law." *Id.*, at 461. The Seventh Amendment, the Court concluded, was accordingly "no bar to . . . enforcement outside the regular courts of law." *Ibid.*

The cases that *Atlas Roofing* relied upon did not extend the public rights exception to "traditional legal claims." *Granfinanciera*, 492 U. S., at 52. Instead, they applied the exception to actions that were "'not . . . suit[s] at common law or in the nature of such . . . suit[s].'" *Atlas Roofing*, 430 U. S., at 453 (quoting *Jones & Laughlin Steel Corp.*, 301 U. S., at 48); see *Atlas Roofing*, 430 U. S., at 450–451 (discussing, *e.g.*, *Murray's Lessee*, *Ex parte Bakelite Corp.*, *Helvering* v. *Mitchell*, 303 U. S. 391 (1938), and *Oceanic Steam Navigation Co*.). Indeed, the Court recognized that if a case did involve a common law action or its equivalent, a jury was required. See 430 U. S., at 455 ("'[W]here the action involves rights and remedies recognized at common law, it must preserve to parties their right to a jury trial.'" (quoting *Pernell* v. *Southall Realty*, 416 U. S. 363, 383 (1974)); *Atlas Roofing*, 430 U. S., at 458–459 (jury required

when "courts of law supplied a cause of action and an adequate remedy to the litigant").

*Atlas Roofing* concluded that Congress could assign the OSH Act adjudications to an agency because the claims were "unknown to the common law." 430 U. S., at 461. The case therefore does not control here, where the statutory claim is "'in the nature of'" a common law suit. *Id.*, at 453 (quoting *Jones & Laughlin*, 301 U. S., at 48). As we have explained, Jarkesy and Patriot28 were prosecuted for "fraudulent conduct," App. to Pet. for Cert. 72a, and the pertinent statutory provisions derive from, and are interpreted in light of, their common law counterparts, see 15 U. S. C. §§77q(a)(2), 78j(b), 80b–6(4); 17 CFR §§240.10b–5(b), 275.206(4)–8(a)(1); *Basic Inc.*, 485 U. S., at 253 (opinion of White, J.).

The reasoning of *Atlas Roofing* cannot support any broader rule. The dissent chants "*Atlas Roofing*" like a mantra, but no matter how many times it repeats those words, it cannot give *Atlas Roofing* substance that it lacks.[4]

───────────

[4] Reading the dissent, one might also think that *Atlas Roofing* is among this Court's most celebrated cases. As the concurrence shows, *Atlas Roofing* represents a departure from our legal traditions. See *post*, at 12–20 (opinion of GORSUCH, J.).

This view is also reflected in the scholarship. Commentators writing comprehensively on Article III and agency adjudication have often simply ignored the case. See, *e.g.*, R. Fallon, Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 915 (1988) (no citation to *Atlas Roofing*); J. Harrison, Public Rights, Private Privileges, and Article III, 54 Ga. L. Rev. 143 (2019) (same); W. Baude, Adjudication Outside Article III, 133 Harv. L. Rev. 1511 (2020) (same).

Others who have considered it have offered nothing but a variety of criticisms. See, *e.g.*, R. Kirst, Administrative Penalties and the Civil Jury: The Supreme Court's Assault on the Seventh Amendment, 126 U. Pa. L. Rev. 1281, 1294 (1978) (through its "careless use of precedent," *Atlas Roofing* did "not recognize or [mis]understood" "careful distinctions developed by . . . earlier judges"); G. Young, Federal Courts & Federal Rights, 45 Brooklyn L. Rev. 1145, 1153 (1979) ("The *Atlas* Court . . . failed to offer an adequate justification for its interpretation of the sev-

Opinion of the Court

Even as *Atlas Roofing* invoked the public rights exception, the definition it offered of the exception was circular. The exception applied, the Court said, "in cases in which 'public rights' are being litigated—*e. g.*, cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes." 430 U. S., at 450; see *id.*, at 458.

After *Atlas Roofing*, this Court clarified in *Tull* that the Seventh Amendment does apply to novel statutory regimes, so long as the claims are akin to common law claims. See 481 U. S., at 421–423. In addition, we have explained that the public rights exception does not apply automatically whenever Congress assigns a matter to an agency for adjudication. See *Granfinanciera*, 492 U. S., at 52.

For its part, the dissent also seems to suggest that *Atlas Roofing* establishes that the public rights exception applies whenever a statute increases governmental efficiency. *Post*, at 15 (opinion of SOTOMAYOR, J.). Again, our precedents foreclose this argument. As *Stern* explained, effects like increasing efficiency and reducing public costs are not enough to trigger the exception. See 564 U. S., at 501; *INS* v. *Chadha*, 462 U. S. 919, 944 (1983). Otherwise, evading

––––––––––

enth amendment, either in terms of precedent or the language and history of the amendment."); M. Redish & D. La Fave, Seventh Amendment Right to Jury Trial in Non-Article III Proceedings: A Study in Dysfunctional Constitutional Theory, 4 Wm. & Mary Bill of Right J. 407, 436 (1995) (criticizing *Atlas Roofing* for failing to "provid[e] a principled basis upon which to determine the proper scope of congressional power to remove the civil jury from federal adjudications"); V. Amar, Implementing an Historical Version of the Jury in an Age of Administrative Factfinding and Sentencing Guidelines, 47 S. Tex. L. Rev. 291, 298 (2005) (questioning *Atlas Roofing* for "invert[ing] and turn[ing] on its head the *Apprendi* doctrine's central insight that juries are most important to check the power of the state" (emphasis deleted)); C. Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 604–605, and n. 189 (2007) (describing *Atlas Roofing* as "misus[ing]" precedent to "deny the novelty of its holding" and "drive a wedge" into the traditional understanding of the public-private rights distinction). We express no opinion on these various criticisms.

the Seventh Amendment would become nothing more than a game, where the Government need only identify some slight advantage to the public from agency adjudication to strip its target of the protections of the Seventh Amendment.

The novel claims in *Atlas Roofing* had never been brought in an Article III court. By contrast, law courts have dealt with fraud actions since before the founding, and Congress had authorized the SEC to bring such actions in Article III courts and still authorizes the SEC to do so today. See 3 Blackstone 41–42; §§77t, 78u, 80b–9. Given the judiciary's long history of handling fraud claims, it cannot be argued that the courts lack the capacity needed to adjudicate such actions.

In short, *Atlas Roofing* does not conflict with our conclusion. When a matter "from its nature, is the subject of a suit at the common law," Congress may not "withdraw [it] from judicial cognizance." *Murray's Lessee*, 18 How., at 284.

*          *          *

A defendant facing a fraud suit has the right to be tried by a jury of his peers before a neutral adjudicator. Rather than recognize that right, the dissent would permit Congress to concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch. That is the very opposite of the separation of powers that the Constitution demands. Jarkesy and Patriot28 are entitled to a jury trial in an Article III court. We do not reach the remaining constitutional issues and affirm the ruling of the Fifth Circuit on the Seventh Amendment ground alone.

The judgment of the Court of Appeals for the Fifth Circuit is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Cite as: 603 U. S. ____ (2024)          1

GORSUCH, J., concurring

# SUPREME COURT OF THE UNITED STATES

———————

No. 22–859

———————

## SECURITIES AND EXCHANGE COMMISSION, PETITIONER *v.* GEORGE R. JARKESY, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2024]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring.

The Court decides a single issue: Whether the Security and Exchange Commission's use of in-house hearings to seek civil penalties violates the Seventh Amendment right to a jury trial. It does. As the Court details, the government has historically litigated suits of this sort before juries, and the Seventh Amendment requires no less.

I write separately to highlight that other constitutional provisions reinforce the correctness of the Court's course. The Seventh Amendment's jury-trial right does not work alone. It operates together with Article III and the Due Process Clause of the Fifth Amendment to limit how the government may go about depriving an individual of life, liberty, or property. The Seventh Amendment guarantees the right to trial by jury. Article III entitles individuals to an independent judge who will preside over that trial. And due process promises any trial will be held in accord with time-honored principles. Taken together, all three provisions vindicate the Constitution's promise of a "fair trial in a fair tribunal." *In re Murchison*, 349 U. S. 133, 136 (1955).

## I

In March 2013, the SEC's Commissioners approved

GORSUCH, J., concurring

charges against Mr. Jarkesy. The charges were serious; the agency accused him of defrauding investors. The relief the agency sought was serious, too: millions of dollars in civil penalties. See SEC, Division of Enforcement's Post-Hearing Memorandum of Law in *In re John Thomas Capital Management Group, LLC*, Admin. Proc. File No. 3–15255, pp. 28–29 (SEC, Apr. 7, 2014). For most of the SEC's 90-year existence, the Commission had to go to federal court to secure that kind of relief against someone like Mr. Jarkesy. *Ante*, at 3–4. Proceeding that way in this case hardly would have promised him an easy ride. But it would have at least guaranteed Mr. Jarkesy a jury, an independent judge, and traditional procedures designed to ensure that anyone caught up in our judicial system receives due process.

In 2010, however, all that changed. With the passage of the Dodd Frank Act, Congress gave the SEC an alternative to court proceedings. Now, the agency could funnel cases like Mr. Jarkesy's through its own "adjudicatory" system. See 124 Stat. 1376, 1862–1865. That is the route the SEC chose when it filed charges against Mr. Jarkesy.

There is little mystery why. The new law gave the SEC's Commissioners—the same officials who authorized the suit against Mr. Jarkesy—the power to preside over his case themselves and issue judgment. To be sure, the Commissioners opted, as they often do, to send Mr. Jarkesy's case in the first instance to an "administrative law judge" (ALJ). See 17 CFR §201.110 (2023). But the title "judge" in this context is not quite what it might seem. Yes, ALJs enjoy some measure of independence as a matter of regulation and statute from the lawyers who pursue charges on behalf of the agency. But they remain servants of the same master—the very agency tasked with prosecuting individuals like Mr. Jarkesy. This close relationship, as others have long recognized, can make it "extremely difficult, if not impossible, for th[e ALJ] to convey the image of being an impartial fact finder." B. Segal, The Administrative Law

Judge, 62 A. B. A. J. 1424, 1426 (1976). And with a jury out of the picture, the ALJ decides not just the law but the facts as well.[1]

Going in, then, the odds were stacked against Mr. Jarkesy. The numbers confirm as much: According to one report, during the period under study the SEC won about 90% of its contested in-house proceedings compared to 69% of its cases in court. D. Thornley & J. Blount, SEC In-House Tribunals: A Call for Reform, 62 Vill. L. Rev. 261, 286 (2017) (Thornley). Reportedly, too, one of the SEC's handful of ALJs even warned individuals during settlement discussions that he had found defendants liable in every contested case and never once "'ruled against the agency's enforcement division.'" *Axon Enterprise, Inc.* v. *FTC*, 598 U. S. 175, 213–214 (2023) (GORSUCH, J., concurring in judgment).

The shift from a court to an ALJ didn't just deprive Mr. Jarkesy of the right to an independent judge and a jury. He also lost many of the procedural protections our courts supply in cases where a person's life, liberty, or property is at stake. After an agency files a civil complaint in court, a defendant may obtain from the SEC a large swathe of documents relevant to the lawsuit. See Fed. Rule Civ. Proc. 26(b)(1). He may subpoena third parties for testimony and documents and take 10 oral depositions—more with the court's permission. Rule 45; Rule 30(a)(2)(A)(i). A court has flexibility, as well, to set deadlines for discovery and other matters to meet the needs of the case. See Rule 16. And

---

[1] In many agencies, litigants are not even entitled to have ALJs, with their modicum of protections, decide their cases. These agencies use "administrative judges." Some agencies can replace these administrative judges if they don't like their decisions. And some of these judges may move in and out of prosecutorial and adjudicatory roles, or move in and out of the very industries their agencies regulate. See *United States* v. *Arthrex, Inc.*, 594 U. S. 1, 36–37 (2021) (GORSUCH, J., concurring in part and dissenting in part).

come trial, the Federal Rules of Evidence apply, meaning that hearsay is generally inadmissible and witnesses must usually testify in person, subject to cross-examination. See Fed. Rule Evid. 802.

Things look very different in agency proceedings. The SEC has a responsibility to provide "documents that contain material exculpatory evidence." 17 CFR §201.230(b)(3). But the defendant enjoys no general right to discovery. Though ALJs enjoy the power to issue subpoenas on the request of litigants like Mr. Jarkesy, §201.232(a), they "often decline to issue [them] or choose to significantly narrow their scope," G. Mark, SEC and CFTC Administrative Proceedings, 19 U. Pa. J. Const. L. 45, 68 (2016). Oral depositions are capped at five, with another two if the ALJ grants permission. §201.233(a). In some cases, an administrative trial must take place as soon as 1 month after service of the charges, and that hearing must follow within 10 months in even the most complex matters. §201.360(a)(2)(ii). The rules of evidence, including their prohibition against hearsay, do not apply with the same rigor they do in court. §201.235(a)(5); see §201.230. For that reason, live testimony often gives way to "investigative testimony"—that is, a "sworn statement" taken outside the presence of the defendant or his counsel. §201.235(b).

How did all this play out in Mr. Jarkesy's case? Accompanying its charges, the SEC disclosed 700 gigabytes of data—equivalent to between 15 and 25 million pages of information—it had collected during its investigation. App. to Pet. for Cert. 164a; Complaint in *Jarkesy* v. *U. S. SEC*, No. 1:14–cv–00114 (DDC, Jan. 29, 2014), ECF Doc. 1, ¶49, pp. 12–13. Over Mr. Jarkesy's protest that it would take "two lawyers or paralegals working twelve-hour days over four decades to review," *ibid.*, the ALJ gave Mr. Jarkesy 10 months to prepare for his hearing, see App. to Pet. for Cert. 156a. Then, after conducting that hearing, the ALJ turned around and obtained from the Commission "an extension of

GORSUCH, J., concurring

six months to file [her] initial decision." *In re John Thomas Capital Management Group LLC*, SEC Release No. 9631, p. 1 (Aug. 13, 2014). The reason? The "'size and complexity of the proceeding.'" *Id.*, at 2. When that decision eventually arrived seven months after the hearing, the ALJ agreed with the SEC on every charge. See App. to Pet. for Cert. 155a–156a, 212a.

Mr. Jarkesy had the right to appeal to the Commission, but appeals to that politically accountable body (again, the same body that approved the charges) tend to go about as one might expect. The Commission may decline to review the ALJ's decision. §201.411(b)(2). If it chooses to hear the case, it may *increase* the penalty imposed on the defendant. Thornley 286. A defendant unhappy with the result can seek further review in court, though that process will take more time and money, too. Nor will he find a jury there, only a judge who must follow the agency's findings if they are supported by "'more than a mere scintilla'" of evidence. *Biestek* v. *Berryhill*, 587 U. S. 97, 103 (2019).

Mr. Jarkesy filed an appeal anyway. The Commission agreed to review the ALJ's decision. It then afforded itself the better part of six years to issue an opinion. And, after all that, it largely agreed with the ALJ. See App. to Pet. for Cert. 71a–74a. None of this likely came as a surprise to the SEC employees in the Division of Enforcement responsible for pressing the action against Mr. Jarkesy. While his appeal was pending, employees in that division—including an "'Enforcement Supervisor'" in the regional office prosecuting Mr. Jarkesy—accessed confidential memos by the Commissioners' advisors about his appeal. See SEC, Second Commission Statement Relating to Certain Administrative Adjudications 3 (June 2, 2023).

## II

## A

If administrative proceedings like Mr. Jarkesy's seem a

thoroughly modern development, the British government
and its agents engaged in a strikingly similar strategy in
colonial America.    Colonial administrators routinely
steered enforcement actions out of local courts and into
vice-admiralty tribunals where they thought they would
win more often.  These tribunals lacked juries.  They lacked
truly independent judges.  And the procedures materially
differed from those available in everyday common-law
courts.

The vice-admiralty courts in the Colonies began as rough
equivalents of English courts of admiralty.  E. Surrency,
The Courts in the American Colonies, 11 Am. J. Legal Hist.
347, 355 (1967).  These courts generally concerned them-
selves with maritime matters arising on "the oceans and
rivers and their immediate shores."  C. Ubbelohde, The
Vice-Admiralty Courts and the American Revolution 19
(1960) (Ubbelohde).  And the proceedings they used ac-
corded more with civil law traditions than common law
ones.  Among other things, this meant officials could try
cases against colonists without a jury.  *Id.*, at 21.

Confined to admiralty disputes, perhaps the lack of a jury
would have proven unexceptional (as juries were not usu-
ally required in such cases then, nor are they today).  See,
*e.g.*, *Lewis* v. *Lewis & Clark Marine, Inc.*, 531 U. S. 438, 448
(2001).  But Parliament deployed these juryless tribunals
in the Colonies to new ends that, according to John Adams,
could fill "'volumes.'"  Ubbelohde vii.  The creep away from
the original province of those courts began with the grant
of authority over violations of certain trade and customs
laws.  But in the decade before the Revolution, the drip,
drip, drip of expanding power became a torrent, as Parlia-
ment allowed more and more actions to be brought in colo-
nial vice-admiralty courts.

Many of the matters added to vice-admiralty jurisdiction
in the Colonies would have required juries in England.  *Id.*,
at 112.  But as the Massachusetts royal governor explained,

colonial juries "'were not to be trusted.'" D. Lovejoy, Rights Imply Equality: The Case Against Admiralty Jurisdiction in America, 1764–1776, 16 Wm. & Mary Q. 459, 468 (1959). Even violations that did not implicate the jury right normally would have been heard in England "before a court in [one's] own neighborhood or county where [one] could count on traditional common-law procedure." *Id.*, at 471. But by expanding the reach of vice-admiralty jurisdiction in the Colonies, Parliament denied similar protections to Americans. See *Erlinger* v. *United States*, 602 U. S. \_\_\_, \_\_\_ (2024) (slip op., at 5).

Vice-admiralty court judges also lacked independence. While judges in England since the end of the seventeenth century generally enjoyed the protection of tenure during good behavior, colonial judges usually served at the pleasure of the royal administration. See *United States* v. *Will*, 449 U. S. 200, 218–219 (1980). And, doing away with the pretense of impartiality entirely, some vice-admiralty judges held dual appointments—for instance, as colonial attorneys general and vice-admiralty judges. Ubbelohde 162–163.

Like the modern SEC, British colonial officials were not *required* to bring many of their cases before the vice-admiralty courts. Often, Parliament gave those officials the option to proceed in either the ordinary common-law courts or the vice-admiralty courts. Unsurprisingly, though, they sought to file where they were most likely to win. And "[i]n this contest, the vice-admiralty courts were usually the victors." *Id.*, at 21.

## B

The abuses of these courts featured prominently in the calls for revolution. In the First Continental Congress, the assembled delegates condemned how Parliament "extend[ed] the jurisdiction of Courts of Admiralty," complained how colonial judges were "dependent on the

Crown," and demanded the right to the "common law of England" and the "great and inestimable privilege" of a jury trial. Declaration and Resolves of the First Continental Congress, Oct. 14, 1774, in 1 Journals of the Continental Congress, 1774–1789, pp. 68–69 (W. Ford 1904 ed.). Two years later, the drafters of the Declaration of Independence repeated these concerns, admonishing the King for "ma[king] Judges dependent on his Will alone," ¶11, and "[f]or depriving [the colonists] in many cases, of the benefits of Trial by Jury," ¶20. By that point, however, the "musket fire at Lexington and Concord . . . signaled the end not only of the vice-admiralty courts, but of all British rule in America." Ubbelohde 190.

When the smoke settled, the American people went to great lengths to prevent a backslide toward anything like the vice-admiralty courts. *Erlinger*, 602 U. S., at \_\_\_–\_\_\_ (slip op., at 5–6). One product of these efforts was Article III of the Constitution. There, the Constitution provided that "[t]he judicial Power"—the power over "Cases" and "Controversies"—would lie with life-tenured, salary-protected judges. §§1–2; see *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S. 325, 346 (2018) (GORSUCH, J., dissenting). As the Court has recognized, this meant the Executive Branch could "exercise no part of th[e] judicial power." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 275 (1856), "no matter how court-like [its] decisionmaking process might appear," *Ortiz* v. *United States*, 585 U. S. 427, 465 (2018) (ALITO, J., dissenting). Nor could Congress "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty"—the traditional scope of the "judicial Power." *Murray's Lessee*, 18 How., at 284; see Art. III, §2.

Despite these guarantees, many at the founding thought Article III didn't go far enough. Yes, it promised a defendant an independent judge rather than one dependent on

those who hold political power. But what would stop Congress from requiring litigants to navigate vice-admiralty's alien procedures in *all* federal cases? Or from making "federal processes" even *more* byzantine, so "as to [effectively] destroy [individual] rights?" Letter from a Federal Farmer (Jan. 20, 1788), in 2 The Complete Anti-Federalist 328 (H. Storing ed. 1981).

And what about civil juries? "[T]he jury trial," one prominent Anti-Federalist observed, "brings with it an open and public discussion of all causes, and excludes secret and arbitrary proceedings." Letter from a Federal Farmer (Jan. 18, 1788), in *id.*, at 320 (Federal Farmer 15). The participation of ordinary Americans "drawn from the body of the people" serves another function, too: "If the conduct of judges shall . . . tend to subvert the laws, and change the forms of government, the jury may check them." *Ibid.* As originally composed, however, the Constitution promised a trial by jury for "all Crimes," but said nothing about civil cases. Art III, §2, cl. 3. Some wondered, did this mean judges, not juries, would be "left masters as to facts" in civil disputes? Federal Farmer 15, at 322. If so, asked another, "what satisfaction can we expect from a lordly court of justice, always ready to protect the officers of government against the weak and helpless citizen"? Essay of a Democratic Federalist (Oct. 17, 1787), in 3 Complete Anti-Federalist 61.

The answer to these concerns was the Bill of Rights. *Erlinger*, 602 U. S., at ___ (slip op., at 6). As the Court details, the Seventh Amendment promised the right to a jury trial in "'[s]uits at common law.'" *Ante*, at 8 (quoting Amdt. 7). But because the Constitution was designed to "endure for ages to come," *McCulloch* v. *Maryland*, 4 Wheat. 316, 415 (1819), this did not mean only those "suits, which the common law recognized among its old and settled proceedings," *Parsons* v. *Bedford*, 3 Pet. 433, 447 (1830). The founding

generation anticipated the possibility Congress would in-
troduce new causes of action and perhaps new remedies,
too. See *ibid.* Accordingly, this Court has long understood
the Seventh Amendment's protections to apply in "all [civil]
suits which are not of equity [or] admiralty jurisdiction."
*Ibid.*; accord, *ante*, at 8–9. In this way, the Seventh Amend-
ment seeks to ensure there will be no juryless vice-admiralty
courts in the United States.

The Fifth Amendment's Due Process Clause addressed
remaining concerns about the processes that would attend
trials before independent judges and juries. It provided
that the government may not deprive anyone of "life, lib-
erty, or property, without due process of law." As originally
understood, this provision prohibited the government from
"depriv[ing] a person of those rights without affording him
the benefit of (at least) those customary procedures to
which freemen were entitled by the old law of England."
*Sessions* v. *Dimaya*, 584 U. S. 148, 176 (2018) (GORSUCH, J.,
concurring in part and concurring in judgment) (internal
quotation marks omitted); see *Erlinger*, 602 U. S., at ___–
___ (slip op., at 6–7).

More than that, because it was "the peculiar province of
the judiciary" to safeguard life, liberty, and property, due
process often meant *judicial* process. 1 St. George Tucker,
Blackstone's Commentaries, Editor's App. 358 (1803). That
is, if the government sought to interfere with those rights,
nothing less than "the process and proceedings of the com-
mon law" had to be observed before any such deprivation
could take place. 3 J. Story, Commentaries on the Consti-
tution of the United States §1783, p. 661 (1833) (Story). In
other words, "'due process of law' generally implie[d] and
include[d] . . . *judex* [a judge], regular allegations, oppor-
tunity to answer, and a trial according to some settled
course of judicial proceedings." *Murray's Lessee*, 18 How.,
at 280. This constitutional baseline was designed to serve

as "a restraint on the legislative" branch, preventing Congress from "mak[ing] any process 'due process of law,' by its mere will." *Id.*, at 276.

### C

These three constitutional provisions were meant to work together, and together they make quick work of this case. In fact, each provision requires the result the Court reaches today.

*First*, because the "'matter'" before us is one "which, from its nature, is the subject of a suit at the common law," *id.*, at 284, "the responsibility for deciding [it] rests with Article III judges in Article III courts." *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011). Nor does it make a difference whether we think of the SEC's action here as a civil-penalties suit or something akin to a traditional fraud claim: At the founding, both kinds of actions were tried in common-law courts. See *ante*, at 9–13 (discussing civil penalties); see also, *e.g.*, *Pasley* v. *Freeman*, 3 T. R. 51, 100 Eng. Rep. 450 (K. B. 1789) (action for fraud); *Baily* v. *Merrell*, 3 Bulst. 94, 81 Eng. Rep. 81 (K. B. 1615) (same). And that tells us all we need to know that the SEC's in-house civil-penalty scheme violates Article III by "withdraw[ing]" the matter "from judicial cognizance" and handing it over to the Executive Branch for an in-house trial. *Murray's Lessee*, 18 How., at 284; see *supra*, at 7–8.

*Second*, because the action the SEC seeks to pursue is not the stuff of equity or admiralty jurisdiction but the sort of suit historically adjudicated before common-law courts, the Seventh Amendment guarantees Mr. Jarkesy the right to have his case decided by a jury of his peers. In this regard, it is irrelevant that the SEC derived its power to sue under a "new statut[e]" or that the agency proceeded under "a new cause of action." Brief for Petitioner 13, 22 (internal quotation marks omitted). As we have seen, the government cannot evade the Seventh Amendment so easily. See *ante*, at

9; *supra*, at 8–10.

*Third*, were there any doubt, the Due Process Clause confirms these conclusions. Cf. *Murray's Lessee*, 18 How., at 275 (explaining that the Article III challenge before the Court could "best be considered" as raising a due process question). Because the penalty the SEC seeks would "depriv[e]" Mr. Jarkesy of "property," Amdt. 5, due process demands nothing less than "the process and proceedings of the common law," 3 Story §1783, at 661. That means the regular course of trial proceedings with their usual protections, see *Murray's Lessee*, 18 How., at 280, not the use of ad hoc adjudication procedures before the same agency responsible for prosecuting the law, subject only to hands-off judicial review, see *supra*, at 10–11.

### III
### A

The government resists these conclusions. As the government sees it, this case implicates the so-called public rights exception. One that defeats not only Mr. Jarkesy's right to trial by jury, but also his right to proceed before an independent trial judge consistent with traditional judicial processes. That is, on the government's account, not only does the Seventh Amendment fall away; so does the usual operation of Article III and the Due Process Clause.

In the government's view, the public rights exception "*at a minimum* allows Congress to create new statutory obligations, impose civil penalties for their violation, and then commit to an administrative agency the function of deciding whether a violation has in fact occurred." Brief for Petitioner 21 (emphasis added; internal quotation marks omitted). Put plainly, all that need be done to dispense almost entirely with three separate constitutional provisions is an Act of Congress creating some new statutory obligation. And, the government continues, this case easily meets that standard because the proceeding against Mr. Jarkesy is one

GORSUCH, J., concurring

"brought by the government against a private party" under a statute designed "to remedy harm to the public at large." *Id.*, at 24 (internal quotation marks omitted).

The Court rightly rejects these arguments. See *ante*, at 19–21. No one denies that, under the public rights exception, Congress may allow the Executive Branch to resolve certain matters free from judicial involvement in the first instance. *Ante*, at 6, 14–15. But, despite its misleading name, the exception does not refer to *all* matters brought by the government against an individual to remedy public harms, or even all those that spring from a statute. See *ante*, at 16–17. Instead, public rights are a narrow class defined and limited by history. As the Court explains, that class has traditionally included the collection of revenue, customs enforcement, immigration, and the grant of public benefits. *Ante*, at 15–17.

How did these matters find themselves categorized as public rights? Competing explanations abound. Some have pointed to ancient practical considerations. In *Murray's Lessee*, for example, the Court reasoned that the "[i]mperative necessity" of tax collection for a functional state had long caused governments to treat "claims for public taxes" differently from "all others." 18 How., at 282. Others have theorized that "the core of the judicial power" concerns the disposition of the "three 'absolute' rights" "to life, liberty, and property." *Wellness Int'l Network, Ltd.* v. *Sharif*, 575 U. S. 665, 713–714 (2015) (THOMAS, J., dissenting). Public rights, the theory goes, involve matters originally understood to fall outside this core. *Id.*, at 714. So, for example, "[a]lthough Congress could authorize executive agencies to dispose of *public* rights in land—often by means of adjudicating a claimant's qualifications for a land grant under a statute—the United States had to go to the courts if it wished to revoke" that grant, which had become the owner's private property. *Id.*, at 715. There are still other theories yet. See, *e.g.*, *Stern*, 564 U. S., at 489.

Whatever their roots, traditionally recognized public rights have at least one feature in common: a serious and unbroken historical pedigree. See *Culley* v. *Marshall*, 601 U. S. 377, 397–398 (2024) (Gorsuch, J., concurring); *ante*, at 14–17. For good reason. If the Article III "judicial Power" encompasses "the stuff of the traditional actions at common law tried by the courts of Westminster in 1789," *ante*, at 14 (internal quotation marks omitted), it follows that matters traditionally adjudicated outside those courts might *not* fall within Article III's ambit. See *Stern*, 564 U. S., at 504–505 (Scalia, J., concurring) ("[A]n Article III judge is required in *all* federal adjudications, unless there is a firmly established historical practice to the contrary"). So too with the Due Process Clause. If that clause sets customary common-law practice as the ordinary procedural baseline, see Part II–B, *supra*, clear historical evidence of a different practice might warrant a departure from that baseline, see *Murray's Lessee*, 18 How., at 280. That's why this Court has said "'a process of law . . . must be taken to be due process of law' if it enjoys 'the sanction of settled usage both in England and in this country.'" *Culley*, 601 U. S., at 397 (Gorsuch, J., concurring) (quoting *Hurtado* v. *California*, 110 U. S. 516, 528 (1884)).

With the public rights exception viewed in this light, the government's invocation of it in this case cannot succeed. Starting with a "'presumption . . . in favor of Article III courts'" and their usual attendant processes, *ante*, at 18, we look for some "deeply rooted" tradition of nonjudicial adjudication before permitting a case to be tried in a different forum under different procedures, *Culley*, 601 U. S., at 397 (Gorsuch, J., concurring). We have upheld summary procedures for customs collection, for example, because they were consistent with both "the common and statute law of England prior to the emigration of our ancestors" and "the laws of many of the States at the time of the adoption of" the Constitution. *Murray's Lessee*, 18 How., at 280; see

*ante*, at 14–15. But when it comes to the kind of civil-penalty suit before us, that same history points in the opposite direction, suggesting actions of this sort belong before an independent judge, a jury, and decided in a trial that accords with traditional judicial procedures. *Ante*, at 9–13; *supra*, at 11–12. Just as SEC practices themselves largely reflected as recently as 2010.

### B

If all that's so, why might the government feel comfortable invoking the public rights exception? To be fair, much of it may have to do with this Court. Some of our past decisions have allowed the government to chip away at the courts' historically exclusive role in adjudicating private rights—and juries' accompanying role in that adjudication. This process began, of all places, in an admiralty case.

In *Crowell* v. *Benson*, 285 U. S. 22 (1932), this Court faced a constitutional challenge to the Longshoremen's and Harbor Workers' Compensation Act of 1927. The Act directed employers to compensate employees for injuries occurring at sea. 44 Stat. 1426. The law further assigned primary responsibility for deciding liability disputes to an Executive Branch official, the deputy commissioner of the United States Employees' Compensation Commission. *Id.*, at 1435–1437; *Crowell*, 285 U. S., at 42–43. The Court acknowledged that this regime empowered the deputy commissioner to decide in the first instance the monetary "liability of one individual to another." *Id.*, at 51. The Court recognized that this amounted to a classic "private right" suit of the kind traditionally tried in court. *Ibid.* The Court even conceded that, under the law, the factual "findings of the deputy commissioner, supported by evidence and within the scope of his authority, shall be final": An Article III court could not review the facts anew. *Id.*, at 46. But the Court upheld the scheme and its limited judicial review anyway.

To get there took a dash of fiction and a pinch of surmise. From time to time, the Court observed, judges appoint their own special "masters and commissioners" to prepare reports on fact issues or damages. *Id.*, at 51. These reports are nonbinding and "essentially . . . advisory." *Ibid.* Judges themselves remain the decisionmakers. In *Crowell*, the Court embraced the fiction that Executive Branch officials might similarly act as assistants or adjuncts to Article III courts. And because judges often adopt the proposed findings of their masters and commissioners, the Court surmised, Article III posed no bar to Congress taking a further step and *requiring* judges to treat the findings of Executive Branch officials as essentially "final." *Id.*, at 46. "To hold otherwise," the Court reasoned, "would be to defeat the obvious purpose of the legislation": "to furnish a prompt, continuous, expert, and inexpensive method for dealing with a class of questions of fact which are peculiarly suited to examination and determination by an administrative agency specially assigned to that task." *Ibid.*

*Crowell* itself only went so far, however. The case fell within federal courts' admiralty jurisdiction, and tribunals sitting in admiralty in England and America alike had long heard certain matters falling within the public rights exception. See *Culley*, 601 U. S., at 398 (GORSUCH, J., concurring). In deciding those matters, courts had long tolerated some flexibility in procedures, had long restricted appellate review of factual findings, and had always proceeded without a jury. *Crowell*, 285 U. S., at 45, 53.

Soon, though, none of that mattered. Almost in a blink, the admiralty limitation was discarded, and more and more agencies began assuming adjudicatory functions previously reserved for judges and juries, employing novel procedures that sometimes bore faint resemblance to those observed in court. Along the way, prominent voices in and out of government expressed concern at this development. Consider just two typical examples. Were an agency endowed with

the power to assess civil penalties, advised a committee overseen by Attorney General (soon-to-be Justice) Robert H. Jackson, "the aggrieved person" should at least "be permitted review de novo by a Federal district court." Final Report of Attorney General's Committee on Administrative Procedure 147 (1941). That was the only way, the committee opined, "to resolve any doubts concerning the constitutionality of the procedure." *Ibid.* Around the same time, a committee of the American Bar Association led by Roscoe Pound sounded a similar alarm. Administrative agencies, the committee warned, had a "tendency to mix up rule making, investigation, prosecution, the advocate's function, the judge's function, and the function of enforcing the judgment, so that the whole proceeding from end to end is one to give effect to a complaint." Report of the Special Committee on Administrative Law, 63 Ann. Rep. 331, 351 (1938).

The high-water mark of the movement toward agency adjudication may have come in 1977 in *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442. Some have read that decision to suggest the category of public rights might encompass pretty much any case arising under any "'new statutory obligations,'" Brief for Petitioner 22 (quoting *Atlas Roofing*, 430 U. S., at 450). It is a view the government essentially espouses in this case. But without reference to any constitutional text or history to guide what does or does not qualify as a public right, that view has (unsurprisingly) proven wholly unworkable.

It did not take long for this Court to realize as much. Just 12 years later, in *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33 (1989), this Court cabined *Atlas Roofing* so narrowly that the author of *Atlas Roofing* complained that the Court had "overrul[ed]" it. 492 U. S., at 71, n. 1 (White, J., dissenting); see *ante*, at 23, n. 3. Far from endorsing the notion that any new statutory obligation could qualify for

18                    SEC *v.* JARKESY

treatment as a public right, for example, the Court in *Granfinancieria* read *Atlas Roofing* as having "left the term 'public rights' undefined." 492 U. S., at 51, n. 8. And since then this Court has, in one case after another, "adhere[d]" only to *Atlas Roofing's* "general teaching" that Congress may constitutionally adopt "new statut[es]" assigning matters that indeed qualify as "public rights . . . to an administrative agency." 492 U. S., at 51 (internal quotation marks omitted); see, *e.g.*, *Stern*, 564 U. S., at 489–490; *Oil States*, 584 U. S., at 345.

Yet, even after the Court moved away from *Atlas Roofing*, our public rights jurisprudence remained muddled. Since then, the Court has suggested that public rights might include those "involving statutory rights that are integral parts of a public regulatory scheme." *Granfinanciera*, 492 U. S., at 55, n. 10. We have changed course and tried our hand at a five-factor balancing test. See *Stern*, 564 U. S., at 491 (describing *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833 (1986)). We have replaced that test with one that considers "at least seven different" factors. 564 U. S., at 504 (Scalia, J., concurring). And at one time or another, these factors have included the consideration of "the concerns that drove Congress to depart from the requirements of Article III." *Schor*, 478 U. S., at 851. So, for example, we have asked whether insistence on "the institutional integrity of the Judicial Branch" would "unduly constrict Congress' ability to take needed and innovative action pursuant to its Article I powers." *Ibid.*

Today, the Court does much to return us to a more traditional understanding of public rights. Adhering to *Granfinancieria*, the Court rejects the government's overbroad reading of *Atlas Roofing* and recognizes that the kind of atextual and ahistorical (not to mention confusing) tests it inspired do little more than ask policy questions the Constitution settled long ago. Yes, a limited category of public rights were originally and even long before understood to

GORSUCH, J., concurring

be susceptible to resolution without a court, jury, or the other usual protections an Article III court affords. But outside of those limited areas, we have no license to deprive the American people of their constitutional right to an independent judge, to a jury of their peers, or to the procedural protections at trial that due process normally demands. Let alone do so whenever the government wishes to dispense with them.

This Court does not subject other constitutional rights to such shabby treatment. We have "reaffirm[ed]," many times and "emphatically[,] that the First Amendment does not permit the State to sacrifice speech for efficiency." *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781, 795 (1988). We have rejected a framework for Second Amendment challenges that would balance the right to bear arms against "'other important governmental interests.'" *District of Columbia* v. *Heller*, 554 U. S. 570, 634 (2008). It is hornbook Fourth Amendment law that "[a] generalized interest in expedient law enforcement cannot, without more, justify a warrantless search." *Georgia* v. *Randolph*, 547 U. S. 103, 115, n. 5 (2006). And even though the Sixth Amendment's guarantee of a jury trial in criminal cases may have "'its weaknesses and the potential for misuse,'" *Duncan* v. *Louisiana*, 391 U. S. 145, 156 (1968), we continue to insist that it "be jealously preserved," *Patton* v. *United States*, 281 U. S. 276, 312 (1930); see *Ramos* v. *Louisiana*, 590 U. S. 83, 110–111 (2020) (plurality opinion); *Erlinger*, 602 U. S., at ___ (slip op., at 18) ("There is no efficiency exception to the . . . Sixth Amendmen[t]").

Why should Article III, the Seventh Amendment, or the Fifth Amendment's promise of due process be any different? None of them exists to "protec[t] judicial authority for its own sake." *Oil States*, 584 U. S., at 356 (GORSUCH, J., dissenting). They exist to "protect the individual." *Bond* v. *United States*, 564 U. S. 211, 222 (2011). And their protec-

tions are no less vital than those afforded by other constitutional provisions.  As American colonists learned under British rule, "the right of trial" means little "when the actual administration of justice is dependent upon caprice, or favour, [or] the will of rulers."  3 Story §1568, at 426; *id.*, §1783, at 661.  In recognizing as much today, the Court essentially follows the advice of Justices Brennan and Marshall, "limit[ing] the judicial authority of non-Article III federal tribunals to th[o]se few, long-established exceptions" that bear the sanction of history, and "countenanc[ing] no further erosion."  *Schor*, 478 U. S., at 859 (Brennan, J., joined by Marshall, J., dissenting).

## C

The dissent's competing account of public rights is astonishing.  On its telling, the Constitution might impose some (undescribed) limits on the power of the government to send cases "involving the liability of one individual to another" to executive tribunals for resolution.  *Post*, at 22 (opinion of SOTOMAYOR, J.).  But, thanks to public rights doctrine, the dissent insists, the Constitution imposes *no* limits on the government's power to seek civil penalties "outside the regular courts of law where there are no juries."  *Post*, at 2.  In that field, the Constitution falls silent.  The dissent does not even attempt to deploy any of the contrived balancing tests that emerged in *Atlas Roofing*'s aftermath to rein in the government's power.  But where in Article III, the Seventh Amendment, and due process can the dissent find this new rule?  What about founding-era practice or original meaning?  And why would a Constitution drawn up to protect against arbitrary government action make it easier for the government than for private parties to escape its dictates?  The dissent offers no answers.

To be sure, the dissent tries to appeal to precedent.  It even asserts that our decisions support, "*without exception,*" its sweeping conception of public rights doctrine.  *Post*, at

12 (emphasis added). But the dissent's approach to our precedents is like a picky child at the dinner table. It selects only a small handful while leaving much else untouched. To start, the dissent lingers briefly on *Murray's Lessee*—but not long enough to explain the opinion's conception of Article III, due process, or the extended historical inquiry that led the Court to conclude the collection of revenue concerned a public right. See *post*, at 9–10; *supra*, at 8, 10–14.

The 19th century behind it (for it does not trouble with the founding era), the dissent turns to *Oceanic Steam Nav. Co.* v. *Stranahan*, 214 U. S. 320 (1909). Drawing on that decision, the dissent contends that "Congress [has] routinely 'impose[d] appropriate obligations'" by statute and given "'executive officers the power to enforce'" them "'without the necessity of invoking the judicial power.'" *Post*, at 11 (quoting *Stranahan*, 214 U. S., at 339). Notably absent from the dissent's account, however, is the decision's discussion of Congress's long-recognized and extensive authority over the field of immigration, the area of law at issue there. See *id.*, at 339. Unmentioned, too, is *Stranahan*'s explanation that what links immigration to other public rights like "tariff[s], . . . internal revenue, taxation," and "foreign commerce" is that, "'from the beginning[,] Congress has exercised a plenary power'" over them "because they all relate to subjects peculiarly within the authority of the legislative department." *Id.*, at 334, 339.

Really, one has to wonder: If the public rights exception is as broad and unqualified as the dissent asserts, why did our predecessors bother to discuss history or Congress's peculiar powers when it comes to revenue and immigration? Why didn't the Court simply announce the rule the dissent would have us announce today: that our Constitution does not stand in the way of "agency adjudications of statutory claims . . . brought by the Government in its sovereign ca-

GORSUCH, J., concurring

pacity"? *Post*, at 4. The answer, of course, is that the Constitution has never countenanced the dissent's notion that the Executive is free to reassign virtually any civil case in which it is a party to its own tribunals where its own employees decide cases and inconvenient juries and traditional trial procedures go by the boards.

That my dissenting colleagues plow ahead anyway with their remarkable conception of public rights is all the more puzzling considering how regularly they have argued *against* that sort of sweeping concentration of governmental power. The dissenters have recognized that a "lack of standardized procedural safeguards" can leave government enforcement schemes "vulnerable to abuse" and individuals subject to coercive "pressure from unchecked prosecutors." *Culley*, 601 U. S., at 405, 407 (SOTOMAYOR, J., joined by KAGAN and JACKSON, JJ., dissenting). They have contended that the Judiciary has an affirmative obligation to supply "meaningful remedies," trials before judges and juries included, even when "Congress or the Executive has [already] created a remedial process." *Egbert* v. *Boule*, 596 U. S. 482, 524–525 (2022) (SOTOMAYOR, J., joined by, *inter alios*, KAGAN, J., dissenting) (internal quotation marks omitted; emphasis deleted). And like most every current Member of this Court at one time or another, they have acknowledged that the jury-trial right "stands as one of the Constitution's most vital protections against arbitrary government." *United States* v. *Haymond*, 588 U. S. 634, 637 (2019) (plurality opinion).

The dissent's conception of public rights is so unqualified that it refuses to commit itself on the question whether even muted forms of judicial review—such as asking executive tribunals to muster "more than a mere scintilla" of evidence in support of their rulings—are constitutionally required in the essentially unbounded class of cases that fall within its conception of public rights. See Part I, *supra*; *post*, at 8, n. 4. Gone, too, is any role for the jury—for why would the

GORSUCH, J., concurring

government ever go to court if it may more readily secure a win before its own employees?  The only attempt to mitigate the havoc its rule would wreak comes when the dissent declares that "'[t]he public-rights doctrine does not extend to . . . criminal matters.'"  *Post*, at 27, n. 9.  But the dissent does not (and cannot) explain how that fits with all else it says.  If, as the dissent insists, a public right is any "new right" that "belongs to the public and inheres in the Government in its sovereign capacity," *post*, at 28, what could possibly better fit the description than the enforcement of new criminal laws?  See *Shinn* v. *Martinez Ramirez*, 596 U. S. 366, 376 (2022) ("The power to convict and punish criminals lies at the heart of the States' residuary and inviolable sovereignty" (internal quotation marks omitted)).[2]

All but admitting its view has no support in "historical practice dating back to the founding," the dissent chastises the Court for daring to rely on that practice to flesh out the scope of the public rights exception.  *Post*, at 18.  It would be so much simpler, the dissent says, to adopt its rule permitting the government to skirt oversight by judge and jury alike whenever it enacts a new law.  And, true enough, "a principle that the government always wins surely would be simple for judges to implement."  *United States* v. *Rahimi*, 602 U. S. ___, ___ (2024) (GORSUCH, J., concurring) (slip op., at 6).  But looking to original meaning and historical practice informing it is exactly how this Court proceeds in so

———————

[2]The best the dissent can do is to observe that "Article III itself prescribes that '[t]he trial of all Crimes . . . shall be by Jury.'"  *Post*, at 27, n. 9 (quoting §2, cl. 3).  That response might be reassuring if the dissent's treatment of the Seventh Amendment didn't supply a roadmap for working around it.  On the dissent's telling, the Seventh Amendment can be dispensed with at will:  It applies "only in judicial proceedings," and not whenever the government chooses to assign a matter to its own in-house tribunals.  *Post*, at 5.  And under that logic, there is no apparent reason why the government could not evade Article III's jury-trial right just as easily, simply by choosing to route criminal prosecutions through executive agencies.

many other contexts where we seek to honor the Constitution's demands—including, notably, when we seek to ascertain the scope of the *criminal* jury-trial right and the defendant's attendant right to confront his accusers. See *Erlinger*, 602 U. S., at ___–___ (slip op., at 19–20); *Crawford* v. *Washington*, 541 U. S. 36, 50 (2004). What's more, this approach has the virtue of "keep[ing] judges in their proper lane" by "seeking to honor the supreme law the people have ordained rather than substituting our will for theirs." *Rahimi*, 602 U. S., at ___–___ (GORSUCH, J., concurring) (slip op., at 4–5); see *Crawford*, 541 U. S., at 67.

It is hard, as well, to take seriously the dissent's charges of unworkability and unpredictability. At least until today, the dissenters supported procedural protections for those in the government's sights in civil as well as criminal cases. What kind of protections? Often, they have argued, it depends on a judicial balancing test. One that is "flexible," defies "technical conception," lacks "fixed content," and will "not always yield the same result" even when applied in similar circumstances. *Culley*, 601 U. S., at 413 (opinion of SOTOMAYOR, J.) (internal quotation marks omitted). As we have seen, that was essentially the course some pursued, too, when it came to the public rights exception in the fallout from *Atlas Roofing*. See Part III–B, *supra*. But that kind of "'we know it when we see it'" approach to constitutional rights, *post*, at 21, can hardly claim any serious advantages when it comes to workability or predictability.

Failing all else, the dissent retreats to *Atlas Roofing*. At least that decision, it insists, supports its nearly boundless conception of public rights. The dissent goes so far as to accuse the Court of undermining "*stare decisis* and the rule of law," *post*, at 15, and engaging in "a power grab," *post*, at 37, by failing to give *Atlas Roofing* its broadest possible construction. It's a "disconcerting" accusation indeed, *post*, at 36, and a misdirected one at that. Construed as broadly as the dissent proposes, *Atlas Roofing*'s view of public rights

GORSUCH, J., concurring

stands as an outlier in our jurisprudence—with no apparent support in original meaning, at odds with prior precedent, and inconsistent with later precedent as well. See *ante*, at 25, n. 4; Part III–B, *supra*. Meanwhile, the Court's alternative construction of *Atlas Roofing* fits far more comfortably with all those legal sources. In that respect, the majority's approach is of a piece with *Granfinanciera*'s similar approach 25 years ago. And, more broadly, it is of a piece with our usual practice of construing "loose language" found in a prior judicial opinion in a way that better conforms it to the mainstream of our precedents. *Groff* v. *DeJoy*, 600 U. S. 447, 474 (2023) (SOTOMAYOR, J., concurring). As the dissenters have previously acknowledged, that course is neither unusual nor at odds with *stare decisis*. See *id.*, at 474–475; see also *Brown* v. *Davenport*, 596 U. S. 118, 141 (2022) ("We neither expect nor hope that our successors will comb these pages for stray comments and stretch them beyond their context—all to justify an outcome inconsistent with this Court's reasoning and judgments").

Were there any doubt about the propriety of the Court's treatment of *Atlas Roofing*, consider one more feature of the alternative the dissent proposes. In defending the broadest possible construction of *Atlas Roofing*'s public rights discussion, the dissent necessarily endorses that decision's exceptionally narrow conception of the Seventh Amendment. See *post*, at 6. After all, as public rights expand, so too the jury-trial right must contract. Yet *Atlas Roofing*'s discussion of the jury-trial right, no less than its discussion of public rights, is difficult to square with precedent and original meaning.

Recall that, from the start, the Seventh Amendment was understood to protect that right "not merely" in suits recognized at common law, but in "*all* suits which are" of legal, as opposed to "equity [or] admiralty[,] jurisdiction." *Parsons*, 3 Pet., at 447 (emphasis added); see Part II–B, *supra*. This Court repeated that understanding of the Amendment

until well into the 1970s, noting, for example, that "the applicability of the constitutional right to jury trial in actions enforcing statutory rights" was "a matter too obvious to be doubted." *Curtis* v. *Loether*, 415 U. S. 189, 193 (1974) (internal quotation marks omitted); accord, *Pernell* v. *Southall Realty*, 416 U. S. 363, 375 (1974) (the Seventh "Amendment requires trial by jury in actions unheard of at common law"). And the Court rejected the notion that a statute must present "a close equivalent" to a common-law cause of action; the jury-trial right attached, we said, so long as the "action involve[d] rights and remedies of the sort traditionally enforced in an action at law." *Ibid.*

*Atlas Roofing* ignored all of that. Instead, it suggested, "[t]he phrase 'Suits at common law' has been construed to refer to cases tried *prior* to the adoption of the Seventh Amendment in courts of law." 430 U. S., at 449 (emphasis added). That cramped construction of the Seventh Amendment was, of course, a key move in *Atlas Roofing*. For without it, the Court would have been hard pressed to suggest the public rights doctrine permits Congress to route any "'new cause of action'" for adjudication before agencies where juries do not sit. *Post*, at 14 (quoting *Atlas Roofing*, 430 U. S., at 461).

Almost immediately, however, the Court rejected *Atlas Roofing*'s analysis, not just with respect to public rights doctrine but the Seventh Amendment, too. Returning to our mainstream precedents, the Court reaffirmed the applicability of the Seventh Amendment to new causes of action, first in *Tull* v. *United States*, 481 U. S. 412 (1987), and then in *Granfinanciera*. See *ante*, at 8–9. And by 1990, our case law had come full circle, announcing once again what has always been true: that "[t]he right to a jury trial includes more than the common-law forms of action recognized in 1791." *Teamsters* v. *Terry*, 494 U. S. 558, 564.

Today, the Court respects and follows this longstanding

message in our Seventh Amendment precedents. The dissent chooses another path entirely—adopting a reading of *Atlas Roofing* that leads not only to an implausibly broad construction of public rights, but to an implausibly narrow understanding of the jury-trial guarantee as well. One wholly at odds with precedents both old and new. Nor is the dissent shy about its real motivation—and it has nothing to do with respect for precedent but much more to do with a "power grab": Holding the government to the Constitution's promise of a jury trial, the dissent insists, would impose "constraints on what," in its view, "modern-day adaptable governance must look like." *Post*, at 37. All of which, at bottom, amounts to little more than a complaint with the Constitution's revolutionary promise of popular oversight of government officials—and with those judges who would honor that promise.

\*

People like Mr. Jarkesy may be unpopular. Perhaps even rightly so: The acts he allegedly committed may warrant serious sanctions. But that should not obscure what is at stake in his case or others like it. While incursions on old rights may begin in cases against the unpopular, they rarely end there. The authority the government seeks (and the dissent would award) in this case—to penalize citizens without a jury, without an independent judge, and under procedures foreign to our courts—certainly contains no such limits. That is why the Constitution built "high walls and clear distinctions" to safeguard individual liberty. *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 239 (1995). Ones that ensure even the least popular among us has an independent judge and a jury of his peers resolve his case under procedures designed to ensure a fair trial in a fair forum. In reaffirming all this today, the Court hardly leaves the SEC without ample powers and recourse. The agency is free to pursue all of its charges against Mr.

28    SEC *v.* JARKESY

Gᴏʀsᴜᴄʜ, J., concurring

Jarkesy.  And it is free to pursue them exactly as it had always done until 2010:  In a court, before a judge, and with a jury.  With these observations, I am pleased to concur.

Cite as: 603 U. S. \_\_\_\_ (2024)          1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

No. 22–859

————————

## SECURITIES AND EXCHANGE COMMISSION, PETITIONER *v.* GEORGE R. JARKESY, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 27, 2024]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and
JUSTICE JACKSON join, dissenting.

Throughout our Nation's history, Congress has authorized agency adjudicators to find violations of statutory obligations and award civil penalties to the Government as an injured sovereign. The Constitution, this Court has said, does not require these civil-penalty claims belonging to the Government to be tried before a jury in federal district court. Congress can instead assign them to an agency for initial adjudication, subject to judicial review. This Court has blessed that practice repeatedly, declaring it "the 'settled judicial construction'" all along; indeed, "'from the beginning.'" *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 460 (1977). Unsurprisingly, Congress has taken this Court's word at face value. It has enacted more than 200 statutes authorizing dozens of agencies to impose civil penalties for violations of statutory obligations. Congress had no reason to anticipate the chaos today's majority would unleash after all these years.

Today, for the very first time, this Court holds that Congress violated the Constitution by authorizing a federal agency to adjudicate a statutory right that inheres in the

Government in its sovereign capacity, also known as a public right. According to the majority, the Constitution requires the Government to seek civil penalties for federal-securities fraud before a jury in federal court. The nature of the remedy is, in the majority's view, virtually dispositive. That is plainly wrong. This Court has held, without exception, that Congress has broad latitude to create statutory obligations that entitle the Government to civil penalties, and then to assign their enforcement outside the regular courts of law where there are no juries.

Beyond the majority's legal errors, its ruling reveals a far more fundamental problem: This Court's repeated failure to appreciate that its decisions can threaten the separation of powers. Here, that threat comes from the Court's mistaken conclusion that Congress cannot assign a certain public-rights matter for initial adjudication to the Executive because it must come only to the Judiciary.

The majority today upends longstanding precedent and the established practice of its coequal partners in our tripartite system of Government. Because the Court fails to act as a neutral umpire when it rewrites established rules in the manner it does today, I respectfully dissent.

## I

The story of this case is straightforward. The Securities and Exchange Commission (SEC or Commission) investigated respondents George Jarkesy and his advisory firm Patriot28, LLC, for alleged violations of federal-securities laws in connection with the launch of two hedge funds.

In deciding how and where to enforce these laws, the SEC could have filed suit in federal court or adjudicated the matter in an administrative enforcement action subject to judicial review. See 15 U. S. C. §§77h–1, 77t, 78u, 78u–2, 78u–3, 80b–3, 80b–9. The SEC opted for the latter. In 2013, the SEC initiated an administrative enforcement action against respondents, alleging violations of the Securities

Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. Specifically, the SEC alleged that respondents falsely told brokers and investors that: (1) a prominent accounting firm would audit the hedge funds; (2) a prominent investment bank would serve as the funds' prime broker; and (3) one of the funds would invest 50% of its capital in certain life-insurance policies. In reality, the audit never took place, the bank never opened a prime brokerage account, and the hedge fund invested less than 20% of its capital in the life-insurance policies. In addition to misrepresenting the funds' investment strategies, respondents allegedly overvalued the funds' holdings to charge higher management fees.

The SEC assigned the action to one of its administrative law judges, who held an evidentiary hearing and issued a lengthy initial decision, concluding that respondents in fact had violated the three securities laws. The full Commission reviewed the initial decision and reached the same determination. The Commission also denied respondents' constitutional challenges to the order, including that the agency's in-house adjudication violated respondents' Seventh Amendment right to a jury trial in federal court. Ultimately, the SEC ordered respondents to pay a civil penalty of $300,000 and to cease and desist from violating the federal-securities laws. It also barred Jarkesy from doing certain things in the securities industry and ordered Patriot28 to disgorge $685,000 in illicit profits.

Respondents filed a petition for review in the Fifth Circuit. 34 F. 4th 446, 466 (2022). A divided panel granted the petition and vacated the SEC's order. The panel held, over the dissent of Judge Davis, that respondents were entitled to a jury trial in federal court under the Seventh Amendment because the federal-securities antifraud provisions were similar to common-law fraud claims to which the jury-trial right would attach. See *id.*, at 451–459. Because the SEC forced respondents to proceed within the agency, the

4                           SEC *v.* JARKESY

Court of Appeals held that the SEC violated respondents'
Seventh Amendment rights and thus vacated the SEC's or-
der.  *Id.*, at 465–466.[1]

The majority affirms the Fifth Circuit's decision, notwith-
standing the mountain of precedent against it.  A faithful
application of our precedent would have led, inexorably, to
upholding the statutory scheme that Congress enacted for
the SEC's in-house adjudication of federal-securities
claims.

## II

The majority did not need to break any new ground to
resolve respondents' Seventh Amendment challenge.  This
Court's longstanding precedent and established govern-
ment practice uniformly support the constitutionality of ad-
ministrative schemes like the SEC's: agency adjudications
of statutory claims for civil penalties brought by the Gov-
ernment in its sovereign capacity.  See Part II–B (*infra*, at
7–14).  In assessing the constitutionality of such adjudica-
tions, the political branches' "'[l]ong settled and established
practice,'" which this Court has upheld and reaffirmed time
and again, is entitled to "'great weight.'"  *Chiafalo* v. *Wash-
ington*, 591 U. S. 578, 592–593 (2020) (quoting *The Pocket
Veto Case*, 279 U. S. 655, 689 (1929)); accord, *Vidal* v. *El-
ster*, 602 U. S. 286, 323 (2024) (Barrett, J., concurring in
part); *id.*, at 330 (Sotomayor, J., concurring in judgment);
*Consumer Financial Protection Bureau* v. *Community Fi-
nancial Services Assn. of America, Ltd.*, 601 U. S. 416, 442

---

[1] As the majority notes, respondents also prevailed on two other con-
stitutional challenges in the Court of Appeals.  See *ante*, at 6.  The di-
vided panel concluded that: (1) the SEC's discretion to bring the case
within the agency instead of federal court violated the nondelegation doc-
trine; and (2) a for-cause restriction on the Administrative Law Judge's
removal violated Article II and the separation of powers.  34 F. 4th 446,
459–465 (CA5 2022).  I disagree with the ruling below on both points.
Because the majority does not reach these issues, though, I address only
the Seventh Amendment challenge discussed in the majority's opinion.

(2024) (KAGAN, J., concurring).

## A

There are two key constitutional provisions at issue here. One is the Seventh Amendment, which "preserve[s]" the "right of trial by jury" in "Suits at common law, where the value in controversy shall exceed twenty dollars." The other is Article III's Vesting Clause, which provides that the "judicial Power of the United States . . . shall be vested" in federal Article III courts. This case presents the familiar interplay between these two provisions.

Although this case involves a Seventh Amendment challenge, the principal question at issue is one rooted in Article III and the separation of powers. That is because, as the majority rightly acknowledges, the Seventh Amendment's jury-trial right "applies" only in "an Article III court." *Ante,* at 7. That conclusion follows from both the text of the Constitution and this Court's precedents.

As to the text, the Amendment is limited to "Suits at common law." That means two things. First, that the right applies only in judicial proceedings. The term "suit," after all, refers to "the prosecution of some demand in a Court of justice," *Cohens* v. *Virginia*, 6 Wheat. 264, 407 (1821) (Marshall, C. J.), or a "proceeding in a court of justice," *Weston* v. *City Council of Charleston*, 2 Pet. 449, 464 (1829) (same) ("The modes of proceeding may be various, but if a right is litigated between parties in a court of justice, the proceeding by which the decision of the court is sought, is a suit"). Consistent with that understanding, this Court has held repeatedly that "the Seventh Amendment is not applicable to administrative proceedings." *Tull* v. *United States*, 481 U. S. 412, 418, n. 4 (1987); accord, *Atlas Roofing*, 430 U. S., at 454–455; *Curtis* v. *Loether*, 415 U. S. 189, 195 (1974). Factfinding by a jury is "incompatible with the whole concept of administrative adjudication," which empowers executive officials to find the relevant facts and apply the law to

those facts like juries do in a courtroom.  *Pernell* v. *Southall Realty*, 416 U. S. 363, 383 (1974) (collecting cases).

Second, the requirement that the "'[s]uit'" must be one "'at common law'" means that the claim at issue must be "'legal in nature.'"  *Ante,* at 8.  So, whether a defendant is entitled to a jury under the Seventh Amendment depends on both the forum and the cause of action.  If the claim is in an Article III proceeding, then the right to a jury attaches if the claim is "legal in nature" and the amount in controversy exceeds $20.  *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 53 (1989); *Atlas Roofing*, 430 U. S., at 454, n. 12, 461, n. 16.  Yet when, as here, the claim proceeds in a non-Article III forum, the relevant question becomes whether "Congress properly assign[ed the] matter" for decision to that forum consistent with Article III and the separation of powers.  *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S. 325, 345 (2018).  In other words, the question is whether Congress improperly bestowed federal judicial power on a non-Article III forum.  See *id*., at 334 (Congress cannot "'confer the Government's "judicial Power" on entities outside Article III'" (quoting *Stern* v. *Marshall*, 564 U. S. 462, 484 (2011))).[2]

The conclusion that Congress properly assigned a matter to an agency for adjudication therefore necessarily "resolves [any] Seventh Amendment challenge."  *Oil States*, 584 U. S., at 345 (explaining that if non-Article III adjudication

––––––––––
[2]Since the founding, Executive Branch officials have adjudicated certain matters, while others have required resolution in an Article III court.  An executive official properly vested with the authority to find facts, apply the law to those facts, and impose the consequences prescribed by law exercises executive power under Article II, not judicial power under Article III.  See *Arlington* v. *FCC*, 569 U. S. 290, 305, n. 4 (2013) (explaining that agency rulemaking and adjudications may "take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'" (quoting Art. II, §1, cl. 1)).

is permissible, then "'the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder'" (quoting *Granfinanciera*, 492 U. S., at 53–54)); see W. Baude, Adjudication Outside Article III, 133 Harv. L. Rev. 1511, 1571 (2020) ("The Article III analysis should be conducted first, on its own. And then . . . if the non-Article III adjudication is permissible, the Seventh Amendment should be ignored"). When executive power is at stake, Congress does not violate Article III or the Seventh Amendment by authorizing a nonjury factfinder to adjudicate the dispute.

So, the critical issue in this type of case is whether Congress can assign a particular matter to a non-Article III factfinder.

### B

For more than a century and a half, this Court has answered that Article III question by pointing to the distinction between "private rights" and "public rights." See *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856) (recognizing public-rights exception). The distinction is helpful because public rights always can be assigned outside of Article III. They "'do not require judicial determination'" under the Constitution, even if they "'are susceptible of it.'" *Crowell* v. *Benson*, 285 U. S. 22, 50 (1932) (quoting *Ex parte Bakelite Corp.*, 279 U. S. 438, 451 (1929)).

The majority says that aspects of the public-rights doctrine have been confusing. See *ante,* at 17. That might be true for cases involving wholly private disputes, but not for cases where the Government is a party.[3] It has long been

_____

[3] Every case that has expressed consternation about the precise contours of the public-rights doctrine, including those cited by the majority, involve only private disputes—or, more precisely, "disputes to which the Federal Government is not a party in its sovereign capacity." *Granfi-*

SOTOMAYOR, J., dissenting

settled and undisputed that, at a minimum, a matter of public rights arises "between the government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments." *Crowell*, 285 U. S., at 50; *Oil States*, 584 U. S., at 335 (describing the "Court's longstanding formulation of the public-rights doctrine"); accord, *Granfinanciera*, 492 U. S., at 51, and n. 8; *Atlas Roofing*, 430 U. S., at 452, 457; *Ex parte Bakelite Corp.*, 279 U. S., at 451. Indeed, "from the time the doctrine of public rights was born, in 1856," everyone understood that public rights "'arise "between the government and others,"'" and refer to "rights *of the public*—that is, rights pertaining to claims brought by or against the United States." *Granfinanciera*, 492 U. S., at 68–69 (Scalia, J., concurring in part and concurring in judgment); see *ibid.* (collecting sources). So, while this Court has recognized public rights in certain disputes between private parties, see *infra*, at 19–20, the doctrine's heartland consists of claims belonging to the Government.

When a claim belongs to the Government as sovereign, the Constitution permits Congress to enact new statutory obligations, prescribe consequences for the breach of those obligations, and then empower federal agencies to adjudicate such violations and impose the appropriate penalty. See *Atlas Roofing*, 430 U. S., at 450–455 (collecting cases).[4]

———————

*nanciera, S. A.* v. *Nordberg*, 492 U. S. 33, 55, n. 10 (1989) (involving dispute between private parties in bankruptcy court); see *ante*, at 17 (citing *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S. 325, 332–334 (2018) (involving patent dispute between private parties before the U. S. Patent and Trademark Office); *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 575 (1985) (involving challenge to arbitration procedure for private parties disputing data compensation under federal pesticide registration program)); see also *Stern* v. *Marshall*, 564 U. S. 462, 469–470 (2011) (involving dispute between private parties in bankruptcy court); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 56–57 (1982) (plurality opinion) (same).

[4] Judicial review of these agency decisions allows Congress to avoid

This Court has repeatedly emphasized these unifying principles through an unbroken series of cases over almost 200 years.

1

Start at the beginning, with *Murray's Lessee* in 1856. In that case, the Government issued a warrant to compel a federal customs collector to produce public funds that the Government determined the collector had unlawfully withheld. See 18 How., at 274–275. The Government executed the warrant to seize and sell a plot of the collector's land to make up for the withheld funds. See *id.*, at 274. In upholding the sale of the seized property, this Court concluded that the Government's in-house assessment and collection of taxes and penalties based on a federal official's adjudication of the facts did not violate Article III. The scheme was

_____

any due process concerns that might arise from having executive officials deprive someone of their property without review in an Article III court. See *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 455, n. 13 (1977) ("[T]hese cases do not present the question whether Congress may commit the adjudication of public rights and the imposition of fines for their violation to an administrative agency without any sort of intervention by a court at any stage of the proceedings"); accord, *Oil States*, 584 U. S., at 344 (same); Tr. of Oral Arg. 29 (Principal Deputy Solicitor General) (stating that "the Court has emphasized that judicial review of agency action may well be required" and the Due Process Clause may "ha[ve] something to say" about that requirement). The concurrence reproaches this dissent for declining to address any potential deficiencies in this administrative scheme, as well as failing to specify which forms of judicial review may be constitutionally required, see *ante,* at 22 (opinion of GORSUCH, J.), even though respondents did not raise any due process challenge in this case. Deciding whether this statutory scheme is procedurally deficient and so circumscribes judicial review that it violates due process would be inconsistent with the "settled principles of party presentation and adversarial testing." *Vidal* v. *Elster*, 602 U. S. 286, 328 (2024) (SOTOMAYOR, J., concurring in judgment) (citing *Maslenjak* v. *United States*, 582 U. S. 335, 354 (2017) (GORSUCH, J., joined by THOMAS, J., concurring in part and concurring in judgment)).

constitutional, the Court said, because "public rights" were at issue. *Id.*, at 284. In other words, the dispute arose between the Government and the customs collector in connection with the Government's exercise of its constitutional power to collect revenue. Congress could have brought such claims, if it wanted, "within the cognizance of the courts of the United States, as it may deem proper." *Ibid.* The Court thus endorsed that constitutional balance: Congress could decide whether to assign a public-rights dispute to the Executive for initial adjudication subject to judicial review or to an Article III federal court for resolution.

Fast forward half a century. In *Oceanic Steam Nav. Co.* v. *Stranahan*, 214 U. S. 320, 338–340 (1909), the Court upheld a customs official's imposition of a penalty on a steamship company that violated immigration laws barring the entry of certain classes of people into the country. The customs official determined the facts, adjudicated the violation, and enforced the statutory prohibition on immigration through the assessment of a monetary penalty. See *id.*, at 329. The Court noted the breadth of Congress's immigration power and held that the civil-penalty statutory scheme at issue was "beyond all question constitutional." *Id.*, at 342. Yet, far from restricting the public-rights doctrine to this particular exercise of congressional power or to specific prerogatives, the *Stranahan* Court went out of its way to explain that the "settled judicial construction" that civil-penalty claims brought by the Government could be assigned to the Executive for initial adjudication extended "not only as to tariff, but as to internal revenue, taxation, and other subjects," including the regulation of foreign commerce. *Id.*, at 339; see also *id.*, at 334–335.

Importantly, *Stranahan* rejected the "proposition" that, in "cases of penalty or punishment, . . . enforcement must depend upon the exertion of judicial power, either by civil or criminal process." *Id.*, at 338. In words that could have

been written in response to today's ruling, the Court explained that such a "proposition magnifies the judicial to the detriment of all other departments of the Government, disregards many previous adjudications of this court, and ignores practices often manifested and hitherto deemed to be free from any possible constitutional question." *Ibid.* For that reason, the validity of legislation authorizing the non-Article III adjudication of civil-penalty claims does not turn on the Judiciary's assessment of whether it is necessary for executive officials "to enforce designated penalties without resort to the courts." *Id.*, at 339. Whether or not such legislation violates Article III depends on whether Congress acted pursuant to a "grant of power made by the Constitution," and not on whether it "relate[s] to subjects peculiarly within the authority of the legislative department of the Government" or on the circumstances that might have "caused Congress to exert a specified power." *Id.*, at 339–340.

By the time *Stranahan* was decided, Congress already routinely "impose[d] appropriate obligations and sanction[ed] their enforcement by reasonable money penalties, giving to executive officers the power to enforce such penalties without the necessity of invoking the judicial power." *Id.*, at 339. Far from limiting the public-rights doctrine to the particular context in *Stranahan* and prior cases, this Court has expressly rejected the notion that the public-rights doctrine is so confined. See *infra*, at 18–19. This Court has repeatedly approved Congress's assignment of public rights to agencies in diverse areas of the law, reflecting Congress's varied constitutional powers.[5] A nonexhaustive list includes "interstate and foreign commerce, taxation, immigration, the public lands, public health, the

—————

[5] The majority's fixation on this dissent's discussion of *Stranahan*, see *ante*, at 16, n. 1, misses the fact that *Stranahan* exists within a long line of cases recognizing the diverse areas of the law comprising the public-rights doctrine.

SOTOMAYOR, J., dissenting

facilities of the post office, pensions, and payments to veterans," *Crowell*, 285 U. S., at 51, and n. 13 (collecting cases); see also, *e.g.*, *Helvering* v. *Mitchell*, 303 U. S. 391, 401–404 (1938) (administrative penalty for underpayment of taxes); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 22–24, 48–49 (1937) (reinstatement of dismissed employee and backpay in adjudication of unfair-labor-practices claim under the National Labor Relations Act); *Phillips* v. *Commissioner*, 283 U. S. 589, 591–592 (1931) (deficiency assessments for unpaid taxes); *Lloyd Sabaudo Societa Anonima per Azioni* v. *Elting*, 287 U. S. 329, 334–335 (1932) (fines for violation of immigration law barring entry of certain classes of individuals); *Ex parte Bakelite Corp.*, 279 U. S., at 446–447, 451, 458 (adjudication of unfair-methods-of-competition and unfair-acts claims, and imposition of additional duties under customs law); *Passavant* v. *United States*, 148 U. S. 214, 215–216, 220 (1893) (penalty for undervaluation of imported merchandise).

The list could go on and on. That is because, in every case where the Government has acted in its sovereign capacity to enforce a new statutory obligation through the administrative imposition of civil penalties or fines, this Court, without exception, has sustained the statutory scheme authorizing that enforcement outside of Article III.

### 2

A unanimous Court made this exact point nearly half a century ago in *Atlas Roofing*. That was the last time this Court considered a public-rights case where the constitutionality of an in-house adjudication of statutory claims brought by the Government was at issue. That case presented the same question as this one: Whether the Seventh Amendment permits Congress to commit the adjudication of a new cause of action for civil penalties to an administrative agency. 430 U. S., at 444. The Court said it did.

In *Atlas Roofing*, the Court explained how Congress identified a national problem, concluded that existing legal remedies were inadequate to address it, and then created a new statutory scheme that endorsed Executive in-house enforcement as a solution. Specifically, Congress found "that work-related deaths and injuries had become a 'drastic' national problem," and that existing causes of action, including tort actions for negligence and wrongful death, did not adequately "protect the employee population from death and injury due to unsafe working conditions." *Id.*, at 444–445. In response, Congress enacted the Occupational Safety and Health Act of 1970 (OSHA) to require employers "to avoid maintaining unsafe or unhealthy working conditions." *Id.*, at 445. OSHA in turn "empower[ed] the Secretary of Labor to promulgate health and safety standards," and the Occupational Safety and Health Review Commission to impose civil penalties on employers maintaining unsafe working conditions, regardless of whether any worker was in fact injured or killed. *Id.*, at 445–446.

Two employers that had been assessed civil penalties for OSHA violations resulting in the death of employees challenged the constitutionality of the statute's enforcement procedures. They observed that "a suit in a federal court by the Government for civil penalties for violation of a statute is a suit for a money judgment[,] which is classically a suit at common law." *Id.*, at 449. Therefore, the employers claimed, the Seventh Amendment right to a jury attached and Congress could not assign the matter to an agency for resolution. See *ibid.*

This Court upheld OSHA's statutory scheme. It relied on the long history of public-rights cases endorsing Congress's now-settled practice of assigning the Government's rights to civil penalties for violations of a statutory obligation to in-house adjudication in the first instance. See *id.*, at 450–455. In light of this "history and our cases," the Court con-

cluded that, where Congress "create[s] a new cause of ac-
tion, and remedies therefor, unknown to the common law,"
it is free to "plac[e] their enforcement in a tribunal supply-
ing speedy and expert resolutions of the issues involved."
*Id.*, at 460–461. "That is the case even if the Seventh
Amendment would have required a jury where the adjudi-
cation of those rights is assigned to a federal court of law."
*Id.*, at 455; see *id.*, at 461, n. 16.

The "new rule" and "legally unsound principle" that the
majority accuses this dissent of "unfurl[ing]" today, *ante,* at
17–18, n. 2, is the one that this Court declared "'settled ju-
dicial construction' . . . 'from the beginning'": "[T]he Gov-
ernment could commit the enforcement of statutes and the
imposition and collection of fines . . . for administrative en-
forcement, without judicial trials," even if the same action
would have required a jury trial if committed to an Article
III court. *Atlas Roofing*, 430 U. S., at 460 (collecting cases);
accord, *Elting*, 287 U. S., at 334 (Congress "may lawfully
impose appropriate obligations, sanction their enforcement
by reasonable money penalties, and invest in administra-
tive officials the power to impose and enforce them");
*Stranahan*, 214 U. S., at 339 (Congress may "impose appro-
priate obligations and sanction their enforcement by rea-
sonable money penalties, giving to executive officers the
power to enforce such penalties without the necessity of in-
voking the judicial power").

## C

It should be obvious by now how this case should have
been resolved under a faithful and straightforward applica-
tion of *Atlas Roofing* and a long line of this Court's prece-
dents. The constitutional question is indistinguishable.
The majority instead wishes away *Atlas Roofing* by burying
it at the end of its opinion and minimizing the unbroken
line of cases on which *Atlas Roofing* relied. That approach

to precedent significantly undermines this Court's commitment to *stare decisis* and the rule of law.

This case may involve a different statute from *Atlas Roofing*, but the schemes are remarkably similar. Here, just as in *Atlas Roofing*, Congress identified a problem; concluded that the existing remedies were inadequate; and enacted a new regulatory scheme as a solution. The problem was a lack of transparency and accountability in the securities market that contributed to the Great Depression of the 1930s. See *ante,* at 1. The inadequate remedies were the then-existing state statutory and common-law fraud causes of action. The solution was a comprehensive federal scheme of securities regulation consisting of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. See *ibid.* In particular, Congress enacted these securities laws to ensure "full disclosure" and promote ethical business practices "in the securities industry," *SEC* v. *Capital Gains Research Bureau, Inc.*, 375 U. S. 180, 186 (1963), as well as to "protect investors against manipulation of stock prices," *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 195 (1976).

The prophylactic nature of the statutory regime also is virtually indistinguishable from the OSHA scheme at issue in *Atlas Roofing*. Among other things, these securities laws prohibit the misrepresentation or concealment of various material facts through the imposition of federal registration and disclosure requirements. See *ante,* at 2. Critically, federal-securities laws do not require proof of actual reliance on an investor's misrepresentations or that an "investor has actually suffered financial loss." *Ante,* at 4; see also *SEC* v. *Life Partners Holdings, Inc.* 854 F. 3d 765, 779 (CA5 2017); *SEC* v. *Blavin*, 760 F. 2d 706, 711 (CA6 1985) (*per curiam*). OSHA too prohibits conduct that could, but does not necessarily, injure a private person. *Atlas Roofing*, 430 U. S., at 445 (OSHA remedies "exis[t] whether or not an employee is

actually injured or killed as a result of the [unsafe or un-healthy working] condition"). The employer's failure to maintain safe and healthy working conditions violates OSHA even if there is no actionable harm to an employee, just as a misrepresentation to investors in connection with the buying or selling of securities violates federal-securities law even if there is no actual injury to the investors.

Moreover, both here and in *Atlas Roofing*, Congress empowered the Government to institute administrative enforcement proceedings to adjudicate potential violations of federal law and impose civil penalties on a private party for those violations, all while making the final agency decision subject to judicial review. In bringing a securities claim, the SEC seeks redress for a "violation" that "is committed against the United States rather than an aggrieved individual," which "is why, for example, a securities-enforcement action may proceed even if victims do not support or are not parties to the prosecution." *Kokesh* v. *SEC*, 581 U. S. 455, 463 (2017). Put differently, the SEC seeks to "'remedy harm to the public at large'" for violation of the Government's rights. *Ibid.* The Government likewise seeks to remedy a public harm when it enforces OSHA's prohibition of unsafe working conditions.

Ultimately, both cases arise between the Government and others in connection with the performance of the Government's constitutional functions, and involve the Government acting in its sovereign capacity to bring a statutory claim on behalf of the United States in order to vindicate the public interest. They both involve, as *Atlas Roofing* put it, "new cause[s] of action, and remedies therefor, unknown to the common law." 430 U. S., at 461. Neither Article III nor the Seventh Amendment prohibits Congress from assigning the enforcement of these new "Governmen[t] rights to civil penalties" to non-Article III adjudicators, and thus "supplying speedy and expert resolutions of the issues involved." *Id.*, at 450, 461. In a world where precedent means

SOTOMAYOR, J., dissenting

something, this should end the case. Yet here it does not.

### III

The practice of assigning the Government's right to civil penalties for statutory violations to non-Article III adjudication had been so settled that it become an undisputable reality of how "our Government has actually worked." *Consumer Financial Protection Bureau*, 601 U. S., at 445 (KAGAN, J., concurring). That is why the Court has had no cause to address this kind of constitutional challenge since its unanimous decision in *Atlas Roofing*. The majority takes a wrecking ball to this settled law and stable government practice. To do so, it misreads this Court's precedents, ignores those that do not suit its thesis, and advances distinctions created from whole cloth.

The majority's treatment of the public-rights doctrine is not only incomplete, but is gerrymandered to produce today's result. See Part III–A (*infra*, at 17–21). Unable to explain that doctrine, the majority effectively ignores the Article III threshold question to focus instead on two Seventh Amendment cases: *Tull* v. *United States*, 481 U. S. 412 (1987), and *Granfinanciera, S. A.* v. *Nordberg*, 492 U. S. 33 (1989). Neither involved the in-house adjudication of statutory claims brought by the Government pursuant to its sovereign powers, which is the critical fact under this Court's precedent. See Part III–B–1 (*infra*, at 22–24) (discussing *Tull*); Part III–B–2 (*infra*, at 24–29) (discussing *Granfinanciera*). The majority and the concurrence then predictably fail to distinguish *Atlas Roofing*, which resolved the Seventh Amendment question for cases like this one implicating that critical fact. See Part III–C (*infra*, at 29–32).

### A

To start, it is almost impossible to discern how the majority defines a public right and whether its view of the doctrine is consistent with this Court's public-rights cases. The

SOTOMAYOR, J., dissenting

majority at times seems to limit the public-rights exception to areas of its own choosing. It points out, for example, that some public-rights cases involved the collection of revenue, customs law, and immigration law, see *ante*, at 14–17, and that *Atlas Roofing* involved OSHA and not "civil penalty suits for fraud," *ante*, at 22.[6] Other times, the majority highlights a particular practice predating the founding, such as the "unbroken tradition" in *Murray's Lessee* of executive officials issuing warrants of distress to collect revenue. *Ante*, at 15; see also *ante*, at 13–14 (GORSUCH, J., concurring). Needless to say, none of these explanations for the doctrine is satisfactory. What is the legal principle behind saying only these areas and no further? This Court has rejected that kind of arbitrary line-drawing in cases like *Stranahan* and *Atlas Roofing*. How does the requirement of a historical practice dating back to the founding, or "flow[ing] from centuries-old rules," *ante*, at 17, account for the broad universe of public-rights cases in the United States Reporter? The majority does not say.

The majority's only other theory fares no better. The majority seems to suggest that a common thread underlying these cases is that "the political branches had traditionally held exclusive power over th[ese] field[s] and had exercised it." *Ante,* at 16–17. To the extent the majority thinks this is a distinction, it fails for at least two reasons.

First, *Atlas Roofing* expressly rejected the argument that the public-rights doctrine is limited to particular exercises of congressional power. The employers in *Atlas Roofing* argued "that cases such as *Murray's Lessee*, *Elting*, [*Stranahan*], *Phillips*, and *Helvering* all deal with the exercise of sovereign powers that are inherently in the exclusive do-

───────────

[6]The majority also cites cases involving "relations with Indian tribes, the administration of public lands, and the granting of public benefits such as payments to veterans, pensions, and patent rights." *Ante*, at 17 (citations omitted).

main of the Federal Government and critical to its very existence—the power over immigration, the importation of goods, and taxation." 430 U. S., at 456. Cabining the cases in that way, the employers argued that "[t]he theory of those cases is inapplicable where the Government exercises other powers that [they] regard[ed] as less fundamental, less exclusive, and less vital to the existence of the Nation, such as the power to regulate commerce among the several States, the latter being the power Congress sought to exercise in enacting [OSHA]." *Ibid.* The Court rejected the employers' argument, explaining that nothing in those cases turned on those particular exercises of the Government's authority. See *id.*, at 456–457; cf. *Crowell*, 285 U. S., at 51 (offering a list of "[f]amiliar illustrations of . . . exercise[s]" of Congress's constitutional authority that have fallen within the public-rights exception to Article III).

Second, even if *Atlas Roofing* had not explicitly rejected the proposed distinction here, the majority cannot reconcile its restrictive view of the public-rights doctrine with *Atlas Roofing* and other precedents. For example, it is unclear how OSHA, or the National Labor Relations Act at issue in *Jones & Laughlin*, would fit the majority's view of the public-rights doctrine, or why the exercise of interstate-commerce power to enact those statutes would be any different from the exercise of that same power to enact the federal-securities laws at issue here. See *Atlas Roofing*, 430 U. S., at 457 ("It is also apparent that *Jones & Laughlin*, *Pernell*, and *Curtis* are not amenable to the limitations suggested by [the employers]").

The majority's description of the doctrine also fails to account for public rights that do not belong to the Federal Government in its sovereign capacity. See *Granfinanciera*, 492 U. S., at 54 ("[T]he Federal Government need not be a party for a case to revolve around 'public rights'"). This Court, after all, has rejected the confinement of public rights to that heartland. See *ibid.* ("[W]e [have] rejected the

view that 'a matter of public rights must at a minimum arise "between the government and others"'"). Conspicuously absent from the majority's discussion are, for example, cases in which this Court held that Congress could assign a private federally created action that was "closely integrated into a public regulatory scheme" for adjudication in a non-Article III forum. *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 594 (1985). These cases include, for example, an agency's adjudication of state-law counterclaims to an investor's federal action against its broker, *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 835–836, 847–850 (1986), and the arbitration of data-compensation disputes among participants in the Environmental Protection Agency's pesticide registration scheme, *Thomas*, 473 U. S., at 571, 589–592. Both *Thomas* and *Schor* thus upheld the non-Article III adjudication of disputes between private parties, which naturally did not involve the Government in its sovereign capacity.

Even accepting the majority's public-rights-are-confusing defense, its "strategy for dealing with the confusion is not to offer a theory for rationalizing this body of law," but to provide an incomplete and unprincipled account of the doctrine. *Haaland* v. *Brackeen*, 599 U. S. 255, 279 (2023). The majority references, but does not explain, "distinctions our cases have drawn," *ante*, at 18, n. 2, also cherry-picking some cases and ignoring others. Indeed, in lieu of a coherent theory, all the majority has to offer is a list of five "historic categories of adjudications [that] fall within the exception," *ante*, at 14–17, and maybe (just maybe) OSHA, which the majority reluctantly adds to the mix at the end of its opinion for good measure, see *ante*, at 22–24. The majority ignores countless public-rights cases and entire strands of the doctrine, and fails to heed its own admonition that "close attention" must be paid "to the basis for each asserted

SOTOMAYOR, J., dissenting

application of the doctrine." *Ante,* at 17.[7]

The majority also attacks a strawman when it asserts that "precedents foreclose th[e] argument" that the public-rights doctrine "applies whenever a statute increases governmental efficiency." *Ante,* at 26; see also *ante,* at 19 (GORSUCH, J., concurring). No one has made that argument in this case; not the Government and certainly not this dissent. The fact that certain rights might be susceptible to speedy and expert resolution through non-Article III adjudication is not what makes them "rights *of the public*—that is, rights pertaining to claims brought by or against the United States." *Granfinanciera,* 492 U. S., at 68–69 (Scalia, J., concurring in part and concurring in judgment).

It is not clear what else, if anything, might qualify as a public right, or what is even left of the doctrine after today's opinion. Rather than recognize the long-settled principle that a statutory right belonging to the Government in its sovereign capacity falls within the public-rights exception to Article III, the majority opts for a "we know it when we see it" formulation. This Court's precedents and our coequal branches of Government deserve better.

### B

Rather than relying on *Atlas Roofing* or the relevant public-rights cases, the majority instead purports to follow *Tull* and *Granfinanciera.* The former involved a suit in federal court and the latter involved a dispute between private parties. So, just like that, the majority ventures off on the wrong path. Indeed, as explained below, both the majority and the concurrence miss the critical distinction drawn in

---

[7] Among other things, the concurrence accuses this dissent of behaving like a "picky child at the dinner table." *Ante,* at 21 (opinion of GORSUCH, J.). The precedents, though, speak for themselves. It is the majority and concurrence that pick and choose among public-rights cases, excluding broad strands of precedent constituting the doctrine.

SOTOMAYOR, J., dissenting

this Court's precedents between the non-Article III adjudi-
cation of public-rights matters involving the liability of one
individual to another and those involving claims belonging
to the Government in its sovereign capacity.

According to the majority, respondents are entitled to a
jury trial in federal court because, as here, *Tull* involved a
Government claim for civil penalties, and *Granfinanciera*
looked to the common law to determine if a statutory cause
of action was legal in nature. By focusing on the remedy in
this case, and the perceived similarities between the statu-
tory cause of action and a common-law analogue, the ma-
jority elides the critical distinction between those cases and
this one: Whether Congress assigned the Government's sov-
ereign rights to civil penalties to a non-Article III factfinder
for adjudication.

1

The majority bafflingly proclaims that "the remedy is all
but dispositive" in this case, *ante,* at 9, ignoring that *Atlas
Roofing* and countless precedents before it rejected that
proposition. Not content to take just a page from the em-
ployers' challenge in *Atlas Roofing*, the majority has taken
their whole brief, resuscitating yet another theory that this
Court has long foreclosed. The employers in *Atlas Roofing*
argued that the Seventh Amendment prohibited Congress
from assigning to an agency the same remedy at issue here:
civil penalties. See 430 U. S., at 450 ("Petitioners . . . claim
that . . . assign[ing] the function of adjudicating the Gov-
ernment's rights to civil penalties for [a statutory] violation
. . . deprive[s] a defendant of his Seventh Amendment jury
right"). This Court rejected that argument outright, citing
a long line of cases involving the Executive's adjudication of
statutory claims for civil penalties brought by the Govern-
ment in its sovereign capacity. *Id.*, at 450–455 (collecting
cases).

As discussed above, this Court has long endorsed statutory schemes authorizing agency adjudicators to find violations and award civil penalties to the Government. See *supra*, at 9–12. Long before *Atlas Roofing*, this Court held that the Constitution permits Congress to enact statutory obligations and then "sanction their enforcement by reasonable money penalties" by government officials "without the necessity of invoking the judicial power." *Stranahan*, 214 U. S., at 339; see *id.*, at 338–339 (collecting cases). That the SEC imposed civil penalties on respondents therefore has little, if any, bearing on the resolution of this case.

Again, even if over a century of precedent did not foreclose the majority's argument, it fails on its own terms. The majority relies almost entirely on *Tull*, which held that statutory claims for civil penalties were "a type of remedy at common law" that entitled a defendant to a jury trial. 481 U. S., at 422; see *id.*, at 425. Critically, however, the *Tull* Court's analysis took place in an entirely different context: federal court. See *ante,* at 8–9 ("In [*Tull*], the Government sued a real estate developer for civil penalties [under the Clean Water Act] *in federal court*" (emphasis added)). *Tull* did not present the question at issue in *Atlas Roofing* and other cases involving non-Article III adjudication of Government claims in the first instance. Rather, *Tull* stands for the unremarkable proposition that, when the Government sues an entity for civil penalties in federal district court, the Seventh Amendment entitles the defendant "to a jury trial to determine his liability on the legal claims." 481 U. S., at 425.

That conclusion says nothing about the constitutionality of the SEC's in-house adjudicative scheme. *Atlas Roofing* and its predecessors could not have been clearer on this point: Congress can assign the enforcement of a statutory obligation for in-house adjudication to executive officials, "even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned to a

federal court of law instead of an administrative agency."
430 U. S., at 455. Although "the Government could commit
the enforcement of statutes and the imposition and collec-
tion of fines to the judiciary, in which event jury trial would
be required," the Government "could also validly opt for ad-
ministrative enforcement, without judicial trials." *Id.*, at
460 (citing *Stranahan*, 214 U. S., at 339; *Hepner* v. *United
States*, 213 U. S. 103 (1909); *United States* v. *Regan*, 232
U. S. 37 (1914); *Helvering*, 303 U. S., at 402–403; *Crowell*,
285 U. S., at 50–51); *Curtis*, 415 U. S., at 195 (explaining
that Congress can "entrust [the] enforcement of statutory
rights to an administrative process . . . free from the stric-
tures of the Seventh Amendment," but must abide by the
Amendment when it does so "in an ordinary civil action in
the district courts").

It would have been quite remarkable for *Tull*, which in-
volved a claim in federal court, to overrule silently more
than a century of caselaw involving non-Article III adjudi-
cations of the Government's rights to civil penalties for stat-
utory violations. Of course, *Tull* did no such thing. *Tull*
even reaffirmed *Atlas Roofing* by emphasizing that the Sev-
enth Amendment depends on the forum, not just the rem-
edy, because it "is not applicable to administrative proceed-
ings." 481 U. S., at 418, n. 4 (citing *Atlas Roofing*, 430 U. S.,
at 454; *Pernell*, 416 U. S., at 383). For the majority to pre-
tend otherwise is wishful thinking at best.

### 2

The majority next argues that the "close relationship" be-
tween the federal-securities laws and common-law fraud
"confirms that this action is 'legal in nature,'" and entitles
respondents to a jury trial. *Ante,* at 13. That argument
does not fare any better than the argument on remedy.
Again, the majority bends inapposite case law to an illogical
thesis. *Granfinanciera*, on which the majority relies to
make its cause-of-action argument, set forth the public-

SOTOMAYOR, J., dissenting

rights analysis only for "disputes to which the Federal Government is not a party in its sovereign capacity." 492 U. S., at 55, n. 10. For cases that, as here, involve the Government in its sovereign capacity, the *Granfinanciera* Court plainly stated that "Congress may fashion causes of action that are closely *analogous* to common-law claims and [still] place them beyond the ambit of the Seventh Amendment by assigning their resolution to a [non-Article III] forum in which jury trials are unavailable." *Id.*, at 52 (citing *Atlas Roofing*, 430 U. S., at 450–461).[8]

The Court held in *Granfinanciera* that "a person who has not submitted a claim against a bankruptcy estate has a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer." 492 U. S., at 36. In doing so, the Court noted that actions to recover such transfers through a claim of fraudulent conveyance were traditionally available at common law. See

_____

[8]The majority leaves open the possibility that *Granfinanciera* might have overruled *Atlas Roofing*. See *ante*, at 22–23. That suggestion strains credulity. By my count, *Granfinanciera* favorably cites to *Atlas Roofing* at least 12 times. See 492 U. S., at 48, 51–54, 57, 60–61; see also *id.*, at 65 (Scalia, J., concurring in part and concurring in judgment). It even reaffirmed the definition of public rights from *Atlas Roofing*, declaring that the Court "adhere[d] to that general teaching . . . in *Atlas Roofing*." 492 U. S., at 51. The majority's only response is to say that Justice White thought *Granfinanciera* may have overruled *Atlas Roofing*. See *ante*, at 23, n. 3; see also *ante*, at 17 (GORSUCH, J., concurring). That is misleading at best. When Justice White said in his *Granfinanciera* dissent that the Court's opinion in that case could be read as overruling or limiting portions of several cases, including *Atlas Roofing*, he was referring to his understanding that *Atlas Roofing* also extended to private disputes. See *Granfinanciera*, 492 U. S., at 79–83; see also Tr. of Oral Arg. 58–59 (Principal Deputy Solicitor General explaining that Justice White understood "*Atlas Roofing* to speak [also] to the private parties cases," not just to cases involving the Government, which "is really a through line that the Court has never questioned"). With respect to claims involving the Government, such as those at issue here, *Granfinanciera* expressly reaffirmed *Atlas Roofing* and "adhere[d] to [its] general teaching." 492 U. S., at 51.

*id.*, at 43–49. That did not resolve the case, however. Un-like in *Tull*, the proceeding at issue in *Granfinanciera* was in a non-Article III forum (*i.e.*, a bankruptcy court). So, to answer whether Congress could assign the fraudulent-con-veyance claim to a bankruptcy judge for decision, Congress needed to decide whether the "legal cause of action in-volve[d] 'public rights.'" 492 U. S., at 53.

*Granfinanciera* explains that there are two ways to iden-tify a "public right." First, there are the matters in which Congress enacts a statutory cause of action that "inheres in, or lies against, the Federal Government in its sovereign ca-pacity." *Id.*, at 53 (citing *Atlas Roofing*, 430 U. S., at 458). These matters necessarily arise between the Government and the people in connection with the Government's exer-cise of its constitutional authority. See *supra*, at 7–8. In these cases, the Court said, *Atlas Roofing* controls the pub-lic-rights analysis. See *Granfinanciera*, 492 U. S., at 51, 53. The Court explained that "Congress may effectively sup-plant a common law cause of action carrying with it a right to a jury trial with a statutory cause of action shorn of a jury trial right if that statutory cause of action inheres in, or lies against, the Federal Government in its sovereign ca-pacity." *Id.*, at 53 (citing *Atlas Roofing*, 430 U. S., at 458).

The second kind of public right that *Granfinanciera* rec-ognized involves "disputes to which the Federal Govern-ment is not a party in its sovereign capacity," 492 U. S., at 55, n. 10, that is, usually "[w]holly private" disputes, *id.*, at 51. The public-rights analysis in these private-dispute cases looks different: "The crucial question, *in cases not in-volving the Federal Government*, is whether 'Congress, act-ing for a valid legislative purpose pursuant to its constitu-tional powers under Article I, has created a seemingly "private" right that is so closely integrated into a public reg-ulatory scheme as to be a matter appropriate for agency res-olution with limited involvement by the Article III judici-ary.'" *Id.*, at 54 (quoting *Thomas*, 473 U. S., at 593–594;

emphasis added; alterations omitted).

These two approaches together stand for the proposition that "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, *and* if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court." 492 U. S., at 54–55 (emphasis added). Once in federal court, "[i]f the right is legal in nature, then it carries with it the Seventh Amendment's guarantee of a jury trial." *Id.*, at 55.

Because *Granfinanciera* did not involve a statutory right that belonged to the Government in its sovereign capacity, *Atlas Roofing* did not control the outcome. Instead, the Court applied the private-disputes test to determine whether fraudulent-conveyance "actions were 'closely intertwined' with the bankruptcy regime." *Ante*, at 20 (quoting *Granfinanciera*, 492 U. S., at 54). The Court held that the fraudulent-conveyance actions "were not inseparable from the bankruptcy process," and thus the public-rights exception did not apply. *Ante*, at 20 (citing *Granfinanciera*, 492 U. S., at 54, 56).

The majority brushes aside this critical distinction between *Atlas Roofing* and *Granfinanciera* in one sentence. That "the Government is the party prosecuting this action," the majority writes, is meaningless because this Court has "never held that the 'presence of the United States as a proper party to the proceeding is . . . sufficient' by itself to trigger the exception." *Ante*, at 22 (quoting *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 69, n. 23 (1982) (plurality opinion)). Here, too, the majority attacks a strawman. The SEC does not claim that the mere presence of the United States as a proper party necessarily means that a public right is at issue. See Reply Brief 8, n. 2 (disclaiming this argument).[9] Of course "what matters is

_____

[9]Indeed, "the public-rights doctrine does not extend to any criminal

28                         SEC *v.* JARKESY

                      SOTOMAYOR, J., dissenting

the substance" of the claim. *Ante*, at 21.

By no means, though, does this case involve a "purely tax-
onomic change." *Granfinanciera*, 492 U. S., at 61. Con-
gress did not just repackage a common-law claim under a
new label. It created new statutory obligations and an en-
tire federal scheme. See *supra*, at 14–16.[10] Perhaps most
importantly, Congress created a new right unknown to the
common law that, unlike common-law fraud, belongs to the
public and inheres in the Government in its sovereign ca-
pacity. That is why, when the SEC seeks to enforce the fed-
eral-securities laws, it does so to remedy the harm to the
United States. See *supra*, at 16. It seeks to protect the in-
tegrity of the securities market as a whole through the im-
position of new and distinct remedies like civil penalties

———————

matters, although the Government is a proper party." *Northern Pipeline
Constr. Co.*, 458 U. S., at 70, n. 24 (plurality opinion) (citing *United
States ex rel. Toth* v. *Quarles*, 350 U. S. 11 (1955)). That is so not only
because this Court has held as much, but also because Article III itself
prescribes that "[t]he trial of all Crimes, except in Cases of Impeachment,
shall be by Jury." §2, cl. 3. In other words, Article III requires criminal
trials to take place before a jury in federal court, but says nothing about
civil-penalty claims brought by the Government. Beyond criminal trials,
the Solicitor General also concedes that, under this Court's precedents,
the public-rights doctrine does not apply when the Government brings a
common-law claim in a proprietary capacity. See Reply Brief 8, n. 2.

[10]The majority spills much ink on the perceived similarities between
federal-securities fraud and common-law fraud, only to conclude that the
causes of action are not identical. That conclusion was inevitable be-
cause of critical differences between the two. Even if Congress drew upon
common-law fraud when it enacted federal-securities laws, see *ante,* at
11–12, this Court has repeatedly disclaimed any suggestion that Con-
gress federalized a common-law fraud claim. See, *e.g., Stoneridge Invest-
ment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U. S. 148, 162 (2008)
("Section 10(b) does not incorporate common-law fraud into federal law");
*SEC* v. *Zandford*, 535 U. S. 813, 820 (2002) ("[T]he statute must not be
construed so broadly as to convert every common-law fraud that happens
to involve securities into a violation of §10(b)"); *Herman & MacLean* v.
*Huddleston*, 459 U. S. 375, 388–389 (1983) ("[T]he antifraud provisions
of the securities laws are not coextensive with common-law doctrines of
fraud").

and orders barring violators from holding certain positions and performing certain activities in the industry. See 15 U. S. C. §§77h–1(f), and (g), 78u–2, 78u–3(f).

For these reasons, "[a]n action brought by an Executive Branch agency to enforce federal securities laws is not the same as an action brought by one individual against another for monetary or injunctive relief of the sort that law courts (with juries) in England or the States have traditionally heard." Brief for Professor John Golden et al. as *Amici Curiae* 3. Congress did not unlawfully "siphon" a traditional legal action "away from an Article III court" when it enacted the federal-securities laws and provided for their enforcement within the SEC. *Ante,* at 21.

The majority asserts that "*Granfinanciera* effectively decides this case." *Ante,* at 20. That can only be true, though, if one ignores what *Granfinanciera* actually says: Its public-rights analysis of whether an action is closely intertwined with a federal regulatory program only applies "in cases not involving the Federal Government." 492 U. S., at 54. The analysis from *Atlas Roofing* controls where, as here, "'the Government is involved in its sovereign capacity under an otherwise valid statute.'" 492 U. S., at 51 (quoting *Atlas Roofing,* 430 U. S., at 458).

### C

Both cases relied on by the majority, *Tull* and *Granfinanciera,* reaffirm that *Atlas Roofing* controls precisely in circumstances like the ones at issue in this case. That is why the majority's late-stage attempt to distinguish *Atlas Roofing* fails. The majority's principal argument that the OSHA scheme in *Atlas Roofing* "did not borrow its cause of action from the common law" and was instead a "self-consciously novel" scheme that "resembled a detailed building code," *ante,* at 23–24, is flawed on multiple fronts.

First, OSHA's cause of action should be largely irrelevant under the majority's view that the remedy of civil penalties

SOTOMAYOR, J., dissenting

is effectively dispositive under *Tull*. *Atlas Roofing*, and
many other cases involving non-Article III adjudications,
also involved civil penalties designed to punish and deter,
and yet the majority does not expressly disavow them. Log-
ically, then, either *Atlas Roofing* and countless other cases
were wrongly decided, or the majority's view on civil penal-
ties is wrong.

Second, because the majority elides the critical distinc-
tion between *Atlas Roofing* and *Granfinanciera*, it fails to
grapple with the fact that this case, like *Atlas Roofing* and
unlike *Granfinanciera*, involves the Government acting in
its sovereign capacity to enforce a statutory violation. That
makes the right at issue a "public right" that Congress can
take outside the purview of Article III, even when the new
cause of action is analogous to a common-law claim.

Third, the relationship between the federal-securities
laws (including their antifraud provisions) and common-
law fraud is materially indistinguishable from the relation-
ship between OSHA and the common-law torts of wrongful
death and negligence. Unlike their common-law compara-
tors, neither statute requires actionable harm to an individ-
ual. See *supra*, at 15. In arguing that OSHA's scheme was
"self-consciously" novel in ways unknown to the common
law, the majority points to the granularity of OSHA stand-
ards. *Ante,* at 23–24. Yet lawyers and regulated parties in
the securities industry would be surprised to hear that this
could be a distinguishing feature. Anyone familiar with the
industry knows securities laws are replete with specific and
exceedingly detailed requirements implementing the stat-
ute's disclosure and antifraud provisions. See, *e.g.*, 17 CFR
§275.206(4)–1(b) (2023) (prohibiting testimonials and en-
dorsements that do not satisfy requirements without meet-
ing complex disclosure requirements); §275.206(4)–2(a)
(prohibiting investment advisers from having custody of cli-
ent funds or securities unless specific requirements are

met, including qualifications, notices, and account statements).

The majority further rests on the notion that Congress drew inspiration from the common law in enacting the antifraud provisions of the federal-securities laws, whereas OSHA's new statutory duty did not bring any common-law soil with it. See *ante*, at 23–24. Yet both statutes share elements with claims at common law that Congress deemed inadequate to address the national problems that prompted it to legislate. See *supra*, at 14–15. Still, even accepting that federal-securities laws bring common-law soil with them and OSHA does not, the majority does not explain why that is a constitutionally relevant distinction.[11]

In sum, all avenues by which the majority attempts to distinguish *Atlas Roofing* fail. The majority cannot escape the entrenched principle that a "legal cause of action involves 'public rights'" that can be taken outside of Article III if the "statutory right is . . . closely intertwined with a federal regulatory program Congress has power to enact" *or* if it "belongs to [o]r exists against the Federal Government." *Granfinanciera*, 492 U. S., at 53–54.[12] In both *Atlas Roofing* and this case, a public right exists. In both statutory

---

[11] In *Tull* v. *United States*, 481 U. S. 412 (1987), for example, there was no common-law soil brought into that federal regulatory regime, and the Seventh Amendment still applied. Indeed, no one can argue that "[t]he purpose of [the Clean Water Act] was . . . to enable the Federal Government to bring or adjudicate claims that traced their ancestry to the common law." *Ante*, at 23–24.

[12] The concurrence's assertion that the majority is "follow[ing] the advice of Justices Brennan and Marshall" by "'limit[ing] the judicial authority of non-Article III federal tribunals'" is misleading. *Ante,* at 20 (quoting *Schor*, 478 U. S., at 859 (Brennan, J., joined by Marshall, J., dissenting)). Justice Brennan in his *Schor* dissent wrote that he would limit the authority of non-Article III tribunals to three recognized exceptions: (1) territorial courts; (2) courts-martial; and (3) forums adjudicating public-rights matters. As examples of the public-rights category, Justice Brennan cited *Murray's Lessee*, *Ex parte Bakelite*, *Crowell*, *Thomas*, and his plurality opinion in *Northern Pipeline*. See *Schor*, 478 U. S., at

SOTOMAYOR, J., dissenting

schemes, regardless of any perceived resemblance to the common law, Congress enacted a new cause of action that created a statutory right belonging to the United States for the Government to enforce pursuant to its sovereign powers.

## IV

A faithful and straightforward application of this Court's longstanding precedent should have resolved this case. Faithful "[a]dherence to precedent is 'a foundation stone of the rule of law.'" *Kisor* v. *Wilkie*, 588 U. S. 558, 586 (2019) (quoting *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 798 (2014)). It allows courts to function, and be perceived, as courts, and not as political entities. "'It promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" 588 U. S., at 586–587 (quoting *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991); alterations omitted). That is why, "even in constitutional cases, a departure from precedent 'demands special justification.'" *Gamble* v. *United States*, 587 U. S. 678, 691 (2019) (quoting *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984)).

Today's decision disregards these foundational principles.[13] Time will tell what is left of the public-rights doc-

––––––––––

859. As those citations demonstrate, both Justices Brennan and Marshall certainly thought that public-rights matters extend to certain private disputes that do not involve the Government as a party, as well as disputes involving the Government in connection with different exercises of congressional power. Indeed, it was Justice Brennan who reaffirmed *Atlas Roofing* in his opinion for the *Granfinanciera* Court and explained that a public right includes, at a minimum, a statutory right that "belongs to [o]r exists against the Federal Government." 492 U. S., at 53–54.

[13] Precedents should not be so easily discarded based on the views of

trine.  Less uncertain, however, are the momentous consequences that flow from the majority's insistence that the Government's rights to civil penalties must now be tried before a jury in federal court.  The majority's decision, which strikes down the SEC's in-house adjudication of civil-penalty claims on the ground that such claims are legal in nature and entitle respondents to a federal jury, effects a seismic shift in this Court's jurisprudence.  Indeed, "[i]f you've never heard of a statute being struck down on that ground," and you recall having read countless cases approving of that arrangement, "you're not alone."  *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. 197, 294 (2020) (KAGAN, J., concurring in judgment with respect to severability and dissenting in part).

The majority pulls a rug out from under Congress without even acknowledging that its decision upends over two centuries of settled Government practice.  The United States, led by then-Solicitor General Robert Bork and then-Assistant Attorney General for the Civil Division Rex Lee, told this Court in *Atlas Roofing* that "during the whole of our history, regulatory fines and penalties have been collected by non-jury procedures pursuant to . . . legislative decisions," and that "[i]t would be most remarkable if, at this late date, the Seventh Amendment were construed to outlaw this consistent rule of government followed for two centuries."  Brief for Respondents in *Atlas Roofing*, O. T. 1976, No. 75–746, etc., pp. 81–82.  This Court agreed and upheld that practice, it seemed, once and for all.

––––––––

some commentators, or on whether or not a particular case is "celebrated."  *Ante*, at 25, n. 4.  *Atlas Roofing* and the long line of cases before it are precedents from this Court entitled to *stare decisis* effect.  Indeed, this Court has reaffirmed and repeatedly cited *Atlas Roofing* with approval.  See, *e.g.*, *Oil States*, 584 U. S., at 344–345; *Stern*, 564 U. S., at 489–490; *Granfinanciera*, 492 U. S., at 48, 51–54, 60–61; *id.*, at 65–66 (Scalia, J., concurring in part and concurring in judgment); *Tull*, 481 U. S., at 418, n. 4; *Northern Pipeline Constr. Co.*, 458 U. S., at 67, n. 18, 69, n. 23, 70, 73, 77 (plurality opinion).

SOTOMAYOR, J., dissenting

Following this Court's precedents and the recommendation of the Administrative Conference of the United States, Congress has enacted countless new statutes in the past 50 years that have empowered federal agencies to impose civil penalties for statutory violations. See 2 P. Verkuilm, D. Gifford, C. Koch, R. Pierce, & J. Lubbers, Administrative Conference of the United States, Recommendations and Reports, The Federal Administrative Judiciary 861, and nn. 350–351 (1992). These statutes are sometimes enacted in addition to, but often instead of, "the traditional civil enforcement statutes that permitted agencies to collect civil penalties only after federal district court trials." *Id.*, at 861. "By 1986, there were over 200 such statutes" and "[t]he trend has, if anything, accelerated" since then. *Id.*, at 861, and n. 351.

Similarly, there are, at the very least, more than two dozen agencies that can impose civil penalties in administrative proceedings. See Tr. of Oral Arg. 78–79 (Principal Deputy Solicitor General) (recognizing two dozen agencies with administrative civil-penalty authorities); see also, *e.g.*, 5 U. S. C. §1215(a)(3)(A)(ii) (Merit Systems Protection Board); 7 U. S. C. §§9(10)(C), 13a (Commodity Futures Trading Commission); §§499c(a), 586, 2279e(a) (Department of Agriculture); 8 U. S. C. §§1324c, 1324d (Department of Justice); 12 U. S. C. §§5563(a)(2), (c), (Consumer Financial Protection Bureau); 16 U. S. C. §823b(c) (Federal Energy Regulatory Commission); 20 U. S. C. §1082(g) (Department of Education); 21 U. S. C. §335b (Department of Health and Human Services/Food and Drug Administration); 29 U. S. C. §666(j) (Occupational Safety and Health Review Commission); 30 U. S. C. §§820(a) and (b) (Federal Mine Safety and Health Review Commission); 31 U. S. C. §5321(a)(2) (Department of the Treasury); 33 U. S. C. §§1319(d) and (g) (Environmental Protection Agency); 39 U. S. C. §3018(c) (Postal Service); 42 U. S. C. §3545(f) (Department of Housing and Urban Development); 46 U. S. C.

§41107(a) (Federal Maritime Commission); 47 U. S. C. §503(b)(3) (Federal Communications Commission); 49 U. S. C. §521 (Federal Railroad Administration); §46301 (Department of Transportation).

Some agencies, like the Consumer Financial Protection Bureau, the Environmental Protection Agency, and the SEC, can pursue civil penalties in both administrative proceedings and federal court. See, *e.g.*, 12 U. S. C. §§5563(a), 5564(a), 5565(a)(1), (2)(H), and (c) (Consumer Financial Protection Bureau); 33 U. S. C. §§1319(a), (b), and (g) (Environmental Protection Agency); *supra,* at 2 (SEC). Others do not have that choice. As the above-cited statutes confirm, the Occupational Safety and Health Review Commission, the Federal Energy Regulatory Commission, the Federal Mine Safety and Health Review Commission, the Department of Agriculture, and many others, can pursue civil penalties only in agency enforcement proceedings. For those and countless other agencies, all the majority can say is tough luck; get a new statute from Congress.

Against this backdrop, our coequal branches will be surprised to learn that the rule they thought long settled, and which remained unchallenged for half a century, is one that, according to the majority and the concurrence, my dissent just announced today. Unfortunately, that mistaken view means that the constitutionality of hundreds of statutes may now be in peril, and dozens of agencies could be stripped of their power to enforce laws enacted by Congress. Rather than acknowledge the earthshattering nature of its holding, the majority has tried to disguise it. The majority claims that its ruling is limited to "civil penalty suits for fraud" pursuant to a statute that is "barely over a decade old," *ante,* at 18, n. 2, 22, an assurance that is in significant tension with other parts of its reasoning. That incredible assertion should fool no one. Today's decision is a massive sea change. Litigants seeking further dismantling of the "administrative state" have reason to rejoice in their win

today, but those of us who cherish the rule of law have nothing to celebrate.

\*　　　\*　　　\*

Today's ruling is part of a disconcerting trend: When it comes to the separation of powers, this Court tells the American public and its coordinate branches that it knows best. See, *e.g.*, *Collins* v. *Yellen*, 594 U. S. 220, 227 (2021) (concluding that the Federal Housing Finance Agency's "structure violates the separation of powers" because the Agency was led by a single Director removable by the President only "'for cause'"); *United States* v. *Arthrex, Inc.*, 594 U. S. 1, 6, 23 (2021) (holding that "authority wielded by [Administrative Patent Judges] during inter partes review is incompatible with their appointment by the Secretary to an inferior office"); *Seila Law*, 591 U. S., at 202–205 (holding that "the structure of the [Consumer Financial Protection Bureau] violates the separation of powers" because it was led by a single Director removable by the President only "for cause"); *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 483–484, 492 (2010) (holding "that the dual for-cause limitations on the removal of [Public Company Accounting Oversight] Board members contravene the Constitution's separation of powers"). The Court tells Congress how best to structure agencies, vindicate harms to the public at large, and even provide for the enforcement of rights created for the Government. It does all of this despite the fact that, compared to its political counterparts, "the Judiciary possesses an inferior understanding of the realities of administration" and how "political power . . . operates." *Free Enterprise Fund*, 561 U. S., at 523 (Breyer, J., dissenting).

There are good reasons for Congress to set up a scheme like the SEC's. It may yield important benefits over jury trials in federal court, such as greater efficiency and expertise, transparency and reasoned decisionmaking, as well as

SOTOMAYOR, J., dissenting

uniformity, predictability, and greater political accountability. See, *e.g.*, Brief for Administrative Law Scholars as *Amici Curiae* 30–32. Others may believe those benefits are overstated, and that a federal jury is a better check on government overreach. See, *e.g.*, Brief for Cato Institute as *Amicus Curiae* 11–25. Those arguments take place against the backdrop of a philosophical (and perhaps ideological) debate on whether the number of agencies and authorities properly corresponds to the ever-increasing and evolving problems faced by our society.

This Court's job is not to decide who wins this debate. These are policy considerations for Congress in exercising its legislative judgment and constitutional authority to decide how to tackle today's problems. It is the electorate, and the Executive to some degree, not this Court, that can and should provide a check on the wisdom of those judgments.

Make no mistake: Today's decision is a power grab. Once again, "the majority arrogates Congress's policymaking role to itself." *Garland* v. *Cargill*, 602 U. S. 406, 442 (2024) (SOTOMAYOR, J., dissenting). It prescribes artificial constraints on what modern-day adaptable governance must look like. In telling Congress that it cannot entrust certain public-rights matters to the Executive because it must bring them first into the Judiciary's province, the majority oversteps its role and encroaches on Congress's constitutional authority. Its decision offends the Framers' constitutional design so critical to the preservation of individual liberty: the division of our Government into three coordinate branches to avoid the concentration of power in the same hands. The Federalist No. 51, p. 349 (J. Cooke ed. 1961) (J. Madison). Judicial aggrandizement is as pernicious to the separation of powers as any aggrandizing action from either of the political branches.

Deeply entrenched in today's ruling is the erroneous belief that any "mistaken or wrongful exertion by the legislative department of its authority" can lead to "grave abuses"

SOTOMAYOR, J., dissenting

and "it behooves the judiciary to apply a corrective by exceeding its own authority" through requiring civil-penalty claims to proceed before a federal jury. *Stranahan*, 214 U. S., at 340. As this Court said over a century ago in this public-rights context, that belief "mistakenly assumes that the courts can alone be safely intrusted with power, and that hence it is their duty to unlawfully exercise prerogatives which they have no right to exert, upon the assumption that wrong must be done to prevent wrong being accomplished." *Ibid*.

By giving respondents a jury trial, even one that the Constitution does not require, the majority may think that it is protecting liberty. That belief, too, is deeply misguided. The American People should not mistake judicial hubris with the protection of individual rights. Our first President understood this well. In his parting words to the Nation, he reminded us that a branch of Government arrogating for itself the power of another based on perceptions of what, "in one instance, may be the instrument of good . . . is the customary weapon by which free governments are destroyed." Farewell Address (1796), in 35 The Writings of George Washington 229 (J. Fitzpatrick ed. 1940) (footnote omitted). The majority today ignores that wisdom.

Because the Court disregards its own precedent and its coequal partners in our tripartite system of Government, I respectfully dissent.

# APPENDIX D

FILED

MAR 2 5 2024

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**

---

RICHARD ARJUN KAUL, MD;
JANE DOE; JOHN DOE.

Plaintiff

v.

JAMES PAUL OETKEN
(PERSONAL AND OFFICIAL CAPACITY)
JANE DOE; JOHN DOE.

Defendant

---

CIVIL ACTION NO.:
5:21-CV-00158-FC

COMPLAINT

2

# K11-18
# KAUL v OETKEN

# CONTENTS

**PARTIES – Page 4**

**RELEVANT/REFERENCED CASES OF 'THE KAUL CASES' – Page 5**

**JURISDICTION + VENUE – Page 6**

**PRELIMINARY STATEMENT – Page 8**

**DEPRIVATION OF ANY/ALL IMMUNITIES – Page 11**

**STATEMENT OF FACT – Page 13**

**LEGAL CLAIMS – Page 18**

Violation of Civil Rights: Section 1983 claim

UN Human Rights Violation: The United Nations Universal Declaration of Human Rights

**DECLARATIONS AND RELIEF SOUGHT – Page 29**

3

# PARTIES

**PLAINTIFF**

RICHARD ARJUN KAUL, MD – 24 Washington Valley Road, Morristown, NJ 07960: 973 876 2877: DRRICHARDKAUL@GMAIL.COM **("PLAINTIFF KAUL")**

**DEFENDANT**

JAMES PAUL OETKEN, ESQ – ROOM 706, 40 FOLEY SQUARE, NY, NY 10007 (**"DEFENDANT OETKEN")**

# RELEVANT/REFERENCED CASES OF 'THE KAUL CASES'

**K1:** KAUL v CHRISTIE: 16-CV-02364

**K3:** KAUL v SCHUMER: 10-CV-13477

**K11-3:** KAUL v ALLSTATE: 21-CV-00736

**K11-7**: KAUL v. ICE ET AL: 21-CV-6992

**K11-10**: KAUL v. ICE ET AL: 23-CV-2016

**K11-11:** KAUL v BCBS: 23-CV-00518

**K11-14**: KAUL v. FEDERATION ET AL: 23-CV-22325

**K11-15**: KAUL v. CHRISTIE/MURPHY: 23-CV-22582

**K11-17**: KAUL v CPEP: 23-CV-00672

# JURISDICTION + VENUE

General:

Plaintiff Kaul claims federal jurisdiction pursuant to:

**(i)** Article III § 2; **(ii)** 28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of Plaintiff Kaul's Rights Under The United States Constitution; **(iii)** 28 U.S.C. § 1332(d)(2)(A) – Plaintiff Kaul is a citizen of a different state to Defendant Oetken

Personal:

The Court has personal jurisdiction over all Defendant Oetken, as he has transacted business, maintained substantial contacts through the Federal Judges Association, and/or committed acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including this District. This Court also has personal jurisdiction over all Defendant Oetken pursuant to Fed. R. Civ. P. 4(k)(1)(A) because he would be subject to a court of general jurisdiction in North Carolina.

Venue:

28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and (2) <u>a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.</u>

Defendant Oetken's K11-7 September 12, 2022 purported 'injunction' and his K11-7 March 15, 2024, threat to hold Plaintiff Kaul in contempt if by March 29, 2024, Plaintiff Kaul does not dismiss K11-17, <u>AND</u> the K11-17 Defendants filing on March 18, 2024 of Defendant Oetken's March 15, 2024 threatening 'ORDER' do constitute a substantial and ongoing injury and violation of Plaintiff Kaul's human/civil/constitutional right to vindicate and or secure his right

to his life/liberty/property/reputation <u>WITHIN</u> the jurisdiction of the United States District Court for the Eastern District of North Carolina, that confers on Plaintiff Kaul the right to sue Defendant Oetken in this district.

# PRELIMINARY STATEMENT

**1.** This case stems from K11-17, and at the core of this case exists an unprecedented/illegal abuse of power by the Defendant, a district judge, one (1) of six hundred and seventy-seven (677) within the United States District Court, who seeks to enforce his judicial will on the entirety of the federal judiciary.

**2.** Defendant James Paul Oetken is a district judge in the Southern District of New York, who, prior to being appointed to the bench was private counsel to multiple financial corporations, a number of whom he defended in the 2008 financial fiasco. Subsequent to his defense of corporations that had caused massive homelessness/poverty on the American people, he was proposed by Senator Charles Schumer to the bench. Plaintiff Kaul sued Schumer on April 4, 2019, in K3 (<u>KAUL v SCHUMER: 19-CV-13477</u>), on charges of racketeering/bribery/public corruption/civil rights violations (**<u>Exhibit 1</u>**). The case was voluntarily dismissed on January 3, 2022 (K3: D.E. 53), but not before Defendant Schumer extracted money from the public purse to fund his legal defense (**<u>Exhibit 2</u>**).

**3.** Defendant Oetken, recognizing his conflict of interest, and in fact exploiting it, did adjudicate K11-7 from August 19, 2021, to September 12, 2022, without disclosing his conflict to the court record or Plaintiff Kaul. This **"pattern"** of K3 Defendant Schumer related conflicted-ness was evident in K1, in which the first presiding judge was Defendant Schumer's brother-in-law, Kevin McNulty, a judge who became disqualified on May 22, 2019 (K1: D.E. 340). Defendant Schumer, a NY State Senator, has for many decades received enormous bribes from the insurance/banking industry on Wall Street, NY, and within K1 were Defendants TD Bank and Allstate/Geico Insurance Companies. The McNulty-Schumer-Oetken-TD-Allstate-Geico nexus was able to <u>directly</u> corrupt the judicial process until K11-17, but still, in an increasingly 'thuggish' manner, attempts to interfere <u>indirectly</u> with threats against Plaintiff Kaul.

**4.** The principal question/issue presented by this case pertains to the demarcation limits of the jurisdiction/authority/power of the orders and decisions of district judges/courts within the United States District Court, <u>or put otherwise</u>, does an opinion/order of a district judge depriving a person of his/her litigation rights, then deprive every other district judge of their right of discretion to permit that person to prosecute his/her claims in their courts.

**5.** Can one district judge assume power over all other district judges?

**6.** Defendant Oetken believes he can, and on March 15, 2024, entered an order (**Exhibit 3**) in K11-7, a case closed on October 6, 2022, in which he threatens Plaintiff Kaul, that if by March 29, 2024, he fails to dismiss K11-17, he will be fined, will be held in contempt, and will likely be arrested/jailed. In his March 15, 2024 'ORDER' Defendant Oetken provides no law to corroborate, nor could he, that he has any legitimate or legal right to coerce Plaintiff Kaul into dismissing K11-17 under threat of imprisonment. Defendant Oetken's illegal actions are a consequence of his scheme, in conjunction with the K11-17 Defendants, to prevent Plaintiff Kaul from further exposing his crimes and those of **The Kaul Cases** Defendants, including Defendant Schumer.

**7.** Plaintiff Kaul respectfully asserts that the answer to the question is no. <u>No district judge has the authority, power or right to prohibit another district judge from deciding</u> whether to permit a litigant to prosecute claims in his/her court, regardless of whether that litigant's claims have complete or partial identity with prior claims. The decision is at the sole discretion of the permitting judge, and not the restricting judge, and the principle underpinning this aspect of jurisprudence pertains to the fact that legal precedent has proven that matters of truth, initially either suppressed or not made evident, do, through repeated legal examination become evident.

**8.** Within the American judicial system, there are hundreds of thousands of cases of exoneration, that only came into being because **"vexatious ... harassing ... frivolous ...**

**scandalous ...**" litigants refused to cease their search of the truth. The Innocence Project is but one example.

**9.** Defendant Oetken's highly unusual and highly improper interference in the legal process of K11-17 in the United States District Court for the Eastern District of North Carolina, does simply confirm his co-conspirator guilt of the levied charges, and the guilt of the K11-17 Defendants.

# DEPRIVATION OF ANY/ALL IMMUNITIES

**10.** Defendant Oetken became deprived of any immunity the moment he commenced conspiring with the K11-7 Defendants in the conception, development, and perpetration of the quid pro quo schemes, as detailed in K11-17 (**Exhibit 4**).

**11.** Defendant Oetken has knowledge of the facts of K11-17. This is evidenced in Defendants Christie/Solomon/Heary's private letter to him (**Exhibit 5**) and by his own admission in his March 15, 2024 'ORDER': **"The Court has learned …"** although Defendants Christie/Solomon/Heary's January 19, 2024, letter was privately addressed to Defendant Oetken, and not the Clerk of the Court nor any other judges within the **"Court"**. Defendant Christie/Solomon/Heary's letter is not published to the SDNY docket, and neither their names nor the letter is referenced on the docket nor in Defendant Oetken's March 15, 2024 'ORDER', as just further evidence of Defendant Oetken's **"pattern"** of illegal exparte violations. Defendant Oetken's March 15, 2024 'ORDER' is arguably without the authority of the Court and constitutes a violation of U.S.C. Section 1018 and the Judiciary Act of 1789.

**12.** Defendant Oetken, with knowledge of the K11-17 facts of his crimes at a time no later than January 19, 2024, has continued to fail to submit an affidavit into K11-17 denying the facts of the quid pro quo schemes/evidential falsification/perjury and other acts of public corruption. His non-denial caused the admission of these facts, facts of felonies and felonies that deprive him of any immunity.

**13.** Defendant Oetken's guilt accounts for both his admission of fact and the failure of the K11-17 Defendants to cause the submission of affidavits from the New York State Ethics Committee, the Judicial Disciplinary Council, and any other judge within the SDNY, as to Defendant Oetken's refuting that Defendant Oetken engaged in criminal schemes with the K11-7 Defendants.

**14.** Defendant Oetken's guilt and his recognition of his guilt account for his March 15, 2024, effort to attempt to coerce Plaintiff Kaul under threat of contempt into dismissing K11-17, in order to attempt to suppress the inevitable March 13, 2024, related K11-17 DISCOVERY ORDER emergence of further evidence of his guilt, that would place him at risk of criminal indictment. As with Defendant Christie, Defendant Oetken's scheme in attempting to hatch plots to jail/kill/silence does nothing but further evidence his crimes, crimes for which, like Edward Manton (**<u>Exhibit 5</u>**), he lacks immunity.

# STATEMENT OF FACT

The following facts are extracted from the K11-7 September 13, 2022, letter from Plaintiffs Kaul/Basch to Defendant Oetken (**Exhibit 6**):

**15.** Commencing in approximately September 2021 to September 2022, Defendant Oetken/agents conspired with the K11-17 Defendants/agents in the manufacturing of a quid pro quo scheme, in which Defendant Oetken received bribes/other tangible favors in return for obstructing Plaintiff Kaul's prosecution of K11-7, by denying all motions for discovery/default/summary judgment.

**16.** Through their nexus with K3 Defendant Charles Schumer and K11-3 Defendant Kevin McNulty, counsel for the K11-7 Defendants knew that Defendant Oetken was a well known **"racketeer"** within the SDNY, with a reputation for 'selling' his opinion to the 'highest bidder'.

**17.** The scheme, having commenced in approximately September 2021, was perpetrated by Defendant Oetken and the K11-7 Defendants up until the September 12, 2022, dismissal with prejudice of K11-7 and the issuing of the purported 'injunction'.

**18.** Defendant Oetken and the K11-7 Defendants used the US wires to communicate what bribes/benefits/favors would be paid for what specific judicial acts.

**19.** Defendant Oetken and the K11-7 Defendants used the US wires to communicate to where the bribes/benefits/favors would be paid or deposited.

**20.** Defendant Oetken and the K11-7 Defendants used the US wires to communicate when the bribes/benefits/favors would be paid or deposited and how the bribes would be apportioned to specific judicial acts.

**21.** Defendant Oetken and the K11-7 Defendants used the US wires to communicate when the bribes/benefits/favors would be paid or deposited.

**22.** Defendant Oetken, in recognizing his conversion of the federal bench into a **"racketeering enterprise"** did endeavor to conduct the knowingly illegal quid pro quo scheme with deceptive secrecy by deceiving Plaintiffs Kaul/Basch, the SDNY Court and the federal record into believing he was conducting himself within the law and in accordance with his juridical/ethical code of conduct.

**23.** On September 12, 2022, Defendant Oetken,  having entered an order dismissing K11-7 with prejudice and having entered a 'injunction' purporting to permanently bar Plaintiff Kaul from pursuing any claims within the United States District Court, did believe that the scheme had succeeded and Plaintiff Kaul, a non-lawyer would neither expose his corrupt tactics or that if **Plaintiff Kaul did, he would  have no knowledge or experience as to the appropriate course of action.**

**24.** Plaintiff Kaul did expose the facts of Defendant Oetken's quid pro quo scheme, exparte communications and the illegal dismissal and 'Fraud on the Court' purported 'injunction', facts to which Defendant Oetken did cause to become admitted.

**25.** However, Defendant Oetken, despite knowing that he had 'been caught' in a crime, did not believe that Plaintiff Kaul would continue to expose his criminal **"patterns"** and would pursue the prosecution of his claims within the United States District Court.

**26.** Defendant Oetken became subject to state/federal disciplinary complaints filed against him by Plaintiff Kaul.

**27.** From March 2023 to December 2023, Plaintiff Kaul filed K11-10/K11-11/K11-14/K11-15/K11-17 and within the filing of each claim were highly incriminating/admitted facts of Defendant Oetken's criminal conversion of the SDNY into a **"racketeering enterprise".**

**28.** Defendant Oetken, recognizing the civil/criminal consequences to him of the immense public exposure of his crimes that would occur if the cases advanced into discovery, did, in conjunction with the K11-10/K11-14 Defendants cause the corrupt dismissal of these cases, based on his purported 'injunction'.

**29.** However, when K11-17 was filed, Plaintiff Kaul submitted as exhibits with his December 12, 2023, Complaint, a copy of the September 12, 2022, purported 'injunction/dismissal opinion, a copy of Plaintiff Kaul's unrefuted/admitted analysis of the September 12, 2022, purported 'injunction/dismissal opinion, 'THE OETKEN ANALYSIS' and copies of all disciplinary complaints filed against Defendant Oetken.

**30.** However, by happenstance in approximately late 2022, Plaintiff Kaul spoke with a female person who had appeared before Defendant Oetken several years earlier in a mortgage dispute with JP Morgan, in which JP Morgan was seeking to have her/her family evicted from their thirty-five year-long residence. Defendant Oetken had, whilst a corporate lawyer, represented JP Morgan in the 2008 dispute with the US Government, in which no executives were prosecuted for the nation-wide devastation of their financial crimes. JP Morgan have 'donated' millions of bribes to K3 Defendant Schumer, the person who sponsored Defendant Oetken's appointment to the federal bench.

**31.** Defendant Oetken concealed his conflict of interest from the female person, and ordered that she/her family be evicted. On the day of this hearing, the female person, upon hearing Defendant Oetken's order or eviction became physically ill and rushed to the bathroom, followed by several female court employees. While in the bathroom, these employees advised the female person that **"you must do something …. He does this all the time"**. The female

person provided a sworn affidavit to Plaintiff Kaul of these harrowing events (**Exhibit 7**), an affidavit that further evidences a **"pattern"** in which Defendant Oetken abuses the power of the court to further the political/economic agendas of himself and those corporations/politicians with whom he conducts his **"pattern of racketeering"** within the United States District Court.

32. With the filing of K11-17, the Defendant Oetken became aware of the nullity of his purported 'injunction' as the Defendants voluminous filings resulted not in the case being dismissed, but in the Court issuing a DISCOVERY ORDER on March 13, 2024 (K11-17: D.E. 65).

33. Defendant Oetken recognized that because the K11-17 Defendants had submitted the purported 'injunction' as their principal defense, the DISCOVERY OFFER would permit Plaintiff Kaul to depose Defendant Oetken about not just the facts surrounding the corrupt procurement of the purported 'injunction' but about many other cases in which Defendant Oetken was conflicted, but nonetheless rendered decisions/judgments in favor of those from whom he received bribes, in both civil/criminal cases.

34. Defendant Oetken, in recognizing the crime exposing effect of the DISCOVERY ORDER, and the nullity of the purported 'injunction' within the United States District Court for the Eastern District of North Carolina, did, in conjunction with the K11-17 Defendants scheme to attempt to coerce Plaintiff Kaul into dismissing K11-17 under threat of contempt of court if he did not.

35. On March 15, 2024, Defendant Oetken, without informing any other judges within the SDNY, did illegally publish to the court docket a knowingly illegal document, that he self-designated as an 'ORDER' (**Exhibit 3**), the true purpose of which is an attempt to prevent further exposure of highly incriminating facts of the criminal conduct of himself and the K11-7/K11-17 Defendants and others.

36. On March 19, 2024, the K11-17 Defendants filed motions seeking to have the Court vacate the DISCOVERY ORDER and stay all deadlines (**Exhibit 8**).

**37.** On March 19/20, 2024, Plaintiff Kaul filed replies to Defendant Oetken's March 15, 2024,

K11-7 'ORDER' and K11-17 Defendants March 19, 2024, motions (**Exhibit 9**).

# LEGAL CLAIMS

**38.** In 2005, Plaintiff Kaul invented and successfully performed the first outpatient minimally invasive spinal fusion, a case/technique that revolutionized the field of spine surgery and has been for many years the standard of care. This event and the consequent success caused Plaintiff Kaul's physician/hospitals/insurance competitors in the minimally invasive spine surgery market to view him, his outpatient surgical center, his technique, and his technique invention as a threat to their market share, and not being able to compete fairly/legally, did resort to committing judicial corruption/political corruption/public corruption/ bribery/perjury/evidential falsification/witness tampering/obstruction of justice/kickbacks/wire fraud/mail fraud/false indictments/false arrests/false imprisonment/kidnapping/attempted drugging-killing. These events occurred over a time period from 2005 to 2023, in conjunction with ongoing/accruing and daily recurring and **"new"** violations of Plaintiff Kaul's human/civil/constitutional rights. In causing the 2012/2014 illegal suspension/revocation of Plaintiff Kaul's NJ license, **The Kaul Cases** Defendants committed a theft of Plaintiff Kaul's intellectual property, from which have been generated/continue to be generated hundreds of millions, if not billions of dollars.

**39.** The above facts, in conjunction with those contained within the factual corpus of **The Kaul Cases** substantiate ongoing violations to a criminal standard of Plaintiff Kaul's fundamental right to life/liberty/property, his right to his hard-earned reputation and specifically, violations of the following rights:

## Violation of Civil Rights
### Section 1983 claim

**40.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's <u>First Amendment Right</u> of the United States

18

Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**41.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's <u>Second Amendment Right</u> of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**42.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's <u>Fourth Amendment Right</u> of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**43.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's <u>Fifth Amendment Right</u> of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**44.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's <u>Sixth Amendment Right</u> of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**45.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing

violation and deprivation of Plaintiff Kaul's Eighth Amendment Right of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**46.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's Fourteenth Amendment Right of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**47.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of his livelihood by preventing its rectification through the judicial process.

**48.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his business real estate by preventing its rectification through the judicial process.

**49.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his personal real estate by preventing its rectification through the judicial process.

**50.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his life earnings by preventing its rectification through the judicial process.

**51.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his pensions by preventing its rectification through the judicial process.

**52.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>financial investments</u> by preventing its rectification through the judicial process.

**53.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>professional licenses</u> by preventing its rectification through the judicial process.

**54.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>accounts receivable</u> **BY** preventing its rectification through the judicial process.

**55.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of his right to <u>due process</u> **BY** preventing his access to discovery and substantive litigation process.

**56.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of his right to <u>free speech</u> **BY** preventing his access to discovery and substantive litigation process.

**57.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right to <u>impartial tribunals/judges/courts</u> **BY** continuing to perpetrate through certain courts within the United States District Court the corruptly procured K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**58.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right to <u>substantively prosecute his claims</u> **BY** continuing to perpetrate through certain courts within the United States District

21

Court the corruptly procured K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**59.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right to <u>equal protection under the law</u> **BY** continuing to perpetrate through certain courts within the United States District Court the corruptly procured K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**6**. These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right <u>to liberty</u> **BY** continuing to perpetrate through certain courts within the United States District Court the corruptly procured K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**61.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right to be compensated for the illegal deprivation of the <u>property of eleven (11) years of his life</u> **BY** continuing to perpetrate through certain courts within the United States District Court the corruptly procured K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**62.** These deprivations/violations/injuries were willfully/maliciously perpetrated by Defendant Oetken within/through/with the assistance of the executive/judicial apparatus of the <u>American State</u>.

**63.** These deprivations/violations/injuries were willfully/maliciously perpetrated by Defendant Oetken within/through/with the assistance of the <u>United States District Court</u>.

64. These deprivations/violations/injuries were willfully/maliciously perpetrated by Defendant Oetken in collusion/conspiracy with private actors associated with the New York Stock Exchange.

65. The commercial/communications nexus between Defendant Oetken and private actors within **The Kaul Cases**, critical to the perpetration of the within pled schemes conferred 'state actor' liability on all private actors within **The Kaul Cases** as to the deprivations/violations/injuries caused to Plaintiff Kaul's human/civil/constitutional rights.

66. The commercial/communications nexus between Defendant Oetken and private actors within **The Kaul Cases**, critical to the perpetration of the within pled schemes conferred 'state actor' liability on all private actors within **The Kaul Cases** as to the deprivations/violations/injuries caused to Plaintiff Kaul's property rights.

67. Defendant Oetken and **The Kaul Cases** Defendants were and are motivated to commit and continue to commit these deprivations/violations/injuries to Plaintiff Kaul's human/civil/constitutional/property rights.

68. The motivation is based on Defendant Oetken and **The Kaul Cases** Defendants scheme to prevent Plaintiff Kaul from exposing their crimes, including those of defrauding the global equities market.

## UN Human Rights Violation

## The United Nations Universal Declaration of Human Rights

69. Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 1 of the United Nations Universal Declaration of Human Rights: **"All human beings are born free and equal in dignity and rights.**

They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood."

**70.** The <u>Article 1</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**71.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 2</u> of the United Nations Universal Declaration of Human Rights. Plaintiff Kaul is a citizen of India: "Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth, or other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional, or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty."

**72.** The <u>Article 2</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**73.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 3</u> of the United Nations Universal Declaration of Human Rights: "Everyone has the right to life, liberty and security of person."

**74.** The <u>Article 3</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**75.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 4</u> of the United Nations Universal Declaration of Human Rights: "No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms."

**76.** The Article 4 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**77.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 5 of the United Nations Universal Declaration of Human Rights: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

**78.** The Article 5 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**79.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 6 of the United Nations Universal Declaration of Human Rights: "Everyone has the right to recognition everywhere as a person before the law."

**80.** The Article 6 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**81.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 7 of the United Nations Universal Declaration of Human Rights: "All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination."

**82.** The Article 7 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**83.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 8 of the United Nations Universal

25

Declaration of Human Rights: "Everyone has the right to an <u>effective remedy</u> by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law."

**84.** The <u>Article 8</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**85.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 9</u> of the United Nations Universal Declaration of Human Rights: "No one shall be subjected to arbitrary arrest, detention or exile."

**86.** The <u>Article 9</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**87.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 10</u> of the United Nations Universal Declaration of Human Rights: "Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him."

**88.** The <u>Article 10</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**89.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 12</u> of the United Nations Universal Declaration of Human Rights: "No one shall be subjected to arbitrary interference with his privacy, family, home, or correspondence, nor to attacks upon his honor and reputation. Everyone has the right to the protection of the law against such interference or attacks."

**90.** The <u>Article 12</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**91.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 17 of the United Nations Universal Declaration of Human Rights: **"1. Everyone has the right to own property alone as well as in association with others. 2. No one shall be arbitrarily deprived of his property."**

**92.** The Article 17 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**93.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 19 of the United Nations Universal Declaration of Human Rights: "Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers."

**94.** The Article 19 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**95.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 23 of the United Nations Universal Declaration of Human Rights: **"Everyone has the right to work, to free choice of employment, to just and favorable conditions of work and to protection against unemployment."**

**96.** The Article 23 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**97.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 23 of the United Nations Universal Declaration of Human Rights: "Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control."

**98.** The Article 23 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**99.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 28 of the United Nations Universal Declaration of Human Rights: "Everyone is entitled to a social and international order in which the rights and freedoms set forth in this Declaration can be fully realized."

**100.** The Article 28 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**101.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 30 of the United Nations Universal Declaration of Human Rights: "Nothing in this Declaration may be interpreted as implying for any State, group or person any right to engage in any activity or to perform any act aimed at the destruction of any of the rights and freedoms set forth herein."

**102**. The Article 30 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

## DECLARATIONS AND INJUNCTIVE RELIEF

**1.** The legal record in K11-17 has established by a preponderance of the evidence that the September 22, 2022, purported 'injunction' issued by U.S.D.J. Oetken in K11-7 is an admitted **'Fraud on the Court'.**

**2.** The United States District Court for the Eastern District of North Carolina did nullify the purported 'injunction' within its jurisdiction, when it admitted the case on November 20, 2023

**3.** The United States District Court for the Eastern District of North Carolina did nullify the purported 'injunction' within its jurisdiction when it issued its March 13, 2024, **ORDER FOR DISCOVERY PLAN**.

**3.** The nullification of the purported 'injunction' within the jurisdiction of the United States District Court for the Eastern District of North Carolina, has rendered the purported 'injunction' a legal nullity within the Eastern District of North Carolina without legal effect or existence.

**4.** Therefore, the nullity and legal non-existence of the purported 'injunction' quite logically means that Plaintiff Kaul could not have violated any purported 'injunction within the jurisdiction of the United States District Court for the Eastern District of North Carolina.

**5.** Therefore, the nullity and legal non-existence of the purported 'injunction' quite logically means that Plaintiff Kaul's continued prosecution of K11-17 within the United States District Court for the Eastern District of North Carolina does not, nor could not, violate any injunction.

**6.** Plaintiff Kaul's human/civil/constitutional rights and the controlling doctrinal law of 'Fraud on the Court' strictly prohibit Defendant Oetken from using the instrumentality of his purported 'injunction' in any manner to infringe on Plaintiff Kaul's human, civil and or constitutional rights to vindicate and or secure his right to his life/liberty/property/reputation.

**7.** Defendant Oetken is prohibited from attempting to use the purported 'injunction', an admitted 'Fraud on the Court, to cause injury or infringe on Plaintiff Kaul's person and or violate his human/civil/constitutional rights within the jurisdiction of the United States.

**8.** Defendant Oetken is ordered to immediately cease and desist from any further interference in the judicial process of the United States District Court for the Eastern District of North Carolina.

**9.** Defendant Oetken's March 15, 2024 'ORDER' in K11-17, a product of the K11-7 September 12, 2022 'Fraud on the Court' purported injunction is itself a 'Fraud on the Court', and is thus null/void for all intents/purposes.

**10.** Defendant Oetken's nullified 'Fraud on the Court' March 15, 2024 'ORDER' that was generated and filed in K11-7 by Defendant Oetken, and then filed in K11-17 by the K11-17 Defendants on March 18, 2024, constitutes a flagrant violation of Plaintiff Kaul's human/civil/constitutional rights to vindicate and or secure his right to his life/liberty/property/reputation.

**11.** Defendant Oetken is ordered to strike from the K11-7 docket the illegally generated and nullified 'Fraud on the Court' March 15, 2024 'ORDER'.

Plaintiff Kaul swears under penalty of perjury that the above statements are true and accurate to the best of my knowledge and that if it is proved that I willfully and knowingly misrepresented the facts, then I will be subject to punishment.

**DATED: MARCH 22, 2024**

**RICHARD ARJUN KAUL, MD**

cc: Clerk of the Court for the SDNY
    Chief Judge for the SDNY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI



SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

OCT - 9 2024

ARTHUR JOHNSTON
BY _____ DEPUTY

---

RICHARD ARJUN KAUL, MD;
JANE DOE; JOHN DOE.

Plaintiff

v.

JAMES PAUL OETKEN
(PERSONAL AND OFFICIAL CAPACITY)
MISSISSIPI MEDICAL BOARD;
NEW YORK STATE ATTORNEY GRIEVANCE COMMITTEE
JANE DOE; JOHN DOE.

Defendants.

CIVIL ACTION NO.: 3:24-cv-621-
cWR-LGI

COMPLAINT

---

2

# CONTENTS

PARTIES – Page 4

RELEVANT/REFERENCED CASES OF 'THE KAUL CASES' – Page 5

JURISDICTION + VENUE – Page 6

PRELIMINARY STATEMENT + BASIS FOR SUIT AGAINST DEFENDANTS
OETKEN/MMB/NYS AGC – Page 8

DEFENDANT OETKEN'S CORRUPTION OF THE UNITED STATES DISTRICT
COURT + CAUSE FOR HIS IMPEACHMENT – Page 12

DEPRIVATION OF ANY/ALL IMMUNITIES – Page 15

STATEMENT OF FACT + DEFENDANT OETKEN'S RULE 8(b)(6)
ADMISSIONS OF FACT – Page 17

LEGAL CLAIMS – Page 29

DECLARATIONS AND RELIEF SOUGHT – Page 52

# PARTIES

**PLAINTIFF**

RICHARD ARJUN KAUL, MD – 6 NORTH MIDLAND AVENUE, NYACK , NY 10960
DRRICHARDKAUL@GMAIL.COM **("PLAINTIFF KAUL")** – 914 250 84313

**DEFENDANT**

MISSISSIPPI MEDICAL BOARD – 1867 CRANE RIDGE DRIVE # 200N, JACKSON, MISSISSIPI 39216
**("DEFENDANT MMB")** – 601 987 3079

JAMES PAUL OETKEN, ESQ – ROOM 706, 40 FOLEY SQUARE, NY, NY 10007 ("**DEFENDANT
OETKEN**") – 212 805 0266

NEW YORK STATE ATTORNEY GRIEVANCE COMMITTEE – 180 MAIDEN LANE, 17TH FLOOR, NY, NY
10038 **("DEFENDANT AGC")** – 212 401 0800

4

# RELEVANT/REFERENCED CASES OF 'THE KAUL CASES'

**K1:** KAUL v CHRISTIE: 16-CV-02364

**K3:** KAUL v SCHUMER: 10-CV-13477

**K11-3:** KAUL v ALLSTATE: 21-CV-00736

**K11-7:** KAUL v. ICE ET AL: 21-CV-6992

**K11-10:** KAUL v. ICE ET AL: 23-CV-2016

**K11-11:** KAUL v BCBS: 23-CV-00518

**K11-14:** KAUL v. FEDERATION ET AL: 23-CV-22325

**K11-15:** KAUL v. CHRISTIE/MURPHY: 23-CV-22582

**K11-17:** KAUL v CPEP: 23-CV-00672

# JURISDICTION + VENUE

General:
**1.** 28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of Plaintiff Kaul's Constitutional rights and U.S.C. § 1964(a)(b)(c)(d) and 1962.

U.S.C. § 1337 – Plaintiff's allegations allege violations of an Act of Congress regulating commerce and monopolies.

Personal:
**2.** The Court has personal jurisdiction over Defendants Oetken/MMB/NYS AGC as they has transacted business, maintained substantial contacts through the Federal Judges Association, and/or committed acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district.

**3.** Additionally, the Defendants RICO violations/offenses/crimes have caused and continue to cause injury to Plaintiff Kaul's life/liberty/property in every state in the United States including the State of Mississippi.

**4.** Defendants scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including the Southern District of Mississippi. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to a court of general jurisdiction in Mississippi.

**5.** More specifically, Defendant Oetken has violated and continues to violate the  principles and holdings set forth by the U.S.C.A for the Fifth Circuit (May 18, 2022) and SCOTUS (June 27, 2024) in SEC v Jarkesy: 22-859

Venue:

6

**6.** 28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and (2) <u>a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.</u>

**7.** Defendant Oetken's K11-7 September 12, 2022 purported 'injunction' (**Exhibit 1**) and his K11-20 October 2, 2024, threat to hold Plaintiff Kaul in contempt if by October 16, 2024, Plaintiff Kaul does not dismiss K11-20, <u>AND</u> the K11-20 Defendants filing on October 3, 2024 of Defendant Oetken's October 2, 2024 threatening 'ORDER' (**Exhibit 20**) do constitute a substantial and ongoing injury and violation of Plaintiff Kaul's human/civil/constitutional right to vindicate and or secure his right to his life/liberty/property/reputation <u>WITHIN</u> the jurisdiction of the U.S.C.A. for the 5th Circuit that confers on Plaintiff Kaul the right to sue Defendants Oetken/MMB/NYS AGC in this district.

# PRELIMINARY STATEMENT + BASIS FOR SUIT AGAINST DEFENDANTS
# OETKEN/MMB/NYS AGC

**8.** In 2005, Plaintiff Kaul invented and successfully performed the first outpatient minimally invasive spinal fusion, a case/technique that revolutionized the field of spine surgery and has been for many years the standard of care.

**9.** This event and the consequent success caused Plaintiff Kaul's physician/hospitals/insurance competitors in the minimally invasive spine surgery market to view him, his outpatient surgical center, his technique, and his technique invention as a threat to their market share, and not being able to compete fairly/legally, did resort to committing judicial corruption/political corruption/public corruption/
bribery/perjury/evidential falsification/witness tampering/obstruction of justice/kickbacks/wire fraud/mail fraud/false indictments/false arrests/false imprisonment/kidnapping/attempted drugging-killing.

**10.** These events occurred over a time period from 2005 to 2023, in conjunction with ongoing/accruing and daily recurring and **"new"** violations of Plaintiff Kaul's human/civil/constitutional rights. In causing the 2012/2014 illegal suspension/revocation of Plaintiff Kaul's NJ license, **The Kaul Cases** Defendants committed a theft of Plaintiff Kaul's intellectual property, from which have been generated/continue to be generated hundreds of millions, if not billions of dollars.

**11.** The above facts, in conjunction with those contained within the factual corpus of **The Kaul Cases** substantiate ongoing violations to a criminal standard of Plaintiff Kaul's fundamental right to life/liberty/property, his right to his hard-earned reputation and specifically, violations of his human/civil/constitutional rights.

**12.** The District of Mississippi has jurisdiction over all Defendants for reasons more fully enunciated below, but in summary, all Defendants, including **The Kaul Cases** Defendants have

8

violated, caused to violate and or aided and abetted the ongoing violation of Plaintiff Kaul's human/civil/constitutional rights in every state in the United States including the State of Mississippi.

**13.** The factual foundation of K11-23 consists of fact admitted in **The Kaul Cases** **(2016-2024)** pursuant to Rule 8(b)(6) and includes amongst other things, bribery/perjury/kidnapping/false indictment/false arrest/false imprisonment/wire fraud/public corruption/judicial corruption/witness tampering/evidence tampering/obstruction of justice.

**14.** On September 12, 2022, in K11-7 Defendant Oetken, after having entered into an admitted bribery related quid pro quo scheme (**Exhibit 2 + Exhibit 3**) with the K11-7 Defendants, did enter a purported nationwide 'injunction' that sought to prevent Plaintiff Kaul from seeking redress for the illegal 2014 revocation of his NJ medical license, more facts of which are detailed below.

**15.** From February 22, 2016 (K1) to the present (K11-20), Plaintiff Kaul's efforts to prosecute his claims have been obstructed by the Defendants violation of discovery orders and schemes of judicial corruption in courts located principally in the NY/NJ area.

Defendant Oetken sits on the bench in the S.D.N.Y,

**16.** However, from June 2023 judges in the Southern District of Florida, the Eastern District of North Carolina and now the Southern District of Texas did progressively advance **The Kaul Cases** in full knowledge of all the circumstances/events/facts surrounding Defendant Oetken's knowingly illegal September 12, 2022, purported 'injunction'.

**17.** In fact, and after the 5th Circuit/SCOTUS rulings in Jarkesy, U.S.D.J. Alfred H. Bennet did on August 30, 2024, enter a Rule 26 order which Defendants have violated and continue to violate.

9

**18.** In furtherance of their obstruction of justice scheme they once again coopted Defendant Oetken into issuing a purported 'order; that threatened to hold Plaintiff Kaul in contempt of he did not dismiss K11-20 by October 16, 2024.

**19.** Defendant Oetken had been complicit in an identical and prior scheme in K11-17, when in collusion/conspiracy with the K11-17 Defendants, who then became the K11-20 Defendants, he issued a similar edict on March 15, 2024 (**Exhibit 6)** two (2) days after Chief Judge Richard E. Meyers entered a Rule 26 order of discovery.

**20.** Defendant Oetken's misconduct is unprecedented in American jurisprudence, and he seeks, through his threats to Plaintiff Kaul, to usurp the authority of every other district judge in the United States.

**21.** The logical extension of such misconduct is that every district judge, for whatever reason, could issue nationwide injunctions in which they positioned themselves as the arbiters and 'gatekeepers' of the entire federal judiciary.

**22.** Defendant AGC is included as it permitted itself to become part of Defendant Oetken's bribery related quid pro quo scheme in mid 2024, when it failed, upon Plaintiff Kaul's ethics complaint, to investigate Defendant Oetken's violations and crimes of accepting bribes in return for illegally selling the power and authority of the United States District Court to **The Kaul Cases** Defendants (**Exhibit 9**).

**23.** Defendant AGC, in failing to investigate or otherwise refer Defendant Oetken to prosecutorial authorities did become complicit in his crimes, and pursuant to RICO is as liable for all of his past/present/future violations as if it had directly committed them.

**24.** Defendant MMB is included as its 2020/2024 denials of Plaintiff Kaul's applications for medical licensure based on the 2014 illegal NJ revocation did cause and continue to cause injury to Plaintiff Kaul in the State of Mississippi.

**25.** Other than the illegal injuries in Mississippi, there exists a factual nexus between Defendant MMB and Defendants Oetken/AGC in that had justice been properly served in K11-7, the illegal 2014 NJ revocation would have been reversed, the reversal of which would have caused the grant of Plaintiff Kaul's 2024 application to the Mississippi Medical Board.

**26.** Had these events occurred, there would have commenced a relative remediation to the immense ongoing/**"new"** twelve-years-plus (2012-2024) of injuries to Plaintiff Kaul's life/liberty/property/reputation.

**27.** But because Defendant Oetken continued and aided and abetted the knowingly illegal continuation of **The Kaul Cases** Defendants corruption through the United States District Court, and because Defendant AGC failed to investigate his crimes (**Exhibit 12 + Exhibit 13**) these Defendants are proximately and willfully liable for the ongoing/**"new"** injuries to Plaintiff Kaul's life/liberty/property/reputation.

# DEFENDANT OETKEN'S CORRUPTION OF THE UNITED STATES DISTRICT COURT + CAUSE FOR HIS IMPEACHMENT

**28.** The central issue in this case pertains to the blatant disrespect of a democratically appointed district judge in the S.D.N.Y. for the SCOTUS principles and holdings of the seminal case of SEC v Jarkesy: 22-859 (June 27, 2024) and his willful failure to recognize that the application of this law to a case he had adjudicated on September 12, 2022, did render his opinion/order null and void, an opinion/order that he admitted were the product of a quid pro quo scheme of bribery with the defendants in that case.

**29.** Defendant James Paul Oetken, did, in period commencing in or round August 2021 enter in to a racketeering conspiracy with the K11-7 Defendants, in which he participated in the conversion of his bench/court into a **"racketeering enterprise"** through which he and his defendant co-conspirators perpetrated a **"pattern of racketeering"** through his court of amongst other things, the commission of the RICO predicate acts of bribery/public corruption/wire fraud/obstruction of justice.

**30.** The purpose of these RICO violations were to injunct Plaintiff Kaul from seeking justice/truth within the United States District Court as to all the facts preceding, surrounding and underpinning the illegal 2012-214 suspension/revocation of his NJ license, a revocation that has since 2012 deprived Plaintiff Kaul of his life/liberty/property/reputation and caused ongoing/"new" violations of his human/civil/constitutional rights.

**31.** Defendant Oetken, in conjunction with Defendant AGC and his co-conspirators in the New York region has acted with a sense of impunity in the belief that his criminal conduct on the bench and its conversion into a **"racketeering enterprise"** would go un-exposed and un-punished.

**32.** It was his sense of omnipotence that caused him to disregard and indeed violate his legal obligations as to the law set forth in Jarkesy, effectively viewing an historical ruling from the

12

U.S.C.SA. for the 5th Circuit and SCOTUS as a ruling whose holdings and principals he, as a democratically appointed New York judge was obliged to ignore and or violate.

**33.** Defendant Oetken sits in a court less than two (2) miles from Wall Street, the home of the SEC and the NYSE on which **The Kaul Cases** Defendant Allstate Insurance Company extracts billions from the American public. It is in this incestuous financial world milieu that Defendant Oetken operates his highly lucrative schemes, in which he sells his bench to the highest bidder in each case, even if those cases involve evicting persons from properties owned by his Wall Street bank co-conspirators.

**34.** Defendant Oetken has for decades conducted these criminal schemes under the purported cover of judicial immunity and the protection of his political sponsors and Defendant AGC, the latter an agency tasked with investigating and policing corrupt lawyers, but an agency that has facilitated Defendant Oetken's long-standing **"pattern of racketeering"**. Defendant Oetken has been able to 'stay under the radar' for so long consequent to the fact that no lawyer has been willing to expose his criminal activities, despite their obligation to do so.

**35.** However, arguably the most reprehensible part of Defendant Oetken's delusion of omnipotence has been his interference in the affairs of district courts from the 4th and 5th Circuits, in which he has threatened Plaintiff Kaul with sanctions/contempt if he did not dismiss cases that district judges in those circuits admitted with full knowledge of Defendant Oetken's September 12, 2022, purported 'injunction'.

**36.** Defendant Oetken seeks to indirectly establish authority over every district judge in the United States District Court with threats against Plaintiff Kaul, and in fact these threats continue despite his knowledge that the SCOTUS ruling in Jarkesy, has for the legally substantiated reasons stated in K11-20, invalidated his September 12, 2022, purported 'injunction', but reasons/law he continues to violate, while siting on the federal bench.

13

**37.** Defendant Oetken's crimes/violations evidence a contemptuous and complete disregard for the authority of every other district judge and court within the United States District Court, including the Justices of the U.S.C.A. for the 5th Circuit and those of the Supreme Court of the United States.

**38.** It is for these reasons and others that U.S.D.J. Oetken must be removed from the federal bench, his case referred to the Senate Judiciary Committee and he be ordered to cease and desist from any further interference in the affairs of other district courts and their judges.

## DEPRIVATION OF ANY/ALL IMMUNITIES

**39.** Defendant Oetken became deprived of any immunity the moment he commenced conspiring with the K11-7 Defendants in the conception, development, and perpetration of the quid pro quo schemes, as detailed in K11-17 (**Exhibit 4**).

**40.** Defendant Oetken has knowledge of the facts of K11-17. This is evidenced in Defendants Christie/Solomon/Heary's private letter to him (**Exhibit 5**) and by his own admission in his March 15, 2024 'ORDER': **"The Court has learned …"** although Defendants Christie/Solomon/Heary's January 19, 2024, letter was privately addressed to Defendant Oetken, and not the Clerk of the Court nor any other judges within the **"Court".**

**41.** Defendant Christie/Solomon/Heary's letter is not published to the SDNY docket, and neither their names nor the letter is referenced on the docket nor in Defendant Oetken's March 15, 2024 'ORDER', as just further evidence of Defendant Oetken's **"pattern"** of illegal exparte violations. Defendant Oetken's March 15, 2024 'ORDER' is arguably without the authority of the Court and constitutes a violation of U.S.C. Section 1018 and the Judiciary Act of 1789.

**42.** Defendant Oetken, with knowledge of the K11-17 facts of his crimes at a time no later than January 19, 2024, has continued to fail to submit an affidavit into K11-17 denying the facts of the quid pro quo schemes/evidential falsification/perjury and other acts of public corruption. His non-denial caused the admission of these facts, facts of felonies and felonies that deprive him of any immunity.

**43.** Defendant Oetken's guilt accounts for both his admission of fact and the failure of the K11-17 Defendants to cause the submission of affidavits from the New York State Ethics Committee, the Judicial Disciplinary Council, and any other judge within the SDNY, as to Defendant Oetken's refuting that Defendant Oetken engaged in criminal schemes with the K11-7 Defendants.

**44.** Defendant Oetken's guilt and his recognition of his guilt account for his March 15, 2024, effort to attempt to coerce Plaintiff Kaul under threat of contempt into dismissing K11-17, in order to attempt to suppress the inevitable March 13, 2024, related K11-17 DISCOVERY ORDER emergence of further evidence of his guilt, that would place him at risk of criminal indictment. Defendant Oetken's fraudulent <u>March 15, 2024,</u> order in K11-7 was entered on to the docket in K11-17 on <u>March 18, 2024</u> <u>**(Exhibit 7).**</u>

**45.** As with Defendant Christie, Defendant Oetken's scheme in attempting to hatch plots to jail/kill/silence does nothing but further evidence his crimes, crimes for which, like Edward Manton <u>**(Exhibit 5)**</u>, he lacks immunity.

# STATEMENT OF FACT + DEFENDANT OETKEN'S RULE 8(b)(6) ADMISSIONS OF FACT

**46.** Plaintiff Kaul respectfully asserts that a chronologically organized statement of fact will most effectively and with greatest clarity illustrate the perversion of justice committed by Defendant Oetken and his co-conspirators, many of whom are defendants in K11-20 actively obstructing/violating the authority of the U.S.D.C. for the S.D.T.

**47.** Pursuant to RICO's doctrine of vicarious liability each Defendant is as liable for the violations/offenses/injuries of every other Defendant as if they directly caused the violations/offenses/injuries. See Salinas v US: 522 US 52 (1997)

**2003 – 2013:**

**48.** In late February/early March 2005, Plaintiff Kaul invented and successfully performed the first outpatient minimally invasive spinal fusion, the facts of which are detailed in K11-20. Consequent to this invention, Plaintiff Kaul earned immense professional and commercial success, which caused jealousy amongst his market competitors who unable to compete with him fairly did commence conspiring with the then NJ Governor and now Defendant Christie.

**49.** The conspiracy involved the perpetration of a series of quid pro quo schemes in which Plaintiff Kaul's competitors funneled bribes to Defendant Christie in return for having him abuse his state executive power to order **The Kaul Cases** Defendant, New Jersey Board of Medical Examiners to manufacture a knowingly false case to cause the illegal suspension-revocation of Plaintiff Kaul's license in 2012/2013.

**50.** **The Kaul Cases** Defendants, of which the K11-20 Defendants are members, did seek not only to cause a license revocation, but sought to permanently eliminate Plaintiff Kaul by attacking every element of his life/liberty/property/reputation, such that his existence would

17

cease, and he would never expose their crimes. Their scheme failed and Plaintiff Kaul did, in late 2013 commence collecting evidence of the crimes/violations of The Kaul Cases Defendants.

## 2013 – 2016:

**51.** Consequent to the revocation and the widespread malicious publicity surrounding the events, Plaintiff Kaul was forced into a state of poverty/homelessness and became obliged to file on June 17, 2013, for Chapter 11 bankruptcy for his four (4) healthcare related businesses.

**52.** On July 21, 2014, the Chapter 11 proceeding was converted to a Chapter 7 liquidation consequent to final order of license revocation on March 24, 2014. The entire revocation proceedings, as detailed in K11-20 were the product of corruption and were corrupt.

**53.** The principal purpose of the corruption was to cause the elimination of the competitive threat posed by Plaintiff Kaul to his competitors in the minimally invasive spine surgery market, that included neurosurgeons/hospitals/insurance companies., all of whom illegally profited from the elimination of Plaintiff Kaul.

**54.** Having had his license revoked in 2014 and illegally deprived of his career (1983-2012), his entire estate and his reputation, Plaintiff Kaul, after much contemplation, decided not to leave the United States and his two (2) young children, but to stay, teach himself the law and seek to have exposed the truth of the crimes of **The Kaul Cases** Defendants. And so, on February 22, 2016, Plaintiff Kaul filed K1 in the Southern District of New York, from where it was on April 16, 2016, transferred to the District of New Jersey over Plaintiff Kaul's objections.

## 2016-2022:

**55.** In this period, Plaintiff Kaul did, in a continued state of poverty, continue to file claims in various district courts based on the national injury caused to his medical career and inability to procure a license in any state except that of Pennsylvania, wherein his application was granted on May 27, 2021, but on condition he find a PA licensed physician willing to periodically

18

monitor his practice, a condition rendered impossible consequent to the malicious and widely publicized articles/stories propagated within the New York-New Jersey-Pennsylvania area.

**56.** As such and despite concerted efforts Plaintiff Kaul was unable to find such a person and his letters to the PA medical board seeking to have the board conduct the monitoring were ignored. From February 22, 2016, after having acquired sufficient knowledge of the law, Plaintiff Kaul filed multiple lawsuits in the United States District Court, most of which were transferred to the District of New Jersey, where they were stayed and or voluntarily dismissed, with the non-transferred cases being cases in which Plaintiff Kaul was not permitted to commence discovery.

**57.** In the period from 2016 to 2024, not one fact has been denied by any of the defendants, the courts (K5/K11-14/K11-15/K11-17/K11-20) in which discovery orders were issued, the Defendants did violate these orders and harass/intimidate/corrupt the judges into staying and or dismissing cases in which they had entered discovery orders.

**58.** On May 27, 2021, Plaintiff Kaul was kidnapped by a group of nine armed men at his place of residence/work in New Jersey, under orders from Defendant Christie, who had been served a Summons/Complaint in K11-2 at his law office in Morristown, NJ, and who mistakenly believed it would intimidate Plaintiff Kaul into ceasing his prosecution of **The Kaul Cases**. It did not and Plaintiff Kaul continued.

**59.** The kidnapping scheme failed and Plaintiff Kaul' person was abandoned at a hospital by two police officers who rapidly disappeared. The events were memorialized in an affidavit filed by Plaintiff Kaul on May 28 in K11-2. No person as of yet has been criminally prosecuted for this crime.

**60.** On August 19, 2021, Plaintiff Kaul filed K11-7. Summonses were issued and briefing was conducted up until February 2022. On September 12, 2022, Defendant Oetken issued an

opinion/order in which none of Plaintiff Kaul's arguments were analyzed and in which none of the highly incriminating evidence of the crimes of **The Kaul Cases** Defendants was either acknowledged, referenced and or critically incorporated into his knowingly fraudulent opinion.

**61.** The reason that Defendant Oetken so blatantly abused the power of the United States District Court pertained to the quid pro quo scheme that he had, in collusion/conspiracy with **The Kaul Cases** Defendants perpetrated in the United States District Court, thus converting it into a **"racketeering enterprise"**.

**62.** On September 12, 2022, Defendant Oetken entered a knowingly fraudulent purported 'injunction' onto the federal docket, that sought to permanently bar Plaintiff Kaul from seeking restitution for the criminally perpetrated immense and ongoing/**"new"** injuries to his life/liberty/property/reputation.

**63.** Defendant Oetken unilaterally set himself up as the nationwide arbiter of the decision of every other judge in the United States District Court as to whether or not they could exercise their independent judgment in accepting cases filed by Plaintiff Kaul, cases that were factually and legally distinct to K11-7.

**2023-2024:**
**64.** K11-17 was filed on November 20, 2023, in the U.S.D.C. for the E.D.N.C. and enclosed principally with **Exhibit 14** were all documents submitted by Defendant Oetken in relation to Plaintiff Kaul, and all documents submitted by Plaintiff Kaul in relation to Defendant Oetken in the period commencing on September 12, 2022.

**65.** On March 13, 2024, the E.D.N.C. subsequent to five (5) months-worth of briefing and knowledge of all documents pertaining to Defendant Oetken's violations/abuse of the power of the United States District Court, did enter an ORDER FOR DISCOVERY PLAN (K11-17: D.E. 65), an order that was violated by the K11-17 Defendants consequent to their prior **"pattern"** of

perpetrating a scheme of judicial corruption/harassment/intimidation purposed to have the case either stayed and or dismissed.

**66.** Regardless, on April 12, 2024, Plaintiff Kaul submitted a 'REPORT OF THE PARTIES PLANNING MEETING', in which he informed the district court of the Defendants violation of the March 13, 2024 'ORDER FOR DISCOVERY PLAN' and on April 18, 2024, submitted 'PLAINTIFF KAUL'S REQUEST FOR THE COURT TO TAKE JUDICIAL NOTICE PURSUANT TO FEDERAL RULE OF EVIDENCE 201, OF DOCUMENTS RELEVANT TO DEFENDANT FEDERATION OF STATE MEDICAL BOARDS' (K11-17: D.E. 94).

**67.** The latter document is irrefutable proof of the fact that state medical boards are not sovereign entities but are in fact subjugate elements of the for-profit entity of Defendant FSMB or as pled by Plaintiff Kaul within **The Kaul Cases**, the **"Federation Cartel" ("FC")**.

**68.** This cartel, one that has taken decades to establish, illegally confers absolute antitrust power on the **"FC"** over, amongst other things, the entire system of so called 'physician regulation and disciplining from which it reaps billions in profit. The **"FC"** aggressively conducts quid pro quo schemes with hospital/insurance/pharmaceutical corporations, and uses its power to terminate physicians who either fail to support or oppose the corporate profiteering agendas of the **"FC"** hospital/insurance/pharmaceutical corporations quid pro quo conspirators.

**69.** It achieves these terminations (read executions) by disseminating orders to its subjugate state medical boards to revoke the targeted physicians' licenses and obstruct their efforts to have those licenses reinstated and or new license issued.

**70.** Thus, pursuant to RICO's doctrine of vicarious liability pursuant to Salinas , the acts/offenses/violations of one state medical board become the liability of all subjugate state medical boards of the **"FC"**. **"The crime of one becomes the crime of all"**

71. And so, a violation of a physicians' human/civil/constitutional rights in one state causes him an injury in all states, which thus provides him standing to bring suit in any/all states.

72. **The Kaul Cases** represent an existential threat to the **"FC"**, which accounts for the lengths to which it and **The Kaul Cases** Defendants have gone to attempt to cause the elimination of Plaintiff Kaul (kidnapping/false indictment/false arrest/false incarceration/attempted killing).

73. Similarly, it accounts for the fact of their corruption of certain members of the politico-judicial bodies to attempt to prevent Plaintiff Kaul from further exposing their decades-long corporate-profit driven crimes against the American public and medical profession.

74. Defendant Oetken is simply one of the more recent public servants to have gotten snared in their 'net of corruption', a 'net' into which he willingly entered in the belief the 'net' would restrict Plaintiff Kaul but never imagining that the net would entrap him and his co-conspirators.

75. However, and arguably the 'spark' that lit the fundamental/illegal structure of the **"FC"** was respectively the May 18, 2022, and June 27, 2024, opinions/orders of the U.S.C.A. for the 5th Circuit and SCOTUS in Jarkesy, which established, as pled in K11-20 (----) that the jury-less article III judge free NJ administrative April 2, 2012, suspension and March 24, 2014, revocation were/are illegal.

76. **The Kaul Cases** Defendants, and particularly the lawyer defendants, recognized these facts as some of many of the knowing illegality of their revocation scheme, but calculated Plaintiff Kaul would be eliminated, and Plaintiff Kaul would never expose the scheme.

77. But when Plaintiff Kaul commenced litigation on February 22, 2016, **The Kaul Cases** Defendants conviction of their impunity began to shudder and so they embarked on grand schemes of politico-judicial corruption, again convinced they would prevent the emergence of

further evidence of their crimes and of the ever-expanding conflagration of their criminal conspiracy.

**78.** However, recognizing in or about 2021 that simple quid pro quo bribery schemes were insufficient, they had Plaintiff Kaul kidnapped/arrested/jailed and realized that the dollar-value of the bribes had to be of sufficient value to have a district judge not only dismiss the case but enter a nationwide injunction purporting to prevent Plaintiff Kaul from seeking restitution for the past ongoing/"new" injuries to his life/liberty/property/reputation, without first obtaining the permission of such a judge willing to take such a risk of criminal conspiracy.

**79.** That judge was Defendant Oetken, a resident of the most expensive part of Manhattan (Chelsea) whose daily living expenses/lifestyle require more than a federal judge's salary does permit. Defendant Oetken sits on many cases involving financial corporations, and treats these cases as personal profit generators.

**80.** Defendant Oetken, recognizing the illegality of his 'injunction' scheme and of his having entered an un-exit-able criminal conspiracy, did quickly succumb to the K11-17 Defendants demand consequent to the March 23, 2024 'ORDER OF DISCOVERY' that he issue an 'order' threatening to hold Plaintiff Kaul in contempt if he did not dismiss K11-17 by March 29, 2024. The K11-17 Defendants threatened Defendant Oetken with exposing his crimes/professional ruin if he failed to comply with their demand.

**81.** Plaintiff Kaul sued Defendant Oetken in K11-18 on March 25, 2024, in the U.S.D.C. for the E.D.N.C. for all of the human/civil/constitutional rights violations pled in K11-23. Defendant Oetken's failure to deny the facts/allegations did, pursuant to Rule 8(b)(6) cause these facts to become admitted for all purposes (**Exhibit 8).**

**82.** The reason for Defendant Oetken's non-denial of the facts in K11-18 was his guilt of those allegations/facts, facts that he had admitted on October 6, 2022 (**Exhibit 3)** and then on August

23

14, 2023, when he belatedly and summarily denied Plaintiff Kaul's October 6, 2022, motion for his disqualification, without denying the facts substantiating that disqualification (**Exhibit 4**).

**83.** Defendant Oetken has denied none of the charges levied against him by Plaintiff Kaul in the period from September 14, 2022, to the present, including those on March 25, 2024, in K11-18.

**84.** Defendant Oetken is guilty of, amongst other things, of having abused the authority and power of the United States District Court to conduct a **"pattern of racketeering"** within the S.D.N.Y. and to attempt to then perpetrate the products of that fraud through every other district court in the United States District Court, by threatening Plaintiff Kaul with contempt if he fails to dismiss cases accepted and adopted by fully informed district judges in those courts.

**85.** On August 26, 2024, Plaintiff Kaul in filing K11-20 in the Southern District of Texas, did inform the court and district judges of all the circumstances/events/facts surrounding the September 12, 2022, purported 'injunction' and affairs associated with Defendant Oetken. Based on these representations and other facts of immense substance and relevance, the U.S.D.C. for the S.D.T did accept the case, issue summonses and an 'ORDER FOR CONFERENCE AND DISCLOSURE OF INTERESTED PARTIES' on August 30, 2024 (**Exhibit 15**).

**86.** The K11-20 Defendants have violated and continue to violate this order while attempting to secretively scheme with Defendant Oetken to have Plaintiff Kaul's person physically restrained (**Exhibit 16 + Exhibit 19**) in order to prevent him appearing for the scheduled November 4, 2024 'INITIAL PRETRIAL AND SCHEDULING CONFERENCE' (**Exhibit 18**). Plaintiff Kaul, in randomly checking the court dockets on October 3, 2024, came to know of the K11-20 Defendants clandestine scheme with Defendant Oetken , and then emailed Defendants a copy of his letter to the S.D.T. judicially noticing it of Defendants letters to Defendant Oetken. This prompted the K11-20 Defendants to submit their secretively filed letters to Defendant Oetken with the S.D.T. just before Plaintiff Kaul filed his judicial notice (**Exhibit 17**), in order to attempt to cover-up their scheme to keep Plaintiff Kaul unaware of Defendant Oetken's October 2, 2024 'order' until

he was arrested/jailed on October 17, 2024, thus keeping him from appearing at the Scheduling Conference on November 4, 2024 (**Exhibit 18**), a move Defendants hoped/believed would cause dismissal of K11-20.

**87.** Defendant Oetken's critical participation in the knowingly illegal September 12, 2022, purported 'injunction' scheme has severely compromised his ability to independently function as a judge within the United States District Court, and as such should be removed from the federal bench.

**88.** And it is Defendant Oetken's recognition of the desperate situation into which he caused his irreversible admission, that accounts for his second threat to attempt to hold Plaintiff Kaul in contempt for allegedly violating an order that he and the K11-20 Defendants know is illegal and the product of a massive bribery related 'Fraud on the Court'.

89. Further bolstering his knowledge of his guilt is the fact that in K11-18 his non-denial of the facts of his crimes did cause their admittance for all purposes pursuant to Rule 8(b)(6). Defendant Oetken would have been better advised to admit or deny the K11-18 facts and attempt to shift the quid pro quo liability onto **The Kaul Cases** Defendants.

**90.** Instead, not only have most of those Defendants admitted in K11-20 to facts of their guilt, but Defendant Oetken's Rule 8(b)(6) admission of the facts of his guilt in K11-18 was unqualified and with acceptance of complete liability, regardless of its procedural dismissal on April 8, 2024 (**Exhibit 10).**

**91.** In fact, it is Defendant Oetken's K11-18 admittance of guilt, acceptance of complete liability and the lack of any defense, that establishes his guilt in K11-23 and an admittance of undisputed fact sufficient for Summary Judgment on all counts.

# LEGAL CLAIMS

## 1. COUNT ONE

**Association-In-Fact Enterprise: U.S.D.C.-S.D.N.Y.-State of New York-NYSE ("USN- Association-In-Fact Enterprise")**

**Defendant Persons: Mississippi Medical Board/New York State Attorney Grievance Committee/James Paul Oetken**

**Co-conspirators: TD Bank/Geico/Grewal**

**RICO Predicate Acts: Bribery/Wire Fraud/Obstruction of Justice/Public Corruption**

**Overview:**

**92.** In a period commencing in or around August 2021, Defendant Oetken did enter a conspiracy with, amongst others, co-conspirators TD Bank/Geico/Grewal, the agreed purpose of which was to cause the knowingly illegal dismissal of K11-7 with prejudice and the entry of a purported nationwide 'injunction' that sought to prevent Plaintiff Kaul from filing any further complaints/petitions/documents in the United States District Court related to the **"denial [not revocation] of his medical license"** and or litigation proceedings initiated by either the K11-7 Defendants or Plaintiff Kaul **"before"** **[not after]** September 12, 2022.

**93.** Defendant Oetken's purported 'injunction' as admitted in K11-18 in a period from March 25 to April 8, 2024, was the product of a bribery related quid pro quo scheme in which Defendant Oetken did, in collusion/conspiracy with his co-conspirators convert the U.S.D.C. for the S.D.N.Y. into an **"association-in-fact racketeering enterprise"** through which he and his co-conspirators perpetrated a **"pattern of racketeering"** through the commission of the knowingly illegal RICO predicate acts of bribery/public corruption/obstruction of justice/wire fraud.

**94.** Defendant Oetken's guilt in K11-23 is consequent to his Rule 8(b)(6) admissions of fact as to his failure to deny the facts in K11-18 and or raise any defense, be it qualified/sovereign/absolute immunity and or claim sufficiency. Res judicata provides no defense to admitted facts regardless of the final case disposition, for the facts are an entity separate from any non-substantive procedural basis for a dismissal.

**95.** In K11-18, Defendant Oetken became aware of the Complaint on or about March 27, 2024, and could have voluntarily entered the case and denied the facts, but he did not, because he was/is guilty of the levied charges/facts.

**96.** In fact, he could even have sought permission from the U.S.C.A. for the 4th Circuit to enter the appeal, but he did not, as further evidence of his guilt, and of his attempt to corruptly manipulate the U.S.C.A. for the 4th Circuit into affirming the dismissal of K11-18.

**97.** Defendant Oetken did not anticipate that Plaintiff Kaul would dismiss the K11-18 4th Circuit appeal and did neither anticipate the filing of K11-20 within the U.S.C.A. for the 5th Circuit, the Circuit from which the seminal ruling in _Jarkesy_ emerged, the principles of which rendered/render illegal the 2014 NJ revocation, all of its legal sequalae and every opinion/order that was based on and or incorporated the illegal 2014 jury-less article III judge free revocation, including the K11-7 September 12, 2022 purported 'injunction'.

**98.** These facts are known to Defendant Oetken, as he was provided a copy of the K11-20 Complaint by Defendants FSMB/Allstate, and knows these facts to be admitted consequent to his knowledge of the K11-20 Defendants Rule 8(b)(6) \failure to deny the facts, thus causing their admission for all purposes.

**99.** However, despite having admitted facts of his crimes in K11-18 and knowing of the K11-20 Defendants admission of facts of their crimes, and of his conflicted lack of authority in matters as to Plaintiff Kaul, he did, in knowing violation of civil/criminal law abuse the authority of the

United States District Court to attempt, in a knowingly illegal manner, threaten Plaintiff Kaul with contempt if he did not dismiss K11-20.

100. Defendants MMB/AGC liability stems in part respectively from their 2024 denial of Plaintiff Kaul's license application to the MMB (**Exhibit 11**) and Defendant AGC's complicity in their failure to investigate Defendant Oetken's bribery related  quid pro quo scheme with **The Kaul Cases** Defendants.

101. Had Defendant AGC investigated Defendant Oetken's crimes and or referred the matter to prosecutorial authorities, the illegality of the 2014 NJ revocation would have been fully exposed as would have Defendant Oetken's illegal abuse of the power/authority of the United States District Court, the net result which would have been a 'turning of the clock' back to 9 am EST on April 2, 2012, and rectification/remediation/compensation of every injury to Plaintiff Kaul's life/liberty/property/reputation.

102. However, of greater import would be a reformation of the state medical board system to bring it into compliance with the Seventh Amendment related ruling in Jarkesy, in which the SEC has been forced to comply, a compliance that constitutes precedent for the same reformation of American state medical boards.

103. The corrupt vigor with which **The Kaul Cases** Defendants have contested the claims (2016-2024) is partly explained by their realization of the illegality of what the crimes they committed against Plaintiff Kaul (2005-2024), and of the immense/detrimental material consequences to their profiteering and imposition of 'fines' against innocent, principally ethnic minority physicians.

104. In essence, **The Kaul Cases** represent an existential threat to the **"Federation Cartel"**, its subjugate state medical boards and their obscene/illegal profiteering at the expense of human life.

**The Association-In-Fact Enterprise**:

**105.** The pleading of an association-in-fact enterprise can be deduced from the pleading of the RICO predicate acts and the **"pattern of racketeering"**. See <u>Boyle v United States, 129 S.Ct 2237 (2009)</u>, but additionally and pursuant to the <u>Boyle</u>, the elements of pleading are as follows:

**106.** <u>A purpose</u> - the illegal bribery related dismissal with prejudice of K11-7 and the entry of a knowingly illegal nationwide 'injunction', the purpose of which was to prevent Plaintiff Kaul from further/fully exposing the long-standing crimes of **The Kaul Cases** Defendants, many of which resulted in the incarceration of principally ethnic minority physicians to whom the insurance industry owed money or who presented a competitive threat in the healthcare market.

**107.** <u>A relationships among those associated with the enterprise</u> – Defendant Oetken's relationship in the S.D.N.Y. with many of the NY-NJ political/Wall Street based Defendants and or individuals/entities associated with them extends back to his 2011 appointment to the federal bench. These corrupt relationships continued after the dismissal and did as a consequence of the dismissal and purported 'injunction' become even further fortified in their criminality. The quid pro quo dismissal purposed scheme committed in K11-7, and then in K11-17 (**Exhibit 14**) and the attempt in K11-20 evidence the ongoing nature of the association-in-fact enterprise

**(108)** <u>Longevity sufficient to permit these associates to pursue the enterprise's purpose</u> – the association-in-fact enterprises that preceded K11-7, that did continue in K11-7/K11-17 and now seeks to extend its racketeering effect into K11-20 do evidence a longevity that commenced in 2011. This longevity is ongoing in 2024 and will continue to operate unless Defendant Oetken is removed from the federal bench and held liable with his co-conspirators for the commission of crime within and 'under cover' of the United States District Court. The perils of permitting Defendant Oetken to continue to sit on the bench and issue knowingly fraudulent opinions that become incorporated into the fabric of American jurisprudence is that

29

they pervert/obstruct the natural course of justice in the United States, and violate Rules 144/455 as to his disqualification, a disqualification that he himself denied on August 14, 2023 (K11-7: D.E. 172).

109. As to the pleading requirements for an association-in-fact enterprise, the circuit splits on what exactly was required were clarified by the Supreme Court in Boyle:

110. "Such a group need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must <u>function as a continuing unit and remain in existence long enough to pursue a course of conduct,</u> nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach."

111. And so, in applying the <u>Boyle</u> standard to the instant matter, the motive/method of the USN Enterprise related relationships between the below identified Defendants and the co-conspirators is as follows: **(i)** Defendant Oetken – Defendant AGC; **(ii)** Defendant Oetken – Defendant MMB; **(iii)** Defendant Oetken – Co-conspirator Grewal; **(iv)** Defendant Oetken – Co-conspirator TD; **(v)** Defendant Oetken – Co-conspirator Geico; **(vi)** Co-conspirator TD – Co-conspirator Grewal; **(vii)** Co-conspirator TD – Co-conspirator Geico; **(viii)** Co-conspirator Geico – Co-conspirator Grewal; **(ix)** Co-conspirator MMB – Co-conspirator Grewal; **(x)** Co-conspirator MMB – Co-conspirator Geico; **(xi)** Co-conspirator MMB – Co-conspirator TD

**112.** Purpose – The overarching purpose of the post-revocation USN enterprise/scheme was to prevent Plaintiff Kaul from invalidating the illegal 2014 NJ revocation and all of its legal and non-legal sequalae, and from exposing the long-standing criminal history of **The Kaul Cases** Defendants, in which they had through schemes of politico-judicial corruption converted state persons/agencies into **"racketeering enterprises"** through which they perpetrated **"patterns of racketeering"** through the commission of RICO predicate acts, many of which resulted in the death and or incarceration of innocent physicians to whom money was owed.

**113** Relationships among those associated with the enterprise – The fundamental and common element that relates the Defendants and the co-conspirators is the fact that all fall into one of two categories, those being state actors with state power and private profit purposed actors seeking state power to further their economic and or political agendas. However, their common purpose was to prevent Plaintiff Kaul from exposing their commission of crime (2005-2014) as to the illegal revocation. In the period from 2014 to 2024, the crimes pertained to various schemes of judicial corruption/kidnapping/false indictment/false arrest/false imprisonment/attempted killing, all purposed to attempt to cover up the revocation related crimes (2005-2014).

**114.** Defendant Oetken illegally profited from illegally selling the power of the United States District Court in a series of quid pro quo schemes with co-conspirators TD/Geico who having participated in the revocation conspiracy by destroying Plaintiff Kaul's economic standing, did bribe Defendant Oetken to dismiss K11-7 and issue an 'injunction' purporting to prevent Plaintiff Kaul from seeking legal redress for the injuries to his life/liberty/property/reputation.

**115.** Co-conspirators TD/Geico were motivated to cause a corruption of Defendant Oetken in an attempt to provide cover for its revocation related crimes, in the knowledge that a public exposure of the crimes would injure their standing on the NYSE, their profits and subject their corporate officers to civil/criminal prosecution.

31

**116.** Defendant Oetken illegally benefitted from perverting the power of the United States District Court in a series of quid pro quo dismissal/purported 'injunction' schemes with co-conspirator Grewal/others, a purpose of which was to prevent Plaintiff Kaul from procuring further proof of the illegality of **The Kaul Cases** Defendant, New Jersey Board of Medical Examiners **("NJBME") 2014** revocation, a revocation the judicial-evidential confirmation of which would cause a nullification/reversal/compensation of the illegal revocation and every legal and non-legal injury subsequently caused to Plaintiff Kaul's life/liberty/property/reputation (2012-2024), in conjunction with the civil/criminal holding of **The Kaul Cases** Defendants.

**117.** Defendant MMB, benefitted from Defendant Oetken's illegal dismissal and purported 'injunction' in that being a subjugate member of the **"Federation Cartel"** it is as liable for the crimes of one member of the cartel, namely **The Kaul Cases** Defendant, NJBME, as if it had directly committed the crimes. Additionally, co-conspirator, MMB, benefitted from having Defendant Oetken dismiss K11-7, in that the dismissal was an effective validation, albeit false, of the illegal 2014 NJ revocation, a position that Defendant MMB used in a knowingly illegal manner to deny Plaintiff Kaul's licensure applications in 2020/2024, thus re-affirming its subjugation/felty to the **"Federation Cartel"**, from which its membership causes profit to its executives.

**(118)** Longevity sufficient to permit these associates to pursue the enterprise's purpose – The purpose of the USN enterprise is to maintain its highly lucrative monopoly power over the entire system of so called 'physician regulation and discipline', the very existence of which has been and is challenged by **The Kaul Cases,** including K11-20. This system was in existence prior to the 2005 commencement of the revocation conspiracy and was further fortified in or around 2008 by the eponymous 'Healthcare Fraud Prevention Partnership', a concoction of the insurance industry purposed to further subjugate the medical profession in order to increase shareholder/executive compensation of the insurance/hospital/pharmaceutical corporations through the exploitation and at the expense of the medical profession. The perpetration of this

32

scheme required a coopting of certain judges/courts to nullify/dismiss/injunct any physicians that challenged the illegal monopoly of the healthcare market by these exploitative for-profit corporations, who were fundamentally/illegally practicing medicine without a license, a condition that existed/exists consequent to their corrupt capture of the regulatory/judicial apparatus of state. All of these factors of consolidation of power have caused a longevity of existence/function such that their knowingly illegal antitrust conspiracies have continued without challenge, until **The Kaul Cases**, to the immense detriment of the public and medical profession.

**Bribery:**

**119.** K11-7 was filed on August 19, 2021, and shortly thereafter the K11-7 Defendants commenced communicating across the US wires and in face-to-face meetings as to the perpetration of a knowingly illegal quid pro quo bribery scheme with Defendant Oetken purposed to have him dismiss K11-7 with prejudice and issue a nationwide 'injunction' that would prevent Plaintiff Kaul from seeking redress for the crimes/violations committed against him (2005 onwards) by **The Kaul Cases** Defendants without Defendant Oetken's permission.

**120.** The conflicted absurdity of this proposition, that Plaintiff Kaul required the permission of a person at the center of the bribery related quid pro quo scheme, accounts in large part for the invalidity of the purported 'injunction' and the decision of Chief Judge Richard E. Meyers to admit the case into the jurisdiction of the E.D.N.C. with full knowledge of all matters related to Defendant Oetken's misconduct in K11-7.

**121.** It would be akin, and Plaintiff Kaul asserts this analogy with the greatest humility, to Nelson Mandela seeking permission from the 1988 apartheid South African President, P.W. Botha, to conduct the affairs of the African National Congress in the dismantling of the brutality/injustice of apartheid.

**122.** In the period from August to December 2021, the K11-7 Defendants had developed and agreed upon a scheme whereby to attempt to create cover the bribes would be transmitted by third party actors to law firms/public relations firms/political lobbyists and specifically to persons/politicians/lawyers with personal and or professional connections to Defendant Oetken, be those connections direct or indirect. In this manner the K11-7 Defendants hoped to create an opaqueness to their knowingly illegal scheme.

**123.** The bribes would originate from the Defendants bank accounts/other investment vehicles (off-shore and domestic) and would be materialized in Defendant Oetken's possession in a multitude of 'gifts/cash deposits in accounts of persons associated with him to third degree/payment of living expenses-mortgage-rent/travel expenses and other easily concealed hard assets, as was exposed in the criminal conviction of US Senator, Robert Menendez.

**124.** The bribes were paid in installments linked to the progress of K11-7, with the final bribe being transmitted in or around December 2022, when it became apparent Plaintiff Kaul had not appealed the corrupt order in the same court building of the circuit in which Defendant Oetken sat.

**125.** Defendant Oetken's chambers/courtroom are at 40 Foley Square, NY, NY, the location of the U.S.C.A. for the Second Circuit, and an appeals circuit on which Defendant Oetken had intermittently sat.

**126.** In a period from September 12, 2022, onwards, it became apparent to Defendant Oetken and **The Kaul Cases** Defendants that the bribery related scheme had failed, and the K11-17 Defendants had become the K11-20 Defendants.

**127.** And specifically in the period from June 27 to October 2024, there emerged new facts/new law that rendered illegal the 2014 NJ revocation and all of its legal/non-legal sequalae, including Defendant Oetken's September 12, 2022, purported 'injunction'.

34

**128.** The SCOTUS ruling in <u>Jarkesy</u> was violated by Defendant Oetken on October 2, 2024, when he issued his knowingly fraudulent order attempting to compel Plaintiff Kaul to dismiss K11-20 under threat of sanctions/contempt.

**129.** Defendant Oetken knew that <u>Jarkesy</u> rendered illegal the 2014 jury-less article III judge free revocation and all its legal/non-legal sequalae, but Defendant Oetken, in a knowingly blatant violation of the law, did enter his October 2, 2024, purported 'order' onto the K11-7 docket. And he did so in part because having entered the criminal conspiracy in 2022, the K11-7/K11-17/K11-20 Defendants threatened him with exposure if he failed to comply with their order.

**130.** And Defendant Oetken recognized and recognizes that such exposure would result in civil/criminal investigations and a re-opening/examination of all his prior cases, for <u>corrupt</u> judges who have sat on the bench for ten (10) years without permanent appellate elevation, develop a sense of frustration, omnipotence and entitlement to what they consider the 'spoils of war'. They lose sight of the immense/immeasurable civic value that they provide through their measured and impartial adjudication, and of the fact that their decisions form the bedrock of American jurisprudence, without which the appellate courts could not function.

**<u>Wire Fraud:</u>**

**131.** In a time period commencing in or around February 2022, Defendant Oetken/agents commenced using the US wires to transmit information to the K11-7 Defendants/agents regarding the perpetration of the knowingly illegal quid pro quo bribery scheme.

**132.** From February 2022 onwards, up to and including October 2024, Defendant Oetken/agents did continue to use the US wires to exchange information/facts as to the failure of the scheme in causing Plaintiff Kaul to crease his prosecution of **<u>The Kaul Cases.</u>**

**133.** Defendant Oetken and **The Kaul Cases** Defendants used the US wires in a knowingly illegal manner on thousands of occasions in the period commencing in February 2022 and continuing into October 2024.

**134.** In these communications, Defendant Oetken did, after having received the entirety of his bribes, express a reluctance to continue to use the authority of the United States District Court to continue perpetrating the scheme.

**135.** Defendant Oetken's reluctance stemmed from the fact that the prosecutorial authorities in the S.D.N.Y. had brought criminal indictments against a sitting US Senator (Robert Menendez) and NYS Mayor (Eric Adams) based on charges of public corruption and specifically engaging in bribery related quid pro quo schemes in which they sold the power of state in exchange for money/gifts/other tangible favors.

**136.** Defendant Oetken, now in a more desperate condition, having recognized that Plaintiff Kaul had exposed his criminal scheme in K11-18 and the ongoing criminal prosecutions of Menendez/Adams became less cautious in his communications with **The Kaul Cases** Defendants.

**137.** Defendant Oetken communicated that he was concerned that his corrupt activities on the bench would be submitted to the Office of the US Attorney for the S.D.N.Y.

**138.** Defendant Oetken used the US wires to communicate his fear that if the prosecutorial authorities subpoenaed his records, he would be charged with the same offenses levied against Menendez/Adams.

**139.** In the continued perpetration of the scheme and its attempted cover up, there were direct communications across the US wires between Defendant Oetken and **The Kaul Cases**

36

Defendants in which Defendant Oetken was threatened with exposure if he failed to follow the orders of **The Kaul Cases** Defendants.

140. In some of these communications, **The Kaul Cases** Defendants expressed immense fear as to the consequences to their lives of Plaintiff Kaul's continued prosecution of **The Kaul Cases**.

141. **The Kaul Cases** Defendants and most recently the K11-20 Defendants, did communicate their grave concerns that if they were deposed by Plaintiff Kaul, further evidence of their crimes would emerge.

142. The K11-20 Defendants, now in a similarly more desperate condition, abandoned all caution as to attempting to 'cover their tracks' and plainly stated that if Plaintiff Kaul were not stopped, they feared they would be indicted, as were Menendez/Adams.

143. The K11-20 Defendants did also use the US wires to transmit that if Plaintiff Kaul's prosecution were successful, officers for the corporate Defendants (Allstate/FSMB) would be held criminally liable.

144. The K11-20 Defendants did use the wires to communicate to each other possible alternative plans to eliminate Plaintiff Kaul if Defendant Oetken did not cooperate.

145. The K11-20 Defendants, in communicating these alternative Plaintiff Kaul elimination plans to Defendant Oetken, did indirectly threaten Defendant Oetken's life and the lives of those related to him to the third degree.

146. In these email communications to both Defendant Oetken's private and official emails, and the emails of his agents, the K11-20 Defendants communicated that if Defendant Oetken did not follow their orders, they would expose other highly incriminating evidence of his prior corrupt acts on the bench and of his homosexual personal life prior to and during his marriage.

**147.** Defendant Oetken, recognizing that his choice was to either comply with the K11-20 Defendants orders or accept the end of his judicial career and possible impeachment/indictment, did comply and use the US wires to issue a knowingly illegal purported order on October 2, 2024, once again threatening Plaintiff Kaul with contempt if he did not dismiss K11-20.

**Obstruction of Justice:**

**148.** Defendant Oetken, a lawyer and a jurist knew that when he entered the bribery related quid pro quo scheme with the K11-7 Defendants in or around February 2022, his acts did and would constitute an obstruction of justice.

**149.** Defendant Oetken knew that some elements of the crime of obstruction of justice to include the elements of there being an ongoing legal proceeding/an awareness of the ongoing legal proceeding/a criminal intent to interfere with the legal proceeding for criminal reasons/ a destruction of evidence (emails/texts/hand written notes)/a interference with witnesses (third parties) to cause a suppression of their testimony.

**150.** Defendant Oetken knew these elements and others because he has adjudicated many cases since 2011 involving obstruction of justice charges, charges/convictions for which has sentenced the perpetrators to jail.

**151.** Defendant Oetken knows the law and knows that he must obey the law.

**152.** Defendants Oetken swore oaths as a lawyer and as a jurist to uphold the Constitution and the law.

**153.** Defendant Oetken knew that in the perpetration of the bribery related quid pro quo scheme he violated not only his oaths, but committed felonies against which he has no immunity.

38

**154.** Defendant Oetken, while recognizing the immense risk of continuing to aid/abet the bribery related qui po quo scheme, did resign himself to the fact that he really had no choice.

**155.** Defendant Oetken's recognition of his desperate situation has made it difficult for him to concentrate on cases before him.

**156.** Defendant Oetken regrets having entered into conspiracy with **The Kaul Cases** Defendants, but accepts that eventually he will be subjected to a form of discipline and or punishment for having violated the Constitution/ the law/his solemn oaths/Plaintiff Kaul's human/civil/constitutional rights.

**157.** In fact, Defendant Oetken's desperation was evidenced when he/agents used the US wires to communicate with persons/entities invested in the company (www.wix.com) from which Plaintiff Kaul issued a release on June 10, 2024, regarding K11-18 and Defendant Oetken's corrupt activities in the S.D.N.Y., to have Plaintiff Kaul's account deactivated.

**158.** Defendant Oetken , in issuing a knowingly illegal 'order' on October 2, 2024, did recognize that he was conflicted and without authority to issue such a document.

**159.** On October 3, 2024, Plaintiff Kaul submitted a letter in response to Defendant Oetken's October 2, 2024 'order' (**Exhibit 21**), which identifies the factual/legal bases as to the invalidity of the 'order'.

## 2. COUNT TWO

## <u>DEPRIVATION OF RIGHTS UNDER COLOR OF LAW</u>

## <u>DEFENDANTS: OETKEN/MMB/AGC</u>

**160.** In 2005, Plaintiff Kaul invented and successfully performed the first outpatient minimally invasive spinal fusion, a case/technique that revolutionized the field of spine surgery and has been for many years the standard of care.

**161.** This event and the consequent success caused Plaintiff Kaul's physician/hospitals/insurance competitors in the minimally invasive spine surgery market to view him, his outpatient surgical center, his technique, and his technique invention as a threat to their market share, and not being able to compete fairly/legally, did resort to committing judicial corruption/political corruption/public corruption/ bribery/perjury/evidential falsification/witness tampering/obstruction of justice/kickbacks/wire fraud/mail fraud/false indictments/false arrests/false imprisonment/kidnapping/attempted drugging-killing.

**162.** These events occurred over a time period from 2005 to 2023, in conjunction with ongoing/accruing and daily recurring and **"new"** violations of Plaintiff Kaul's human/civil/constitutional rights.

**163.** In causing the 2012/2014 illegal suspension/revocation of Plaintiff Kaul's NJ license, <u>**The Kaul Cases**</u> Defendants committed a theft of Plaintiff Kaul's intellectual property, from which have been generated/continue to be generated hundreds of millions, if not billions of dollars.

**164.** The above facts, in conjunction with those contained within the factual corpus of <u>**The Kaul Cases**</u> substantiate ongoing violations to a criminal standard of Plaintiff Kaul's fundamental right to life/liberty/property, his right to his hard-earned reputation and specifically, violations of the following rights:

40

## Violation of Civil Rights
## Section 1983 claim

**165.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's First Amendment Right of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**166.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's Second Amendment Right of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**167.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's Fourth Amendment Right of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**168.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's Fifth Amendment Right of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**169.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing

violation and deprivation of Plaintiff Kaul's <u>Sixth Amendment Right</u> of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**170.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's <u>Eighth Amendment Right</u> of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**171.** In a period from September 12, 2022, to the present, Defendant Oetken did abuse state power in attempting to and in fact achieving in K11-10/K11-14 a knowing/willful/continuing violation and deprivation of Plaintiff Kaul's <u>Fourteenth Amendment Right</u> of the United States Constitution, **CONSEQUENT TO** the illegal purported 'injunction' violating Plaintiff Kaul's right to litigate his claims/vindicate his rights in the United States District Court.

**172.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of his <u>livelihood</u> by preventing its rectification through the judicial process.

**173.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>business real estate</u> by preventing its rectification through the judicial process.

**174.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>personal real estate</u> by preventing its rectification through the judicial process.

**175.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>life earnings</u> by preventing its rectification through the judicial process.

**176.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>pensions</u> by preventing its rectification through the judicial process.

**177.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>financial investments</u> by preventing its rectification through the judicial process.

**178.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>professional licenses</u> by preventing its rectification through the judicial process.

**179.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>accounts receivable</u> BY preventing its rectification through the judicial process.

**180.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of his right to <u>due process</u> **BY** preventing his access to discovery and substantive litigation process.

**181.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/continue to deprive Plaintiff Kaul of his right to <u>free speech</u> **BY** preventing his access to discovery and substantive litigation process.

**182.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right to <u>impartial tribunals/judges/courts</u> **BY** continuing to perpetrate through certain courts within the United States District Court the corruptly procured K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**183.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right to <u>substantively prosecute his claims</u> **BY** continuing to perpetrate through certain courts within the United States District Court the corruptly procured K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**184.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right to <u>equal protection under the law</u> **BY** continuing to perpetrate through certain courts within the United States District Court the corruptly procured K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**185.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right <u>to liberty</u> **BY** continuing to perpetrate through certain courts within the United States District Court the corruptly procured K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**186.** These deprivations/violations willfully/maliciously caused by Defendant Oetken did illegally deprive/attempt to continue to deprive Plaintiff Kaul of his right to be compensated for the illegal deprivation of the <u>property of eleven (11) years of his life</u> **BY** continuing to perpetrate through certain courts within the United States District Court the corruptly procured

K11-17 'Fraud on the Court' 'injunction', which has prevented Plaintiff Kaul's access to discovery and substantive litigation process.

**187.** These deprivations/violations/injuries were willfully/maliciously perpetrated by Defendant Oetken within/through/with the assistance of the executive/judicial apparatus of the <u>American State</u>.

**188.** These deprivations/violations/injuries were willfully/maliciously perpetrated by Defendant Oetken within/through/with the assistance of the <u>United States District Court</u>.

**189.** These deprivations/violations/injuries were willfully/maliciously perpetrated by Defendant Oetken in collusion/conspiracy with private actors associated with the <u>New York Stock Exchange</u>.

**190.** The commercial/communications nexus between Defendant Oetken and private actors within **The Kaul Cases**, critical to the perpetration of the within pled schemes conferred 'state actor' liability on all private actors within **The Kaul Cases** as to the deprivations/violations/injuries caused to Plaintiff Kaul's <u>human/civil/constitutional rights</u>.

**191.** The commercial/communications nexus between Defendant Oetken and private actors within **The Kaul Cases**, critical to the perpetration of the within pled schemes conferred 'state actor' liability on all private actors within **The Kaul Cases** as to the deprivations/violations/injuries caused to Plaintiff Kaul's <u>property rights</u>.

**192.** Defendant Oetken and **The Kaul Cases** Defendants were and are motivated to commit and continue to commit these deprivations/violations/injuries to Plaintiff Kaul's <u>human/civil/constitutional/property rights</u>.

**193.** The motivation is based on Defendant Oetken and **The Kaul Cases** Defendants scheme to prevent Plaintiff Kaul from exposing their crimes, including those of <u>defrauding the global equities market</u>.

## UN Human Rights Violation
## The United Nations Universal Declaration of Human Rights

**194.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 1</u> of the United Nations Universal Declaration of Human Rights: **"All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood."**

**195.** The <u>Article 1</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**196.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 2</u> of the United Nations Universal Declaration of Human Rights. Plaintiff Kaul is a citizen of India: **"Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth, or other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional, or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty."**

**197.** The <u>Article 2</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**198.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 3 of the United Nations Universal Declaration of Human Rights: **"Everyone has the right to life, liberty and security of person."**

**199.** The Article 3 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**200.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 4 of the United Nations Universal Declaration of Human Rights: **"No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms."**

**201.** The Article 4 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**203.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 5 of the United Nations Universal Declaration of Human Rights: **"No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."**

**204.** The Article 5 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**205.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 6 of the United Nations Universal Declaration of Human Rights: **"Everyone has the right to recognition everywhere as a person before the law."**

**206.** The Article 6 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**207.** Defendant Oetken and The Kaul Cases Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 7 of the United Nations Universal Declaration of Human Rights: "All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination."

**208.** The Article 7 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**209.** Defendant Oetken and The Kaul Cases Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 8 of the United Nations Universal Declaration of Human Rights: "Everyone has the right to an **effective remedy** by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law."

**210.** The Article 8 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**211.** Defendant Oetken and The Kaul Cases Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 9 of the United Nations Universal Declaration of Human Rights: "No one shall be subjected to arbitrary arrest, detention or exile."

**212.** The Article 9 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**213.** Defendant Oetken and The Kaul Cases Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 10 of the United Nations Universal Declaration of Human Rights: "Everyone is entitled in full equality to a fair and public hearing by

48

an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him."

214. The Article 10 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

215. Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 12 of the United Nations Universal Declaration of Human Rights: **"No one shall be subjected to arbitrary interference with his privacy, family, home, or correspondence, nor to attacks upon his honor and reputation. Everyone has the right to the protection of the law against such interference or attacks."**

216. The Article 12 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

217. Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 17 of the United Nations Universal Declaration of Human Rights: **"1. Everyone has the right to own property alone as well as in association with others. 2. No one shall be arbitrarily deprived of his property."**

218. The Article 17 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

219. Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to Article 19 of the United Nations Universal Declaration of Human Rights: **"Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media and regardless of frontiers."**

220. The Article 19 violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**221.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 23</u> of the United Nations Universal Declaration of Human Rights: **"Everyone has the right to work, to free choice of employment, to just and favorable conditions of work and to protection against unemployment."**

**222.** The <u>Article 23</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**223.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 23</u> of the United Nations Universal Declaration of Human Rights: **"Everyone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control."**

**224.** The <u>Article 23</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**225.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 28</u> of the United Nations Universal Declaration of Human Rights: **"Everyone is entitled to a social and international order in which the rights and freedoms set forth in this Declaration can be fully realized."**

**226.** The <u>Article 28</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

**227.** Defendant Oetken and **The Kaul Cases** Defendants-Co-Conspirators did knowingly and maliciously violate Plaintiff Kaul's rights pursuant to <u>Article 30</u> of the United Nations Universal Declaration of Human Rights: **"Nothing in this Declaration may be interpreted as implying for any State, group or person any right to engage in any activity or to perform any act aimed at the destruction of any of the rights and freedoms set forth herein."**

**228**. The <u>Article 30</u> violation caused and continues to cause deprivations/violations/injuries to Plaintiff Kaul's human/constitutional/property rights.

# DECLARATIONS AND INJUNCTIVE RELIEF

**1.** The legal record in K11-20 has established by a preponderance of the evidence that the September 22, 2022, purported 'injunction' issued by U.S.D.J. Oetken in K11-7 is an admitted **'Fraud on the Court'.**

**2.** The United States District Court for the Southern District of Texas-Houston Division did nullify the purported 'injunction' within its jurisdiction, when it admitted the case on August 26/30, 2024.

**3.** The United States District Court for the Southern District of Texas-Houston Division did nullify the purported 'injunction' within its jurisdiction when it issued its March 13, 2024, **ORDER FOR DISCOVERY PLAN (Exhibit 5).**

**3.** The nullification of the purported 'injunction' within the jurisdiction of the United States District Court for the Southern District of Texas-Houston Division, has rendered the purported 'injunction' a legal nullity within the Southern District of Texas-Houston Division without legal effect or existence.

**4.** Therefore, the nullity and legal non-existence of the purported 'injunction' quite logically means that Plaintiff Kaul could not have violated any purported 'injunction within the jurisdiction of the United States District Court for the Southern District of Texas-Houston Division

**5.** Therefore, the nullity and legal non-existence of the purported 'injunction' quite logically means that Plaintiff Kaul's continued prosecution of K11-17 within the United States District Court for the Southern District of Texas-Houston Division does not, nor could not, violate any injunction.

**6.** Plaintiff Kaul's human/civil/constitutional rights and the controlling doctrinal law of 'Fraud on the Court' strictly prohibit Defendant Oetken from using the instrumentality of his purported 'injunction' in any manner to infringe on Plaintiff Kaul's human, civil and or constitutional rights to vindicate and or secure his right to his life/liberty/property/reputation.

**7.** Defendant Oetken is prohibited from attempting to use the purported 'injunction', an admitted 'Fraud on the Court, to cause injury or infringe on Plaintiff Kaul's person and or violate his human/civil/constitutional rights within the jurisdiction of the United States.

**8.** Defendant Oetken is ordered to immediately cease and desist from any further interference in the judicial process of the United States District Court for the Southern District of Texas-Houston Division.

**9.** Defendant Oetken's published October 2, 2024 'ORDER' in K11-20, a product of the K11-7 September 12, 2022 'Fraud on the Court' purported injunction is itself a 'Fraud on the Court', and is thus null/void for all intents/purposes.

**10.** Defendant Oetken's nullified 'Fraud on the Court' October 2, 2024 'ORDER' that was generated and filed in K11-7 by Defendant Oetken, and then filed in K11-20 by the K11-20 Defendants on October 3, 2024 (**Exhibit 22**) constitutes a flagrant violation of Plaintiff Kaul's human/civil/constitutional rights to vindicate and or secure his right to his life/liberty/property/reputation.

**11.** Defendant Oetken is ordered to strike from the K11-7 docket the illegally generated and nullified 'Fraud on the Court' October 2, 2024 'ORDER'.

Plaintiff Kaul swears under penalty of perjury that the above statements are true and accurate to the best of my knowledge and that if it is proved that I willfully and knowingly misrepresented the facts, then I will be subject to punishment.

DATED: OCTOBER 8, 2024

RICHARD ARJUN KAUL, MD

# K11-30
# KAUL v OETKEN

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

RICHARD ARJUN KAUL, MD;
JANE DOE; JOHN DOE.

Plaintiff

v.

JAMES PAUL OETKEN
(PERSONAL AND OFFICIAL CAPACITY)
EDWARD SPONZILLI; PAUL E. DWYER;
DANIEL M. STOLZ; DAVID J. D'ALOIA;
JAY W, BROWN; EDWARD G. SPONZILLI.
JANE DOE; JOHN DOE.

Defendants.

CIVIL ACTION NO.:

COMPLAINT

---

# PARTIES

**PLAINTIFF**

RICHARD ARJUN KAUL, MD – 41 CALLA AVENUE, FLORAL PARK, NY 11001
DRRICHARDKAUL@GMAIL.COM **("PLAINTIFF KAUL") –** 914 250 84313

**DEFENDANT**

JAMES PAUL OETKEN, ESQ – ROOM 706, 40 FOLEY SQUARE, NY, NY 10007 ("**DEFENDANT OETKEN"**)

EDWARD G. SPONZILLI - 400 CROSSING BLVD,.8th FLOOR NORRIS McAUGHLIN, P.A. BRIDGEWATER NJ 08807-5933 **("DEFENDANT SPONZILLI")**

PAUL E. DWYER – METRO EAST OFFICE PARK, WARWICK, RI 02886 **("DEFENDANT DWYER")**

DANIEL M. STOLZ – GENOVA BURNS, 494 MAYOR KENNETH A. GIBSON BLVD, NEWARK, NJ 07102 ("**DEFENDANT STOLZ")**

DAVID J. D'ALOIA – SAIBER LAW FIRM, 132 WEST 31 ST STREET, 9TH FLOOR, NY, NY 10001 **("DEFENDANT D'ALOIA")**

JAY W, BROWN – BALLAD SPAHR, LLP 1909 K STREET, NW  SUITE 12th FLOOR WASHINGTON, DC 20006-1157 – 202 661 7698 **("DEFENDANT BROWN")**

# RELEVANT/REFERENCED CASES OF 'THE KAUL CASES'

**K1:** KAUL v CHRISTIE: 16-CV-02364 – CLOSED

**K11-7**: KAUL v. ICE ET AL: 21-CV-6992 – CLOSED

**K11-14**: KAUL v. FEDERATION ET AL: 23-CV-22325 – CLOSED

**K11-18:** KAUL v OETKEN: 24-CV-00185-CLOSED

**K11-20:** KAUL v FEDERATION STATE MEDICAL BOARDS: 24-CV-03180-CLOSED

**K11-23:** KAUL v OETKEN: 24-CV-00621 – OPEN BUT DEFENDANT OETKEN DISMISSED

**K11-27**: KAUL v FEDERATION STATE MEDICAL BOARDS: 25-CV-01676 – OPEN

**K11-28**: KAUL v NORTH DAKOTA MEDICAL BOARD ET AL: 25-CV-00147-CLOSED

# JURISDICTION + VENUE

**General:**

**1.** 28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of
Plaintiff Kaul's Constitutional rights and U.S.C. § 1964(a)(b)(c)(d) and 1962.
U.S.C. § 1337 – Plaintiff's allegations allege violations of an Act of Congress regulating
commerce and monopolies.

**Personal:**

**2.** The Court has personal jurisdiction over Defendants
Oetken/Sponzilli/Dwyer/Stolz/Brown/D'Aloia as they have transacted business, maintained
substantial contacts and/or committed acts in furtherance of the illegal scheme and conspiracy
throughout the United States, including in this district.

**3.** Additionally, the Defendants RICO violations/offenses/crimes have caused  and  continue to
cause injury to Plaintiff Kaul's life/liberty/property in every state in the United States including
the State of New York.

**4.** Defendants scheme and conspiracy have been directed at and have had the intended effect
of causing injury to persons residing in, located in, or doing business throughout the United
States including the Southern District of New York. This Court also has personal jurisdiction over
all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to a court of
general jurisdiction in Dakota.

**Venue:**

**6.** 28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any
defendant resides, if all defendants are residents of the State in which the district is located and

(2) <u>a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated</u>.

**7.** Defendant Oetken's K11-7 September 12, 2022 purported and knowingly illegal 'injunction'

**See hyperlink:**

[https://www.drrichardkaul.com/_files/ugd/7d05d1_1f1f9cebc0134fe5835a33640aa2ed67.pdf)](https://www.drrichardkaul.com/_files/ugd/7d05d1_1f1f9cebc0134fe5835a33640aa2ed67.pdf)

and his K11-20 October 2, 2024, threat to hold Plaintiff Kaul in contempt if by October 16, 2024, Plaintiff Kaul did not dismiss K11-20, <u>AND</u> the K11-20 Defendants filing on October 3, 2024 of Defendant Oetken's October 2, 2024 threatening 'ORDER' **See hyperlink:**

[https://www.drrichardkaul.com/_files/ugd/7d05d1_6328d6d06c8f46d9a7aaec22370b981b.pdf](https://www.drrichardkaul.com/_files/ugd/7d05d1_6328d6d06c8f46d9a7aaec22370b981b.pdf)

do constitute a substantial and ongoing injury and violation of Plaintiff Kaul's human/civil/constitutional right to vindicate and or secure his right to his life/liberty/property/reputation <u>WITHIN</u> the jurisdiction of the S.D.N.Y.

# PRELIMINARY STATEMENT

Before any of the Defendants/Readers/Judges advance into the textual substance of the case, Plaintiff Kaul respectfully asserts that (**Exhibit 1**) should be read/reviewed, as it constitutes the foundation that will forever expose/substantiate the criminality possessed by the Defendants not just in their illegally conspired issuance of a knowingly illegal nationwide injunction (September 12, 2022 in K11-7), but then for a period from September 12, 2022 to the present in the knowingly illegal exploitation of the authority/jurisdiction of the S.D.N.Y. in the violation of the independent authority/jurisdiction of other district courts (S.D.F./E.D.N.C./S.D.T.) in using the knowingly illegal injunction in schemes of harassment/intimidation/bribing/coercing of other district judges into dismissing cases of **The Kaul Cases** that those judges, fully aware of the illegal September 12, 2022 'injunction' did admit the cases and enter discovery/trial orders. Defendants Oetken/Sponzilli/Dwyer/Stolz/D'Aloia/Brown magnified the deprivation of Plaintiff Kaul's right to life/liberty/property/reputation by at least three (3) years, when if they had not illegally interfered in K11-14/K11-15/K11-17/K11-18/K11-19/K11-20 (2022-2025), it is likely that remediation/rectification/compensation would have commenced to the four thousand eight hundred and sixty-six (4,866) ongoing days-worth to Plaintiff Kaul's life/liberty/property/reputation.

**8.** Not surprisingly the world's finest and most expert purveyors of corruption and certain types of lawyerly-like sophisticated courtroom crime are those whose lives and careers have been intertwined/immersed in ostensibly professional relationships of legal and judicial assistance with those who have found themselves on the so called 'wrong-side' of the law. They say, **"the company you keep is the company that keeps you"** and that there are no better masters of lawlessness than masters of law, that it is only the deepest knowledge of light that permits the darkest perception of dark.

**9.** The Defendants are indeed masters of the legal art and have admirably demonstrated such within **The Kaul Cases.** However, for men of admitted guilt, constrained by the taut of truth, they have maneuvered with forced restriction, but as best as can be expected on the girded

legal landscape of the United States District Court. The Defendants claustrophobic maneuverability has inevitably been associated with strategic error forcing them into increasingly reckless, but unavoidable acts/patterns of ever-expanding criminality drawing more and more people into the '**Revocation-Cover-Up-Conspiracy'** (2005-2025).

**10.** The Defendants corrupt, controlling and extortionate relationship with Defendant James Paul Oetken is a central feature of a sub-conspiracy of the '**Revocation-Cover-Up-Conspiracy'** that has been and continues to be perpetrated within K11-7 (May 10, 2023 to present) by **The Kaul Cases** Defendants, including the K11-30 Defendants.

**11.** In essence this sub-conspiracy of the '**Revocation-Cover-Up-Conspiracy'** involved its principal perpetrators (Defendants Allstate/Christie/Solomon/Heary/Stolz) requesting, then persuading, then coercing, then bribing and then threatening Defendant Oetken (2023-2025) to threaten Plaintiff Kaul with holding him in contempt unless he dismissed cases he filed in other district courts. Cases that had been admitted by the district judges with full knowledge of Defendant Oetken's purported September 12, 2022 'injunction'.

**12.** The Defendants motivation for the perpetration of this sub-conspiracy pertains to their efforts to prevent Plaintiff Kaul from further exposing both their offenses/violations/crimes and those of **The Kaul Cases** and others.

**13.** The specific facts of this K11-7 based sub-conspiracy of the '**Revocation-Cover-Up-Conspiracy'** , that was/is perpetrated within the S.D.N.Y. are set forth below in the 'STATEMENT OF FACT' section. And as to the issue of immunity, it almost goes without saying that absolutely none exists for Defendant Oetken or any of the Defendants, as the subject matter/admissions of fact/state of fact of the K11-30 claims are those of a conspiracy of crime and willful constitutional violations committed against the life/liberty/property/reputation and human/civil/constitutional rights of Plaintiff Kaul. The most recent example being the knowingly illegal attempt to schedule a conflicted June 16, 2025 contempt hearing in K11-7. And then of

course the scheduling of a knowingly illegal September 12, 2022 purported 'injunction' in K11-7, that the June 27, 2025 SCOTUS opinion on **Trump v CASA** held that district courts from the founding of the Republic NEVER had the authority to issue nation wide injunctions. Plaintiff Kaul was correct as to the illegality of Defendant Oetken's purported 'injunction' from the moment it was issued. It was, as Plaintiff Kaul consistently asserted a 'Fraud on the Court', and in every district court in which the case was dismissed on the fraudulently 'injunction' will, pursuant to the doctrine of "Fraud on the Court' be compelled to re-try the case/s/.

# STATEMENT OF FACT

**14.** The factual foundation of **The Kaul Cases**, of which K11-30 is one, commenced in 2005, when Plaintiff Kaul invented and successfully performed the first percutaneous spinal fusion, a procedure that revolutionized the field of spine surgery, became the standard of care approximately a decade ago and has helped millions of people worldwide with debilitating spinal pain.

**15**. The invention brought Plaintiff Kaul professional and commercial success, that unfortunately caused immense professional jealousy amongst his market competitors in the spine surgery field, who unable to fairly compete due to lack of the necessary surgical skills did resort to committing offenses/violations/crimes against Plaintiff Kaul. In approximately 2008, they entered into a bribery related quid pro quo scheme with Defendant Christie, the then governor of New Jersey, in which in return for bribes he abused gubernatorial power and ordered the state medical board to manufacture a knowingly false license revocation case against Plaintiff Kaul. The purpose was to cause a theft of his intellectual property and eliminate him from the market, thus increasing their profits and wealth.

**16. The Kaul Cases** Defendants caused the license suspension proceedings to commence on April 2, 2012 and the final revocation occurred on March 24, 2014. **The Kaul Cases** Defendant, James Howard Solomon, acted as the administrative law judge and recommended revocation in a proceeding that was a massive fraud, as the evidence/admissions (**Exhibit 11**) now irrefutably prove.

**17**. On February 22, 2016, Plaintiff Kaul filed K1 and from that commencement date he filed a series of cases, **The Kaul Cases**, in the United States District Court, but due to **The Kaul Cases** Defendants corruption/harassment/mafia-like intimidation of certain judges within the United States District Court, the cases were either stayed or dismissed, and no discovery or trials were

conducted. Plaintiff Kaul, however, did not relent and persisted in his efforts to hold
accountable **The Kaul Cases** Defendants.

**18**. On August 19, 2021, Plaintiff Kaul filed K11-7 in the S.D.N.Y. and the case was immediately
assigned to Defendant Oetken, who issued no discovery order but only summons. By February
2022, all briefing had been submitted and the K11-7 Defendants were seeking dismissal and the
entry of a nationwide injunction preventing Plaintiff Kaul from filing any other cases in any
other district courts without first obtaining Defendant Oetken's permission.

**19.** On September 12, 2022 Defendant Oetken granted the K11-7 Defendants motions for
dismissal/injunction, and entered into the record his knowingly fraudulent dismissal/injunction.
Plaintiff Kaul, recognizing the illegality of the dismissal/injunction, as there existed absolutely
no factual/legal bases on which to grant the motions, did, on September 14, 2022, file an in-
person request with the Clerk of the Court for the disclosure/production of Defendant Oetken's
financial holdings/records and all ex parte communications pursuant to the Rules 144/455 and
the Courthouse and Transparency Act of 2022.

**20.** As of July 28, 2025 none of the requested financial information has ever been produced
despite the submission of a request in K11-23 (**Exhibit 2**). And on October 6, 2022, filed a
motion for Defendant Oetken's disqualification (**Exhibit 3**), a motion that was not adjudicated
until August 13, 2023, and then only because the district judge in K11-14, knowing the illegality
of Defendant Oetken's September 12, 2022 'injunction' refused to dismiss K11-14 unless
Defendant Oetken resolved the pending disqualification motion. The motion was summarily
denied, but Defendant Oetken's failure to deny any of the highly incriminating facts did cause
their admission and further corroboration of crimes to which he has since admitted, including
but not limited to bribery related quid pro quo schemes perpetrated in the SDNY.

**21**. The magistrate judge's failure to grant Plaintiff Kaul's enforcement motion in K11-23
(**Exhibit 2**) and Defendant Oetken's failure to produce the financial information as required by

law did and do constitute a further admission of his bribery related quid pro quo not only with the K11-7 Defendants, but with multiple other principally corporate entities that have appeared before him. Defendant Oetken was sponsored by **The Kaul Cases** Defendant Charles E. Schumer and appointed by President Barack Obama.

**DEFENDANT OETKEN'S THREATS OF CONTEMPT**

**22.** Plaintiff Kaul, having established that the K11-7 Defendant Oetken issued September 12, 2022 purported 'injunction' was the product of crime and thus a 'Fraud on the Court', did proceed to file other cases in the United States District Court, and in the period from September 12, 2022 to July 27, 2025 did file further cases seeking to expose the truth of the offenses/violations/crimes (2005-2025) committed against the life/liberty/property and human/civil/constitutional rights of Plaintiff Kaul by **The Kaul Cases** Defendants. In the filing of these cases, Plaintiff Kaul submitted to the court every document related to the purported 'injunction', a copy of the 'injunction', and with this knowledge the cases were admitted by the district judges and discovery orders entered.

**23.** In every case, **The Kaul Cases** Defendants, but particularly Defendants Christie/Solomon/Heary/Allstate/FSMB did request/harass/bribe/threaten Defendant Oetken into threatening Plaintiff Kaul with contempt of he did not dismiss the case. Plaintiff Kaul did not dismiss any of the cases, and on October 9, 2024 sued Defendant Oetken in K11-23 (**Exhibit 4**) and on January 6, 2025, he procured admissions of fact from Defendant Oetken (**Exhibit 5**).

**24.** As Plaintiff Kaul progressively filed cases, each one proceeded further towards discovery and trial, but **The Kaul Cases** Defendants violated every discovery order, claiming that Defendant Oetken's September 12, 2022 purported 'injunction' insulated them from discovery. In fact, in K11-20, on December 9, 2024 the district judge entered a 'SCHEDULING ORDER' (**Exhibit 6**), but it was violated by the K11-20 Defendants.

**25.** In the period from the January 7, 2025 dismissal of K11-20, a dismissal based on Defendant Oetken's K11-7 purported 'injunction', up to the April 11, 2025 issuance in K11-27 (filed April 9, 2025) of a July 9, 2025 Rule 16 conference, Defendant Oetken did, on May 8, 2025, publish to the K11-7 docket, a docket officially closed in October 2022 and never officially re-opened, an order (**Exhibit 7**) scheduling a knowingly illegal contempt hearing on June 17, 2025 for Plaintiff Kaul as to his alleged violations of Defendant Oetken's knowingly illegal September 12, 2022 K11-7 'injunction'.

**26.** Defendant Oetken, despite then being a Defendant in K11-23 and knowingly conflicted, a conflicted-ness known by all the lawyers who filed motions seeking to have him conduct a contempt hearing, did nonetheless schedule the knowingly illegal hearing. Evident in this scenario and the current planned re-attempt to conduct some Plaintiff Kaul eliminating scheme, is the fact that Defendant Oetken is for whatever reason so thoroughly compromised, both personally/professionally by **The Kaul Cases** Defendants, that there is no order they issue that he will or cannot refuse to obey.

**27.** The situation is of this magnitude for no judge would so compromise his life/career unless the consequences of non-compliance with **The Kaul Cases** Defendants mafia-like threats involved the threat of serious bodily injury and or death. It would be wiser/safer for Defendant Oetken to relinquish his career and save his life.

**28.** However, in response to Defendant Oetken's May 8, 2025 order re: the June 17, 2025 proposed hearing, Plaintiff Kaul did distribute notices to all relevant federal and judicial authorities/persons as to the illegality of Defendant Oetken's proposed June 17, 2025 hearing, and the illegality of any products of that hearing. The effect of these notices was to cause Defendant Oetken to not conduct the proposed June 17, 2025 hearing, a conflicted hearing that Plaintiff Kaul's non-attendance of which Defendant Oetken was explicitly informed.

**29.** And indeed, as reflected by the docket, no hearing was conducted, although on June 26, 2025 Defendant Lipman did misrepresent to in K11-27 that a hearing had been conducted (**Exhibit 8**). This lie was shown to be such by a filing submitted by Plaintiff Kaul on June 27, 2025 (**Exhibit 9**), but of note is the fact that the magistrate judge in K11-27 took no action against Defendant Lipman upon being noticed of his knowing fraud. Defendant Lipman was one of the lawyers who filed motions in K11-7 compelling a knowingly conflicted Defendant Oetken to schedule a contempt hearing, an act, the illegality of which Defendant Oetken could not have but known.

**30.** Compounding **The Kaul Cases** Defendants corruption within the Southern District of Texas in K11-27, was the fact that the magistrate judge (Richard W. Bennett) entered no sanctions or disciplinary orders against Defendant Lipman's June 26, 2025 violation of Plaintiff Kaul's civil rights, thus causing himself, pursuant to Section 1986 of the Civil Rights Act to become as liable for Defendant Lipman's violations of Plaintiff Kaul's human/civil/constitutional rights as if he had directly violated them himself.

**31.** These events caused Plaintiff Kaul to file complaints against Defendant Lipman and U.S.M.J. Bennett with the Texas/Pennsylvania State Bars. With the rising crescendo of these events in district courts in New York and Texas, and the failure/public humiliation of **The Kaul Cases** Defendants contempt hearing scheme, in conjunction with the New York State Attorney Grievance Committee's referral of Defendant Oetken to the disciplinary council of the United States Court of Appeals for the Second Circuit, **The Kaul Cases** Defendants reacted with anger towards Defendant Oetken.

**32.** The Kaul contempt/jailing scheme had failed and so there was conducted a meeting to discuss the options, bearing in mind that on June 27, 2025 the Supreme Court of the United States, in Trump v CASA, had held that district courts did not and never did have the authority to issue nationwide injunctions, a ruling that subsequent to that in Jarkesy v SEC: 22-859 (June 27, 2024), which rendered illegal Plaintiff Kaul's 2014 NJ jury-less article III judge free $475,000

'fine' imposing license revocation (ordered by **The Kaul Cases** Defendant, James Howard Solomon), then rendered illegal the September 12, 2022 purported K11-7 Defendant Oetken issued purported 'injunction'. The illegality of the NJ 2012/2014 license suspension/revocation did cause and continues to cause illegal ongoing**/"new"** injury to Plaintiff Kaul's life/liberty/property/reputation (4,863 days-worth: April 2, 2012 to July 26, 2025).

**33.** The enormity of the magnitude of the illegal ongoing injustice committed against the life/liberty/property/reputation and human/civil/constitutional rights of Plaintiff Kaul haunts **The Kaul Cases** Defendants day and night, and there is nothing they will not attempt to cause the elimination of Plaintiff Kaul.

**34.** Defendant Oetken remains subjugated to **The Kaul Cases** Defendants and for reasons, some known and some not, he has no option but to follow their orders. The scheme now underway will involve a soon to be filed motion by Defendant Heary's recently admitted lawyer who will seek to illegally re-use the fraudulent K11-7 docket in a further perpetration of the criminal conspiracy that has been conducted by Defendant Oetken and his co-defendants/conspirators since August 19, 2021 in the S.D.N.Y. in K11-7, the filing date of the case. A date never to be forgotten and forever regretted on the calendar of the Defendants notorious tactics in the '**Revocation-Cover-Up-Conspiracy'**.

# LEGAL CLAIMS

# RICO

**Association-In-Fact-Enterprise: OETKEN CHAMBERS-NORRIS MCLAUGHLIN-MCELVANEY-SAIBER-GENOVA BURNS ("ONMSG-AIF-ENTERPRISE")**
**Defendants: Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli**
**Co-conspirators: Christie/Heary/Allstate/FSMB**
**RICO Predicate Acts: Wire Fraud/Bribery/Public Corruption/**
**Conspiracy/Extortion/Public Corruption/Threats**

**Overview**:

**35.** In a period commencing on or about January 22, 2025, Defendants Oetken/Dwyer/Stolz/D'Aloia/Sponzilli, did form a sub-conspiracy within the '**Revocation-Cover-Up-Conspiracy**' (2005-2025) that for the purposes of this Complaint and forthwith within **The Kaul Cases** is identified as the '**Kaul Contempt Elimination Conspiracy'**, the elements of which are described below:

**a**. Nature and Purpose – The '**Kaul Contempt Elimination Conspiracy'** was conceived of by the Defendants/others in a period commencing in or around mid 2023, and was prompted by the fact that Plaintiff Kaul had established the illegality of Defendant Oetken's September 12, 2022 purported 'injunction' in K11-7. And consequently was continuing to file and prosecute **The Kaul Cases** in other district courts in the United States District Court that willingly and with knowledge of Defendant Oetken's purported 'injunction' admited the cases. **The Kaul Cases** Defendants and their lawyers, Defendants Dwyer/Stolz/D'Aloia/Sponzilli, in recognizing that they could not directly and using legal methods prevent independent district judges from adjudicating the cases, did create then '**Kaul Contempt Elimination Conspiracy',** in or around

16

mid 2023, with the initial purpose of having Defendant Oetken threaten Plaintiff Kaul with contempt if he did not dismiss the cases by a certain date. The Defendants did exchange information during their face-face meetings in their law offices and Defendant Oetken's chambers at the SDNY, and during these criminally purposed meetings that were conducted over the US wires, it was agreed upon that the issuance of contempt orders, although knowingly illegal, would cause Plaintiff Kaul to dismiss the cases.

The '**Kaul Contempt Elimination Conspiracy'** is a criminal racketeering conspiracy, conducted through the **"Oetken-Norris-McElvaney-Saiber-Genova- Association-In-Fact-Enterprise" ("ONMSG-AIF-ENTERPRISE")**, through which the Defendants/co-conspirators have perpetrated **"patterns of racketeering"** through the commission of the RICO predicate acts of, amongst other things, wire fraud/conspiracy/extortion/bribery/public corruption/threats, the purpose of which has been to cause a contempt related elimination of Plaintiff Kaul through jail and or death, under the 'cover' of the purported authority/jurisdiction of the Southern District of New York and Defendants law firms in the commission of a knowingly illegal and blatant criminal conspiracy, in which Defendants knew/know there exists nothing but evidence of criminal violations of the law and of Plaintiff Kaul's human/civil/constitutional rights. One sentence speaks the case.

**b.** Structure – The association-in-fact function of the **"ONMSG-AIF-ENTERPRISE"** stems from the manner of its genesis from a judge, a law chamber, lawyers and law firms who were caused to coalesce in their criminal conspiracy by a case, K11-7, filed in the Office of the Clerk of the Court in the United States District Court for the Southern District of New York on August 19, 2021. The case, involving undoubtedly high net-worth members of the medical, legal, political and business worlds was assigned to Defendant Oetken, a jurist whose practice involved instructing that such cases be diverted to his chambers for 'first refusal'. K11-7 was indeed funneled into Defendant Oetken's remit and was not refused, but admitted into his court with case number 21-CV-06992-JPO, a case absent an overseeing magistrate judge, but one, if legitimately tried would have required the assistance of a magistrate judge in the

17

administration of a not unexpected high work volume. Defendant Oetken and the Defendants, recognizing the 'value' of the case and the value of a dismissal and nationwide injunction, wanted no 'loose lips' and or 'prying eyes' on the crimes they knew they were about to commit, and so the associational element of the structure had to be constructed in silence and secrecy.

The perpetration of the crimes within the '**Revocation-Cover-Up-Conspiracy**' used the 'cover' of Defendants chambers/court and law offices, in order to attempt to maintain absolute secrecy. However, beneath the façade of seemingly legitimate legal authority, there was being conducted a criminal **"pattern of racketeering"** in which the structure of the channels of communication and transfer of bribes involved both on-shore and off-shore exchanges between publicly traded corporations, banks, financial institutions and a multitude of accounts and other entities of expense associated with parties associated up to the third-degree with the Defendants and their co-conspirators.

The structure, the forensic specifics of it and the nexus of exchange of information and material/non-material benefits and bribes is entirely traceable with the application of retrogression and retro/cross functional interlinking neural network AI models, even if deleted. Detection, pattern recognition and liability analysis are conducted by off-site frames and the recency of the facts of the '**Kaul Contempt Elimination Conspiracy'** and the relative recency of those of the '**Revocation-Cover-Up-Conspiracy**' will render depositions a simple confirmation process of digital fact. As to the non-digital communications and face-face conversations, the retroactive reconstruction modalities of AI based off the digital data will recreate those non-digital forms of communication with an accuracy sufficient for the inquisitor to simply 'fill in the gaps' and have the Defendants admit or deny their truth. The 'fishing expedition' days of yonder-years are rapidly disappearing in the early morning ocean mist of digital clarity.

c. Function – The principal purpose of the **"ONMSG-AIF-ENTERPRISE"** was and is to facilitate the perpetration of both the **Revocation-Cover-Up-Conspiracy**' and specifically the '**Kaul Contempt Elimination Conspiracy'** in secrecy and under 'cover' of the seeming authority and

jurisdiction of the district court and Defendants law firms, knowing that claims of attorney-client and judicial privilege would provide some initial protection against detection and exposure of the criminality of their schemes to have Plaintiff Kaul jailed and or killed. It would not be inaccurate to state that in or around 2021 (May 27, 2021 kidnapping) the subject matter of **The Kaul Cases** morphed from that pertaining to an illegal 2014 NJ license revocation to a scenario of judicial assisted assassination, in which the assassins were those with JD and MBA suffixes. In essence the **"ONMSG-AIF-ENTERPRISE"** was an illegally functioning but legally constituted 'hit machine'. A rogue element of the legal system.

## RICO Predicate Acts:

**36. Wire Fraud –** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint (**Exhibit 5**) and the January 6, 2025 admissions of fact (**Exhibit 6**), and are included in this Complaint as if set forth and pled within the Complaint.

**37. Bribery -** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**38. Public Corruption -** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**39. <u>Conspiracy</u> -** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**40. <u>Extortion</u> -** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**41. <u>Public Corruption</u> -** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**42. <u>Threats</u> -** In or around late 2021, shortly after the filing of K11-7, the initial contact was made between Defendant Oetken and Defendant Allstate as to the perpetration of a bribery related quid pro quo scheme. The admitted facts of this scheme are contained in the October 9, 2024 K11-23 Complaint and the January 6, 2025 admissions of fact, and are included in this Complaint as if set forth and pled within the Complaint.

**43.** Defendant Allstate was the initiator of the scheme consequent to its long and obsessively practiced history of corruption of the political and judicial bodies of both state and federal government. Defendant Allstate's corruption and corrosion of the fabric of American society commenced in earnest in the late 1970s with the encouragement of Associate Justice Lewis F. Powell Jr, with the 1971 publication of the **"Powell Memorandum"** entitled **"Attack On**

**America Free Enterprise System"**. A critical summary by Senator Whitehouse of the destructive effects of Powell's pernicious philosophy is included (**Exhibit 10**), a philosophy that found traction in the 2010 decision in Citizen's United.

## Defendants Dwyer/Stolz/D'Aloia/Brown/Sponzilli Direct And Vicarious Liability

**44**. Pursuant to United States v. Coonan, 938 F. 2d 1553 (2nd Circuit 1991) and Salinas v United States, 522 U.S. 52 (1997), and Plaintiff Kaul's aphorism of **"the crime of one becomes the crime of all"**, the liability of every offense/violation/crime committed and admitted by Defendant Oetken becomes the liability of Defendants Dwyer/Stolz/D'Aloia/Brown/Sponzilli as if they had actually/directly committed the crimes themselves. Thus, Defendant Oetken's Rule 8(b)(6) admissions as set forth in his January 6, 2025 'ADMISSIONS OF MATERIAL FACT' (**Exhibit 6**) and as admitted by his failure to deny the allegations/facts set forth in the October 9, 2024 K11-23 Complaint (**Exhibit 5**), a copy of which was served on him on October 16, 2024 in his chambers in the S.D.N.Y., the chambers constituting an element of the **"ONMSG-AIF-ENTERPRISE",** are the facts, the admissions of which now constitute the guilt of Defendants Dwyer/Stolz/D'Aloia/Brown/Sponzilli of the within levied racketeering/section 1983 charges.

# SECTION 1983

## Defendants: Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli

**45**. Section 1983 of the Civil Rights Act, originally known as the Ku Klux Klan Act of 1871, provides a legal mechanism whereby a person whose human/civil/constitutional rights are violated by a person or persons in which one of the individuals (Defendant Oetken) is a 'state actor' and has acted/communicated in concert with 'non-state actors' (Dwyer/Stolz/D'Aloia/Brown/Sponzilli), the acting/communicating/concerting of which converts the 'non-state actors' into 'state actors', who as a consequence then assume all the violation liabilities of the 'state actors' as if they were originally 'state actors' and had never been 'non-state actors'.

**47.** Thus, the following life/liberty/property rights and constitutional rights of Plaintiff Kaul were violated and continue to remain violated by Defendants Oetken/ Dwyer/Stolz/D'Aloia/Brown/Sponzilli.

48. All of the below deprivations/violations were perpetrated by/through/within the '**Revocation-Cover-Up-Conspiracy'** (2005-2025) and pursuant to RICO's doctrine of vicarious liability (see above), the liability of all the offenses/violations/crimes of the **Revocation-Cover-Up-Conspiracy'** of any Defendant becomes the liability of all Defendants regardless of when they entered or claimed to have departed the '**Revocation-Cover-Up-Conspiracy'.** Not dissimilar to the mafia's mantra of 'one way in, one way out'. Keeps things organized in the world of organized crime, of which Defendants' chambers/law offices are the most 'organized' of the 'organized'. No better 'cloak of crime' than that of the priest's habit/dog-collar or the black robe of the bench/JD insignia. In fact, and it must be stated that just as with the Catholic Church, the plague of judicial corruption is not unique to the S.D.N.Y. or Defendants Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli, but is a nationwide scourge that needs aggressive eradication of the principal perpetrators and elimination of the crime/corruption

coercing concept of so called 'life tenure'. An ongoing example of the immense human tragedy of this travesty is detailed in an appeal to the U.S.C.A. for the 5th Circuit by an innocent Indian physician wrongly incarcerated for twenty-one (21) years by a conflicted/corrupt district judge in the Eastern District of Louisiana (**Exhibit 12**).

**49**. Occasionally the power of the federal bench releases a deceiving aroma of omnipotence that the wiser, experienced and more spiritually attuned judicial souls recognize as forewarnings of a fall; a recognition they meet with humility and a re-realization that the bench demands its occupants protect the rights of the innocent, the weak, the afflicted, the poor, but most importantly the rights of the law. For the law is supreme and no one, neither judge nor president nor convicted criminal is above the law. It is never a wasted effort to be brought back to the initiating ideas and principles that undergird what for many in the world of law was once their raison d'etre.

Regardless, the facts/law do substantiate that:

**50.** In a period from 2008/2009 to the present, **The Kaul** Defendants, as 'state actors' did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the First Amendment of the United States Constitution.

**51.** In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as 'state actors' did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the Second Amendment of the United States Constitution.

**52.** In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the Fourth Amendment of the United States Constitution.

**53.** In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the <u>Fifth Amendment</u> of the United States Constitution.

**54**. In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the <u>Sixth Amendment</u> of the United States Constitution.

**55**. In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Plaintiff Kaul of his constitutional rights pursuant to the <u>Eight Amendment</u> of the United States Constitution.

**56.** In a period from 2008/2009 to the present, **The Kaul Cases** Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive/continue to deprive Kaul Plaintiff of his constitutional rights pursuant to the <u>Fourteenth Amendment</u> of the United States Constitution.

**57**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of his <u>livelihood</u>.

**58**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>business real estate</u>.

**59**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>personal real estate</u>.

**60**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>life earnings</u>.

**61**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>pensions</u>.

**62.** These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>financial investments</u>.

**63**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>professional licenses</u>.

**64**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the property of all his <u>accounts receivable</u>.

**65**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to <u>due process</u>.

**66**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to <u>free speech</u>.

**67**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to <u>impartial tribunals/judges/courts</u>.

**68**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to <u>prosecute his claims</u>.

**69**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right to <u>equal protection under the law</u>.

**70**. These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of his right <u>to liberty</u>.

**71.** These deprivations/violations willfully/maliciously caused by **The Kaul Cases** Defendants did illegally deprive/continue to deprive Plaintiff Kaul of the <u>property of eleven (11) years of his life</u>.

**72.** These deprivations/violations/injuries were willfully/maliciously perpetrated by private actors within/through/with the assistance of the executive/judicial apparatus of the <u>American State</u>.

**73**. These deprivations/violations/injuries were willfully/maliciously perpetrated by private actors within/through/with the assistance of the <u>United States Bankruptcy Court</u>.

**74.** These deprivations/violations/injuries were willfully/maliciously perpetrated by private actors within/through/with the assistance of the <u>United States District Court</u>.

**75**. These deprivations/violations/injuries were willfully/maliciously perpetrated by private actors within/through/with the assistance of the <u>New York Stock Exchange</u>.

**76**. These deprivations/violations/injuries were willfully/maliciously perpetrated by state actors within/through/with the assistance of the executive/judicial apparatus of the <u>American State</u>.

**77**. These deprivations/violations/injuries were willfully/maliciously perpetrated by state actors within/through/with the assistance of the <u>United States Bankruptcy Court</u>.

**78**. These deprivations/violations/injuries were willfully/maliciously perpetrated by state actors within/through/with the assistance of the <u>United States District Court</u>.

**79**. These deprivations/violations/injuries were willfully/maliciously perpetrated by state actors within/through/with the assistance of the <u>New York Stock Exchange</u>.

**80**. The commercial/communications nexus between state and private actors within **The Kaul Cases**, critical to the perpetration of the within pled schemes confers 'state actor' liability on all private actors as to the deprivations/violations/injuries caused to Plaintiff Kaul's <u>human/constitutional rights</u>.

**81**. The commercial/communications nexus between state and private actors within **The Kaul Cases**, critical to the perpetration of the within pled schemes confers 'state actor' liability on all private actors as to the deprivations/violations/injuries caused to all Plaintiff Kaul's <u>property rights</u>, as stated above.

**82**. **The Kaul Cases** Defendants were and are motivated to commit and continue to commit these deprivations/violations/injuries to Plaintiff Kaul's <u>human/constitutional/property rights</u>.

**83**. The motivation is based on **The Kaul Cases** Defendants scheme to prevent Plaintiff Kaul from exposing their crimes, including those of <u>defrauding the global equities market</u>.

## CONCLUSION AND RELIEF

Had Plaintiff Kaul not invented and successfully performed the first percutaneous spinal fusion in 2005, an element of his life path, it can be safely assumed, would not have found its way into the Southern District of New York or in fact any district courts of the United States District Court. An act of inventive spark in 2005 caused, to use a California analogy, a nationwide legal inferno in 2025, that has been 'fanned' and fueled by corrupt lawyers, corrupt judges, corrupt insurance executives, corrupt politicians and a corrupt media. And in the twenty (20) years of the ' '**Revocation-Cover-Up-Conspiracy'**, Plaintiff Kaul came to wonder when truth had departed to seek more conducive and deserving climes in other enclaves of the planet. But even in those moments, Plaintiff Kaul, being uninformed of the **"Powell Memorandum"** and the philosophical forces from which it emanated, had no idea that courts, those 'church-like' places of supposed sanctity, solemnity and irreproachability had at some tragic point in American history become reservoirs, generators and conduits for the criminal enterprises of certain wealthy/powerful sectors and persons of the corporate and political elements of the fundamental fabric of America. The words republic and democracy became 'shells' of their former selves and a dictatorial admixture of corporate theocracy and political fundamentalism seeped in to the crevices of the American experiment, proving right the European naysayers of the 16/17/18 hundreds that the experiment would fail not because of a genuine desire to make it work, but because of the **"Selfish Gene"** that history has arguably shown contributes to human survival. Darwin (1859-Royal College) foretold it and Dawkins (1976-Oxford) reframed and genetically refocused it.

But the church accepted the wickedness of its lost way, and underwent massive global reforms orchestrated from the Vatican by God's earthly emissary. Catholic judges/politicians occupy a not unsubstantial part of the American judiciary and political bodies, and are thus no strangers to reform. Just as reform was imposed on the Catholic Church in America, a reformation in which its members willingly cooperated, so must there be a reformation of the American Court, and as Plaintiff Kaul has argued, is arguing and will continue to argue, the starting point is the

application and enforcement of the Seventh Amendment related principles/holdings of the Supreme Court of the United States in <u>SEC v Jarkesy: 22-859</u> (June 27, 2024) as to the requirement of a jury and an article III judge when a deprivation of a person's life/liberty/property/reputation is at stake. These illegal conditions engulfed the illegal 2014 NJ jury-less article III judge free $475,000 'fine' imposing revocation of Plaintiff Kaul's NJ medical license, an illegal revocation that was caused because of the anti-competitive violations/human rights violations perpetrated by **The Kaul Cases** Defendants against Plaintiff Kaul because of his 2005 percutaneous spinal fusion invention.

Defendants Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli are guilty of the within charges, the facts of which were committed and perpetrated through the judicial apparatus of the S.D.N.Y., converting it into a **"racketeering enterprise"** and Defendants Oetken/ Dwyer/Stolz/D'Aloia/Brown/Sponzilli into a law degree enabled racketeers.

## THE IMMEDIATE AND PERMANENT CLOSURE OF THE K11-17 DOCKET

But what renders this entire scenario of unmitigated mafia-like crime as evidence of a massive ongoing criminal conspiracy is the fact that Defendant Oetken, despite having been sued in K11-18/K11-23/K11-28 and admitting to the facts of his offenses/violations/crimes on January 6, 2025 in K11-23, and being referred by the NYS State Bar to the disciplinary committee of the U.S.C.A. for the Second Circuit, continues to perpetrate the '**Revocation-Cover-Up-Conspiracy'** by not only permitting lawyers to make appearances on a docket that was officially closed in October 2022 and never re-opened, but to illegally enter orders/hearings himself that are purposed to attempt to prevent him from administrative/civil/criminal prosecutions in other matters and jurisdictions. The June 27, 2025 decision by SCOTUS in <u>Trump v CASA</u>  (**Exhibit 1**) proves that his September 12, 2022 purported 'injunction' was illegal not only for being the admitted product of bribery, but because, as set forth in the SCOTUS June 27, 2025 opinion, it had never been permitted by the law in the history of the Republic, and was thus illegal, a 'Fraud on the Court' as I have been claiming almost for the moment it was issued.  Defendant

Oetken, and thus **The Kaul Cases** Defendants offenses/violations/crimes violated Plaintiff Kaul's rights in K11-10-SDNY/K11-14-SDF/K11-15-SDF/K11-17-EDNC/K11-20-SDT (2023-2025) causing further compensable injuries/damages to my life/liberty/property/reputation and human/civil/constitutional rights. If any further lawyers/Defendant Oetken make any entries on the K11-7, they will be sued by Plaintiff Kaul for violating his human/civil/constitutional rights and will liable for further monetary injuries **AND** Complaints will continue to be filed with the NYS Attorney Grievance Committee/others until compliance with the law/orders in all courts across the country is achieved or law licenses, law careers and liberty are lost.

A lawyer/judge who has conspired with his client to commit/perpetuate crime, the '**Revocation-Cover-Up-Conspiracy'** is a criminal and there exist no privileges that protect any element, however old, of that conglomeration of racketeering/anti-trust/public corruption crime woven over decades under cover of court and law.

Defendant Oetken's continued perpetration of a criminal conspiracy in the S.D.N.Y. and the notification of this fact to the court, the judges and the staff does, pursuant to Section 1986 cause them to become liable to suit. In prior years/times, this type of corruption might have gone un-investigated and undisciplined consequent to the amalgamation of lawyers/judges/politicians across the political spectrum. That exists no more and Defendant Oetken must be removed from the bench, a dismissal, the proceedings of which will expose corruption already in the sights of DOGE.

Plaintiff Kaul asserts that based in the above evidence/facts/law/argument the **K11-7 docket is immediately closed with orders to the Clerk of the Court to permit no further filings**, and that Defendants Oetken/Dwyer/Stolz/D'Aloia/Brown/Sponzilli are referred to the NY/PA/NJ/DC state bars.

Plaintiff Kaul also requests the immediate entry a Rule 26 conference and a Rule 16 conference scheduled within a month.

Plaintiff Kaul demands CONSEQUENTIAL/COMPENSATORY/PUNITIVE damages from Defendants Dwyer/Stolz/D'Aloia/Brown/Sponzilli and Defendant Oetken in his personal capacity.

Plaintiff Kaul demands a public apology from all Defendants and the immediate reinstatement of his illegally revoked New Jersey medical license.

In certify that the above statements are true and accurate to the best of my knowledge.

DATED: JULY 27, 2025                    _____

                                        RICHARD ARJUN KAUL, MD

# APPENDIX E

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
F I L E D

JUN 2 7 2025

Nathan Ochsner, Clerk of Court

RICHARD ARJUN KAUL, MD;
JANE DOE; JOHN DOE.

v.

FEDERATION STATE MEDICAL BOARDS;
CENTER FOR PERSONALIZED
EDUCATION FOR PHYSICIANS;
JAMES HOWARD SOLOMON;
ALLSTATE INSURANCE COMPANY;
CHRISTOPHER J. CHRISTIE; ROBERT FRANCIS HEARY
DANIEL STOLZ; JANE DOE; JOHN DOE.

CIVIL ACTION: NO.: 25-CV-01676
RWB

**PLAINTIFF KAUL REPLY TO**
**DEFENDANTS CHRISTIE/SOLOMON**
**MOTION TO STAY AT D.E. 36**

1

Screened by US Marshal

# PRE AND POST JARKESY AND LOPER REFERENCED CASES OF 'THE KAUL CASES'

**K11-7**: KAUL v ICE ET AL: 21-CV-6992-CLOSED – PRE JARKESY

**K11-27**: KAUL V FEDRERATION: 25-CV-01676-OPEN-POST JARKESY

**K11-28**: KAUL v OETKEN: 25-CV-00147-OPEN-POST JARKESY

2

# STATEMENT

Plaintiff Kaul respectfully contradicts Defendants Christie/Solomon's statement:

**"The Court held a hearing on the Motion for Contempt in an Order to Show Cause Hearing on June 17, 2025"** at D.E. 36 Page 5 of 9.

This statement is a knowing falsehood purposed to attempt to mislead the Court, the futility however of which further evidences the K11-27 Defendants decades-long commission of fraud. Please find attached a copy of the relevant pages of the docket in K11-7 (**Exhibit 1**).

JAMES PAUL OETKEN remains a Defendant in K11-28, and on June 18, 2025 Plaintiff Kaul's May 15, 2025 complaint to the New York State Attorney Grievance Committee regarding his offenses/violations/crimes, was transmitted by this committee to the United States Court of Appeals for the Second Circuit (**Exhibit 2**).

No hearing was held, K11-28 Defendant Oetken remains conflicted and the K11-27 Defendants June 26, 2025 submission constitutes further evidence of their **"ongoing pattern of racketeering"** within the United States District Court and as perpetrated by/through/within the '**Revocation-Cover-Up-Conspiracy'** (2005-2025).

The resolution of the applicability of SEC v Jarkesy: 22-859 (June 27, 2024) to the illegal 2014 NJ jury-less/article III judge-free/$475,000 'fine' imposing license revocation of Plaintiff Kaul's NJ license; and the current, but illegal, nationwide system of physician license suspension/revocation proceedings, does remain pending.

For the above stated reasons, and particularly for the imposition on state medical boards of the Jarkesy-SEC like reformations, the Rule 16 hearing on July 9, 2025 should proceed and Defendants Christie/Solomon's motion should be viewed as frivolous and be denied.

## CONCLUSION

For the above stated reasons Plaintiff Kaul respectfully asserts that Defendants Christie/Solomon's meritless 'motion' does not warrant judicial intervention.

I certify that the above statements are true and accurate to the best of my knowledge.

DATED: JUNE 26, 2025

_____
RICHARD ARJUN KAUL, MD

## CERTIFICATION OF SERVICE

I certify that on June 26, 2026 at approximately 4:30 PM EST, a copy of the within document was emailed to counsel for the K11-27 Defendants.

DATED: JUNE 26, 2025

_____
RICHARD ARJUN KAUL, MD

4

# Exhibit 1

| | | Document filed by Allstate Insurance Company, Christopher J. Cristie, Federation State Medical Boards, Daniel Stolz. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8). (Dwyer, Paul) (Entered: 04/30/2025) |
|---|---|---|
| 05/05/2025 | 189 | AFFIDAVIT OF SERVICE of Motion to Hold Plaintiff in Contempt and Local Civ. Rule 83.3 served on Richard Arjun Kaul on 4/25/25. Service was accepted by Ms. Shelia "Doe". Document filed by Robert Heary. (Attachments: # 1 Affidavit of Service to Plaintiff).(Sponzilli, Edward) (Entered: 05/05/2025) |
| 05/07/2025 | 191 | PLAINTIFF KAUL'S REPLY TO DEFENDANTS CHRISTIE/ALLSTATE/FSMB/ STOLZ/HEARY'S APRIL 30, 2025 MOTION AT D.E.188 + DEFENDANTS HEARY'S MARCH 13, 2025 (D.E. 182) REFILED MOTION ON MAY 5, 2025 (D.E. 189-1). re: 188 JOINT MOTION for Special Hearing re: 180 JOINT MOTION for Special Hearing *For Motion to Dismiss (corrected). Motion fot Contempt (not Motion to Dismiss)..* Document filed by Richard Arjun Kaul..(rro) (Entered: 05/09/2025) |
| 05/08/2025 | 190 | ORDER: Plaintiff Richard Arjun Kaul shall show cause as to why he should not be held in contempt, pursuant to the motions at ECF Nos. 179, 180, 182, and 188 for violation of the Court's September 22, 2022 and subsequent orders, at a hearing on June 17, 2025 at 2:30 p.m. The hearing will take place in Courtroom 706, Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. Plaintiff Richard Arjun Kaul shall file any written response to the motions for contempt on or before May 30, 2025, and such response shall not exceed 30 double-spaced pages. ( Responses due by 5/30/2025) Show Cause Hearing set for 6/17/2025 at 02:30 PM in Courtroom 706, 40 Centre Street, New York, NY 10007 before Judge J. Paul Oetken. (Signed by Judge J. Paul Oetken on 5/8/2025) (rro) (Entered: 05/08/2025) |
| 05/09/2025 | | MAILING RECEIPT: Document No: 190. Mailed to: David Basch 90 S Sparta Ave. Sparta, NJ 07871; JaneDoe ; JohnDoe ; Richard Arjun Kaul 440 c Somerset Drive Pearl River, NJ 10965. (kgo) (Entered: 05/09/2025) |
| 05/09/2025 | 192 | PLAINTIFF KAUL'S REPLY TO DEFENDANTS CHRISTIE/ALLSTATE/FSMB/ STOLZ MOTION AT D.E. 188 re: 188 JOINT MOTION for Special Hearing re: 180 JOINT MOTION for Special Hearing *For Motion to Dismiss (corrected). Motion fot Contempt (not Motion to Dismiss)..* Document filed by Richard Arjun Kaul. (jjc) (Entered: 05/13/2025) |
| 06/03/2025 | 193 | ON AN EMERGENCY PETITION FOR A WRIT OF PROHIBITION TO THE SOUTHERN DISTRICT OF NEW YORK IN CASE NO. 21-CV-06992-JPO. Document filed by Richard Arjun Kaul. (jjc) (Entered: 06/05/2025) |
| 06/11/2025 | 194 | LETTER addressed to Clerk of Court from RICHARD ARJUN KAUL dated 6/11/2025 re: Please find submitted the following documents the above referenced document. Please ensure this document is published to the docket, regardless of what instructions you may have received from Kll-23 Defendant Oetken to withhold critical filings.. Document filed by Richard Arjun Kaul..(nd) (Entered: 06/13/2025) |
| 06/12/2025 | 196 | LETTER addressed to Clerk of the Court from Richard Arjun Kaul dated 6/12/2025 re: SUBMISSIONS IN SUPPORT OF PROOF OF ILLEGALITY OF K11-23 DEFENDANT OETKEN'S PURPORTED JUNE 17, 2025 'CONTEMPT' HEARING. Document filed by Richard Arjun Kaul. (Attachments: # 1 Exhibit Letter part 2) (jjc) (Entered: 06/16/2025) |

| 06/16/2025 | 195 | NOTICE of Certificate of Non-Service of Motion for Contempt re: 180 JOINT MOTION for Special Hearing *For Motion to Dismiss (corrected)*., 188 JOINT MOTION for Special Hearing re: 180 JOINT MOTION for Special Hearing *For Motion to Dismiss (corrected)*. *Motion fot Contempt (not Motion to Dismiss)*.. Document filed by Allstate Insurance Company, Christopher J. Cristie, Federation State Medical Boards, Daniel Stolz..(Dwyer, Paul) (Entered: 06/16/2025) |
| 06/25/2025 | 197 | MOTION for Matthew Stephen Lee Cate to Withdraw as Attorney . Document filed by Federation State Medical Boards. (Attachments: # 1 Proposed Order Granting Motion to Withdraw, # 2 Affidavit of Service on Pro Se Party).(Cate, Matthew) (Entered: 06/25/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/26/2025 14:47:32 | | |
| **PACER Login:** | dbbortho | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-06992-JPO |
| **Billable Pages:** | 23 | **Cost:** | 2.30 |

# APPENDIX F

(Slip Opinion)          OCTOBER TERM, 2024          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v*. CASA, INC., ET AL.

ON APPLICATION FOR PARTIAL STAY

No. 24A884.   Argued May 15, 2025—Decided June 27, 2025*

Plaintiffs (respondents here)—individuals, organizations, and States—filed three separate suits to enjoin the implementation and enforcement of President Trump's Executive Order No. 14160. See Protecting the Meaning and Value of American Citizenship, 90 Fed. Reg. 8449. The Executive Order identifies circumstances in which a person born in the United States is not "subject to the jurisdiction thereof" and is thus not recognized as an American citizen. The plaintiffs allege that the Executive Order violates the Fourteenth Amendment's Citizenship Clause, §1, and §201 of the Nationality Act of 1940. In each case, the District Court entered a "universal injunction"—an injunction barring executive officials from applying the Executive Order to *anyone*, not just the plaintiffs. And in each case, the Court of Appeals denied the Government's request to stay the sweeping relief. The Government argues that the District Courts lacked equitable authority to impose universal relief and has filed three nearly identical emergency applications seeking partial stays to limit the preliminary injunctions to the plaintiffs in each case. The applications do not raise—and thus the Court does not address—the question whether the Executive Order violates the Citizenship Clause or Nationality Act. Instead, the issue the Court decides is whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions.

——————

*Together with No. 24A885, *Trump, President of the United States, et al.* v. *Washington et al.*, and No. 24A886, *Trump, President of the United States, et al.* v. *New Jersey et al.*, also on applications for partial stays.

*Held*: Universal injunctions likely exceed the equitable authority that Congress has given to federal courts. The Court grants the Government's applications for a partial stay of the injunctions entered below, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue. Pp. 4–26.

(a) The issue raised by these applications—whether Congress has granted federal courts authority to universally enjoin the enforcement of an executive order—plainly warrants this Court's review. On multiple occasions, and across administrations, the Solicitor General has asked the Court to consider the propriety of this expansive remedy. As the number of universal injunctions has increased over the years, so too has the importance of the issue. Pp. 4–5.

(b) The Government is likely to succeed on the merits of its claim that the District Courts lacked authority to issue universal injunctions. See *Nken* v. *Holder*, 556 U. S. 418, 434 (holding that for a stay application to be granted, the applicant must make a strong showing of likelihood of success on the merits). The issuance of a universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power. The Judiciary Act of 1789 endowed federal courts with jurisdiction over "all suits . . . in equity," §11, 1 Stat. 78, and still today, this statute "is what authorizes the federal courts to issue equitable remedies," S. Bray & E. Sherwin, Remedies 442. This Court has held that the statutory grant encompasses only those sorts of equitable remedies "traditionally accorded by courts of equity" at our country's inception. *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 319.

Universal injunctions are not sufficiently "analogous" to any relief available in the court of equity in England at the time of the founding. *Grupo Mexicano*, 527 U. S., at 318–319. Equity offered a mechanism for the Crown "to secure justice where it would not be secured by the ordinary and existing processes of law." G. Adams, The Origin of English Equity, 16 Colum. L. Rev. 87, 91. This "judicial prerogative of the King" thus extended to "those causes which the ordinary judges were incapable of determining." 1 J. Pomeroy, Equity Jurisprudence §31, p. 27. Eventually, the Crown instituted the "practice of delegating the cases" that "came before" the judicial prerogative "to the chancellor for his sole decision." *Id.*, §34, at 28. The "general rule in Equity [was] that all persons materially interested [in the suit] [were] to be made parties to it." J. Story, Commentaries on Equity Pleadings §72, p. 74 (Story). Injunctions were no exception; there were "sometimes suits to restrain the actions of particular officers against particular plaintiffs." S. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 425 (Bray, Multiple Chancellors). Of importance

here, suits in equity were brought by and against individual parties, and the Chancellor's remedies were generally party specific. See *Iveson* v. *Harris*, 7 Ves. 251, 257, 32 Eng. Rep. 102, 104 ("[Y]ou cannot have an injunction except against a party to the suit"). In sum, under longstanding equity practice in England, there was no remedy "remotely like a national injunction." Bray, Multiple Chancellors 425.

Nor did founding-era courts of equity in the United States chart a different course. If anything, the approach traditionally taken by federal courts cuts *against* the existence of such a sweeping remedy. Consider *Scott* v. *Donald*, where the plaintiff successfully challenged the constitutionality of a law on which state officials had relied to confiscate alcohol that the plaintiff kept for personal use. See 165 U. S. 107, 109 (statement of case); *id.*, at 111–112 (opinion of the Court). Although the plaintiff sought an injunction barring enforcement of the law against both himself and anyone "whose rights [were] infringed and threatened" by it, the Court permitted only relief benefitting the named plaintiff. *Id.*, at 115–117. In the ensuing decades, the Court consistently rebuffed requests for relief that extended beyond the parties. See, *e.g.*, *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, 123; *Frothingham* v. *Mellon*, decided with *Massachusetts* v. *Mellon*, 262 U. S. 447, 487–489.

The Court's early refusals to grant relief to nonparties are consistent with the party-specific principles that permeate the Court's understanding of equity. "[N]either declaratory nor injunctive relief," the Court has said, "can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931. In fact, universal injunctions were conspicuously nonexistent for most of the Nation's history. Their absence from 18th and 19th century equity practice settles the question of judicial authority.

While "equity is flexible," *Grupo Mexicano*, 527 U. S., at 322, the Court's precedent emphasizes that its "flexibility is confined within the broad boundaries of traditional equitable relief." *Ibid.* Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act. Pp. 5–11.

(c) Respondents' counterarguments are unavailing. Pp. 11–21.

(1) In an effort to satisfy *Grupo Mexicano*'s historical test, respondents claim that universal injunctions are the modern equivalent of the decree resulting from a "bill of peace"—a form of group litigation in the Court of Chancery. Respondents contend that the existence of this historic equitable device means that federal courts have the equitable authority to issue universal injunctions under the Judiciary Act. The analogy, however, does not work. True, "bills of peace allowed

4                         TRUMP *v.* CASA, INC.

Syllabus

[courts of equity] to adjudicate the rights of members of dispersed groups without formally joining them to a lawsuit through the usual procedures." *Arizona* v. *Biden*, 40 F. 4th 375, 397 (Sutton, C. J., concurring). Unlike universal injunctions, however, which reach *anyone* affected by executive or legislative action, bills of peace involved a "group [that] was small and cohesive." Bray, Multiple Chancellors 426. And unlike universal injunctions, which bind only the parties to the suit, decrees resulting from a bill of peace "would bind all members of the group, whether they were present in the action or not." 7A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1751, at 10.

The bill of peace lives in modern form, but not as the universal injunction. It is instead analogous to the modern class action—which, in federal court, is governed by Rule 23 of the Federal Rules of Civil Procedure. See *ibid*. Rule 23 requires numerosity (such that joinder is impracticable), common questions of law or fact, typicality, and representative parties who adequately protect the interests of the class. Fed. Rule Civ. Proc. 23(a). The requirements for a bill of peace were virtually identical. See 7A Wright, Federal Practice and Procedure §1751, at 10 and n. 4. By forging a shortcut to relief that benefits parties and nonparties alike, universal injunctions impermissibly circumvent Rule 23's procedural protections. Pp. 12–15.

(2) Respondents contend that universal injunctions—or at least *these* universal injunctions—are simply an application of the principle that a court of equity may fashion a remedy that awards complete relief. But "complete relief" is not synonymous with "universal relief." It is a narrower concept, long embraced in the equitable tradition, that allows courts to "administer complete relief *between the parties*." *Kinney-Coastal Oil Co.* v. *Kieffer*, 277 U. S. 488, 507 (emphasis added). To be sure, party-specific injunctions sometimes "advantag[e] nonparties," *Trump* v. *Hawaii*, 585 U. S 667, 717 (THOMAS, J., concurring), but they do so only incidentally.

Here, prohibiting enforcement of the Executive Order against the child of an individual pregnant plaintiff will give that plaintiff complete relief: Her child will not be denied citizenship. And extending the injunction to cover everyone similarly situated would not render *her* relief any more complete. So the individual and associational respondents are wrong to characterize the universal injunction as simply an application of the complete-relief principle. The inquiry is more complicated for the state respondents, because the relevant injunction does not purport to directly benefit nonparties. Instead, the District Court for the District of Massachusetts decided that a universal injunction was necessary to provide the States *themselves* complete re-

Cite as: 606 U. S. ____ (2025)            5

Syllabus

lief. As the States see it, their harms—financial injuries and the administrative burdens flowing from citizen-dependent benefits programs—cannot be remedied without a blanket ban on the enforcement of the Executive Order. Children often move across state lines or are born outside their parents' State of residence. Given the cross-border flow, the States say, a "patchwork injunction" would prove unworkable for the provision of certain federally funded benefits. The Government retorts that even if the injunction is designed to benefit only the States, it is "more burdensome than necessary to redress" their asserted harms, see *Califano* v. *Yamasaki*, 442 U. S. 682, 702, and that narrower relief is appropriate. The Court declines to take up these arguments in the first instance. The lower courts should determine whether a narrower injunction is appropriate, so we leave it to them to consider these and any related arguments. Pp. 15–19.

(3) Respondents defend universal injunctions as a matter of policy; the Government advances policy arguments running the other way. As with most questions of law, the policy pros and cons are beside the point. **Under the Court's well-established precedent, see *Grupo Mexicano*, 527 U. S., at 319, because universal injunctions lack a founding-era forebear, federal courts lack authority to issue them. Pp. 19–21.**

(d) To obtain interim relief, the Government must show that it is likely to suffer irreparable harm absent a stay. *Nken*, 556 U. S., at 434–435. When a federal court enters a universal injunction against the Government, it "improper[ly] intru[des]" on "a coordinate branch of the Government" and prevents the Government from enforcing its policies against nonparties. *INS* v. *Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U. S. 1301, 1306 (O'Connor, J., in chambers); see also *Maryland* v. *King*, 567 U. S. 1301, 1303 (ROBERTS, C. J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury'" (alteration in original)). The Court's practice also demonstrates that an applicant need not show it will prevail on the underlying merits when it seeks a stay on a threshold issue. See, *e.g.*, *Gutierrez* v. *Saenz*, 603 U. S. ___; *OPM* v. *AFGE*, 604 U. S. ___. The Government here is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the authority conferred by the Judiciary Act. And the balance of equities does not counsel against awarding the Government interim relief: A partial stay will cause no harm to respondents because they will remain protected by the preliminary injunctions to the extent necessary and appropriate to afford them complete relief. Pp. 24–26.

(e) When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too. The

6                    TRUMP *v.* CASA, INC.

Syllabus

Government's applications for partial stays of the preliminary injunctions are granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue.  P. 26.

Applications for partial stays granted.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined. ALITO, J., filed a concurring opinion, in which THOMAS, J., joined. KAVANAUGH, J., filed a concurring opinion. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN and JACKSON, JJ., joined. JACKSON, J., filed a dissenting opinion.

Cite as: 606 U. S. ____ (2025)    1

Opinion of the Court

# SUPREME COURT OF THE UNITED STATES

————————

No. 24A884

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

ON APPLICATION FOR PARTIAL STAY

————————

No. 24A885

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

ON APPLICATION FOR PARTIAL STAY

————————

No. 24A886

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE BARRETT delivered the opinion of the Court.

The United States has filed three emergency applications challenging the scope of a federal court's authority to enjoin Government officials from enforcing an executive order. Traditionally, courts issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit. The injunctions before us today reflect a more recent development: district courts asserting the power to prohibit enforcement of a law or policy against *anyone*. These injunctions—known as "universal injunctions"—likely exceed the equitable authority that

2                    TRUMP *v.* CASA, INC.

Opinion of the Court

Congress has granted to federal courts.[1]  We therefore grant
the Government's applications to partially stay the injunc-
tions entered below.

I

The applications before us concern three overlapping,
universal preliminary injunctions entered by three differ-
ent District Courts.  See 763 F. Supp. 3d 723 (Md. 2025),
appeal pending, No. 25–1153 (CA4); 765 F. Supp. 3d 1142
(WD Wash. 2025), appeal pending, No. 25–807 (CA9); *Doe*
v. *Trump*, 766 F. Supp. 3d 266 (Mass. 2025), appeal pend-
ing, No. 25–1170 (CA1).  The plaintiffs—individuals, organ-
izations, and States—sought to enjoin the implementation
and enforcement of President Trump's Executive Order No.
14160.[2]  See Protecting the Meaning and Value of American
Citizenship, 90 Fed. Reg. 8449 (2025).  The Executive Order
identifies circumstances in which a person born in the
United States is not "subject to the jurisdiction thereof" and

───────────

[1] Such injunctions are sometimes called "nationwide injunctions," re-
flecting their use by a single district court to bar the enforcement of a
law anywhere in the Nation.  But the term "universal" better captures
how these injunctions work.  Even a traditional, parties-only injunction
can apply beyond the jurisdiction of the issuing court.  *Steele* v. *Bulova
Watch Co.*, 344 U. S. 280, 289 (1952) (When "exercising its equity pow-
ers," a district court "may command persons properly before it to cease
or perform acts outside its territorial jurisdiction").  The difference be-
tween a traditional injunction and a universal injunction is not so much
*where* it applies, but *whom* it protects: A universal injunction prohibits
the Government from enforcing the law against *anyone*, anywhere.  H.
Wasserman, "Nationwide" Injunctions Are Really "Universal" Injunc-
tions and They Are Never Appropriate, 22 Lewis & Clark L. Rev. 335,
338 (2018).

[2] The Government does not dispute—nor could it—that the individual
plaintiffs have standing to sue.  But it argues that the States lack third-
party standing because their claims rest exclusively on the rights of in-
dividuals.  Application for Partial Stay of Injunction in No. 24A884,
pp. 28–32.  It also challenges the District Courts' authority to grant relief
to the organizations' members who are not identified in the complaints.
See *id.*, at 22.  We do not address these arguments.

Opinion of the Court

is thus not recognized as an American citizen.  See *ibid*. Specifically, it sets forth the "policy of the United States" to no longer issue or accept documentation of citizenship in two scenarios: "(1) when [a] person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when [a] person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth." *Ibid*.  The Executive Order also provides for a 30-day ramp-up period.  During that time, the order directs executive agencies to develop and issue public guidance regarding the order's implementation.  See *id*., at 8449–8450.

The plaintiffs filed suit, alleging that the Executive Order violates the Fourteenth Amendment's Citizenship Clause, §1, as well as §201 of the Nationality Act of 1940, 54 Stat. 1138 (codified at 8 U. S. C. §1401).  In each case, the District Court concluded that the Executive Order is likely unlawful and entered a universal preliminary injunction barring various executive officials from applying the policy to *anyone* in the country.  And in each case, the Court of Appeals denied the Government's request to stay the sweeping relief. See 2025 WL 654902 (CA4, Feb. 28, 2025); 2025 WL 553485 (CA9, Feb. 19, 2025); 131 F. 4th 27 (CA1 2025).

The Government has now filed three nearly identical applications seeking to partially stay the universal preliminary injunctions and limit them to the parties.  See Application for Partial Stay of Injunction in No. 24A884; Application for Partial Stay of Injunction in No. 24A885; Application for Partial Stay of Injunction in No. 24A886.[3] The applications do not raise—and thus we do not address—the question whether the Executive Order violates

───────────

[3]Because the applications are materially identical, we cite only the application in No. 24A884 throughout the rest of the opinion.

the Citizenship Clause or Nationality Act. The issue before us is one of remedy: whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions.

## II

The question whether Congress has granted federal courts the authority to universally enjoin the enforcement of an executive or legislative policy plainly warrants our review, as Members of this Court have repeatedly emphasized. See, *e.g.*, *McHenry* v. *Texas Top Cop Shop*, 604 U. S. ___, ___ (2025) (GORSUCH, J., concurring in grant of stay) (slip op., at 1) ("I would . . . take this case now to resolve definitively the question whether a district court may issue universal injunctive relief"); *Labrador* v. *Poe*, 601 U. S. ___, ___–___ (2024) (GORSUCH, J., joined by THOMAS and ALITO, JJ., concurring in grant of stay) (slip op., at 7–8) ("[T]he propriety of universal injunctive relief [is] a question of great significance that has been in need of the Court's attention for some time"); *Griffin* v. *HM Florida-ORL, LLC*, 601 U. S. ___, ___ (2023) (statement of KAVANAUGH, J., joined by BARRETT, J., except as to footnote 1, respecting denial of application for stay) (slip op., at 3) (Universal injunctions present "an important question that could warrant our review in the future"); *Trump* v. *Hawaii*, 585 U. S. 667, 713 (2018) (THOMAS, J., concurring) ("If [universal injunctions'] popularity continues, this Court must address their legality"). On multiple occasions, and across administrations, the Solicitor General has asked us to consider the propriety of this expansive remedy. See, *e.g.*, Application for Stay of Injunction in *McHenry* v. *Texas Top Cop Shop*, *Inc.*, O. T. 2024, No. 24A653 (Biden administration); Brief for Petitioners in *Trump* v. *Hawaii*, O. T. 2017, No. 17–965 (first Trump administration).

It is easy to see why. By the end of the Biden administration, we had reached "a state of affairs where almost every

Opinion of the Court

major presidential act [was] immediately frozen by a federal district court." W. Baude & S. Bray, Comment, Proper Parties, Proper Relief, 137 Harv. L. Rev. 153, 174 (2023). The trend has continued: During the first 100 days of the second Trump administration, district courts issued approximately 25 universal injunctions. Congressional Research Service, J. Lampe, Nationwide Injunctions in the First Hundred Days of the Second Trump Administration 1 (May 16, 2025). As the number of universal injunctions has increased, so too has the importance of the issue.

## III

### A

The Government is likely to succeed on the merits of its argument regarding the scope of relief. See *Nken* v. *Holder*, 556 U. S. 418, 434 (2009) (holding that for a stay application to be granted, the applicant must make "'a strong showing that [it] is likely to succeed on the merits'"). A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power.[4]

The Judiciary Act of 1789 endowed federal courts with jurisdiction over "all suits . . . in equity," §11, 1 Stat. 78, and still today, this statute "is what authorizes the federal courts to issue equitable remedies," S. Bray & E. Sherwin, Remedies 442 (4th ed. 2024). Though flexible, this equitable authority is not freewheeling. We have held that the statutory grant encompasses only those sorts of equitable remedies "traditionally accorded by courts of equity" at our country's inception. *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 319 (1999); see also, *e.g.*, *Payne* v. *Hook*, 7 Wall. 425, 430 (1869) ("The equity jurisdiction conferred on the Federal courts is the same

———————

[4] Our decision rests solely on the statutory authority that federal courts possess under the Judiciary Act of 1789. We express no view on the Government's argument that Article III forecloses universal relief.

6                    TRUMP *v.* CASA, INC.

Opinion of the Court

that the High Court of Chancery in England possesses").[5]
We must therefore ask whether universal injunctions are
sufficiently "analogous" to the relief issued "'by the High
Court of Chancery in England at the time of the adoption of
the Constitution and the enactment of the original Judici-
ary Act.'" *Grupo Mexicano*, 527 U. S., at 318–319 (quoting
A. Dobie, Handbook of Federal Jurisdiction and Procedure
660 (1928)).

The answer is no: Neither the universal injunction nor
any analogous form of relief was available in the High
Court of Chancery in England at the time of the founding.
Equity offered a mechanism for the Crown "to secure justice
where it would not be secured by the ordinary and existing
processes of law." G. Adams, The Origin of English Equity,
16 Colum. L. Rev. 87, 91 (1916). This "judicial prerogative
of the King" thus extended to "those causes which the ordi-
nary judges were incapable of determining." 1 J. Pomeroy,
Equity Jurisprudence §31, p. 27 (1881). Eventually, the
Crown instituted the "practice of delegating the cases" that
"came before" the judicial prerogative "to the chancellor for
his sole decision." *Id.*, §34, at 28. This "became the common
mode of dealing with such controversies." *Ibid.*

Of importance here, suits in equity were brought by and
against individual parties. Indeed, the "general rule in Eq-
uity [was that all persons materially interested [in the
suit] [were] to be made parties to it." J. Story, Commen-
taries on Equity Pleadings §72, p. 74 (2d ed. 1840) (Story).
Injunctions were no exception; there were "sometimes suits

───────────

[5] See also *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 105 (1945) ("[T]he
federal courts [have] no power that they would not have had in any event
when courts were given 'cognizance,' by the first Judiciary Act, of suits
'in equity'"); *Boyle* v. *Zacharie & Turner*, 6 Pet. 648, 658 (1832) ("[T]he
settled doctrine of this court is, that the remedies in equity are to be ad-
ministered, not according to the state practice, but according to the prac-
tice of courts of equity in the parent country").

to restrain the actions of *particular* officers against *particular* plaintiffs."  S. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 425 (2017) (Bray, Multiple Chancellors) (emphasis added).  And in certain cases, the "Attorney General could be a defendant." *Ibid.*  The Chancellor's remedies were also typically party specific.  "As a general rule, an injunction" could not bind one who was not a "party to the cause."  F. Calvert, Suits in Equity 120 (2d ed. 1847); see also *Iveson* v. *Harris*, 7 Ves. 251, 257, 32 Eng. Rep. 102, 104 (1802) ("[Y]ou cannot have an injunction except against a party to the suit").  Suffice it to say, then, under longstanding equity practice in England, there was no remedy "remotely like a national injunction."  Bray, Multiple Chancellors 425.

Nor did founding-era courts of equity in the United States chart a different course.  See 1 Pomeroy, Equity Jurisprudence §41, at 33–34.  If anything, the approach traditionally taken by federal courts cuts *against* the existence of such a sweeping remedy.  Consider *Scott* v. *Donald*, where the plaintiff successfully challenged the constitutionality of a law on which state officials had relied to confiscate alcohol that the plaintiff kept for personal use.  See 165 U. S. 107, 109 (1897) (statement of case); *id.*, at 111–112 (opinion of the Court).  Although the plaintiff sought an injunction barring enforcement of the law against both himself and anyone else "whose rights [were] infringed and threatened" by it, this Court permitted only a narrower decree between "the parties named as plaintiff and defendants in the bill." *Id.*, at 115–117.[6]

―――――――
    [6]Though the principal dissent claims otherwise, we do not treat *Scott* as "dispositive."  *Post*, at 28 (opinion of SOTOMAYOR, J.).  Under *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308 (1999), the lack of a historical analogue is dispositive.  *Scott* simply illustrates that as late as 1897, this Court adhered to a party-specific view of relief.  And while the principal dissent relies on *Smyth* v. *Ames*, 169 U. S. 466, 518 (1898), as a counterexample to *Scott*, see *post*, at 28 (opinion of

8                    TRUMP *v.* CASA, INC.

Opinion of the Court

In the ensuing decades, we consistently rebuffed requests for relief that extended beyond the parties. See, *e.g.*, *Perkins* v. *Lukens Steel Co.*, 310 U. S. 113, 123 (1940) ("The benefits of [the court's] injunction" improperly extended "to bidders throughout the Nation who were not parties to any proceeding, who were not before the court[,] and who had sought no relief"); cf. *Frothingham* v. *Mellon*, decided with *Massachusetts* v. *Mellon*, 262 U. S. 447, 487–489 (1923) (concluding that the Court lacked authority to issue "preventive relief" that would apply to people who "suffe[r] in some indefinite way in common with people generally"); Bray, Multiple Chancellors 433 (explaining that the *Frothingham* analysis "intertwines concepts of equity, remedies, and the judicial power"). As Justice Nelson put it while riding circuit, "[t]here is scarcely a suit at law, or in equity, . . . in which a general statute is interpreted, that does not involve a question in which other parties are interested." *Cutting* v. *Gilbert*, 6 F. Cas. 1079, 1080 (No. 3,519) (CC SDNY 1865). But to allow all persons subject to the statute to be treated as parties to a lawsuit "would confound the established order of judicial proceedings." *Ibid.*

Our early refusals to grant relief to nonparties are consistent with the party-specific principles that permeate our understanding of equity. "[N]either declaratory nor injunctive relief," we have said, "can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931 (1975); see also *Gregory* v. *Stetson*, 133 U. S. 579, 586 (1890) ("It is an elementary principle

––––––––––––
SOTOMAYOR, J.), it is unclear why. Even supporters of the universal injunction recognize that "the decree [that *Smyth*] affirmed did not reach beyond the parties." M. Sohoni, The Lost History of the "Universal" Injunction, 133 Harv. L. Rev. 920, 939 (2020); *Smyth*, 169 U. S., at 476–477 (statement of case) (quoting circuit court order that enjoined state officials from enforcing the statute "against *said* railroad companies" (emphasis added)).

Opinion of the Court

that a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it. This principle is fundamental"); Baude, 137 Harv. L. Rev., at 168 (noting the "party-specific understanding of what equitable remedies do").

In fact, universal injunctions were not a feature of federal-court litigation until sometime in the 20th century. See Bray, Multiple Chancellors 448–452 (discussing various rationales for the birth of the universal injunction); see also Application in No. 24A884, at 17–18. The D. C. Circuit issued what some regard as the first universal injunction in 1963. See *Wirtz* v. *Baldor Elec. Co.*, 337 F. 2d 518, 535 (enjoining the Secretary of Labor "with respect to the entire [electric motors and generators] industry," not just the named plaintiffs to the lawsuit).[7] Yet such injunctions remained rare until the turn of the 21st century, when their use gradually accelerated. See Bray, Multiple Chancellors 439–443 (referencing *Flast* v. *Cohen*, 392 U. S. 83 (1968), and *Harlem Valley Transp. Assn.* v. *Stafford*, 360 F. Supp. 1057 (SDNY 1973)). One study identified approximately 127 universal injunctions issued between 1963 and 2023.

─────────

[7]There is some dispute about whether *Wirtz* was the first universal injunction. Professor Mila Sohoni points to other possible 20th-century examples, including *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), and *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288 (1913). See M. Sohoni, 133 Harv. L. Rev., at 943; Brief for Professor Mila Sohoni as *Amica Curiae* 3; see also *post*, at 21 (opinion of SOTOMAYOR, J.). But see M. Morley, Disaggregating the History of Nationwide Injunctions: A Response to Professor Sohoni, 72 Ala. L. Rev. 239, 252–256 (2020) (disputing these examples). Regardless, under any account, universal injunctions postdated the founding by more than a century—and under *Grupo Mexicano*, equitable authority exercised under the Judiciary Act must derive from founding-era practice. 527 U. S., at 319. It also bears emphasis that none of these cases addresses the propriety of universal relief. Like a "drive-by-jurisdictional rulin[g]," implicit acquiescence to a broad remedy "ha[s] no precedential effect." *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 91 (1998).

10                     TRUMP *v.* CASA, INC.

Opinion of the Court

See District Court Reform: Nationwide Injunctions, 137
Harv. L. Rev. 1701, 1705 (2024).  Ninety-six of them—over
three quarters—were issued during the administrations of
President George W. Bush, President Obama, President
Trump, and President Biden.  *Ibid.*

The bottom line?  The universal injunction was conspicu-
ously nonexistent for most of our Nation's history.  Its ab-
sence from 18th- and 19th-century equity practice settles
the question of judicial authority.[8]  See *Grupo Mexicano*,
527 U. S., at 318–319.  That the absence continued into the
20th century renders any claim of historical pedigree still
more implausible.  Even during the "deluge of constitu-
tional litigation that occurred in the wake of *Ex parte
Young*, throughout the *Lochner* Era, and at the dawn of the
New Deal," universal injunctions were nowhere to be found.
M. Morley, Disaggregating the History of Nationwide In-
junctions: A Response to Professor Sohoni, 72 Ala. L. Rev.
239, 252 (2020) (footnotes omitted).  Had federal courts be-
lieved themselves to possess the tool, surely they would not
have let it lay idle.

Faced with this timeline, the principal dissent accuses us
of "misunderstand[ing] the nature of equity" as being
"fr[ozen] in amber . . . at the time of the Judiciary Act."
*Post*, at 29 (opinion of SOTOMAYOR, J.).  Not so.  We said it
before, see *supra*, at 5, and say it again: "[E]quity is flexi-
ble."  *Grupo Mexicano*, 527 U. S., at 322.  At the same time,
its "flexibility is confined within the broad boundaries of

_____

[8]The principal dissent faults us for failing to identify a single found-
ing-era case in which this Court held that universal injunctions exceed a fed-
eral court's equitable authority.  See *post*, at 29 (opinion of SOTOMAYOR,
J.).  But this absence only bolsters our case.  That this Court had no oc-
casion to reject the universal injunction as inconsistent with traditional
equity practice merely demonstrates that no party even bothered to ask
for such a sweeping remedy—because no court would have entertained
the request.  Cf. *Grupo Mexicano*, 527 U. S., at 332 ("[E]quitable powers
conferred by the Judiciary Act of 1789 did not include the power to create
remedies previously unknown to equity jurisprudence").

Opinion of the Court

traditional equitable relief."[9]  *Ibid.*  A modern device need not have an exact historical match, but under *Grupo Mexicano*, it must have a founding-era antecedent.  And neither the universal injunction nor a sufficiently comparable predecessor was available from a court of equity at the time of our country's inception.  See *id.*, at 333.  Because the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority under the Judiciary Act.[10]  See *id.*, at 318–319.

## B

Respondents raise several counterarguments, which the principal dissent echoes.  First, they insist that the universal injunction has a sufficient historical analogue: a decree resulting from a bill of peace.  Second, they maintain that

--------

[9] Notwithstanding *Grupo Mexicano*, the principal dissent invokes *Ex parte Young*, 209 U. S. 123 (1908), as support for the proposition that equity can encompass remedies that have "no analogue in the relief exercised in the English Court of Chancery," because *Ex parte Young* permits plaintiffs to "obtain plaintiff-protective injunctions against Government officials," and the English Court of Chancery "could not enjoin the Crown or English officers," *post*, at 30 (opinion of SOTOMAYOR, J.).  But contrary to the principal dissent's suggestion, *Ex parte Young* does not say—either explicitly or implicitly—that courts may devise novel remedies that have no background in traditional equitable practice.  Historically, a court of equity could issue an antisuit injunction to prevent an officer from engaging in tortious conduct.  *Ex parte Young* justifies its holding by reference to a long line of cases authorizing suits against state officials in certain circumstances.  See 209 U. S., at 150–152 (citing, *e.g.*, *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824); *Governor of Georgia* v. *Madrazo*, 1 Pet. 110 (1828); and *Davis* v. *Gray*, 16 Wall. 203 (1873)).  Support for the principal dissent's approach is found not in *Ex parte Young*, but in Justice Ginsburg's partial dissent in *Grupo Mexicano*, which eschews the governing historical approach in favor of "[a] dynamic equity jurisprudence."  527 U. S., at 337 (opinion concurring in part and dissenting in part).

[10] Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.  See 5 U. S. C. §706(2) (authorizing courts to "hold unlawful and set aside agency action").

universal injunctions are consistent with the principle that a court of equity may fashion complete relief for the parties. Third, they argue that universal injunctions serve important policy objectives.

### 1

In an effort to satisfy *Grupo Mexicano*'s historical test, respondents claim that universal injunctive relief *does* have a founding-era forebear: the decree obtained on a "bill of peace," which was a form of group litigation permitted in English courts. See Opposition to Application in No. 24A884 (*CASA*), pp. 30–31; see also Brief for Professor Mila Sohoni as *Amica Curiae* 6–8. This bill allowed the Chancellor to consolidate multiple suits that involved a "common claim the plaintiff could have against multiple defendants" or "some kind of common claim that multiple plaintiffs could have against a single defendant." Bray, Multiple Chancellors 426; see *How* v. *Tenants of Bromsgrove*, 1 Vern. 22, 23 Eng. Rep. 277 (1681) (suit by a lord against his tenants collectively); *Brown* v. *Vermuden*, 1 Ch. Ca. 283, 22 Eng. Rep. 802 (1676), and *Brown* v. *Vermuden*, 1 Ch. Ca. 272, 22 Eng. Rep. 796 (1676) (suit by a parson against lead miners in a parish, who named four of their members to defend the suit in a representative capacity). Universal injunctions are analogous to this traditional equitable device, respondents say, so federal courts have authority under the Judiciary Act to issue them.

The analogy does not work. True, "bills of peace allowed [courts of equity] to adjudicate the rights of members of dispersed groups without formally joining them to a lawsuit through the usual procedures." *Arizona* v. *Biden*, 40 F. 4th 375, 397 (CA6 2022) (Sutton, C. J., concurring); see Story §§120–135 (discussing representative suits). Even so, their use was confined to limited circumstances. See 7A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1751, p. 10, and n. 4 (4th ed. 2021) (citing *Adair* v.

Opinion of the Court

*New River Co.*, 11 Ves. 429, 32 Eng. Rep. 1154 (Ch. 1803)). Unlike universal injunctions, which reach *anyone* affected by legislative or executive action—no matter how large the group or how tangential the effect—a bill of peace involved a "group [that] was small and cohesive," and the suit did not "resolve a question of legal interpretation for the entire realm." Bray, Multiple Chancellors 426. And unlike universal injunctions, which bind only the parties to the suit, decrees obtained on a bill of peace "would bind all members of the group, whether they were present in the action or not." 7A Wright, Federal Practice and Procedure §1751, at 10; see *Smith* v. *Swormstedt*, 16 How. 288, 303 (1854) (When "a court of equity permits a portion of the parties in interest to represent the entire body . . . the decree binds all of them the same as if all were before the court"); see also Story §120 ("[I]n most, if not in all, cases of this sort, the decree obtained upon such a Bill will ordinarily be held binding upon all other persons standing in the same predicament"). As Chief Judge Sutton aptly put it, "[t]he domesticated animal known as a bill of peace looks nothing like the dragon of nationwide injunctions." *Arizona*, 40 F. 4th, at 397 (concurring opinion).

The bill of peace lives in modern form, but not as the universal injunction. It evolved into the modern class action, which is governed in federal court by Rule 23 of the Federal Rules of Civil Procedure. 7A Wright, Federal Practice and Procedure §1751, at 10 ("It was the English bill of peace that developed into what is now known as the class action"); see *Hansberry* v. *Lee*, 311 U. S. 32, 41 (1940) ("The class suit was an invention of equity"). And while Rule 23 is in some ways "more restrictive of representative suits than the original bills of peace," *Rodgers* v. *Bryant*, 942 F. 3d 451, 464 (CA8 2019) (Stras, J., concurring), it would still be recognizable to an English Chancellor. Rule 23 requires numerosity (such that joinder is impracticable), common questions of law or fact, typicality, and representative parties

who adequately protect the interests of the class. Fed. Rule Civ. Proc. 23(a). The requirements for a bill of peace were virtually identical. See 7A Wright, Federal Practice and Procedure §1751, at 10, and n. 4 (citing *Adair*, 11 Ves. 429, 32 Eng. Rep. 1154). None of these requirements is a prerequisite for a universal injunction.

Rule 23's limits on class actions underscore a significant problem with universal injunctions. A "'properly conducted class action,'" we have said, "can come about in federal courts in just one way—through the procedure set out in Rule 23." *Smith* v. *Bayer Corp.*, 564 U. S. 299, 315 (2011); Fed. Rule Civ. Proc. 23(a) ("One or more members of a class may sue or be sued as representative parties on behalf of all members *only if*" Rule 23(a)'s requirements are satisfied (emphasis added)). Yet by forging a shortcut to relief that benefits parties and nonparties alike, universal injunctions circumvent Rule 23's procedural protections and allow "'courts to "create *de facto* class actions at will."'" *Smith*, 564 U. S., at 315 (quoting *Taylor* v. *Sturgell*, 553 U. S. 880, 901 (2008)). Why bother with a Rule 23 class action when the quick fix of a universal injunction is on the table? Cf. *Grupo Mexicano*, 527 U. S., at 330–331 ("Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?"). The principal dissent's suggestion that these suits *could* have satisfied Rule 23's requirements simply proves that universal injunctions are a class-action workaround. *Post*, at 25–26 (opinion of SOTOMAYOR, J.).

The taxpayer suit is a similarly inadequate historical analogy. Contra, *post*, at 24–25. In a successful taxpayer suit, a court would enjoin the collection of an unlawful tax against "taxpayers joined as co-plaintiffs, or by one taxpayer suing on behalf of himself and all others similarly situated." 1 Pomeroy, Equity Jurisprudence §260, at 277. To be sure, some state courts would occasionally "enjoin the

enforcement and collection" of taxes against an "entire community," even when a "single taxpayer su[ed] on his own account." *Id.*, at 277–278. But the practice of extending relief "with respect to any taxpayer" was not adopted by state courts until the mid-19th century, and even then, not all states were willing to provide such sweeping relief. See Bray, Multiple Chancellors 427. This post-founding practice of some state courts thus sheds minimal light on federal courts' equitable authority under the Judiciary Act. What is more, in *Frothingham*, we refused to allow a single taxpayer to challenge a federal appropriations act. 262 U. S., at 486–487. That counsels against placing much, if any, reliance on taxpayer suits as justification for the modern universal injunction.

### 2

Respondents contend that universal injunctions—or at least *these* universal injunctions—are consistent with the principle that a court of equity may fashion a remedy that awards complete relief. See Opposition to Application in No. 24A884 (*CASA*), at 22–25; Opposition to Application in No. 24A885 (*Washington*), pp. 28–32; Opposition to Application in No. 24A886 (*New Jersey*), pp. 31–39. We agree that the complete-relief principle has deep roots in equity. But to the extent respondents argue that it justifies the award of relief to nonparties, they are mistaken.[11]

---

[11] JUSTICE JACKSON, for her part, thinks the "premise" that universal injunctions provide relief to nonparties is "suspect" because, in her view, "[n]onparties may *benefit* from an injunction, but only the plaintiff gets *relief*." *Post*, at 8–9, n. 2 (dissenting opinion). The availability of contempt proceedings suggests otherwise. Consider the civil contempt context. Under "traditional principles of equity practice," courts may "impos[e] civil contempt sanctions to 'coerce [a] defendant into compliance' with an injunction." *Taggart* v. *Lorenzen*, 587 U. S. 554, 560 (2019) (quoting *United States* v. *Mine Workers*, 330 U. S. 258, 303–304 (1947)). Generally, civil contempt proceedings occur between the original parties to the lawsuit. See *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418,

"Complete relief" is not synonymous with "universal re-
lief." It is a narrower concept: The equitable tradition has
long embraced the rule that courts generally "may admin-
ister complete relief *between the parties*." *Kinney-Coastal
Oil Co.* v. *Kieffer*, 277 U. S. 488, 507 (1928) (emphasis
added). While party-specific injunctions sometimes "ad-
vantag[e] nonparties," *Trump*, 585 U. S., at 717 (THOMAS,
J., concurring), they do so only incidentally.

Consider an archetypal case: a nuisance in which one
neighbor sues another for blasting loud music at all hours
of the night. To afford the plaintiff complete relief, the court
has only one feasible option: order the defendant to turn her
music down—or better yet, off. That order will necessarily
benefit the defendant's surrounding neighbors too; there is
no way "to peel off just the portion of the nuisance that
harmed the plaintiff." *Rodgers*, 942 F. 3d, at 462 (Stras, J.,
concurring); see A. Woolhandler & C. Nelson, Does History
Defeat Standing Doctrine? 102 Mich. L. Rev. 689, 702
(2004). But while the court's injunction might have the
*practical effect* of benefiting nonparties, "that benefit [is]
merely incidental." *Trump*, 585 U. S., at 717 (THOMAS, J.,
concurring); see also 3 J. Pomeroy, Equity Jurisprudence
§1349, pp. 380–381 (1883).[12] As a matter of law, the injunc-

─────────────

444–445 (1911). But a federal court's "power in civil contempt proceed-
ings is determined by the requirements of full remedial relief" to "effect
compliance with its decree." *McComb* v. *Jacksonville Paper Co.*, 336
U. S. 187, 193–194 (1949). And "[w]hen an order grants relief for a non-
party," as is the case with universal injunctions, "the procedure for en-
forcing the order is the same as for a party." Fed. Rule Civ. Proc. 71; see,
*e.g.*, *Zamecnik* v. *Indiana Prairie School Dist. No. 204*, 636 F. 3d 874, 879
(CA7 2011). So a nonparty covered by a universal injunction is likely to
reap both the practical benefit and the formal relief of the injunction.
See M. Smith, Only Where Justified: Toward Limits and Explanatory
Requirements for Nationwide Injunctions, 95 Notre Dame L. Rev. 2013,
2019 (2020).

[12]There may be other injuries for which it is all but impossible for

Opinion of the Court

tion's protection extends only to the suing plaintiff—as evidenced by the fact that only the plaintiff can enforce the judgment against the defendant responsible for the nuisance. If the nuisance persists, and another neighbor wants to shut it down, she must file her own suit.[13]

The individual and associational respondents are therefore wrong to characterize the universal injunction as simply an application of the complete-relief principle. Under this principle, the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*. See *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*" (emphasis added)). Here, prohibiting enforcement of the Executive Order against the child of an individual pregnant plaintiff will give that plaintiff complete relief: Her child will not be denied citizenship. Extending the injunction to cover all other similarly situated individuals would not render *her* relief any more complete.

The complete-relief inquiry is more complicated for the state respondents, because the relevant injunction does not purport to directly benefit nonparties. Instead, the District Court for the District of Massachusetts decided that a uni-

_____

courts to craft relief that is complete *and* benefits only the named plaintiffs. See, *e.g.*, *Shaw* v. *Hunt*, 517 U. S. 899 (1996) (racially gerrymandered congressional maps).

[13] The new plaintiff might be able to assert nonmutual offensive issue preclusion. See *Parklane Hosiery Co.* v. *Shore*, 439 U. S. 322, 331–332 (1979) (setting forth prerequisites for applying the doctrine). But nonmutual offensive issue preclusion is unavailable against the United States. *United States* v. *Mendoza*, 464 U. S. 154, 155 (1984). That universal injunctions end-run this rule is one of the Government's objections to them.

18                    TRUMP *v.* CASA, INC.

Opinion of the Court

versal injunction was necessary to provide the States *themselves* with complete relief.  See 766 F. Supp. 3d, at 288.[14] The States maintain that the District Court made the right call.  See Opposition to Application in No. 24A886 (*New Jersey*), at 31–39.

As the States see it, their harms—financial injuries and the administrative burdens flowing from citizen-dependent benefits programs—cannot be remedied without a blanket ban on the enforcement of the Executive Order.  See, *e.g.*, *id.*, at 9–11.  Children often move across state lines or are born outside their parents' State of residence.  *Id.*, at 31, 35. Given the cross-border flow, the States say, a "patchwork injunction" would prove unworkable, because it would require them to track and verify the immigration status of the parents of every child, along with the birth State of every child for whom they provide certain federally funded benefits.  *Ibid.*

The Government—unsurprisingly—sees matters differently.  It retorts that even if the injunction is designed to benefit only the States, it is "more burdensome than necessary to redress" their asserted harms.  *Califano*, 442 U. S., at 702.  After all, to say that a court *can* award complete relief is not to say that it *should* do so.  Complete relief is not a guarantee—it is the maximum a court can provide. And in equity, "the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be."  S. Bray & P. Miller, Getting into Equity, 97 Notre Dame L. Rev. 1763, 1797 (2022).  In short, "[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."  *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329

───────────

[14]The District Court for the Western District of Washington acknowledged the state respondents' complete-relief argument but primarily granted a universal injunction on the basis that the "extreme nature of the equities . . . alone warrant[ed] nationwide relief."  765 F. Supp. 3d 1142, 1153 (2025).

(1944).

Leaning on these principles, the Government contends that narrower relief is appropriate. For instance, the District Court could forbid the Government to apply the Executive Order within the respondent States, including to children born elsewhere but living in those States. Application in No. 24A884, at 23. Or, the Government says, the District Court could direct the Government to "treat covered children as eligible for purposes of federally funded welfare benefits." *Ibid.* It asks us to stay the injunction insofar as it sweeps too broadly.

We decline to take up these arguments in the first instance. The lower courts should determine whether a narrower injunction is appropriate; we therefore leave it to them to consider these and any related arguments.

3

Respondents also defend universal injunctions as a matter of policy. They argue that a universal injunction is sometimes the only practical way to quickly protect groups from unlawful government action. See Opposition to Application in No. 24A884 (*CASA*), at 26–27; see also A. Frost, In Defense of Nationwide Injunctions, 93 N. Y. U. L. Rev. 1065, 1090–1094 (2018) (suggesting that universal injunctions are appropriate when not all interested individuals can come quickly to court); *post*, at 37–39 (SOTOMAYOR, J., dissenting). Respondents also contend that universal injunctions are an appropriate remedy to preserve equal treatment among individuals when the Executive Branch adopts a facially unlawful policy. Opposition to Application in No. 24A884 (*CASA*), at 25–27; cf. *post*, at 22 (SOTOMAYOR, J., dissenting). And they suggest that forcing plaintiffs to proceed on an individual basis can result in confusion or piecemeal litigation that imposes unnecessary costs on courts and others. See Opposition to Application in No. 24A885 (*Washington*), at 31–32; Frost, 93 N. Y. U.

20                    TRUMP *v.* CASA, INC.

Opinion of the Court

L. Rev., at 1098–1101; see also *post*, at 31 (SOTOMAYOR, J.,
dissenting).  So, they insist, universal injunctions must be
permitted for the good of the system.

The Government advances policy arguments running the
other way.  Echoing Chief Judge Sutton, the Government
asserts that avoiding a patchwork enforcement system is a
justification that "lacks a limiting principle and would
make nationwide injunctions the rule rather than the ex-
ception" for challenges to many kinds of federal law.  *Ari-
zona*, 40 F. 4th, at 397 (concurring opinion).  It stresses—as
the principal dissent also observes—that universal injunc-
tions incentivize forum shopping, since a successful chal-
lenge in one jurisdiction entails relief nationwide.  See Ap-
plication in No. 24A884, at 19–20; see also *post*, at 22
(opinion of SOTOMAYOR, J.).  In a similar vein, the Govern-
ment observes that universal injunctions operate asymmet-
rically: A plaintiff must win just one suit to secure sweeping
relief.  But to fend off such an injunction, the Government
must win everywhere.  See Application in No. 24A884,
at 19–20; see also *post*, at 22–23 (opinion of SOTOMAYOR, J.)
(acknowledging this concern).[15]  Moreover, the Government
contends, the practice of universal injunctions means that
highly consequential cases are often decided in a "fast
and furious" process of "'rushed, high-stakes, [and] low-
information'" decisionmaking.  *Labrador*, 601 U. S., at ___
(slip op., at 12) (GORSUCH, J., concurring in grant of stay).
When a district court issues a universal injunction, thereby
halting the enforcement of federal policy, the Government
says that it has little recourse but to proceed to the court of
appeals for an emergency stay.  The loser in the court of

––––––––––

[15]The Government contrasts this with class actions.  A judgment in a
Rule 23 class action (favorable or not) binds the whole class—so if the
defendant wins, it is protected from future suits.  But because an adverse
ruling on a request for universal relief lacks this preclusive effect, plain-
tiffs can continue to file in different forums until they find a court willing
to award such relief.

appeals will then seek a stay from this Court. See Application in No. 24A884, at 20. This process forces courts to resolve significant and difficult questions of law on a highly expedited basis and without full briefing. See *ibid.*[16]

The upshot: As with most disputed issues, there are arguments on both sides. But as with most questions of law, the policy pros and cons are beside the point. Under our well-established precedent, the equitable relief available in the federal courts is that "traditionally accorded by courts of equity" at the time of our founding. *Grupo Mexicano*, 527 U. S., at 319. Nothing like a universal injunction was available at the founding, or for that matter, for more than a century thereafter. **Thus, under the Judiciary Act, federal courts lack authority to issue them**.

## C

The principal dissent focuses on conventional legal terrain, like the Judiciary Act of 1789 and our cases on equity. JUSTICE JACKSON, however, chooses a startling line of attack that is tethered neither to these sources nor, frankly, to any doctrine whatsoever. Waving away attention to the limits on judicial power as a "mind-numbingly technical query," *post*, at 3 (dissenting opinion), she offers a vision of

_____

[16] Acknowledging these problems, the principal dissent admits that "[t]here may be good reasons not to issue universal injunctions in the typical case." *Post*, at 23 (opinion of SOTOMAYOR, J.). This concession, while welcome, is inconsistent with the position that the universal injunction is a "nothing to see here" extension of the kind of decree obtained on a bill of peace. Neither the principal dissent nor respondents have pointed to any evidence that such decrees presented any of the universal injunction's systemic problems or that they were reserved for situations in which the defendant's conduct was "patently unconstitutional" and risked "exceptional" harm. *Post*, at 22–23. It is precisely because the universal injunction is a new, potent remedy that it poses new, potent risks. **Our observation in *Grupo Mexicano* rings true here: "Even when sitting as a court in equity, we have no authority to craft a 'nuclear weapon' of the law." 527 U. S., at 332.**

the judicial role that would make even the most ardent defender of judicial supremacy blush.  In her telling, the fundamental role of courts is to "order everyone (including the Executive) to follow the law—full stop."  *Post*, at 2; see also *post*, at 10 ("[T]he function of the courts—both in theory and in practice—necessarily includes announcing what the law requires in . . . suits for the benefit of all who are protected by the Constitution, not merely doling out relief to injured private parties"); see also *post*, at 11, n. 3, 15.  And, she warns, if courts lack the power to "require the Executive to adhere to law universally," *post*, at 15, courts will leave a "gash in the basic tenets of our founding charter that could turn out to be a mortal wound," *post*, at 12.

Rhetoric aside, JUSTICE JACKSON's position is difficult to pin down.  She might be arguing that universal injunctions are appropriate—even required—whenever the defendant is part of the Executive Branch.  See, *e.g.*, *post*, at 3, 10–12, 16–18.  If so, her position goes far beyond the mainstream defense of universal injunctions.  See, *e.g.*, Frost, 93 N. Y. U. L. Rev., at 1069 ("Nationwide injunctions come with significant costs and should never be the default remedy in cases challenging federal executive action").  As best we can tell, though, her argument is more extreme still, because its logic does not depend on the entry of a universal injunction: JUSTICE JACKSON appears to believe that the reasoning behind *any* court order demands "universal adherence," at least where the Executive is concerned.  *Post*, at 2 (dissenting opinion).  In her law-declaring vision of the judicial function, a district court's opinion is not just persuasive, but has the legal force of a judgment.  But see *Haaland* v. *Brackeen*, 599 U. S. 255, 294 (2023) ("It is a federal court's judgment, not its opinion, that remedies an injury").  Once a single district court deems executive conduct unlawful, it has stated what the law requires. And the Executive must conform to that view, ceasing its enforcement of the

law against anyone, anywhere.[17]

We will not dwell on JUSTICE JACKSON's argument, which is at odds with more than two centuries' worth of precedent, not to mention the Constitution itself. **We observe only this: JUSTICE JACKSON decries an imperial Executive while embracing an imperial Judiciary.**

No one disputes that the Executive has a duty to follow the law. But the Judiciary does not have unbridled authority to enforce this obligation—in fact, sometimes the law prohibits the Judiciary from doing so. See, *e.g.*, *Marbury* v. *Madison*, 1 Cranch 137 (1803) (concluding that James Madison had violated the law but holding that the Court lacked jurisdiction to issue a writ of mandamus ordering him to follow it). But see *post*, at 15 (JACKSON, J., dissenting) ("If courts do not have the authority to require the Executive to adhere to law universally, . . . compliance with law sometimes becomes a matter of Executive prerogative"). **Observing the limits on judicial authority—including, as relevant here, the boundaries of the Judiciary Act of 1789—is required by a judge's oath to follow the law.**

JUSTICE JACKSON skips over that part. Because analyzing the governing statute involves boring "legalese," *post*, at 3, she seeks to answer "a far more basic question of enormous practical significance: May a federal court in the

⸻

[17] Think about what this position means. If a judge in the District of Alaska holds that a criminal statute is unconstitutional, can the United States prosecute a defendant under that statute in the District of Maryland? Perhaps JUSTICE JACKSON would instinctively say yes; it is hard to imagine anyone saying no. But why, on JUSTICE JACKSON's logic, does it not violate the rule of law for the Executive to initiate a prosecution elsewhere? See *post*, at 2 (dissenting opinion). Among its many problems, JUSTICE JACKSON's view is at odds with our system of divided judicial authority. See, *e.g.*, this Court's Rule 10(a) (identifying conflict in the decisions of the courts of appeals as grounds for granting certiorari). **It is also in considerable tension with the reality that district court opinions lack precedential force even vis-à-vis other judges in the same judicial district.** See *Camreta* v. *Greene*, 563 U. S. 692, 709, n. 7 (2011).

United States of America order the Executive to follow the law?" *Ibid.* In other words, it is unnecessary to consider whether Congress has constrained the Judiciary; what matters is how the Judiciary may constrain the Executive. JUSTICE JACKSON would do well to heed her own admonition: "[E]veryone, from the President on down, is bound by law." *Ibid.* That goes for judges too.

## IV

Finally, the Government must show a likelihood that it will suffer irreparable harm absent a stay. *Nken*, 556 U. S., at 434–435. When a federal court enters a universal injunction against the Government, it "improper[ly] intru[des]" on "a coordinate branch of the Government" and prevents the Government from enforcing its policies against nonparties. *INS* v. *Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U. S. 1301, 1306 (1993) (O'Connor, J., in chambers). That is enough to justify interim relief.

The principal dissent disagrees, insisting that "it strains credulity to treat the Executive Branch as irreparably harmed" by these injunctions, even if they are overly broad. *Post*, at 17 (opinion of SOTOMAYOR, J.); see also Opposition to Application in No. 24A884 (*CASA*), at 16–20. That is so, the principal dissent argues, because the Executive Order is unconstitutional. Thus, "the Executive Branch has no right to enforce [it] against anyone." *Post*, at 15.

The principal dissent's analysis of the Executive Order is premature because the birthright citizenship issue is not before us.[18] And because the birthright citizenship issue is

―――――――――
[18]The dissent worries that the Citizenship Clause challenge will never reach this Court, because if the plaintiffs continue to prevail, they will have no reason to petition for certiorari. And if the Government keeps losing, it will "ha[ve] no incentive to file a petition here . . . because the outcome of such an appeal would be preordained." *Post*, at 42 (opinion of SOTOMAYOR, J.). But at oral argument, the Solicitor General acknowledged that challenges to the Executive Order are pending in multiple

not before us, we take no position on whether the dissent's analysis is right. The dissent is wrong to say, however, that a stay applicant cannot demonstrate irreparable harm from a threshold error without also showing that, at the end of the day, it will prevail on the underlying merits. That is not how the *Nken* factors work. See 556 U. S., at 434. For instance, when we are asked to stay an execution on the grounds of a serious legal question, we ask whether the capital defendant is likely to prevail on the merits of the issue before us, not whether he is likely to prevail on the merits of the underlying suit. See, *e.g.*, *Gutierrez* v. *Saenz*, 603 U. S. ___ (2024) (granting application for a stay based on a question implicating the prisoner's standing to attempt to access DNA testing). The same is true when an applicant seeks a stay in other contexts. See, *e.g.*, *OPM* v. *AFGE*, 604 U. S. ___ (2025) (granting application for stay because the organizational plaintiffs' allegations were "insufficient to support [their] standing"). So too here.

The question before us is whether the Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the authority conferred by the Judiciary Act. The answer to that question is yes. See *Coleman* v. *Paccar Inc.*, 424 U. S. 1301, 1307–1308 (1976) (Rehnquist, C. J., in chambers); *Trump* v. *International Refugee Assistance Project*, 582 U. S. 571, 578–579 (2017) (*per curiam*); see also *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury'" (alteration in original)). And

_____

circuits, Tr. of Oral Arg. 50, and when asked directly "When you lose one of those, do you intend to seek cert?", the Solicitor General responded, "yes, absolutely." *Ibid.* And while the dissent speculates that the Government would disregard an unfavorable opinion from this Court, the Solicitor General represented that the Government will respect both the judgments and the opinions of this Court. See *id.*, at 62–63.

the balance of equities does not counsel against awarding the Government interim relief: Partial stays will cause no harm to respondents because they will remain protected by the preliminary injunctions to the extent necessary and appropriate to afford them complete relief.

\*    \*    \*

Some say that the universal injunction "give[s] the Judiciary a powerful tool to check the Executive Branch." *Trump*, 585 U. S., at 720 (THOMAS, J., concurring) (citing S. Amdur & D. Hausman, Nationwide Injunctions and Nationwide Harm, 131 Harv. L. Rev. Forum 49, 51, 54 (2017); S. Malveaux, Class Actions, Civil Rights, and the National Injunction, 131 Harv. L. Rev. Forum, 56, 57, 60–62 (2017)). But federal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them. When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too.

The Government's applications to partially stay the preliminary injunctions are granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue. The lower courts shall move expeditiously to ensure that, with respect to each plaintiff, the injunctions comport with this rule and otherwise comply with principles of equity. The injunctions are also stayed to the extent that they prohibit executive agencies from developing and issuing public guidance about the Executive's plans to implement the Executive Order. Consistent with the Solicitor General's representation, §2 of the Executive Order shall not take effect until 30 days after the date of this opinion. See Tr. of Oral Arg. 55.

*It is so ordered.*

Cite as: 606 U. S. ____ (2025)          1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

No. 24A884

————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

ON APPLICATION FOR PARTIAL STAY

————

No. 24A885

————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

ON APPLICATION FOR PARTIAL STAY

————

No. 24A886

————

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

The Court today holds that federal courts may not issue so-called universal injunctions. I agree and join in full. As the Court explains, the Judiciary Act of 1789—the statute that "'authorizes the federal courts to issue equitable remedies'"—does not permit universal injunctions. *Ante,* at 5. It authorizes only those remedies traditionally available in equity, and there is no historical tradition allowing courts to provide "relief that extend[s] beyond the parties." *Ante,* at 5–11. That conclusion is dispositive: As I have previously explained, "[i]f district courts have any authority to issue

universal injunctions," it must come from some specific statutory or constitutional grant. *Trump* v. *Hawaii*, 585 U. S. 667, 713–714 (2018) (concurring opinion). But, the Judiciary Act is the only real possibility, and serious constitutional questions would arise even if Congress purported to one day allow universal injunctions. See *id.*, at 714, n. 2; see also *United States* v. *Texas*, 599 U. S. 670, 693–694 (2023) (GORSUCH, J., concurring in judgment).

I write separately to emphasize the majority's guidance regarding how courts should tailor remedies specific to the parties. Courts must not distort "the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). Otherwise, they risk replicating the problems of universal injunctions under the guise of granting complete relief.

As the Court recognizes, the complete-relief principle operates as a ceiling: In no circumstance can a court award relief beyond that necessary to redress the plaintiffs' injuries. See *ante,* at 18 ("Complete relief is not a guarantee— it is the maximum a court can provide"). This limitation follows from both Article III and traditional equitable practice. Because Article III limits courts to resolving specific "Cases" and "Controversies," see U. S. Const., Art. III, §2, it requires that any remedy "be tailored to redress the plaintiff's particular injury." *Gill* v. *Whitford*, 585 U. S. 48, 73 (2018). And, equitable remedies historically operated on a plaintiff-specific basis. *Ante,* at 6–9. Accordingly, any "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U. S. 343, 357 (1996).

Courts therefore err insofar as they treat complete relief as a mandate. Some judges have read our precedents to suggest that courts should provide plaintiffs whatever remedy is necessary to give them complete relief. See, *e.g.*,

*Mock* v. *Garland*, 75 F. 4th 563, 587 (CA5 2023) ("[I]njunctions should be crafted to 'provide complete relief to the plaintiffs'"); Z. Siddique, Nationwide Injunctions, 117 Colum. L. Rev. 2095, 2106 (2017) ("[C]ourts . . . tailor their injunctions to provide complete relief to the parties—no less and no more"). But, that reading misunderstands the complete-relief principle.

This principle reflects the equitable "rule that courts generally 'may administer complete relief between the parties.'" *Ante,* at 16 (emphasis deleted). It is an important "aim of the law of remedies . . . to put the plaintiff in her rightful position." S. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 466 (2017) (Bray). But, "to say that a court *can* award complete relief is not to say that it *should* do so." *Ante,* at 18. And, in some circumstances, a court *cannot* award complete relief.

As the Court today affirms, any relief must fall within traditional limits on a court's equitable powers. See *ante,* at 5–6 (citing *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 319 (1999); *Payne* v. *Hook,* 7 Wall. 425, 430 (1869)). Courts must ask whether the relief plaintiffs seek "was traditionally accorded by courts of equity." *Grupo Mexicano*, 527 U. S., at 319. And, they must ensure that any injunctions comport with both the complete-relief principle and other "principles of equity." *Ante,* at 26. For example, courts may need to weigh considerations such as equity's concern "with justice . . . also for the defendant." Bray 468; see H. McClintock, Handbook of the Principles of Equity 78 (2d ed. 1948). In some cases, traditional equitable limits will require courts and plaintiffs to make do with less than complete relief.

This Court's decision in *Frothingham* v. *Mellon*, decided with *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923), exemplifies this constraint. Appellant Frothingham sought to "enjoin the execution of a federal appropriation act" on the

grounds that the Act exceeded the Government's authority and that its execution would improperly increase her tax burden. *Id.*, at 479, 486. On a maximalist view of the complete-relief principle, Frothingham would have been entitled to a national injunction had her claim been meritorious. After all, "a prohibition on using *her* tax money for the [statute] would have been wholly ineffectual" in remedying the injury caused by unlawful federal spending, given "the fungibility of money": The Government would still have been free to execute the statute, so long as it labeled the underlying funds as coming from other taxpayers. Bray 431. A court thus would have needed to enjoin all spending under the statute to provide effective relief. But, this Court rejected Frothingham's request for such an injunction as beyond "the preventive powers of a court of equity." 262 U. S., at 487. Among other reasons, it emphasized that an individual taxpayer's "interest in the moneys of the Treasury" was "comparatively minute and indeterminable," and that the petitioner had not suffered any "direct injury" but rather was "suffer[ing] in some indefinite way in common with people generally." *Id.*, at 487–488.*

To be sure, "[w]hat counts as complete relief" can be a difficult question. Bray 467. Many plaintiffs argue that only sweeping relief can redress their injuries. And, I do not dispute that there will be cases requiring an "indivisible remedy" that incidentally benefits third parties, Tr. of Oral Arg., 14–15, such as "[i]njunctions barring public nuisances," *Hawaii*, 585 U. S., at 717 (THOMAS, J., concurring). But, such cases are by far the exception.

An indivisible remedy is appropriate only when it would be "all but impossible" to devise relief that reaches only the plaintiffs. *Ante,* at 16–17, n. 12. Such impossibility is a

_____

*Although courts now treat *Frothingham* primarily as a case about taxpayer standing, its analysis in fact "intertwine[d] concepts of equity, remedies, and the judicial power." Bray 430–433; see *ante,* at 8.

THOMAS, J., concurring

high bar. For example, the Court today readily dispatches with the individual and associational respondents' position that they require a universal injunction, notwithstanding their argument that a "plaintiff-specific injunction" would be difficult to administer and would subject the associations' members to the burden of having "to identify and disclose to the government" their membership. Tr. of Oral Arg. 141–142. As the Court recognizes, "prohibiting enforcement of the Executive Order against the child of an individual pregnant plaintiff" is all that is required to "give that plaintiff complete relief." *Ante,* at 17. Courts may not use the complete-relief principle to revive the universal injunction.

\*    \*    \*

For good reason, the Court today puts an end to the "increasingly common" practice of federal courts issuing universal injunctions. *Hawaii,* 585 U. S., at 713 (THOMAS, J., concurring). The Court also makes clear that the complete-relief principle provides a ceiling on federal courts' authority, which must be applied alongside other "principles of equity" and our holding that universal injunctions are impermissible. *Ante,* at 26. Lower courts should carefully heed this Court's guidance and cabin their grants of injunctive relief in light of historical equitable limits. If they cannot do so, this Court will continue to be "dutybound" to intervene. *Hawaii,* 585 U. S., at 721 (THOMAS, J., concurring).

# SUPREME COURT OF THE UNITED STATES

————————

No. 24A884

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

ON APPLICATION FOR PARTIAL STAY

————————

No. 24A885

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

ON APPLICATION FOR PARTIAL STAY

————————

No. 24A886

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, concurring.

I join the opinion of the Court but write separately to note two related issues that are left unresolved and potentially threaten the practical significance of today's decision: the availability of third-party standing and class certification.

First, the Court does not address the weighty issue whether the state plaintiffs have third-party standing to assert the Citizenship Clause claims of their individual residents. See *ante*, at 2, n. 2; see also *ante*, at 26 ("The Government's applications to partially stay the preliminary

injunctions are granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff *with standing to sue*" (emphasis added)). Ordinarily, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers* v. *Ohio*, 499 U. S. 400, 410 (1991). In limited circumstances, however, the Court has permitted a party to assert the rights of a third party. Admittedly, the Court has not pinned down the precise circumstances in which third-party standing is permissible. See *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. 118, 127, n. 3 (2014). And commentators have emphasized the need for "greater doctrinal coherence." C. Bradley & E. Young, Unpacking Third-Party Standing, 131 Yale L. J. 1, 7 (2021) (Bradley & Young).

But at a minimum, we have said that a litigant seeking to assert the legal rights or interests of others must demonstrate ordinary Article III standing for itself *and* answer the additional "threshold question whether [it has] standing to raise the rights of others." *Kowalski* v. *Tesmer*, 543 U. S. 125, 129 (2004). But see *FDA* v. *Alliance for Hippocratic Medicine*, 602 U. S. 367, 398 (2024) (THOMAS, J., concurring). This latter requirement, as we have explained, entails a showing that the litigant has a "close relationship" to the right holder and that there is some "'hindrance'" to the right holder's ability to "protect his own interests." *Kowalski*, 543 U. S., at 130 (quoting *Powers*, 499 U. S., at 411). So long as third-party standing doctrine remains good law, federal courts should take care to apply these limitations conscientiously, including against state plaintiffs. That is especially so in cases such as these, in which the parties claiming third-party standing (*i.e.*, the States) are not directly subject to the challenged policy in the relevant respect and face, at most, collateral injuries. See Bradley & Young 56–60.

ALITO, J., concurring

Today's decision only underscores the need for rigorous and evenhanded enforcement of third-party-standing limitations. The Court holds today that injunctive relief should generally extend only to the suing plaintiff. See *ante*, at 16–17. That will have the salutary effect of bringing an end to the practice of runaway "universal" injunctions, but it leaves other questions unanswered. Perhaps most important, when a State brings a suit to vindicate the rights of individual residents and then procures injunctive relief, does the injunction bind the defendant with respect to all residents of that State? If so, States will have every incentive to bring third-party suits on behalf of their residents to obtain a broader scope of equitable relief than any individual resident could procure in his own suit. Left unchecked, the practice of reflexive state third-party standing will undermine today's decision as a practical matter.

Second, today's decision will have very little value if district courts award relief to broadly defined classes without following "Rule 23's procedural protections" for class certification. *Ante*, at 14. The class action is a powerful tool, and we have accordingly held that class "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U. S. 338, 350–351 (2011) (internal quotation marks omitted). These requirements are more than "a mere pleading standard," *id.*, at 350, and a hasty application of Rule 23 of the Federal Rules of Civil Procedure can have drastic consequences, creating "potential unfairness" for absent class members and confusion (and pressure to settle) for defendants. *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 161 (1982). Recognizing these effects, Congress took the exceptional step of authorizing interlocutory review of class certification. See Fed. Rule Civ. Proc. 23(f).

Putting the kibosh on universal injunctions does nothing to disrupt Rule 23's requirements. Of course, Rule 23 may

permit the certification of nationwide classes in some discrete scenarios. But district courts should not view today's decision as an invitation to certify nationwide classes without scrupulous adherence to the rigors of Rule 23. Otherwise, the universal injunction will return from the grave under the guise of "nationwide class relief," and today's decision will be of little more than minor academic interest.

\*      \*      \*

Lax enforcement of the requirements for third-party standing and class certification would create a potentially significant loophole to today's decision. Federal courts should thus be vigilant against such potential abuses of these tools. I do not understand the Court's decision to reflect any disagreement with these concerns, so I join its decision in full.

KAVANAUGH, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

No. 24A884

————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

ON APPLICATION FOR PARTIAL STAY

————

No. 24A885

————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

ON APPLICATION FOR PARTIAL STAY

————

No. 24A886

————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE KAVANAUGH, concurring.

The plaintiffs here sought preliminary injunctions against enforcement of the President's Executive Order on birthright citizenship. The District Courts granted *universal* preliminary injunctions—that is, injunctions prohibiting enforcement of the Executive Order against anyone. Under the Court's holding today, district courts issuing injunctions under the authority afforded by the Judiciary Act of 1789 may award only plaintiff-specific relief. I join the Court's careful and persuasive opinion, which will bring needed clarity to the law of remedies.

To be sure, in the wake of the Court's decision, plaintiffs

KAVANAUGH, J., concurring

who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under Federal Rule of Civil Procedure 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide. See *ante*, at 13–14; *A. A. R. P.* v. *Trump*, 605 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 7); *Califano* v. *Yamasaki*, 442 U. S. 682, 701–703 (1979). And in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily "set aside" a new agency rule. 5 U. S. C. §706(2); see, *e.g.*, *West Virginia* v. *EPA*, 577 U. S. 1126 (2016); see also *Corner Post, Inc.* v. *Board of Governors*, 603 U. S. 799, 826–843 (2024) (KAVANAUGH, J., concurring).[1]

But importantly, today's decision will require district courts to follow proper legal procedures when awarding such relief. Most significantly, district courts can no longer award preliminary nationwide or classwide relief except when such relief is legally authorized. And that salutary development will help bring substantially more order and discipline to the ubiquitous preliminary litigation over new federal statutes and executive actions.

I write separately simply to underscore that this case focuses on only one discrete aspect of the preliminary litigation relating to major new federal statutes and executive actions—namely, what *district courts* may do with respect to those new statutes and executive actions in what might be called "the interim before the interim." Although district courts have received much of the attention (and criticism) in debates over the universal-injunction issue, those courts generally do not have the last word when they grant or deny preliminary injunctions. The

---

[1] In addition, as the Court notes, an injunction granting complete relief to plaintiffs may also, as a practical matter, benefit nonparties. *Ante*, at 15–19.

courts of appeals and this Court can (and regularly do) expeditiously review district court decisions awarding or denying preliminary injunctive relief. The losing party in the district court—the defendant against whom an injunction is granted, or the plaintiff who is denied an injunction—will often go to the court of appeals to seek a temporary stay or injunction. And then the losing party in the court of appeals may promptly come to this Court with an application for a stay or injunction. This Court has therefore often acted as the ultimate decider of the interim legal status of major new federal statutes and executive actions. See, *e.g.*, *Ohio* v. *EPA*, 603 U. S. 279 (2024); *Danco Laboratories, LLC* v. *Alliance for Hippocratic Medicine*, 598 U. S. ___ (2023); *National Federation of Independent Business* v. *OSHA*, 595 U. S. 109 (2022) (*per curiam*); *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. 758 (2021) (*per curiam*); see also *Labrador* v. *Poe*, 601 U. S. ___, ___–___ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 2–3).

After today's decision, that order of operations will not change. In justiciable cases, this Court, not the district courts or courts of appeals, will often still be the ultimate decisionmaker as to the interim legal status of major new federal statutes and executive actions—that is, the interim legal status for the several-year period before a final decision on the merits.

## I

The Court's decision today focuses on the "interim before the interim"—the preliminary relief that district courts can award (and courts of appeals can approve) for the generally *weeks-long* interim before this Court can assess and settle the matter for the often *years-long* interim before a final decision on the merits. To appreciate the broader context surrounding today's decision, it is important to understand

this Court's role in preliminary litigation of this sort.

The basic scenario in these kinds of applications to this Court is by now familiar. Congress passes a major new statute, or the Executive Branch issues a major new rule or executive order. The litigation over the legality of the new statute or executive action winds its way through the federal courts. And that litigation may meander on for many months or often years before this Court can issue a final ruling deciding the legality of the new statute or executive action.

In the meantime, various plaintiffs may seek preliminary injunctions, sometimes in many different district courts. And a government defendant against whom a preliminary injunction is granted (or a plaintiff who is denied a preliminary injunction) may seek a temporary stay or injunction in the court of appeals and then in this Court.

That preliminary-injunction litigation—which typically takes place at a rapid-fire pace long before the merits litigation culminates several years down the road—raises a question: What should the *interim* legal status of the significant new federal statute or executive action at issue be during the several-year period before this Court's final ruling on the merits?

That interim-status question is itself immensely important. The issue of whether a major new federal statute or executive action "is enforceable during the several years while the parties wait for a final merits ruling . . . raises a separate question of extraordinary significance to the parties and the American people." *Labrador* v. *Poe*, 601 U. S. ___, ___–___ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 2–3).

The interim-status issue in turn raises two other critical questions: Should there be a *nationally uniform* answer on the question of whether a major new federal statute or executive action can be legally enforced in the often years-long interim period until this Court reaches a final decision

KAVANAUGH, J., concurring

on the merits? If so, *who decides* what the nationally uniform interim answer is?

*First*, in my view, there often (perhaps not always, but often) should be a nationally uniform answer on whether a *major* new federal statute, rule, or executive order can be enforced throughout the United States during the several-year interim period until its legality is finally decided on the merits.

Consider just a few of the major executive actions that have been the subject of intense preliminary-injunction or other pre-enforcement litigation in the past 10 years or so, under Presidents of both political parties. They range from travel bans to birthright citizenship, from the Clean Power Plan to student loan forgiveness, from the OSHA vaccine mandate to the service of transgender individuals in the military, from Title IX regulations to abortion drugs. And the list goes on. Those executive actions often are highly significant and have widespread effects on many individuals, businesses, governments, and other organizations throughout the United States.

Often, it is not especially workable or sustainable or desirable to have a patchwork scheme, potentially for several years, in which a major new federal statute or executive action of that kind applies to some people or organizations in certain States or regions, but not to others. The national reach of many businesses and government programs, as well as the regular movement of the American people into and out of different States and regions, would make it difficult to sensibly maintain such a scattershot system of federal law.

*Second*, if one agrees that the years-long interim status of a highly significant new federal statute or executive action should often be uniform throughout the United States, who decides what the interim status is?

The answer typically will be this Court, as has been the case both traditionally and recently. This Court's actions

6                TRUMP *v.* CASA, INC.

KAVANAUGH, J., concurring

in resolving applications for interim relief help provide clarity and uniformity as to the interim legal status of major new federal statutes, rules, and executive orders. In particular, the Court's disposition of applications for interim relief often will effectively settle, *de jure* or *de facto*, the interim legal status of those statutes or executive actions nationwide.

The decision today will not alter this Court's traditional role in those matters. Going forward, in the wake of a major new federal statute or executive action, different district courts may enter a slew of preliminary rulings on the legality of that statute or executive action. Or alternatively, perhaps a district court (or courts) will grant or deny the functional equivalent of a universal injunction—for example, by granting or denying a preliminary injunction to a putative nationwide class under Rule 23(b)(2), or by preliminarily setting aside or declining to set aside an agency rule under the APA.

No matter how the preliminary-injunction litigation on those kinds of significant matters transpires in the district courts, the courts of appeals in turn will undoubtedly be called upon to promptly grant or deny temporary stays or temporary injunctions in many cases.

And regardless of whether the district courts have issued a series of individual preliminary rulings, or instead have issued one or more broader classwide or set-aside preliminary rulings, the losing parties in the courts of appeals will regularly come to this Court in matters involving major new federal statutes and executive actions.[2]

If there is no classwide or set-aside relief in those kinds of nationally significant matters, then one would expect a flood of decisions from lower courts, after which the losing

———————

[2] By statute, some litigation may start in a court of appeals or three-judge district court and then come directly to this Court.

KAVANAUGH, J., concurring

parties on both sides will probably inundate this Court with applications for stays or injunctions.[3]  And in cases where classwide or set-aside relief has been awarded, the losing side in the lower courts will likewise regularly come to this Court if the matter is sufficiently important.

When a stay or injunction application arrives here, this Court should not and cannot hide in the tall grass.  When we receive such an application, we must grant or deny.[4] And when we do—that is, when this Court makes a decision on the interim legal status of a major new federal statute or executive action—that decision will often constitute a form of precedent (*de jure* or *de facto*) that provides guidance throughout the United States during the years-long interim period until a final decision on the merits.

_____

[3]That scenario explains why it would not make much sense for this Court to apply different standards to (i) an application for an injunction and (ii) an application for a stay of an injunction.  See, *e.g.*, *Tandon* v. *Newsom*, 593 U. S. 61, 64 (2021) (*per curiam*) (applying the usual stay standard to an application for an injunction).

Suppose a district court in Circuit A enjoins a new executive action.  And the court of appeals in Circuit A then declines to stay the injunction.  Meanwhile, a district court in Circuit B does not enjoin that new executive action, and the court of appeals in Circuit B also declines to enjoin it.  Both cases come to this Court on applications for interim relief—one seeking a stay of injunction and one seeking an injunction.  It would not be particularly rational to deny a stay and leave the injunction in place in Circuit A, and then to turn around and deny an injunction in Circuit B on account of a purportedly higher standard for this Court to grant injunctions rather than stays.  The standards should mesh so that this Court can ensure uniformity without regard to the happenstance of how various courts of appeals and district courts ruled.

[4]To obtain an interim stay or injunction, "an applicant must show (1) a reasonable probability that four Justices will consider the issue sufficiently meritorious to grant certiorari; (2) a fair prospect that a majority of the Court will vote to reverse the judgment below; and (3) a likelihood that irreparable harm will result from the denial" of the application.  *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*); see *Tandon*, 593 U. S., at 64.  The Court may also consider (4) the "balance" of "the equities" and "relative harms" to the parties. *Hollingsworth*, 558 U. S., at 190.

Kavanaugh, J., concurring

## II

It is sometimes suggested, however, that this Court should adopt a policy of presumptively denying applications for stays or injunctions—even applications involving significant new federal statutes or executive actions—regardless of which way the various lower courts have ruled. That suggestion is flawed, in my view, because it would often leave an unworkable or intolerable patchwork of federal law in place. And even in cases where there is no patchwork—for example, because an application comes to us with a single nationwide class-action injunction—what if this Court thinks the lower court's decision is wrong? On student loan forgiveness or the Clean Power Plan or mifepristone or the travel bans, for example? Should we have a rule of presumptively denying relief, thereby allowing erroneous injunctions (or erroneous denials of injunctions) of major new statutes and executive actions to remain in place for several years, and thus severely harming the Government and would-be beneficiaries of (or regulated parties under) those new statutes and executive actions? I think not. And this Court's actions over the years reflect that the Court thinks not.

Unless and until this Court grants or denies an application for stay or injunction, tremendous uncertainty may surround the interim legal status of the new federal statute or executive action throughout the country. The statute or executive action may be in effect in some places but not others, for some businesses but not others, for some Americans but not others. That temporary geographic, organizational, and individual variation in federal law might not warrant this Court's intervention in run-of-the-mill cases—which is why it makes sense that this Court denies applications for interim relief when the Court is unlikely to later grant certiorari. See *Does 1–3* v. *Mills*, 595 U. S. ___, ___ (2021) (BARRETT, J., concurring in denial of application for injunctive relief). But in cases involving

major new federal statutes or executive actions, uniformity is often essential or at least sensible and prudent. In those kinds of cases, disuniformity—even if only for a few years or less—can be chaotic. And such chaos is not good for the law or the country.

One of this Court's roles, in justiciable cases, is to resolve major legal questions of national importance and ensure uniformity of federal law. So a default policy of off-loading to lower courts the final word on whether to green-light or block major new federal statutes and executive actions for the several-year interim until a final ruling on the merits would seem to amount to an abdication of this Court's proper role.

Some might object that this Court is not well equipped to make those significant decisions—namely, decisions about the interim status of a major new federal statute or executive action—on an expedited basis. But district courts and courts of appeals are likewise not perfectly equipped to make expedited preliminary judgments on important matters of this kind. Yet they have to do so, and so do we. By law, federal courts are open and can receive and review applications for relief 24/7/365. See 28 U. S. C. §452 ("All courts of the United States shall be deemed always open for the purpose of filing proper papers . . . and making motions and orders"). And this Court has procedural tools that can help us make the best possible interim decision in the limited time available—administrative stays, additional briefing, *amicus* briefs, oral argument, certiorari before judgment, and the like. On top of that, this Court has nine Justices, each of whom can (and does) consult and deliberate with the other eight to help the Court determine the best answer, unlike a smaller three-judge court of appeals panel or one-judge district court. And this Court also will have the benefit of the prior decisions in the case at hand from the court of appeals and the district court.

Some might argue that preliminary disputes over the

Kavanaugh, J., concurring

legality of major new statutes and executive actions can draw this Court into difficult or controversial matters earlier than we might like, as distinct from what happens on our slower-moving merits docket. That is an understandable concern. But when it comes to the interim status of major new federal statutes and executive actions, it is often important for reasons of clarity, stability, and uniformity that this Court be the decider. And Members of the Court have life tenure so that we can make tough calls without fear or favor. As with the merits docket, the Court's role in resolving applications for interim relief is to neutrally referee each matter based on the relevant legal standard. Avoiding controversial or difficult decisions on those applications is neither feasible nor appropriate.

Some might also worry that an early or rushed decision on an application could "lock in" the Court's assessment of the merits and subtly deter the Court from later making a different final decision. But in deciding applications for interim relief involving major new statutes or executive actions, we often have no choice but to make a preliminary assessment of likelihood of success on the merits; after all, in cases of that sort, the other relevant factors (irreparable harm and the equities) are often very weighty on both sides. See *Labrador* v. *Poe*, 601 U. S. ___, ___–___ (2024) (Kavanaugh, J., concurring in grant of stay) (slip op., at 3–4). Moreover, judges strive to make the correct decision based on current information notwithstanding any previous assessment of the merits earlier in the litigation. It is not uncommon to think and decide differently when one knows more. This Court has done so in the past, see *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), and undoubtedly will continue to do so in the future.

To reiterate, this Court should not insert itself into run-of-the-mill preliminary-injunction cases where we are not likely to grant certiorari down the road. But determining the nationally uniform *interim* legal status for several years

KAVANAUGH, J., concurring

of, say, the Clean Power Plan or Title IX regulations or mifepristone rules is a role that the American people appropriately expect this Court—and not only the courts of appeals or district courts—to fulfill.

\*    \*    \*

The volume of preliminary-injunction and other pre-enforcement litigation over new federal laws and executive actions coming to this Court has been growing in recent years. That trend is in part the result of the increasing number of major new executive actions by recent Presidential administrations (of both political parties) that have had difficulty passing significant new legislation through Congress. Meanwhile, applications for stays or injunctions in capital-punishment cases, election disputes, and other time-sensitive matters (including numerous COVID–19-related disputes in the few years beginning in 2020) have also continued to come to this Court on a steady basis, as they traditionally have.

Although the volume of applications has increased, the Court's responsibility for deciding consequential applications for stays or injunctions is not new. See, *e.g.*, *West Virginia* v. *EPA*, 577 U. S. 1126 (2016) (temporarily enjoining Clean Power Plan); *Purcell* v. *Gonzalez*, 549 U. S. 1 (2006) (*per curiam*) (vacating injunction pending appeal regarding state voter ID law); *Rubin* v. *United States*, 524 U. S. 1301 (1998) (Rehnquist, C. J., in chambers) (denying stay pending certiorari of order enforcing subpoenas to Secret Service agents regarding their observations of the President); *Schlesinger* v. *Holtzman*, 414 U. S. 1321 (1973) (Marshall, J., in chambers) (staying District Court's injunction that had ordered a halt to bombing in Cambodia); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 584, 589 (1952) (after expedited oral argument, affirming District Court's preliminary injunction that proscribed seizure of steel mills by government); cf.

*Rosenberg* v. *United States*, 346 U. S. 273, 283–285 (1953) (vacating stay of execution of the Rosenbergs).

Today's decision on district court injunctions will not affect this Court's vitally important responsibility to resolve applications for stays or injunctions with respect to major new federal statutes and executive actions. Deciding those applications is not a distraction from our job. It is a critical part of our job. With that understanding, I join the Court's opinion in full.

# SUPREME COURT OF THE UNITED STATES

————————

No. 24A884

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

### ON APPLICATION FOR PARTIAL STAY

————————

No. 24A885

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

### ON APPLICATION FOR PARTIAL STAY

————————

No. 24A886

————————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

### ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting.

Children born in the United States and subject to its laws are United States citizens. That has been the legal rule since the founding, and it was the English rule well before then. This Court once attempted to repudiate it, holding in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), that the children of enslaved black Americans were not citizens. To remedy that grievous error, the States passed in 1866 and Congress ratified in 1868 the Fourteenth Amendment's Citizenship Clause, which enshrined birthright citizenship in

the Constitution. There it has remained, accepted and re-
spected by Congress, by the Executive, and by this Court.
Until today.

It is now the President who attempts, in an Executive Or-
der (Order or Citizenship Order), to repudiate birthright
citizenship. Every court to evaluate the Order has deemed
it patently unconstitutional and, for that reason, has en-
joined the Federal Government from enforcing it. Unde-
terred, the Government now asks this Court to grant emer-
gency relief, insisting it will suffer irreparable harm unless
it can deprive at least some children born in the United
States of citizenship. See Protecting the Meaning and
Value of American Citizenship, Exec. Order No. 14160, 90
Fed. Reg. 8849 (2025).

The Government does not ask for complete stays of the
injunctions, as it ordinarily does before this Court. Why?
The answer is obvious: To get such relief, the Government
would have to show that the Order is likely constitutional,
an impossible task in light of the Constitution's text, his-
tory, this Court's precedents, federal law, and Executive
Branch practice. So the Government instead tries its hand
at a different game. It asks this Court to hold that, no mat-
ter how illegal a law or policy, courts can never simply tell
the Executive to stop enforcing it against anyone. Instead,
the Government says, it should be able to apply the Citizen-
ship Order (whose legality it does not defend) to everyone
except the plaintiffs who filed this lawsuit.

The gamesmanship in this request is apparent and the
Government makes no attempt to hide it. Yet, shamefully,
this Court plays along. A majority of this Court decides that
these applications, of all cases, provide the appropriate oc-
casion to resolve the question of universal injunctions and
end the centuries-old practice once and for all. In its rush
to do so the Court disregards basic principles of equity as
well as the long history of injunctive relief granted to non-
parties.

No right is safe in the new legal regime the Court creates. Today, the threat is to birthright citizenship. Tomorrow, a different administration may try to seize firearms from law-abiding citizens or prevent people of certain faiths from gathering to worship. The majority holds that, absent cumbersome class-action litigation, courts cannot completely enjoin even such plainly unlawful policies unless doing so is necessary to afford the formal parties complete relief. That holding renders constitutional guarantees meaningful in name only for any individuals who are not parties to a lawsuit. Because I will not be complicit in so grave an attack on our system of law, I dissent.

## I

The majority ignores entirely whether the President's Executive Order is constitutional, instead focusing only on the question whether federal courts have the equitable authority to issue universal injunctions. Yet the Order's patent unlawfulness reveals the gravity of the majority's error and underscores why equity supports universal injunctions as appropriate remedies in this kind of case. As every conceivable source of law confirms, birthright citizenship is the law of the land.

## A

The Citizenship Clause provides that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U. S. Const., Amdt. 14, §1. That means what it says. Nestled in the Fourteenth Amendment alongside the Equal Protection Clause, the Citizenship Clause does not discriminate on the basis of race, sex, ethnicity, religion, or, importantly here, parentage. It refers instead to "[a]ll persons born or naturalized in the United States." *Ibid*.

Besides birth, there is only one condition: that one be

4                    TRUMP *v.* CASA, INC.

"subject to the jurisdiction" of the United States. Yet that condition too leaves no room for ambiguity. To be "subject to the jurisdiction" of the United States means simply to be bound to its authority and its laws. See N. Webster, An American Dictionary of the English Language 732 (C. Goodrich & N. Porter eds. 1865) (defining jurisdiction as the "[p]ower of governing or legislating," or "the power or right of exercising authority"). As the Government would presumably concede, virtually everyone born in the United States and present in its territory is subject to its authority and its laws. After all, "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Schooner Exchange* v. *McFaddon,* 7 Cranch 116, 136 (1812) (Marshall, C. J., for the Court). Once a citizen of another nation steps onto United States soil, she is (with narrow exception) "amenable to the jurisdiction" of the United States. *Id.*, at 144. That is why "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Plyler* v. *Doe*, 457 U. S. 202, 211, n. 10 (1982).

Few constitutional questions can be answered by resort to the text of the Constitution alone, but this is one. The Fourteenth Amendment guarantees birthright citizenship.

### B

Unsurprisingly given the clarity of the Citizenship Clause's text, every other source of interpretation confirms this conclusion. Consider, first, its history. Long before the Fourteenth Amendment, and indeed before the founding, the common-law rule of *jus soli* (literally, right of the soil) governed English citizenship. That rule rendered a person's birthplace determinative of her citizenship status. Thus, "the children of aliens, born . . . in England," generally were "natural-born subjects, and entitled to all the privileges of such." 1 W. Blackstone, Commentaries on the

SOTOMAYOR, J., dissenting

Laws of England 361–362 (1765); see also H. Broom & G. Denman, Constitutional Law Viewed in Relation to Common Law 31 (2d ed. 1885) (describing *Calvin's Case* (1608), which established that "[e]very one born within the dominions of the King of England . . . is . . . entitled to enjoy all the rights and liberties of an Englishman").

That English common-law rule carried over to the United States after the founding. Shortly after the Constitution's ratification, James Madison observed that "it [was] an established maxim that birth is a criterion of allegiance," *i.e.*, of citizenship. 1 Annals of Cong. 404 (1789). Birth, he explained, could convey citizenship in two ways: either through "place" (under the "right of the soil" principle) or through "parentage" (as for one born to United States citizens). *Ibid.* "[B]ut, in general," Madison explained, "place is the most certain criterion" and "it is what applies in the United States." *Ibid.* Mere decades later, Justice Story wrote that "[n]othing is better settled . . . than the doctrine that the children even of aliens born in a country . . . are subjects by birth." *Inglis* v. *Trustees of Sailor's Snug Harbour in City of New York*, 3 Pet. 99, 164 (1830). Well before the Fourteenth Amendment, then, it was the undisputed "law of the United States [that] every person born within the dominions and allegiance of the United States, whatever were the situation of his parents, is a natural born citizen." *Lynch* v. *Clarke*, 1 Sand. Ch. 583, 663 (N. Y. Ch. 1844).

Though the law was clear, the Nation did not always live up to its promise. Infamously, this Court departed from the birthright citizenship principle in *Dred Scott*, 19 How. 393, holding that the children of enslaved black Americans "are not included, and were not intended to be included, under the word 'citizens' in the Constitution." *Id.*, at 404. Following the Civil War, the Reconstruction Congress corrected that grave error. Section 1 of the Civil Rights Act of 1866, 14 Stat. 27, declared that "all persons born in the United

States and not subject to any foreign power" would be "citizens of the United States." The Fourteenth Amendment's guarantee of birthright citizenship followed two years later.

The lawmakers who ratified the Fourteenth Amendment understood that it would extend citizenship to all children born here, regardless of parental citizenship. Indeed, some objected to its passage on those grounds, complaining that it would permanently extend citizenship to immigrants who "invade [state] borders" and "settle as trespassers." Cong. Globe, 39th Cong., 1st Sess., 2891 (1866). Proponents agreed, if not with the anti-immigrant sentiment, that the Clause would extend citizenship to the children of immigrants. For example, Senator Conness of California (one of the Amendment's lead supporters) confirmed on the floor "that the children born here of Mongolian parents shall be declared by the Constitution of the United States to be entitled to civil rights and to equal protection before the law." *Id.*, at 2892. "We have declared that by law" in the Civil Rights Act, he explained, and "now it is proposed to incorporate the same provision in the fundamental instrument of the nation." *Id.*, at 2891. Not one Senator disagreed with this understanding of the Clause.

In the end, "[t]he Citizenship Clause was no legal innovation." J. Ho, Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment, 9 Green Bag 2d 367, 369 (2006); see also *id.*, at 368 ("Birthright citizenship is guaranteed by the Fourteenth Amendment. That birthright is protected no less for children of undocumented persons than for descendants of *Mayflower* passengers"). "It simply restored the longstanding English common law doctrine of *jus soli*" abrogated by *Dred Scott*. Ho, 9 Green Bag 2d, at 369; see also M. Ramsey, Originalism and Birthright Citizenship, 109 Geo. L. J. 405, 472 (2020) (The "central purpose" of the Citizenship Clause "was, of course, to overrule *Dred Scott*").

C

Following the ratification of the Fourteenth Amendment, this Court confirmed the Amendment's plain meaning in *United States* v. *Wong Kim Ark*, 169 U. S. 649 (1898). At issue was the citizenship of Wong Kim Ark, a young California resident born in San Francisco to Chinese immigrant parents. *Id.*, at 652. When Wong returned to California from a trip to China, a custom's collector denied him entry on the sole ground that he was not a citizen of the United States. *Id.*, at 653.

This Court held that "[t]he Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory." *Id.*, at 693. As the President does today, the Government in *Wong Kim Ark* rested its case on the Clause's sole qualifier. Wong was not subject to the jurisdiction of the United States, the Government claimed, because at birth his parents were aliens in the United States who were "subjects of the emperor of China," thus making Wong a subject of the emperor of China as well. *Id.*, at 652–653. This Court squarely rejected that attempt to limit the Citizenship Clause's reach. Instead, it held, the "'subject to the jurisdiction'" qualifier excludes only "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign State," *id.*, at 682, "with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes," *id.*, at 693.[1]

––––––––––

[1] The first two exceptions "ha[d] already been shown, by the law of England and by our own law, from the time of the first settlement of the English colonies in America, [to be] recognized exceptions to the fundamental rule of citizenship by birth within the country." *Wong Kim Ark*, 169 U. S., at 682. The additional exception for certain children born to Indian tribe members reflected the country's historical understanding that Indian tribes were "*quasi* foreign nations" within the physical boundaries of the United States. See Cong. Globe, 39th Cong., 1st Sess.,

That holding conclusively settled any remaining dispute over the Citizenship Clause's meaning. Since then, all three branches of Government have unflinchingly adhered to it.

This Court, for one, has repeatedly reaffirmed *Wong Kim Ark*'s holding. Notwithstanding legislation purporting to render Japanese persons "ineligible" for citizenship, we held in *Morrison* v. *California*, 291 U. S. 82 (1934), that a child with Japanese parents "is a citizen of the United States if he was born within the United States." *Id.*, at 85. The Court recognized the same rule even during World War II, when individuals of Japanese ancestry were subject to curfew and exclusion orders. See *Hirabayashi* v. *United States*, 320 U. S. 81, 96–97 (1943). So too has the Court recognized that the child of parents unlawfully present in the United States "is, of course, an American citizen by birth." *United States ex rel. Hintopoulos* v. *Shaughnessy*, 353 U. S. 72, 73 (1957). The same is true of children whose parents gained admission into the United States by unlawful means. See, *e.g.*, *INS* v. *Errico*, 385 U. S. 214, 215–216 (1966); *INS* v. *Rios-Pineda*, 471 U. S. 444, 446 (1985).

Congress, for its part, has also reaffirmed the principles of birthright citizenship by enshrining it in a federal statute. Section 201 of the Nationality Act of 1940 provides that all those "born in the United States, and subject to the jurisdiction thereof," "shall be nationals and citizens of the United States at birth." 8 U. S. C. §1401(a); see also *Taggart* v. *Lorenzen*, 587 U. S. 554, 560 (2019) (recognizing

─────────

2890 (1866). Treaties between many tribes and the Federal Government, at the time, ensured that it was the tribe, and not the United States Government, that had "prescriptive and law enforcement authority" over tribal members. M. Ramsey, Originalism and Birthright Citizenship, 109 Geo. L. J. 405, 443–444 (2020); see *id.*, at 442–444. Congress eventually extended birthright citizenship to tribal members born in the United States in 1924. See Indian Citizenship Act of 1924, ch. 233, 43 Stat. 253, 8 U. S. C. §1401(b). These exceptions are not at issue in these cases.

"longstanding interpretive principle" that if statutory term
"'is "obviously transplanted from another legal source," it
"brings the old soil with it"'").

   For at least the last century, the Executive Branch has
adhered to the same principle. When Congress proposed to
reaffirm birthright citizenship in the 1940 Nationality Act,
cabinet officials described it as "a statement of the common-
law rule, which has been in the United States from the be-
ginning of its existence." House Committee on Immigration
and Naturalization, Nationality Laws of the United States,
76th Cong., 1st Sess., 7 (Comm. Print 1939). Indeed, the
Government concedes even now that the Executive Branch
has recognized the vitality of birthright citizenship "at least
back to World War II, if not earlier." App. to Opposition to
Application in No. 24A886, p. 323a. That explains, among
other things, why the Social Security Administration and
the Department of State have long accepted proof of one's
birthplace as proof of citizenship. See 44 Fed. Reg. 10369,
10371 (1979); 20 CFR §§422.107(d), 422.103(c)(2) (2024); 22
CFR §§51.40, 51.42 (2024).

   Some decades ago, the Office of Legal Counsel was asked
to respond to a House bill that would have denied birthright
citizenship to "'children born in the United States to par-
ents who are not citizens or permanent resident aliens.'" 19
Op. OLC 340, 341 (1995). The answer well summed up the
state of the law: This "office grapples with many difficult
and close issues of constitutional law. The lawfulness of
this bill is not among them. This legislation is unquestion-
ably unconstitutional." *Ibid.*

## II
### A

   Undeterred by the Constitution, history, Supreme Court
precedent, federal law, and longstanding Executive Branch
practice, President Donald J. Trump issued Executive Or-
der No. 14160 on the day of his inauguration that purported

to redefine American citizenship.  The Order declares that
United States citizenship does not extend to persons who
are born to a mother unlawfully present in the United
States, or lawfully present on a temporary basis, and a fa-
ther who is neither a citizen nor lawful permanent resident.
*Ibid.*  It further prohibits federal agencies from issuing cit-
izenship documentation to such persons or accepting state
documentation to that effect, and it directs a slew of federal
officials to conform agency regulations to the Order.  *Id.*, at
8449–8450.  The prohibition, according to the Order, ap-
plies "only to persons who are born within the United States
after 30 days from the date of th[e] order."  *Id.*, at 8449.

### B

Shortly after the President issued the Citizenship Order,
several groups of plaintiffs (together, respondents) chal-
lenged the Order in Federal District Courts in Maryland,
Massachusetts, and Washington.  Respondents include: a
group of pregnant women[2] whose children will not be
United States citizens under the terms of the Citizenship
Order; two immigrants-rights organizations with thou-
sands of members across the country who are likely to give
birth to children who would also be denied citizenship un-
der the Order; and 22 States, the District of Columbia, and
the city of San Francisco.  In their respective suits, respond-
ents asserted that the Citizenship Order violates the Four-
teenth Amendment and §1401(a).

Respondents also sought a preliminary injunction bar-
ring enforcement of the Citizenship Order during the pen-
dency of the litigation.  If allowed to go into effect, they said,
the policy would inflict irreparable harm on their children

———————

[2]Two of these women seek to represent a class of pregnant women and
children residing in Washington State, who are affected by the Citizen-
ship Order.  See Complaint in No. 2:25–cv–00127 (WD Wash., Feb. 4,
2025), ECF Doc. 106.  The District Court has yet to rule on the certifica-
tion of that putative class.

(and their members' children) by denying them "enjoyment of the full privileges, rights, and benefits that come with U. S. citizenship," and rendering them vulnerable to unlawful deportation before the Courts could adjudicate their constitutional claim. Complaint in No. 8:25–cv–00201 (D Md., Jan. 21, 2025), p. 6, ¶12; see also Complaint in No. 2:25–cv–00127 (WD Wash., Feb. 4, 2025), ECF Doc. 106, pp. 33–36, ¶¶120–139 (Washington Complaint).

　As for the States, they attested that enforcement of the Citizenship Order would cost them millions of dollars in federal funding and impose significant administrative burdens. The States "administer numerous programs for the benefit of their residents, including for newborns and young children, some of whom are wards of the plaintiff States who are entitled to care by statute." *Id.*, at 23, ¶79. Those social welfare programs include ones provided for by state law, as well as ones established by federal law, such as Medicaid and the Children's Health Insurance Program: Several of them "are funded in part by federal dollars, with federal funding frequently tied to the citizenship and immigration status of the individuals served." *Ibid.* By stripping some children within the States of their citizenship, the Order would reduce the States' federal funding, "forc[ing the States] to bear significantly increased costs to operate and fund programs that ensure the health and well-being of their residents." *Id.*, at 6, ¶8, 4–5, ¶6; see also Opposition to Application in No. 24A886 (New Jersey), pp. 9–11; Complaint in No. 1:25–cv–10139 (D Mass., Jan. 21, 2025), pp. 23–42, ¶¶121–201. Relatedly, because the States must verify the citizenship status of the individuals they serve, the States alleged that the Citizenship Order would force them to expend significant sums to "modif[y] their . . . operational structures and administration" to account for the changes in citizenship. Washington Complaint 6, ¶8; see also Opposition to Application in No. 24A886 (New Jersey), at 9–11.

12                    TRUMP *v.* CASA, INC.

All three District Courts preliminarily enjoined enforcement of the Citizenship Order. Each court determined that the Citizenship Order was likely unlawful, that respondents were likely to face irreparable harm without an injunction, and that the equities and public interest cut decisively in respondents' favor. See 763 F. Supp. 3d 723, 727, 744–745 (Md. 2025); 765 F. Supp. 3d 1142, 1152–1153 (WD Wash. 2025); *Doe* v. *Trump*, 766 F. Supp. 3d 266, 274, 285–287 (Mass. 2025).

The District Courts further determined that only injunctions blocking the Citizenship Order's enforcement nationwide would completely redress respondents' injuries. For the organizational plaintiffs, the Maryland District Court explained that those plaintiffs have "'over 680,000 members . . . who reside in all 50 U.S. states'" and "hundreds of them expect to give birth soon." 763 F. Supp. 3d, at 746. The Washington District Court found that "a geographically limited injunction would be ineffective" for the state plaintiffs "as it would not completely relieve [the States] of the Order's financial burden(s)." 765 F. Supp. 3d, at 1153. For one thing, that court explained, the constant flow of people moving in and out of various States meant some children born to noncitizen parents in a nonplaintiff State would later reside in a plaintiff State. Once there, those children (under state law) would be eligible for state benefits. Yet due to the Citizenship Order, the plaintiff States would no longer receive federal funding to support those benefits. In addition, the plaintiff States would have to create an entirely new administrative and recordkeeping system to accommodate children who were not citizens under the Order and born in a nonplaintiff State. So if the District Court allowed birthright citizenship to continue for children born in the plaintiff States, but not in any other State, that would not completely redress the States' financial injury. *Ibid.*

For identical reasons, the Massachusetts District Court

also found that the state plaintiffs' injuries could be re-
dressed only by a universal injunction. See 766 F. Supp.
3d, at 288 ("The harms [the States] have established stem
from the [Order's] impact on the citizenship status—and
the ability to discern or verify such status—for any child
located or seeking various services within their jurisdic-
tion").

The Government filed motions to stay the injunctions in
three separate Courts of Appeals. Nowhere did the Govern-
ment contest the District Courts' uniform holdings that the
Citizenship Order likely violated the Constitution. Instead,
it challenged only the scope of the ordered relief, arguing
that the injunctions should be narrowed to block the Order's
enforcement against only the individual persons named in
the complaints.

All three appellate courts denied the Government's re-
quest and left the preliminary injunctions intact. See 131
F. 4th 27 (CA1 2025); 2025 WL 654902 (CA4, Feb. 28, 2025);
2025 WL 553485 (CA9, Feb. 19, 2025). The Fourth Circuit,
which reviewed the preliminary injunction issued to the or-
ganizational plaintiffs, concluded that "[t]he district court
. . . carefully explained why an injunction limited to the par-
ties—including organizations with hundreds of thousands
of members nationwide—would be unworkable in practice
and thus fail to provide complete relie[f] to the plaintiffs."
2025 WL 654902, *1. The First and Ninth Circuits left un-
disturbed the Massachusetts and Washington District
Courts' respective determinations that only universal in-
junctions would fully redress the States' injuries. See 131
F. 4th, 42–43; 2025 WL 553485, *1.

On March 13, the Government filed emergency applica-
tions with this Court requesting partial stays of the three
preliminary injunctions of the Citizenship Order. The Gov-
ernment renews its contention that the injunctions must be
narrowed to benefit only formal parties in these cases.

SOTOMAYOR, J., dissenting

### III

In partially granting the Government's remarkable request, the Court distorts well-established equitable principles several times over. A stay, this Court has said, "'is not a matter of right,'" but rather "'an exercise of judicial discretion.'" *Nken* v. *Holder*, 556 U. S. 418, 433 (2009). For centuries, courts have "close[d] the doors" of equity to those "tainted with inequitableness or bad faith relative to the matter in which [they] seek relief." *Precision Instrument Mfg. Co.* v. *Automotive Maintenance Machinery Co.*, 324 U. S. 806, 814 (1945). Yet the majority throws the doors of equity open to the Government in a case where it seeks to undo a fundamental and clearly established constitutional right. The Citizenship Order's patent unlawfulness is reason enough to deny the Government's applications.

The Government also falls well short of satisfying its burden to show that it will likely suffer irreparable harm absent a stay and that it will likely succeed on the merits of its challenge to the scope of the injunctions. *Nken*, 556 U. S., at 434–435. The Executive Branch has respected birthright citizenship for well over a century, and it advances no plausible reason why maintaining the status quo while the litigation proceeds would cause it irrevocable harm. Nor could it, for the Constitution and federal law prohibit the enforcement of the Citizenship Order.

For all that, moreover, the Government is not even correct on the merits of universal injunctions. To the contrary, universal injunctions are consistent with long-established principles of equity, once respected by this Court. What is more, these cases do not even squarely present the legality of universal injunctions. That is because, even if the majority were right that injunctions can only offer "complete relief *to the plaintiffs before the court*," *ante,* at 17, each of the lower courts here correctly determined that the nationwide relief they issued was necessary to remedy respondents' in-

SOTOMAYOR, J., dissenting

juries completely.  So even ignoring the traditional stay factors and accepting the majority's view of the merits, there is no reason to grant relief in these cases.

A

It is a bedrock principle that parties who request a stay must show they will likely suffer irreparable harm absent such relief.  Indeed, "[t]he authority to grant stays has historically been justified by the perceived need 'to prevent irreparable injury to the parties or to the public' pending review."  *Nken*, 556 U. S., at 432 (quoting *Scripps-Howard Radio, Inc.* v. *FCC*, 316 U. S. 4, 9 (1942)).  Thus, an apparent likelihood of success on the merits never suffices on its own to justify this Court's intervention: Our emergency docket is not a mechanism for an expedited appeal.  Accordingly, "this Court can avoid delving into the merits" "[i]f the [applicant does not] demonstrat[e] an irreparable injury."  *Labrador* v. *Poe*, 601 U. S. ___, ___ (2024) (KAVANAUGH, J., concurring in grant of stay) (slip op., at 3); contra, *ante*, at 8–11 (KAVANAUGH, J., concurring).

What grave harm does the Executive face that prompts a majority of this Court to grant it relief?  The answer, the Government says, is the inability to enforce the Citizenship Order against nonparties.  For the majority, that answer suffices.  See *ante*, at 24 ("When a federal court enters a universal injunction against the Government, it 'improper[ly] intrude[s]' on 'a coordinate branch of the Government' and prevents the Government from enforcing its policies against nonparties").

The problem, however, is that the Executive Branch has no right to enforce the Citizenship Order against anyone.  As the Executive itself once put it, the Order is "unquestionably unconstitutional."  *Supra*, at 9.  It defies logic to say that maintaining a centuries-long status quo for a few months longer will irreparably injure the Government.  See *Starbucks Corp.* v. *McKinney*, 602 U. S. 339, 345–346

16                    TRUMP *v.* CASA, INC.

(2024) (The "purpose" of equitable relief "'is merely to pre-serve the relative positions of the parties until a trial on the merits can be held'").  The President's "mandate . . . to ex-ercise his executive power," *Myers* v. *United States*, 272 U. S. 52, 123 (1926), in any event, does not permit him to rewrite the Constitution or statutory provisions at a whim. By forging ahead and granting relief to the Government an-yway, this Court endorses the radical proposition that the President is harmed, irreparably, whenever he cannot do something he wants to do, even if what he wants to do is break the law.

The majority claims that it can sidestep "analysis of the Executive Order" altogether because (in its view) every overbroad injunction necessarily causes irreparable harm sufficient to warrant emergency intervention. *Ante,* at 24. Yet where a purportedly overbroad injunction orders the Government to do only what this Court has expressly held it is required to do, it is hard to see how it could cause any harm. At oral argument, the Government conceded it was bound to follow this Court's precedent.  See Tr. of Oral Arg. 62–63.  This Court's precedent establishes beyond a shade of doubt that the Executive Order is unconstitutional.  See *supra*, at 3–9.  Thus, by enjoining the Government from vi-olating settled law, the District Courts' orders do not cause the Government any harm.

The majority's contrary position is self-refuting.  Suppose an executive order barred women from receiving unemploy-ment benefits or black citizens from voting.  Is the Govern-ment irreparably harmed, and entitled to emergency relief, by a district court order universally enjoining such policies? The majority, apparently, would say yes.

Nothing in this Court's precedents supports that result. It turns one of the "'most critical' factors we must consider in deciding whether to grant a stay" into a box-checking ex-ercise whenever the relevant enjoined action is an executive one. *Trump* v. *International Refugee Assistance Project*, 582

U. S. 571, 584 (2017) (THOMAS, J., concurring in part and dissenting in part). Even accepting that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers), that democratic consideration cuts against the Government in these cases. Through the ratification of the Fourteenth Amendment, Congress and the States constitutionalized birthright citizenship. Congress also codified birthright citizenship in §1401(a). It is thus the Citizenship Order, not the District Courts' injunctions, that prevents the "'effectuat[ion]'" of a constitutional amendment and repeals a "'statut[e] enacted by representatives of [the American] people.'" *Id.*, at 1303.

Simply put, it strains credulity to treat the Executive Branch as irreparably harmed by injunctions that direct it to continue following settled law. "All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." *United States* v. *Lee*, 106 U. S. 196, 220 (1882); but see *Trump* v. *United States*, 603 U. S. 593 (2024). The injunctions do no more harm to the Executive than the Constitution and federal law do.

### B

A majority of this Court nonetheless rushes to address the merits of the Government's applications, holding that universal injunctions "likely exceed the equitable authority that Congress has granted to federal courts." *Ante,* at 1–2. A majority that has repeatedly pledged its fealty to "history and tradition" thus eliminates an equitable power firmly grounded in centuries of equitable principles and practice. By stripping all federal courts, including itself, of that power, the Court kneecaps the Judiciary's authority to stop the Executive from enforcing even the most unconstitutional policies. That runs directly counter to the point of equity: empowering courts to do complete justice, including

through flexible remedies that have historically benefited parties and nonparties alike.

### 1

A brief recounting of equity's history demonstrates the majority's grave error. The American legal system grew out of English law, which had two primary judicial institutions: the common-law courts and equity courts. Equity courts arose because of the inflexibility of the common-law system; their purpose was to look beyond formal writs and provide remedies where the common law gave inadequate relief. In Blackstone's words, equity was meant "to give remedy in cases where none before was administered." 3 Commentaries on the Laws of England, at 50.

Adaptability has always been a hallmark of equity, especially with regard to the scope of its remedies. While common-law courts were "compelled to limit their inquiry to the very parties in the litigation before them," equity courts could "adjust the rights of all, however numerous," and "adapt their decrees to all the varieties of circumstances, which may arise, and adjust them to all the peculiar rights of all the parties in interest." J. Story, Commentaries on Equity Jurisprudence §28, pp. 27–28 (2d ed. 1839). After all, equity's "constant aim" was "to do complete justice." J. Story, Commentaries on Equity Pleadings §72, p. 74 (2d ed. 1840). Accordingly, equity courts could "decid[e] upon and settl[e] the rights of all persons interested in the subject-matter of the suit, so that the performance of the decree of the Court may be perfectly safe to those, who are compelled to obey it, and also, that future litigation may be prevented." *Ibid.*

For equity courts, injunctions were "manifestly indispensable for the purposes of social justice in a great variety of cases." Story, Commentaries on Equity Jurisprudence §959a, at 227. Unlike this Court, then, those courts "constantly decline[d] to lay down any rule which shall limit

their power and discretion as to the particular cases, in which such injunctions shall be granted, or withheld." *Ibid.* Justice Story underscored the "wisdom in this course": Equity courts needed flexibility to craft injunctions for particular cases, as it was "impossible to foresee all the exigencies of society which may require their aid and assistance to protect rights or redress wrongs." *Ibid.*

In their pursuit of complete justice, equity courts could award injunctive and other equitable relief to parties and nonparties alike. For centuries, they did so through what was known as "bills of peace." If a plaintiff or group of plaintiffs filed such a bill, an English court could use a single case to settle disputes affecting whole communities, for "the inherent jurisdiction of equity" included the power "to interfere for the prevention of a multiplicity of suits." 1 J. Pomeroy, Equity Jurisprudence §260, p. 278 (1881). Bills of peace issued in cases "'where the parties [were] very numerous, and the court perceive[d] that it [would] be almost impossible to bring them all before the court; or where the question is of general interest, and a few may sue for the benefit of the whole.'" *Ortiz* v. *Fibreboard Corp.*, 527 U. S. 815, 832 (1999) (quoting *West* v. *Randall*, 29 F. Cas. 718, 722 (No. 17,424) (CC RI 1820) (Story, J.)). In such cases, a court could "grant [equitable relief] without making other persons parties," instead considering them "quasi parties to the record, at least for the purpose of taking the benefit of the decree, and of entitling themselves to other equitable relief, if their rights [were] jeopard[iz]ed." *Id.*, at 723.

Early American courts embraced bills of peace and extended their logic to cases "which [were] not technically 'bills of peace,' but '[were] analogous to,' or 'within the principle' of such bills." 1 Pomeroy, Equity Jurisprudence §269, at 293. One example was taxpayer suits, which allowed courts to enjoin universally the enforcement of a challenged tax. Sometimes, such suits were filed "by any number of taxpayers joined as co-plaintiffs, or by one taxpayer suing

on behalf of himself and all others similarly situated." *Id.*, at 277. But taxpayer suits were not always representative in nature: Even "a single taxpayer suing on his own account," if victorious, could enjoin the collection of a tax against anyone. *Ibid.* Individual plaintiffs, moreover, could secure an order "to set aside and annul any and every illegal public official action . . . whereby a debt . . . would be unlawfully created." *Ibid.* By allowing "complete and final relief [to] be given to an entire community by means of one judicial decree," American courts (like their English counterparts) spared nonparties and themselves from the burden of "an indefinite amount of separate litigation." *Id.*, at 278.

Federal courts have also exercised equitable authority to enjoin universally federal and state laws for more than a century. For instance, before deciding the constitutionality of a new federal law in *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288 (1913), this Court entered an order blocking the law's enforcement against parties and nonparties. See M. Sohoni, The Lost History of the "Universal" Injunction, 133 Harv. L. Rev. 920, 944–946 (2020). In *Lewis*, two newspaper publishers challenged as unconstitutional a federal law requiring publishers to file with the Postmaster General twice-yearly disclosures about their editorial board membership, corporate ownership, and subscribership. Sohoni, 133 Harv. L. Rev., at 944. After the District Court upheld the law and authorized a direct appeal to the Supreme Court, one of the publishers moved for a restraining order. The proposed order sought relief not only for the publisher who filed it, but asked the Court to "'restrai[n]'" the Postmaster General and other federal officials from enforcing the law against "'*appellant and other newspaper publishers.*'" *Id.*, at 946. This Court readily agreed, see *Journal of Commerce and Commercial Bulletin* v. *Burleson*, 229 U. S. 600, 601 (1913) (*per curiam*), even as it would have sufficed

for the movant publishers' sake to enjoin the Act's enforcement against them alone pending their appeal.

In *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925), too, this Court affirmed a universal injunction of Oregon's compulsory public schooling law. See Sohoni, 133 Harv. L. Rev., at 959–962. Two private school owners challenged that law in a suit against the Governor of Oregon and other state officials. "The plaintiffs did not sue on behalf of a represented group or class; they sued for themselves, alleging that the law was an unconstitutional interference with their property rights." *Id.*, at 959. Yet a three-judge federal court awarded them a universal injunction. See *id.*, at 960–961. This Court, in affirming that relief, twice described it as "appropriate." *Pierce*, 268 U. S., at 530, 533. The Court understood that the injunction it affirmed would provide relief to nonparties, commenting that such relief was necessary because enforcing the Act would result not only in the "destruction of appellees' primary schools," but would also destroy "perhaps all other private primary schools for normal children within the State of Oregon." *Id.*, at 534.

Cases like *Lewis* and *Pierce* were not outliers. Throughout the early 20th century, federal courts granted universal injunctions even when a narrower remedy would have sufficed to redress the parties' injuries. See, *e.g.*, *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943) (affirming an injunction that shielded the plaintiff class of Jehovah's Witnesses, and any other children with religious scruples, from complying with a state law requiring children to salute the American flag); see also Sohoni, 133 Harv. L. Rev., at 943–993 (collecting cases). It is certainly true that federal courts have granted more universal injunctions of federal laws in recent decades. But the issuance of broad equitable relief intended to benefit parties and nonparties has deep roots in equity's history and in this Court's precedents.

The universal injunctions of the Citizenship Order fit

firmly within that tradition. The right to birthright citizenship is "clear," the Citizenship Order is an "'illegal act,'" and without the "'preventive process of injunction,'" the right will be "'irreparably injured.'" *Arthur* v. *Oakes*, 63 F. 310, 328 (CA7 1894) (Harlan, J.) (describing standard for when an injunction should issue). It would be "'almost impossible,'" moreover, "'to bring all [affected individuals] before the court,'" *Ortiz*, 527 U. S., at 832, justifying the use of one suit to settle the issue of the Citizenship Order's constitutionality for all affected persons. See 1 Pomeroy, Equity Jurisprudence §260, at 450–451. Complete justice, the "constant aim" of equity, Story, Commentaries on Equity Pleadings §72, at 74, demands a universal injunction: "'the only remedy which the law allows to prevent the commission'" of a flagrantly illegal policy. *Arthur*, 63 F., at 328. The District Courts, by granting such relief, appropriately "settle[d] the rights of all persons interested in the subject-matter" of these suits, binding the Government so as to prevent needless "future litigation." Story, Commentaries on Equity Pleadings §72, at 74.

Of course, as a matter of equitable discretion, courts may often have weighty reasons not to award universal relief. Among other things, universal injunctions can prevent different district and appellate courts from considering the same issues in parallel, forestalling the legal dialogue (or "percolation") the federal system uses to answer difficult questions correctly. Not so here, however, because the Citizenship Order is patently unconstitutional under settled law and a variety of district and appellate courts have reviewed the issue. So too can universal injunctions encourage forum shopping, by allowing preferred district judges in a venue picked by one plaintiff to enjoin governmental policies nationwide. They also operate asymmetrically against the Government, giving plaintiffs a litigation advantage: To halt Government action everywhere, a plaintiff must win

only one universal injunction across many potential lawsuits. Yet this is not a scenario where granting universal relief will encourage forum shopping or give plaintiffs the upper hand. Quite the opposite: By awarding universal relief below, the District Courts just ordered the Government to do everywhere what any reasonable jurist would order the Government to do anywhere.

There may be good reasons not to issue universal injunctions in the typical case, when the merits are open to reasonable disagreement and there is no claim of extraordinary and imminent irreparable harm.[3] See Story, Commentaries on Equity Jurisprudence §959a, at 227 ("[Injunctive relief] ought . . . to be guarded with extreme caution, and applied only in very clear cases"); cf. *ante,* at 13 ( "[The] use [of bills of peace] was confined to limited circumstances"). The universal injunctions in these cases, however, are more than appropriate. These injunctions, after all, protect newborns from the exceptional, irreparable harm associated with losing a foundational constitutional right and its immediate benefits. They thus honor the most basic value of our constitutional system: They keep the Government within the bounds of law. *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803).

### 2

The majority's contrary reasoning falls flat. The majority starts with the Judiciary Act of 1789, which gives federal courts jurisdiction over "all suits . . . in equity." §11, 1 Stat. 78. In the majority's telling, universal injunctions are inconsistent with equity jurisdiction because they are not "sufficiently 'analogous' to the relief '"exercised by the High

—————————

[3] These prudential considerations, however, have nothing to do with whether universal injunctions are consistent with historical equitable principles and practice. Contra *ante,* at 21, n. 16; but cf. *ante,* at 21 ("[T]he policy pros and cons [of universal injunctions] are beside the point").

24                    TRUMP *v.* CASA, INC.

Court of Chancery in England at the time of the adoption of
the Constitution and the enactment of the original Judici-
ary Act."'" *Ante,* at 6 (quoting *Grupo Mexicano de Desar-
rollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 318–
319 (1999)). In reaching that ahistorical result, the Court
claims that the English Chancellor's remedies were "typi-
cally" party specific, and emphasizes that party-specific
principles have permeated this Court's understanding of
equity. *Ante,* at 6–9.

The majority's argument stumbles out the gate. As the
majority must itself concede, injunctions issued by English
courts of equity were "typically," but not always, party spe-
cific. *Ante,* at 7. After all, bills of peace, for centuries, al-
lowed English courts to adjudicate the rights of parties not
before it, and to award remedies intended to benefit entire
affected communities. Taxpayer suits, too, could lead to a
complete injunction of a tax, even when only a single plain-
tiff filed suit.

The majority seeks to distinguish bills of peace from uni-
versal injunctions by urging that the former (but not the
latter) typically applied to small and cohesive groups and
were representative in nature. See *ante,* at 13. Yet those
are distinctions without a difference. Equity courts had the
flexibility to "adapt their decrees to all the varieties of cir-
cumstances, which may arise, and adjust them to all the
peculiar rights of all the parties in interest." Story, Com-
mentaries on Equity Jurisprudence §28, at 28. There is no
equitable principle that caps the number of parties in inter-
est. Indeed, in taxpayer suits, a single plaintiff could get
the relief of "annul[ling] any and every kind of tax or as-
sessment" that applied to an entire "county, town, or city."

1 Pomeroy, Equity Jurisprudence §260, at 277.[4]  "[T]he inherent jurisdiction of equity to interfere for the prevention of a multiplicity of suits," moreover, is what empowered common law courts to issue bills of peace.  *Id.*, at 450–451 (4th ed. 1918).  That is why early American courts understood taxpayer suits, in which even a "single taxpayer suing on his own account" and not on behalf of others could secure a total injunction, to be a natural extension of a bill of peace. *Id.*, at 277 (1881).[5]

It is also unclear why "'cohesive[ness]'" or "representative[ness]" would preclude even those universal injunctions that, like here, benefit a discrete and cohesive group.  *Ante,* at 13.  The Citizenship Order itself applies only to a subset group of newborn children: that is, children born to a mother unlawfully or temporarily present, and a father who

───────────

[4] *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923), which addressed a taxpayer's standing to challenge a federal appropriation, did not consider how broadly a court could enjoin Government action and is therefore not to the contrary.  *Id.*, at 488; contra, *ante,* at 15.

[5] The majority asserts that taxpayer suits are an "inadequate historical analogy" for a universal injunction, *ante,* at 14, but cannot dispute their essential similarity: By providing relief to an entire affected community, both do more than merely redress a plaintiff's injuries.  Instead, the majority says that single-plaintiff, nonrepresentative taxpayer suits cannot be proper "historical" analogues because they trace only back to the "mid-19th century."  See *ibid.*  Yet the same is true of plaintiff-protective injunctions against federal and state government officials, an equitable remedy the majority embraces by reference to "a long line of cases authorizing suits against State officials in certain circumstances" that range from the cusp of the mid-19th century to the late mid-19th century. *Ante,* at 11, n. 9.  In any event, early American courts deemed taxpayer suits "'analogous to,' [and] 'within the principle of' . . . bills [of peace],'" 1 Pomeroy, Equity Jurisprudence §269, at 293, which trace back to the equitable practice of the English Chancery Court, *ante,* at 12.  Nor is it clear why it matters that individual taxpayer suits occurred in state courts, or that those courts did not always award the broad injunctions available to them.  Contra, *ante,* at 15.  The relevant question is simply whether a court of equity could award injunctive relief to nonparties. The answer to that question is, obviously, yes.

is neither a citizen nor lawful permanent resident. Those mothers and fathers share "not only [a common] interest in the question, but one in common in the subject-matter of th[is] suit." *Scott* v. *Donald*, 165 U. S. 107, 116 (1897). Nor is there any doubt that at least the individual respondents adequately represent the injunction's beneficiaries: Like all affected parents, they "are necessarily interested in obtaining the relief sought" to preserve their children's citizenship. *Emmons* v. *National Mut. Bldg. & Loan Assn. of NY*, 135 F. 689, 691 (CA4 1905) (explaining the "well-known doctrine of equity jurisprudence" that " 'the relief sought by [a plaintiff]' " must be " "beneficial to those whom he undertakes to represent' " (quoting 1 R. White, F. Nichols, & H. Garrett, Daniell's Chancery Practice 243 (6th Am. ed. 1894))). What was true of bills of peace is thus true of these universal injunctions and universal injunctions generally, too: Both allow courts to " 'adjudicate the rights of members of dispersed groups without formally joining them to a lawsuit through the usual procedures.' " *Ante,* at 13.

That bills of peace bear some resemblance to modern day Federal Rule of Civil Procedure 23 class actions does not mean they cannot also be a historical analogue to the universal injunction. Contra, *ante,* at 13 ("The bill of peace lives in modern form" as the "modern class action . . . governed in federal court by Rule 23," "not as the universal injunction"). In the majority's view, Rule 23 class actions, but not universal injunctions, would "be recognizable to an English Chancellor" because the limitations on class actions mirror those that applied to bills of peace. *Ante,* at 14 (Rule 23 "requires numerosity (such that joinder is impracticable), common questions of law or fact, typicality, and representative parties who adequately protect the interests of the class"); cf. *supra*, at 25 (explaining why the universal injunctions in these cases are consistent with those limits). To the extent that English Chancellors would care about the differences between Rule 23 and universal injunctions,

Cite as: 606 U. S. ____ (2025)    27

SOTOMAYOR, J., dissenting

the majority provides absolutely no reason to conclude they would think the former permissible and not the latter. To the contrary, unlike the Court today, the English Chancery Court recognized that principles of equity permit granting relief to nonparties. The history of bills of peace makes that apparent, particularly because they went beyond what Rule 23 permits. See *ante,* at 13–14 ("[T]he modern Rule 23 is in some ways 'more restrictive of representative suits than the original bills of peace'"). They are thus a common ancestor to both class actions and universal injunctions.

In any event, nothing in Rule 23 purports to supplant or modify federal courts' equitable authority under the Judiciary Act to grant relief to nonparties, nor could it. Contra, *ante,* at 14. The majority frets that universal injunctions, if permissible, will empower federal courts to create *de facto* class actions at will, thereby circumventing Rule 23's procedural protections. *Ibid.* Those concerns, however, have not been borne out in reality. Rule 23 has coexisted with universal injunctions against the Government for decades. Universal injunctions also cannot supplant the paradigm form of class actions, which seek money damages. In all events, to the extent the majority's concern has any teeth, reviewing courts are already well equipped to safeguard Rule 23's procedural protections. If there is a genuine lack of clarity as to the lawfulness of challenged Government action, district courts may well abuse their discretion by reflexively issuing universal injunctions where a Rule 23 class action would be more appropriate. See *Ashcroft* v. *American Civil Liberties Union,* 542 U. S. 656, 664 (2004) (standard of review for preliminary injunctions is "'abuse of discretion'").

The majority next insists that the practice of "founding-era courts of equity in the United States" cuts against universal injunctions, and that this Court "consistently rebuffed requests for relief that extended beyond the parties." *Ante,* at 8. The majority's account is irreconcilable with

early American bills of peace and the history of taxpayer suits. It further contradicts this Court's practice, in cases like *Lewis*, *Pierce*, and *Barnette*, of affirming and granting universal injunctions even when narrower, plaintiff-focused injunctions would have offered complete relief to the parties. See *supra*, at 20–21. The majority instead focuses on one case from 1897, in which this Court "permitted only a narro[w] decree between 'the parties named as plaintiff and defendants in the bill,'" *ante,* at 7 (quoting *Scott*, 165 U. S., at 117), over others, including from the same period, doing just the opposite. The majority offers no principled basis to deem the question resolved by a single case from 1897 while cases just a few years later charted a different course. Indeed, if the relevant inquiry turns on "founding-era practice," then there is no reason why a case from 1897 should be dispositive. *Ante,* at 9, n. 7.

In the majority's telling, *Scott* merely "illustrates that as late as 1897, this Court adhered to a party-specific view of relief." *Ante,* at 7–8, n. 6. Nothing in *Scott*, however, dictates that equitable relief must always be party specific. To the contrary, just one year after *Scott,* the Court endorsed the opposite view: "Only a court of equity," the Court explained, "is competent to . . . determine, once for all and without a multiplicity of suits, matters that affect not simply individuals, but the interests of the entire community." *Smyth* v. *Ames,* 169 U. S. 466, 518 (1898); see also *id.*, at 517 ("[T]he circuit court of the United States, sitting in equity, can make a comprehensive decree covering the whole ground of controversy, and thus avoid the multiplicity of suits that would inevitably arise under the statute").[6]

_____

[6] Regardless of the actual decree the *Smyth* court approved, see *ante,* at 7–8, n. 6, its analysis clearly reveals that the Court understood equity to permit broad relief intended to benefit parties and nonparties alike. That is why this Court later approved or granted universal injunctions

The majority does not identify a single case, from the founding era or otherwise, in which this Court held that federal courts may never issue universal injunctions or broad equitable relief that extends to nonparties. That is to be expected, given the historical support for such relief and its use in bills of peace and taxpayer suits.

Most critically, the majority fundamentally misunderstands the nature of equity by freezing in amber the precise remedies available at the time of the Judiciary Act. Even as it declares that "'[e]quity is flexible,'" *ante,* at 11, the majority ignores the very flexibility that historically allowed equity to secure complete justice where the rigid forms of common law proved inadequate. Indeed, "[i]n th[e] early times [of the common law] the chief juridical employment of the chancellor must have been in devising new writs, directed to the courts of common law, to give remedy in cases where none before was administered." 3 Blackstone, Commentaries on the Laws of England, at 50. Adaptability has thus always been at the equity's core. Hence why equity courts "constantly decline[d] to lay down any rule which shall limit their power and discretion as to the particular cases, in which such injunctions shall be granted, or withheld." Story, Commentaries on Equity Jurisprudence §959(a), at 227. The Judiciary Act of 1789 codified equity itself, not merely a static list of remedies.

Historical analogues are no doubt instructive and provide important guidance, but requiring an exact historical match for every equitable remedy defies equity's purpose. Equity courts understood the "wisdom" in keeping injunctive relief flexible, for it was "impossible to foresee all the exigencies of society which may require their aid and assistance to protect rights or redress wrongs." *Ibid.* Of course,

_____

in *Lewis*, *Pierce*, and *Barnette* without "address[ing] the propriety of universal relief." *Ante,* at 9, n. 7. See also *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288 (1913); *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943).

30                    TRUMP *v.* CASA, INC.

in assessing whether a remedy falls within federal courts'
equity jurisdiction under the Judiciary Act, this Court has
asked "[w]hether the relief . . . was traditionally accorded
by courts of equity." *Grupo Mexicano,* 527 U. S., at 319.
*Grupo Mexicano*, however, does not dictate the level of gen-
erality for that historical inquiry, and general principles of
equity that themselves existed at the founding militate
against requiring a near exact match as the majority does.
Cf. *United States* v. *Rahimi*, 602 U. S. 680, 692 (2024) ("The
law must comport with the principles underlying the Sec-
ond Amendment, but it need not be a 'dead ringer' or a 'his-
torical twin'").

Indeed, equitable relief in the United States has evolved
in one respect to protect rights and redress wrongs that
even the majority does not question: Plaintiffs today may
obtain plaintiff-protective injunctions against Government
officials that block the enforcement of unconstitutional
laws, relief exemplified by *Ex parte Young*, 209 U. S. 123
(1908). That remedy, which traces back to the equity prac-
tice of mid-19th century courts, finds no analogue in the re-
lief exercised in the English Court of Chancery, which could
not enjoin the Crown or English officers. See *supra*, at 24,
n. 4; see also Sohoni, 133 Harv. L. Rev., at 928, 1002–1006;
see also R. Fallon, D. Meltzer, & D. Shapiro, Hart and
Wechsler's The Federal Courts and the Federal System
958–959 (5th ed. 2003) (noting that, in *Young*, "the threat-
ened conduct of the defendant would not have been an ac-
tionable wrong at common law" and that the "principle [in
*Young*] has been easily absorbed in suits challenging *fed-
eral* official action"). Under the majority's rigid historical
test, however, even plaintiff-protective injunctions against

SOTOMAYOR, J., dissenting

patently unlawful Government action should be impermissible.[7]  Such a result demonstrates the folly of treating equity as a closed system, rather than one designed to adapt to new circumstances.

The relative absence of universal injunctions against the United States before the late 20th century, moreover, reflects constitutional and procedural limitations on judicial power, not equitable ones.  Brief for Legal Historians in No. 24A884 as *Amici Curiae* 13–16.  Until the enactment of the Amendments to the Administrative Procedure Act in 1976, sovereign immunity barred most suits against the Federal Government.  *Id.*, at 14–15 (citing G. Sisk, Litigation With the Federal Government §4.10(b), p. 339 (2016)).  Officer suits against Cabinet officials before that point, moreover, could be brought only in Washington, D. C., due to limits on personal jurisdiction and venue that existed at the time.  Brief for Legal Historians in No. 24A884 as *Amici Curiae* 15–16.  The later emergence of universal injunctions against the United States followed the removal of those barriers and the expansion of federal actions and laws.  The rise of universal injunctions therefore represents equity's essential adaptation to modern governance.

It is a "common expression . . . that Courts of Equity delight to do justice, and not by halves."  Story, Commentaries on Equity Pleadings §72, at 74.  The majority, however, delights to do justice by piecemeal.  Its decision to strip the federal courts of the authority to issue universal injunctions of even flagrantly unlawful Government action represents a grave and unsupported diminution of the judicial power of equity.  Centuries ago, Chief Justice Marshall warned that "[i]f the legislatures of the several states may, at will,

───────────

[7]The majority's expressed support for such injunctions is thus irreconcilable with its view that equitable remedies must be very closely "'analogous' to the relief '"exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act."'"  *Ante,* at 6.

SOTOMAYOR, J., dissenting

annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery." *United States* v. *Peters*, 5 Cranch 115, 136 (1809). The Court should have heeded that warning today.

## C

Even the majority's view of the law cannot justify issuance of emergency relief to the Government in these cases, for the majority leaves open whether these particular injunctions may pass muster under its ruling. Indeed, the lower courts issued the challenged injunctions consistent with an equitable principle that even the majority embraces: Courts may award an equitable remedy when it is "necessary to provide complete relief to the plaintiffs." *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). As the majority recounts, "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief between the parties.'" *Ante,* at 16 (quoting *Kinney-Coastal Oil Co.* v. *Kieffer*, 277 U. S. 488, 507 (1928); emphasis deleted).[8]

So too does the Court recognize that, in some cases, complete relief will require a broad remedy that necessarily benefits nonparties. See *ante,* at 17, n. 13 ("There may be other injuries for which it is all but impossible for courts to craft relief that is both complete *and* benefits only the named plaintiffs"); see also *Gill* v. *Whitford*, 585 U. S. 48, 66–67 (2018) ("[T]he only way to vindicate an individual plaintiff's right to an equally weighted vote [is] through a wholesale 'restructuring of the geographical distribution of seats in a state legislature'"). Hence the majority's nui-

---

[8] That explains the majority's bottom line, in which it declares that the Government's applications are "granted, but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue." *Ante*, at 27.

sance hypothetical: If a plaintiff sues her neighbor for playing loud music at night, a court can order the neighbor to turn off the music at night, even if doing so will naturally benefit other neighbors who are not parties to the suit.  See *ante,* at 16–17.

The majority need not resort to hypotheticals, however, because the very injunctions in these cases were necessary to give respondents complete relief.  Indeed, each District Court found that a universal injunction was the only feasible option to redress fully respondents' injuries.  See 763 F. Supp. 3d, at 746 (concluding that "[o]nly a nationwide injunction will provide complete relief to the plaintiffs" because the organizational plaintiffs have "'over 680,000 members . . . who reside in all 50 U.S. states and several U.S. territories'" and "'[h]undreds or even thousands'" of those members "'will give birth to children in the United States over the coming weeks and months'" (alterations in original)); 765 F. Supp. 3d, at 1153 ("[A] geographically limited injunction would be ineffective, as it would not completely relieve [the plaintiff States] of the Order's financial burden(s)"); 766 F. Supp. 3d, at 288 (explaining that "injunctive relief limited to the State plaintiffs [would be] inadequate" because it would "fai[l] in providing complete relief to the State plaintiffs").

Recognizing as much, the majority retreats to the view that, even if a court "*can* award complete relief," it "*should* [not] do so" reflexively.  *Ante,* at 18; see also *ibid*. ("Complete relief is not a guarantee—it is the maximum a court can provide"); *ante,* at 2 (opinion of THOMAS, J.) (suggesting courts "err insofar as they treat complete relief as a mandate").  Even so, the Court never suggests that the District Courts in these cases should not have awarded relief to the parties that completely remedied their alleged injuries.  Nor could it.  The majority recognizes that "in equity, 'the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be.'"  *Ante,* at 18–19.

34                    TRUMP *v.* CASA, INC.

SOTOMAYOR, J., dissenting

Here, respondents paired their respective requests for complete relief with the strongest story possible: Without such relief, an executive order that violates the Constitution, federal law, Supreme Court precedent, history, and over a century of Executive Branch practice would infringe upon their constitutional rights or cause them to incur significant financial and administrative costs.

Perhaps that is why the majority leaves open the possibility that the District Courts, in these cases, could have granted at least respondent States a nationwide injunction consistent with the notion of "complete relief." The majority recognizes, correctly, that the Massachusetts District Court "decided that a universal injunction was necessary to provide the States *themselves* with complete relief." *Ante,* at 18.[9] And the majority does not dispute the basis for those decisions: "Children often move across state lines or are born outside their parents' State of residence," and "th[is] cross-border flow" would make an injunction protecting only children born in the party States "unworkable." *Ante,* 18. A narrower injunction would "require [the States] to track and verify the immigration status of the parents of every child, along with the birth State of every child for whom they provide certain federally funded benefits." *Ante*, at 18. Unrebutted record evidence bears this out and shows that the Citizenship Order would irreparably harm the States, even if it does not apply to children born within their boundaries. The Court does not contend otherwise. That should be the end of the matter.

---

[9]In the majority's telling, the Washington District Court "acknowledged the state respondents' complete relief argument but primarily granted a universal injunction" based on its weighing of the equities. See *ante,* at 18, n. 14. Not so. That court carefully explained why "a geographically limited injunction would be ineffective, as it would not completely relieve [the States] of the Order's financial burden(s)." 765 F. Supp. 3d 1142, 1153–1154 (2025). A narrower injunction, it explained, would be "unworkable" and would itself likely impose new "recordkeeping and administrative burden[s]" on the States. *Id.*, at 1154.

SOTOMAYOR, J., dissenting

Nevertheless, the majority suggests that the District Courts might consider, after this Court hands down its decision, whether some alternative narrower injunction would provide the States complete relief. See *ibid.* What would such an injunction look like, and would it be feasible? The Court does not say. The majority does note, but takes no position on, two narrower injunctions the Government claims would still give complete relief to the States: an order prohibiting the Government from enforcing the Citizenship Order in respondent States, including as to state residents born elsewhere; or an order directing the Government to treat children covered by the Citizenship Order as eligible for federally funded welfare benefits when those children reside in a respondent State. See *ibid.* (citing Application for Partial Stay of Injunction in No. 24A884, p. 23).

As an initial matter, the Government never raised those narrower injunctions to the District Courts, meaning it forfeited them. That is what the First Circuit expressly held, 131 F. 4th, at 43 ("declining to consider" those alternatives because they were "raised for [the] first time . . . in support of stay pending appeal of preliminary injunction"), and the majority does not dispute the point. It is true that plaintiffs seeking a preliminary injunction bear the burden of making "a clear showing that [they are] entitled to such relief." *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 22 (2008). The States met that burden, however: They presented what is still uncontroverted evidence that an injunction applicable only to children born within their borders would give them less than complete relief. Accordingly, it was reasonable for the District Courts to fashion the remedies that they did, for they were "not obligated to undertake the task of chiseling from the government's across-the-board [Executive Order] a different policy the government never identified, endorsed, or defended." *J. D.* v. *Azar*, 925 F. 3d 1291, 1336 (CADC 2019) (*per curiam*).

Those proffered alternatives, moreover, are unworkable

on their face. Each would require creating a two-tiered scheme in which the Government's recognition of some children's citizenship status or eligibility for federally funded benefits would change based on whether a child resides in one of respondent States at any given moment. That scheme would have to operate, somehow, without imposing an administrative burden on respondent States or disrupting their receipt of federal funds to which they are entitled. "[T]he regular movement of the American people into and out of different States . . . would make it difficult to sensibly maintain such a scattershot system." *Ante,* at 5 (opinion of KAVANAUGH, J.).

Such a system would also be incompatible with federal law. Some statutes, like those governing Medicaid and Supplemental Nutrition Assistance Program (SNAP) benefits, require States to give benefits only to applicants with a Social Security number and to use those numbers for certain administrative purposes. See, *e.g.*, 7 U. S. C. §2025(e); 42 U. S. C. §1320b–7(a)(1). States could not comply with those laws under the Government's alternative injunctions because children covered by the Citizenship Order in non-party States would still be treated as noncitizens at birth. Thus, when some of those children later move to one of respondent States, they would lack Social Security numbers. No matter how it is done, discarding the nationwide status quo of birthright citizenship would result in chaos.

What is more, the principle of complete relief does not require courts to award only the absolute narrowest injunction possible. To conclude otherwise would eviscerate the "discretion and judgment" that is integral to the crafting of injunctive relief. *International Refugee Assistance Project*, 582 U. S., at 579. Indeed, equitable relief "[t]raditionally . . . has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown* v. *Board of Education*, 349 U. S. 294, 300 (1955) (footnote omitted). That is

why the court in the majority's nuisance hypothetical can "order the defendant to turn her music down," or to turn it "off," even though the latter is technically more burdensome on the defendant than necessary to give the plaintiff complete relief. *Ante,* at 16.

Accordingly, the District Courts appropriately determined that the "only one feasible option" that would give complete relief to the States was a universal injunction. See *ibid.* Clearly, the majority is asking the lower courts themselves to explain what is patently obvious about the Government's proposed injunctions and any others that can be imagined.

Inexplicably, however, the Court declares that, for the associational and individual respondents, injunctions enjoining the Government from enforcing the Citizenship Order against them (and only them) would have sufficed. See *ante,* at 17–18. In fashioning equitable relief, however, courts must take into account "'what is workable.'" *North Carolina* v. *Covington*, 581 U. S. 486, 488 (2017) (*per curiam*). Just like the injunction that the majority blesses in the context of its nuisance-suit hypothetical, which will bestow a peaceful night upon the plaintiff's neighbors even when the plaintiff is not herself at home, the preliminary injunction for the associational and individual respondents reflects what is practicable. As the Maryland District Court found, "'hundreds or even thousands'" of the associational respondents' members, who reside in all 50 States, "'will give birth to children in the United States over the coming weeks and months.'" 763 F. Supp. 3d, at 746. Theoretically, it might be possible for a court to fashion an injunction that runs to each of the thousands of expectant mothers in that group. But see *ante,* at 5 (opinion of KAVANAUGH, J.) ("Often, it is not especially workable or sustainable or desirable to have a patchwork scheme . . . in which a major new federal statute or executive action . . . applies to some people or organizations in certain States or

regions, but not to others"). Yet anything less than a nationwide injunction creates a risk that the Government, inadvertently or intentionally, will enforce the Citizenship Order against some of the plaintiffs' children before this Court rules definitively on the Order's lawfulness.

A narrower injunction would necessarily task "[t]hose [responsible for] determining a baby's citizenship status . . . with [correctly] confirming [biological] parentage, the citizenship or immigration status of both [biological] parents, and membership in specific organizations." Opposition to Application for Partial Stay of Injunction in No. 24A884, p. 24. That, in turn, would "impose an enormous burden on expecting parents, membership organizations, government employees at all levels, and hospital staff," increasing the risk of mistake. *Ibid.* The risk of noncompliance is also particularly stark here, where the challenged action itself reflects an utter disregard for settled precedent, and given the Government's repeated insistence that it need not provide notice to individuals before their sudden deportations. See, *e.g.*, *A. A. R. P.* v. *Trump*, 605 U. S. ___, ___ (2025) (*per curiam*) (slip op., at 2); *Department of Homeland Security* v. *D. V. D.*, 606 U. S. ___, ___ (2025) (SOTOMAYOR, J., dissenting) (slip op., at 15). The majority does not identify a narrower alternative that is both practical and mitigates that risk.

At the very least, there is no reason to think that the District Court abused its discretion in deciding that only a nationwide injunction could protect the plaintiffs' fundamental rights. See *Ashcroft*, 542 U. S., at 664 (setting forth the standard of review). "Crafting a preliminary injunction," after all, "is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *International Refugee Assistance Project*, 582 U. S., at 579. Applying deferential abuse-of-discretion review, the Fourth Circuit emphasized that the "[t]he district court . . . carefully

explained why an injunction limited to the parties—including organizations with hundreds of thousands of members nationwide—would be unworkable in practice and thus fail to provide complete relie[f] to the plaintiffs." 2025 WL 654902, *1. The majority gives no justification for deeming the District Court's reasoned assessment an abuse of discretion.

## D

The equities and public interest weigh decisively against the Government. For all of the reasons discussed, the Citizenship Order is patently unconstitutional. To allow the Government to enforce it against even one newborn child is an assault on our constitutional order and antithetical to equity and public interest. Cf. *Salazar* v. *Buono*, 559 U. S. 700, 714–715 (2010) (plurality opinion) ("'[A] court must never ignore . . . circumstances underlying [equitable relief] lest the decree be turned into an "instrument of wrong"'").

Meanwhile, newborns subject to the Citizenship Order will face the gravest harms imaginable. If the Order does in fact go into effect without further intervention by the District Courts, children will lose, at least for the time being, "a most precious right," *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 159 (1963), and "cherished status" that "carries with it the privilege of full participation in the affairs of our society," *Knauer* v. *United States*, 328 U. S. 654, 658 (1946). Affected children also risk losing the chance to participate in American society altogether, unless their parents have sufficient resources to file individual suits or successfully challenge the Citizenship Order in removal proceedings. Indeed, the Order risks the "creation of a substantial 'shadow population'" for covered children born in the United States who remain here. *Plyler*, 457 U. S., at 218. Without Social Security numbers and other documentation, these children will be denied critical public services, like SNAP and Medicaid, and lose the ability to engage fully in

SOTOMAYOR, J., dissenting

civic life by being born in States that have not filed a lawsuit. Worse yet, the Order threatens to render American-born children stateless, a status "deplored in the international community" for causing "the total destruction of the individual's status in organized society." *Trop* v. *Dulles*, 356 U. S. 86, 101–102 (1958) (plurality opinion). That threat hangs like a guillotine over this litigation.

The Order will cause chaos for the families of all affected children too, as expecting parents scramble to understand whether the Order will apply to them and what ramifications it will have. If allowed to take effect, the Order may even wrench newborns from the arms of parents lawfully in the United States, for it purports to strip citizenship from the children of parents legally present on a temporary basis. See 90 Fed. Reg. 8449. Those newborns could face deportation, even as their parents remain lawfully in the country. In light of all these consequences, there can be no serious question over where the equities lie in these cases.

## IV

The Court's decision is nothing less than an open invitation for the Government to bypass the Constitution. The Executive Branch can now enforce policies that flout settled law and violate countless individuals' constitutional rights, and the federal courts will be hamstrung to stop its actions fully. Until the day that every affected person manages to become party to a lawsuit and secures for himself injunctive relief, the Government may act lawlessly indefinitely.

Not even a decision from this Court would necessarily bind the Government to stop, completely and permanently, its commission of unquestionably unconstitutional conduct. The majority interprets the Judiciary Act, which defines the equity jurisdiction for all federal courts, this Court included, as prohibiting the issuance of universal injunctions (unless necessary for complete relief). What, besides equity, enables this Court to order the Government to cease

completely the enforcement of illegal policies? The majority does not say. So even if this Court later rules that the Citizenship Order is unlawful, we may nevertheless lack the power to enjoin enforcement as to anyone not formally a party before the Court. In a case where the Government is acting in open defiance of the Constitution, federal law, and this Court's holdings, it is naive to believe the Government will treat this Court's opinions on those policies as "*de facto*" universal injunctions absent an express order directing total nonenforcement. *Ante*, at 6 (opinion of KAVANAUGH, J.).

Indeed, at oral argument, the Government refused to commit to obeying any court order issued by a Federal Court of Appeals holding the Citizenship Order unlawful (except with respect to the plaintiffs in the suit), even within the relevant Circuit. Tr. of Oral Arg. 61–63. To the extent the Government cannot commit to compliance with Court of Appeals decisions in those Circuits, it offers no principled reason why it would treat the opinions of this Court any differently nationwide. Thus, by stripping even itself of the ability to issue universal injunctions, the Court diminishes its role as "the ultimate decider of the interim [and permanent] legal status of major new federal statutes and executive actions." *Ante*, at 3 (opinion of KAVANAUGH, J.).

There is a serious question, moreover, whether this Court will ever get the chance to rule on the constitutionality of a policy like the Citizenship Order. Contra, *ante*, at 6 (opinion of KAVANAUGH, J.) ("[T]he losing parties in the courts of appeals will regularly come to this Court in matters involving major new federal statutes and executive actions"). In the ordinary course, parties who prevail in the lower courts generally cannot seek review from this Court, likely leaving it up to the Government's discretion whether a petition will

42                    TRUMP *v.* CASA, INC.

be filed here.[10]  These cases prove the point:  Every court to consider the Citizenship Order's merits has found that it is unconstitutional in preliminary rulings.  Because respondents prevailed on the merits and received universal injunctions, they have no reason to file an appeal.  The Government has no incentive to file a petition here either, because the outcome of such an appeal would be preordained.  The Government recognizes as much, which is why its emergency applications challenged only the scope of the preliminary injunctions.

Even accepting that this Court will get the opportunity to "ac[t] as the ultimate decider" of patently unlawful policies, *ante,* at 3 (opinion of KAVANAUGH, J.), and that the Executive Branch will treat this Court's opinions as *de facto* universal injunctions,[11] it is still necessary for the lower courts to have the equitable authority to issue universal injunctions, too.  As JUSTICE KAVANAUGH notes, it can take, at a minimum, "*weeks*" for an application concerning a major

───────────

[10] On rare occasion, this Court has permitted a party who prevailed in the lower courts nonetheless to obtain this Court's review of a legal question.  See, *e.g.*, *Camreta* v. *Greene*, 563 U. S. 692, 698 (2011) (allowing a government official who prevailed on grounds of qualified immunity to challenge an underlying adverse constitutional ruling).  Those exceptions have no relevance here, however, because there is no adverse determination for respondents to challenge.

[11] The majority insists that the constitutionality of the Citizenship Order will come before this Court eventually and that, when it does, the Government will obey this Court's resulting opinion with respect to all newborn children.  *Ante,* at 25, n. 18.  Why?  The majority is sure that the Government will honor its oral-argument promises to "'seek cert'" when it "'lose[s] one of'" its pending appeals and to "respect both the judgments and opinions of this Court."  *Ibid.* (quoting Tr. of Oral Arg. 50).  The majority's certainty that the Government will keep its word is nothing short of a leap of faith, given that the Government has adopted a plainly unconstitutional policy in defiance of this Court's precedent and then gamed the system to stymie this Court's consideration of the policy's merits.  In any event, the Government's promise is cold comfort to the many children whose parents do not file a lawsuit and whose citizenship status remains in flux pending this Court's review.

new policy to reach this Court. *Ibid.* In the interim, the Government may feel free to execute illegal policies against nonparties and cause immeasurable harm that this Court may never be able to remedy. Indeed, in these cases, there is a serious risk the Government will seek to deport new-borns whose parents have not filed suit if all the injunctions are narrowed on remand. That unconscionable result only underscores why it is necessary, in some cases, for lower courts to issue universal injunctions.

Fortunately, in the rubble of its assault on equity juris-diction, the majority leaves untouched one important tool to provide broad relief to individuals subject to lawless Government conduct: Rule 23(b)(2) class actions for injunctive relief. That mechanism may provide some relief, but it is not a perfect substitute for a universal injunction. First, a named plaintiff must incur the higher cost of pursuing class relief, which will involve, at a minimum, overcoming the hurdle of class certification. "'[D]emonstrating th[e] pre-requisites'" of numerosity, commonality and typicality and the adequacy of the named plaintiff to represent the class "'is difficult and time consuming and has been getting harder as a result of recent court decisions and federal leg-islation.'" *Chicago* v. *Barr*, 961 F. 3d 882, 917 (CA7 2020) (quoting A. Frost, In Defense of Nationwide Injunctions, 93 N. Y. U. L. Rev. 1065, 1096 (2018); alterations in original). "'Courts have heightened the evidentiary standard for class certification'" as well, "'requiring hearings and sometimes significant amounts of evidence on the merits of the class before certifying the class.'" 961 F. 3d, at 917. In recent years, moreover, "'courts have started to deny class certi-fication if they think there has been a flaw in class defini-tion,'" sometimes "'without first allowing the plaintiffs to amend that definition in response to the court's concerns.'" *Ibid.* What is more, "'defendants can seek interlocutory re-view of a court's decision to certify a class, adding further delay and expense to the certification process.'" *Ibid.*

Hence why some "'describ[e] the class certification process as a "drawn-out procedural bog," which comes with significant expense and delay for the would be class member.'" *Ibid.* Indeed, at oral argument, the Government refused to concede that a class could be certified to challenge the Citizenship Order and promised to invoke Rule 23's barriers to stop it. See Tr. of Oral Arg. 31–32.

Nevertheless, the parents of children covered by the Citizenship Order would be well advised to file promptly class-action suits and to request temporary injunctive relief for the putative class pending class certification. See *A. A. R. P.*, 605 U. S., at ___ (slip op., at 7); *Califano*, 442 U. S., at 701–703; see also *ante,* at 1–2 (opinion of KAVANAUGH, J.) (recognizing that lower courts, in some circumstances, can "award preliminary classwide relief that may . . . be statewide, regionwide, or even nationwide"). For suits challenging policies as blatantly unlawful and harmful as the Citizenship Order, moreover, lower courts would be wise to act swiftly on such requests for relief and to adjudicate the cases as quickly as they can so as to enable this Court's prompt review.

\*   \*   \*

The rule of law is not a given in this Nation, nor any other. It is a precept of our democracy that will endure only if those brave enough in every branch fight for its survival. Today, the Court abdicates its vital role in that effort. With the stroke of a pen, the President has made a "solemn mockery" of our Constitution. *Peters*, 5 Cranch, at 136. Rather than stand firm, the Court gives way. Because such complicity should know no place in our system of law, I dissent.

# SUPREME COURT OF THE UNITED STATES

————

No. 24A884

————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* CASA, INC., ET AL.

ON APPLICATION FOR PARTIAL STAY

————

No. 24A885

————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* WASHINGTON, ET AL.

ON APPLICATION FOR PARTIAL STAY

————

No. 24A886

————

## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEW JERSEY, ET AL.

ON APPLICATION FOR PARTIAL STAY

[June 27, 2025]

JUSTICE JACKSON, dissenting.

I agree with every word of JUSTICE SOTOMAYOR's dissent. I write separately to emphasize a key conceptual point: The Court's decision to permit the Executive to violate the Constitution with respect to anyone who has not yet sued is an existential threat to the rule of law.

It is important to recognize that the Executive's bid to vanquish so-called "universal injunctions" is, at bottom, a request for this Court's permission to engage in unlawful behavior. When the Government says "do not allow the lower courts to enjoin executive action universally as a remedy for unconstitutional conduct," what it is actually saying

JACKSON, J., dissenting

is that the Executive wants to continue doing something that a court has determined violates the Constitution— please allow this. That is some solicitation. With its ruling today, the majority largely grants the Government's wish. But, in my view, if this country is going to persist as a Nation of laws and not men, the Judiciary has no choice but to deny it.

Stated simply, what it means to have a system of government that is bounded by law is that everyone is constrained by the law, no exceptions. And for that to actually happen, courts must have the power to order everyone (including the Executive) to follow the law—full stop. To conclude otherwise is to endorse the creation of a zone of lawlessness within which the Executive has the prerogative to take or leave the law as it wishes, and where individuals who would otherwise be entitled to the law's protection become subject to the Executive's whims instead.

The majority cannot deny that our Constitution was designed to split the powers of a monarch between the governing branches to protect the People. Nor is it debatable that the role of the Judiciary in our constitutional scheme is to ensure fidelity to law. But these core values are strangely absent from today's decision. Focusing on inapt comparisons to impotent English tribunals, the majority ignores the Judiciary's foundational duty to uphold the Constitution and laws of the United States. The majority's ruling thus not only diverges from first principles, it is also profoundly dangerous, since it gives the Executive the go-ahead to sometimes wield the kind of unchecked, arbitrary power the Founders crafted our Constitution to eradicate. The very institution our founding charter charges with the duty to ensure universal adherence to the law now requires judges to shrug and turn their backs to intermittent lawlessness. With deep disillusionment, I dissent.

JACKSON, J., dissenting

## I

To hear the majority tell it, this suit raises a mind-numbingly technical query: Are universal injunctions "sufficiently 'analogous' to the relief issued 'by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act'" to fall within the equitable authority Congress granted federal courts in the Judiciary Act of 1789? *Ante*, at 6. But that legalese is a smokescreen. It obscures a far more basic question of enormous legal and practical significance: May a federal court in the United States of America order the Executive to follow the law?

### A

To ask this question is to answer it. In a constitutional Republic such as ours, a federal court has the power to order the Executive to follow the law—and it must. It is axiomatic that the Constitution of the United States and the statutes that the People's representatives have enacted govern in our system of government. Thus, everyone, from the President on down, is bound by law. By duty and nature, federal courts say what the law is (if there is a genuine dispute), and require those who are subject to the law to conform their behavior to what the law requires. This is the essence of the rule of law.

Do not take my word for it. Venerated figures in our Nation's history have repeatedly emphasized that "[t]he essence of our free Government is 'leave to live by no man's leave, underneath the law'—to be governed by those impersonal forces which we call law." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 654 (1952) (R. Jackson, J., concurring). "Our Government is fashioned to fulfill this concept so far as humanly possible." *Id.*, at 654–655. Put differently, the United States of America has "'"a government of laws and not of men."'" *Cooper* v. *Aaron*, 358 U. S. 1, 23 (1958) (Frankfurter, J., concurring) (quoting *United States*

v. *Mine Workers*, 330 U. S. 258, 307 (1947) (Frankfurter, J., concurring in judgment)); see also, *e.g.*, Mass. Const., pt. 1, Art. XXX (1780), in 3 Federal and State Constitutions 1893 (F. Thorpe ed. 1909) (J. Adams); *Marbury* v. *Madison*, 1 Cranch 137, 163 (1803) (Marshall, C. J., for the Court); *United States* v. *Dickson*, 15 Pet. 141, 162 (1841) (Story, J., for the Court).

That familiar adage is more than just mere "'rhetorical flourish.'" *Cooper*, 358 U. S., at 23. It is "'the rejection in positive terms of rule by fiat, whether by the fiat of governmental or private power.'" *Ibid.* Indeed, "constitutionalism has one essential quality: it is a legal limitation on government; it is the antithesis of arbitrary rule; its opposite is despotic government, the government of will instead of law." C. McIlwain, *Constitutionalism*: Ancient and Modern 21–22 (rev. ed. 1947); see also *id.*, at 21 ("All constitutional government is by definition limited government").

Those who birthed our Nation limited the power of government to preserve freedom. As they knew all too well, "constant experience shows us that every man invested with power is apt to abuse it, and to carry his authority as far as it will go." Montesquieu, The Spirit of Laws, in 38 Great Books of the Western World 69 (T. Nugent transl., R. Hutchins ed. 1952). But the Founders reasoned that the vice of human ambition could be channeled to prevent the country from devolving into despotism—ambition could be "made to counteract ambition." The Federalist No. 51, p. 322 (C. Rossiter ed. 1961) (J. Madison). If there were, say, a Constitution that divided power across institutions "in such a manner as that each may be a check on the other," then it could be possible to establish Government by and for the People and thus stave off autocracy. *Ibid.*; see also *Myers* v. *United States*, 272 U. S. 52, 293 (1926) (Brandeis, J., dissenting) ("The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power").

JACKSON, J., dissenting

Through such separated institutions, power checks power. See Montesquieu, The Spirit of Laws, at 69. Our system of institutional checks thus exists for a reason: so that "the private interest of every individual may be a sentinel over the public rights." The Federalist No. 51, at 322.

### B

The distribution of power between the Judiciary and the Executive is of particular importance to the operation of a society governed by law. Made up of "'free, impartial, and independent'" judges and justices, the Judiciary checks the political branches of Government by explaining what the law is and "securing obedience" with it. *Mine Workers*, 330 U. S., at 308, 312 (opinion of Frankfurter, J.); see *Marbury*, 1 Cranch, at 177. The federal courts were thus established "not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government." *United States* v. *Lee*, 106 U. S. 196, 220 (1882).

Quite unlike a rule-of-kings governing system, in a rule-of-law regime, nearly "[e]very act of government may be challenged by an appeal to law." *Cooper*, 358 U. S., at 23 (opinion of Frankfurter, J.). In this country, the Executive does not stand above or outside of the law. Consequently, when courts are called upon to adjudicate the lawfulness of the actions of the other branches of Government, the Judiciary plays "an essential part of the democratic process." *Mine Workers*, 330 U. S., at 312. Were it otherwise—were courts unable or unwilling to command the Government to follow the law—they would "sanctio[n] a tyranny" that has no place in a country committed to "well-regulated liberty and the protection of personal rights." *Lee*, 106 U. S., at 221. It is law—and "'Law alone'"—that "'saves a society from being rent by internecine strife or ruled by mere brute power however disguised.'" *Cooper*, 358 U. S., at 23 (quoting *Mine Workers*, 330 U. S., at 308).

6                    TRUMP *v.* CASA, INC.

JACKSON, J., dissenting

The power to compel the Executive to follow the law is particularly vital where the relevant law is the Constitution. When the Executive transgresses an Act of Congress, there are mechanisms through which Congress can assert its check against the Executive unilaterally—such as, for example, asserting the power of the purse. See K. Stith, Congress' Power of the Purse, 97 Yale L. J. 1343, 1360 (1988) (describing Congress's ability to "regulat[e] executive branch activities by limitations on appropriations"). But when the Executive violates the Constitution, the only recourse is the courts. Eliminate that check, and our government ceases to be one of "limited powers." *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991). After all, a limit that "do[es] not confine the perso[n] on whom [it is] imposed" is no limit at all. *Marbury*, 1 Cranch, at 176.[1]

## II

With that background, we can now turn to this suit and

_____

[1] These foundational separation-of-powers principles are, of course, the doctrinal underpinnings of the observations I make in Parts II and III, *infra*. If my point is "difficult to pin down," *ante*, at 22, that could be due to the majority's myopic initial framing—it casts today's emergency applications as being solely about the scope of judicial authority, while ignoring (or forgetting) the concomitant expansion of executive power that results when the equitable remedial power of judges is needlessly restricted. Or perhaps the culprit is the majority's threshold decision to rest its holding solely on the Judiciary Act, *ante*, at 5, n. 4, thereby facilitating its convenient sidestepping of the startling constitutional implications that follow from blanket limitations on the Judiciary's response to the Executive's lawlessness. Whatever the source of the majority's confusion, there is no question that its statutory holding restricting the traditional equitable power of federal courts to craft a suitable remedy for established (or likely) constitutional violations has significant ramifications for the separation of powers and for constitutional rights more broadly. JUSTICE SOTOMAYOR thoroughly explains why restricting judges in this manner is legally and historically unfounded. My goal is to highlight the myriad ways in which the majority's newly minted no-universal-injunctions limitation also subverts core constitutional norms and is fundamentally incompatible with the rule of law.

focus on the ways in which the majority's ruling undermines our constitutional system. JUSTICE SOTOMAYOR has laid out the relevant facts, see *ante*, at 9–13 (dissenting opinion), and I will not repeat what she has said. It suffices for my purposes to reiterate that, before these applications arrived here, three District Courts had concluded that Executive Order No. 14160—which attempts to alter the Constitution's express conferral of citizenship on all who are born in this Nation, Amdt. 14, §1—likely violates the Constitution. Those courts each thus enjoined the Executive from enforcing that order anywhere, against anyone. See 763 F. Supp. 3d 723 (Md. 2025), appeal pending, No. 25–1153 (CA4); 765 F. Supp. 3d 1142 (WD Wash. 2025), appeal pending, No. 25–807 (CA9); *Doe* v. *Trump*, 766 F. Supp. 3d 266 (Mass. 2025), appeal pending, No. 25–1170 (CA1). Three Courts of Appeals then declined to upset these injunctions during the pendency of the Government's appeals. See 2025 WL 654902 (CA4, Feb. 28, 2025); 2025 WL 553485 (CA9, Feb. 19, 2025); 131 F. 4th 27 (CA1 2025).

The majority now does what none of the lower courts that have considered Executive Order No. 14160 would do: It allows the Executive's constitutionally dubious mandate to go into effect with respect to anyone who is not already a plaintiff in one of the existing legal actions. Notably, the Court has *not* determined that any of the lower courts were *wrong* about their conclusion that the executive order likely violates the Constitution—the Executive has not asked us to rule on the lawfulness of Executive Order No. 14160. But the majority allows the Executive to implement this order (which lower courts have so far uniformly declared likely unconstitutional) nonetheless.

Given the critical role of the Judiciary in maintaining the rule of law, see Part I, *supra*, it is odd, to say the least, that the Court would grant the Executive's wish to be freed from the constraints of law by prohibiting district courts from ordering complete compliance with the Constitution. But the

JACKSON, J., dissenting

majority goes there.  It holds that, even assuming that Executive Order No. 14160 violates the Constitution, federal courts lack the power to prevent the Executive from continuing to implement that unconstitutional directive.

As I understand the concern, in this clash over the respective powers of two coordinate branches of Government, the majority sees a power grab—but not by a presumably lawless Executive choosing to act in a manner that flouts the plain text of the Constitution.  Instead, to the majority, the power-hungry actors are . . . (wait for it) . . . the district courts.  See *ante*, at 1 (admonishing district courts for daring to "asser[t] the power" to order the Executive to follow the law universally).  In the majority's view, federal courts only have the power to "afford the plaintiff complete relief" in the cases brought before them; they can do nothing more. *Ante*, at 16.  And the majority thinks a so-called universal injunction—that is, a court order requiring the Executive to follow the law across the board and not just with respect to the plaintiff—"grant[s] relief to nonparties."  See *ante*, at 6–8.  Therefore, the majority reasons, issuing such orders exceeds district courts' authority.  See *ante*, at 21.

So many questions arise.[2]  The majority's analysis is fully

─────────

[2]Although I will not spend much space discussing it here, the majority's primary premise—that universal injunctions "grant relief to nonparties"—is suspect.  When a court issues an injunction (universal or otherwise), it does so via an order that governs the relationship between the plaintiff and the defendant.  Fed. Rule Civ. Proc. 65(d).  That order provides the plaintiff with *relief*: If the plaintiff believes that the defendant has violated the court's order, she may come back to court, injunction in hand, and demand enforcement or compensation through the mechanism of civil contempt.  See *Longshoremen* v. *Philadelphia Marine Trade Assn.*, 389 U. S. 64, 75 (1967) (recognizing that an "injunction" is "an equitable decree compelling obedience under the threat of contempt").  As the majority recognizes, nonparties may benefit from an injunction a court issues in a plaintiff's case.  See *ante*, at 16.  But that does not mean those incidental beneficiaries have received relief—"the injunction's pro-

interrogated, and countered, in JUSTICE SOTOMAYOR's dissent. My objective is to expose the core conceptual fallacy underlying the majority's reasoning, which, to me, also tends to demonstrate why, and how, today's ruling threatens the rule of law.

The pillar upon which today's ruling rests is the majority's contention that the remedial power of the federal courts is limited to granting "complete relief" to the parties. *Ante*, at 15–16. And the majority's sole basis for that prop-

———————

tection" (*i.e.*, the ability to seek contempt) "extends only to the suing plaintiff." *Ante*, at 17.

An injunction prohibiting the Executive from acting unlawfully operates precisely the same way. Such an injunction may benefit nonparties as a practical matter—but only the named plaintiffs have the right to return to the issuing court and seek contempt, if the Executive fails to comply. See *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 444–445 (1911) ("Proceedings for civil contempt are between the original parties"); *Buckeye Coal & R. Co.* v. *Hocking Valley R. Co.*, 269 U. S. 42, 48–49 (1925) (holding that a nonparty injured by the defendant's noncompliance with an injunction could not enforce the injunction); cf. *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 750 (1975) ("[A] consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it"). So, the majority's concern that universal injunctions inappropriately grant "relief" to nonparties is incorrect. Nonparties may *benefit* from an injunction, but only the plaintiff gets *relief*.

Federal Rule of Civil Procedure 71 is not to the contrary. Contra, *ante*, at 15, n. 11. At most, that rule and the cases the majority cites suggest that, in certain narrow circumstances, a nonparty for whose benefit an injunction was issued may be able to go to the issuing court and seek contempt. But "the precise contours of Rule 71 . . . remain unclear," *Beckett* v. *Air Line Pilots Assn.*, 995 F. 2d 280, 287–288 (CADC 1993), and courts have largely recognized that, to the extent nonparty enforcement of an injunction is available, the nonparty must stand in a close relationship to the plaintiff or have been specifically named in the injunction. See *United States* v. *American Soc. of Composers, Authors, and Publishers*, 341 F. 2d 1003, 1008 (CA2 1965) (nonparty could not enforce injunction where it was "not . . . named in the judgment" even though it was "indirectly or economically benefited by the decree").

10                    TRUMP *v.* CASA, INC.

osition is the practice of the High Court of Chancery in Eng-
land. *Ante*, at 6–7. But this cramped characterization of
the Judiciary's function is highly questionable when it
comes to suits against the Executive. That is, even if the
majority is correct that courts in England at the time of the
founding were so limited—and I have my doubts, see *ante*,
at 18–20 (SOTOMAYOR, J., dissenting)—why would courts in
*our* constitutional system be limited *in the same way*?

The Founders of the United States of America squarely
rejected a governing system in which the King ruled all, and
all others, including the courts, were his subordinates. In
our Constitution-centered system, the People are the rulers
and we have the rule of law. So, it makes little sense to look
to the relationship between English courts and the King for
guidance on the power of our Nation's Judiciary vis-à-vis its
Executive. See The Federalist No. 69, at 416 (A. Hamilton)
(explaining how the President differs from the King, includ-
ing because "[t]he person of the King of Great Britain is sa-
cred and inviolable; there is no constitutional tribunal to
which he is amenable"). Indeed, it is precisely because the
law constrains the Government in our system that the Ju-
diciary's assignment is so broad, per the Constitution. Fed-
eral courts entertain suits against the Government claim-
ing constitutional violations. Thus, the function of the
courts—both in theory and in practice—necessarily in-
cludes announcing what the law requires in such suits for
the benefit of all who are protected by the Constitution, not
merely doling out relief to injured private parties.

Put differently, the majority views the Judiciary's power
through an aperture that is much too small, leading it to
think that the *only* function of our courts is to provide "com-
plete relief" to private parties. Sure, federal courts do that,
and they do it well. But they *also* diligently maintain the
rule of law itself. When it comes to upholding the law, fed-
eral courts ensure that all comers—*i.e.*, everyone to whom

JACKSON, J., dissenting

the law applies and over whom the court has personal jurisdiction (including and perhaps especially the Executive)—know what the law is and, most important, follow it.[3]

## III

Still, upon reading the Court's opinion, the majority's foundational mistake in mischaracterizing the true scope and nature of a federal court's power might seem only marginally impactful. Indeed, one might wonder: Why all the fuss? After all, the majority recognizes that district courts can still issue universal injunctions in some circumstances. See *ante*, at 16–18. It even acknowledges that the lower

_____

[3] No one is saying that the reasoning of a district court's opinion, on its own, "has the legal force of a judgment," *ante*, at 22; of course it does not. The real issue today's applications raise is whether district-court opinions are entitled to respect while litigation over the lawfulness of the defendant's conduct is ongoing. As I have explained, the majority's key move is to start by assuming that the remedial power of federal courts is quite narrow (*i.e.*, it is only appropriately exercised to grant "complete relief" to the parties). *Ante*, at 5–11, 16. The majority forgets (or ignores) that federal courts also make pronouncements of law and issue orders compelling compliance if violations are identified. Then, having zeroed in on solely the courts' plaintiff-specific-remedies function, the majority unsurprisingly insists that a district court cannot respond to the Executive's decision to violate the law universally by issuing an order compelling universal cessation of the Executive's unlawful behavior. This kind of broad injunction is merely one tool in a judge's kit of remedial options—one that is directly responsive to the court's duty to uphold the law and the Executive's decision to consciously violate it—and it is no more or less binding than any of the district court's other determinations. So, rather than disdainfully securing permission to disregard the district court's opinion and continue engaging in unlawful conduct vis-à-vis anyone who is not the plaintiff, an enjoined Executive that believes the district court was wrong to conclude that its behavior is unlawful has a rule-of-law-affirming response at the ready: It can seek expedited review of the merits on appeal. District courts themselves also have the flexibility to stay their injunctions pending appeal, if that is requested and the circumstances demand it. But rather than permit lower courts to adapt their remedies to the particulars of a given case, the majority today ties judges' hands, requiring them to acquiesce to executive lawlessness in every situation.

courts may reimpose the same universal injunctions at is-
sue in *these* cases, if the courts find on remand that doing
so is necessary to provide complete relief to the named
plaintiffs. See *ante*, at 19. From the standpoint of out-
comes, that's all welcome news. But, as I explain below,
from the perspective of constitutional theory and actual
practice, disaster looms.

What I mean by this is that our rights-based legal system
can only function properly if the Executive, and everyone
else, is *always* bound by law. Today's decision is a seismic
shock to that foundational norm. Allowing the Executive to
violate the law at its prerogative with respect to anyone
who has not yet sued carves out a huge exception—a gash
in the basic tenets of our founding charter that could turn
out to be a mortal wound. What is more, to me, requiring
courts themselves to provide the dagger (by giving their *im-
primatur* to the Executive Branch's intermittent lawless-
ness) makes a mockery of the Judiciary's solemn duty to
safeguard the rule of law.

### A

Do remember: The Executive has not asked this Court to
determine whether Executive Order No. 14160 complies
with the Constitution. Rather, it has come to us seeking
the right to continue enforcing that order *regardless*—*i.e.*,
even though six courts have now said the order is likely un-
constitutional. What the Executive wants, in effect, is for
this Court to bless and facilitate its desire to operate in two
different zones moving forward: one in which it is required
to follow the law (because a particular plaintiff has secured
a personal injunction prohibiting its unlawful conduct), and
another in which it can choose to violate the law with re-
spect to certain people (those who have yet to sue).

In the first zone, law reigns. For the named plaintiffs in
the suits before us, for example, the lower courts' determi-

nation that Executive Order No. 14160 is likely unconstitutional and cannot be implemented has teeth. Per the courts' orders, the Executive is prohibited from denying citizenship to the offspring of the named plaintiffs. See *ante*, at 26 (leaving the injunctions in place to the extent "necessary to provide complete relief to each plaintiff with standing to sue"). Within this zone, the courts' rule of decision—that Executive Order No. 14160 is likely unconstitutional—applies.

But with its ruling today, the majority endorses the creation of a second zone—one in which that rule of decision has no effect. In this zone, which is populated by those who lack the wherewithal or ability to go to court, all bets are off. There is no court-issued mandate requiring the Executive to honor birthright citizenship in compliance with the Constitution, so the people within this zone are left to the prerogatives of the Executive as to whether their constitutional rights will be respected. It does not matter what six federal courts have said about Executive Order No. 14160; those courts are powerless to make the Executive stop enforcing that order altogether. In effect, then, that powerlessness creates a void that renders the Constitution's constraints irrelevant to the Executive's actions. Of course, the Executive *might* choose to follow the law in this zone as well—but that is left to its discretion. And the Solicitor General has now confirmed that, in the absence of a personal injunction secured by a particular plaintiff, this Executive's view is that compliance with lower court rulings on matters of constitutional significance is optional.[4]

---

[4]The Solicitor General said that quiet part out loud by baldly asserting that the Executive reserves the right to defy Circuit precedent. Tr. of Oral Arg. 33–34, 60–61. Although he further suggested that the administration would abide by precedent from *this* Court in future similar cases, *id.*, at 35, 63, even that seems to be a matter of prerogative, as there is no inherent limit to the limited-scope-of-authority logic that underlies today's holding, see *ante*, at 41 (SOTOMAYOR, J., dissenting). The

14            TRUMP *v.* CASA, INC.

JACKSON, J., dissenting

I am not the first to observe that a legal system that operates on two different tracks (one of which grants to the Executive the prerogative to disregard the law) is anathema to the rule of law.[5] Thus, the law-free zone that results from this Court's near elimination of universal injunctions is not an unfamiliar archetype. Also eerily echoing history's horrors is the fact that today's prerogative zone is unlikely to impact the public in a randomly distributed manner. Those in the good graces of the Executive have nothing to fear; the new prerogative that the Executive has to act unlawfully will not be exercised with respect to *them*. Those who accede to the Executive's demands, too, will be in the clear. The wealthy and the well connected will have little difficulty securing legal representation, going to court, and obtaining injunctive relief in their own name if the Executive violates their rights.

Consequently, the zone of lawlessness the majority has now authorized will disproportionately impact the poor, the

——————

Executive's less-than-sterling record of compliance with Supreme Court rulings to date casts further doubt on this compliance claim; as JUSTICE SOTOMAYOR has explained, the Executive Order at issue here seems to squarely violate at least one—and perhaps five—of our bedrock precedents. See *ante,* at 7–9 (dissenting opinion).

[5]See E. Fraenkel, The Dual State, pp. xiii, 3, 71 (1941) (describing the way in which the creation of a "Prerogative State" where the Executive "exercises unlimited arbitrariness . . . unchecked by any legal guarantees" is incompatible with the rule of law); see also J. Locke, Second Treatise of Civil Government 13 (J. Gough ed. 1948) ("[F]reedom of men under government is to have a standing rule to live by, common to every one of that society . . . and not to be subject to the . . . arbitrary will of another man"); The Federalist No. 26, p. 169 (C. Rossiter ed. 1961) (A. Hamilton) (contrasting the monarch's "prerogative" with the emergence of "liberty"); *Myers* v. *United States,* 272 U. S. 52, 295 (1926) (Brandeis, J., dissenting) ("[P]rotection of the individual . . . from the arbitrary or capricious exercise of power [is] an essential of free government"); *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 641 (1952) (R. Jackson, J., concurring) (observing that our Constitution—which embodies the rule of law—does not grant to the Executive the "prerogative exercised by George III").

uneducated, and the unpopular—*i.e.*, those who may not have the wherewithal to lawyer up, and will all too often find themselves beholden to the Executive's whims. This is yet another crack in the foundation of the rule of law, which requires "equality and justice in its application." *Papachristou* v. *Jacksonville*, 405 U. S. 156, 171 (1972). In the end, though, everyone will be affected, because it is law's evenhanded application—"to minorities as well as majorities, to the poor as well as the rich"—that "holds society together." *Ibid.*

The majority "skips over" these consequences. *Ante*, at 23. No one denies that the power of federal courts is limited—both by the Constitution and by Congress. But the majority seems to forget (or ignores) that the Constitution and Congress also limit the power of the Executive. In addition, it is indisputable that the Executive's power to leverage physical force in a manner that directly threatens to deprive people of life, liberty, or property creates uniquely harmful risks when unconstrained by law. But the majority today roots its holding in a purported statutory limitation, not a constitutional one. *Ante*, at 5, n. 4. And, as I have explained, our Constitution gives federal courts the authority to order the Executive to stop acting unlawfully. See Part I, *supra*. To the extent Congress has attempted to strip federal courts of that power via the Judiciary Act (and, to be clear, I do not think it has, for the reasons JUSTICE SOTOMAYOR discusses, see *ante*, at 23–31), it is powerless to do so.

The bottom line is this: If courts do not have the authority to require the Executive to adhere to law universally, a dual-track system develops in which courts are ousted as guardians in some situations and compliance with law sometimes becomes a matter of executive prerogative. But "[t]here can be no free society without law administered through an independent judiciary." *Mine Workers*, 330 U. S., at 312 (opinion of Frankfurter, J.). "If one man"—

16                    TRUMP *v.* CASA, INC.

even a very important man, and even a democratically elected man—"can be allowed to determine for himself what is law, every man can. That means first chaos, then tyranny." *Ibid.*

### B

This leads me to another potentially destructive aspect of today's decision—the Court's dismissive treatment of the solemn duties and responsibilities of the lower courts. Sworn judicial officers must now put on blinders and take a see-no-evil stance with respect to harmful executive conduct, even though those same officials have already announced that such conduct is likely unconstitutional. Yes, certain named plaintiffs have brought particular lawsuits seeking protection of their legal rights. But their claim is that Executive Order No. 14160 violates the Constitution. If the court agrees with them, why on Earth must it permit that unconstitutional government action to take effect at all?

I have already explained why the majority's answer—because the court is powerless to do anything but give "complete relief" to those parties—is wrong in terms of the actual scope of federal courts' authority. See Part I, *supra.* I now observe that this response also erroneously suggests that a court does something wrongful when it imposes a universal injunction in a single plaintiff's lawsuit—akin to giving a windfall to those who do not deserve the law's protection because *they* have not sued. *Ante,* at 8–9, 12–15. This way of conceptualizing universal injunctions mistakes that remedy for the unearned spoils of particular adversarial engagements, rather than a necessary tool employed to defend the Constitution by reinforcing pre-existing rights.

Here is what I mean. Our Constitution indisputably con-

fers individual rights that operate as unequivocal protections against government action.[6] Thus, a constrained Executive—*i.e.*, one who is bound by the Constitution not to violate people's rights—is a public benefit, guaranteed to all from the start, without regard to the nature or existence of any particular enforcement action.[7] Properly understood, then, when the Executive violates those pre-existing rights in a nonparticularized manner, a universal injunction merely restores what the People were always owed; that remedy does *not* improperly distribute an unearned benefit to those who did not have the temerity to secure it for themselves by filing a lawsuit.

Or consider it the other way: When a court is prevented from enjoining the Executive universally after the Executive establishes a universal practice of stripping people's constitutional rights, anyone who is entitled to the Constitution's protection but will instead be subjected to the Executive's whims is improperly divested of their inheritance. The Constitution is flipped on its head, for its promises are essentially nullified.[8] So, rather than having a governing

———————

[6] See, *e.g.*, Amdt. 1 (prohibiting the government from preventing the "free exercise" of religion or "abridging the freedom of speech"); Amdt. 2 (prohibiting the government from infringing on the right "to keep and bear Arms"); Amdt. 4 (prohibiting the government from conducting "unreasonable searches and seizures"); Amdt. 5 (prohibiting the government from depriving persons of "life, liberty, or property, without due process of law").

[7] In this way of framing the issue, nonparties are more than mere "incidental" beneficiaries of universal injunctions that require the Executive to respect constitutional rights. See n. 2, *supra*. Rather, the very concept of constitutional rights makes the People *intended* beneficiaries of the constraints that the Constitution imposes on executive action.

[8] Again, the law binds the Executive from the outset in our constitutional scheme, for the benefit of all. See Part I, *supra*. Thus, a lawsuit is merely the vehicle that invokes the Judiciary's power to check the Executive by enforcing the law. The topsy-turvy scheme the majority creates today gets those well-established norms exactly backward: The law disappears as an initial constraint on the Executive, and apparently only

18                  TRUMP *v.* CASA, INC.

JACKSON, J., dissenting

system characterized by protected rights, the default be-
comes an Executive that can do whatever it wants to whom-
ever it wants, unless and until each affected individual af-
firmatively invokes the law's protection.

A concrete example helps to illustrate why this turnabout
undermines the rule of law.  Imagine an Executive who is-
sues a blanket order that is blatantly unconstitutional—de-
manding, say, that any and all of its political foes be sum-
marily and indefinitely incarcerated in a prison outside the
jurisdiction of the United States, without any hearing or
chance to be heard in court.  Shortly after learning of this
edict, one such political rival rushes into court with his law-
yer, claims the Executive's order violates the Constitution,
and secures an injunction that prohibits the Executive from
enforcing that unconstitutional mandate.  The upshot of to-
day's decision is that, despite that rival's success in per-
suading a judge of the unconstitutional nature of the Exec-
utive's proclamation, the court's ruling and injunction can
*only* require the Executive to shelve any no-process incar-
ceration plan that targets *that particular individual* (the
named plaintiff); the Executive can keep right on rounding
up its other foes, despite the court's clear and unequivocal
pronouncement that the executive order is unlawful.

The majority today says that, unless and until the other
political rivals seek and secure their own personal injunc-
tions, the Executive can carry on acting unconstitutionally
with respect to each of them, as if the Constitution's due
process requirement does not exist.  For those who get to
court in time, their right not to be indefinitely imprisoned
without due process will be protected.  But if they are una-
ble to sue or get to the courthouse too late, the majority
says, oh well, there is nothing to be done, despite the fact

———————

exists if a particular plaintiff files a particular lawsuit in a particular
court, claiming his (particular) entitlement.

JACKSON, J., dissenting

that their detention without due process is plainly prohibited by law.

A Martian arriving here from another planet would see these circumstances and surely wonder: "*what good is the Constitution, then*?" What, really, is this system for protecting people's rights if it amounts to *this*—placing the onus on the victims to invoke the law's protection, and rendering the very institution that has the singular function of ensuring compliance with the Constitution powerless to prevent the Government from violating it? "Those things Americans call constitutional rights seem hardly worth the paper they are written on!"

These observations are indictments, especially for a Nation that prides itself on being fair and free. But, after today, that is where we are. What the majority has done is allow the Executive to nullify the statutory and constitutional rights of the uncounseled, the underresourced, and the unwary, by prohibiting the lower courts from ordering the Executive to follow the law across the board. Moreover, officers who have sworn an oath to uphold the law are now required to allow the Executive to blatantly violate it. Federal judges pledge to support and defend the Constitution of the United States against all enemies, foreign or domestic. 5 U. S. C. §3331. They do *not* agree to permit unconstitutional behavior by the Executive (or anyone else). But the majority forgets (or ignores) this duty, eagerly imposing a limit on the power of courts that, in essence, prevents judges from doing what their oaths require.[9]

_____
[9]The majority highlights a number of policy concerns that some say warrant restriction of the universal-injunction remedy. *Ante*, at 20–21. In my view, those downsides pale in comparison to the consequences of forcing federal courts to acquiesce to executive lawlessness. Moreover, and in any event, the various practical problems critics have identified are largely overblown. For example, while many accuse universal injunctions of preventing percolation, the facts of this very suit demonstrate otherwise: Three different District Courts each considered the merits of Executive Order No. 14160, and appeals are now pending in

20                    TRUMP *v.* CASA, INC.

JACKSON, J., dissenting

I view the demise of the notion that a federal judge can order the Executive to adhere to the Constitution—full stop—as a sad day for America.  The majority's unpersuasive effort to justify this result makes it sadder still.  It is the responsibility of each and every jurist to hold the line.  But the Court now requires judges to look the other way after finding that the Executive is violating the law, shamefully permitting unlawful conduct to continue unabated.

Today's ruling thus surreptitiously stymies the Judiciary's core duty to protect and defend constitutional rights.  It does this indirectly, by preventing lower courts from telling the Executive that it has to stop engaging in conduct that violates the Constitution.   Instead, now, a court's power to prevent constitutional violations comes with an asterisk—a court can make the Executive cease its unconstitutional conduct *but* only with respect to the particular plaintiffs named in the lawsuit before them, leaving the Executive free to violate the constitutional rights of anyone and everyone else.

—————

three Courts of Appeals.  See *supra*, at 7.  Other prudential concerns are better addressed in more targeted ways, such as by changing venue rules to prevent forum or judge shopping, or by encouraging lower courts to expedite their review, thereby teeing the merits up for this Court as quickly as possible.

That is not to say that universal injunctions can or should be issued in every case; a court must always fit its remedy to the particular case before it, and those particulars may caution against issuing universal relief in certain instances.  See *ante*, at 22–23 (SOTOMAYOR, J., dissenting).  But the Court today for the first time ever adopts a blanket authority-diminishing rule: It declares that courts do not have the power to exercise their equitable discretion to order the Executive to completely cease acting pursuant to an unlawful directive (unless doing so is necessary to provide complete relief to a given plaintiff ).  And, again, this very suit illustrates why that bright line rule goes much too far.  As JUSTICE SOTOMAYOR emphasizes, multiple courts have recognized that Executive Order No. 14160 is "patently unconstitutional under settled law," and those courts thus issued the relief necessary to "protect newborns from the exceptional, irreparable harm associated with losing a foundational constitutional right and its immediate benefits."  *Ibid.*

JACKSON, J., dissenting

\*     \*     \*

Make no mistake: Today's ruling allows the Executive to deny people rights that the Founders plainly wrote into our Constitution, so long as those individuals have not found a lawyer or asked a court in a particular manner to have their rights protected. This perverse burden shifting cannot co-exist with the rule of law. In essence, the Court has now shoved lower court judges out of the way in cases where executive action is challenged, and has gifted the Executive with the prerogative of sometimes disregarding the law. As a result, the Judiciary—the one institution that is solely responsible for ensuring our Republic endures as a Nation of laws—has put both our legal system, and our system of government, in grave jeopardy.

"The accretion of dangerous power does not come in a day." *Youngstown*, 343 U. S., at 594 (opinion of Frankfurter, J.). But "[i]t does come," "from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Ibid*. By needlessly granting the Government's emergency application to prohibit universal injunctions, the Court has cleared a path for the Executive to choose law-free action at this perilous moment for our Constitution—right when the Judiciary should be hunkering down to do all it can to preserve the law's constraints. I have no doubt that, if judges must allow the Executive to act unlawfully in some circumstances, as the Court concludes today, executive lawlessness will flourish, and from there, it is not difficult to predict how this all ends. Eventually, executive power will become completely uncontainable, and our beloved constitutional Republic will be no more.

Perhaps the degradation of our rule-of-law regime would happen anyway. But this Court's complicity in the creation of a culture of disdain for lower courts, their rulings, and the law (as they interpret it) will surely hasten the downfall

22                    TRUMP *v.* CASA, INC.

JACKSON, J., dissenting

of our governing institutions, enabling our collective demise. At the very least, I lament that the majority is so caught up in minutiae of the Government's self-serving, finger-pointing arguments that it misses the plot. The majority forgets (or ignores) that "[w]ith all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations." *Id.*, at 655 (opinion of R. Jackson, J.). Tragically, the majority also shuns this prescient warning: Even if "[s]uch institutions may be destined to pass away," "it is the duty of the Court to be last, not first, to give them up." *Ibid.*

# APPENDIX G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD ARJUN KAUL, *et al.*,

                                        Plaintiffs,

                        -v-

INTERCONTINENTAL EXCHANGE, *et al.*,

                                        Defendants.

                                        21-CV-6992 (JPO)

                                        ORDER

J. PAUL OETKEN, District Judge:

        Plaintiff Richard Arjun Kaul shall show cause as to why he should not be held in

contempt, pursuant to the motions at ECF Nos. 179, 180, 182, and 188 for violation of the

Court's September 22, 2022 and subsequent orders, at a hearing on **June 17, 2025 at 2:30 p.m.**

The hearing will take place in Courtroom 706, Thurgood Marshall United States Courthouse, 40

Foley Square, New York, New York.  Plaintiff Richard Arjun Kaul shall file any written

response to the motions for contempt on or before May 30, 2025, and such response shall not

exceed 30 double-spaced pages.

        SO ORDERED.

Dated:  May 8, 2025
        New York, New York

                                        _____
                                        J. PAUL OETKEN
                                        United States District Judge

The Clerk of Court is directed to mail a copy of this order to:

                Richard Arjun Kaul
                24 Washington Valley Road
                Morristown, NJ 07960

# APPENDIX H



400 Crossing Boulevard
8th Floor
P.O. Box 5933
Bridgewater, NJ 08807

T: 908-722-0700
F: 908-722-0755

.

Richard J. Birch, Esq.
Direct Dial: 908-252-4254
Email: rjbirch@norris-law.com

August 21, 2025

**Via Email and Certified Mail**
Richard Arjun Kaul, M.D.
drrichardkaul@gmail.com
41 Calla Avenue
Floral Park, NY 11001

Re:    **Richard Arjun Kaul, M.D. v. Center for Personalized Education for
Physicians, et al.
Civil Action No.: 1:21-cv-06992-JPO**

Dear Mr. Kaul:

This firm represents Defendant Robert Heary ("Defendant") in the above-referenced
matter. Please find the enclosed Joint Status Request Letter filed with the Court today, August 21,
2025, on behalf of all Defendants including Dr. Heary, Allstate Insurance Company, Federation
State Medical Boards, Christopher J. Christie and Daniel Stolz.

Please be guided accordingly. Thank you.

Very Truly Yours,

*s/Richard Birch*
Richard J. Birch, Esq.

RJB/mc
Encl.



BRIDGEWATER, NJ  |  NEW YORK, NY  |  ALLENTOWN, PA

WWW.NORRISMCLAUGHLIN.COM

12488897



400 Crossing Boulevard
8th Floor
P.O. Box 5933
Bridgewater, NJ 08807

T: 908-722-0700
F: 908-722-0755

**WRITER'S DIRECT DIAL & EMAIL ADDRESS**
**(908) 252-4166**
egsponzilli@norris-law.com

August 21, 2025

**Via ECF**
The Hon. J. Paul Oetken, U.S.D.J.
United States District Court, Southern District of New York
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

> **Re:** **Richard Arjun Kaul, M.D. v. Center for Personalized Education for Physicians, et al.**
> **Civil Action No.: 1:21-cv-06992-JPO**

Dear Judge Oetken:

This firm represents Defendant Robert Heary ("Dr. Heary") in the above-referenced matter. Please accept this correspondence as a joint letter on behalf of Defendants Dr. Heary, Allstate Insurance Company, Federation State Medical Boards, Christopher J. Christie and Daniel Stolz (collectively "Defendants").

As Your Honor will recall, Your Honor ordered on the return date of an Order to Show Cause on June 17, 2025, that Plaintiff Richard A. Kaul ("Plaintiff") be held in contempt for repeated violations of this Court's September 12, 2022, anti-filing injunction (the "Anti-Filing Injunction"). Your Honor stated the Court would enter an Order awarding Defendants attorneys' fees and costs for all matters filed by Plaintiff in violation of the Anti-Filing Injunction and that Defendants would be given sixty (60) days from the date of the Order to submit certifications detailing Defendants' attorneys' fees and costs. The Court further provided that Plaintiff would be given a final opportunity to avoid arrest and detention by withdrawing all cases filed in violation of the Anti-Filing Injunction. Enclosed is a copy of the transcript from the June 17, 2025, proceeding.

We write to respectfully request an update on the status of the above-mentioned Order. As Your Honor may be aware, Plaintiff has filed another lawsuit against Your Honor and the attorneys representing the Defendants in this matter. See, Kaul v. Oetken, et al., Civil Action No. 1:25-cv-06495.



The Hon. J. Paul Oetken, U.S.D.J.
August 20, 2025
Page 2

       In the alternative, and if the Court would prefer, Defendants will prepare and submit a proposed form of order for the Court's consideration.

       We thank the Court for its kind courtesies.

                     **Respectfully submitted,**

                     **NORRIS McLAUGHLIN, P.A.**
                     *Attorneys for Defendant, Robert Heary*
                     By: *s/Edward Sponzilli*
                     Edward Sponzilli, Esq.
                     400 Crossing Blvd., 8th Floor
                     Bridgewater, NJ 08807
                     Telephone: (908)-252-4166
                     Facsimile: (908)-722-0755
                     Email: egsponzilli@norris-law.com

                     **BALLARD SPAHR LLP**
                     *Attorneys for Defendant, Federation of State Medical Board*
                     By: *s/Patrick Compton*
                     Patrick G. Compton, Esq.
                     1909 K Street, NW, 12th Floor
                     Washington DC, 20006-1157
                     Telephone: (303)-454-0521
                     Facsimile: (202)-661-2299
                     Email: comptonp@ballardspahr.com

                     **McELROY DEUTSCH MULVANEY & CARPENTER LLP**
                     *Attorneys for Defendant, Christopher J. Christie*
                     By: *s/Paul Dwyer*
                     Paul E. Dwyer, Esq.
                     Metro East Office Park
                     117 Metro Center Blvd., Suite 1004
                     Warwick, RI 02886
                     Telephone: (401)-298-9010
                     Facsimile: (401)-921-2134
                     Email: pdwyer@mdmc-law.com

The Hon. J. Paul Oetken, U.S.D.J.
August 20, 2025
Page 3

**SAIBER, LLC**
*Attorneys for Defendant, Allstate Insurance Company*
By: *s/David D'Aloia*
David J. D'Aloia, Esq.
18 Columbia Turnpike, Suite 2002
Florham Park, NJ 07932
Telephone: (973)-645-4805
Facsimile: (973)-622-3349
Email: ddaloia@saiber.com

**PRO SE DEFENDANT**
By: *s/Daniel Stolz*
Daniel M. Stolz, Esq., *pro se*
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973)-645-4805
Facsimile: (973)-622-3349
Email: dstolz@wjslaw.com

Encl.
EGS/rjb
cc:    Richard A. Kaul, pro se (via Certified Mail & e-mail: drrichardkaul@gmail.com)

The Hon. J. Paul Oetken, U.S.D.J.
August 20, 2025
Page 4

P6HEKAUC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   M.D. RICHARD ARJUN KAUL, ET
     AL.,
 4
                    Plaintiffs,
 5
              v.                            21 Civ. 6992 (JPO)
 6
     INTERCONTINENTAL EXCHANGE, ET
 7   AL.,
                                            Conference
 8
                    Defendants.
 9
     ------------------------------x
10                                          New York, N.Y.
                                            June 17, 2025
11                                          2:30 p.m.

12   Before:

13                    HON. J. PAUL OETKEN,

14                                          District Judge

15                         APPEARANCES

16   SAIBER LLC
             Attorney for Defendant Allstate Insurance Company
17   BY:  GERI ALBIN

18   BALLARD SPAHR LLP
             Attorney for Defendant Federation State Medical Boards
19   BY:  JAY W. BROWN

20   NORRIS MCLAUGHLIN, PA
             Attorney for Defendant Robert Heary
21   BY:  EDWARD G. SPONZILLI

22   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
             Attorney for Defendant Christopher J. Cristie
23   BY:  PAUL E. DWYER, JR.

24

25
```

```
 1                    (Case called)

 2                    MS. ALBIN:  Good afternoon, your Honor.

 3                    Geri Albin for the Allstate defendants, from the

 4    Saiber law firm.

 5                    THE COURT:  Good afternoon.

 6                    MR. BROWN:  Good afternoon, your Honor.

 7                    Jay Brown from Ballard Spahr for the Federation.

 8                    THE COURT:  Good afternoon.

 9                    MR. SPONZILLI:  Good afternoon, your Honor.

10                    Edward G. Sponzilli with the law firm Norris

11    McLaughlin, on behalf of the defendant Robery Heary.

12                    THE COURT:  Good afternoon.

13                    MR. SPONZILLI:  Thank you, your Honor.

14                    THE DEPUTY CLERK:  And for defendant Christopher

15    Cristie.

16                    MR. DWYER:  Paul Dwyer, your Honor, from the law firm

17    McElroy, Deutsch, Mulvaney & Carpenter.

18                    THE COURT:  Good afternoon.

19                    I scheduled this in an order on May 8, 2025,

20    indicating in that May 8 order that plaintiff Richard Arjun

21    Kaul shall show cause as to why he should not be held in

22    contempt for a violation of the Court's order regarding filing

23    of certain lawsuits in federal courts, and I set the hearing

24    for in person today in this courtroom at this time.

25                    I understand that Richard Kaul, although he did file a
```

 1    response which is on the docket, he's not here.  I understand,

 2    Ms. Albin, you had some information from the Texas case about

 3    whether he would be here.

 4              And you can remain seated, just pull the mic close to

 5    you when you speak, if you would.

 6              You all can remain seated.

 7              MS. ALBIN:  Sure.  Absolutely.

 8              In our Southern District of Texas matter against

 9    Mr. Kaul, 4:25-1676, at ECF number 24 in a response to

10    Allstate's motion to dismiss, Plaintiff Kaul, in summary,

11    discussed his nonparticipation in what he calls the May 8 and

12    June 17, '25 events.  And that in summary, his nonparticipation

13    would be conspiring against himself and be disrespecting the

14    authority and power of the courts of the Fifth Circuit.

15              And I can quote if you want to hear specifically what

16    he said in his submission.  It's a little hard to understand

17    but I can read it to you.

18              THE COURT:  So, you said he said his participation

19    would -- his nonparticipation --

20              MS. ALBIN:  Yeah.  He would not be participating in

21    today's hearing, is basically what he said.

22              THE COURT:  So, he referred to this hearing --

23              MS. ALBIN:  So, he called the May 8 to June 17, 2025,

24    events, so I assume that's from the date of your order to the

25    date of today's events.

P6HEKAUC

1            THE COURT:  Okay.  Yeah, and if you could just read,

2    if you don't mind.

3            MS. ALBIN:  Sure.  This is from Mr. Kaul's submission:

4            On the point of my nonparticipation in the May 8 to

5    June 17, 2025, events, the law and my human civil

6    constitutional rights do prohibit me from any involvement in

7    any aspects of these crimes, crimes that are now part of the

8    "revocation cover-up conspiracy."  If I were to participate in

9    these offenses, violation, crimes, which I will not, I would be

10   complicit in the revocation cover-up conspiracy, would be

11   conspiring against myself, and would cause my human civil

12   constitutional rights any my legitimately admitted claims in

13   K1123 and K1127 to be undermined and possibly negated in their

14   entirety.  The inculcative effect of which would be a violation

15   of the authority, jurisdiction of the United States District

16   Court for the Southern District of Texas and Mississippi.

17           If I were to participate in these offenses, violation,

18   crimes, which I will not, the authority and power of the courts

19   within the Fifth Circuit would be further disrespected and

20   violated by the K1127 defendants and the K1123 defendant

21   Oetken.  A dangerous precedent would be set and would be at

22   complete odds with the admitted facts of K1123, defendant

23   Oetken, and the K1127 defendants.

24           Apologies for the pronunciation of your name if it's

25   incorrect.

P6HEKAUC

 1              THE COURT:  No, you did pretty well.

 2              MS. ALBIN:  So, I could keep going but -- would you

 3  like me to continue?

 4              THE COURT:  No, you don't need to.

 5              MS. ALBIN:  Okay.

 6              THE COURT:  So, just to be clear, that's in the Texas

 7  case, 25-CV-1676?

 8              MS. ALBIN:  That's correct.

 9              THE COURT:  So, that's pending in the Southern

10  District of Texas.

11              MS. ALBIN:  Correct.  And it's ECF number 24, page 18,

12  is the specific quote.

13              THE COURT:  Okay.  And that's one that's not been

14  dismissed or withdrawn, that case; is that right?

15              MS. ALBIN:  That's correct.  We have a motion to

16  dismiss fully briefed and pending, and a motion to stay also

17  pending in that court.

18              THE COURT:  All right.  He's also filed -- well, he's

19  filed various cases.  There's one in the District of North

20  Dakota which names me and I think a New York state medical

21  board.  I'm not sure who else, actually; it might be a

22  different board, and I'm not sure who else it names.  But he

23  emailed it yesterday to my chambers, the complaint in that case

24  in North Dakota.

25              So, just so the record is clear, this all relates to a

 1    filing injunction that I issued on or about September 12, 2022,

 2    which said the following, and this is on the docket:

 3            From the date of this opinion and order, Plaintiff

 4    Kaul is barred from filing in any United States District Court

 5    any action, motion, petition, complaint, or request for relief

 6    against any of the defendants named in this litigation that

 7    relates to or arises from the denial of his medical license.

 8            And then it continues:

 9            Without first obtaining leave from this Court.

10            So, I have before me a joint motion by certain

11    defendants in this case, meaning the case number 21-CV-6992,

12    which is the case that is closed but in which these proceedings

13    are occurring.  The motion is at docket number 180, and in that

14    motion, defendants Christie, the Federation of State Medical

15    Boards, Allstate, Stolz, S-T-O-L-Z, move for a finding that the

16    plaintiff is in contempt and asking for certain relief.

17            Then at docket number 182, there's a motion along the

18    same lines to hold the plaintiff in contempt on behalf of

19    defendant Robert Heary, H-E-A-R-Y, and then there's another

20    supplemental motion at docket number 188 noting that the

21    plaintiff, Mr. Kaul, has again violated the injunction by

22    initiating litigation in the District of Columbia District

23    Court without obtaining the Court's leave.

24            So, I guess I'll turn it over to whoever wants to

25    start.  It's defendant's motion.  And the question is how you

P6HEKAUC

1   think I should go about ruling on the motion, and specifically

2   what relief you think makes the most sense.

3                MR. DWYER:  Your Honor, Paul Dwyer for Mr. Christie.

4                In order to find him in contempt, your Honor, the

5   order which he's violating must be clear and unambiguous.  It

6   clearly is, your Honor.  He has explained in numerous pleadings

7   what he understood the orders to mean, he filed, as sort of an

8   example, on Exhibit 3 in the D.C. Circuit -- in the D.C. court

9   accusing your Honor of issuing a knowingly illegal nation-wide

10  injunction that prevented Plaintiff Kaul from seeking

11  recompense in any court in the United States for the injuries

12  caused to his life, liberty, property, reputation for the Kaul

13  case's defendants without first seeking and being granted his

14  permission.

15               So, he clearly understood the meaning of this.  That's

16  paragraph 35 of that D.C. complaint, and similar language

17  appears in paragraph 34 of the complaint filed in the Southern

18  District of Texas.

19               The evidence must be clear and convincing, your Honor.

20  Your Honor is aware of and we've provided as exhibits a number

21  of cases that he's filed, nine after that order was issued, so

22  it is clear that he has violated the order.

23               THE COURT:  When you say nine, that's naming your

24  client?

25               MR. DWYER:  Yes.

P6HEKAUC

1    THE COURT:  And that includes the D.C. case?

2    MR. DWYER:  Yes, your Honor.

3    THE COURT:  Okay.

4    MR. DWYER:  And there were nine.

5         In a letter to Judge Bloom in Florida, dated

6    August 20, 2023, which is Exhibit L our motion, he wrote:

7         We do inform the defendants that should K14 be

8    dismissed and if dismissed without prejudice or with prejudice,

9    these conditions will be immaterial to the filing of a case in

10   another district court for the simple fact that the opinion

11   order in K11-7 under the law remains an admitted fraud on the

12   Court.

13        So, he is not only unrepentant, your Honor, he has

14   made it clear that he will and plans to continue to violate

15   this order.  And also it has to be shown that the party has not

16   diligently attempted to comply in a reasonable manner.  He

17   clearly has not with his filings.

18        The objections that he makes are just -- he claims

19   that this is an ongoing injury.  His subsequent actions when he

20   applies for a medical license and he's denied a medical license

21   is not an ongoing injury, your Honor, it is a consequence of

22   his loss of license in New Jersey.  These are not ongoing

23   injuries.  And he then claims that the order's illegal.  That

24   should have been challenged years ago and he failed to appeal

25   your Honor's order.

 1          The appropriate relief, your Honor, we'd ask for two:

 2          One, that he be ordered to pay attorney's fees for the

 3     cases that he has filed in violation of the order, dating back

 4     to 2023.  We ask for a 60-day order there where we could

 5     present evidence as to the reasonableness of the charges.

 6          And then we've also asked for Mr. Kaul to be

 7     incarcerated until he complies with an order of this Court to

 8     dismiss the now-pending Texas action.  We would ask that that

 9     issue and he be held in contempt for violations of this order.

10          Your Honor has a wide range of remedies that your

11     Honor can order, including incarceration.  And incarceration

12     sounds as though it's a very harsh penalty; however, he has the

13     keys to his freedom by simply agreeing to comply with the order

14     or, I should say, complying with the order.  It's incarceration

15     only for the purpose of compelling adherence to the order.

16          Your Honor, we simply ask that he be held in contempt,

17     that a writ of body attachment issue, and that he be order to

18     pay all defendants' reasonable legal fees dating back from his

19     first violation of this order.

20          THE COURT:  So, is the Southern District of Texas case

21     the only now-pending case?

22          MR. DWYER:  To my knowledge.  I know there's a North

23     Dakota action that was just filed.

24          THE COURT:  I don't think that's against any of your

25     clients.

P6HEKAUC

1          MR. DWYER:  That's not, but right now it's only just

2     the one in the Southern District of Texas.

3          THE COURT:  Okay.  Well, a couple questions:

4          One is the attorney's fees order.  I mean, I guess is

5     there point?  I mean, I don't know how information you all have

6     about whether he's indigent.  I do know that he has filed *in*

7     *forma pauperis* applications, including this one, which I think

8     was filed yesterday in the North Dakota case against me, which

9     says he has no wages, he gets stipends from friends and family

10    for food and transportation and free accommodation, and that he

11    has judgments against him.  He owes his ex-wife $2 million in

12    outstanding child support and alimony, and he says there are

13    multi-million dollar judgments that stemmed from the illegal

14    license revocation.  So, I don't know.  I mean, I don't know if

15    you know if that's true.  I guess, is there a point to awarding

16    fees?

17         MR. DWYER:  I understand there is a judgment held by

18    Allstate for $6 million.  I don't know the truthfulness of

19    Mr. Kaul.  He's made many outrageous allegations.  If it's not

20    collectible, your Honor, it would not be collectible, but I

21    think an award at least as a symbol of the problems that he has

22    created for these defendants.  And if he should come into

23    inheritance or something 20 years from now, it could still be

24    enforced.  So, I do think it's worth while.  However, I think

25    that incarceration for the period of time to allow him to

1    comply with this Court's order is really necessary.

2              THE COURT:  All right.  Thank you.

3              One other question.  I'll give all of you a chance to

4    add anything you'd like.  One other question I have is whether

5    you know about his correct address.  I know that there was a

6    filing of unable to serve from the Nassau County Sheriff's

7    Department which I guess was an attempt to serve him at an

8    address --

9              MR. DWYER:  Yes, your Honor.

10             THE COURT:  -- in Floral Park, New York.  And I think

11   some of his more recent cases indicate an address on Somerset

12   Drive in Pearl River, New York.  Do you all have any

13   information about -- I have no doubt if I issue an arrest

14   warrant, the marshals will be able to find him eventually.  I'm

15   just wondering, in the event that I do one sort of one final

16   warning with a date certain where he would be arrested to

17   withdraw any pending litigation, I want to know what's the best

18   place to send that, if you have any information on that.

19             MR. DWYER:  I do not.  We were unable to serve him.

20   It was returned.  I know my brother, however, was successful in

21   serving him.

22             THE COURT:  Okay.  Anything you all can add?

23             So, who was successful in serving?

24             You were?

25             MR. SPONZILLI:  It was my firm, your Honor.

P6HEKAUC

 1          THE COURT:  Okay.  Where did you find him?

 2          MR. SPONZILLI:  I have that in this binder.  The

 3  question is can I pull it out the way I did earlier today.

 4          MS. ALBIN:  I'm sorry to interrupt.  It was that

 5  Floral Park address.

 6          MR. SPONZILLI:  Yes, it was.  And it was Nassau

 7  County, it was that Floral Park address.  And in fact, he even

 8  responded with kind of an excoriation for finding him.  His

 9  position has been that -- and by the way, Edward Sponzilli

10  speaking for purposes of the record -- that he had been in the

11  past harassed and he claimed that former Governor Christie's

12  people had tried to kidnap him.  He has all these allegations,

13  so he says that's why he is not giving people his address.

14  However, he's filing matters before courts, and the courts and

15  the parties have to be able to communicate with him.

16          But counsel is correct that that is the correct

17  address where we did receive an affidavit from the process

18  server indicating that was the address at which they were able

19  to serve him.  And I will try to put my hands on it.  I'm sorry

20  that I did not -- I should have flagged it, but I will --

21          THE COURT:  Well, it must have been the same address.

22          MR. SPONZILLI:  It was that address.

23          THE COURT:  41 Calla Avenue, Floral Park, New York,

24  11001.

25          MR. SPONZILLI:  That's the address, your Honor.

P6HEKAUC

1           THE COURT:  And subsequently, I guess, other

2     defendants were not able to serve him there.  And it says:  As

3     per resident, the plaintiff is not associated with the address.

4           MR. DWYER:  Yes, your Honor.

5           THE COURT:  Okay.  So, as far as you know, he's not at

6     the Pearl River address anymore.

7           MR. SPONZILLI:  Well, I don't know.  As I say, your

8     Honor, recently when the service was effectuated, he was there.

9     Now, whether he's somewhere else -- we had found out that there

10    were a number of addresses that he does use, and I can have my

11    office compile those for your Honor to supply to the

12    U.S. Marshals as an aid to try to find him, but I think we had

13    three or four, maybe five different addresses for the

14    plaintiff.

15          THE COURT:  He does seem to be keeping track of the

16    docket.  I mean, it does seem like he's checking things on the

17    docket.

18          MR. SPONZILLI:  Yes, he is, your Honor.

19          THE COURT:  Because he's responding to things that get

20    filed, so I'm assuming he is checking the docket in some way.

21          MR. SPONZILLI:  Yes, your Honor.

22          THE COURT:  He's certainly utilizing the docket of

23    various courts.

24          Do you all have an email address for him?  Did anyone

25    ever have any email address for him?

P6HEKAUC

1        MR. SPONZILLI:  I believe we did, your Honor.  I don't

2    have that in front of me, but again, we can supply what email

3    addresses we've had from him over the years.  Our part in this

4    goes back to approximately 2016.

5        I'd like to say a few things, if I might.

6        THE COURT:  Sure.

7        MR. SPONZILLI:  I don't know if I'm out of order here.

8        THE COURT:  No, no.  Please do.

9        MR. SPONZILLI:  A few things that I think should be

10   emphasized.  Much of his complaint has to do with his loss of

11   his license in New Jersey.  In New Jersey, the process is to

12   have a hearing in front of an administrative law judge, which

13   is tantamount to an Article I type judge, and that judge heard

14   evidence, and I believe it was somewhere over 40 days of

15   evidence and many, many witnesses, and at the conclusion issued

16   a decision which recommended -- and in our process here in New

17   Jersey, the finding is a recommendation to an agency, which

18   would be the Board of Medical Examiners, and then they adopted

19   that, they agreed with that, and then they issued his

20   revocation.

21       What I think is important is that under law in New

22   Jersey, Kaul had the right to appeal that decision.  He never

23   did.  That's extremely important, because he's trying to say

24   all of this, that he was denied due process under the law.  He

25   had that due process to take the appeal, he chose not to.  The

P6HEKAUC

1    first time he brought any kind of litigation that has to do

2    with this subject was a suit in the state court of New Jersey

3    in what we call the superior court law division, and he sued

4    three doctors claiming they were the cause of his loss of

5    license, one of whom is Dr. Heary.

6           That case was dismissed.  And when he filed his first

7    federal action, it started here in the Southern District and it

8    was before Judge Sullivan.  And Judge Sullivan, noting that all

9    of the parties and everything relating to the case had to do

10   with New Jersey, he felt that the venue should be in the

11   district of New Jersey and that's why he transferred it, and

12   then everything began from there in about 2016.  And there

13   were, I think, about four federal district judges in New Jersey

14   who heard these various applications.  I think he had to go

15   through maybe four or five versions of his complaint before the

16   Court would allow him to proceed under its Rule 8 analysis, and

17   then all of the parties in that case brought applications for

18   dismissal as 12(b)(6) applications under *Iqbal* and *Twombly*.

19   And eventually, the Court did grant that motion.

20          And after that, there were a series of lawsuits; some

21   were simultaneous, but they always went back to the same theme.

22   And he obviously called upon just about every imaginable cause

23   of action from RICO to anti-trust, et cetera, and he claimed

24   that the core of his case was that although he was an

25   anesthesiologist who was trained in the United Kingdom --

 1    where, by the way, a patient of his died because of his

 2    inattention and for which he was charged in the United

 3    Kingdom -- he came then to New Jersey and, unfortunately, did

 4    get a license.  He was put on probation, he of course violated

 5    that probation eventually, had a number of people who he

 6    performed what was called minimally invasive spinal surgery

 7    despite the fact that his training was as an anesthesiologist.

 8    And he claimed that, oh, he invented this procedure and that

 9    there was a conspiracy by orthopedic surgeons and neurologists

10    who wanted to save these types of procedures for themselves and

11    not allow people in other forms of medical practice.  So, that

12    began the whole process.

13            And what he has done is every time a jurist rules

14    against him, he claims the only way that jurist could possibly

15    have come out against him is if that jurist were bribed or were

16    engaged in some kind of fraudulent conspiracy with the

17    defendants.  And he has so charged many of the judges

18    throughout his history and seems not to be shy about adding as

19    many as he possibly can.

20            And what is particularly troubling for all of us and

21    our clients is that every time he goes into a new jurisdiction

22    -- and of course he has a little trick.  What he does is he

23    sends a letter, and it could be to Mississippi, Texas, North

24    Carolina, Florida.  He's been to quite a few states.  Not all.

25    He's still got a number yet to do and I'm sure he will.  And he

P6HEKAUC

 1   sends a letter and he says, I would like to be licensed in your

 2   state.  He doesn't even go through the process.  But because of

 3   his loss of license in New Jersey, obviously no one is going to

 4   say:  Welcome here.

 5          And in some of the instances, they don't even respond

 6   and he says:  Oh, they didn't respond, therefore I have

 7   jurisdiction here, I'm going to bring a lawsuit in this

 8   district.  And he claims despite all of the defendants having

 9   absolutely no connection to that jurisdiction, and therefore no

10   personal jurisdiction exists for any of the defendants, he

11   still proceeds.

12          And what's a problem, as your Honor, I'm sure, is

13   aware, is in many districts a person who files an action,

14   normally it goes through a process under the rules and the

15   district judge doesn't even get to this issue until sometimes

16   months down the road.  And consequently, he takes the position:

17   Oh, nobody did anything.  Judge Oetken's order is out there but

18   they're ignoring it because they feel that it doesn't have any

19   merit.  But it takes months for us to be able to reach that

20   point where the judge is presented with your Honor's order.

21          And the other problem is, for many of us, although I'm

22   admitted in four jurisdictions but I'm not admitted in 50

23   jurisdictions, so we have to then get local counsel and that's

24   an additional expense.  So, all of us on behalf of our parties

25   have really been incurring a lot of expense and really there is

P6HEKAUC

1    absolutely no merit in any of this.  And he's very contumacious

2    because he continues to suggest that this conspiracy is

3    ongoing.  And as I said, he could have addressed any legitimate

4    issues back in 2014, which he never decided to do.  So, I just

5    wanted to indicate that for the record.

6         And one other thing that I'd like to indicate for the

7    record.  We've been mentioning these K with numbers after them.

8    That's the Plaintiff Kaul's designation.  So, he's been kind of

9    helpful in the fact that I think his newest numbers is K27,

10   which means that he now has 27 lawsuits in federal courts.  He

11   has not numbered the state actions, and he chooses really to go

12   with the federal courts as opposed to state jurisdictions.

13        So, I wanted that background to be part of the record.

14   And I agree with counsel that I think it is beneficial to award

15   counsel fees, and we would all submit affidavits of our

16   expenses and fees, but also I think it's imperative that the

17   Court incarcerate the plaintiff at least until he dismisses

18   this charge.  But I have to say, I have very little optimism

19   that even that incarceration will stop him.  And we've all been

20   struggling to figure out if there is some way to shortcut this

21   process, and we haven't yet come up with a way to do that.  It

22   would be great if there could be some kind of docketing

23   throughout the country so that any judge would know of this

24   contumacious disobedience to this court and to all of the other

25   courts where he has tried to do this, but so far we have not

P6HEKAUC

1    been able to come up with anything.  And of course, we invite

2    your Honor if there's anything your Honor might be able to do,

3    because it is an injustice and it is a tremendous disservice to

4    the interests of justices and to all the courts throughout the

5    country, many of whom have very, very substantial dockets, as

6    does this Court.  And to force this Court to spend time on

7    these type of issues is really unfair to all of the legitimate

8    litigants who need to be heard before this tribunal.

9         Thank you, your Honor.

10        THE COURT:  Yes.  Thank you.  That's helpful

11   background and I appreciate that.  And I have been myself, as I

12   know you are, puzzling over what makes sense here.  I have on

13   the kind of notice to whether courts issue, I have in the past

14   ordered litigants who are sanctioned for some reason to file

15   with every new suit a copy of my order, but in this case, I

16   don't think that's going to be efficacious because in his view

17   it's an illegal order.  And if I order him to attach it to any

18   new suit, I don't think he will.  He's already been ordered not

19   to file the suit and he's filing the suit.

20        So, you know, contempt is tricky.  There's civil

21   contempt and there's criminal contempt.  Civil contempt is kind

22   of the category of contempt where you would incarcerate someone

23   for coercive reasons.  You incarcerate them until they comply

24   with an order, and I think that's where we are.  Criminal

25   contempt is different and often involves a referral to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    United States Attorney's Office where it is punishment for

2    failure to comply, which would be after the civil contempt

3    process fails.  So, you know, my thought is to issue an order

4    now that would give him one last chance to withdraw any pending

5    cases at the very least, perhaps to commit to not filing new

6    cases or else he will be incarcerated.

7            And the one other thought I had is -- and from talking

8    to colleagues, this is something that's been helpful in the

9    past, which is to appoint counsel for him either when he's

10   arrested or before in the form of the Federal Defenders or an

11   appointed criminal defense lawyer.  And the reason I say that

12   is because in some cases, that has resulted in compliance

13   because an attorney talks to them and is trying to serve their

14   interests of keeping them out of jail.  So, that's another

15   thing I've been thinking about.

16           I wanted to ask while I'm thinking about a possible

17   order to him, where is the address -- I just want to be sure

18   that I give the marshals as much information as I can about

19   reaching him for both a warning and for a possible arrest

20   warrant.  What is the address where he was last successfully

21   served, if you all know?

22           MR. SPONZILLI:  I believe that was the address that we

23   previously indicated to your Honor in Nassau County.  I think

24   that was the last address that he had effectuated service upon

25   him.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P6HEKAUC

 1           But as I say, your Honor, I think that collectively
 2    all counsel in this case could collaborate and put together a
 3    list of past addresses, past emails, or other forms of
 4    communication that we have to assist the marshal service in
 5    trying to track him down.
 6           And if I might, your Honor, the other part of your
 7    Honor's commentary makes some sense, that if he were appointed
 8    a federal public defender and then he were presented with the
 9    possibility of criminal contempt by the United States
10    Attorney's Office in the Southern District of New York, that
11    might have a great lever, that could be more successful.  And I
12    certainly think that if he now violates this new order,
13    whatever that might be, from your Honor, that might be the next
14    step and maybe the only step that has any real chance of
15    success.
16           Thank you, your Honor.
17           THE COURT:  All right.  Thank you.
18           Mr. Brown, anything you want to add?
19           MR. BROWN:  Thank you, your Honor.
20           On behalf of the Federation, I won't repeat what's
21    already been said, I'll simply note that we join in and believe
22    it is appropriate here both to make an award of fees because of
23    the potential that that would stop him from further abusing the
24    system and our clients, and that holding him in contempt is
25    essential to bringing an end to the burden he's placing on the

1    courts, including this court, as well as our clients.

2            But I stand mainly to say that I do have the email

3    address through which he regularly communicates if your Honor

4    would like me to give that.

5            THE COURT:  Yes, please.

6            MR. BROWN:  I will say it and then spell it for the

7    record.  It is drrichardkaul@gmail.com.  And that is

8    D-R-R-I-C-H-A-R-D-K-A-U-L @gmail.com.

9            THE COURT:  Thank you.

10           MS. ALBIN:  Your Honor?

11           THE COURT:  Yes.

12           MS. ALBIN:  On behalf of Allstate again, I fully agree

13    with and support the sentiments of my colleagues.  As you know,

14    Allstate has been the target of over 20 lawsuits, a number of

15    them after your anti-filing injunction was issued.

16           I've been asked by my client, Allstate, to also bring

17    to the Court's attention that on his personal website

18    drrichardkaul.com, he has posted an excerpt from Luigi

19    Mangione's manifesto, and we see this as a highly concerning

20    and threatening behavior for Allstate and its employees and, it

21    should be noted, along with the increasing volatile and

22    harassing behavior that has occurred in many of these

23    submissions to and against Allstate and my colleagues and their

24    clients.  So, we just wanted to mention that in support of your

25    contempt order for not only fees but also potential

1     incarceration as well.

2              THE COURT:  All right.  Thank you.

3          Have any of you encountered him in a live court

4     proceeding?  Has he appeared in person for any of these

5     proceedings?

6              MR. SPONZILLI:  Yes, your Honor.  In fact, back in the

7     early days in the case that was transferred from this district

8     to New Jersey, the case where ultimately Judge Nolte in that

9     district did have his ruling and opinion.  He was present in

10    several of those instances, and I actually got to see him and

11    speak him very shortly, but he has not been appearing for most

12    of the cases since then.  So, his early days, he was in

13    attendance.

14             THE COURT:  Thank you.

15             MS. ALBIN:  Your Honor, I don't believe that there had

16    been many in-person appearances that required his appearance,

17    and I think that was sort of by design on our part because his

18    submissions were so repetitive and volatile and without any

19    regard to the rules of court, so we were trying to sort of

20    minimize that by not having as many in-person conferences as

21    possible and just resting on the papers.

22             THE COURT:  Understood.

23          Well, the history of this case and the other cases is

24    well documented and laid out in the parties' papers.  Although

25    Mr. Kaul is not here today, it's clear to me, and I certainly

P6HEKAUC

1  find by clear and convincing evidence, that his continued

2  filings of these cases in multiple federal district courts is,

3  as Mr. Sponzilli said, contumacious and is also vexatious and

4  harassing, and that a finding of contempt is warranted and that

5  sanctions are warranted in the form of attorney's fees as

6  requested by the parties.

7          I'm going to reserve on the precise order.  I am going

8  to award fees based on that finding, and I'm going to work on

9  an order that will give him an opportunity to avoid arrest and

10  detention by withdrawing any cases that have been filed

11  involving these defendants relating to the denial of his

12  medical license.  And if you all would provide me with any of

13  the address information that you have just in a letter or

14  however you want to do it, that would be helpful.  So, I'll be

15  issuing an order along those lines shortly.

16          And is two months enough time to give me any attorney

17  fee information?

18          MR. SPONZILLI:  Absolutely, your Honor.

19          MR. BROWN:  Yes, your Honor.

20          MR. DWYER:  Yes, your Honor.

21          THE COURT:  All right.  Anything else for today?

22          MR. DWYER:  No, your Honor.

23          MR. BROWN:  No.

24          THE COURT:  Thank you all.  We're adjourned.

25          (Adjourned)

# APPENDIX I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.D. RICHARD ARJUN KAUL, *et al.*,
                                  Plaintiffs,

-v-

INTERCONTINENTAL EXCHANGE, *et al.*,
                                  Defendants.

21-CV-6992 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

"This case is another chapter in a long saga of repetitive, frivolous lawsuits [*pro se*

Plaintiff Richard Arjun] Kaul has brought against numerous defendants regarding revocation of

his license to practice medicine." *Kaul v. Fed'n of State Med. Boards*, 21-CV-57, 2021 WL

6550884, at *1 (N.D. Tex. Sept. 17, 2021), *report and recommendation adopted*, 21-CV-57,

2022 WL 171294 (N.D. Tex. Jan. 19, 2022). *Pro se* Plaintiffs Richard Arjun Kaul and David

Basch sue various stock exchange holding companies (Defendant Intercontinental Exchange),

banks and insurance companies (Defendants GEICO; TD Bank; Allstate Insurance Company),

medical boards and medical officials (Defendants Federation State Medical Boards), New Jersey

officials (Defendants Christopher J. Christie; Philip Murphy; Gurbir Grewal), health institutions

and practitioners (Defendants Atlantic Health System; Robert Heary), law firms (Defendant

Rivkin Radler), and lawyers (Defendants Max Gersenoff; Daniel Stolz).

The amended complaint can be understood to assert claims under the Sarbanes-Oxley Act

("SOX"), the Racketeer Influence Corrupt Organizations Act ("RICO"), Section 1983, and the

United Nations Declaration of Human Rights.  Various defendants move to dismiss the amended

complaint for failure to contain a short and plain statement of claims; for lack of personal

jurisdiction; for lack of venue; and for failure to state a claim.  Several defendants request that

1

Plaintiff Kaul be barred from filing further lawsuits against them for alleged violations arising from these facts.

For the reasons that follow, this action is dismissed for pleading failures; for lack of venue; and for failure to state a claim. Given Plaintiff Kaul's history of filing repetitive and frivolous lawsuits, the action will not be transferred. The action is dismissed with prejudice. Plaintiff Kaul is barred from filing further lawsuits against these defendants for alleged violations arising out of this set of facts.

## I.    Background

### A.    Filing History

"In March 2014, the New Jersey State Board of Medical Examiners . . . revoked [Plaintiff Richard Arjun Kaul's] medical license." *Kaul v. Christie*, 372 F. Supp. 3d 206, 215 (D.N.J. 2019). It found that "his performance of spine surgeries on 11 patients without proper training and experience constituted gross and repeated malpractice, negligence, and incompetence." *Id.* Since then, Plaintiff Kaul has filed a series of lawsuits around the country. These lawsuits generally allege that "a network of politically connected neurosurgeons wanted to make an example of him," and so "with the assistance of a cabal of lawyers, hospitals, insurance companies and media figures, they importuned public officials to banish him from the practice of medicine in New Jersey." *Id.* No lawsuits have resulted in any relief for Kaul.

Over the past decade, Plaintiff Kaul has filed four substantially similar cases in the Southern District of New York. Each has been transferred to the District of New Jersey. *See, e.g.*, *Kaul v. Christie*, 16-CV-1346 (S.D.N.Y. Apr. 19, 2016) (Sullivan, J.) (transferring action to D.N.J.); *Kaul v. Christie*, 18-CV-3131, 2018 WL 10038784 (S.D.N.Y. Apr. 11, 2018) (McMahon, J.) (transferring action to D.N.J.); *Kaul v. Schumer*, 19-CV-3046 (S.D.N.Y. May 29, 2019) (Stanton, J.) (transferring action to D.N.J.); *Kaul v. Murphy*, 21-CV-5293 (S.D.N.Y. June

21, 2021) (Briccetti, J.) (transferring action to D.N.J.). Plaintiff has filed a case in the Northern District of Georgia alleging that New Jersey officials targeted him. That case too was transferred to the District of New Jersey. *See Patel v. Crist*, No. 19-CV-739, 2019 WL 11583344, at *1 (N.D. Ga. Apr. 2, 2019) (Brown, J.). Plaintiff has filed two cases in the District of Columbia. One was dismissed in part and otherwise transferred to the District of New Jersey. *See Kaul v. Fed'n of State Med. Boards*, No. 19-CV-3050, 2020 WL 7042821, at *1 (D.D.C. Dec. 1, 2020) (Chutkan, J.); *Kaul v. Fed'n of State Med. Boards*, No. 19-CV-3050, 2021 WL 1209211, at *1 (D.D.C. Mar. 31, 2021) (Chutkan, J.). The other was dismissed *sua sponte*. *See Kaul v. Fed'n of State Med. Boards*, No. 20-CV-1612, 2021 WL 6549978, at *1 (D.D.C. Nov. 23, 2021) (Chutkan, J.) Plaintiff has filed a case in the District of Connecticut. It too was transferred to the District of New Jersey. *See Kaul v. Murphy*, No. 21-CV-439, 2021 WL 1601149, at *2 (D. Conn. Apr. 23, 2021) (Bryant, J.). Plaintiff has filed a case in the District of Massachusetts. It was dismissed for lack of venue and transfer was refused. *See Kaul v. Bos. Partners, Inc.*, No. 21-CV-10326, 2021 WL 3272216, at *1 (D. Mass. July 30, 2021). Plaintiff has filed a case in the Northern District of Texas. It was dismissed with prejudice. *See Kaul v. Fed'n of State Med. Boards*, 21-CV-57, 2021 WL 6550884, at *1 (N.D. Tex. Sept. 17, 2021) (Ray, Jr., J.), *report and recommendation adopted*, 21-CV-57, 2022 WL 171294 (N.D. Tex. Jan. 19, 2022). Plaintiff appears to have filed a complaint in the Northern District of Illinois as well. *See* Compl., *Kaul v. Allstate Ins. Co.*, No. 21-CV-736 (N.D. Ill. Feb. 5, 2021), ECF No. 1.

Plaintiff Kaul has never received any relief in these cases. District courts in the District of New Jersey have dismissed some. *See, e.g.*, *Kaul v. Christie*, 16-CV-2364, 2019 WL 920815 (D.N.J. Feb. 22, 2019) (McNulty, J.) (granting motion to dismiss); *Kaul v. Christie*, 372 F. Supp. 3d 206 (D.N.J. Feb. 25, 2019) (McNulty, J.) (granting motion to dismiss); *Kaul v. Christie*, No.

16-CV-2364, 2019 WL 13176430, at *4 (D.N.J. July 29, 2019) (Martinotti, J.) (denying motion for reconsideration); *Patel v. Crist*, No. 19-CV-9232, 2020 WL 64618, at *1 (D.N.J. Jan. 7, 2020) (Vazquez, J.) (granting motion to dismiss); *Patel v. Crist*, No. 19-CV-8946, 2020 WL 64571, at *1 (D.N.J. Jan. 7, 2020) (Vazquez, J.) (granting motion to dismiss); *Patel v. Crist*, No. 19-CV-9232, 2020 WL 6156772, at *1 (D.N.J. Oct. 20, 2020) (granting motion to dismiss); *Patel v. Crist*, No. 19-CV-8946, 2020 WL 6156751, at *1 (D.N.J. Oct. 20, 2020) (granting motion to dismiss); *Kaul v. Murphy*, No. 21-CV-13063, 2021 WL 3663873, at *1 (D.N.J. July 9, 2021) (dismissing complaint *sua sponte*). Kaul has voluntarily dismissed others. *See, e.g.*, *Kaul v. Christie*, No. 19-1651, 2019 WL 4733531, at *1 (3d Cir. June 20, 2019) (dismissing appeal without prejudice pursuant to Fed. R. App. P. 42(b)); *Kaul v. Stein*, No. 20-3522, 2021 WL 6197149, at *1 (3d Cir. Nov. 12, 2021) (dismissing appeal pursuant to Fed. R. App. P. 42(b)); (Dkt. No. 101 at 3-4.) But Kaul continues to file lawsuits in various jurisdictions.

### B. Factual Background

The amended complaint follows the pattern of Plaintiff Kaul's earlier filings. The sprawling, largely indecipherable 432-page document references a purported kidnapping; a "Slaving-Nazi-COVID-Insurance Axis"; and other conspiracies. (*See* Dkt. No. 14 ("Am. Compl.") at 9.) It identifies six specifically. First, it alleges that the New York Stock Exchange, the Securities Exchange Commission, and State of New Jersey conspired to: "(i) hav[e] Kaul's medical license revoked; (ii) eradicat[e] all debt owed to Kaul by insurance carriers (approx. $45 million); (iii) destroy[] Kaul's reputation; (iv) eliminat[e] any future financial liability to Kaul; (v) caus[e] Kaul to enter a state of poverty/homelessness; (vi) attempt[] to cause Kaul to be jailed/deported/killed; [and] (vii) intimidat[e] other minimally invasive spine surgeons into not performing minimally invasive spine surgery, in order to divert a greater percentage of the public's insurance premiums into corporate/executive compensation." (Am. Compl. ¶ 21.)

The second is that after "Kaul's corporations" filed for bankruptcy, Defendants Allstate and GEICO conspired with the bankruptcy trustee, Defendant Daniel Stolz, "to accept bribes from Defendants Allstate/Geico in return for not pursuing the $45 million owed to Kaul by Defendants Allstate/Geico and others within the insurance industry." (Am. Compl. ¶¶ 73-74.)

The third is that Defendants converted "the legislative/executive/judicial branches of the State of New Jersey and the United States District Court" to an association-in fact enterprise. (Am. Compl. ¶ 94.) The enterprise was designed "to increase . . . economic/political power within the American legal/medical/business/political sectors of the industry, at the expense of Kaul . . . an non-neurosurgical minimally invasive spine surgeons," and "to use the United States District Court to provide cover for the Defendants' crimes." (Am. Compl. ¶ 94.)

The fourth is that Defendants "convert[ed] the executive/legislative/judicial branches of the State of New Jersey, United States Bankruptcy Court and the United States [D]istrict Court into an association-in-fact racketeering enterprise." (Am. Compl. ¶ 105.) The amended complaint alleges that Defendants Allstate and GEICO conspired with Defendant Federation of State Medical Boards "to globally disseminate information regarding Kaul's elimination, in order to prevent him exposing their crimes." (Am. Compl. ¶ 111.) It further alleges that Defendants Allstate and GEICO participated in a "bribery-based scheme of racketeering" to "commit corruption of judges within the United States District Court." (Am. Compl. ¶¶ 112-114.)

The fifth is that Defendant Christie "conspire[d] with Defendants Murphy/Grewal/ Allstate/Geico to have Kaul kidnapped on May 28, 2021, by nine (9) armed individuals . . . who purported to be NJ state police." (Am. Compl. ¶ 120.) The complaint alleges that Defendants Allstate and GEICO "funnel[led] bribes to Defendants Christie/Murphy/Grewal, as part of a quid pro scheme, in which Defendants Christie/Murphy/Grewal sold, without the public's permission,

state power to Defendants Allstate/Geico, in furtherance of their efforts to eliminate Kaul, and prevent him from further exposing their crimes."  (Am. Compl. ¶ 134.)

The sixth is that Defendants conspired to "prevent Kaul from obtaining a physician license in the State of New York."  (Am. Compl. at 35.)  The State of New York too was allegedly converted into a "racketeering enterprise."  (Am. Compl. at 36-37.)  In short, Plaintiffs allege that Defendants initially conspired to revoke Kaul's medical license and that Defendants have conspired to deny Kaul relief at every relevant proceeding since then.  (*See* Am. Compl.)

For example, the amended complaint emphasizes that Plaintiff Kaul filed suit against Defendant GEICO, among others, in the Southern District of New York.  (*See* Am. Compl. ¶ 14.)  There, Plaintiff Kaul sought "$28,000 trillion" in monetary damages.  (*See* Am. Compl. ¶ 14.)  Plaintiff Kaul alleges that Defendants did not disclose this liability "in SEC filings, Forms 10K/13K, and in the corporations' accounts."  (Am. Compl. ¶ 14.)  Instead, they "conspired with their lawyers and accounts to file knowingly false returns/accounts."  (Am. Compl. ¶ 15.)  Finally, Plaintiff Kaul summarily alleges that Defendants "violate[d] and deprive[d] Kaul of his constitutional rights pursuant to the 1st/2nd/4th/5th/6th/8th/14th amendments . . ." and deprived him of "(i) his property; (ii) his right to due process; (iii) his right to freedom to freedom of speech; (iv) his right to an impartial tribunal; (v) his prosecutorial rights; (vi) his right to equal protection; [and] (vii) his liberty and a decade of his life."  (Am. Compl. ¶ 140.)  And Plaintiff alleges that Defendants "abused the power of the American State to violate Kaul's human rights as enshrined in the Universal Declaration of Human Rights."  (Am. Compl. ¶ 140.)

As relevant to Plaintiff Basch, the amended complaint alleges only that Defendant GEICO "in collusion and conspiracy with Defendants Rivkin Radler/Gersenoff," committed "RICO predicate acts of bribery/public corruption, in funneling bribes to judges within the

District of New Jersey in a series of quid pro quo schemes, in which corrupted judges did enter order/judgements adverse to Plaintiff Basch and other physicians, while entering order/judgments advantageous to Defendant Geico."  (Am. Compl. ¶ 148.)

## C. Procedural History

Plaintiffs filed this action on August 19, 2021.  (*See* Dkt. No. 1 ("Compl.").)  The amended complaint can be understood to assert the following claims.  First, the amended complaint asserts that Defendants violated reporting requirements under the Sarbanes-Oxley Act. *See* 15 U.S.C. § 7241; (Am. Compl. ¶¶ 14-20.).  Second, it asserts that Defendants violated the Racketeer Influence Corrupt Organizations Act ("RICO").  *See* 18 U.S.C. § 1962(c); (Am. Compl. ¶¶ 21-135, pp. 35-37.)  Third, it identifies constitutional violations and asserts a cause of action under 42 U.S.C. § 1983.  (*See* Am. Compl. ¶ 140.)  Fourth, it asserts a cause of action under the United Nations Declaration of Human Rights.  (*See* Am. Compl. ¶ 140.)

Defendants move to dismiss.  Several defendants move to dismiss the complaint under Federal Rule of Civil Procedure 8 for failure to contain a short and plain statement of claims. (*See* Dkt. No. 70 ("Federation Memo") at 6-7; Dkt. No. 83 ("ICE Memo") at 10-11; Dkt. No. 94 ("Allstate Merits Memo") at 1, 13; Dkt. No. 145 ("Heary Memo") at 10.)  Other defendants move to dismiss the complaint under Rule 12(b)(2) for lack of personal jurisdiction.  (*See* Dkt. No. 128 ("Atlantic Health Memo") at 9; Dkt. No. 145 ("Heary Memo") at 6-7.)  Other defendants move to dismiss the complaint under Rule 12(b)(3) for lack of venue.  (*See* Dkt. No. 83 ("ICE Memo") at 16-19; Dkt. No. 92 ("Allstate Venue Memo") at 1-21; Dkt. No. 118 ("Christie Memo") at 2-13; Dkt. No. 128 ("Atlantic Health Memo") at 9.)  Still others move to dismiss the complaint under Rule 12(b)(6) for failure to state a claim.  (*See, e.g.*, Dkt. No. 70 ("Federation Memo") at 7-10; Dkt. No. 83 ("ICE Memo") at 13-21; Dkt. No. 94 ("Allstate Merits Memo") at 2-12; Dkt. No. 101 ("GEICO Memo") at 10-24; Dkt. No. 97 ("TD Bank

Memo") at 7-13; Dkt. No. 145 ("Heary Memo") at 8-16.)  Finally, several defendants have

requested that an anti-filing injunction be issued against Plaintiff Kaul.  (*See, e.g.*, Dkt. No. 70

("Federation Memo") at 10-13; Dkt. No. 97 ("TD Bank Memo") at 13; Dkt. No. 101 ("GEICO

Memo") at 26-29; Dkt. No. 104 ("Allstate Injunction Memo") at 1-3; Dkt. No. 118 ("Christie

Memo") at 13-17; Dkt. No. 150 ("Atlantic Health Injunction Memo") at 1-5; Dkt. No. 145

("Heary Memo") at 16-19.)

## II.  Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to make "a short and plain

statement of the claim showing that the pleader is entitled to relief."  Rule 8(d)(1) further

requires that "[e]ach allegation must be simple, concise, and direct."  "A complaint fails to

comply with Rule 8(a)(2) if it is so confused, ambiguous, vague, or otherwise unintelligible that

its true substance, if any, is well disguised."  *Strunk v. U.S. House of Representatives*, 68 F.

App'x 233, 253 (2d Cir. 2003).

Rule 12(b)(2) permits a court to dismiss a defendant for "lack of personal jurisdiction."

A plaintiff "bears the burden of demonstrating personal jurisdiction over a person or entity

against whom it seeks to bring suit."  *Penguin Gr. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34

(2d Cir. 2010).  The plaintiff is required to make only "a prima facie showing," *Schultz v. Safra

Nat'l Bank of New York*, 377 F. App'x 101, 102 (2d Cir. 2010), and such a showing "may be

established solely by allegations" in good faith.  *Aviles v. S&P Global, Inc.*, 380 F. Supp. 3d 221,

256 (S.D.N.Y. 2019).  But those allegations must have "factual specificity"; conclusory

statements do not suffice.  *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

Rule 12(b)(3) permits a court to dismiss a complaint for "improper venue."  Under 28

U.S.C. § 1391, a civil action may only be brought in "a judicial district in which any defendant

resides, if all defendants are residents of the State in which the district is located"; "a judicial

district in which a substantial part of the events or omissions giving rise to the claim occurred, or

a substantial part of property that is the subject of the action is situated"; or "if there is no district

in which an action may otherwise be brought . . . any judicial district in which any defendant is

subject to the court's personal jurisdiction with respect to such action." In deciding venue, the

Court "must draw all reasonable inferences and resolve all factual conflicts in favor of plaintiff."

*Pablo Star Ltd. v. Welsh Gov't*, 170 F. Supp. 3d 597, 609 (S.D.N.Y. 2016).

Rule 12(b)(6) authorizes a district court to dismiss a complaint for "failure to state a

claim upon which relief can be granted." To survive a motion to dismiss for failure to state a

claim, a complainant must state "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This means that a complaint is properly dismissed where "the allegations in a complaint,

however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. A

complaint is also properly dismissed "where the well-pleaded facts do not permit the court to

infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

Plaintiff is proceeding *pro se*. "It is well-established that the submissions of a *pro se*

litigant must be construed liberally and interpreted to raise the strongest arguments that they

suggest." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020). "Nonetheless, a

*pro se* complaint must state a plausible claim for relief." *Id.*

## III.    Discussion

The amended complaint is dismissed with prejudice. The pleading violates Rule 8(a)(2)

because it fails to provide a plain statement of the claims at issue. The amended complaint fails

to establish venue because all of the defendants are not residents of New York, and a substantial

part of the alleged violations do not arise in the Southern District of New York. In the

alternative, the amended complaint fails to state a claim. Dismissal is appropriate rather than

transfer. And Plaintiff Kaul is barred from filing new actions arising from these facts.

### A. Rule 8(a)(2)

The pleading here totals 432 pages of single-space paragraphs and exhibits. (*See* Am.

Compl.) As in Plaintiff Kaul's previous cases, the amended complaint "contains rambling

quotes and excerpts from various sources, . . . spurious comparisons between the insurance

industry, on the one hand, and Nazi Germany and slavery, on the other, . . . and difficult-to-

follow references to Mr. Kaul's other pending litigation (and related documents)." *Bos. Partners,*

*Inc.*, 2021 WL 3272216, at *3. Such a pleading amounts to "a prolix and unintelligible

'conspiracy theory novel.'" *O'Neil v. Ponzi*, 394 Fed. App'x 795, 796 (2d Cir. 2010). It fails "to

provide fair notice of the claims and enable the adverse party to answer the complaint and

prepare for trial." *Strunk*, 68 Fed. App'x at 235. Accordingly, the amended complaint is

dismissed on the ground that it fails to provide a short and plain statement of the claim under

Rule 8.

### B. Personal Jurisdiction and Venue

This action is also dismissed for lack of venue. Defendants Atlantic Health Systems and

Robert Heary move to dismiss for lack of personal jurisdiction. (*See* Dkt. No. 128 ("Atlantic

Health Memo") at 9; Dkt. No. 145 ("Heary Memo") at 6-7.) Defendants Intercontinental

Exchange, Allstate, Chris Christie, and Atlantic Health Systems also move to dismiss for lack of

venue. (*See* Dkt. No. 83 ("ICE Memo") at 16-19; Dkt. No. 92 ("Allstate Venue Memo") at 1-21;

Dkt. No. 118 ("Christie Memo") at 2-13; Dkt. No. 128 ("Atlantic Health Memo") at 9. "[A]

federal court has leeway to choose among threshold grounds for denying audience to a case on

the merits." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)

(marks omitted). A dismissal for lack of venue is more appropriate here.

Plaintiffs have not met their burden to allege venue. To assess venue, a court "must

determine whether the case falls within one of the three categories set out in [28 U.S.C.]

§ 1391(b)." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist., of Tex.*, 571 U.S. 49, 56

(2013). Venue does not lie in the Southern District of New York under Section 1391(b)(1)

because, as alleged, nearly all defendants reside outside of New York. (*See* Am. Compl. at 3.)

Venue does not lie in the Southern District of New York under Section 1391(b)(2)

because "a substantial part of the events or omissions giving rise to the claim" did not occur in

this district. 28 U.S.C. § 1391(b)(2). To apply this provision a district court must "(1) identify

the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those

claims, and (2) determine whether a substantial part of those acts or omissions occurred in the

district where the suit was filed." *Fisher v. Int'l Student Exch., Inc.*, 38 F. Supp. 3d 276, 284-85

(E.D.N.Y 2014) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir.

2005)) (internal quotation marks omitted). The nature of the claims here, liberally construed,

concern the revocation of Plaintiff Kaul's license, his alleged targeting during subsequent

proceedings, and Defendants' alleged efforts to evade accountability. To support those

allegations, the pleading identifies various proceedings; financial disclosures; bribery schemes;

judicial orders; attempts to kidnap; and denials of license applications. (*See* Am. Compl.)

Almost all of those allegations concern events and omissions in New Jersey. The initial

alleged conspiracy, for example, arises from the revocation of Plaintiff Kaul's license. (*See* Am.

Compl. ¶ 21.) Plaintiff Kaul was licensed to practice in New Jersey. (*See* Am. Compl. Ex. 1.)

He performed his spine surgeries in New Jersey; his license was revoked by the New Jersey State

Board of Medical Examiners; and the administrative disciplinary proceedings were initiated by the Attorney General of New Jersey. *See Kaul v. Christie*, No. 16-CV-2364, 2019 WL 920815, at *5 (D.N.J. Feb. 22, 2019). The alleged kidnapping, for another, concerns actions undertaken by New Jersey officials such as Defendants Christie, Murphy, and Grewal. (*See* Am. Compl. ¶ 120.) The other counts follow the same pattern. Indeed, Plaintiffs list "The State of New Jersey" and "The District of New Jersey-Newark." as alleged co-conspirators. (*See id.*)

Plaintiffs identify several potential contacts in New York City. All are conclusory. None are substantial. "Substantiality for venue purposes is a more qualitative than quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." *Daniel v. American Bd. of Emergency Medicine*, 428 F.3d 408, 432-33 (2d Cir. 2005). "[F]or venue to be proper, *significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere. *AEI Life, LLC v. Lincoln Ben. Life Co.*, 305 F.R.D. 37, 43 (E.D.N.Y. 2015) (quotation omitted). Even had Plaintiffs alleged any factual basis to support his allegations concerning New York City, those contacts would be insubstantial in light of the nature of Plaintiffs' claims — primarily, a series of RICO claims — and the reality that the allegations place those schemes primarily in New Jersey.

Further, any alleged contacts are insubstantial in light of Plaintiffs' gamesmanship. "Mr. Kaul appears to be engaged in forum shopping." *Bos. Partners, Inc.*, 2021 WL 3272216, at *2. "Apparently dissatisfied with the judges in the District of New Jersey, . . . he has initiated lawsuits, based on the same underlying factual contentions, against many of the defendants in this case (and others), in various federal district courts around the country." *Id.* He "seems

prepared to file essentially the same suit in any federal district court other than in New Jersey until he succeeds." *Id.* Such manufactured contacts are not a substantial part of the claims here.

If venue is not proper, "the case must be dismissed or transferred under [28 U.S.C.] § 1406(a)." *Atl. Marine Constr. Co.*, 571 U.S. at 56. Section 1406(a) provides that an improper district court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Dismissal is appropriate here. Transfer would not be in the interests of justice. First, as already explained, Plaintiff Kaul appears to be forum-shopping. Second, "based on Mr. Kaul's prior conduct, if the Court were to transfer the case to the District of New Jersey, Mr. Kaul would likely voluntarily dismiss the case (or abandon his prosecution of it) and then re-file elsewhere." *Bos. Partners, Inc.*, 2021 WL 3272216, at *3. Third, as explained below, Plaintiffs "is unlikely to state a viable claim against any of the defendants even if the case were transferred." *Id.* Fourth, "whatever impediment there may be to an adjudication on the merits is the result of Mr. Kaul's own conduct." *Id.* Accordingly, the action is dismissed. Plaintiff Kaul's conduct warrants a dismissal with prejudice.

### C. Merits

In the alternative, even if venue is proper, the amended complaint is dismissed for failure to state a claim. Each asserted claim is meritless.

#### 1. Sarbanes-Oxley

Plaintiffs' claim under the Sarbanes-Oxley Act is meritless. Plaintiffs allege that some Defendants violated various reporting requirements, *see, e.g.*, 15 U.S.C. § 7241, because they did not report Plaintiff Kaul's claim for $28,000 trillion in monetary damages in a prior case. (*See* Am. Compl. ¶ 14.) But Sarbanes-Oxley does not supply a private cause of action for Plaintiffs' claim. Sarbanes-Oxley contains two express rights of action. One relates to insider trading, *see* 15 U.S.C. § 7244(a)(2)(B), and the other relates to whistleblowing, *see* 18 U.S.C. § 1514A(b).

13

Those rights of action "have nothing to do with the facts pleaded by [Plaintiffs,]" *Li v. Ali Baba Grp. Holding Ltd.*, No. 19-CV-11629, 2021 WL 4084574, at *4, and there is no basis to infer a private right to enforce the provisions identified by Plaintiffs, *see Cohen v. Viray*, 622 F.3d 188, 194 (2d Cir. 2010). Accordingly, Plaintiff's Sarbanes-Oxley Act claim does not state a claim.

## 2. RICO

Plaintiffs' RICO allegations are also meritless. To state a valid civil RICO claim, a plaintiff must plausibly allege that defendants "engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013). Plaintiffs do not adequately allege the existence of a RICO enterprise. "[A] RICO enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct, the existence of which is proven by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004). It requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to purpose the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938 (2009). Accordingly, to allege an enterprise, a plaintiff must at least plead with specificity both "the nature of the defendants' common interests and the mechanics of the alleged ongoing working relationship." *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC,* No. 11-CV-7801, 2012 WL 1231775, at *6 (S.D.N.Y. Apr. 11, 2012). Plaintiffs have not done so. There is no explanation, for example, of the alleged "hierarchy, organization, and activities of the alleged association." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 360 (S.D.N.Y. 2014). Instead, Plaintiffs simply identify entities and alleged crimes. Such a "conclusory naming of a string of entities" does not suffice. *Id.*

14

Further, Plaintiffs at most identify predicate acts; they do not plausibly allege a "course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves—a requirement in this Circuit." *First Capital*, 385 F.3d at 174. Accordingly, Plaintiffs' RICO allegations do not state a claim.

### 3. Section 1983

Plaintiffs' Section 1983 allegations are meritless as well. "To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014). Most of the defendants here are not state actors. *See, e.g.*, *Desiderio v. Nat'l Ass'n of Sec. Dealer, Inc.*, 191 F.3d 198, 206 (2d Cir. 1999) (finding the New York Stock Exchange not to be state actor); *Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 426 (S.D.N.Y. 1998) (finding private insurer not to be state actor). And, in any event, although Plaintiffs list various constitutional amendments and constitutional rights, they do not allege any factual basis from which to infer that these constitutional provisions have been violated. *See Iqbal*, 556 U.S. at 678.

### 4. UN Declaration of Human Rights

Lastly, Plaintiffs' claim under the United Nation's Declaration of Human Rights is meritless. Plaintiff alleges that Defendants "abused the power of the American State to violate Kaul's human rights as enshrined in the Universal Declaration of Human Rights." (Am. Comp. ¶ 140.) But "the Universal Declaration of Human Rights . . . provides no private rights of action." *United States v. Chatman*, 351 F. App'x 740, 741 (3d Cir. 2009). Because any amendment would be futile, there is no reason to give Plaintiffs leave to amend.

### D. Filing Injunction

Finally, the Court concludes that an anti-filing injunction for Plaintiff Kaul is appropriate. "That [a] district court possesse[s] the authority to enjoin [parties] from further vexatious

litigation is beyond peradventure." *Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 23 (2d Cir. 1986). To

determine whether an anti-filing injunction is appropriate, a district court must consider: "(1) the

litigant's history of litigation and in particular whether it entailed vexatious, harassing or

duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant

have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by

counsel; (4) whether the litigant has caused needless expense to other parties or has posed an

unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be

adequate to protect the courts and other parties." *Eliahu v. Jewish Agency for Israel*, 919 F.3d

709, 714 (2d Cir. 2019).

    These factors favor issuing an anti-filing injunction. First, Plaintiff Kaul has an extensive

history of duplicative lawsuits. Over the past decade, Plaintiff Kaul has filed at least twelve

lawsuits outside the District of New Jersey. (*See, supra*, pp. 2-3.) Those lawsuits all concern the

denial of his medical license in New Jersey as well as subsequent related proceedings. Courts

have dismissed claims on preclusion grounds. *See, e.g.*, *Kaul v. Fed'n of State Med. Boards*, 21-

CV-57, 2021 WL 6550884, at *3 (N.D. Tex. Sept. 17, 2021) (Ray, Jr., J.), *report and*

*recommendation adopted*, 21-CV-57, 2022 WL 171294 (N.D. Tex. Jan. 19, 2022). In those

cases, Plaintiff Kaul has a history of being a vexatious and harassing litigant. *Cf. Kaul v.*

*Murphy*, No. 21-CV-13063, 2021 WL 3663873, at *1 (D.N.J. July 9, 2021) ("Plaintiff has been a

frequent, vexatious litigant before this Court."). Plaintiff Kaul harasses officials to manufacture

litigation. *See, e.g.*, *Bos. Partners, Inc.*, 2021 WL 3272216, at *3 n.13 ("It appears that one of

Mr. Kaul's tactics is to send a letter to someone alerting them to the alleged conspiracy (or

asking them to disclaim involvement) and then, if the recipient does not respond, concluding that

they are a participant in the conspiracy."); (Dkt. No. 71, Ex. 3.) (letter addressed to New

Hampshire licensing officials warning that their potential "misconduct would constitute a conspiracy involving the State of New Hampshire and would expose the state to legal liability"). Plaintiff Kaul harasses opposing parties during litigation.  For example, in *Kaul v. Murphy*, 21-CV-9788, the district court ultimately ordered Kaul not to "communicat[e], or attempt[] to directly communicate, with any represented Defendants or their relatives, and from entering the property where any represented Defendant resides."  (Dkt. No. 71, Ex. B., 186.)  And the Court has serious doubts about Plaintiff Kaul's candor with the Court.  For example, Plaintiff Kaul alleges that certain Defendants have "admitted to the RICO and Section 1983 claims," citing an Exhibit 5 (*See* Am. Compl. pp. 225-28), but this document appears to be fabricated.  (*See* Dkt. No. 97 at 2-3, 14.)  These facts weigh heavily in favor of an injunction.

Second, Plaintiff Kaul has no objective expectation of prevailing.  He has not prevailed in any of the twelve duplicative cases he has filed with the district courts around the United States.  As explained above, and as other courts have found, the filings in these cases are "bizarre, far-fetched, and reliant on flawed premises."  *Bos. Partners, Inc.*, 2021 WL 3663873, at *3.

Third, although Plaintiff Kaul proceeds *pro se*, he is a sophisticated litigant.  *Kaul v. Fed'n of State Med. Boards*, No. 19-CV-3050, 2020 WL 7042821, at *17 (D.D.C. Dec. 1, 2020) ("Although they are proceeding *pro se*, Plaintiffs are highly educated and experienced in utilizing the court system.")  Regardless, given the other factors, an injunction is appropriate for Plaintiff Kaul even though he proceeds *pro se*.  *See, e.g.*, *Schuster v. Charter Communs., Inc.*, No. 18-CV-1826, 2021 WL 1317370 (S.D.N.Y. Apr. 8, 2021) (issuing anti-filing injunction for *pro se* litigant); *Edwards v. Barclays Servs. Corp.*, 19-CV-9326, 2020 WL 2087749 (S.D.N.Y. May 1, 2020), *report and recommendation adopted*, No. 19-CV-9326, 2020 WL 3446870

(S.D.N.Y. June 24, 2020) (same); *see also Lipko v. Christie*, 94 F. App'x 12, 14 (2d Cir. 2004) (enjoining *pro se* litigant from filing appeals).

Fourth, Plaintiff Kaul has caused needless expense to other parties and needlessly burdened court personnel. For example, he regularly files documents that must be stricken. *See, e.g.*, *Kaul v. Schumer*, 19-CV-13477, ECF No. 13 (filing purported "Request[s] for admission or denial of statements" directed to sitting United States District Court Judges").

Fifth, lesser sanctions would not be adequate. For years, Plaintiff Kaul has filed cases in improper venues and then voluntarily dismissed them once they reach the District of New Jersey. *See Bos. Partners, Inc.*, 2021 WL 3272216, at *3. There is no reason to think that practice will abate. Further, Plaintiff has already ignored an anti-filing injunction that covers a defendant in this case. (*See* Dkt. No. 129-1 ("Stolz Declaration") ¶ 5.) "Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Safir*, 792 F.2d at 24. Absent an injunction, it is likely that Kaul would continue here.

The filing injunction here must be "appropriately narrow." *Bd. of Managers of 2900 Ocean Ave. Condo. v. Bronkovic*, 83 F.3d 44, 45 (2d Cir. 1996). Given Plaintiff Kaul's history, he should be enjoined from filing lawsuits arising from the allegations here. Given Plaintiff Kaul's litigation practices, he is enjoined from filing those lawsuits in any federal court. When a litigant has demonstrated "a pattern of abusing different district courts around the country, an injunction which applies to all federal district courts is warranted." *Sassower*, 833 F. Supp. 253, 270 (S.D.N.Y. 1993) (citing *In re Martin-Trigona*, 737 F.2d 1254, 1262 (2d Cir. 1984)).

\*\*\*

From the date of this Opinion and Order, Plaintiff Kaul is barred from filing in any United States district court any action, motion, petition, complaint, or request for relief against any of the Defendants named in this litigation that relates to or arises from (i) the denial of his medical license; (ii) subsequent litigation proceedings initiated by the Defendants here before the date of this Order; (iii) subsequent litigation proceedings initiated by Plaintiff Kaul before the date of this Order; without first obtaining leave from this Court.  Any motion for leave must include the caption "Request for Permission to File under Filing Injunction" and must be submitted to the Pro Se Intake Unit of this Court along with Plaintiff Kaul's proposed filings.

If Plaintiff Kaul violates this Opinion and Order and files any materials without first obtaining leave to file, any request will be denied for failure to comply with this Opinion and Order, and Plaintiff Kaul may be subject to sanctions, including monetary penalties or contempt. *See Schuster*, 2021 WL 1317370, at *11.  The Court clarifies that this filing injunction does not prevent Kaul from filing an appeal from this Opinion and Order.

## IV. Conclusion

For the foregoing reasons, Defendants' motions to dismiss the complaint are GRANTED. The complaint is hereby dismissed for pleading failures under Rule 8(a)(2); for lack of venue; and for failure to state a claim.

Defendants' motions for an anti-filing injunction are also GRANTED as set forth above.

The Clerk of Court is directed to:

(1) close the motions at Docket Numbers 69, 82, 91, 93, 95, 100, 103, 117, 126, 140,

144, and 149;

(2) enter final judgment in favor of Defendants dismissing the complaint with prejudice;

(3) mail a copy of this opinion and order to the *pro se* parties in this matter; and

(4) close this case.

SO ORDERED.

Dated: September 12, 2022
New York, New York

_____
J. PAUL OETKEN
United States District Judge

# APPENDIX J

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 23-cv-22325-BLOOM/Otazo-Reyes

RICHARD ARJUN KAUL, M.D. *et al.*,

      Plaintiffs,

v.

FEDERATION STATE MEDICAL
BOARDS – FLORIDA BOARD OF
MEDICINE, *et al.*,

      Defendants.

_____/

## <u>ORDER ON MOTION TO DISMISS</u>

**THIS CAUSE** is before the Court upon Defendant Federation of State Medical Boards of

the United States, Inc.'s ("FSMB") Motion to Dismiss, ECF No. [17] ("Motion"), filed on August

3, 2023. The deadline for Plaintiff Richard Arjun Kaul, M.D. ("Kaul") and David Basch, M.D. to

file a Response was on August 17, 2023, and neither Plaintiff complied nor requested an extension

of time.[1] The Court has reviewed the Motion, the record as a whole, Kaul's history of litigation,

the filing injunction entered against him, the applicable law, and is otherwise fully advised. For

the reasons set forth below, the Motion is granted.

On July 5, 2023, Plaintiffs filed a 154-page Amended Complaint against Defendants

Federation State Medical Boards-Florida Board of Medicine, Governor Christopher J. Christie,

Daniel Stolz, Robert Heary, GEICO, Jane Doe, and John Doe ("Defendants"). ECF No. [6]. The

Amended Complaint is difficult to follow, but it appears to allege eleven counts arising under the

---

[1]Plaintiffs' failure to respond to Defendant's Motion is "deemed sufficient cause for granting the motion by default."
S.D. Fla. L.R. 7.1(c)(1); *see also GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1311 n.7 (S.D.
Fla. 2017) ("When a party fails to respond to an argument or address a claim in a responsive brief, such argument or
claim can be deemed abandoned.").

Racketeer Influenced and Corrupt Organizations Act (RICO), a § 1983 claim, and a violation of the United Nations Universal Declaration of Human Rights. In general, the Amended Complaint complains of the revocation of Kaul's medical license in New Jersey in 2012 and a vast, sprawling conspiracy by Defendants to unlawfully prohibit him from practicing medicine.

FSMB argues that the Amended Complaint fails to comply with Federal Rule of Civil Procedure 8(a)(2), which requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" FSMB is indisputably correct. As the District of Massachusetts described a similar pleading filed by Plaintiff Kaul, the Amended Complaint is replete with "bizarre, far-fetched" claims, including, for example, "spurious comparisons between the insurance industry . . . and Nazi Germany and slavery[.]" *Kaul v. Boston Partners, Inc.*, No. 21-CV-10326-ADB, 2021 WL 3272216, at *3 (D. Mass. July 30, 2021). In short, FSMB is correct that there is nothing "short and plain" about the Amended Complaint, so dismissal for failure to comply with Rule 8(a)(2) is appropriate.

The Motion additionally argues that dismissal with prejudice is appropriate because Plaintiff Kaul has violated a filing injunction entered against him on September 12, 2022 in *Kaul v. Intercontinental Exchange*, No. 21-cv-6992 (S.D.N.Y. Sept. 12, 2022) (the "S.D.N.Y. Case"). ECF No. [17] at 2. That case, like the present case, alleged a vast conspiracy relating to the revocation of Kaul's medical license. The S.D.N.Y. court examined Kaul's "history of being a vexatious and harassing litigant" and found that he had filed "at least twelve lawsuits outside the District of New Jersey," all of which "concern the denial of his medical license in New Jersey as well as subsequent related proceedings." *Id.* at 17. He "has not prevailed in any of the twelve duplicative cases he has filed with the district courts around the United States." *Id.* at 18. His lawsuits "caused needless expense to other parties" and burdened court personnel. *Id.* at 19. The

2

S.D.N.Y. court dismissed Plaintiff Kaul's lawsuit with prejudice.

The S.D.N.Y. court also deemed it necessary to issue a filing injunction against Kaul due to his "extensive history of duplicative lawsuits." *Id.* at 17. "For years, Kaul has filed cases in improper venues and then voluntarily dismissed them once they reach the District of New Jersey." *Id.* The court found that no lesser sanctions would be adequate to abate Kaul's vexatious litigation. Accordingly, it imposed an injunction against Kaul:

> from filing in any United States district court any action . . . against any of the Defendants named in this litigation that relates to or arises from (i) the denial of his medical license, (ii) subsequent litigation proceedings initiated by the Defendants here before the date of this Order; (iii) subsequent litigation proceedings initiated by Plaintiff Kaul before the date of this Order; without first obtaining leave from this Court.

*Id.* at 20.

Kaul's present lawsuit is brought by the same two named plaintiffs as in the S.D.N.Y. case (Kaul and Basch), and it names many of the same Defendants as in the that case (GEICO, Federation State Medical Boards, Christopher J. Christie, Daniel Stolz). While the 154-page Complaint is difficult to follow, ECF No. [6], it plainly "relates to or arises from [ ] the denial of [Kaul's] medical license."

Filing injunctions issued by other district courts are enforceable in this District. *See Martin-Trigona v. Shaw*, 986 F.2d 1284, 1387 (11th Cir. 1993) (affirming dismissal pursuant to an injunction entered by the District Court of Connecticut). "The only restriction [the Eleventh] Circuit has placed upon injunctions designed to protect against abusive and vexatious litigation is that a litigant cannot be 'completely foreclosed from any access to the court.'" *Id.* (quoting *Procup v. Strickland*, 792 F.2d 1069, 1074 (11th Cir. 1986) (en banc)). The Eleventh Circuit has "upheld dismissals of *pro se* actions where the plaintiffs, who were frequent litigators, violated injunctions prohibiting them from filing or attempting to initiate any new lawsuits in any federal court without

first obtaining leave of the court." *Dinardo v. Palm Beach Cnty. Cir. Ct. Judge*, 199 F. App'x 731, 735 (11th Cir. 2006) (affirming a district court's *sua sponte* dismissal order for failure to comply with a filing injunction).

The S.D.N.Y. court's filing injunction does not completely foreclose Plaintiff Kaul's access to the court. Only certain claims against certain Defendants are covered by that injunction, and the injunction allows him to file new cases so long as he first seeks leave to do so. ECF No. [17-1] at 20. Similar injunctions are routinely upheld. *See, e.g.*, *Dinardo*, 199 F. App'x at 737.

In sum, the Amended Complaint is in violation of a valid filing injunction entered by the Southern District of New York. "Dismissal of a complaint with prejudice is an appropriate means to enforce violations of such injunctions." *Martin-Trigona*, 986 F.2d at 1388.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant FMSB's Motion to Dismiss, **ECF No. [17**], is **GRANTED**.

2. Kaul's Amended Complaint, **ECF No. [6]**, is **DISMISSED WITH PREJUDICE**.

3. To the extent not otherwise disposed of, all pending motions are **DENIED AS MOOT** and all deadlines are **TERMINATED**.

4. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 22, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of record

Richard Arjun Kaul

4

24 Washington Valley Road
Morristown, NY 07960

David Basch
90 S. Sparta Ave.
Sparta, NJ 07871

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:23-cv-00672-M-KS

| | | |
|---|---|---|
| RICHARD ARJUN KAUL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| CENTER FOR PERSONALIZED EDUCATION | ) | |
| FOR PHYSICIANS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

This matter comes before the court on the motions to dismiss filed by Defendants

Christopher J. Christie ("Christie") and James Howard Solomon ("Solomon") [DE 17]; Allstate

Insurance Company ("Allstate") [DE 36]; Federation of State Medical Boards of the United States,

Inc. (the "Federation") [DE 43]; Richard F. Heary ("Heary") [DE 48]; Center for Personalized

Education for Physicians ("CPEP") [DE 58]; and Daniel Stolz ("Stolz") [DE 64]. Plaintiff has filed

pro se responses to each of the pending motions. *See* DE 31, 51, 56, 61, 67, 84. For the following

reasons, the motions are granted.

**I. Factual and Procedural Background**

Plaintiff alleges that, more than a decade ago, he pioneered "the first outpatient minimally

invasive spinal fusion" procedure, which "revolutionized the field of spine surgery" and

"immensely benefitted" the public. DE 1 ¶¶ 15, 30. He was later reported to the state licensing

authority for performing his spinal fusion procedure, resulting in the revocation of his New Jersey

medical license in 2014. *Id.* ¶ 135. The New Jersey State Board of Medical Examiners found that

"his performance of spine surgeries on 11 patients without proper training and experience

constituted gross and repeated malpractice, negligence, and incompetence." *Kaul v. Christie*, 372

F. Supp. 3d 206, 215 (D.N.J. 2019). However, according to Plaintiff, the revocation allegedly resulted from a vast bribery and racketeering scheme involving numerous medical professionals, lawyers, government officials, and insurance companies. *Id.* ¶¶ 146–162. Since the revocation, Plaintiff has instituted approximately sixteen prior actions seeking monetary and injunctive relief, including the reinstatement of his medical license. *Id.* at 9.

Based on his filing history, on September 12, 2022, United States District Judge J. Paul Oetken enjoined Plaintiff from suing the defendants in *Kaul v. Intercontinental Exchange* ("*Kaul 2021*") in any federal district court for claims relating to or arising from "(i) the denial of his medical license; (ii) subsequent litigation proceedings initiated by the Defendants [t]here before the date of this Order; (iii) subsequent litigation proceedings initiated by Plaintiff Kaul before the date of this Order; without first obtaining leave from this Court." *See* No. 21-CV-6992, 2022 WL 4133427, at *9 (S.D.N.Y. Sept. 12, 2022). Judge Oetken warned that, if Plaintiff violates the order, "any request will be denied for failure to comply with this Opinion and Order, and [he] may be subject to sanctions, including monetary penalties or contempt." *Id.*

After entry of the filing injunction, Plaintiff filed suit in this district. *See* DE 1. The complaint in this case is 132 pages and appears to allege fifteen claims arising under the Racketeer Influence Corrupt Organizations Act ("RICO"), Section 1983 of Title 42 of the United States Code, and the United Nations Declaration of Human Rights. It seeks monetary and injunctive relief, including the reinstatement of his New Jersey medical license. It also names several *Kaul 2021* defendants (the Federation; Allstate; Christie; Heary; and Stolz) as well as other defendants who were unnamed in the previous suit (CPEP and Solomon). *See id.* at 131.

On January 11, 2024, Defendants Christie and Solomon moved to dismiss the complaint. DE 17. Defendants Allstate, Federation, Heary, and CPEP have also moved for dismissal. DE 36,

2

43, 48, 58. On March 13, 2024, Defendant Stolz joined the pending motions. DE 64. Plaintiff filed pro se responses to each motion. DE 31, 51, 56, 61, 67, 84.

On March 15, 2024, Judge Oetken issued an order confirming that Plaintiff had not sought permission to institute this action and thus has violated the filing injunction. *See* DE 173 at 2, *Kaul* 2021, No. 1:21-cv-6992. Judge Oetken denied Plaintiff permission to file or pursue this action against the defendants named in *Kaul* 2021 and ordered Plaintiff "to withdraw the EDNC action as to those defendants within 14 days of the date of this order. If he fails to do so, he may be subject to monetary sanctions and contempt." *Id.* To date, Plaintiff has not voluntarily withdrawn any affected claims. The motions are ripe for disposition.

## II. Discussion

### A. Rule 8

CPEP and Soloman argue that Plaintiff has failed to comply with Rule 8 of the Federal Rules of Civil Procedure and "leave to amend would be futile because Plaintiff has had multiple opportunities in various jurisdiction to amend his allegations and has perpetually failed to meet the Rule 8 requirements." *See* DE 18 at 4–5; DE 59 at 4–5 ("Kaul's recycled contentions have been repeatedly dismissed in courts across the United States because they do not plead a claim for relief.").

Kaul responds that "Defendants have not specifically described their misunderstanding" to portions of the complaint. DE 31 at 8. He contends that they "know and understand the exact meaning of these statements pertains to the insurance industry's over four hundred (400) year-long profit-purposed 'pattern of racketeering' that commenced with the trans-Atlantic slaving genocide, progressed to insuring the Nazi's execution gas chambers/human incinerators to the current asset seizing/trafficking on masse of ethnic minority physicians into for-profit American jails to the profiting from investing/funding/financing forced mass vaccination programs." *Id.* at 8–9

3

(emphasis omitted). He asserts that he does not need to amend the complaint, but if the court finds otherwise, he will correct any specific deficiencies identified for him. *Id.* at 9.

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to set forth "a short and plain statement of the claim showing that" the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2). The pleading requirement is violated when a complaint is replete with "vague ramblings and nonsensical claims" that defendants must attempt to decipher the "incomprehensible" to defend themselves. *El-Bey v. North Carolina*, 2014 WL 691580, at *2 (M.D.N.C. Feb. 21, 2014). Failure to satisfy the pleading requirement after having fair notice of the specific defects in a complaint and a meaningful chance to fix them is grounds for dismissal. *Dillard v. Perry*, 2019 WL 1244701, at *5 (E.D.N.C. Mar. 18, 2019). The opportunity to amend is not required when the effort would be futile. *See Arroyo v. Zamora*, 2018 WL 1413195, at *5 (W.D.N.C. Mar. 21, 2018).

Pro se pleadings are "to be liberally construed." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97 (1976)). "Principles requiring generous construction of pro se complaints are not, however, without limits." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). "Every party—pro se or otherwise—must comply with the Federal Rules of Civil Procedure." *Tagirova v. Elizabeth City State Univ.*, 2017 WL 4019516, at *4 (E.D.N.C. Sept. 11, 2017).

As CPEP and Solomon correctly point out, the complaint in this case is neither "short" nor "plain." It is 132 pages of vague and/or conclusory allegations, accompanied by 567 pages of exhibits. The complaint, like the complaints supporting Plaintiff's previous litigations, depends on "bizarre, far-fetched" claims "reliant on flawed premises" and "spurious comparisons between the insurance industry, on the one hand, and Nazi Germany and slavery, on the other, and difficult-to-

4

follow references to Mr. Kaul's other pending litigations (and related documents)." *Kaul v. Boston Partners, Inc.*, 2021 WL 3272216, at *3 (D. Mass. July 30, 2021).

Leave to amend would be futile in this case. Plaintiff maintains in essence that he will not amend his complaint to comply with Rule 8 unless specific deficiencies are identified in his complaint. *See* DE 31 at 9. "District judges have no obligation to act as counsel or paralegal to pro se litigants." *Pliler v. Ford*, 542 U.S. 225, 231 (2004). Moreover, Plaintiff has had several prior chances in his other litigations to amend his recycled allegations to state a short, plain, and plausible claim to relief, yet those other litigations "have [never] resulted in any relief for [him]." *See Kaul* 2021, 2022 WL 4133427, at *1–2. Based on the record as a whole, his filing history, and the assertions in his response, dismissal with prejudice under Fed. R. Civ. P. 8(a)(2) is appropriate.

### B. Filing Injunction

The Federation, Allstate, Christie, Heary, and Stolz argue that dismissal with prejudice is also appropriate because Plaintiff has violated the filing injunction entered against him in *Kaul* 2021. *See, e.g.*, DE 18 at 2–4; DE 37 at 11–13; DE 44 at 2–5; DE 49 at 4–7. Plaintiff responds that the injunction, like all nationwide injunctions, "are heavily disfavored" and that the injunction was a product of "Fraud on the Court" and judicial corruption. *See, e.g.*, DE 31 at 4–7; DE 51 at 25–29; DE 56 at 3–6; DE 61 at 25–26.

The filing injunction enjoined Plaintiff from suing the above-named Defendants (Federation, Allstate, Christie, Heary, and Stolz) in any federal district court for claims relating to or arising from "the denial of his medical license . . . without first obtaining leave from this Court." *See Kaul* 2021, 2022 WL 4133427, at *9. Plaintiff did not appeal, and no court has invalidated, the filing injunction. Thus, the filing injunction remains in full effect. *See* DE 173 at 2, *Kaul* 2021, No. 1:21-cv-6992 (enforcing filing injunction).

5

There is no genuine dispute regarding whether Plaintiff has violated the injunction by filing the pending claims against the above-named Defendants. Plaintiff has again sued the above-named Defendants with allegations that they conspired "to make an example of him and cause public officials to bar him from practicing medicine in New Jersey," in violation of federal and international law. *See, e.g., Kaul v. Intercontinental Exch.*, No. 23-cv-02016, 2023 WL 3346769, at *1 (S.D.N.Y. May 10, 2023); DE 1 ¶¶ 14, 45, 110, 135, 137, 141–144 (alleging private and public corruption stemming from the denial of his New Jersey medical license and seeking monetary and injunctive relief, including the reinstatement of his medical license). He has not sought permission to file the instant claims against the above-named Defendants. *See* DE 173 at 2, *Kaul* 2021, No. 1:21-cv-6992 (confirming violation of filing injunction). "Dismissal of a complaint with prejudice is an appropriate means to enforce violations of such injunctions." *Kaul v. Fed'n State Med. Bds. – Fla. Bd. of Med.* (S.D. Fla. Aug. 22, 2023) (quoting *Martin-Trigona v. Shaw*, 986 F.2d 1284, 1388 (11th Cir. 1993)).

### III. Conclusion

For the foregoing reasons, the court GRANTS Defendants' motions [DE 17, 36, 43, 48, 58, 64] and DISMISSES Plaintiff's complaint with prejudice.

The clerk of court is DIRECTED to close this case.

SO ORDERED this ___14th___ day of June, 2024.

Richard E Myers II
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

6

United States District Court
Southern District of Texas
**ENTERED**
January 07, 2025
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| RICHARD ARJUN KAUL MD, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:24-CV-03180 |
| | § | |
| FEDERATION STATE MEDICAL | § | |
| BOARDS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## **ORDER**

Before the Court are *pro se* Plaintiff Richard Arjun Kaul's ("Plaintiff") Complaint (Doc. #1); Defendant James Howard Solomon's ("Solomon") Motion to Dismiss (Doc. #20) and Plaintiff's Response (Doc. #33); Defendant Allstate Insurance Company's ("Allstate") Motion to Dismiss (Doc. #25)[1] and Plaintiff's Response (Doc. #37); Defendant Christopher J. Christie's ("Christie") Motion to Dismiss (Doc. #26) and Plaintiff's Response (Doc. #40); Defendant Daniel Stolz's ("Stolz") Motion to Dismiss (Doc. #27) and Plaintiff's Response (Doc. #45); Defendant Center for Personalized Education for Physicians' ("CPEP") Motion to Dismiss (Doc. #30) and Plaintiff's Response (Doc. #43); and Defendant Federation State Medical Boards' (the "Federation") Motion to Dismiss (Doc. #31) and Plaintiff's Response (Doc. #44). Having considered the parties' arguments and the applicable legal authority, the Court grants each of the Motions to Dismiss.

---

[1] Also before the Court is Allstate's Motion for Extension of Time to Answer, Move, or Otherwise Respond to Plaintiff's Complaint (the "Motion for Extension of Time"). Doc. #15. The Court finds that the Motion for Extension of Time should be granted and deems Allstate's Motion to Dismiss (Doc. #25) timely filed as of September 30, 2024.

## I.     Background

This case arises out of the revocation of Plaintiff's license to practice medicine.  Doc. #1 at 11.  Plaintiff was once a licensed anesthesiologist in New Jersey, but had his medical license revoked following an administrative disciplinary proceeding in 2013.  *Id.*  Solomon was the Administrative Law Judge ("ALJ") that presided over the administrative law proceeding.  *Id.*  Solomon determined that Plaintiff's license should be revoked because he had conducted several spinal surgeries without proper training and education.  *See Kaul v. Christie*, 372 F. Supp. 3d 206, 221–24 (D.N.J. 2019).  Solomon's opinion was adopted by the New Jersey Board of Medical Examiners in 2014.  *Id.* at 224.

Following the revocation of Plaintiff's medical license, he filed a litany of *pro se* actions against numerous parties, including federal and state officials, insurance companies, banking institutions, and medical boards.  *See, e.g., Kaul v. Fed'n of State Med. Boards, et al.*, No. 4:21-CV-00057, 2021 WL 6550884, at *1 (N.D. Tex. Sept. 17, 2021), *report and recommendation adopted*, 2022 WL 171294 (N.D. Tex. Jan. 19, 2022) ("This case is another chapter in a long saga of repetitive, frivolous lawsuits Kaul has brought against numerous defendants regarding revocation of his license to practice medicine.").  In an effort to stop the barrage of actions being filed, the Honorable James Paul Oetken in the United States District Court for the Southern District of New York issued a nationwide pre-filing injunction against Plaintiff, prohibiting him from filing "any action, motion, petition, complaint, or request for relief" against certain parties that relates to the revocation of Plaintiff's medical license, without first obtaining leave.  *See Kaul v. Intercontinental Exch.*, No. 21-CV-6992, 2022 WL 4133427, at *9 (S.D.N.Y. Sept. 12, 2022).  The injunction issued by Judge Oetken covers several Defendants in this action, including the Federation, Allstate, Christie, Stolz, and Robert Francis Heary ("Heary").  *Id.*

2

Despite the injunction, Plaintiff filed a Complaint in this Court on August 26, 2024, alleging various claims against the Federation, Allstate, Christie, Stolz, and Heary, as well as CPEP and Solomon.  Doc. #1.  The Federation, Allstate, Christie, Stolz, CPEP, and Solomon have since appeared and filed Motions to Dismiss based on the filing injunction and pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2).  *See* Doc Nos. 20, 25, 26, 27, 30, 31.  Heary has not yet made an appearance in this action.  The Court will first resolve Plaintiff's claims against the Federation, Allstate, Christie, Stolz, and Heary, because these parties are all covered by the filing injunction.  Then, the Court will resolve Solomon and CPEP's Motions to Dismiss in turn.

## II. Legal Standards

### a. Federal Rule of Civil Procedure 12(b)(1)

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction tests the court's statutory or constitutional power to adjudicate the case." *Wesolek v. Layton*, 871 F. Supp. 2d 620, 627 (S.D. Tex. 2012) (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).  District courts may dismiss a case for lack of subject matter jurisdiction based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).  "The burden of proof for a [Rule] 12(b)(1) motion to dismiss is on the party asserting jurisdiction, and, at the pleading stage, the plaintiff's burden is to allege a plausible set of facts establishing jurisdiction."  *Haverkamp v. Linthicum*, 6 F.4th 662, 668 (5th Cir. 2021) (cleaned up).  Moreover, "all well-pleaded facts are taken as true and all reasonable inferences must be made in the plaintiff's favor."  *Id.* at 668–69.

### b.  Federal Rule of Civil Procedure 12(b)(2)

A claim against a defendant over whom the court lacks personal jurisdiction must be dismissed. FED. R. CIV. P. 12(b)(2). When a court rules on a Rule 12(b)(2) motion without a hearing, as is the case here, the plaintiff must make a prima facie showing of jurisdiction. *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). The Texas long-arm statute extends personal jurisdiction as far as the federal constitutional requirements of due process allow. *Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of New York, Inc.*, 889 F. Supp. 2d 912, 920 (S.D. Tex. 2012). "As a result, the long-arm statute and the federal [d]ue [p]rocess inquiries are essentially identical." *Id.* "To satisfy the requirements of due process, the plaintiff must demonstrate: (1) that the non-resident purposely availed himself of the benefits and protections of the forum state by establishing minimum contacts with the state; and (2) that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009) (cleaned up).

"Jurisdiction may be general or specific." *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 484 (5th Cir. 2008). "Specific jurisdiction exists when the plaintiff's claim against the non-resident defendant arises out of or relates to activities that the defendant purposefully directed at the forum state. In contrast, general jurisdiction requires the defendant to have maintained 'continuous and systematic' contacts with the forum state." *Mullins*, 564 F.3d at 398 (citations omitted).

### III.  Analysis

### a.  The Federation, Allstate, Christie, Stolz, and Heary

The Federation, Allstate, Christie, and Stolz have all filed Motions to Dismiss based on the pre-filing injunction entered by Judge Oetken. Doc. Nos. 25, 26, 27, 31. Though Heary has not

appeared in this action, Judge Oetken's injunction also applies to him. *See Intercontinental Exch.*, 2022 WL 4133427, at *9. The Fifth Circuit has held that "[a] district court may bar a vexatious litigant from filing future . . . complaints unless [he] seeks the prior approval of a district or magistrate judge." *Potts v. Texas*, 354 F. App'x 70, 71 (5th Cir. 2009). If a plaintiff fails "to comply with [a] Pre-Filing Injunction," his "case may be dismissed for failure to obey a court order." *Balistreri-Amrhein v. Universal Ins. Co. of N. Am.*, No. 4:21-CV-224-ALM-KPJ, 2022 WL 17731827, at *2 (E.D. Tex. Oct. 31, 2022) (citing *McCullough v. Lynaugh*, 835 F.2d 1126, 1127 (5th Cir. 1988); *Dunn v. Farrell*, 598 F. App'x 332, 333 (5th Cir. 2015)), *report and recommendation adopted*, 2023 WL 175159 (E.D. Tex. Jan. 12, 2023).

Here, Plaintiff's claims against the Federation, Allstate, Christie, Stolz, and Heary arise out of the revocation of his medical license and subsequent litigation proceedings. *See* Doc. #1. Moreover, there is nothing before the Court suggesting Plaintiff sought leave to file his Complaint. Thus, the Court finds that Plaintiff filed his Complaint in violation of Judge Oetken's pre-filing injunction. *See Intercontinental Exch.*, 2022 WL 4133427, at *9. Accordingly, the claims Plaintiff has asserted against the Federation, Allstate, Christie, Stolz, and Heary are dismissed. *See Rodriguez v. Killam*, No. 3:23-CV-139-L-BK, 2023 WL 6563408, at *2 (N.D. Tex. Aug. 15, 2023), *report and recommendation adopted as modified*, No. 3:23-CV-139-L-BK, 2023 WL 6141597 (N.D. Tex. Sept. 18, 2023) (dismissing the plaintiff's claims with prejudice for failure to comply with a pre-filing injunction); *Dunn v. Farrell*, 598 F. App'x 332, 333 (5th Cir. 2015) ("A district court may sua sponte dismiss an action for failure . . . to comply with any court order.").[2]

---

[2] The Court also notes that this case is not Plaintiff's first attempt to flout Judge Oetken's order. Several other district courts across the country have dismissed actions filed by Plaintiff based on the pre-filing injunction. *See, e.g., Kaul v. Intercontinental Exch.*, No. 23CV02016JLROTW, 2023 WL 3346769, at *3 (S.D.N.Y. May 10, 2023); *Kaul v. Fed'n State Med. Boards - Fla. Bd. of Med.*, No. 23-CV-22325, 2023 WL 5428497, at *2 (S.D. Fla. Aug. 23, 2023), *appeal dismissed*

### b. Solomon

Next, Solomon has asserted judicial immunity and moved to dismiss Plaintiff's claims for lack of subject-matter jurisdiction under Rule 12(b)(1).  Doc. #20 at 3.  "A judge generally has absolute immunity from suits for damages."  *Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 221 (5th Cir. 2009).  Judicial immunity extends to ALJs.  *See Boone v. Matthews*, No. 4:24-CV-1448, 2024 WL 4645063, at *2 (S.D. Tex. Oct. 9, 2024), *report and recommendation adopted*, 2023 WL 11967625 (S.D. Tex. Oct. 31, 2024) (holding that an ALJ was immune from suit because the plaintiff's claims were premised on actions that "occurred in the context of [the ALJ's] judicial capacity").  "There are only two situations in which judicial immunity may be overcome: (1) the complained of action was not taken in a judicial capacity; or (2) the action was taken 'in the complete absence of all jurisdiction.'"  *Id.* (quoting *Davis*, 565 F.3d at 221).

Plaintiff's claims against Solomon relate to his actions as the presiding ALJ in an administrative law proceeding.  *See* Doc. #1 at 11, 25–26.  Specifically, Plaintiff accuses Solomon of being corrupt and holding an "illegally conducted administrative law proceeding."  *Id.* at 25.  Thus, "[w]ithout question, the ALJ's actions occurred in in the context of [his] judicial capacity."  *See Boone*, 2024 WL 4645063, at *2.  Moreover, Plaintiff does not allege or argue that Solomon acted without jurisdiction.  Thus, the Court finds that Solomon enjoys judicial immunity and his Motion to Dismiss is granted under Rule 12(b)(2).  *See id.* at *2–3; *Kaul v. Christie*, 372 F. Supp. 3d 206, 246 (D.N.J. 2019) (dismissing Plaintiff's claims against Solomon in a separate action based on judicial immunity).

---

*sub nom. Kaul v. GEICO Ins. Co.*, No. 23-12856-AA, 2024 WL 832290 (11th Cir. Jan. 4, 2024); *Kaul v. Ctr. for Personalized Educ. for Physicians*, No. 5:23-CV-00672-M-KS, 2024 WL 3015744, at *3 (E.D.N.C. June 14, 2024).

6

### c.   CPEP

CPEP, the only remaining defendant in this action, has moved to dismiss Plaintiff's claims under Rule 12(b)(2) for lack of personal jurisdiction.   Doc. #30 at 3.   With respect to general jurisdiction, Plaintiff must show that CPEP's "contacts with the forum state are 'substantial, continuous, and systematic.'"   *Final Expense Direct v. Python Leads, LLC*, 689 F. Supp. 3d 430, 435 (S.D. Tex. 2023) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–19 (1984)).   "A corporate defendant is subject to general jurisdiction where it is incorporated and where it has its principal place of business."   *Id.*   In addition, there are "exceptional cases" in which courts may exercise general jurisdiction if a corporation's "operations in another forum" are "so substantial and of such a nature as to render the corporation at home in that State."   *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (internal quotations and citation omitted).   Here, Plaintiff's Complaint alleges that CPEP is a resident of North Carolina.   Doc. #1 at 11.   Plaintiff does not allege any facts indicating CPEP has continuous and systematic contacts in Texas such that CPEP is "at home" in the state.   *See id.*   Thus, Plaintiff has not made a prima facie showing of general personal jurisdiction over CPEP.

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."   *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotations and citation omitted).   "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation."   *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (cleaned up).   "The defendant's suit-related conduct must create a substantial connection with the forum state, and 'the relationship must arise out of contacts that the defendant himself creates with the forum State' . . .

7

with the 'minimum contacts analysis look[ing] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Associated Energy Grp., LLC v. Air Cargo Germany GMBH*, 24 F. Supp. 3d 602, 608 (S.D. Tex. 2014) (quoting *Walden*, 571 U.S. at 284–85). "[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 571 U.S. at 286. As such, "[t]he mere act of contracting with a resident of the state is, without more, insufficient to confer personal jurisdiction." *Am. Gen. Life Ins. Co. v. Rasche*, 273 F.R.D. 391, 395 (S.D. Tex. 2011).

The Court finds that Plaintiff has failed to allege minimum contacts sufficient to make a prima facie showing of the Court's specific personal jurisdiction over CPEP. The Complaint alleges that CPEP is a North Carolina resident, and the events giving rise to Plaintiff's claims primarily occurred in New Jersey. The sole contact alleged in the Complaint is Plaintiff's vague assertion that CPEP has a business relationship with the Federation, which operates in Texas. Doc. #1 at 11, 42–43. However, "the existence of a contract between the nonresident defendant and a resident of the forum [is] insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004). Because Plaintiff does not allege any other contacts between CPEP and Texas other than this apparent business relationship between CPEP and the Federation, the Court finds Plaintiff has not demonstrated personal jurisdiction exists. Accordingly, CPEP's Motion to Dismiss for lack of personal jurisdiction is granted.

## IV.    Conclusion

In conclusion, the Court finds that Plaintiff's claims against the Federation, Allstate, Christie, and Stolz should be dismissed because Plaintiff failed to comply with the pre-filing injunction issued by Judge Oetken. As such, the Federation, Allstate, Christie, and Stolz's

respective Motions to Dismiss (Doc. Nos. 25, 26, 27, 31) are hereby GRANTED for the reasons stated herein, and Plaintiff's claims against these parties are DISMISSED WITH PREJUDICE. Allstate's Motion for Extension of Time (Doc. #15) is also GRANTED. In addition, because the pre-filing injunction also applies to Heary, the Court sua sponte DISMISSES WITH PREJUDICE Plaintiff's claims against Heary.

Moreover, the Court has determined Solomon is entitled to judicial immunity. As such, Solomon's Motion to Dismiss (Doc. #20) is GRANTED pursuant to Rule 12(b)(1), and Plaintiff's claims against Solomon are DISMISSED WITH PREJUDICE. With respect to CPEP, the Court finds that the Court lacks personal jurisdiction. Thus, CPEP's Motion to Dismiss (Doc. #30) is hereby GRANTED pursuant to Rule 12(b)(2), and Plaintiff's claims against CPEP are DISMISSED WITHOUT PREJUDICE.

Finally, because all of Plaintiff's claims have been dismissed, the remaining pending motions in this case (Doc. Nos. 12, 24, 32, 35, 52, 53, 65, 87, 90, 93, 94, 95, 96, 97, 98, 99, 101) are DENIED as MOOT.

It is so ORDERED.

January 7, 2025
Date

The Honorable Alfred H. Bennett
United States District Judge

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD ARJUN KAUL, MD; JANE DOE;
JOHN DOE,

                   Plaintiffs,

           -against-

JAMES PAUL OETKEN; EDWARD
SPONZILLI; PAUL E. DWYER; DANIEL M.
STOLZ; DAVID J. D'ALOIA; JAY W.
BROWN; JANE DOE; JOHN DOE,

                   Defendants.

25-CV-6495 (LTS)

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District Judge:

      Plaintiff Richard Arjun Kaul, who is proceeding *pro se*, brings this new civil action

against several individuals and entities regarding an alleged conspiracy on the part of

Defendants, involving the denial of his medical license, and the subsequent litigation related to

this denial.[1] By order dated August 13, 2025, the Court directed Plaintiff to pay the fees to

initiate a new civil action or request leave to proceed *in forma pauperis* ("IFP"). Plaintiff filed an

IFP application on August 15, 2025. The Court grants this application, but for the following

reasons, dismisses the action.

### DISCUSSION

      On September 12, 2022, Plaintiff was barred from filing any new action, motion, petition,

complaint, or request for relief regarding the denial of his medical license. *See Kaul v.

Intercontinental Exch.*, No. 21-CV-6992 (JPO) (S.D.N.Y. Sept. 13, 2022) ("*Kaul I*"). The

injunction barred Plaintiff from filing any such action against (1) Intercontinental Exchange, a

---

[1] Plaintiff includes a Jane Doe and a John Doe as plaintiffs in this action but does provide
any information suggesting that other individuals intended to participate in this action. The Court
therefore refers to a single plaintiff throughout this order.

stock exchange holding company; (2) GEICO, TD Bank, and Allstate Insurance Company

("Allstate"), banks and insurance companies; (3) Federation of State Medical Boards ("FSMB");

(4) Arthur Hengerer, Robert Heary, and Atlantic Health Systems, doctors and a health institution;

(5) New Jersey officials Chris Christie, Philip Murphy, and Gurbir Grewal; (6) Daniel Stolz and

Max Gersenoff, two lawyers; and (7) Rivkin Radler, a law firm. The injunction specifically

barred Plaintiff

> from filing in any United States district court any action, motion, petition, complaint, or request for relief against any of the Defendants named in this litigation that relates to or arises from (i) the denial of his medical license; (ii) subsequent litigation proceedings initiated by the Defendants here before the date of this Order; (iii) subsequent litigation proceedings initiated by Plaintiff Kaul before the date of this Order; without first obtaining leave from this Court. Any motion for leave must include the caption "Request for Permission to File under Filing Injunction" and must be submitted to the Pro Se Intake Unit of this Court along with Plaintiff Kaul's proposed filings.

*Kaul I*, ECF 1:21-CV-6992, 168, at 19.

Plaintiff now files this new action, asserting claims against the Honorable J. Paul Oetken,

the district judge who issued the injunction in *Kaul I*; Stolz, who Plaintiff sued in *Kaul I*; Edward

Sponzilli, a lawyer who represented Heary in *Kaul I*; Paul E. Dwyer, a lawyer who represented

Christie, Murphy, and Grewal in *Kaul I*;  David J. D'Aloia, a lawyer who represented Allstate in

*Kaul I*; and Jay Brown, a lawyer who represented the FSMB in *Kaul I*. The claims asserted in

this action concern the alleged conspiracy regarding the denial of Plaintiff's medical license, as

well as the subsequent litigation proceedings. Accordingly, the *Kaul I* injunction applies.

Because Plaintiff did not request leave of court to file this new action, the Court dismisses the

action for failure to comply with the *Kaul I* injunction order.

## CONCLUSION

The Court grants Plaintiff's IFP application and directs the Clerk of Court to terminate

this motion (ECF 4).

The Court dismisses this action for failure to comply with the injunction issued in *Kaul v. Intercontinental Exch.*, No. 21-CV-6992 (JPO) (S.D.N.Y. Sept. 13, 2022).

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated:    August 20, 2025
          New York, New York

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge

# APPENDIX K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.D. RICHARD ARJUN KAUL, *et al.*,
                              Plaintiffs,

                    -v-

INTERCONTINENTAL EXCHANGE, *et al.*,
                              Defendants.

21-CV-6992 (JPO)

ORDER

J. PAUL OETKEN, District Judge:

On September 12, 2022, the Court issued an Opinion and Order granting Defendants'

motion to dismiss, noting that Plaintiff Kaul "has a history of being a vexatious and harassing

litigant." (ECF No. 168 at 16.) Kaul "harasses officials to manufacture litigation." (*Id.*) In

particular, "[i]t appears that one of Mr. Kaul's tactics is to send a letter to someone alerting them

to the alleged conspiracy (or asking them to disclaim involvement) and then, if the recipient does

not respond, concluding that they are a participant in the conspiracy." (*Id.* (quoting *Kaul v. Bos.

Partners, Inc.*, No. 21-CV-10326, 2021 WL 3272216, at *3 n.13 (D. Mass. July 30, 2021).)

Kaul, joined by co-Plaintiff David Basch, once again attempts to employ this tactic via a

motion for judicial disqualification. (ECF No. 171.) Their arguments pursuant to 28 U.S.C. §

455 and 28 U.S.C. § 144 are unsupported, impermissibly speculative, and without merit.

The motion is therefore DENIED.

The Clerk of Court is directed to close the motion at ECF No. 171.

SO ORDERED.

Dated: August 14, 2023
       New York, New York

                                        J. PAUL OETKEN
                                        United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.D. RICHARD ARJUN KAUL, *et al.*
                                        Plaintiffs,

                        -v-

INTERCONTINENTAL EXCHANGE, *et al.*
                                        Defendants.

21-CV-6992 (JPO)

ORDER

J. PAUL OETKEN, District Judge:

On September 12, 2022, this Court issued an order imposing a nationwide filing injunction against Plaintiff Richard Arjun Kaul, following his filing of multiple frivolous and vexatious lawsuits against numerous defendants in this Court and other courts. *See Kaul v. Intercontinental Exchange*, No. 21-CV-6992, 2022 WL 4133427, at *8-9 (S.D.N.Y. Sept. 12, 2022). Specifically, that order barred Kaul from "filing in any United States district court any action, motion, petition, complaint, or request for relief against any of the Defendants named in this litigation that relates to or arises from . . . the denial of his medical license . . . without first obtaining leave from this Court." *Id.* at *9. The order further provided that if Kaul violated the order by filing such materials without first obtaining leave of this Court, "any request will be denied for failure to comply with this Opinion and Order, and Plaintiff Kaul may be subject to sanctions . . . ." *Id.*

Kaul did not file an appeal from this Court's September 12, 2022 order.

The Court has learned that Kaul has filed suit in the United States District Court for the Eastern District of North Carolina alleging wrongdoing against several defendants in connection with the revocation of his medical license. *Kaul v. Center for Professional Education for Physicians, et al.*, No. 5:23-CV-672 (E.D.N.C.) ("the EDNC action"). That lawsuit names

1

certain individuals who were also defendants in this action, including Christopher Christie and Dr. Robert Heary.  Kaul did not obtain permission from this Court prior to filing the EDNC action.  He is therefore in violation of this Court's filing injunction.

Accordingly, Kaul is hereby DENIED permission to file or pursue the EDNC action as to defendants Christie, Heary, and any other defendants who were named in this action.  Kaul is further ORDERED to withdraw the EDNC action as to those defendants within 14 days of the date of this order.  If he fails to do so, he may be subject to monetary sanctions and contempt.

SO ORDERED.

Dated: March 15, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge

The Clerk of Court is directed to mail a copy of this order to:

Richard Arjun Kaul
24 Washington Valley Road
Morristown, NJ 07960

# Ballard Spahr
### LLP

- - - - - - - - - - - - - - - - - -

1909 K Street, NW
12th Floor
Washington, DC 20006-1157
TEL 202.661.2200
FAX 202.661.2299
www.ballardspahr.com

Jay Ward Brown
Tel: 202.508.1136
Fax: 202.661.2299
brownjay@ballardspahr.com

September 16, 2024

*Via CM/ECF*

Hon. J. Paul Oetken
United States District Court
Room 2101
40 Foley Square
New York, NY 10007

Re**:**   *Kaul, et al. v. Intercontinental Exchange, et al.* Case No. 1:21-cv-06992-JPO

Dear Judge Oetken:

Pursuant to Local Civil Rule 7.1, the Federation of State Medical Boards of the United States, Inc. ("Federation"), dismissed defendant in the above-referenced action, requests that the Court (1) deny Plaintiff Richard Arjun Kaul permission to further pursue his claim against the Federation asserted in *Kaul v. Federation of State Medical Boards, et al.*, No. 4:24-cv-3180, in the Southern District of Texas (the "Texas Action"),[1] and (2) order Kaul to withdraw the Texas Action.

In particular, the Court on September 12, 2022, issued an order imposing a nationwide filing injunction against Kaul. *See* ECF No. 168. The order states:

> From the date of this Opinion and Order, Plaintiff Kaul is barred from filing in any United States district court any action, motion, petition, complaint, or request for relief against any of the Defendants named in this litigation that relates to or arises from (i) the denial of his medical license; (ii) subsequent litigation proceedings initiated by the Defendants here before the date of this Order; (iii) subsequent litigation proceedings initiated by Plaintiff Kaul before the date of this Order; without first obtaining leave from this Court.

---

[1] A copy of the 160-page Complaint filed in the Texas Action, but not the more than 600 pages of exhibits, is attached as Exhibit 1 to this letter motion.

Hon. J. Paul Oetken
September 16, 2024
Page 2

Kaul repeatedly has defied the Court's order. *See Kaul v. Federation of State Medical Boards*, No. 1:23-cv-22325-BB (S.D. Fla.) (dismissed Aug. 22, 2023); *Kaul v. Ctr. for Personalized Ed. for Physicians*, No. 5:23-cv-672-M-KS (E.D.N.C.) ("EDNC Action") (dismissed June 14, 2024). And when the Court on March 15, 2024, ordered Kaul to withdraw his complaint filed in the EDNC Action against the Federation and others, *see* ECF No. 173, Kaul disobeyed that order as well.

Kaul has yet again flouted the Court's order by filing the Texas Action without first obtaining leave from this Court. Specifically, Kaul's claims in the Texas Action are based on an alleged scheme to prevent him from practicing medicine "based on the illegal 2012/2014 suspension/revocation of his New Jersey license." *See* Ex. 1 at 13; *id.* at 17 ("But for the illegal 2014 revocation, Plaintiff Kaul would not have been caused injury . . . ."). The Complaint is thus a rehash of Kaul's repeatedly dismissed theory of a conspiracy that purportedly began more than a decade ago. *See generally id.*

Because Kaul has therefore violated this Court's anti-filing injunction, the Federation respectfully requests that the Court deny Kaul permission to pursue the Texas Action and order him to immediately dismiss the Complaint as to the Federation.

Sincerely,

Jay Ward Brown

cc:
Richard Arjun Kaul (via email)
All counsel of record in this action (via ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

M.D. RICHARD ARJUN KAUL, *et al.*
                            Plaintiffs,

                    -v-

INTERCONTINENTAL EXCHANGE, *et al.*
                            Defendants.

21-CV-6992 (JPO)

ORDER

J. PAUL OETKEN, District Judge:

On September 12, 2022, this Court issued an order imposing a nationwide filing injunction against Plaintiff Richard Arjun Kaul, following his filing of multiple frivolous and vexatious lawsuits against numerous defendants in this Court and other courts. *See Kaul v. Intercontinental Exchange*, No. 21-CV-6992, 2022 WL 4133427, at *8-9 (S.D.N.Y. Sept. 12, 2022). Specifically, that order barred Kaul from "filing in any United States district court any action, motion, petition, complaint, or request for relief against any of the Defendants named in this litigation that relates to or arises from . . . the denial of his medical license . . . without first obtaining leave from this Court." *Id*. at *9. The order further provided that if Kaul violated the order by filing such materials without first obtaining leave of this Court, "any request will be denied for failure to comply with this Opinion and Order, and Plaintiff Kaul may be subject to sanctions . . . ." *Id*.

Kaul did not file an appeal from this Court's September 12, 2022 order.

The Court has learned that Kaul has filed suit in the United States District Court for the Southern District of Texas alleging wrongdoing against several defendants in connection with the revocation of his medical license. *Kaul v. Federation State Medical Boards, et al.*, No. 4:24-cv-3180 (S.D. Tex.) ("the Texas action"). That lawsuit names certain entities that were also

1

defendants in this action, including the Federation of State Medical Boards and Allstate Insurance Company. Kaul did not obtain permission from this Court prior to filing the Texas action. He is therefore in violation of this Court's filing injunction.

Accordingly, Kaul is hereby DENIED permission to file or pursue the Texas action as to defendants Federation of State Medical Boards, Allstate Insurance Company, and any other defendants who were named in this action. Kaul is further ORDERED to withdraw the Texas action as to those defendants within 14 days of the date of this order. If he fails to do so, he may be subject to monetary sanctions and contempt.

SO ORDERED.

Dated: October 2, 2024
New York, New York

_____
J. PAUL OETKEN
United States District Judge

The Clerk of Court is directed to mail a copy of this order to:

Richard Arjun Kaul
24 Washington Valley Road
Morristown, NJ 07960

2

# APPENDIX L

www.drrichardkaul.com

MAY 29, 2025

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
500 PEARL STREET, NY, NY 10007

**RE: KAUL v ICE: 21-CV-06992**
    **K11-7**
    **KAUL v OETKEN: 24-CV-00162**
    **K11-23**
    **NOTICE AS TO PETITION TO THE SUPREME COURT OF THE UNITED STATES FOR WRIT OF
    PROHIBITION TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
    NEW YORK.**

Dear Clerk of the Court,

Please find submitted the above document for publishing to the docket in KAUL v ICE: 21-CV-
06992-JPO.

Yours sincerely

K. Ki.
_____
RICHARD ARJUN KAUL, MD

No. 25-_____

---

# IN THE SUPREME COURT OF THE UNITED STATES

---

## PETITIONER RICHARD ARJUN KAUL
### vs.
## RESPONDENT JAMES PAUL OETKEN

---

## ON AN EMERGENCY PETITION FOR A WRIT OF PROHIBITION TO THE SOUTHERN DISTRICT OF NEW YORK IN CASE NO. 21-CV-06992-JPO

---

## RICHARD ARJUN KAUL, MD

## PROPRIA PERSONA PLAINTIFF

## 440c SOMERSET DRIVE

## PEARL RIVER, NY, 10965

## drrichardkaul@gmail.com

## DATED: May 27, 2025


## RELATED CASE

## KAUL v OETKEN ET AL: 24-CV-00621-CWR-LGI
## U.S.D.C. FOR SOUTHERN DISTRICT OF MISSISSIPPI

# CONTENTS

INDEX OF APPENDICES – Page ii

PARTIES TO THE PROCEEDING – Page iv

REFERENCED CASES OF THE KAUL CASES – Page v

SUMMARY OF ISSUES AND QUESTIONS PRESENTED – Page vi

CORPORATE DISCLOSURE STATEMENT – Page viii

LEGAL STANDARD OF REVIEW AND LEGAL AUTHORITIES AS TO GRANT OF WRIT – Page ix

APPENDICES' HYPERLINKS -Page x

PRELIMINARY STATEMENT AND CONTEXTUAL FACTS – Page 1

ISSUES AND QUESTIONS PRESENTED – Page 7

STATEMENT AND FACTS NECESSARY TO UNDERSTAND PETITION – Page 9

ARGUMENT – Page 18

REASONS FOR GRANTING THE WRIT – Page 30

RELIEF SOUGHT – Page 36

# INDEX OF APPENDICES

## All Appendices from A to I are hyperlinked within the petition to the relevant documents

**Appendix A:** <u>138 S. Ct. 2392 (2018) 585 U.S. 667 Donald J. TRUMP, President of the United States, et al., Petitioners v. HAWAII, et al. No. 17-965</u>. (June 26, 2018) Supreme Court of United States – Concurring opinion of Justice Thomas as to unconstitutionality, in equity and illegality of nationwide injunctions, which undermines Respondent Oetken's September 12, 2022 purported 'injunction' in K11-7.

**Appendix B:** Plaintiff Kaul notice to Defendant Oetken of nullity and Conflicted-ness of May 8 to June 17, 2025 proposal in K11-7.

**Appendix C:** Complaint in <u>Kaul v Oetken at al: 24-CV-00621-CWR-LGI</u> (U.S.D.C. for the S.D.M.)

**Appendix D:** Notice of Defendants Christie/Solomon in K11-17 re: Respondent Oetken's March 15, 2024 threat of contempt to Plaintiff Kaul to dismiss K11-17 by March 29, 2025. Petitioner Kaul sued Respondent on March 25, 2024 in K11-18.

**Appendix E:** Admissions of material and undisputed fact pursuant to Rule 8(b)(6) as to Defendant James Paul Oetken + Admissions of material and undisputed fact pursuant to Rule 8(b)(6) as to Defendant New York Attorney Grievance Committee.

**Appendix F:** September 12, 2022 opinion/order/injunction issued by Respondent James Paul Oetken in K11-7.

**Appendix G**: Complaint in K11-15 + Statement of material facts for Defendant Kenneth Murphy.

**Appendix H**: The Oetken Disqualification + '**THE OETKEN ANALYSIS**' in K11-7 + August 14, 2023 K11-14 prompted 'order' denying disqualification motion

**Appendix I**: Evidence/facts as to violation of the independent authority and Jurisdiction of the Southern District of Florida-K11 14-August 2023-U.S.D.J. Beth Bloom + Eastern District of North Carolina-K11-17-June 2024-Chief Judge Richard E. Myers III +Southern District of Texas –K11-20-January 7, 2025-U.S.D.J. Alfred H. Bennett

**Appendix J**: Notice to Defendant Oetken of nullity and conflicted-ness of May 8, 2025 entry onto the K11-7 docket.

# PARTIES TO THE PROCEEDING

**PETITIONER**

RICHARD ARJUN KAUL, MD

**RESPONDENT**:

JAMES PAUL OETKEN, ESQ

# REFERENCED CASES OF THE KAUL CASES

**K11-7**: KAUL v ICE ET AL: 21-CV-6992-CLOSED – PRE JARKESY (S.D.N.Y.)

**K11-14**: KAUL v FEDERATION ET AL: 23-CV-22325-CLOSED – PRE JARKESY (S.D.F.)

**K11-15**: KAUL v CHRISTIE/MURPHY: 23-CV-22582-CLOSED – PRE JARKESY (S.D.F.)

**K11-19**: KAUL v TEXAS MEDICAL BOARD ET AL: 24-CV-00163-CLOSED-PRE + POST JARKESY (S.D.T.)

**K11-20**: KAUL v FEDERATION: 24-CV-03180-CLOSED – POST JARKESY (S.D.T.)

**K11-22**: KAUL v BCBSA ET AL: 23-CV-01688-OPEN – PRE JARKESY (N.D.A)

**K11-23**: KAUL v OETKEN ET AL: 24-CV-00621-OPEN – POST JARKESY (S.D.M.)

**K11-24**: KAUL v FEDERATION: 25-CV-25-CLOSED – POST JARKESY (S.D.M.)

**K11-27**: KAUL v FEDERATION: 25-CV-01676-OPEN-POST JARKESY (S.D.T.)

# SUMMARY OF THE ISSUES AND QUESTIONS PRESENTED

**1. Does** K11-23 Defendant James Paul Oetken's simultaneous Defendant status in K11-23 in which he has admitted to his guilt of the charges levied in K11-23 and in which he is being prosecuted by Petitioner Kaul **and** his May 8, 2025 adoption of the authority and jurisdiction of the Southern District of New York to propose conducting a June 17, 2025 contempt hearing against Petitioner Kaul as to the K11-23 subject matter and facts to which he has admitted guilt, **while** knowing of a Rule 16 hearing in K11-27 scheduled for July 9, 2025, in which he is named as a co-conspirator **constitute** a knowing violation of Petitioner Kaul's human/civil/constitutional rights?

**2.** Do Respondent Oetken's knowingly illegal violations constitute a 'Fraud on the Court'?

**3.** Does Respondent Oetken's willful and knowing aiding and abetting of perpetuation of four thousand eight hundred and four days (4,804) worth of ongoing/**"new"** illegal violations of Petitioner Kaul's

human/civil/constitutional rights to Petitioner Kaul's life, liberty, property and reputation constitute a crime against Petitioner Kaul?

4. Does the law view any products of Respondent Oetken's proposed June 17, 2025 'Fraud on the Court' as anything but a 'Fraud on the Court'?

5. Would any of the products of Respondent Oetken's proposed June 17, 2025 'Fraud on the Court' be anything but legally invalid and subject matter for further civil/criminal litigation against him?

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 29.6 of this Court's Rules, Petitioner RICHARD

ARJUN KAUL, MD, states that he files this petition on behalf of his

person and no parent company and that no publicly traded corporation

either owns or has been promised 10% or more of the settlement and or

judgment monies.

# LEGAL STANDARD OF REVIEW AND LEGAL AUTHORITIES AS TO GRANT OF WRIT

All Writs Act 28 U.S.C. § 1651 – Writ of Prohibition

United States v Hoffman, 71 U.S. 158 (1866)

Smith v Whitney & Others, 116 U.S. 167 Supreme Court of the United States (January 4, 1886)

PULLIAM, MAGISTRATE FOR THE COUNTY OF CULPEPER, VIRGINIA v. ALLEN ET AL. 466 U.S. 522 No. 82-1432. Supreme Court of United States (May 14, 1984)

# APPENDICES' HYPERLINKS

The links to Appendices I to J are as below. Should the hyperlink within the petition not function, the Appendices can be accessed through these links:

## APPENDIX A

https://www.drrichardkaul.com/_files/ugd/7d05d1_7e09b31184594ea094ac01da95ab8f5c.pdf

## APPENDIX B

https://www.drrichardkaul.com/_files/ugd/7d05d1_04677bc85f7a4f7f8928aeb0407f7834.pdf

## APPENDIX C

https://www.drrichardkaul.com/_files/ugd/7d05d1_6875942a52a14d74984125e2ce93a2e3.pdf

## APPENDIX D

https://www.drrichardkaul.com/_files/ugd/7d05d1_56ff435881204cbf9169a8275e40424e.pdf

## APPENDIX E

https://www.drrichardkaul.com/_files/ugd/7d05d1_a20a8fa019e949839590ff8218e6f8a2.pdf

## APPENDIX F

https://www.drrichardkaul.com/_files/ugd/7d05d1_35b4ce97acbe4b45832a09f8cd767162.pdf

## APPENDIX G

https://www.drrichardkaul.com/_files/ugd/7d05d1_dfcdb75a68424abaa74d42d963d818ec.pdf

APPENDIX H

https://www.drrichardkaul.com/_files/ugd/7d05d1_3e971901a9654c898f06e44071ef3c94.pdf

APPENDIX I

https://www.drrichardkaul.com/_files/ugd/7d05d1_aa9f172da0a44176bf9e2be51ec5890f.pdf

APPENDIX J

https://www.drrichardkaul.com/_files/ugd/7d05d1_8db86846ffc34d0a9a12ce01dbd9af64.pdf

APPENDIX C + F

https://www.drrichardkaul.com/_files/ugd/7d05d1_e84c46298c32428480df0cccf4921f53.pdf

# PRELIMINARY STATEMENT AND CONTEXTUAL FACTS

The facts underpinning this petition are all part of the **'Revocation-Cover-Up-Conspiracy'** (2005-2025), a conspiracy that commenced in 2005 by **The Kaul Cases** Defendants consequent to Petitioner Kaul's invention and successful performance of the first minimally invasive percutaneous outpatient spinal fusion. This procedure revolutionized the field of spine surgery, became the standard of care almost a decade ago, generated billions of dollars for spine device companies who stole Plaintiff Kaul's intellectual property and manufactured their own devices. The stolen intellectual property and the 2014 illegal revocation of Petitioner Kaul's NJ license caused an illegal enrichment of Petitioner Kaul's market competitors, including most individuals/entities within **The Kaul Cases.**

Respondent Oetken entered the **'Revocation-Cover-Up-Conspiracy'** in or around late 2021/early 2022 and remains trapped, active and conflicted within it, consequent to his knowingly illegal May 8, 2025 purported 'order' in K11-7 to conduct a contempt hearing against Petitioner Kaul on June 17, 2025, a person who is the Plaintiff currently prosecuting him in K11-23. Petitioner Kaul noticed his DOJ counsel on May 10, 2025 of the conflict (Appendix B). This is the latest and most egregious example of Respondent Oetken's criminal conduct within the **'Revocation-Cover-Up-Conspiracy'**, an act the liability of which does pursuant to RICO's doctrine of vicarious liability insure to **The Kaul Cases** Defendants, including the K11-27 Defendants.

1

It has been within the **'Revocation-Cover-Up-Conspiracy'** that **The Kaul Cases** Defendants have since 2005 committed and continue to commit offenses/violations/crimes against the life/liberty/property/reputation and human/civil/constitutional rights of Petitioner Kaul, through the perpetration of amongst other things, the admitted crimes of kidnapping/false indictment/false arrest/false imprisonment/attempted killing/bribery/perjury/public corruption. evidential tampering/witness tampering/money laundering/bankruptcy fraud/securities fraud/unjust enrichment/judicial corruption/tax evasion/embezzlement.

The following statement provides some initial context as to Respondent Oetken's past, ongoing and new violations (August 2023 to present) of the authority and jurisdiction of multiple independent district courts within the United States District Court (K11-14-Southern District of Florida/K11-17-Eastern District of North Carolina/K11-20-Southern District of Texas) such that an emergent writ of prohibition is warranted to halt his re-violation of the authority and jurisdiction of the Southern District of Texas in K11-27 and to cause him to permanently cease any further violations.

Petitioner Kaul respectfully asserts that the facts set forth below in the **'STATEMENT OF FACT'** account for why Respondent Oetken is continuing to engage in ever more serious offenses/violations/crimes within the United States District Court and why the issuance of a writ of prohibition is warranted prior to June 17, 2025. This is the date that a conflicted Respondent-K11-23 Defendant

2

Oetken, who is being prosecuted by Petitioner Kaul in K11-23 **(Appendix C)**

proposes to conduct a 'contempt' hearing to attempt to silence, suppress and or

eliminate Petitioner Kaul in order to prevent a further exposition of his

offenses/violations/crimes and those of **The Kaul Cases** Defendants (2005-2025).

The egregiousness of these ongoing violations stem from K11-23 Defendant

Oetken's attempts to conceal his knowingly perpetration of a long-standing

**"pattern of racketeering"** involving the conversion of his bench in the S.D.N.Y.

into a **"racketeering enterprise"** through which he perpetrated and continues to

perpetrate the RICO predicate acts of, amongst other things, bribery, fraud,

conspiracy, quid pro quo schemes, evidential falsification, witness tampering and

public corruption. Since his 2011 appointment to the federal bench and his abuse of

that bench for personal monetary gain, his sense of impunity emboldened by the

fact that no lawyer or judge in that court had the courage or sense of righteousness

to report his offenses/violations/crimes. Respondent Oetken's Illegal acts that

destroyed the lives of countless innocent and relatively poor non-corporate persons

who appeared before him in cases involving corporations and large businesses, from

whom he enriched himself through bribes he demanded in return for entering

dispositions favorable to their case/s.

This petition, and the facts upon which it is based seek to expose and cause to

conclude the continued perpetration of such activity. American federal judges are

bestowed by the public with immense lifetime tenure power and are trusted to use

that power for the good of society and not for their own corrupt enrichment. Since

his 2011 appointment, K11-23 Defendant Oetken has become immensely and disproportionately wealthy through his corrupt abuse of the federal bench, which is why he continues to fail to publicly provide his financial holdings/records and exparte communications, despite repeated discovery requests in K11-7/K11-23 and his knowing legal obligations to do so. Absent external wealth, a district court judge's net-worth of tens-of-millions of dollars is inconsistent with their income, and is explained by only by corruption.

As stated above, K11-23 Defendant Oetken has sought since August 2021 to silence, suppress and or eliminate Petitioner Kaul in order to prevent a further exposition of his offenses/violations/crimes and those of **'The Kaul Cases'** Defendants (2005-2025). However, on September 12, 2022 in K11-7, these efforts did threaten to extend across the country with the entry by K11-23 Defendant Oetken of a knowingly illegal bribery related nationwide 'injunction' that purported to bestow on him the power of deciding whether Plaintiff Kaul had the right to file suits in other district courts for the ongoing/"new" injuries to his life/liberty/property/reputation. K11-23 Defendant Oetken's September 12, 2022 purported 'injunction' sought to deprive every other independent district judge of their authority to decide whether or not to admit Plaintiff Kaul's cases.

However, when Plaintiff Kaul did file cases and they were admitted by multiple district judges, Respondent Oetken in recognizing that he had no direct authority over any other district judge, did attempt to exact it indirectly by repeatedly threatening Petitioner Kaul with contempt if he did not dismiss the cases.

4

Petitioner Kaul refused to dismiss any of his cases, but certain district judges who had admitted the cases and entered discovery orders with full knowledge of the purported 'injunction' did under duress dismiss the cases (K11-14/K11-17/K11-20). On March 15, 2024, when Respondent Oetken filed an order threatening to hold Petitioner Kaul in contempt if he did not dismiss K11-17 by March 29, 2024 (**Appendix D**), Petitioner Kaul filed a civil rights case (K11-18) against Respondent Oetken on March 25, 2024 in the E.D.N.C., where it was randomly assigned to U.S.D.J. Flannagan, the case reassigned by Chief Judge Myers to himself on April 1, 2024, summons issued on April 2, 2024 and then dismissed with prejudice on April 8, 2024. On May 9, 2024 Petitioner Kaul filed an appeal in the U.S.C.A. for the 4th Circuit, submitted an informal opening brief on May 29, 2024, but then on July 23, 2024 requested the 4th Circuit adjudicate the K11-18 appeal before the K11-17 appeal (K11-17 was dismissed by Chief Judge Myers on June 14, 2024 based on Respondent Oetken's purported 'injunction' and appealed on July 15, 2024). On July 23, 2024 the 4th Circuit declined Petitioner Kaul's request and thus on July 30, 2024, Petitioner Kaul dismissed both appeals.

It was Respondent Oetken's refusal to recognize that it was just a question of time before his **"pattern of racketeering"**, once corruptly restricted to the controllable environment of the S.D.N.Y., but now becoming a nationwide issue that effectively threatened to end Petitioner Kaul's life, that caused him to admit in K11-23 to his offenses/violations/crimes and become the subject of this petition. On August 26, 2024, Petitioner Kaul filed K11-20 in the Southern District of Texas – Houston,

where with full disclosure of the K11-7 'injunction' related matters, it was admitted, and a scheduling order issued on December 9, 2024. However, on October 2, 2024, Respondent Oetken issued an order threatening to hold Petitioner Kaul in contempt if he did not dismiss K11-20 by October 16, 2024. In response and on October 9, 2024 Petitioner Kaul filed K11-23 in the Jackson Division of the Southern District of Mississippi, summons were issued on October 10, 2024 and Respondent Oetken was served on October 16, 2024. In K11-23

Petitioner Kaul has procured admissions of fact from Respondent Oetken (**Appendix E**). However, despite the pendency of K11-23 and his conflicted status as a Defendant he did with a knowing illegality on May 8, 2025 propose on his K11-7 docket in the S.D.N.Y. that a contempt proceeding be conducted on June 17, 2025 against Petitioner Kaul, who remains the Plaintiff in K11-23.

## ISSUES AND QUESTIONS PRESENTED

Petitioner Kaul respectfully asserts that this petition simply requests an enforcement of centuries-old due process-impartial tribunal rights related Constitutional law. And specifically, the undeniable and irrefutable fact of conflict that exists when a person who is a judge is a defendant being prosecuted by a lay-person in a court other than his own for a series of offenses/violations/crimes, then illegally uses his own court as a defense by attempting to hold that lay person in contempt in his court for prosecuting him in another court of the same system to which his court belongs.

If there were any question or issue to be raised it would be what specific criminal forces, pressures and or factors were forced on Respondent Oetken by the K11-27 and others that caused him to commit and continue to commit such egregiously illegal acts as those of publishing to the federal docket material he knows does violate both civil and criminal law. And do these illegal acts constitute further evidence of his long-standing **"pattern of racketeering"** and the perpetuation of his conversion of his bench into a **"racketeering enterprise"**.

Respondent Oetken, in his May 8, 2025 purported order and in full knowledge of the illegality of the proposed June 17, 2025 hearing, did commit further offenses/violations/crimes in assigning himself as judge, a purpose being to exclude himself as a witness to the proceeding and thus exclude his admissions of fact in K11-23 and his Defendant status in K11-23. And if such an illegal hearing were to proceed with Petitioner Kaul, which it will not, Respondent Oetken would most

definitely suppress or strike from the record any evidence or facts of his K11-23 admitted offenses, violations, crimes.

But moreover, in this matter there is one issue that legally precludes Petitioner Kaul from participating in or aiding and abetting any element of Respondent Oetken's proposed May 8 to June 17, 2025 events, and it is that any participation or aiding and abetting of such an illegal proceeding would cause Petitioner Kaul to join the criminal '**Revocation-Cover-Up-Conspiracy**' This would not only cause him to conspire against himself but would make him liable for all the past, present and future offenses/violations/crimes of **The Kaul Cases** Defendants. In effect, Respondent Oetken's May 8, 2025 submission is a 'request-order' to Petitioner Kaul to join a criminal conspiracy, a 'request-order' that further substantiates his guilt and the filing of further **"racketeering"** charges in present and future cases of **The Kaul Cases** if necessary.

Whether Respondent Oetken knows this or not, it is a fact that his May 8 to June 17, 2025 proposal caused the S.D.N.Y. and certain staff to become even more enmeshed in the '**Revocation-Cover-Up-Conspiracy**'.

It would seem about time that **The Kaul Cases** Defendants are held to account for their twenty (20) year-long spree offenses/violations/crimes. Respondent Oetken's judicial career is but one of their many casualties, for which they, the supposed caring physicians, public servants and beneficent **"You're in Good Hands with Allstate"** corporations do care not.

8

# STATEMENT AND FACT NECESSARY TO UNDERSTAND PETITION

The facts substantiating the petition and probative to the grant of the writ of prohibition are as below:

Respondent Oetken, a single district judge in the Southern District of New York has since the September 12, 2022 entry of his admittedly and corruptly procured 'injunction' in K11-7 (**Appendix C + F**) willfully and knowingly violated the authority and jurisdiction of district courts and judges in the Southern District of Florida (K11-14), the Eastern District of North Carolina (K11-17) and the Southern District of Texas (K11-20), a court whose jurisdiction and authority he continues to attempt to violate in K11-27. His illegal threats of contempt based on a knowingly illegal 'injunction' have violated not just the human/civil/constitutional rights of Petitioner Kaul, but have attempted to deprive and have deprived/violated the independent and **inherent** power of district courts/judges that admitted K11-14/K11-17/K11-20/K11-27.

There existed no illegal or unconstitutional act within Petitioner Kaul's prosecution of **The Kaul Cases**, that warranted nor indeed warrants a nationwide injunction, nor law or fact in the K11-7 Defendants 2021/2022 motions for such an injunction. And in fact, in K11-7, neither the Defendants nor Respondent Oetken addressed/contested/rebutted/rejected Petitioner Kaul's nullifying differentiation of every case cited by the K11-7 Defendants in support of their false motions. Respondent Oetken, consequent to his bribery related quid pro quo with the K11-7 Defendants simply ignored the law/facts/argument submitted by Petitioner Kaul in

9

K11-7 and entered a willfully fraudulent opinion whose entire foundation is completely unrelated to the facts/law that Petitioner Kaul, as the record so irrefutably shows, did/do undermine the entry of an injunction.

Since 2023 (K11-14) Respondent Oetken has illegally, persistently and knowingly exceeded his authority and jurisdiction, and in the process has violated the rights/authority/jurisdiction of Petitioner Kaul and the district court judges/courts in K11-14/K11-17/K11-20 and now in K11-27.

The grant of a writ of prohibition, as with a writ of mandamus is an **"extraordinary"** remedy for **"extraordinary circumstances"**, where the normal appellate avenue is either unavailable or irreparable injury will continue to be caused while during the normal years-long course of an appeal. In this case, Respondent Oetken, in purposefully proposing June 17, 2025 for the hearing date, did so with the express intention of seeking to have eliminated Petitioner Kaul before the July 9, 2025 scheduled Rule 16 conference in K11-27. And in eliminating Petitioner Kaul, the K11-27 Defendants in collusion and conspiracy with Respondent and K11-23 Defendant Oetken will move to have K11-27 dismissed, in the hope that it will prevent Respondent Kaul from exposing their offenses/violations/crimes (2005-2025).

Thus, by the time any appeal might reach the appellate courts, Petitioner Kaul will be eliminated, either through continued incarceration and or death. These schemes have been perpetrated against Petitioner Kaul since May 27, 2021 on three (3) occasions, and constituted an element of the subject matter of K11-7/K11-14/K11-

15/K11-17/K11-20/K11-24, and which in K11-15 was set for trial. It is the intent of Respondent Oetken and the K11-27 Defendants to use the June 17, 2025 hearing to attempt to successfully cause this elimination.

The reluctance that exists within appellate courts to grants writs of mandamus, prohibition and injunction pertains to the conversion of a judge into a litigant. However, that condition already exists in K11-23, in which Respondent Oetken and his K11-23 co-defendant, NYS Attorney Grievance Committee are not only litigants, but have pursuant to Rule 8(b)(6) admitted to the offenses/violations/crimes that substantiate this petition. There exists privity/proximity between the subject matter of K11-23 and K11-7, such that the grant of a writ in K11-7 simply reflects an extension of the adversarial condition that already exists in K11-23 and is entirely warranted consequent to the conflict that now exists in K11-7 because Petitioner has been prosecuting Respondent in K11-23 since October 9, 2024.

And these conditions were firmly established by Respondent Oetken himself, who chose on May 8, 2025 to illegally abuse the power of the S.D.N.Y. in order to attempt to defend from Petitioner Kaul his life/liberty/property in K11-23 in the Southern District of Mississippi and the life/liberty/property/reputation of his K11-27 bribery-related co-conspirators in the Southern District of Texas in K11-27. There exists no other case in the entire corpus of American jurisprudence that approximates the **"extraordinary"** facts underpinning this petition.

Thus, this petition does not constitute a substitution for appeal, as if Respondent Oetken, already a knowingly conflicted and law-disregarding K11-23 Defendant

11

whose June 17, 2025 proposed hearing further evidences his guilt of the charges

levied in K11-23, is not immediately prohibited, Petitioner Kaul will not for reasons

related to elimination be able to file an appeal. In fact, in **The Kaul Cases**

Defendants June 14, 2023 illegal arrest-kidnapping/incarceration, there was an

attempt to stymie his mental capacity and end his life (**Appendix G**).

And even if Petitioner Kaul's rights/person were protected, which the facts in the

'**Revocation-Cover-Up-Conspiracy**' (/2005-2025) evidence otherwise, the time to

file an appeal of the final September 12, 2022 order is past.

Reposed within the following Appendices are documents containing facts from **The**

**Kaul Cases** that prove Respondent Oetken's repeated violations of the

authority/jurisdiction of multiple other district courts/judges and his continuing

offenses/violations/crimes committed against the life/liberty/property/reputation of

Petitioner Kaul that do, in conjunction with the other within cited factors of

unavailability of appellate recourse and irreparable/permanent injury to

life/liberty/property, warrant an emergent issuance of a writ of prohibition.


# 1. Admissions Of Fact of K11-27 Defendants And K11-23 Defendants Oetken and NYS Attorney Grievance Committee (Appendix E)

The facts within these documents do evidence the guilt of **The Kaul Cases**

Defendants, including K11-23 Defendant Oetken of the charges levied in **The Kaul**

**Cases**, including K11-23 and K11-27. The volume of fact reflects the over twenty

(20) year period of the '**Revocation-Cover-Up-Conspiracy**', through by and which

**The Kaul Cases** Defendants have perpetrated massive "**patterns of**

**racketeering"** and human/civil/constitutional rights violations. Similarly, the serious and enormous volume of highly incrimination fact accounts for the desperate/illegal May 8 to June 17, 2025 proposed contempt hearing by a conflicted K11-23 Defendant Oetken who has admitted to his guilt of amongst other things, bribery related quid pro quo schemes with the K11-7 Defendants. In return for the bribes K11-23 Defendant Oetken issued on September 12, 2022 a knowingly fraudulent nationwide 'injunction' against Plaintiff Kaul.

## 2. Complaint in K11-23: KAUL v OETKEN ET AL: 24-CV-00621-CWR-LGI (Appendix C)

The facts as asserted and admitted in the Complaint do for the reasons of law set forth within this petition, deprive K11-23 Defendant of any jurisdiction or authority in any matter involving Plaintiff Kaul, and do under the cited law warrant the emergent entry of a writ of prohibition, that bars him from any further participation in his May 8 to June 17, 2025 proposal as to a contempt hearing.

## 3. Plaintiff Kaul's October 6, 2022 motion for disqualification in K11-7 and K11-23 Defendant Oetken's August 14 reply (Appendix H).

K11-23 Defendant Oetken's conversion of his bench in the S.D.N.Y. into a **"racketeering enterprise"** involved egregious derogations of fact and established law, such that many of his corrupt/incompetent opinions were entirely illegal. The problem existed and continued to exist because there was no oversight and no lawyer or judge who had the courage or sense of righteousness to report this

individual to the authorities, while he and his greed destroyed countless innocent lives. Plaintiff Kaul's **'THE OETKEN ANALYSIS'** (**Appendix H – Page 31 of 39**) unequivocally proves that his September 12, 2022 'opinion-injunction' had no basis in law or fact, and for that reason alone, other than the K11-7 Defendants bribes, was illegal ab initio. However, lending to the 'opinion-injunction's status as a 'Fraud on the Court' was the fact of his admitted bribery related quid pro quo scheme with the K11-7 Defendants, a scheme, that he has been forced to continue in K11-7 in the S.D.N.Y. and a scheme the corrupt effects of which he and the K11-7 to K11-27 Defendants have perpetrated into the district courts in the Southern District of Florida (K11-14)/Eastern District of North Carolina (K11-17)/Southern District of Texas (K11-20) (K11-27)/Southern District of Mississippi (K11-24). The seeds of his and the K11-7 to K11-27 Defendants nationwide criminal **"pattern of racketeering"** were laid arguably in March 2005 with the emergence of the **'Revocation-Cover-Up-Conspiracy'** when Plaintiff Kaul invented and successfully performed the first ever percutaneous spinal fusion. This procedure helped millions of patients worldwide, revolutionized the field of spine surgery and its intellectual property generated billions of dollars for medical device companies/surgeons/hospitals/surgical centers. Thus, it became imperative for **The Kaul Cases** Defendants/others to eliminate Petitioner Kaul from the market, in order to attempt to steal these facts/assets from Petitioner Kaul _and_ attempt to illegally lay claim to them. This scheme, an element of the **'Revocation-Cover-Up-Conspiracy'** was convinced in its assessment that Petitioner Kaul would be

14

eliminated, but he was not, which further accounts for Respondent Oetken's knowingly illegal May 8 to June 17, 2025 proposed events. K11-23 Defendant Oetken joined the **'Revocation-Cover-Up-Conspiracy'** in or around August 2021 with the filing of K11-7 in the S.D.N.Y.

K11-23 Oetken's admitted acceptance of bribes from the K11-7 Defendants (**Appendix E**) and his Defendant status in K11-23 do prohibit him from having any involvement in K11-7, be it ministerial/adjudicative. This prohibition stems also from his issuance of the knowingly illegal September 12, 2022 'opinion/injunction', which Plaintiff Kaul proved/proves in the **'OETKEN ANALYSIS'** had/has no basis in law or fact. K11-23 Defendant Oetken, as did all the K11-7 Defendants, ignored every fact/argument and differentiation as set forth by Plaintiff Kaul of all Defendants' citations as to dismissal/injunctions, an uncontested and thus admitted differentiation that irrefutably established there was no legal/factual basis for either a dismissal or injunction. The opinion was patently the product of corruption, a fact that was unquestionably/further exposed by the gross factual/legal erroneousness.

But it was from and with this September 12, 2022 'Fraud on the Court' that K11-23 Defendant and the K11-7 to K11-27 Defendants did then perpetuate a further 'Fraud on the Court' against multiple other district judges, who for some reason, while knowing it was a 'Fraud on the Court' did wrongly permit it to become incorporated with an underline{appearance, albeit false, of authority} into the fabric of

American jurisprudence and did cause to be improperly used in the erroneous dismissals of K11-17 and K11-20.

The metastasis of the admittedly illegal September 12, 2022 K11-7 products of crime are set forth below in section 4.

## 4. **K11-23 Defendant Oetken's 'weaponization' and illegal submissions/manipulation of the K11-7/ K11-17/K11-20/K11-24/K11-27 dockets to attempt to conceal his and The Kaul Cases Defendants offenses/violations/crimes (2005-2025) from the United States, Plaintiff Kaul and the record do warrant an emergent issuance of a writ of prohibition (Appendix I).**

K11-23 Defendant Oetken's unprecedented interference and violation of the independent authority and jurisdiction of multiple other district courts in the period from 2023 to the present stems from his admitted guilt of the charges levied in K11-23, and the guilt of the K11-27 Defendants of the charges levied in K11-27. This is one of the reasons for the K11-17/K11-20/K11-24/K11-27 Defendants transparent tactic of flooding the docket with judicially aimed harassing irrelevant voluminous material that cannot and will not undo their guilt. Their purpose/hope is to attempt to dissuade the Court from pressing the case for the truth of the factual foundation of **The Kaul Cases**. And having had no discovery nor trial in over nine (9) years despite having filed many valid/merit-full cases, the question remains as to would discovery/trial be more likely to expose the truth than constant discovery evasion and dismissals. And to have known many years and many cases ago that the truth resided in fact with Dr. Kaul and not **The Kaul Cases** Defendants. And to know that K11-23 Defendant Oetken's proposed illegal June 17, 2025 contempt hearing

constitutes just another gross ongoing/"**new**" violation of Plaintiff Kaul's human/civil/constitutional rights, rights against which **The Kaul Cases** Defendants have committed offenses/violations/crimes since 2005. And all because of professional jealousy and market monopolization. Competition breeds innovation and innovation makes a country strong, whereas its lack and the unbridled greed of the so called 'elite' do the exact opposite. History cannot but tell the truth.

Plaintiff Kaul's filings in K11-14/K11-17/K11-20/K11-24/K11-27 were all, except with K11-14, initiated with Complaints/Exhibits that included full disclosure of the September 12, 2022 'injunction' and surrounding events. These disclosures are contained within **Appendix I** as are documents of K11-27 Defendants violation of the independent jurisdiction/authority of the district court/judge, a copy of Plaintiff Kaul's objection and a copy of the dismissal order. Each case file is replete with thousand-page submissions from the K11-7 to K11-27 Defendants, copies of which due to their ever-increasing irrelevancy, harassing voluminous nature and not unpredictable air of regret, are not included.

# ARGUMENT

## Respondent Oetken's State of K11-23 Related Conflicted-ness Deprives Him From Exercising The Jurisdiction Of The Southern District Of New York In Any Matters Pertaining To Petitioner Kaul.

Respondent Oetken, a lawyer and a federal judge recognizes the absolute illegality of his May 8 – June 17, 2025 proposed hearing, but for reasons pertaining to his admitted bribery related quid pro quo scheme with the K11-7/K11-27 Defendants and other as yet unknown reasons, he commenced a course of action of which he was knowingly prohibited. In recognizing that he was/is a Defendant in K11-23 in which he is being prosecuted by Petitioner Kaul and in which he has admitted to the facts of his offenses/violations/crimes that deprive him of exercising the jurisdiction of the Southern District of New York over any matters pertaining to Petitioner Kaul, his attempt to exercise that jurisdiction further evidences his guilt and desperation and that of the K11-27 Defendants. The threat of incarceration (**Martin Thomas Manton**) and economic/professional ruination are the only factors that could account for such an egregious commission of crime, and in a court [S.D.N.Y.] in which every judge is aware of his offenses/violations/crimes.

The case of Smith v Whitney & Others, 116 U.S. 167 Supreme Court of the United States (January 4, 1886) established both the standard for the deprivation from a district judge of the exercise of a court's jurisdiction and the right to pursue the extraordinary remedy of a writ of prohibition over an appeal. The opinion constituted these standards with a series of statements as to the jurist's

jurisdictional deprivation, the right of writ petition and these standards and their K11-27 corollaries are as follows:

"It is often said that the granting or refusing of a writ of prohibition is discretionary ... where the question of the jurisdiction of the court whose action is sought to be prohibited is doubtful, or depends on facts which are not made matter of record ... But where that court has clearly no jurisdiction of the suit or prosecution instituted before it, and the defendant therein has objected to its jurisdiction at the outset, and has no other remedy, he is entitled to a writ of prohibition as matter of right; and a refusal to grant it, where all the proceedings appear of record, may be reviewed on error. This is the clear result of the modern English decisions ... See also Weston v. City Council of Charleston, 2 Pet. 449, reversing on error S.C., Harper, 340." at 173-174.

This could be no more perfectly fitting an opinion to Respondent Oetken's absolute conflict-based deprivation of right to exercise the jurisdiction of the Southern District of New York, and the fact that he exercised it on May 8 and intends to continue to exercise it on June 17, 2025 do under the Whitney standard warrant a grant of the writ of prohibition. Petitioner Kaul has vehemently objected to Respondent's May 8 – June 17, 2025 proposal for a contempt hearing (Appendix B):

"The petitioner in the present case objected, at the very beginning of the proceedings before the court martial, that it had no jurisdiction to try him on the charges laid before it; and the facts upon which his objection to its

jurisdiction are based, as well as the final judgment dismissing his petition for a writ of prohibition, appear of record. The case is therefore within the appellate jurisdiction of this court." at 174.

Despite Petitioner Kaul's recorded objections, as disseminated to his counsel and to the Clerk of the Court (**Appendix B**) he continues to violate the jurisdiction and authority of the S.D.N.Y. by failing to either dismiss or disqualify himself from the proceeding:

"**The object of a writ of prohibition is to prevent a court of peculiar, limited or inferior jurisdiction from <u>assuming jurisdiction of a matter beyond its legal cognizance</u>.**" at 176 and "**A writ of prohibition is never to be issued unless it clearly appears that the inferior court is about to <u>exceed its jurisdiction</u>.**" at 176.

Respondent Oetken's extremis malfeasance is that consequent to his conflicted defendant status in K11-23, he is absolutely deprived of exercising any aspect of the jurisdiction of the S.D.N.Y., and not merely that he has even exceeded or proceeded past his legal cognizance of the matter. Thus, the application of this element of the <u>Whitney</u> standard does warrant an emergent grant of the writ of prohibition that would be consistent with his extremis malfeasance.

## Respondent Oetken's Willful, Knowing and Malicious Violation Of The Independence And Jurisdiction Of Multiple Other District Judges In The United States District Court Warrants Issuance Of Writ of Prohibition

Within **The Kaul Cases**, Respondent Oetken has since at least late 2021 and with a knowing illegality perpetrated by, through and with the authority/power of the United States District Court offenses/violations/crimes against the authority and jurisdiction of multiple independent district judges/courts and the life/liberty/property/reputation and human/civil/constitutional rights of Petitioner Kaul. Respondent's 'rights-violating-rampage' was/is a direct consequence of his efforts to attempt to 'cover-up' his admitted guilt of the charges levied in **The Kaul Cases**. Charges, the facts of which were/are conducted, aided and abetted through the **'Revocation-Cover-Up-Conspiracy'** (2005-2025), in which multiple **"patterns of racketeering"** were/are conducted through public-private persons, state agencies and corporations in the commission of amongst other things the RICO predicate acts of: kidnapping/bribery/perjury/money laundering/bankruptcy fraud/evidential tampering/witness tampering/public corruption/false indictment/false arrest and false incarceration.

Consequent to Respondents entry in late 2021 to mid 2022 into the **'Revocation-Cover-Up-Conspiracy'** and his then, albeit false, conviction that his knowingly illegal September 12, 2022 'injunction' would eliminate Petitioner Kaul and any threat of exposure he presented to **The Kaul Cases** Defendants, it became imperative to the preservation of his own life/liberty/property/reputation that he enforced whatever measures necessary, legal or illegal, to suppress Petitioner

21

Kaul's continued prosecution of **The Kaul Cases** in independent district courts outside of his jurisdiction in the S.D.N.Y.

Respondent, in recognizing that he could not ostensibly violate the independent jurisdiction and authority of other district courts and judges, did realize that his only option was to have Petitioner and his litigation efforts eliminated and or suppressed. However, it became apparent in early 2025 that after K11-14/K11-17/K11-20/K11-24 his and the K11-7 to K11-27 Defendants illegal tactics had not and were not working, he, in conspiracy and collusion with the K11-27 Defendants perpetrated a willfully illegal scheme within the **'Revocation-Cover-Up-Conspiracy'** in which they published to the docket of the S.D.N.Y. (K11-7: D.E. 179 to 192) thousands of pages of knowingly illegal documents proposing an equally knowingly illegal contempt hearing for June 17, 2025, twenty-two (22) days before the scheduled July 9, 2025 Rule 16 conference in K11-27 and before the anticipated SCOTUS opinions in President Trump's injunction related cases (**Appendix A**). Opinions at the heart of which rest the issue/answer as to the legitimacy/legality of district court issued nationwide injunctions. It is the intention of the K11-27 Defendants and Respondent Oetken to attempt to have Petitioner Kaul eliminated (jail/death) before the SCOTUS opinions and the K11-27 Rule 16 proceeding, and to then have him seized until K11-27 is dismissed and the threat of his existence is eliminated. This, **The Kaul Cases** Defendants and particularly Defendants Christie/Solomon/Heary have proven (September 21, 2016/May 27, 2021/June 14,

2023) is their modus operandi and the greater their desperation, the greater the insanity of their schemes.

The case of <u>PULLIAM, MAGISTRATE FOR THE COUNTY OF CULPEPER, VIRGINIA v. ALLEN ET AL. 466 U.S. 522 No. 82-1432. Supreme Court of United States</u> (May 14, 1984) established the standard as to the respect to be accorded to independent courts, a concept that originated in the English common law and was based on the freedom of a judge to act interpretively <u>but</u> within the law. However, the rights and responsibilities of this independence did not extend to those who used the bench to perpetrate crime: **"This provision of the law is not for the protection or benefit of a <u>malicious or corrupt judge,</u> but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence, and without fear of consequences. <u>Scott v. Stansfield, 3 L. R. Ex., at 223, quoted in Bradley v. Fisher, 13 Wall. 335, 350, n.</u> (1872)."**

Respondent Oetken's admissions of fact as to his corrupt offenses/violations/crimes (**Appendix E**) in conjunction with his illegal May 8 to June 17, 2025 proposal (**Appendix B**) do <u>deprive him permanently of any immunity</u> in K11-23 or any future case involving Petitioner Kaul, AND or right to exercise the jurisdiction of the S.D.N.Y., as he does so now in his illegal further guilt affirming May 8 – June 17, 2025 proposed proceeding.

Respondent Oetken's offenses/violations/crimes in the 21st century within the United States District Court are the exact ones and type that caused the

23

development of the issuance of writs from the Court of the Kings Bench commencing around the time of Lord Coke. Those of bribery and derogation of the law and facts:

"In practice, controlling an inferior court in the proper exercise of its jurisdiction meant that the King's Bench used and continues to use the writs to prevent a judge from committing all manner of errors, including departing from the rules of natural justice, <u>proceeding with a suit in which he has an interest, misconstruing substantive law, and rejecting legal evidence</u>. See 1 Halsbury's Laws of England ¶¶ 76, 81, 130 (4th ed. 1973); Gordon, The Observance of Law as a Condition of Jurisdiction, 47 L. Q. Rev. 386, 394 (1931) ... Examples are numerous in which a judge of the King's Bench, <u>by issuing a writ of prohibition at the request of a party before an inferior or rival court, enjoined that court from proceeding with a trial</u> or from committing a perceived error during the course of that trial. See generally Dobbs, The Decline of Jurisdiction by Consent, 40 N. C. L. Rev. 49, 60-61 (1961)." at 533.

Respondent Oetken's illegal **"pattern"** on the bench, un-exposed for almost eleven (11) years, has been exactly that identified in <u>Pullman</u> and forewarned/highlighted in the 1880s development of English common law and its instructive effect on the evolution of American jurisprudence. Respondent Oetken, if not prohibited in his pursuit of offenses/violations/crimes would cause the 'clock to turn back' on his

continued and illegal application of American jurisprudence to a time when judges committed **"all manner of errors"** and that is putting it politely.

The <u>Pullman</u> standard as applied to the facts of Respondent Oetken's violations of the jurisdiction of other district courts does substantiate the issuance of a writ of prohibition: **"In Gould v. Gapper, 5 East. 345, 102 Eng. Rep. 1102 (K. B. 1804), the court made explicit what had been implicit in a number of earlier decisions. <u>It held that a writ of prohibition would be granted not only when a court had exceeded its jurisdiction,</u> but also when the court, either a noncommon-law court or an inferior common-law court, had <u>misconstrued an Act of Parliament or, acting under the rules of the civil law, had decided otherwise than the courts of common law would upon the same subject."</u> at 534.

By, through and within K11-7, Respondent Oetken not only violated the jurisdiction of multiple other district courts, but did in his knowingly fraudulent September 12, 2022 purported opinion/injunction completely ignore the facts, the law and its differentiation by Petitioner Kaul as set forth in the K11-7 case file (August 21, 2021 to September 12, 2022), and as addressed in the **'OETKEN ANALYSIS' (Appendix H)**. The egregiousness of Respondent Oetken's offenses/violations/crimes continuing from at least August 21, 2021 with Petitioner Kaul to the present May 8 – June 17, 2025 proposed hearing directly correlates with his complete immersion in the **'Revocation-Cover-Up-Conspiracy'**. And does

25

unquestionably establish a **"pattern"** that preceded Petitioner Kaul, and as independently corroborated by his court staff (**Appendix J**).

## Respondent Oetken's Continuing, Knowing and Willful Violation of Petitioner Kaul's Human/Civil/Constitutional Rights Does Warrant A Grant Of A Writ Of Prohibition And Deprives Him Of Any And All Immunity

Respondent Oetken is guilty of the charges levied in K11-23, has admitted to such and he knows that the K11-27 Defendants are guilty of the facts/charges levied in K11-27. Respondent Oetken knows the personal and professional consequences of his guilt and the vicariously related guilt of that of the K11-27 Defendants and his co-conspirators. Their 'bet' was a large 'bet'.

Respondent Oetken's offenses/violations/crimes in conjunction with his conflicted-ness consequent to his Defendant status in K11-23 do deprive him of exercising the jurisdiction of the S.D.N.Y. and have in conjunction with the knowingly illegal May 8 to June 17, 2025 proposed events irrefutably deprived him of any and all immunity in K11-23 and any future cases involving Petitioner Kaul. The pending immunity question in K11-23 has been resolved, not by Petitioner Kaul, not by the Southern District of Mississippi, not by K11-23 Defendant Oetken's lawyers, not by a ruling from SCOTUS as to immunity, but by the recalcitrant criminal abuse of the authority/jurisdiction/power of the Southern District of New York by Respondent Oetken himself.

26

K11-23 Defendant Oetken was effectively cautioned on October 9, 2024 to not continue to interfere in Plaintiff Kaul's prosecution of **The Kaul Cases** within the 5th Circuit with threats to hold him in contempt unless he dismissed cases admitted by independent judges in independent courts. However, with the K11-27 April 9 filing and April 11, 2025 issuance of a Rule 26 order and July 9, 2025 Rule 16 conference, he and the K11-27 Defendants chose to ignore that forewarning and on May 8, 2025 did once again attempt to violate and interfere with Plaintiff Kaul's right of prosecution of **The Kaul Cases** in the 5th Circuit. In conjunction with the illegal use of the S.D.N.Y. in K11-7 the K11-27 Defendants have yet again violated a discovery/trial order from the Southern District of Texas (K11-20/K11-27), and have refused to confer with Petitioner Kaul in the issuance of a scheduling order, thus further violating Petitioner Kaul's right to due process. All of these facts/violations further substantiate Summary Judgment/Verdict as they are consistent with and evidence of the defenselessness of the K11-27 Defendants.

The Pullman standard substantiates not just the entry of a writ of prohibition to Respondent Oetken in K11-7, to prohibit him from continuing any further judicial participation in the May 8 to June 17, 2025 events proposed no doubt by himself and the K11-27 Defendants, but also a deprivation of immunity in K11-23, a deprivation that will permit Petitioner Kaul's prosecution of K11-23 Defendant Oetken to proceed in this case and others if necessary (See K11-26):

**"Our own experience is fully consistent with the common law's rejection of a rule of judicial immunity from prospective relief. We never have had a**

rule of absolute judicial immunity from prospective relief, and there is no evidence that the absence of that immunity has had a chilling effect on judicial independence. None of the seminal opinions on judicial immunity, either in England or in this country, has involved immunity from injunctive relief. No Court of Appeals ever has concluded that immunity bars injunctive relief against a judge. <u>At least seven Circuits have indicated affirmatively that there is no immunity bar to such relief, and in situations where in their judgment an injunction against a judicial officer was necessary to prevent irreparable injury to a petitioner's constitutional rights, courts have granted that relief."</u>

The issuance of a writ of prohibition, as with that of mandamus is an "extraordinary" instrument that is however issued without reservation in "extraordinary" circumstances. And those circumstances do exist when a knowingly guilt admitting jurist, who while being prosecuted by a plaintiff in one court is abusing the authority/power/jurisdiction of his bench in another court to attempt to mount his defense through the scheduling of knowingly illegal contempt proceedings:

"Occasionally, however, there are "really extraordinary causes" and, in such cases, there has been no suggestion that judicial immunity prevents the supervising court from issuing the writ." at 538.

K11-23 Defendant Oetken's May 8 to June 17, 2025 proposed illegal events placed the final 'nail in his immunity coffin' to deprive him of any and all immunity and

subject him to prosecution by Petitioner-Plaintiff Kaul in K11-23. K11-23 Defendant Oetken violated the trust that the district court in K11-23 placed in him to conduct himself lawfully (K11-23: D.E. 21-December 30, 2024 + 37-March 19, 2025). In fact, not more than fifty (50) days after that trust was reaffirmed, K11-23 Defendant did blatantly cause it to be violated, which substantiates a lift of the stay. Regardless, Respondent Oetken's liability within the United States District Court has been 'cemented' by his May 8 to June 17, 2025 proposal in K11-7. On his and the K11-27 Defendants 'chessboard' they have been checkmated by Petitioner Kaul's 'back rank mate' moves in the context of the changing legal landscape as to nationwide injunctions.

# REASONS FOR GRANTING THE WRIT

## The gravity of harm caused by Respondent's illegal and conflicted exercise of the jurisdiction and power of the Southern District of New York do warrant a grant of a writ of prohibition

Respondent is a Defendant in K11-23 (**Appendix C**) in which he is being prosecuted by Petitioner and in which has admitted to committing, amongst other things, a series of quid pro quo bribery related crimes with **The Kaul Cases** Defendants, including the K11-27 Defendants, while on the bench in the Southern District of New York, in a period from approximately late 2021 to the present (**Appendix E**).

Respondent now proposes to conduct in a knowingly illegal and unconstitutional manner, a contempt hearing on June 17, 2025 on his bench in the S.D.N.Y., for the purpose of eliminating Petitioner Kaul from prosecuting him in K11-23 and the K11-27 Defendants in K11-27, Defendants who bribed him in K11-7; the purpose being to attempt to prevent Petitioner Kaul further exposing Respondent Oetken's offenses/violations/crimes and those of **The Kaul Cases** Defendants (2005-2025). However, these offenses/violations/crimes are not just against Petitioner Kaul but against the independent authority/jurisdiction of the district courts of the Southern District of Florida (K11-14), the Eastern District of North Carolina (K11-17), the Southern District of Texas (K11-20) and are planned to re-violate the independent authority/jurisdiction of the Southern District of Texas (K11-27).

Respondent, in conspiracy and collusion with the K11-27 Defendants seeks to further the '**Revocation-Cover-Up-Conspiracy**' (2005 -2025), in which there have been committed and are continuing to be committed the admitted crimes of amongst other things, false indictment/false arrest/false imprisonment/attempted killing/bribery/perjury/obstruction of justice/judicial corruption/public corruption/wire fraud/securities fraud/unjust enrichment/insider trading/willful violations of human-civil-constitutional rights.

These offenses/violations/crimes by **The Kaul Cases** Defendants, which include three (3) members of the insurance industry and Defendant TD Bank, recently convicted of money laundering, were committed against the United States, its people and Plaintiff Kaul and have caused immense harm. The perpetration of these massive life-ending harms was once made possible because of pre-DOGE corruption of the political and legal bodies of the American Republic. The post-DOGE world and its mandated digitally enforced transparency of public servant wealth has lifted the 'shadows' in which public corruption could once conceal its filth. If Respondent is not prohibited from proceeding with his illegal June 17, 2025 hearing, he will cause an irreversible harm to Petitioner's prosecution of K11-27, in which there is scheduled a Rule 16 conference on July 9, 2025. It is the intent of Respondent and K11-27 Defendants to illegally abuse the judicial process on June 17, 2025 to cause a permanent elimination of, as they have attempted on three (3) separate occasions (2016/2021/2023), Petitioner Kaul's person, in order to attempt to have K11-27 dismissed and permanently eliminate the threat of him exposing

their offenses/violations/crimes and the consequences of these facts to their life/liberty/property/reputation.

Respondent and the K11-27 Defendants are 'fighting for their lives' and there is no criminal harm, be it conducted through corrupt courts/judges/politicians/certain governmental agencies that they will not attempt to commit against Petitioner Kaul if it hints at saving their lives.

## The lack of an adequate remedy on appeal

Even assuming Petitioner Kaul were able to appeal an order that is part of a proceeding (K11-7) the final appeal date (October 27, 2022) of which was forty-five (45) days from the September 12, 2022, the appeal would not protect Petitioner Kaul from Respondent attempting to enforce his illegally procured 'contempt' order, an illegal order that would be a "Fraud on the Court' product of the illegal K11-7 September 12, 2022 purported 'injunction'. Respondent's enforcement would be abused to cause Petitioner Kaul to remain incarcerated until he acquiesced to K11-27 Defendants/Respondent's mafia-like extortion threats that he would remain incarcerated until he 'signed away' all his rights to prosecute any of **The Kaul Cases**, for the injuries they caused to his life/liberty/property/reputation (2005-2025).

In the absence of an adequate remedy on appeal or even the right to appeal, prohibition provides the only remedy to prevent what would be a life-long permanent and irreparable injury to Petitioner Kaul's life/liberty/property/reputation.

## **The Kaul Cases Defendants nine (9) year abuse of the federal court system requires the definitive and affirming action of a superior court writ and or a trial court judgment**

In the twenty (20) years since the commencement of the '**Revocation-Cover-Up-Conspiracy**', it was not until June/July 2023 with U.S.D.J. Beth Bloom in the Southern District of Florida (K11-14), that Petitioner witnessed some sense of the beginning of justice, and although Judge Bloom was not able to deliver K11-15 to trial, her efforts were immensely appreciated as she was the jurist who began the 'turn-around'. With the November 20, 2023 filing of K11-17 in the Eastern District of North Carolina, Chief Judge Richard E. Myers III advanced the case even further, with the entry of a Rule 26 order on March 13, 2024. And again although, despite his best efforts to get the case to trial, it was dismissed on June 14, 2024 under duress from Respondent and the K11-17 Defendants. The combined efforts of Judges Bloom and Myers provided substantial momentum to **The Kaul Cases,** and with the June 27, 2024 SCOTUS ruling in <u>SEC v Jarkesy: 22-859</u>, that momentum accelerated and on August 26, 2024, Petitioner filed K11-20 in the Southern District of Texas, where U.S.D.J. Alfred Bennett entered a discovery/trial order on December 9, 2024, but an order as with every other order he entered was violated by the K11-20 Defendants. And again, under duress/threats from Respondent Oetken he dismissed K11-20 on January 7, 2025 based on Respondent's knowingly illegal September 12, 2022 purported 'injunction'.

On January 14, 2025, Petitioner Kaul filed K11-24 in the Southern District of Mississippi, summons were issued, Defendant Allstate Insurance Company was

33

served, and it submitted a motion for dismissal based on Respondent's 'injunction'.
U.S.D.J. Tom Lee ignored and invalidated the 'injunction' in his venue related
February 20, 2025 dismissal order/opinion. Petitioner Kaul, in recognizing the
judicial invalidation of the 'injunction' and the nationwide injunction related
pending cases before the Supreme Court of the United States involving President
Trump - Donald J. Trump, President of the United States, et al., Applicants
v. CASA, Inc., et al. + Trump v Washington + Trump v New Jersey - filed K11-27 in
the Southern District of Texas on April 9, 2025 and on April 11, 2025 a Rule 26
order was entered with a Rule 16 conference scheduled for July 9, 2025. This date
and the soon-to-be (early-mid June, 2025) issuance of the SCOTUS opinions in
President Trump's nationwide injunction related cases explains Respondent and
K11-27 Defendants conspiracy to schedule their knowingly illegal 'contempt'
hearing on June 17, 2025, yet another violation of the jurisdiction/authority of the
United States District Court. Respondent and K11-27 Defendants know, based on
amongst other things, oral argument, that the SCOTUS opinions will likely not be
helpful to their criminal activities, and most certainly not to their admitted guilt of
the charges levied in K11-27.

There exists not one case in the entire corpus of American jurisprudence in which a
single pro se litigant has been subjected to a nationwide injunction for simply
seeking to properly use the courts to vindicate illegal ongoing/"new" injuries to his
life/liberty/property/reputation and violations of his human/civil/constitutional
rights. Nationwide injunctions, as evident from the pending SCOTUS cases of

President Trump are reserved for governments, corporations and public agencies whose actions would impact the public welfare. Petitioner Kaul's prosecution of **The Kaul Cases** seeks simply to attempt to rectify the twenty (20) years-worth of injury caused to his life/liberty/property by **The Kaul Cases** Defendants and to effectuate a long-overdue Jarkesy related change in the state medical board licensing process. And it is this and nothing more that renders unconscionable the illegally proposed June 17, 2025 'contempt' hearing conspired to by Respondent Oetken and the K11-27 Defendants, an act that substantiates the issuance of a writ of prohibition.

# RELIEF SOUGHT

Petitioner, RICHARD ARJUN KAUL, MD **("Petitioner Kaul")** seeks a writ of prohibition that prohibits Respondent, JAMES PAUL OETKEN, ESQ ("Respondent Oetken") from having any further ministerial or adjudicative involvement in any matter involving Petitioner Kaul, and being restricted only to matters involving his defense and Defendant status in K11-23, in which he is the subject of prosecution by Petitioner Kaul.

I certify under penalty of perjury that the above statements are true and accurate to the best of my knowledge, and that the enclosed Appendices A to J are true and accurate copies of the originals.

DATED: MAY 27, 2025

RICHARD ARJUN KAUL, MD



PRIORITY® MAIL

-81-01

FROM:
RICHARD ARTHUR KAUL, MD
440c SOMERSET DRIVE
PEARL RIVER, NY 10965

RECEIVED
JUN 3 - 2025
CLERK'S OFFICE
S.D.N.Y.

TO:
CLERK OF THE COURT
UNITED STATES DISTRICT COURT
500 PEARL STREET, NY, NY
10007

pro se

RECEIVED
JUN 0 4 2025
PRO SE OFFICE

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.

# APPENDIX M

United States District Court
Southern District of Texas

**ENTERED**

January 07, 2025

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| RICHARD ARJUN KAUL MD, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:24-CV-03180 |
| | § | |
| FEDERATION STATE MEDICAL | § | |
| BOARDS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

Before the Court are *pro se* Plaintiff Richard Arjun Kaul's ("Plaintiff") Complaint (Doc. #1); Defendant James Howard Solomon's ("Solomon") Motion to Dismiss (Doc. #20) and Plaintiff's Response (Doc. #33); Defendant Allstate Insurance Company's ("Allstate") Motion to Dismiss (Doc. #25)[1] and Plaintiff's Response (Doc. #37); Defendant Christopher J. Christie's ("Christie") Motion to Dismiss (Doc. #26) and Plaintiff's Response (Doc. #40); Defendant Daniel Stolz's ("Stolz") Motion to Dismiss (Doc. #27) and Plaintiff's Response (Doc. #45); Defendant Center for Personalized Education for Physicians' ("CPEP") Motion to Dismiss (Doc. #30) and Plaintiff's Response (Doc. #43); and Defendant Federation State Medical Boards' (the "Federation") Motion to Dismiss (Doc. #31) and Plaintiff's Response (Doc. #44). Having considered the parties' arguments and the applicable legal authority, the Court grants each of the Motions to Dismiss.

---

[1] Also before the Court is Allstate's Motion for Extension of Time to Answer, Move, or Otherwise Respond to Plaintiff's Complaint (the "Motion for Extension of Time"). Doc. #15. The Court finds that the Motion for Extension of Time should be granted and deems Allstate's Motion to Dismiss (Doc. #25) timely filed as of September 30, 2024.

## I.    Background

This case arises out of the revocation of Plaintiff's license to practice medicine.  Doc. #1 at 11.  Plaintiff was once a licensed anesthesiologist in New Jersey, but had his medical license revoked following an administrative disciplinary proceeding in 2013.  *Id.*  Solomon was the Administrative Law Judge ("ALJ") that presided over the administrative law proceeding.  *Id.*  Solomon determined that Plaintiff's license should be revoked because he had conducted several spinal surgeries without proper training and education.  *See Kaul v. Christie*, 372 F. Supp. 3d 206, 221–24 (D.N.J. 2019).  Solomon's opinion was adopted by the New Jersey Board of Medical Examiners in 2014.  *Id.* at 224.

Following the revocation of Plaintiff's medical license, he filed a litany of *pro se* actions against numerous parties, including federal and state officials, insurance companies, banking institutions, and medical boards.  *See, e.g., Kaul v. Fed'n of State Med. Boards, et al.*, No. 4:21-CV-00057, 2021 WL 6550884, at *1 (N.D. Tex. Sept. 17, 2021), *report and recommendation adopted*, 2022 WL 171294 (N.D. Tex. Jan. 19, 2022) ("This case is another chapter in a long saga of repetitive, frivolous lawsuits Kaul has brought against numerous defendants regarding revocation of his license to practice medicine.").  In an effort to stop the barrage of actions being filed, the Honorable James Paul Oetken in the United States District Court for the Southern District of New York issued a nationwide pre-filing injunction against Plaintiff, prohibiting him from filing "any action, motion, petition, complaint, or request for relief" against certain parties that relates to the revocation of Plaintiff's medical license, without first obtaining leave.  *See Kaul v. Intercontinental Exch.*, No. 21-CV-6992, 2022 WL 4133427, at *9 (S.D.N.Y. Sept. 12, 2022).  The injunction issued by Judge Oetken covers several Defendants in this action, including the Federation, Allstate, Christie, Stolz, and Robert Francis Heary ("Heary").  *Id.*

2

Despite the injunction, Plaintiff filed a Complaint in this Court on August 26, 2024, alleging various claims against the Federation, Allstate, Christie, Stolz, and Heary, as well as CPEP and Solomon.  Doc. #1.  The Federation, Allstate, Christie, Stolz, CPEP, and Solomon have since appeared and filed Motions to Dismiss based on the filing injunction and pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2).  *See* Doc Nos. 20, 25, 26, 27, 30, 31.  Heary has not yet made an appearance in this action.  The Court will first resolve Plaintiff's claims against the Federation, Allstate, Christie, Stolz, and Heary, because these parties are all covered by the filing injunction.  Then, the Court will resolve Solomon and CPEP's Motions to Dismiss in turn.

## II.     Legal Standards

### a.     Federal Rule of Civil Procedure 12(b)(1)

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction tests the court's statutory or constitutional power to adjudicate the case." *Wesolek v. Layton*, 871 F. Supp. 2d 620, 627 (S.D. Tex. 2012) (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).  District courts may dismiss a case for lack of subject matter jurisdiction based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).  "The burden of proof for a [Rule] 12(b)(1) motion to dismiss is on the party asserting jurisdiction, and, at the pleading stage, the plaintiff's burden is to allege a plausible set of facts establishing jurisdiction."  *Haverkamp v. Linthicum*, 6 F.4th 662, 668 (5th Cir. 2021) (cleaned up).  Moreover, "all well-pleaded facts are taken as true and all reasonable inferences must be made in the plaintiff's favor."  *Id.* at 668–69.

3

### b.    Federal Rule of Civil Procedure 12(b)(2)

A claim against a defendant over whom the court lacks personal jurisdiction must be dismissed.  FED. R. CIV. P. 12(b)(2).  When a court rules on a Rule 12(b)(2) motion without a hearing, as is the case here, the plaintiff must make a prima facie showing of jurisdiction.  *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  The Texas long-arm statute extends personal jurisdiction as far as the federal constitutional requirements of due process allow. *Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of New York, Inc.*, 889 F. Supp. 2d 912, 920 (S.D. Tex. 2012).  "As a result, the long-arm statute and the federal [d]ue [p]rocess inquiries are essentially identical."  *Id.*  "To satisfy the requirements of due process, the plaintiff must demonstrate: (1) that the non-resident purposely availed himself of the benefits and protections of the forum state by establishing minimum contacts with the state; and (2) that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009) (cleaned up).

"Jurisdiction may be general or specific."  *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 484 (5th Cir. 2008).  "Specific jurisdiction exists when the plaintiff's claim against the non-resident defendant arises out of or relates to activities that the defendant purposefully directed at the forum state.  In contrast, general jurisdiction requires the defendant to have maintained 'continuous and systematic' contacts with the forum state."  *Mullins*, 564 F.3d at 398 (citations omitted).

### III.    Analysis

### a.    The Federation, Allstate, Christie, Stolz, and Heary

The Federation, Allstate, Christie, and Stolz have all filed Motions to Dismiss based on the pre-filing injunction entered by Judge Oetken.  Doc. Nos. 25, 26, 27, 31.  Though Heary has not

4

appeared in this action, Judge Oetken's injunction also applies to him. *See Intercontinental Exch.*, 2022 WL 4133427, at *9. The Fifth Circuit has held that "[a] district court may bar a vexatious litigant from filing future . . . complaints unless [he] seeks the prior approval of a district or magistrate judge." *Potts v. Texas*, 354 F. App'x 70, 71 (5th Cir. 2009). If a plaintiff fails "to comply with [a] Pre-Filing Injunction," his "case may be dismissed for failure to obey a court order." *Balistreri-Amrhein v. Universal Ins. Co. of N. Am.*, No. 4:21-CV-224-ALM-KPJ, 2022 WL 17731827, at *2 (E.D. Tex. Oct. 31, 2022) (citing *McCullough v. Lynaugh*, 835 F.2d 1126, 1127 (5th Cir. 1988); *Dunn v. Farrell*, 598 F. App'x 332, 333 (5th Cir. 2015)), *report and recommendation adopted*, 2023 WL 175159 (E.D. Tex. Jan. 12, 2023).

Here, Plaintiff's claims against the Federation, Allstate, Christie, Stolz, and Heary arise out of the revocation of his medical license and subsequent litigation proceedings. *See* Doc. #1. Moreover, there is nothing before the Court suggesting Plaintiff sought leave to file his Complaint. Thus, the Court finds that Plaintiff filed his Complaint in violation of Judge Oetken's pre-filing injunction. *See Intercontinental Exch.*, 2022 WL 4133427, at *9. Accordingly, the claims Plaintiff has asserted against the Federation, Allstate, Christie, Stolz, and Heary are dismissed. *See Rodriguez v. Killam*, No. 3:23-CV-139-L-BK, 2023 WL 6563408, at *2 (N.D. Tex. Aug. 15, 2023), *report and recommendation adopted as modified*, No. 3:23-CV-139-L-BK, 2023 WL 6141597 (N.D. Tex. Sept. 18, 2023) (dismissing the plaintiff's claims with prejudice for failure to comply with a pre-filing injunction); *Dunn v. Farrell*, 598 F. App'x 332, 333 (5th Cir. 2015) ("A district court may sua sponte dismiss an action for failure . . . to comply with any court order.").[2]

---

[2] The Court also notes that this case is not Plaintiff's first attempt to flout Judge Oetken's order. Several other district courts across the country have dismissed actions filed by Plaintiff based on the pre-filing injunction. *See, e.g.*, *Kaul v. Intercontinental Exch.*, No. 23CV02016JLROTW, 2023 WL 3346769, at *3 (S.D.N.Y. May 10, 2023); *Kaul v. Fed'n State Med. Boards - Fla. Bd. of Med.*, No. 23-CV-22325, 2023 WL 5428497, at *2 (S.D. Fla. Aug. 23, 2023), *appeal dismissed*

### b. Solomon

Next, Solomon has asserted judicial immunity and moved to dismiss Plaintiff's claims for lack of subject-matter jurisdiction under Rule 12(b)(1).  Doc. #20 at 3.  "A judge generally has absolute immunity from suits for damages."  *Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 221 (5th Cir. 2009).  Judicial immunity extends to ALJs.  *See Boone v. Matthews*, No. 4:24-CV-1448, 2024 WL 4645063, at *2 (S.D. Tex. Oct. 9, 2024), *report and recommendation adopted*, 2023 WL 11967625 (S.D. Tex. Oct. 31, 2024) (holding that an ALJ was immune from suit because the plaintiff's claims were premised on actions that "occurred in the context of [the ALJ's] judicial capacity").  "There are only two situations in which judicial immunity may be overcome: (1) the complained of action was not taken in a judicial capacity; or (2) the action was taken 'in the complete absence of all jurisdiction.'"  *Id.* (quoting *Davis*, 565 F.3d at 221).

Plaintiff's claims against Solomon relate to his actions as the presiding ALJ in an administrative law proceeding.  *See* Doc. #1 at 11, 25–26.  Specifically, Plaintiff accuses Solomon of being corrupt and holding an "illegally conducted administrative law proceeding."  *Id.* at 25.  Thus, "[w]ithout question, the ALJ's actions occurred in in the context of [his] judicial capacity."  *See Boone*, 2024 WL 4645063, at *2.  Moreover, Plaintiff does not allege or argue that Solomon acted without jurisdiction.  Thus, the Court finds that Solomon enjoys judicial immunity and his Motion to Dismiss is granted under Rule 12(b)(2).  *See id.* at *2–3; *Kaul v. Christie*, 372 F. Supp. 3d 206, 246 (D.N.J. 2019) (dismissing Plaintiff's claims against Solomon in a separate action based on judicial immunity).

---

*sub nom. Kaul v. GEICO Ins. Co.*, No. 23-12856-AA, 2024 WL 832290 (11th Cir. Jan. 4, 2024); *Kaul v. Ctr. for Personalized Educ. for Physicians*, No. 5:23-CV-00672-M-KS, 2024 WL 3015744, at *3 (E.D.N.C. June 14, 2024).

6

### c.  CPEP

CPEP, the only remaining defendant in this action, has moved to dismiss Plaintiff's claims under Rule 12(b)(2) for lack of personal jurisdiction.  Doc. #30 at 3.  With respect to general jurisdiction, Plaintiff must show that CPEP's "contacts with the forum state are 'substantial, continuous, and systematic.'"  *Final Expense Direct v. Python Leads, LLC*, 689 F. Supp. 3d 430, 435 (S.D. Tex. 2023) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–19 (1984)).  "A corporate defendant is subject to general jurisdiction where it is incorporated and where it has its principal place of business."  *Id.*  In addition, there are "exceptional cases" in which courts may exercise general jurisdiction if a corporation's "operations in another forum" are "so substantial and of such a nature as to render the corporation at home in that State."  *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (internal quotations and citation omitted).  Here, Plaintiff's Complaint alleges that CPEP is a resident of North Carolina.  Doc. #1 at 11.  Plaintiff does not allege any facts indicating CPEP has continuous and systematic contacts in Texas such that CPEP is "at home" in the state.  *See id.*  Thus, Plaintiff has not made a prima facie showing of general personal jurisdiction over CPEP.

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotations and citation omitted).  "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation."  *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (cleaned up).  "The defendant's suit-related conduct must create a substantial connection with the forum state, and 'the relationship must arise out of contacts that the defendant himself creates with the forum State' . . .

with the 'minimum contacts analysis look[ing] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Associated Energy Grp., LLC v. Air Cargo Germany GMBH*, 24 F. Supp. 3d 602, 608 (S.D. Tex. 2014) (quoting *Walden*, 571 U.S. at 284–85). "[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 571 U.S. at 286. As such, "[t]he mere act of contracting with a resident of the state is, without more, insufficient to confer personal jurisdiction." *Am. Gen. Life Ins. Co. v. Rasche*, 273 F.R.D. 391, 395 (S.D. Tex. 2011).

The Court finds that Plaintiff has failed to allege minimum contacts sufficient to make a prima facie showing of the Court's specific personal jurisdiction over CPEP. The Complaint alleges that CPEP is a North Carolina resident, and the events giving rise to Plaintiff's claims primarily occurred in New Jersey. The sole contact alleged in the Complaint is Plaintiff's vague assertion that CPEP has a business relationship with the Federation, which operates in Texas. Doc. #1 at 11, 42–43. However, "the existence of a contract between the nonresident defendant and a resident of the forum [is] insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004). Because Plaintiff does not allege any other contacts between CPEP and Texas other than this apparent business relationship between CPEP and the Federation, the Court finds Plaintiff has not demonstrated personal jurisdiction exists. Accordingly, CPEP's Motion to Dismiss for lack of personal jurisdiction is granted.

## IV. Conclusion

In conclusion, the Court finds that Plaintiff's claims against the Federation, Allstate, Christie, and Stolz should be dismissed because Plaintiff failed to comply with the pre-filing injunction issued by Judge Oetken. As such, the Federation, Allstate, Christie, and Stolz's

8

respective Motions to Dismiss (Doc. Nos. 25, 26, 27, 31) are hereby GRANTED for the reasons stated herein, and Plaintiff's claims against these parties are DISMISSED WITH PREJUDICE. Allstate's Motion for Extension of Time (Doc. #15) is also GRANTED. In addition, because the pre-filing injunction also applies to Heary, the Court sua sponte DISMISSES WITH PREJUDICE Plaintiff's claims against Heary.

Moreover, the Court has determined Solomon is entitled to judicial immunity. As such, Solomon's Motion to Dismiss (Doc. #20) is GRANTED pursuant to Rule 12(b)(1), and Plaintiff's claims against Solomon are DISMISSED WITH PREJUDICE. With respect to CPEP, the Court finds that the Court lacks personal jurisdiction. Thus, CPEP's Motion to Dismiss (Doc. #30) is hereby GRANTED pursuant to Rule 12(b)(2), and Plaintiff's claims against CPEP are DISMISSED WITHOUT PREJUDICE.

Finally, because all of Plaintiff's claims have been dismissed, the remaining pending motions in this case (Doc. Nos. 12, 24, 32, 35, 52, 53, 65, 87, 90, 93, 94, 95, 96, 97, 98, 99, 101) are DENIED as MOOT.

It is so ORDERED.

January 7, 2025
Date

_____
The Honorable Alfred H. Bennett
United States District Judge

9

# APPENDIX N

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

United States Courts
Southern District of Texas
F I L E D

JUL 2 3 2025

Nathan Ochsner, Clerk of Court

RICHARD ARJUN KAUL, MD

Petitioner-Plaintiff

v.

District Court Case No. 25-CV-01676

FEDERATION STATE MEDICAL BOARDS ET AL

Respondent-Defendants.

## NOTICE OF INTERLOCUTORY APPEAL

DATED: JULY 15, 2025

RICHARD ARJUN KAUL, MD

41 CALLA AVENUE
FLORAL PARK, NY 11001
914 250 8413
drrichardkaul@gmail.com

1

# THE KAUL CASES AS REFERENCED WITHIN

**K1**: KAUL v CHRISTIE ET AL: 16-02364-CLOSED (S.D.N.Y.)

**K11-7**: KAUL/BASCH v ICE ET AL: 21-CV-06992 (S.D.N.Y.)

**K11-14**: KAUL v GEICO ET AL: 23-CV-22325 (S.D.F.)

**K11-15**: KAUL v CHRISTIE ET AL: 23-CV-22582 (S.D.F.)

**K11-17**: KAUL v CPEP ET AL: 23-CV-00672 (E.D.N.C.)

**K11-19**: KAUL v TEXAS MEDICAL BOARD ET AL: 24-CV-00163 (S.D.T.-GALVESTON)

**K11-20**: KAUL v FEDERATION ET AL: 24-CV-03180 (S.D.T.-HOUSTON)

**K11-23**: KAUL v OETKEN ET AL: 24-CV-00621 (S.D.M.-JACKSON)

**K11-27**: KAUL v FEDERATION ET AL: 25-CV-01676 (S.D.T.-HOUSTON)

## **PREAMBLE**

Less than twelve (12) months ago, and specifically on August 21, 2024, Petitioner-

Plaintiff Kaul submitted a similar but somewhat less muted set of facts and

argument seeking to have this Court hold that the Constitutional principles set

forth in SEC v Jarkesy: 22-858 (June 27, 2024) be applied to the nationwide state

board medical licensing system in the same manner as those principles have by

now been substantially embedded in the regulatory functioning of the SEC.

Unfortunately, the 2024 application was neither denied nor granted but was

dismissed for want of jurisdiction after having previously been granted jurisdiction

upon a stay of the case imposed by the district court.

During the pendency of the appeal and despite the submission of argument

seeking this Court's opinion as to the applicability of Jarkesy to the illegality of

Plaintiff Kaul's jury-less article II judge-free $475,000 'fine' imposing revocation,

the appeal was dismissed for lack of jurisdiction and on February 2, 2025, the

district court case dismissed the case based on lack of jurisdiction, despite facts

admitted by the Defendants of tortious injury that did/do establish jurisdiction

and are subject to the Texas long-arm statute. Neither the district court nor

appellate court addressed the substantive Jarkesy related question as to the

nationwide state medical board physician license suspending/revoking process.

3

On January 31, 2025, Petitioner-Plaintiff Kaul noticed the Supreme Court of the United States for a Petition for a Writ of Certiorari to the U.S.C.A. for the Fifth Circuit on the issue, principally, of the lower court's abdication of their legal duty to apply and legally analyze Jarkesy to the facts of K11-19. Neither the district nor the appellate court conducted these mandated judicial functions, for reasons unknown. The 5th Circuit had no hesitation in rendering a decisive decision in Jarkesy and therefore seemed obliged to do the same in K11-19, and had it done so, it is likely the current application would not have become necessary.

In K11-19, and on January 31, 2025 Petitioner Kaul then sought resolution from the Supreme Court of the United States, wherein he filed forty-four (44) copies and an original for a petition for a writ of certiorari on February 14, 2025. However, errors in formatting caused their return with an advisory letter to rectify the formatting errors, make absolutely no changes to the text and return the petition for docketing (**Appendix A**). However, due to then prohibitive cost of formatting the re-submission of the petition unfeasible and so Plaintiff-Petitioner Kaul submitted a notice of withdrawal, which was accepted by the Supreme Court of the United States on May 1, 2025 (**Appendix B**).

4

A complete copy of the Brief and Appendices had been placed and initially

reviewed by the legal staff and clerks at the Supreme Court of the United States,

but these were returned with the March 18, 2025 notice of amendment.

Nowhere in the legal journey from the filing of K11-19 (**Appendix C**) (June 5, 2024)

through the Fifth Circuit and its voluntary withdrawal from SCOTUS on May 1,

2025 to its February 3, 2025 dismissal without prejudice by the U.S.D.C. for the

S.D.T.-Galveston , did any of the courts analyze and opine on Plaintiff Kaul's

argument set forth in his June 5, 2024 Complaint, in which he states: '**THE**

**DETERMINATIVE RELEVANCE AND APPLICABLITY OF JARKESY v SEC**' (K11-19: D.E.

1 Page 6 of 33) (**Appendix C**) and its unchallenged/accepted applicability to the

nationwide process of physician license suspension and revocation.

The stakes in this case and those of **The Kaul Cases** are high, but necessary to

bring to an end the decades-long abuses of American physicians by the lawless

unconstitutional jury-less article III judge-free medical license suspensions and

revocations of principally ethnic minority physicians. These physicians are viewed

as either threatening or failing to support the economic/political agendas of

ruthless for-profit publicly traded healthcare corporations

(insurance/hospital/pharmaceutical) whose machine engineered algorithms place

5

executive/corporate/shareholder profit over the suffering and lives of the millions of families of their premium-paying patients.

It is true that multi-million-dollar net-worth corrupt politicians within the American government have been bribed to the hilt by these entities and thus stand impotent in the face of crimes against the humanity of the people who voted them into political office believing their lies. This is common knowledge, but the consequences to the health/welfare of the American people will eventually deprive society of the very people upon which the survival of society depends, and that dependence cannot categorically not be replaced by Artificial Intelligence, much to the chagrin of those who want to eliminate millions of Americans who are viewed as simply 'food-eaters'.

In K11-19, SCOTUS sought to have Plaintiff Kaul format the briefs according as per SCOTUS rules prior to their docketing, but the cost-prohibitive effect caused him to have to withdraw the petition in April 2025. That scenario will not be repeated. And as the seriousness of the facts of threat to life/liberty/property of this application as compared to that of August 2024 do evidence, there exists an increased imperativeness of having the Jarkesy issue viz a viz the nationwide state license suspension/revocation system definitively addressed. With the filing of K1 on February 22, 2016, **The Kaul Cases** Defendants did not anticipate that Plaintiff

6

Kaul would persist in his litigation efforts until there came about, as previously

and frequently referred to, a **"Reformation of American Medical Boards"**.

## **PRELIMINARY STATEMENT**

Petitioner-Plaintiff Kaul respectfully asserts that the context of the 'PREAMBLE'
was necessary to provide a coherent, logical and structured format to a
case/petition whose factual foundation commenced in 2005, involves an
intersection of the worlds of medicine, business, law and politics and an outcome
with the potential to reform the regulatory world of American medicine.
Petitioner-Plaintiff, RICHARD ARJUN KAUL, MD, submits this interlocutory appeal
of the JULY 8, 2025, ORDER (**Appendix D**) of the United States District Court for
the Southern District of Texas – Houston Division, an order issued within K11-27, a
case the Complaint (**Appendix E**) of which was filed on April 9, 2025. The July 8,
2025 order effectively stays the case and thus this petition seeks to cause the
district court to enter a Rule 16 SCHEDULING ORDER to permit discovery to
commence and case deadlines to be implemented. It is of immense note that in
the over nine( (9) years since the filing of K1 (February 22, 2016), none of **The
Kaul Cases** Defendants have complied with any of the multiple discovery orders
entered by multiple courts (K5-December 16, 2020/K11-15-February 2, 2024/K11-
17-March 13, 2024/K11-19-June 14, 2024/K11-20-August 30, 2024 + December 9,
2024/K11-23-November 4, 2024/K11-27-July 9, 2025). The principal excuse
provided pertained to the illegal September 12, 2022 purported 'injunction'

8

issued in K11-7 by Oetken, an individual now under investigation by the

disciplinary council of the U.S.C.A. for the Second Circuit (**Appendix F**).

There now exists no nationwide injunction impediment to this case advancing

towards a resolution of the applicability of the June 27, 2024 7th Amendment

holding in the SCOTUS opinion in SEC v Jarkesy: 22-859 to the nationwide system

of state medical board license physician suspension and or revocation license

proceedings, in the same manner in which the functioning of the SEC was brought

into constitutional compliance in Jarkesy.

The case pending in the district court (K11-27) is the healthcare equivalent of the

finance sector case of Jarkesy, in which the issues of unconstitutional jury-less

article III judge-free administrative agency deprivations of livelihood licenses and

imposition of monetary 'fines' are the central features.

Defendant-Respondent Federation State Medical Boards, as does every legally

cognizant party to the matter, recognize the perfect applicability of Jarkesy to the

**"Federation Cartel"** controlled state medical board system, and so did the

Supreme Court of the United States in Plaintiff-Petitioner Kaul's February 14,

2025 'PETITION FOR WRIT OF CETIORARI' pursuant to Rule 10 sections (a) and (c)

(**Appendix G**). However, despite the March 18, 2025 letter from SCOTUS requiring

the submissions be formatted prior to a scheduled docketing (**Appendix H),** the

9

prohibitive formatting cost caused Plaintiff-Petitioner Kaul to voluntarily withdraw the petition on April 24, 2025 (**Appendix B**).

K11-27, as with K11-19, places the applicability of Jarkesy to the nationwide state medical board licensing suspension/revocation process at the center of the case and arguably as its definitive element. This is a matter of which SCOTUS has expressed an interest in conclusively resolving in the promotion of consistency as to administrative agencies involved in issues pertaining to serious constitutional matters of life, liberty and property.

There are of course forces for whom such constitutional compliance constitute obstacles to their political and economic agendas, which accounts not only for the corrupt July 8, 2025 cancellation of the scheduled July 9, 2025 conference, but the incriminating effort to omit any reference to an ostensible stay of discovery until adjudication of Defendant-Respondents futile/dilatory motions to dismiss. These are the 'games' played by those operating in the 'bad faith' of pending defeat. The stay/dismiss motions were placed before U.S.M.J. Bennett since May 8, 2025 and there is no reason as to why they were not adjudicated, except of course if one assumes the purpose of the delay was to attempt to prevent Plaintiff-Petitioner Kaul from moving the matter towards the Supreme Court of the United States. The omission from the July 8, 2025 order of any reference to a stay of

discovery pertains to the court's prior August 19, 2024 experience in K11-19,

when the referenced discovery stay violated the court's obligation to address the

controlling and conclusive authority of Jarkesy on the outcome of the case

(**Appendix I**). Plaintiff-Petitioner Kaul incorporated the referenced discovery stay

into his August 27, 2024 petition for interlocutory relief to the U.S.C.A. for the 5th

Circuit, an incorporation that highlighted the district court's purposeful omission

of any reference to the controlling/conclusive authority of Jarkesy on the illegality

of the illegal 2012/2014 NJ jury-less article III judge-free $475,000 'fine' imposing

suspension/revocation, the effects of which spawned thirteen (13) year-worth of

ongoing/**"new"** injury to Plaintiff-Petitioner Kaul's

life/liberty/property/reputation.  U.S.M.J. Bennett and the K11-27 Defendants

purposeful omission of any reference to a stay of discovery in the July 8, 2025

conference cancellation order (**Appendix D**) is an attempt, albeit futile, to hinder

the progress of the Jarkesy related matter to the Supreme Court of the United

States, where an affirmation of Plaintiff-Petitioner Kaul's petition would bring the

nationwide state licensing system into constitutional compliance, a revolutionary

change about one hundred and fifty (150) years overdue. The change will be good

for the public, for the medical profession, for equity and for the law but of course

there will be those corporate-types who bemoan the 'good ole days of billions-

11

reaping physician indentured servitude'. State medical boards will resume their original purpose of simply issuing licenses, a function closer to that of the DMV and innovative medicine will once again flourish in America. It might remind some of those over sixty (60) of the falling of the Berlin Wall and the disintegration of communist-like bureaucratic tyrannies. A new perestroika.

The omission of the 'stay of discovery' trick by U.S.M.J. Bennett and the K11-27 Defendants was/is purposed to attempt to 'paralyze' K11-27, but it is of no avail, as pursuant to the doctrine of tacit admission, the K11-27 case file is replete with claims of staying and commencing discovery, the avoidance of which by U.S.M.J. Bennett failed to serve his and his K11-27 co-conspirators corrupt case 'paralyzing' scheme. A statement unanswered will answer itself. A basic tenet of Socratic discourse.

**HOWEVER**, analyzed either way, the interpretation works to the advantage of Plaintiff Kaul in that if the tacit admission pertains to a stay of discovery, then there exists, as there did in K11-19, the basis for an interlocutory appeal of the tacitly issued stay, BUT if the tacit admission pertains to a commencing of discovery, then the K11-27 Defendants will be compelled to discovery.

Plaintiff Kaul, in analyzing these aspects of K11-19 and K11-27 from a wider and timely perspective did ascertain that the K11-27 Defendants principal strategy

12

involved attempting to avoid Plaintiff Kaul from placing the question of the

applicability of Jarkesy to state medical boards suspension/revocation

proceedings before SCOTUS and attempting to avoid subjection to discovery. In

fact, it was the almost complete proximity in April 2025 of Plaintiff Kaul's Jarkesy

related petition for a writ of certiorari to SCOTUS that prompted the U.S.D.C. for

the Southern District of Texas to rapidly admit K11-27 on April 9 and issue a Rule

26(f) order on April 11, 2025 to deceive/distract Plaintiff Kaul from correcting the

formatting errors in his SCOTUS submissions, and divert his attention away from

the SCOTUS petition to K11-27. It would also explain the inordinate time (April 11

to July 7, 2025) from the Rule 26(a) order to the July 9, 2025 Rule 16 conference,

during which the K11-27 Defendants and their U.S.D.C.-S.D.T./U.S.D.C.-S.D.N.Y.

co-conspirators planned to have, in collusion/conspiracy with Oetken, Plaintiff

Kaul arrested/jailed at the proposed June 17, 2025 'contempt' hearing in K11-7,

thus rendering the K11-27 July 9, 2025 'contempt' hearing moot. The plan was for

the K11-27 Defendants, in collusion/conspiracy with U.S.M.J. Bennett to dismiss

K11-27 and keep Plaintiff Kaul incarcerated till he either died or signed away his

rights to ever file suit against any person, however remotely connected to **The**

**Kaul Cases**, under penalty of contempt related re-incarceration for increasingly

longer periods. And it also explains why the corrupted U.S.M.J. Richard Bennett

cancelled the July 9, 2025 hearing, with no rescheduling and an omission of any reference to the multiple claims for discovery within the K11-27 case file. The problem, however, for both him and his K11-27 co-conspirators is that his tacit silence did cause an admission that if discovery was stayed, interlocutory appeal would be warranted and in the alternative that if an admission that a discovery stay was not granted, then discovery would proceed. Either way, the K11-27 Defendants and co-conspirator Bennett did manipulate themselves into travelling down either DISCOVERY ROAD or SCOTUS ROAD, the joint destination of which is defeat.

## THE OBSTRUCTION OF DISCOVERY

The July 8, 2025 cancellation of the July 9, 2025 Rule 16 scheduling conference on the false pretext that motions pending for months to stay/dismiss the case were to be adjudicated before setting a scheduling does constitute an effective denial of discovery. Throughout **The Kaul Cases**, every discovery order issued by every court has been violated by **The Kaul Cases** Defendants, and on June 27 2025, the K11-27 Defendants became officially deprived by the SCOTUS holding in Trump v CASA of Oetken's knowingly illegal K11-7 September 12, 2022 purported nationwide 'injunction'. The K11-7 Defendants and U.S.M.J. Bennett, in recognizing their defenselessness did issue an unsubstantiated two (2) line

14

cancellation order of the July 9, 2025 conference which had been scheduled on April 11, 2025, two days after the April 9, 2025 case filing. However, for the reasons articulated in the 'PRELIMINARY SECTION' the only two possible interpretations are that discovery is stayed, in which case interlocutory appeal proceeds or discovery proceeds in which case interlocutory appeal is stayed. The tactic of U.S.M.J. Bennett in collusion/conspiracy with counsel for the K11-27 Defendants to 'paralyze' the case in the district court is insufficient to circumvent the admissions of tacit silence, an ancient truth espousing doctrine that originated from the premise that if a man's words were but those of truth, then truth would safeguard their passage to proof and innocence. But that is not and never has been the case with **The Kaul Cases** Defendants and their crooked judicial co-conspirators, of which there have been many on this nine (9) plus odyssey of **The Kaul Cases**.

And so, the continued obstruction/violation of justice of discovery, of Plaintiff Kaul's life/liberty/property and human/civil/constitutional rights since the 2005 invention and successful performance of the first percutaneous spinal fusion are continued with the July 8, 2025 cancellation of the July 9, 2025 scheduling conference.

## **REFERRAL OF LAWYER TO THE STATE BAR OF TEXAS**

The increasing and impunity-tinged extremis of the malfeasance of lawyers and

certain judges within **The Kaul Cases** over a nine (9) year-plus period did cause

Plaintiff Kaul to submit a complaint to the OFFICE OF THE CHIEF DISCIPLINARY

OFFICER OF THE STATE BAR OF TEXAS on July 14, 2025, the first 23 pages of a 300-

page filing are enclosed in (**Appendix J**). The complaint is lodged against counsel

for K11-27 Defendants Christopher J. Christie/James Howard Solomon, Matthew

Lipman, for  perpetrating a massive fraud against an officer of the United States

District Court, that officer being U.S.M.J. Richard Bennett, who took no remedial

action when provided proof the fraud, thus causing his incrimination in the fraud.

The inclusion of this document reflects the seriousness of the

offenses/violations/crimes that have been committed not just against Plaintiff

Kaul's life/liberty/property/reputation and his human/civil/constitutional rights

but against the principles of law that certain lawyers/judges, as the officers and

guardians of the Court have so criminally derogated in K11-27.

This type of misconduct and worse has placed Oetken before the disciplinary

committee of the U.S.C.A. for the Second Circuit (**Appendix F**) and the misconduct

of U.S.M.J. Bennett and his K11-27 co-conspirators should similarly be summoned

before the U.S.C.A. for the Fifth Circuit.

# RELEVANT CHRONOLOGY

## OVERVIEW

A purpose of K11-27 is to have the Supreme Court of the United States hold, as set forth on the opening page of the Complaint, that the physician license suspension and revocation process is conducted according to the principles and holdings set forth by SCOTUS in SEC v Jarkesy: 22-859 (June 27, 2024). Those conditions being that all suspension and revocation proceedings are conducted in accordance with the due process protections of the Constitution and specifically with the Seventh Amendment jury related requirement and that of an article III judge in the United States District Court. The law recognizes a medical license as the property of the holder and as with all forms of life/liberty/property its ownership is protected by the United States Constitution. Thus, to lawfully deprive a person of his life/liberty/property requires that the process of deprivation comply with all relevant clauses of the United States Constitution, as the law holds that any deprivation of any of these clauses is an illegal act and that the product of that illegality is itself illegal.

As Plaintiff Kaul has been asserting since 2012, as evidenced by the record of **The Kaul Cases**, the suspension/revocation of his New Jersey license to practice

17

medicine and surgery was not only conducted illegally but was, is and remains illegal. And thus, every ongoing/**"new"** injury to his

life/liberty/property/reputation and human/civil/constitutional rights caused consequent to the 2012/2014 illegal suspension/revocation was and does remain illegal and the product of offenses/violations/crimes committed willfully and with malice against Plaintiff Kaul's life/liberty/property/reputation and human/civil/constitutional rights by **The Kaul Cases** Defendants.

The K11-27 Defendants, having witnessed the progression of legal events in K11-19, whereby the Jarkesy related question as to the illegal jury-less article III judge free $475,000 'fine' 2014 NJ license revocation was almost addressed but for brief formatting corrections, did collude and conspire with U.S.M.J. Richard Bennett to issue on July 8, 2025 a judicial order that cancelled the July 9, 2025 scheduling conference absent any written basis. However, on July 10, 2025 at 2:28 PM EST, Plaintiff Kaul spoke with one of Bennett's clerks, a female, as to the reason for the cancellation and was informed it was related to the fact that the Defendants had filed motions for a stay. No other information was provided, neither a date for rescheduling nor what would be the next procedural step. The call lasted one minute and thirty-six (36) seconds.

The July 8, 2025 cancellation order was entered sometime after 3 pm EST in the
absolute absence of any given reason, the purpose being to attempt to render it
unappealable and immune to appellate review. At the heart of this scheme is the
K11-27 Defendants attempt to prevent the Supreme Court of the United States
from bringing the nationwide medical licensing suspension/revocation process
under the above referenced constitutional protections. Although apparent to
those involved in the regulatory aspect of American medicine, it is a fact that
American physicians possess fewer rights than convicted criminals with regards to
the property of their medical careers and licenses. There exits no comparable
situation in any other profession or trade, such that a physician's livelihood can be
stripped without any of the usual safeguards associated with one's
life/liberty/property. In America there are four hundred (400) physician suicides a
year.

The furtive and 'bare-bone' nature of the July 8, 2025 conference cancellation
was purposed, in conjunction with the proposed June 17, 2025 'contempt-jailing'
hearing in K11-7 to cause the elimination (jail/death) of Plaintiff Kaul and a final
conclusion to the Jarkesy related SCOTUS litigation efforts as to the
unprecedented reformation of the license suspension/revocation process.

Within the two-thousand five hundred and fifty-four (2,554) page K11-27 file, there exists no legal or factual basis on which U.S.M.J. Bennett had the right to cancel the July 8, 2025 conference, which is why the order submitted none. His expectation, along with that of the K11-27 Defendants was that on June 17, 2025 in K11-7, Oetken, in his knowingly illegal 'contempt' hearing would find Plaintiff-Petitioner Kaul in contempt of his knowingly illegal September 12, 2022 purported 'injunction' and cause his incarceration for a period sufficient to prevent his appearance for the July 9, 2025 Rule 16 conference in K11-27, a hoped-for absence that would result in the dismissal of K11-27. U.S.M.J. Bennett played a pivotal role in this illegal scheme and thus the law holds for his disqualification from the case. A disqualification that is further substantiated by his failure to bar Defendants Christie/Solomon's lawyer, Matthew Lipman, from the case based upon his willful misrepresentation to the Court that Oetken conducted a hearing on June 17, 2025 in K11-7, when he knew it to be a lie. Plaintiff Kaul has reported this matter to the Texas State Bar.

## THE VIOLATION OF THE AUTHORITY AND JURISDICTION OF THE U.S.C.A. FOR THE FIFTH CIRCUIT OF U.S.D.J. JAMES PAUL OETKEN AND ILLEGAL HIS SEPTEMBER 12, 2022 PURPORTED NATIONWIDE 'INJUNCTION' IN K11-7.

Since the commencement of **The Kaul Cases** in 2016, the factual foundation of

which commenced in 2005 when Plaintiff Kaul invented and successfully

performed the first outpatient minimally invasive spine fusion, a procedure that

revolutionized the filed of spine surgery, became the standard of care about a

decade ago, has helped millions of disabled back pain patients, and the

intellectual property of which was stolen from him by the illegal 2014 NJ jury-less

article III judge free $475,000 'fine' related revocation, in order that **The Kaul**

**Cases** Defendants could illegally profit from his technique.

In the twenty (20) year period since the invention, there did emerge a

**'Revocation-Cover-Up-Conspiracy'** (2005-2025) in which one of the principal

purposes was to cause Plaintiff Kaul's elimination, in order to prevent him from

further exposing the crimes of **The Kaul Cases** Defendants, crimes that included

amongst other things, bribery/kidnapping/false indictment/false arrest/false

incarceration/attempted killing/securities fraud/bribery/perjury/money

laundering/securities fraud/public corruption.

An element of the **'Revocation-Cover-Up-Conspiracy'** pertained to the issuance

on September 12, 2022 by James Paul Oetken, a jurist corrupted in K11-7 by the

21

K11-7 Defendants in a quid pro quo, in which in return for millions of dollars he entered a knowingly illegal nationwide 'injunction', which he used to threaten Plaintiff Kaul with contempt if he ever filed another case in any other court in America without his permission. However, after having confirmed the illegality of Oetken's purported 'injunction', Plaintiff Kaul filed further suits in courts within the U.S.C.A. for the 5th Circuit, but not without providing full disclosure to all district judges of all the 'injunction' related facts, consequent to which they knowingly/willingly admitted the cases and issued Rule 12/16/trial orders. Without fail, Oetken/agents would harass/intimidate/bribes the judges within the 5th Circuit to dismiss all the cases, thus violating the independent authority of the district courts within the 5t Circuit. Consequently, on October 9, 2024 Plaintiff Kaul sued Oetken in the U.S.D.C. for the Southern District of Mississippi (K11-23) and litigated the case to protect the authority, independence of the 5th Circuit and to rectify the injuries caused to his life/liberty/property, despite being threatened by Oetken with contempt and jail.

Fortunately, on June 27, 2025, the Supreme Court of the United States in **Trump v CASA** rendered a decision that held that district judge issued nationwide injunctions not only were illegal but had always been illegal. This ruling nullified

K11-23 Defendant Oetken's September 12, 2022 ' injunction' and all the case

obstructing/dismissing (K11-14/K11-7/K11-20) products of that illegal instrument.

However, as if to lend another layer of 'state color' criminality to the K11-27

Defendants increasingly desperate efforts to avoid the Supreme Court and or

discovery, they conspired with a conflicted K11-23 Defendant Oetken to schedule

in K11-7, on his own docket in the SDNY, a June 17, 2025 'contempt' hearing, the

plan being to arrest and incarcerate Plaintiff Kaul on that day, the purpose being

to eliminate him for the purpose of preventing him from appearing on July 9,

2025 for the scheduled Rule 16 conference in K11-27, a non-appearance that

would cause a case dismissal and to then have him forever sign away all his rights

to legally vindicate the twenty (20) years plus of injury to his life/liberty/property

as a condition of his release from jail and with any re-violation resulting in

immediate re-imprisonment. Whether this remains the last desperate stand of

the K11-27 Defendants remains to be seen.

The purpose in relaying these facts pertains to the petition for interlocutory relief,

as the K11-27 Defendants, in collision/conspiracy with U.S.M.J. Bennett caused

the issuance on July 8, 2025 of a two-line cancellation order of the July 9, 2025

scheduling conference, the purpose being to attempt to 'paralyze' the case, and

prevent discovery and a resolution of the <u>Jarkesy</u> question by either the U.S.C.A.

for the Fifth Circuit or the Supreme Court of the United States. This question

would have been answered in K11-19 if Plaintiff Kaul were in possession at that

time of the necessary brief formatting funds. SCOTUS had reviewed the

submission and was prepared to docket the petition (**Appendix H**).

## THE  K11-27 CASE FILE

The K11-27 case file consists principally of the K11-27 Defendants motions to stay

discovery/dismiss the case, based principally on the illegal/invalidated September

12, 2022 purported 'injunction' of K11-23 Defendant Oetken, and some other

frivolous claims of jurisdiction/venue, claims all of which were neutered in the

Complaint and subsequent filings by Plaintiff Kaul. But more tellingly all K11-27

Defendants have pursuant to Rule 8(b)(6) admitted to the facts of their guilt and

to the guilt itself of the charges levied in K11-27. For example, Defendants

Christie/Solomon (**Appendix K**). Thus, being defenselessness and guilty, their

submissions in K11-27 are frivolous in the extreme. Their plan and hope was to

have Plaintiff Kaul arrested and jailed on June 17, 2025 by K11-23 Defendant

Oetken and held for as long was necessary. This scheme, incidentally, 'backfired'

on them and Oetken is now under investigation by a disciplinary council of the 2nd

Circuit Court of Appeals, having been referred by the Attorney Grievance

24

Committee of the New York State Bar in or around mid to late June, 2025

(**Appendix F**).

## THE MISCONDUCT OF A LAWYER (MATTHEW LIPMAN) AND A MAGISTRATE JUDGE (RICHARD BENNETT) IN THE S.D.T. - HOUSTON

In keeping with the long-history of offenses/violations/crimes committed by **The**

**Kaul Cases** Defendants by/through/within the '**Revocation-Cover-Up-Conspiracy'**,

and a sense of impunity that appears to have so perverted their judgment, these

two individuals (Bennett/Lipman) although one can be sure that their malfeasant

acts were not perpetrated in isolation, did convert the United States District Court

for the Southern District of Texas, as did their co-conspirator Oetken in the

S.D.N.Y., into a **"racketeering enterprise"** through which they have committed

and are committing the RICO predicate acts of fraud purposed to obstruct the

legitimate process of justice. The facts of this tiresome malfeasance are contained

and self-explanatory within (**Appendix J**).

It would appear that the K11-27 Defendants and their co-conspirator judges have

forgotten the sanctity of the judicial process and the courts in which the process

is conducted, forgetting that their self-serving /offenses/violations/crimes impact

and destroy the lives of other human beings. It might serve them well if their life

were to be subjected to the dishonest, unethical and criminal abuse of power that

25

they exact on others, many victims of whom are far less informed than Plaintiff Kaul of their punishable/reprehensible conduct.

## THE INTERLOCUTORY APPEAL AND OR DISCOVERY

As set forth in this petition for interlocutory review, Plaintiff Kaul believes it will assist the jurisdiction of the U.S.C.A. for the 5th Circuit in that the paralyzing effect of Bennett's July 8, 2025 conference cancellation will be nullified by a grant of the petition, whereby the Jarkesy question as to the state medical board suspension/revocation process can be answered either by the 5th Circuit or advanced for resolution to the Supreme Court of the United States.

The question will be inevitably be resolved as there are twelve (12) circuits in the United States and Plaintiff Kaul has standing in all. The Fifth Circuit seemed the most appropriate as it was from this circuit that emanated the brilliantly drafted opinion in Jarkesy on May 18, 2022.

## LISTED BELOW ARE THE CRITICAL CHRONOLOGICAL LEGAL EVENTS OF THE ILLEGALITY OF THE K11-27 DEFENDANTS AND JAMES PAUL OETKEN (U.S.D.J. – S.D.N.Y.) AND RICHARD W. BENNETT (U.S.M.J. – S.D.T.)

The scheming and conniving of the K11-27 Defendants, in collusion/conspiracy with Oetken and Bennett, however unethical and distasteful was and is purposed to obstruct the commencement of Plaintiff Kaul's discovery related prosecution of K11-27 and his efforts to place the Jarkesy related question before SCOTUS as to the applicability of its principle and holdings to the nationwide process of physician license suspension and revocation, viz a viz, a jury, an article III judge and all the constitutional protections accorded one's life/liberty/property. The consequences of this landmark petition are far-reaching and will bring the entire physician license suspension/revocation system into constitutional compliance and had the 2024 K11-19 events been adequately funded , then the 2024 petition would have achieved its landmark effect. But as some say, better late than never.

## ARGUMENT

The K11-27 Defendants have caused an improper interference and corruption of

the Court for the purpose of attempting to prevent Petitioner Kaul from moving

for discovery and or Summary Judgment. This has been an element of **The Kaul**

**Cases** Defendants **"pattern of racketeering"** within the United States District

Court throughout **The Kaul Cases** (2016-2025), a tactic of which involves them

employing senators from New Jersey to coerce the relevant state senators into

pressing the district judge into effectively 'paralyzing' and or improperly

dismissing the case.

However, the issue of corruption aside, the district court's July 8, 2025,

conference cancellation order, other than improperly preventing the entry of an

order of Summary Judgment, does violate the law in that it seeks to permanently

prevent the application of Jarkesy to the facts of the case. Defendants have failed

within all of their submissions to address this determinative case, and have thus

admitted to the fact that the application of this case to the admitted facts do

cause the case to be summarily proved.

The district court's actions are contrary to and do impede the purpose of

respectively the May 18, 2022/June 27, 2024, rulings from the U.S.C.A. for the

Fifth Circuit and SCOTUS in Jarkesy. This case constitutes a test of the law to the

American healthcare sector, and specifically the so-called area of physician

'regulation and disciplining', an area, arguably, in which administrative state

agencies have for decades exacted inhumane levels of human/civil/constitutional

rights abuses on physicians and other licensed professionals. Every year

approximately four hundred (400) American physicians commit suicide, with the

majority being related to licensing issues/loss.

There exists no basis for the district court to impede discovery, as pursuant to

Jarkesy and as briefed within the case, the 2014 jury-less article III judge-free

$475,000 'fine' imposing NJ license revocation proceeding was conducted illegally

and was and is illegal, and thus there exists an unequivocal factual and legal basis

for judgment, as there does with all of the K11-27 Defendants admissions of fact.

The K11-27 Defendants recognition of the chronological coalescing of the ruling in

Jarkesy with Petitioner's continued prosecution of **The Kaul Cases**, (2016-2025)

and the immense legal consequences for the wider business of 'physician

regulation and disciplining' account for their corruption of the district court, and

the district court's improper July 8, 2025 cancellation of the July 9, 2025

scheduling conference. A cancellation that violates the purpose, principle and

point of the law set forth by the U.S.C.A. for the Fifth Circuit and SCOTUS in

Jarkesy.

## CONCLUSION

It took almost a decade for George Jarkesy to bring the constitutional abuses of the SEC to the attention of SCOTUS, and for SCOTUS to redirect and remind the SEC of the Constitution. It required slightly fewer years for disenfranchised fishermen to have their grievances of business ending administrative over-regulation recognized and rectified by SCOTUS. The administrative abuses that underpinned these actions in the finance and fishing sectors did exist to the same, if not greater extent in the area of physician regulation and disciplining, facts of which the district judge is aware, which accounts for his July 8, 2025 cancellation order.

There currently exists no other case within the American courts that pertains to the administrative regulatory abuses that this case presents, and in fact the importance of his case was highlighted on June 13, 2012, by Petitioner Kaul's then lawyer during a knowingly illegal suspension hearing with **The Kaul Cases** Defendant New Jersey Board of Medical Examiners (**Appendix L**).

The consequences of this case reach far beyond Petitioner Kaul, and represent a rectification of an arguably un-paralleled degree of abuse within an unconstitutional and illegal system of so called 'physician regulation/discipline',

30

the sole purpose of which is actually the advancement of the economic/political

agendas of for-profit healthcare corporations and physician market monopolizes.

For these reasons, Petitioner Kaul respectfully requests this Court does, as

expeditiously as possible, vacate the July 8, 2025 cancellation order and reinstate

the Rule 16 scheduling order.

Plaintiff-Petitioner Kaul certifies that the foregoing statements are true and

accurate to the best of his knowledge.

DATED: JULY 17 , 2025

RICHARD ARJUN KAUL, MD

www.drrichardkaul.com

**JULY 18, 2025**

United States Courts
Southern District of Texas
FILED

JUL 23 2025

Nathan Ochsner, Clerk of Court

CLERK OF THE COURT
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
515 RUSK AVENUE
HOUSTON, TX 77002

**RE: KAUL v FEDERATION ET AL.**
   **25-CV-01676-ASH-RWB**
   **K11-27**
   **PETITION TO THE U.S.C.A. FOR THE FIFTH CIRCUIT FOR INTERLOCUTORY RELIEF AS TO THE**
   **CANCELLED JULY 9, 2025 SCHEDULING CONFERENCE.**

Dear Clerk of the Court,

Please find submitted the following documents:

1. **PETITION TO THE U.S.C.A. FOR THE FIFTH CIRCUIT FOR INTERLOCUTORY RELIEF AS TO THE**
   **DISTRICT COURT'S JULY 8, 2025 CANCELLATION OF THE JULY 9, 2025 SCHEDULING**
   **CONFERENCE.**

2. **MOTION AND AFFIDAVIT TO PROCEED IFP.**

Yours sincerely

RICHARD ARJUN KAUL, MD

RICHARD KAUL
(914) 250-8413
THE UPS STORE #1748
45 S PARK PL
MORRISTOWN NJ 07960-3986

5 LBS          1 OF 1
SHP WT: 5 LBS
DATE: 18 JUL 2025

United States Courts
Southern District of Texas
FILED

JUL 2 3 2025

Nathan Ochsner, Clerk of Court

SHIP     SOUTHERN DISTRICT OF TEXAS
TO:  US DISTRICT COURT, CLERK OF COURT
       515 RUSKA AVE

HOUSTON   TX 77002

TX 775 9-02

**UPS GROUND**
TRACKING #: 1Z X24 411 03 0737 1311

XMF7JZ5     DATA CORP007 US 7759   JUL 23 05:47:50 2025   HIP 25.3.2     ZD621R

MHEJ8HXE0C9M ISH 13.00C ZZP 450 25.5U 06/2025

NIE NOTICE ON REVERSE regarding UPS Terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.     WRD K 0025

US DISTRICT COURT CLERK OF COUR
515 RUSK ST

HOUSTON TX 77002

P: WALL     S: WALL
429 – 6000          I: 429

1ZX24411030737   1311
XMF7JZ5     DATA CORP007   JUL 23 05:47:50 2025
US    7702    HIP 25.3.2     ZD621R

# APPENDIX O

[www.drrichardkaul.com](www.drrichardkaul.com)

**MARCH 19, 2025**

**Hon. Ronnie Abrams**
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

**RE: KAUL v ICE: 21-CV-06992**
 **K11-7**
 **KAUL v OETKEN: 24-CV-00162**
 **K11-23**
 **ADMITTED ILLEGALITY AND JUDICIALLY INVALIDITED 'INJUNCTION' OF K11-23**
 **DEFENDANT JAMES PAUL OETKEN**

Dear Judge Abrams

I write this letter to bring to your attention an issue in the Southern District of New York, of which you might or might not be aware. The issue involves K11-23 Defendant James Paul Oetken, who despite having admitted to, amongst other things, perpetrating a bribery related quid pro quo scheme in his chambers of the SDNY (K11-7: D.E. 181) remains on the bench. This document and others of relevance can be found at 21-CV-06992 (K11-7) and 24-CV-00621 (K11-23).

The afore referenced scheme occurred in a period from August 19, 2021 and September 12, 2022, when in return for bribes and other favors, Defendant Oetken issued a knowingly illegal anti-filing nationwide 'injunction', the invalidity and illegality of which has now been proven in other district courts by other judges and most importantly by Defendant Oetken's own admissions. Having irrefutably established these facts, **The Kaul Cases** Defendants, and specifically and currently the K11-25 (KAUL v FEDERATION: 25-CV-00164) Defendants, have, since February 19, 2025, flooded the SDNY docket with multi-thousand-page filings, directed at every judge within the SDNY, in a desperate plea to have someone adopt Defendant Oetken's knowingly and admittedly illegal September 12, 2022 purported nationwide 'injunction' in K11-7. This unprecedented and guilt confirming strategy pertains to the fact that in K11-17 (KAUL v CPEP: 23-CV-00672)/K11-20 (KAUL v FSMB: 24-CV-03180)/K11-24 (KAUL v FSMB-25-CV-25)/K11-25, the K11-25 Defendants have admitted, pursuant to Rule 8(b)(6) to all the facts of

1

their guilt of the crimes of amongst others (kidnapping/false indictment/false arrest/false incarceration/attempted killing/securities fraud/evidential tampering/witness tampering/public corruption/bribery/bank fraud/bankruptcy fraud/perjury/wire fraud/mail fraud/judicial corruption/kickbacks/money laundering/chemical weapon trafficking/crimes against humanity as to the worldwide propagation of the knowingly toxic COVID mRNA supposed 'vaccine') **and** are defenseless because of the afore-stated invalidation of the illegal September 12, 2022 purported 'injunction' issued by K11-23 Defendant Oetken.

This scenario, into which **The Kaul Cases** Defendants did fundamentally maneuvered themselves stems, in truth from professional jealousy, greed, stupidity and a startling amount of arrogance and corruption. That **The Kaul Cases** Defendants and specifically at this moment the K11-25 Defendants, would find themselves in a situation where they are metaphorically 'begging' every judge in the SDNY to join their '**Revocation-Cover-Up-Conspiracy'** (2005-2025), and pursuant to RICO's doctrine of vicarious liability (See <u>U.S. v. Coonan, 839 F.2d 886(1988)</u> and <u>Salinas v. United States, 522 U.S. 52 (1997)</u> to assume liability for every offense/violation/crime/injury caused and continuing to be caused to Plaintiff Kaul for the last twenty (20) years.

Plaintiff Kaul respectfully asserts that having provided sufficient context, the main point of this notice is to request the following information pursuant to the Courthouse and Transparency Act of 2022, to the US Code Sections 144/455 related principals of judicial impartiality, non-bias and the appearance of impartiality. This information is also sought pursuant to Plaintiff Kaul's constitutional rights, of amongst other things, due process, impartial tribunals and equal protection, a deprivation to all of which he has have been subjected to since 2005, along with that of his life/liberty/property/reputation.

The relevant period for which the information sought pertains to 2016 (K1) to 2025 (K11-25):

**1**. Any and all exparte communications/their substance concerning any aspect of **The Kaul Cases** (2016-2025)  and or the '**Revocation-Cover-Up-Conspiracy** (2005-2025) between any of **The Kaul Cases** Defendants and or their agents and yourself and any agents acting on your behalf.

**2**. Any and all exparte communications/their substance concerning any aspect of **The Kaul Cases** (2016-2025)  and or the '**Revocation-Cover-Up-Conspiracy** (2005-2025) between any **federal politicians** and or their agents and yourself and any agents acting on your behalf.

**3.** Any and all exparte communications/their substance concerning any aspect of **The Kaul Cases** (2016-2025)  and or the '**Revocation-Cover-Up-Conspiracy** (2005-2025) between any **state politicians** and or their agents and yourself and any agents acting on your behalf.

**4.** Any and all exparte communications/their substance concerning any aspect of **The Kaul Cases** (2016-2025)  and or the '**Revocation-Cover-Up-Conspiracy** (2005-2025) between any **political lobbyists** and or their agents and yourself and any agents acting on your behalf.

**5**. Any and all exparte communications/their substance concerning any aspect of **The Kaul Cases** (2016-2025)  and or the '**Revocation-Cover-Up-Conspiracy** (2005-2025) between any **federal judges** and or their agents and yourself and any agents acting on your behalf.

**6.** Any and all exparte communications/their substance concerning any aspect of **The Kaul Cases** (2016-2025)  and or the '**Revocation-Cover-Up-Conspiracy** (2005-2025) between **K11-23 Defendant Oetken** and or their agents and yourself and any agents acting on your behalf.

**7**. Any and all exparte communications/their substance concerning any aspect of **The Kaul Cases** (2016-2025)  and or the '**Revocation-Cover-Up-Conspiracy** (2005-2025) between any **state judges** and or their agents and yourself and any agents acting on your behalf.

**8.** Any and all exchanges of any tangible or non-tangible goods/products/services/favors and or anything else of value that was provided by a person or any agent acting on behalf of that person to you at any point in time in return for bribing you into <u>entering</u> a particular preordained decision in a particular case, for the purpose of having <u>manipulated</u> the case towards a specific preordained outcome.

**9.** Any and all exchanges of any tangible or non-tangible goods/products/services/favors and or anything else of value that was provided by a person or any agent acting on behalf of that person to you at any point in time in return for bribing you into having <u>entered</u> a particular preordained decision in a particular case, for the purpose of having <u>manipulated </u>the case towards a specific preordained outcome.

**10**. A list of your AO10 disclosures.

**11**. A list of any all relatives to the third degree that have  participated in any and all exchanges of any tangible or non-tangible goods/products/services/favors and or anything else of value that was provided by a person or any agent acting on behalf of that person to them at any point in time in return for bribing you into <u>entering</u> a particular preordained decision in a particular case, for the purpose of having <u>manipulated</u> the case towards a specific preordained outcome.

**12**. A list of any all relatives to the third degree that have  participated in any and all exchanges of any tangible or non-tangible goods/products/services/favors and or anything else of value that was provided by a person or any agent acting on behalf of that person to you at any point in time in return for bribing you into having <u>entered</u> a particular preordained decision in a particular case, for the purpose of having <u>manipulated </u>the case towards a specific preordained outcome.

**13**. A list of any and all complaints filed against you by any party with any regulatory or disciplinary body and or court, and their resolution.

**14.** A list of any and all off-shore bank accounts, trusts and other financial vehicles whether known to the IRS or not.

Although this list is not exhaustive, if you believe there is any other information that would, even if you chose to become involved in the '**Revocation-Cover-Up-Conspiracy'** ,constitute a conflict of interest, please, in the spirit of full disclosure, state that information as part of this notice.

Due to the seriousness of the issues underpinning Defendant Oetken's admissions of guilt and the K11-25 Defendants scheme to coopt and further corrupt the United States District Court, a copy of this letter will be forwarded to the United States Marshal Service, the Department of Justice, the FBI, DOGE and the President.

The American people are sick and tired of the malignant corruption that has been allowed to be perpetrated for decades by self-enriching public servants and faceless un-elected bureaucrats , operating in the shadows of the judicial/administrative bodies of state. Too many crimes and too much illegal profiteering has been committed against too many people in too much darkness, such that a democracy exists only by a thread in the United States.

**I do respectfully request that the sought information be submitted both under seal to the record, and directly and confidentially to me at** **drrichardkaul@gmail.com.**

Please submit the requested information by **April 2, 2025**, and please be noticed that failure to submit will constitute an admission of being conflicted with any aspect/element/person associated with **The Kaul Cases** and or the '**Revocation-Cover-Up-Conspiracy'** and thus any opinion/order will be null/void ab initio and of no legal value to the K11-25 Defendants in any of **The Kaul Cases**.

It remains my position that Defendant Oetken's position on the federal bench remains utterly untenable, as to permit him to do so does confirm that within the SDNY the commission of crime and the conversion of federal benches into **"racketeering enterprises"** is a not uncommon practice within its judiciary. Thus, in this factual scenario, any order entered on behalf of Defendant Oetken by any judge who fails to provide the above sought in formation will constitute a further crime of against the United States of America and will be null and void for all purposes.


Yours sincerely

R.K—

_____
RICHARD ARJUN KAUL, MD

cc: DEPARTMENT OF JUSTICE – PUBLIC CORRUPTION AND INTEGRITY UNIT

4

KASH PATEL – FEDERAL BUREAU OF INVESTIGATION
CHIEF OF UNITED STATES MARSHALS
ELON MUCK – DOGE
PRESIDENT DONALD TRUMP

# APPENDIX P

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 23-cv-22325-BLOOM/Otazo-Reyes

RICHARD ARJUN KAUL and
DAVID BASCH,

     Plaintiffs,

v.

FEDERATION STATE MEDICAL
BOARDS – FLORIDA BOARD OF
MEDICINE, *et al.*,

     Defendants.

_____/

## ORDER REQUIRING SCHEDULING REPORT
## AND CERTIFICATES OF INTERESTED PARTIES[1]

    **THIS CAUSE** is before the Court upon a *sua sponte* review of the record. **Within twenty-one (21) days of an appearance by a Defendant in this case**, the parties are directed to prepare and file a joint scheduling report, as required by Local Rule 16.1. The joint scheduling report and proposed order shall include all information required by Local Rule 16.1(b)(2) and (3). In addition, at the time of filing the joint scheduling report, the parties, including governmental parties, must file certificates of interested parties and corporate disclosure statements that contain a complete list of persons, associated persons, firms, partnerships, or corporations that have a financial interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party (to the extent they have not already done so). Throughout the pendency of the action, the parties are under a continuing obligation to amend, correct, and update the certificates.

---

[1] The parties must not include Judge Bloom and the assigned U.S. Magistrate Judge as interested parties unless they have an interest in the litigation.

***Detailed Discovery Schedule***: Local Rule 16.1(a) provides for a differentiated case management system based on the complexity of each case and the requirement for judicial involvement. That system categorizes cases along three case management tracks: expedited, standard, or complex.

- Expedited track cases are relatively non-complex, require 1 to 3 days of trial, and between 90 and 179 days for discovery from the date of the scheduling order.
- Standard track cases require 3 to 10 days of trial, and between 180 and 269 days for discovery from the date of the scheduling order.
- Complex track cases are unusually complex, require over 10 days of trial, and between 270 and 365 days for discovery from the date of the scheduling order.

"The following factors [are] considered in evaluating and assigning cases to a particular track: the complexity of the case, number of parties, number of expert witnesses, volume of evidence, problems locating or preserving evidence, time estimated by the parties for discovery and time reasonably required for trial, among other factors." S.D. Fla. L.R. 16.1(a)(3).

Fed. R. Civ. P. 26(b)(1) allows discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. The parties shall participate in good faith in developing a detailed discovery plan, including any agreed-upon limitation on scope, frequency and the extent of discovery. The parties shall include in their scheduling report any unique discovery matters, including any electronically stored information that should be preserved and accessed. The parties shall establish a detailed schedule for the preservation, disclosure and access of each different type or category of electronically stored information.

Consistent with the differentiated case management system, other relevant local rules (such

as Local Rule 16.2, regarding mediation), and the twin goals of expeditious and attentive case management, the Court anticipates the following scheduling deadlines in the run of cases:

- Selection of a mediator and scheduling of a time, date and place for mediation within 30 days of the scheduling order.
- Deadline to amend pleadings and join parties within 60 days of the scheduling order.
- Completion of all discovery consistent with the case management track guidelines, and 120 days prior to trial.
- Completion of mediation prior to the deadline for dispositive pre-trial motions.
- Deadline for dispositive pre-trial motions and *Daubert* motions (which include motions to strike experts) 100 days prior to trial.
- Deadline for submission of joint pre-trial stipulation, proposed jury instructions and verdict form, or proposed findings of fact and conclusions of law, as applicable, 40 days prior to trial.
- Calendar call one week prior to trial.

Those deadlines are not exhaustive of deadlines which may be set in the scheduling order.

The parties should address their joint scheduling report and their proposed pre-trial deadlines both to the differentiated case management system and to the Court's anticipated deadlines. The parties are encouraged to explain their proposed deadlines in light of those overarching guidelines, including as to the factors listed in Local Rule 16.1(a)(3). **The parties are cautioned that if they fail to submit a joint scheduling report by the applicable deadline, the Court may unilaterally set this case on a case management track in accordance with Local Rule 16.1(a) and calculated as if the scheduling report had been timely filed.**

As part of the joint scheduling report, the parties shall jointly complete and file with the Court the *Election to Jurisdiction by a United States Magistrate Judge for Final Disposition of Motions* appended to this Order as **Attachment A**. The Court will not accept unilateral submissions. A "Yes" should be checked only if all parties agree. If the parties consent to a full disposition of the case by the Magistrate Judge, including trial and entry of final judgment, the parties shall jointly file the *Election to Jurisdiction* form appended to this Order as **Attachment**

**B**. The parties are advised that even if they do not consent to jurisdiction by the Magistrate Judge, in accordance with 28 U.S.C. § 636(b), the Court may still refer motions to the Magistrate Judge for a report and recommendations.

The parties are advised that the failure to comply with any of the procedures contained in this Order or the Local Rules may result in the imposition of appropriate sanctions, including, but not limited to, the dismissal of this action or entry of default.

**DONE AND ORDERED** in Chambers at Miami, Florida, on July 5, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 23-cv-22325-BLOOM/Otazo-Reyes

RICHARD ARJUN KAUL and
DAVID BASCH,

      Plaintiffs,

v.

FEDERATION STATE MEDICAL
BOARDS – FLORIDA BOARD OF
MEDICINE, *et al.*,

      Defendants.

_____/

## ELECTION TO JURISDICTION BY A UNITED STATES
## MAGISTRATE JUDGE FOR FINAL DISPOSITION OF MOTIONS

      In accordance with the provisions of 28 U.S.C. § 636(c), the undersigned parties to the above-captioned civil matter hereby jointly and voluntarily elect to have a United States Magistrate Judge decide the following motions and issue a final order or judgment with respect thereto:

      1. Motions for Costs              Yes \_\_\_\_\_ No \_\_\_\_\_

      2. Motions for Attorney's Fees      Yes \_\_\_\_\_ No \_\_\_\_\_

      3. Motions for Sanctions          Yes \_\_\_\_\_ No \_\_\_\_\_

      4. Motions to Dismiss           Yes \_\_\_\_\_ No \_\_\_\_\_

      5. Motions for Summary Judgment    Yes \_\_\_\_\_ No \_\_\_\_\_

_____    _____
(Date)           (Signature—Plaintiff's Counsel or Plaintiff if *pro se*)

_____    _____
(Date)           (Signature—Defendant's Counsel or Defendant if *pro se*)

**Attachment A**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 23-cv-22325-BLOOM/Otazo-Reyes

RICHARD ARJUN KAUL and
DAVID BASCH,

       Plaintiffs,

v.

FEDERATION STATE MEDICAL
BOARDS – FLORIDA BOARD OF
MEDICINE, *et al.*,

       Defendants.

_____/

## <u>MAGISTRATE JUDGE JURISDICTION FOR TRIAL</u>

In accordance with the provisions of 28 U.S.C. § 636(c), the undersigned parties to the above-captioned civil matter hereby jointly and voluntarily elect to have a United States Magistrate Judge conduct any and all further proceedings in the case, including TRIAL, and entry of final judgment with respect thereto.


_____    _____
(Date)           (Signature—Plaintiff's Counsel or Plaintiff if *pro se*)


_____    _____
(Date)           (Signature—Defendant's Counsel or Defendant if *pro se*)


**Attachment B**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 23-cv-22582-BLOOM/Torres

RICHARD ARJUN KAUL, MD,

     Plaintiff,

v.

KENNETH MURPHY

     Defendant.

_____/

## ORDER SETTING TRIAL AND PRE-TRIAL SCHEDULE, REQUIRING MEDIATION, AND REFERRING CERTAIN MATTERS TO MAGISTRATE JUDGE

**THIS CAUSE** is set for trial during the Court's two-week trial calendar beginning on **January 13, 2025, at 9:00 a.m.** Calendar call will be held at **1:45 p.m. on Tuesday, January 7, 2025**. No pre-trial conference will be held unless a party requests one at a later date and the Court determines that one is necessary. Unless instructed otherwise by subsequent order, the trial and all other proceedings in this case shall be conducted in **Courtroom 10-2 at the Wilkie D. Ferguson, Jr. United States Courthouse, 400 North Miami Avenue, Miami, FL 33128**. The parties shall adhere to the following schedule:

| | |
|---|---|
| **February 15, 2024** | Parties exchange initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1). The parties are reminded that pursuant to S.D. Fla. L.R. 26.1(b), initial disclosures shall not be filed with the Court unless an exception noted in the Local Rules applies. |
| **February 22, 2024** | The parties shall select a mediator pursuant to Local Rule 16.2, shall **schedule a time, date, and place for mediation**, and shall jointly **file a notice, and proposed order scheduling mediation** via CM/ECF in the form specified on the Court's website, http://www.flsd.uscourts.gov. If the parties cannot agree on a mediator, they shall notify the Clerk in writing as soon as possible, and the Clerk shall designate a certified mediator on a blind rotation basis. Counsel for all parties shall familiarize themselves with and adhere to all provisions of Local Rule 16.2. Within **three (3) days** of mediation, the parties are required to file a mediation report with the Court. Pursuant to the procedures outlined in the CM/ECF |

Administrative Procedures, **the proposed order is also to be emailed to bloom@flsd.uscourts.gov in Word format.**

| | |
|---|---|
| **April 1, 2024** | All motions to amend pleadings or join parties are filed. |
| **August 20, 2024** | Parties disclose experts and exchange expert witness summaries or reports. |
| **September 3, 2024** | Parties exchange rebuttal expert witness summaries or reports. |
| **September 17, 2024** | All discovery, including expert discovery, is completed. |
| **October 1, 2024** | Parties must have completed mediation and filed a mediation report. |
| **October 9, 2024** | All dispositive pre-trial motions and *Daubert* motions (which include motions to strike experts) are filed. This deadline does not include motions *in limine* but **includes all other pre-trial motions.** |
| **December 30, 2024** | Parties submit joint pre-trial stipulation in accordance with Local Rule 16.1(e), a joint summary of the parties' motion(s) *in limine*, proposed jury instructions and verdict form, or proposed findings of fact and conclusions of law, as applicable. |

<u>**A Joint Summary of the Parties' Motion(s)** *in Limine*</u>. The joint summary must contain a cover page providing the style of the case and an index of the motion(s) *in limine*. For each evidentiary issue, the joint summary must include: a one-page argument identifying the evidence sought to be excluded or included at trial and citing legal authority supporting exclusion or inclusion; and a one-page response to the argument citing legal authority in support of admission or exclusion of the disputed evidence. The parties must work together to prepare the joint summary and are encouraged to resolve evidentiary issues through stipulation. Motions *in limine* will not be accepted in any other form.

*<u>**Daubert** Motions</u>*. Each party is limited to filing one *Daubert* motion. If all evidentiary issues cannot be addressed in a 20-page memorandum, leave to exceed the page limit will be granted. **The parties are reminded that *Daubert* motions must contain the Local Rule 7.1(a)(3) certification**.

**Summary Judgment Motions**. The parties are reminded that strict compliance with Local Rule 56.1 is mandated. Pursuant to Local Rule 56.1(b), a statement of material facts must be supported by *specific* references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court. In the event a responding party fails to controvert a movant's supported material facts in an opposing statement of material facts, the movant's material facts will be deemed admitted. Local Rule 56.1(c). In the interest of judicial economy, in the interest of proper and careful consideration of each party's statement of material facts, and in the interest of determining matters on summary judgment on the merits, the Court orders as follows:

1. Each exhibit referenced in the motion for summary judgment and/or in the statement of material facts must be filed on the docket. Exhibits which have already been filed on the docket *need not be refiled.* If a deposition transcript is referenced, a complete copy must be filed **which includes all exhibits.** Within twenty-four (24) hours of filing a motion for summary judgment, the movant shall separately file an index of the cited exhibits which names each exhibit and references the docket entry at which that exhibit may be found.

2. Each exhibit referenced in the response to the motion for summary judgment and/or in the opposing statement of material facts must be filed on the docket. Exhibits which have already been filed on the docket *need not be refiled.* If a deposition transcript is relied upon, a complete copy must be filed **which includes all exhibits.** Within twenty-four (24) hours of filing a response to the motion for summary judgment, the responding party shall separately file an index of the cited exhibits which names each exhibit and references the docket entry at which that exhibit may be found.

3. In the event that cross motions for summary judgment are filed, the Court may order the parties to submit a consolidated statement of material facts and responses as appropriate. If cross motions are anticipated, the parties may jointly move for an order to file consolidated statements prior to filing the motions for summary judgment.

**Jury Instructions and Verdict Form (if applicable).** The parties shall submit their proposed jury instructions and verdict form jointly, although they need not agree on each proposed instruction. Where the parties do not agree on a proposed instruction, that instruction shall be set forth in bold type. Instructions proposed only by a plaintiff shall be underlined. Instructions proposed only by a defendant shall be italicized. Every instruction must be supported by citation to authority. The parties shall use as a guide the Eleventh Circuit Pattern Jury Instructions for Civil Cases, including the directions to counsel contained therein. Proposed jury instructions and verdict form, in typed form, including substantive charges and defenses, shall be submitted to the Court prior to calendar call, in Word format, via e-mail to bloom@flsd.uscourts.gov. Instructions for filing proposed documents may be viewed at http://www.flsd.uscourts.gov.

**Referral to Magistrate Judge.** Pursuant to 28 U.S.C. § 636 and this District's Magistrate Judge Rules, all discovery matters are referred to **Chief Magistrate Judge Edwin G. Torres**. Furthermore, pursuant to 28 U.S.C. § 636(c)(1), the parties may consent to trial and final disposition by Magistrate Judge Torres. **The deadline for submitting consent is October 9, 2024.**

**Discovery.** The parties may stipulate to extend the time to answer interrogatories, produce documents, and answer requests for admissions. The parties shall not file with the Court notices or motions memorializing any such stipulation unless the stipulation interferes with the deadlines set forth above. Stipulations that would so interfere may be made only with the Court's approval.

4

*See* Fed. R. Civ. P. 29. To the extent not abrogated or contradicted by this Order, all agreements and stipulations entered into between the parties prior to this Order continue to bind the parties. The Court reminds the parties that under the Local Rules, initial and expert disclosures; deposition transcripts; interrogatories; requests for documents, electronically stored information or things, or to permit entry upon land; requests for admission; notices of taking depositions or notices of serving subpoenas; and associated responses, objections, notices or any associated proof of service, **shall not be filed until they are used in the proceeding or the court orders their filing**. S.D. Fla. L.R. 26.1(b). Improper filings will be stricken from the record. In addition to the documents enumerated in Local Rule 26.1(b), the parties shall not file notices of deposition with the Court. The parties must make every effort to resolve discovery disputes without requiring Court intervention. Strict compliance with the Local Rules is expected.

**Discovery Disputes**. If parties are unable to resolve their discovery disputes without Court intervention, the parties must contact Magistrate Judge Torres's chambers—which are located at 99 Northeast Fourth Street, 10th floor, Miami, FL 33132—via telephone at (305) 523-5750 to ascertain the available dates and times for a discovery hearing. Magistrate Judge Torres holds a discovery calendar every Thursday and only on Thursdays. The parties should further consult Magistrate Judge Torres's standing discovery order, which sets forth procedures to presenting discovery disputes and will be issued following the entry of this Order. The individual calling Magistrate Judge Torres's chambers must leave a message that identifies only the parties' case number and a call back number if the individual's call goes to voicemail.

Magistrate Judge Torres expects all parties to act courteously and professionally in the resolution of their discovery disputes and to confer in an attempt to resolve the discovery issue

prior to requesting the hearing. The Court may impose sanctions, monetary or otherwise, if the Court determines discovery is being improperly sought or is not being provided in good faith.

**Civility and Professionalism.** Members of the bar and the Court are proud of the long tradition of courteous practice in the Southern District of Florida. Indeed, it is a fundamental tenet of this Court that attorneys in this District be governed at all times by a spirit of cooperation, professionalism, and civility. For example, and without limiting the foregoing, it remains the Court's expectation that counsel will seek to accommodate their fellow practitioners, including in matters of scheduling, whenever reasonably possible and that counsel will work to eliminate disputes by reasonable agreement to the fullest extent permitted by the bounds of zealous representation and ethical practice.

To that end, the Court advises the parties that strict compliance with the requirements of Local Rule 7.1(a)(3) is expected. In addition, if a motion for extension of time is opposed, this Court requires that the certificate of conferral state briefly the reason(s) for opposing counsel's objection to the requested extension.

The parties are further advised that the failure to comply with any of the procedures contained in this Order or the Local Rules may result in the imposition of appropriate sanctions, including, but not limited to, the dismissal of this action or entry of default.

**DONE AND ORDERED** in Chambers at Miami, Florida, on February 1, 2024.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:23-CV-672-M-KS

| | | |
|---|---|---|
| RICHARD ARJUN KAUL., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER FOR DISCOVERY PLAN** |
| | ) | |
| CENTER FOR PERSONALIZED | ) | |
| EDUCATION FOR PHYSICIANS, et al., | ) | |
| Defendants. | ) | |

Pursuant to Rule 16(b) of the Federal Rules of Civil Procedure, the Court will enter a scheduling order in this case. **The Rule 26(f) meeting must occur by 4/12/2024.** The attorneys of record and all unrepresented parties that have appeared in the case are jointly responsible for arranging the conference and for attempting in good faith to agree on the proposed discovery plan. **The discovery plan must be submitted to the Court within fourteen (14) days after the 26(f) meeting.**

Please confer with opposing counsel and present to the Court a discovery plan in accordance with the Rule 26 Report of the Parties' Planning Meeting form, available on the district's website. Pursuant to Rule 16(b), the planning meeting required by Fed. R. Civ. P. 26(f) and the discovery plan contemplated by this request are a mandatory part of the process of formulating a scheduling order. If counsel cannot agree on a discovery plan, please submit your respective positions to the Clerk of Court, and the Court will resolve the disputed issues. Following court approval, modifications of the scheduling order will be allowed only by motion and for good cause shown.

**Mandatory initial disclosures must be made within fourteen (14) days after the Rule 26(f) conference** unless (1) a different time is set by stipulation of parties or court order, or (2) a party objects during the 26(f) conference and states the objection and the response thereto in the discovery plan. Absent a stipulation or court order, any party first served or otherwise joined after the 26(f) conference must make these disclosures within thirty (30) days after being served or joined. Failure to disclose information required by Rule 26(a) or 26(e)(1) may subject the offending party or parties to sanctions pursuant to Rule 37, Fed. R. Civ. P.

Note that Local Rule 7.1 requires that all motions (except those relating to the admissibility of evidence at trial) must be filed within 30 days after the conclusion of discovery. Untimely motions may be summarily denied. Also, note that cases are currently being docketed for trial 60 to 90 days after discovery expires with a final pretrial conference scheduled approximately two weeks prior to trial.

**This district now mandates mediation, pursuant to Local ADR Rule 101, for civil cases in specified categories.** Refer to Local ADR Rule 101.1a and other relevant rules to determine the applicability of the mediation requirement to this case. **The parties in cases subject to mandatory mediation must discuss mediation plans at the 26(f) conference and report their plans in the discovery plan, pursuant to Local ADR Rule 101.1a(b).**

SO ORDERED this the 13th day of March, 2024.

/s/  Peter A. Moore, Jr.
Clerk of Court

United States District Court
Southern District of Texas
**ENTERED**
August 30, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**


**CIVIL ACTION NO. 4:24–cv–03180**
**Kaul MD et al v. Federation State Medical Boards et al**

ORDER FOR CONFERENCE AND
DISCLOSURE OF INTERESTED PARTIES

1.  Counsel and all parties appearing *pro se* shall appear for an initial pretrial and scheduling conference before

Magistrate Judge Christina A Bryan
on October 1, 2024 at 10:00 AM
by video
**Join ZoomGov Meeting**
**Meeting:** 161 376 2172
**Passcode:** 664485

2.  Counsel shall file with the clerk within fifteen days from receipt of this order a certificate listing all persons, associations of persons, firms, partnerships, corporations, affiliates, parent corporations, or other entities that are financially interested in the outcome of this litigation. If a group can be specified by a general description, individual listing is not necessary. Underline the name of each corporation whose securities are publicly traded. If new parties are added or if additional persons or entities that are financially interested in the outcome of the litigation are identified at any time during the pendency of this litigation, then each counsel shall promptly file an amended certificate with the clerk.

3.  After the parties confer (in person or by telephone) as required by FED. R. CIV. P. 26(f), counsel and all parties appearing *pro se* shall prepare and file not less than 10 days before the conference a joint discovery/case management plan containing the information as required by FED. R. CIV. P. 26(f) using the form available at http://www.txs.uscourts.gov/sites/txs/files/ahb_jdcmp.pdf.

4.  Counsel will complete the attached proposed scheduling order and file it with the joint discovery/case management plan. The court will sign the agreed scheduling order and may rule on any pending motions at the conference.

5.  Counsel and all parties appearing *pro se* who file or remove an action must serve a copy of this order with the summons and complaint or with the notice of removal.

6.  Attendance by an attorney who has authority to bind each represented party is required at the conference.

7. Counsel and all parties appearing *pro se* shall discuss whether alternative dispute resolution is appropriate and at the conference advise the court of the results of their discussions.

8. FED. R. CIV. P. 4(m) requires defendant(s) to be served within 90 days after the filing of the complaint. The failure of plaintiff(s) to file proof of service within 90 days after the filing of the complaint may result in dismissal of this action by the court on its own initiative.

9. Counsel will deliver to chambers copies of all instruments filed under seal regardless of their length.

10. Failure to comply with this order may result in sanctions, including dismissal of the action and assessment of fees and costs.

**By Order of the Court**

**Court Procedures:** Information on the court's practices and procedures and how to reach court personnel may be obtained at the Clerk's website at www.txs.uscourts.gov or from the intake desk of the Clerk's office.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| Richard Arjun Kaul MD, et al. | § | |
| | § | |
| *versus* | § | Civil Action 4:24–cv–03180 |
| | § | |
| Federation State Medical Boards, et al. | § | |

## PROPOSED
## SCHEDULING ORDER

1. _____ **AMENDMENTS TO PLEADINGS AND ADDITION OF NEW PARTIES**
Party requesting joinder will furnish a copy of this scheduling order to new parties.

**EXPERTS**

2a. _____ Plaintiff, or party with the burden of proof, will designate expert witnesses in writing, listing the qualifications of each expert, the opinions the expert will present, and the bases for the opinions as required under Federal Rule of Civil Procedure 26(A)(2).

2b. _____ Defendant, or party without the burden of proof, will designate expert witnesses in writing, listing the qualifications of each expert, the opinions the expert will present, and the bases for the opinions as required under Federal Rule of Civil Procedure 26(A)(2).

3. _____ **DISCOVERY**
Counsel may, by agreement continue discovery beyond the deadline. No continuance will be granted because of information acquired in post–deadline discovery.

4. _____ **MOTIONS DEADLINE**
Including any motion challenging an expert witness (only motions in limine on issues other than experts may be filed after this date). The motion deadline may <u>not</u> be changed by agreement.

**JOINT PRETRIAL ORDER**

5a. <u>To be determined by the Court.</u>    THE DEFENDANT shall supply the Plaintiff with a final version of its pretrial order by this date. (Where available, Defendant should supply Plaintiff with an electronic copy.)

5b. <u>To be determined by the Court.</u>    THE PLAINTIFF is responsible for filing the pretrial order on this date. All Motions in Limine must also be filed by this date.

6. <u>To be determined by the Court.</u>    **DOCKET CALL** is set at 1:30 p.m. in Courtroom 9A.

7. <u>To be determined by the Court.</u>    **TRIAL** is set at 9:00 a.m. in Courtroom 9A.
Case is subject to being called to trial on short notice during the two week period beginning on this date.


The Clerk shall enter this Order and provide a copy to all parties.


SIGNED on _____, at Houston, Texas.


_____
Alfred H. Bennett
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


RICHARD ARJUN KAUL, MD                                    PLAINTIFF

v.                                    CIVIL ACTION NO. 3:24cv621-CWR-LGI

JAMES PAUL OETKEN, ET AL                                 DEFENDANTS


**RULE 16(a) INITIAL ORDER**

The above captioned cause is set for a **TELEPHONIC CASE MANAGEMENT CONFERENCE (TCMC)** on January 9, 2025 at 3:00 pm before:


United States Magistrate Judge LaKeysha Greer Isaac
501 E. Court Street, Suite 6.150
Jackson, MS  39201
**isaac_chambers@mssd.uscourts.gov**
*Dial-in Number to use for Conference:*  **(888) 684-8852  PASSCODE: 3566012**


**Unless otherwise instructed, the above dial-in number will be used for the Telephonic Case Management Conference.**


No later than twenty-one (21) days prior to the TCMC, counsel shall confer regarding all matters set forth in L.U.Civ. R. 26(f).

No later than fourteen (14) days after the attorney conference and seven (7) days prior to the TCMC, **counsel shall submit a proposed case management order to the judge only.** This submission shall **not** be filed with the Clerk of Court.  By the same deadline, **counsel shall also submit a confidential memorandum (3 page maximum) setting forth a brief explanation of the case, and a candid appraisal of the respective positions, including possible settlement figures to:**

**isaac_chambers@mssd.uscourts.gov**

(PRO SE persons must MAIL their memo instead of using the e-mail address.) Counsel will also furnish in their memorandum a good-faith estimate of the expense of carrying the litigation through trial and the appellate process, if not settled, and will have discussed these costs with their respective clients.  These memoranda are **<u>not</u>** to be exchanged and will be viewed only by the Court.  Further, these memoranda shall **<u>not</u>** be filed with the Clerk of Court. Do **not** mail a separate copy.

**THE FAILURE OF ANY PARTY TO TIMELY SUBMIT THE PROPOSED CASE MANAGEMENT ORDER AND CONFIDENTIAL MEMORANDA MAY REQUIRE ATTENDANCE IN PERSON BY ALL DEFAULTING COUNSEL AT THE CASE MANAGEMENT CONFERENCE.  ALL ATTORNEYS OF RECORD FOR THE DEFAULTING PARTY SHALL BE REQUIRED TO ATTEND AND THE CONFERENCE SHALL NOT BE SUBJECT TO RESCHEDULING. SANCTIONS WILL BE IMPOSED AT THE CONFERENCE.**

At the telephonic case management conference, the Court and the parties shall:

1. Identify the principal factual and legal issues in dispute;
2. Identify the alternative dispute resolution procedure which counsel intend to use, or report specifically why no such procedure would assist in the resolution of the case;
3. Indicate whether all parties consent to jurisdiction by a magistrate judge;
4. Review the parties' compliance with their disclosure obligations and consider whether to order additional disclosures;
5. Determine whether to order early filing of any motions that might significantly affect the scope of discovery or other aspects of the litigation, and provide for the staged resolution, or bifurcation of issues for trial consistent with 42(b) Fed.R.Civ.P.;
6. Determine the plan for at least the first stage of discovery; impose limitations on each discovery tool, time periods and other appropriate matters;
7. Determine the date for the Local Rule 26(g) settlement conference or mediation;
8. Discuss scheduling and set appropriate scheduling deadlines including dates for a settlement conference, completion of discovery, motions, the final pretrial conference and trial.  The parties should be prepared to discuss prior conflicts with the trial date.
9. Verify that counsel are registered for electronic document filing and are familiar with the Administrative Procedures for Electronic Filing.

A Case Management Order shall be entered by the Court after the conference. A Uniform Case Management Order form and case management time lines have been developed and are available on the Court 's website at www.mssd.uscourts.gov and as Form No. 1 in the revised Uniform Local Rules, effective December 1, 2015. Counsel shall use that format in discussions and preparation. The Uniform Local Rules are also available on the Court's website.

                                 /s/ Lakeysha Greer Isaac
                                 LAKEYSHA GREER ISAAC
                        UNITED STATES MAGISTRATE JUDGE

Dated: November 4, 2024

United States District Court
Southern District of Texas

**ENTERED**
April 17, 2025
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT      SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Richard Arjun Kaul MD, | § | |
| | § | |
| *versus* | § | Civil Action 4:25−cv−01676 |
| | § | |
| Federation State Medical Boards, et al. | § | |

### Order Setting Conference

1.   Counsel shall appear for an initial pretrial conference:

### July 9, 2025, at 10:45 AM
Before United States Magistrate Judge Richard W Bennett
by video

2.   Within 15 days of receiving this order, counsel must file a list of all entities that are financially interested in this litigation, including parent, subsidiary, and affiliated corporations as well as all known attorneys of record. When a group description is effective disclosure, an individual listing is not necessary. Underline the names of corporations with publicly traded securities. Counsel must promptly amend the list when parties are added or additional interested parties are identified.

3.   The plaintiff must serve the defendant within 90 days of filing the complaint. The plaintiff's failure to file proof of service within that time may result in dismissal by the court on its own initiative. *See* Fed. R. Civ. P. Rule 4(m).

4.   At least 14 days before the conference, counsel must file a joint case management plan listing the identities and purposes of witnesses, sources and types of documents, and other requirements for a prompt and inexpensive preparation of this case for disposition by motion or trial. *See* Fed R. Civ. P. Rule 26(f).

5.   The parties shall agree on additional deadlines for completion of pretrial matters including all expert designation dates and discovery cut-offs as well as dates for exchanging of initial disclosures if they have not already been completed.

6.  By the conference, counsel will have interviewed their clients and read all relevant documents; readily available documents will have been exchanged at the plan meeting at the latest.

7.  The court will set a schedule for initial preparation and may rule on motions pending or made at the conference.

8.  Counsel in charge of a case must appear at all hearings or conferences. A motion to appear on behalf of the attorney-in-charge will be granted only upon showing of good cause, and only if the attorney to be substituted is familiar with the case and has authority to bind the client. The motion to appear must be ruled on in advance of the hearing or conference date.

9.  Counsel who appear at the conference must have authority to bind the client and must know the facts.

10. Counsel must have discussed alternative dispute resolution with their clients and each other; at the conference, the court will consider whether a method of ADR is suited to this case.

11. The court will enter a scheduling order and may rule on any pending motions at the conference.

12. The Plaintiff(s), or the party removing this suit from state court, **SHALL SERVE THE OPPOSING PARTY OR PARTIES** with copies of:

    A.  this ORDER FOR CONFERENCE,
    B.  the form for the JOINT REPORT ON MEETING REQUIRED BY RULE 26(f) AND JOINT DISCOVERY/CASE MANAGEMENT PLAN.
    C.  JUDGE HANEN'S RULES OF COURT WHICH CAN BE FOUND IN THE COURT'S WEBSITE AT HTTPS://WWW.TXS.USCOURTS.GOV.

13. These papers **SHALL BE SERVED CONTEMPORANEOUSLY WITH THE SUMMONS AND COMPLAINT.**

14. The parties will be bound by the provisions contained in this ORDER, the papers mentioned in No. 4 above, and the dates set out in the scheduling order to be entered in this case.

15. Failure to comply with this order may result in sanctions, including dismissal of the action and assessment of expenses.

BY THE ORDER OF THE COURT

United States District Court
Southern District of Texas
**ENTERED**
December 09, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

RICHARD ARJUN KAUL MD, et al.                  §
                                               §
                                               §
*versus*                                       §          Civil Action 4:24-CV-03180
                                               §
                                               §
FEDERATION STATE MEDICAL BOARDS, et al.

## SCHEDULING ORDER

| | | |
|---|---|---|
| 1. | March 31, 2025 | **AMENDMENTS TO PLEADINGS AND ADDITION OF NEW PARTIES**<br>Party requesting joinder will furnish a copy of this scheduling order to new parties. |
| 2a. | June 30, 2025 | **EXPERTS**<br>Plaintiff, or party with the burden of proof, will designate expert witnesses in writing, listing the qualifications of each expert, the opinions the expert will present, and the bases for the opinions as required under Federal Rule of Civil Procedure 26(A)(2). |
| 2b. | August 15, 2025 | Defendant, or party with the burden of proof, will designate expert witnesses in writing, listing the qualifications of each expert, the opinions the expert will present, and the bases for the opinions as required under Federal Rule of Civil Procedure 26(A)(2). |
| 3 | September 30, 2025 | **DISCOVERY**<br>Counsel may, by agreement continue discovery beyond the deadline.  No continuance will be granted because of information acquired in post-deadline discovery. |
| 4. | October 31, 2025 | **MOTIONS DEADLINE**<br>Including any motion challenging an expert witness. (only motions in limine on issues other than experts may be filed after this date)  The motion deadline may <u>not</u> be changed by agreement. |

| | | |
|---|---|---|
| 5a. | January 30, 2026 | **JOINT PRETRIAL ORDER**<br>THE DEFENDANT shall supply the Plaintiff with a<br>final version of its pretrial order on this date.  (Where available,<br>Defendant should supply Plaintiff with an electronic copy.) |
| 5b. | February 13, 2026 | THE PLAINTIFF is responsible for filing the pretrial<br>order on this date. All Motions in Limine must also be filed by<br>this date. |
| 6. | February 27, 2026 | **DOCKET CALL** is set at 1:30 p.m. in Courtroom 9A. |
| 7. | March 2, 2026 | **TRIAL** is set at 9:00 a.m. in Courtroom 9A.<br>Case is subject to being called to trial on short notice during the<br>two week period beginning on this date. |

The Clerk shall enter this Order and provide a copy to all parties.

Signed on December 09, 2024, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge

# APPENDIX Q

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI



SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

**JAN - 6 2025**

ARTHUR JOHNSTON
BY_____ DEPUTY

---

RICHARD ARJUN KAUL, MD;
JANE DOE; JOHN DOE.

Plaintiff

v.

JAMES PAUL OETKEN
(PERSONAL AND OFFICIAL CAPACITY)
MISSISSIPI MEDICAL BOARD;
NEW YORK STATE ATTORNEY GRIEVANCE
COMMITTEE; JANE DOE; JOHN DOE.

Defendants.

*3:24-ev-00621-CWR-LG-I*

CIVIL ACTION NO.: 24-CV-00621-CWR-LGI

---

## ADMISSIONS OF MATERIAL AND UNDISPUTED FACT NOT RELATED TO THE ISSUE PENDING THE COURT'S RULING ON THE MOTION AND PURSUANT TO RULE 8(b)(6) AS TO DEFENDANT JAMES PAUL OETKEN

Respectfully Submitted

RICHARD ARJUN KAUL, MD

JANUARY 5, 2025

1

# RELEVANT REFERENCES TO THE KAUL CASES

**K1 –** <u>KAUL v CHRISTIE: 16-CV-02364</u> (FEBRUARY 22, 2016, TO NOVEMBER 16, 2021-U.S.D.C.-D.N.J.)

**K11-7 -** <u>KAUL/BASCH v ICE: 21-CV-06992</u> (AUGUST 19, 2021, TO SEPTEMBER 12, 2022-SOUTHERN DISTRICT OF NEW YORK)

**K11-10 -** <u>KAUL/BASCH v ICE: 23-CV-2016</u> (MARCH 9, 2023, TO MAY 16, 2023-SOUTHERN DISTRICT OF NEW YORK)

**K11-14 -** <u>KAUL v GEICO: 23-CV-22325</u> (JUNE 22, 2023, TO AUGUST 23, 2023-SOUTHERN DISTRICT OF FLORIDA)

**K11-17 -** <u>KAUL v CPEP: 23-CV-00672</u> (NOVEMBER 20, 2023, TO JUNE 14, 2024 - EASTERN DISTRICT OF NORTH CAROLINA)

**K11-18 –** <u>KAUL v OETKEN: 24-CV-00185</u> (MARCH 25, 2024, TO APRIL 8, 2024-EASTERN DISTRICT OF NORTH CAROLINA)

**K11-20 –** <u>KAUL v FEDERATION STATE MEDICAL BOARDS: 24-CV-03180</u> (AUGUST 26, 2024, TO PRESENT-SOUTHERN DISTRICT OF TEXAS)

**K11-22 –** <u>KAUL v BCBSA: 23-CV-01688</u> (DECEMBER 12, 2023, TO PRESENT-NORTHERN DISTRICT OF ALABAMA)

**K11-23 –** <u>KAUL v OETKEN: 24-CV-00621</u> (OCTOBER 9, 2024 TO PRESENT-SOUTHERN DISTRICT OF MISSISSIPPI)

For ease of reference Defendant JAMES PAUL OETKEN will be referred to as "I"

## K11-23 + Failure To Deny Bribes

**1.** I admit that when I entered the knowingly illegal injunction on September 12, 2022, I instructed the Clerk of the Court to ensure Plaintiff Kaul was provided instructions on how to appeal in conjunction with an application to proceed in forma pauperis (D.E. 169-1).

**2.** I admit that the purpose of encouraging Plaintiff Kaul to file an appeal to the U.S.C.A. for the Second Circuit was that I did intermittently sit on the appellate bench and was informed it likely I be elevated to the appellate court if Plaintiff Kaul 'took the appellate bait'.

**3.** I admit I know that if Plaintiff Kaul did file an appeal, no other district court would admit any of his filings, and his claims would be restricted to the U.S.C.A. for the Second Circuit.

**4.** I admit I knew that the Second Circuit would ultimately deny Plaintiff Kaul's appeal and validate my knowingly illegal injunction.

**5.** I admit I knew that the validation of my injunction by the U.S.C.A. for the Second Circuit would forever preclude Plaintiff Kaul from filing any lawsuits in the United States District Court that had any connection, however remote, to any aspect of his professional licensing history.

**6.** I admit I knew that if I succeeded in eliminating Plaintiff Kaul in this bureaucratic manner, I would have been permanently elevated to the U.S.C.A. for the Second Circuit.

**7.** I admit that an elevation to the U.S.C.A. for the Second Circuit would have had the effect of permanently 'burying' all the bribery related quid pro quo crimes I had committed since being appointed to the federal bench in 2011 by a politician notorious even by political standards for egregious acts of political corruption.

**8.** I admit that had I been elevated to the U.S.C.A. for the Second Circuit, this politician would have secured even greater protection for his corrupt and criminal perversion of the power of government.

**9.** I admit, however, that because of Plaintiff Kaul, none of these hypotheticals occurred and my career was negatively impacted.

**10.** I admit the negative impact on my career in conjunction with preventing Plaintiff Kaul from exposing my crimes did cause me to threaten him with contempt and incarceration.

**11.** I admit I know of **The Kaul Cases** attempt on June 14/15, 2023 to have Plaintiff Kaul, while illegally incarcerated at the medium-maximum security Mercer County Prison in Trenton, NJ,

poisoned with the anti-psychotic medication, Librium, in order to have him deemed mentally unstable and committed indefinitely to a psychiatric institution.

**12.** I admit that on October 9, 2024, Plaintiff Kaul filed K11-23, in which I am accused of, amongst other things, bribery, conspiracy, perpetrating quid pro quo schemes, wire fraud, and public corruption.

**13.** I admit that I was served with a copy of K11-23 on October 16, 2024 at approximately 9:30 am EST in my courtroom at the S.D.N.Y. by a security officer employed by the United States District Court.

**14.** I admit that on November 15, 2024, the Court ordered I answer the Complaint by December 16, 2024.

**15.** I admit that on December 16, 2024 I filed documents entitled 'MOTION TO DISMISS' (D.E. 12) and 'MEMORANDUM IN SUPPORT MOTION TO DISMISS' (D.E. 13).

**16.** I admit that in neither of these documents did I deny the allegations/facts of bribery, conspiracy, perpetrating quid pro quo schemes, wire fraud, and public corruption.
asserted in the Complaint in K11-23.

**17.** I admit I knew/know that in failing to deny the allegations/facts I did violate the Court's November 15, 2024 order.

**18.** I admit I knew/know that in failing to deny the allegations/facts I did cause them to become admitted for all purposes pursuant to Rule 8(b)(6).

**19.** I admit I knew/know that the allegations/facts constitute the commission of violations of criminal law.

**20.** I admit I knew/know that the immunity defense I raised in my impermissibly filed 'MOTION TO DISMISS' (D.E. 12) and 'MEMORANDUM IN SUPPORT MOTION TO DISMISS' (D.E. 13) were/are invalid because my Rule 8(b)(6) admissions of my commission of bribery related crime are not protected by any immunity defense.

**21.** I admit I am guilty of the charges levied in K11-23.

**22.** I admit that if I were innocent of the charges levied in K11-20 I would simply have denied them, but I did not because I am guilty of the charges.

**23.** I admit I know that on December 20, 2024, Plaintiff Kaul filed a 'NOTICE OF DEFENDANT OETKEN'S ADMISSION OF FACT PURSUANT TO HIS RULE 8(b)(6) FAILURE TO DENY THE

ALLEGATIONS AND FACTS ASSERTED WITHIN THE COMPLAINT, AND PURSUANT TO HIS VIOLATION OF THE COURT'S DECEMBER 16, 2024 ORDER TO ANSWER THE COMPAINT'.

**24.** I admit I know that a <u>responsive pleading</u> was ordered by the Court on November 15, 2024.

**25.** I admit I know that pursuant to Rule 8(b)(6) the **"Effect of Failing to Deny An Allegation- other than one relating to damages-is admitted if a responsive pleading is required and the allegation is not denied."**

**26.** I admit I know that on December 27, 2024, Plaintiff Kaul filed a 'REPLY DEFENDANT OETKEN MEMORANDUM OF MOTION TO DISMISS'.

**27.** I admit I read Plaintiff Kaul's 'REPLY DEFENDANT OETKEN MEMORANDUM OF MOTION TO DISMISS' through the perspective of a lawyer and judge.

**28.** I admit that through the perspective of a lawyer and judge I agree with every argument submitted in Plaintiff Kaul's 'REPLY DEFENDANT OETKEN MEMORANDUM OF MOTION TO DISMISS'.

**29.** I admit that of the thousands of opinions I have issued in my judicial career in cases involving charges of bribery against public servants, many of them contain arguments either identical or consistent with those submitted by Plaintiff Kaul.

**30.** I admit that in these cases I have ruled in favor of government prosecutors who have submitted such arguments against criminal defendants charged with bribery and public corruption.

**31.** I admit that in these cases in which guilty verdicts have been rendered, I did sentence the defendants to terms of imprisonment and substantial fines.

**32.** I admit that through the perspective of a defendant, who is also a lawyer and judge, I should be held at least to the standard of the common man committing common crime if not higher.

**33.** I admit that my Rule 8(b)(6) related admittance of the facts of bribery, conspiracy, perpetrating quid pro quo schemes, wire fraud, and public corruption asserted in the Complaint in K11-23, did deprive me of any immunity.

**34.** I admit that in the Complaint (D.E. 1 Page 14 of 54), Plaintiff Kaul identified the facts that caused me to be deprived of '… ANY/ALL IMMUNITIES'.

**35.** I admit that in my December 16, 2024 'MOTION TO DISMISS' (D.E. 12) and 'MEMORANDUM IN SUPPORT MOTION TO DISMISS' (D.E. 13) I did not deny any of the facts asserted in paras. 39 to 45 or indeed any of the facts within the entire Complaint.

**36.** I admit that on January 3, 2025 IN K11-23 I submitted my 'REPLY IN SUPPORT OF MOTION TO DISMISS'.

**37.** I admit that in my 'REPLY IN SUPPORT OF MOTION TO DISMISS' I submitted an answer to the bribery charge levied in the K11-23 Complaint.

**38.** I admit, however, that the answer was intended to purposefully mislead the Court into believing Defendant Oetken was innocent of the levied charges of bribery, conspiracy, perpetrating quid pro quo schemes, wire fraud, and public corruption.

**39.** I admit that one of the answers in furtherance of this deception is: **"However, Judge Oetken has committed no crimes and Kaul's blanket statement is insufficient to support a finding of criminal activity."** (D.E. 23 Page 2 of 5).

**40.** I admit that I and my lawyers conspired to manufacture a, and to use my own word, **"blanket"** statement in which I did not specifically deny having committed the crimes of bribery, conspiracy, perpetrating quid pro quo schemes, wire fraud, and public corruption.

**41.** I admit that I and my lawyers believed that if we used the word **"crimes"** in a general sense it would deceive the Court into believing I had not committed bribery, conspiracy, perpetrating quid pro quo schemes, wire fraud, and public corruption.

**42.** I admit that the deceptive state-of-mind of myself and my lawyers is evidenced in our use of the term **"blanket"** to describe, albeit a false description, of Plaintiff Kaul's claims, when in fact it represents, both in textual and meaning proximity, my use of the general term **"crimes"** to appear to but not actually deny my commission of bribery, conspiracy, perpetrating quid pro quo schemes, wire fraud, and public corruption.

**43.** I admit that I and my lawyers, knowing I had committed crime, could not simply deny the allegations/facts, and so filed a motion to dismiss, while planning to use my final reply to deceive the Court into believing I committed no crime, knowing that Plaintiff Kaul could not respond to my final **"crimes"** based reply.

**44.** I admit that I did commit crimes, which explains the extent to which I have proceeded since 2023 in attempting to prevent other district courts and judges from hearing any of **The Kaul Cases**.

**45.** I admit that my nationwide injunction against a single litigant is a gross deviation from the true purpose of such restrictions, and in conjunction with threats of contempt does constitute an unprecedented violation of the human/civil/constitutional rights of person whose life/liberty/property/reputation rights have been illegally deprived for almost thirteen (13) years and who has not once been provided an opportunity to litigate his claims through discovery to trial.

**46.** I admit that my conduct and that of **The Kaul Cases** Defendants is, other than being illegal, does evidence our guilt of the levied charges to a criminal standard.

## **Defendant Oetken Career Milestones And Transition From Lawful To Unlawful Conduct**

**47.** I admit I graduated from high school in or around 1984.

**48.** I admit I attended college from 1984 to 1988 and did graduate.

**49.** I admit I attended law school from 1988 to 1992 and did graduate.

**50.** I admit I did take and pass the NYS Bar Exam after I graduated law school.

**51.** I admit I did swear an oath upon admission to the NYS Bar.

**52.** I admit the oath involved a promise to uphold the law, faithfully support the Constitution and conduct my practice of law in an ethical manner.

**53.** I admit that after graduating law school and in the period from 1992 to approximately 2002 I provided legal counsel to politicians.

**54.** I admit that in the period from 2002 to 2011 I worked in the private sector and provided legal counsel to publicly traded corporations.

**55.** I admit that as a consequence of working in the milieu of the political and corporate worlds, I came to witness and know their corrupt intersection.

**56.** I admit that as a consequence of being immersed in this corrupt politico-corporate milieu, I began to view profit-purposed manipulations of law and ethics as a 'normal' way of conducting public service and business.

**57.** I admit that being immersed in these manipulations caused a perversion of my moral and ethical framework.

**58.** I admit that being immersed in these manipulations caused me to become highly experienced in knowingly dishonest perversions of the law to suit political and business agendas.

**59.** I admit that in 2010 I was sponsored by the US Senator for New York to the federal bench.

**60.** I admit that in 2011 I was assigned to the federal bench in the Southern District of New York.

**61.** I admit that upon assignment to the federal bench I did, with my hand on the Bible, swear an oath to the Constitution and a promise to faithfully uphold the law.

**62.** I admit that in the period from 2011 to 2025, I adjudicated approximately four thousand five hundred (4,500) cases.

**63.** I admit that the majority of the cases involved commercial, business and financial disputes involving mostly high net worth individuals and financial sector corporations.

**64.** I admit that I also presided over criminal cases in which defendants were convicted by juries of bribery and public corruption.

**65.** I admit that I sentenced to jail persons convicted of bribery and public corruption.

**66.** I admit that in my sentencing remarks in these bribery and public corruption cases, I described the perniciousness of the offenses in that when public servants violate the public trust, there can be nothing more corrosive to the well-being of society and its democratic institutions.

**67.** I admit that in many of the public corruption cases filed before me and within the S.D.N.Y., the press conference given by the U.S. Attorney would invariably involve how such conduct would not be tolerated in the S.D.N.Y and how the perpetrators would be tenaciously pursued and prosecuted.

**68.** I admit that by the time I was appointed to the federal bench I was well-versed in the manufacturing of schemes by lawyers in which the law is perverted, violated and ignored to provide justification and cover for the furtherance of knowingly illegal agendas of politicians and corporations.

**69.** I admit that I know the principal reason I was nominated by the US Senator for NY was my lengthy pre-judicial experience in the corrupt manufacturing of politico-corporate malfeasance supporting legal opinion.

**70.** I admit that I know my appointment had nothing to do with an aspect of my personal life, an aspect that was however conveniently and publicly exploited by the politicians.

**71.** I admit that over the almost fourteen (14) years I have sat on the federal bench, there has been an escalation in the brazenness and seriousness of the crimes, violations and other wrongdoing I have committed against the law, the public and the United States.

**72.** I admit that I know one of the reasons for this unchecked escalation has been the fact that no lawyer or judge has accused me of engaging in corrupt activities.

**73.** I admit I know that within the court, the non-lawyer and non-judicial staff that work in my courtroom do know of my corrupt activities.

**74.** I admit I know that one of the reasons no lawyer of judge has reported me is because they believe their 'whistleblowing' will cause the politician who sponsored me to retaliate and attempt to silence them.

**75.** I admit that the politician's retaliation and 'whistleblower' silencing would stem from his fear that the 'whistleblower' exposing of my corrupt use of the federal bench to further his schemes of political corruption with Wall Street based insurance, hospital, pharmaceutical and banking corporations, would end his political career.

**76.** I admit I know that in 2019, Plaintiff Kaul sued this politician in the S.D.N.Y. on charges of racketeering, bribery, quid pro quo schemes and public corruption.

**77.** I admit I knew this fact when Plaintiff Kaul filed K11-7 on August 19, 2021, and despite knowing I was conflicted, I did nonetheless adjudicate the case.

## Common Knowledge Of The Truth Of The Crimes Of The Kaul Cases Defendants

**78.** I admit that as a district judge in a highly staffed district court with unrestricted access to evidence/facts and persons possessing this corpus of evidence/fact AND having been involved as a Judge, Co-conspirator and Defendant in **The Kaul Cases** since 2021 I have come to know the truth of the crimes of **The Kaul Cases** Defendants.

**79.** I admit I know that having been involved as a Judge, Co-conspirator and Defendant in **The Kaul Cases** since 2021 **The Kaul Cases** Defendants have come to know the truth of each other's crimes, including mine.

**80.** I admit I know that each Defendant played a particular role in the 'Kaul Elimination Conspiracy'.

**81.** I admit I know that the two fundamental elements of the scheme pertained to those who purchased state power and those who sold and exercised it.

**82.** I admit I know that Defendants Allstate/Heary purchased state power from Defendant Christie through bribery.

**83.** I admit I know Defendant Christie abused his power to cause the illegal revocation of Plaintiff Kaul's license and an ongoing deprivation of his life/liberty/property/reputation and violation of his human/civil/constitutional rights.

**84.** I admit I know that Defendants Allstate/Heary purchased state power from Defendant Solomon through bribery.

**85.** I admit I know Defendant Solomon abused his power to cause the illegal revocation of Plaintiff Kaul's license and an ongoing deprivation of his life/liberty/property/reputation and violation of his human/civil/constitutional rights.

**86.** I admit I know that Defendant Allstate purchased regulatory power from Defendant FSMB through bribery.

**87.** I admit I know Defendant FSMB abused its power to cause an illegal obstruction of Plaintiff Kaul's efforts to have his illegal revoked NJ license reinstated and or obtain a license in another state.

**88.** I admit I know Defendant FSMB abused its power to cause an ongoing deprivation of Plaintiff Kaul's life/liberty/property/reputation and violation of his human/civil/constitutional rights.

**89.** I admit I know that Defendant Allstate purchased bankruptcy trustee power from Defendant Stolz through bribery.

**90.** I admit I know that Defendant Stolz abused his power in failing to file claims and or collect the over $52 million dollars owed to Plaintiff Kaul's estate/eighty-three creditors of this estate by Defendant Allstate and other insurance companies.

**91.** I admit I know the truth of the factual foundation of all  **The Kaul Cases**, including K11-7 and K11-20.

## The Crime Of The September 12, 2022 'Injunction' in K11-7 — August 19, 2021 To September 12, 2022

**92.** I admit that on August 19, 2021, K11-7 was filed in the United States District Court for the Southern District of New York.

**93.** I admit that the case was not placed into the court's random judicial assignment system.

**94.** I admit that the case was improperly assigned to me because I had informed the Clerk's office to inform me of any cases that involved publicly traded corporations.

**95.** I admit that upon being informed of the case filing, and reviewing the complaint, I did come to know that in K1 Plaintiff Kaul had caused the May 22, 2019 disqualification of the district judge in the District of New Jersey for having received bribes.

**96.** I admit that I knew/know that the district judge in K1 is the brother-in-law of the politician who sponsored me to the federal bench.

**97.** I admit that I knew these facts presented a conflict of interest, but did nonetheless have the case assigned to me.

**98.** I admit that I instructed the court not to assign a magistrate judge to the case.

**99.** I admit that my instruction to not have an independent magistrate judge assigned pertained to my intent to corruptly adjudicate the case.

**100.** I admit that upon adopting judicial control of the case, I recognized that Plaintiff Kaul was cognizant and highly attuned to the defendants schemes of judicial corruption.

**101.** I admit that recognizing Plaintiff Kaul's acute awareness of this issue, it was imperative for me to administer the case in a manner that attempted to deceive Plaintiff Kaul into believing I was impartially administering the case.

**102.** I admit that a principal purpose of deceiving Plaintiff Kaul into believing I was impartially administering the case and that it would proceed into discovery, pertained to the belief of the defendants and myself that if Plaintiff Kaul thought K11-7 would move into discovery, then he would stop filing cases in other districts and would dismiss any pending cases.

**103.** I admit that I and the defendants schemed that once Plaintiff Kaul, believing that K11-17 would advance into discovery, had dismissed any pending cases and not filed any new cases, I would dismiss K11-7 with prejudice and enter a nationwide 'injunction'.

**104.** I admit that my receipt of the bribes from the K11-7 defendants was transferred in partial payments from the commencement of the scheme to the point at which Plaintiff Kaul's right to appeal had expired.

**105.** I admit that to attempt to conceal the bribes, they were transferred through off-shore institutions and through other schemes involving the dispensation of shares in publicly traded corporations.

**106.** I admit that in the perpetration of the bribery related quid pro quo scheme, I utilized my prior experience as counsel to corrupt politicians and corporations to implement schemes to attempt to conceal the bribes.

**107.** I admit that both I and the defendants were convinced that my deceitful administration and adjudication of K11-7 would cause an effective elimination of Plaintiff Kaul by forever precluding his ability/rights to secure justice for the crimes committed against his life/liberty/property/reputation.

**108**. I admit that I and the defendants did believe that such an effective elimination would cause Plaintiff Kaul to leave the United States and or commit suicide.

**109.** I admit that I and the defendants, despite knowing that Plaintiff Kaul had two (2) young children, did not care that our actions could cause his death.

**110.** I admit that the only concern I and the defendants possessed was that of continuing to profit from our crimes.

**111.** I admit that the scheme was of a 'bait and switch' nature.

**112.** I admit that in the perpetration of the scheme I used the docket of the United States District Court to publish knowingly fraudulent orders purposed to deceive Plaintiff Kaul into believing I would advance the case into discovery.

**113.** I admit that from the commencement and throughout the perpetration of the scheme there were extensive and detailed communications between myself and agents acting on my behalf and the defendants and agents acting on their behalf.

**114.** I admit that these communications involved the 'who/what/where/when/how/why' specifications of the quid pro quo scheme in which in return for the bribes I would dismiss K11-7 with prejudice and enter a nationwide 'injunction'.

**115.** I admit I knew these communications were illegal and in furtherance of a knowingly illegal scheme.

**116.** I admit that these communications were conducted in a knowingly illegal manner across the US wires.

**117.** I admit that I and the defendants knew/know that the use of the US wires constitutes the felony of wire fraud.

**118.** I admit I know that these communications were also conducted in face-to-face meetings in my chambers in the S.D.N.Y.

**119.** I admit I knew/know that the use of my chambers to further a knowingly illegal scheme through face-to-face meetings was/is illegal.

**120.** I admit that these 'secret' meetings in my chambers were conducted after my court staff had departed the building.

**121.** I admit that some of the communications occurred between myself and agents acting on my behalf and the defendants and agents acting on their behalf in places outside of the court building.

**122.** I admit that in these non-court meetings the arrival and departure at the meeting location of the persons involved was staggered, in order to avoid any person observing the gathering of high-profile lawyers and an equally high-profile federal judge.

**123.** I admit that despite knowing of the illegality of the communications, of their conduction within my chambers within the S.D.N.Y. and of their furtherance of knowingly illegal bribery related scheme, I did nonetheless commit these crimes in a knowingly illegal manner.

**124.** I admit that my willful and knowing perpetration of these crimes while in possession of the power of a federal judge does constitute a high crime against not just Plaintiff Kaul and the United States but against the Constitution of the United States.

**125.** I admit that during the digital and face-to-face communications, the timing of my orders of dismissal with prejudice and injunction was discussed.

**126.** I admit that I and the defendants agreed that the orders would be entered once Plaintiff Kaul had dismissed all pending cases and there were no remaining cases within the United States District Court through which he could prosecute **The Kaul Cases** Defendants.

**127.** I admit that during the communications I and the defendants agreed that the September 12, 2022 opinion/order/injunction would be co-drafted.

**128.** I admit that during the communications I and the defendants agreed that the September 12, 2022 opinion/order/injunction would contain no analysis of any of Plaintiff Kaul's

arguments and or refutation and distinguishment of the arguments/cases cited by the K11-7 Defendants.

**129.** I admit that during the communications I and the defendants agreed that the September 12, 2022 opinion/order/injunction would encourage Plaintiff Kaul to appeal the opinion/order/injunction in order to attempt to further preclude him from filing cases in other districts.

**130.** I admit that during the communications I and the defendants agreed that we knew any appeal would be denied, because certain judges on the appeal court had been sponsored by the same politician who had sponsored me.

**131.** I admit that during the communications I and the defendants agreed that the appeal would be denied because certain judges on the appeal court continued to participate in quid pro quo schemes with the insurance and banking defendants in K11-7.

**132.** I admit that during the communications I and the defendants agreed that if the opinion/order/injunction were drafted in as defamatory a manner as possible, it would demoralize Plaintiff Kaul to the point where he would discontinue his efforts to hold **The Kaul Cases** Defendants liable for their crimes/violations/injuries.

**133.** I admit that I and the defendants agreed that if the opinion/order/injunction were drafted in as defamatory a manner as possible, it would, if Plaintiff Kaul did not appeal and filed new cases, cause other judges to dismiss these cases.

**134.** I admit that despite knowing the truth of the factual foundation of K11-7, I did dismiss the case with prejudice and enter a nationwide injunction on September 12, 2022

**135.** I admit I know that the dismissal and nationwide injunction were the product of an illegal bribery related quid pro quo scheme.

**136.** I admit that on September 14, 2022, Plaintiff Kaul submitted a notice to the S.D.N.Y. that was addressed to me and in which he requested a list of my financial holdings, my Forms AO10 and the substance of all ex parte communications with the K11-7 Defendants.

**137.** I admit that since September 14, 2022 I have failed to disclose to the court, to the docket or to Plaintiff Kaul any of my financial holdings, ex parte communications and or any form of bribe, be it tangible/intangible, that was received through any means by me, or any party related to me in the third-degree.

**138.** I admit that my issuance on September 12, 2022 of a knowingly fraudulent document, that of the injunction, did become illegally incorporated into the fabric of American jurisprudence and the court records of the United States District Court.

**139.** I admit that the incorporation of a knowingly fraudulent document issued by a judicial officer, into the court records of the United States District Court constitutes a <u>treasonous</u> crime against the United States.

## The Motion For Disqualification + K11-14 – October 6, 2022 To August 23, 2023

**140**. I admit that on October 6, 2022, Plaintiff Kaul filed a motion for my disqualification.

**141**. I admit that the motion was based partly on my commission of the crimes of bribery, conspiracy, perpetrating quid pro quo schemes, wire fraud, and public corruption.

**142.** I admit that the motion was based partly on my collusion and conspiracy in corruptly using the authority of the United States District Court to attempt to conceal **The Kaul Cases** Defendants crimes of mail fraud/wire fraud/bribery/obstruction of justice/kickbacks/perjury/evidential falsification/witness tampering/kidnapping/false indictment/false arrest/false imprisonment/attempted killing.

**143.** I admit that my failure to timely address Plaintiff Kaul's October 6, 2022 motion for disqualification and deny the within facts did cause the admission of those facts.

**144.** I admit that the motion was based in part on my failure to analyze/refute/contest any of Plaintiff Kaul's one hundred and seventy-three (173) arguments/sub-arguments submitted in K11-7.

**145.** I admit that the motion was based in part on my knowingly fraudulent reliance on law, the invalidity of which was shown by Plaintiff Kaul to definitively not support the entry of an injunction.

**146.** I admit that the motion was based on my bribery related derogation of the relevant law and my threat to hold Plaintiff Kaul in contempt if he violated my knowingly illegal order/injunction.

**147.** I admit I knew/know that the order/injunction had no basis in fact or law, but was simply the product of judicial corruption, for which I threatened to hold Plaintiff Kaul in contempt if he violated.

**148.** I admit that my use of the US wires to enter this knowingly fraudulent order/injunction onto the federal docket constitutes the offense of wire fraud.

**149.** I admit that within the motion for disqualification and at D.E. 171 Page 12 of 39, Plaintiff Kaul did state: **"Democracy and the peaceful order of society cease to exist when the judiciary is morally bent, perverted from fact and willfully blind to the law. When partiality, personal bias and conflicts of interest pollute the administration of justice, the public loses confidence in the system of justice, and lawlessness displaces lawfulness."**

**150.** I admit I know of the December 4, 2024 killing of the CEO of the healthcare insurance company, United Health Care by Luigi Mangeone.

**151.** I admit that it was an unlawful act, but one born out of the lethal lawlessness of the corporate health insurance industry and the failure of the government to hold it accountable.

**152.** I admit that the killing sparked a nationwide public outrage and calls to hold the insurance industry legally accountable.

**153.** I admit that I know the reason for the killing of the CEO pertained to his directives to his corporation to deny life-saving care to premium paying patients.

**154.** I admit that I was a corporate lawyer, and worked for corporations with investments in highly profitable healthcare insurance corporations.

**155.** I admit that I know K11-7 Defendants Allstate Insurance Company and Geico profit from the sale of auto accident-related healthcare insurance policies.

**156.** I admit I know that these policies are purposed to pay for the provision of care to patients injured in car accidents.

**157.** I admit I know that in K11-7 and throughout **The Kaul Cases** Plaintiff Kaul has claimed that Defendants Allstate/Geico/Blue Cross Blue Shield (K11-22) conduct the same care denying **"pattern of racketeering"** as does United Healthcare.

**158.** I admit that the claims regarding denial of care are located at - D.E. 14 Para. 106 Page 27 of 432 – D.E. 14 Para. 132 Page 34 of 432.

**159.** I admit I know that in the K11-7 Complaint (D.E. 14 Para. 106 Page 27 of 432) Plaintiff Kaul states with regards to Defendants Allstate/Geico: " **... whose shared economic mission is the maximization of corporate profit and share price, through the exploitation of the American public (denial of care) and medical profession (license suspension/revocation/incarceration) ..."**

**160.** I admit that despite knowing these facts of patient care denial, I dismissed Plaintiff Kaul's claims Defendants Allstate Insurance Company and Geico because I had willingly and knowingly accepted bribes.

**161.** I admit that my bribe related dismissal of K11-7 did aid and abet the perpetuation of the insurance industry's 'deny ... delay ... defend' scheme of the denial of life-saving care to the American public.

**162.** I admit that as a lawyer and federal judge I understand RICO's vicarious liability doctrine, wherein the liability of the crimes/offenses/violations/injuries caused by any of the conspiracy's perpetrators and or co-conspirators becomes the liability of all perpetrators/co-conspirators.

**163.** I admit that I am as responsible as Defendants Allstate/Geico for the immense harm caused to those members of the American public whose life-saving and life-altering care was denied by these for-profit corporations.

**164.** I admit that I eventually adjudicated the motion for disqualification on August 14, 2023.

**165.** I admit that I denied the motion for disqualification in an unsubstantiated order that failed to address/contest/refute/analyze the cited and controlling law.

**166.** I admit that I denied the motion for disqualification in an unsubstantiated order in which I failed to deny any of the facts of amongst other things, bribery/public corruption/wire fraud/conspiracy.

**167.** I admit that I denied the motion for disqualification in an unsubstantiated order, in which I failed to deny the fact that I engaged in a bribery related quid pro quo scheme with the K11-7 Defendants, in which in return for the bribes I dismissed K11-7 with prejudice and entered a nationwide injunction against Plaintiff Kaul.

**168.** I admit that the reason for the delay in denying the disqualification motion pertained to the fact that the district judge in K11-14 believed my nationwide injunction was indeed the product of bribery, because I had failed to deny the facts asserted in Plaintiff Kaul's September 14, 2022 notice (D.E. 170) and the October 6, 2022 motion for disqualification (D.E. 171).

**169.** I admit that the district judge in K11-14 indicated that if I did not deny the motion for disqualification, she would not dismiss K11-14 based on my September 12, 2022 purported injunction.

**170.** I admit that the district judge in K11-14 indicated that if she dismissed K11-14 on an injunction that was the product of crime, she would become liable for the crime.

**171.** I admit that the district judge in K11-14 indicated that the motion for disqualification had to be denied before she would issue her denial of K11-14 based on the K11-7 September 12, 2022 purported injunction.

**172.** I admit that the K11-7 Defendants who were now the K11-14 Defendants employed threats and persuasion to have me deny the motion for disqualification, in order that the district judge in K11-14 would dismiss the case.

**173.** I admit that I recognized that if I did not comply with the demands of the K11-14 district judge and the K11-7/K11-14 Defendants, my criminal acts of, amongst other things,

bribery/public corruption and wire fraud would be exposed and subject me to impeachment and criminal prosecution.

**174.** I admit that as a consequence of these demands and threats, I did, on August 14, 2023 deny the motion for disqualification without denying any of the within facts of, amongst other things, bribery/public corruption/wire fraud.

**175.** I admit I knew my actions did constitute the commission of crime, in that I aided and abetted the Defendants conversion of the S.D.N.Y. into a **"racketeering enterprise"** through which they and I perpetrated a knowingly illegal **"pattern of racketeering"** a purpose of which was to attempt to prevent the exposure of my crimes in other district courts over which I had no control.

**176.** I admit I know that after having agreed to the demands and threats of the K11-7/K11-14 Defendants and the K11-14 district judge, K11-14 was dismissed with prejudice on August 23, 2023 based on the K11-7 September 12, 2022 injunction.

**177.** I admit that I experienced a sense of relief at having had another district court appear to legitimize my September 12, 2022 injunction.

**178.** I admit that even though I experienced a sense of relief at a public display of such apparent legitimization, I knew the district judge in K11-14 recognized the injunction was a product of a quid pro quo scheme of bribery.

**179.** I admit I believed that the dismissal of K11-14 would convince Plaintiff Kaul to cease his campaign of litigation.

**180.** I admit the incorrectness of my belief is a direct reflection of Plaintiff Kaul's recognition of the seriousness of my crimes.

**181.** I admit I know that Plaintiff Kaul's recognition of the seriousness of my crimes is based on his knowledge of my recognition of the seriousness of my crimes.

## K11-10 And The Knowingly Illegal Issuance Of Threats To Hold Plaintiff Kaul In Contempt If He Failed To Dismiss K11-17 And K11-20 – March 9, 2023 To October 2, 2024

**182.** I admit I know that Plaintiff Kaul did not appeal the September 12, 2022 order/injunction.

**183.** I admit I know that on September 14, 2022, at D.E. 170, Plaintiff Kaul filed a notice with the Clerk of the Court for the S.D.N.Y. that requested I produce and publish to the court docket my financial holdings and the contents of all ex parte communications with the K11-17 Defendants.

**184.** I admit that since September 14, 2022 I have failed to disclose to the court, to the docket or to Plaintiff Kaul any of my financial holdings, ex parte communications and or any form of bribe, be it tangible/intangible, that was received through any means by me, or any party related to me in the third-degree.

**185.** I admit that I have failed and continue to fail to disclose the requested information because I am guilty of having participated in a bribery related quid pro quo scheme with the K11-7 Defendants.

**186.** I admit I know that on March 9, 2023, Plaintiff Kaul filed K11-10 in the S.D.N.Y.

**187.** I admit I came to know the case had been randomly assigned to another district judge, who had been recently appointed to the federal bench.

**188.** I admit I know that the staff in the court's filing office came to know in or around late September-October 2022 of the bribery related quid pro quo scheme in which I had engaged.

**189.** I admit I know that as a consequence of the staff coming to know of the scheme, they did not inform me of the filing of K11-10.

**190.** I admit that sometime after the filing of K11-10 the K11-10 Defendants engaged in ex parte communications with me during which they informed me that Plaintiff Kaul had filed K11-10.

**191.** I admit that upon becoming aware of K11-10, I ensured the district judge became aware of the order/injunction I had entered in K11-7 on September 12, 2022.

**192.** I admit I know that as a consequence of my knowingly illegal September 12, 2022 order/injunction, the district judge in K11-10 did on May 10, 2023 dismiss K11-10 with prejudice.

22

**193.** I admit I know that on November 20, 2023, Plaintiff Kaul filed K11-17 in the U.S.D.C. for the E.D.N.C.

**194.** I admit that in late November 2023 the K11-17 Defendants engaged in ex parte communications with me during which they informed me that Plaintiff Kaul had filed K11-17.

**195.** I admit that in becoming aware of K11-17, I came to know that Plaintiff Kaul had informed the district judge of the injunction by submitting a copy within Exhibit 14 and referencing the injunction within the Complaint.

**196.** I admit that in coming to know that the district judge had admitted the case with full knowledge of the injunction, I decided to take no action.

**197.** I admit that an element of me deciding to take no action pertained to the fact that no discovery order had been entered.

**198.** I admit that the lack of a discovery order would prevent Plaintiff Kaul from serving discovery upon me and exposing my corrupt actions surrounding the issuance of the September 12, 2022 injunction.

**199.** I admit that in a period from November 20, 2023, the K11-17 Defendants sent me an ex parte letter requesting I issue an order compelling Plaintiff Kaul to dismiss K11-17.

**200.** I admit this letter was not published to the docket of the S.D.N.Y.

**201.** I admit no other judge nor court employee in the S.D.N.Y. was made aware of this letter.

**202.** I admit the reason this letter was kept concealed from other judges and staff was to prevent any investigation into the corrupt circumstances surrounding my bribery related issuance of the injunction.

**203.** I admit I took no action on the letter as no discovery order had been entered in K11-17.

**204.** I admit I know that on March 13, 2023, a discovery order was entered in K11-17.

**205.** I admit that on March 13, 2023 the K11-17 Defendants informed me of the issuance of the discovery order in K11-17.

**206**. I admit that the issuance of the discovery order in K11-17 convinced me that Plaintiff Kaul would use the tools of discovery to expose the facts of my bribery related quid pro quo scheme with the K11-7 Defendants.

23

**207.** I admit that the issuance of the discovery order in K11-17 convinced me that Plaintiff Kaul would use the tools of discovery to expose the identities of all persons involved in the bribery related quid pro quo scheme with the K11-7 Defendants.

**208.** I admit that both I and the K11-17 Defendants in recognizing the risk of such exposure, did agree that I should issue an order to Plaintiff Kaul threatening to hold him in contempt if he did not dismiss K11-17.

**209.** I admit that on March 15, 2024 I issued an order to Plaintiff Kaul threatening to hold him in contempt if he did not dismiss K11-17, and had this order published to the docket of the S.D.N.Y.

**210.** I admit I know that the issuance of this order was illegal and was the product of the crime of the bribery related quid pro quo scheme that caused the September 12, 2022 issuance of the injunction.

**211.** I admit that despite knowing the issuance of the March 15, 2024 was illegal, I did nonetheless issue the order in the belief that it would prevent Plaintiff Kaul from using discovery to expose the facts of my crimes and of those associated with the commission of the crimes.

**212.** I admit I know that having had the knowingly illegal order published to the S.D.N.Y. docket, it was downloaded by the K11-27 Defendants.

**213.** I admit I know that having downloaded the March 15, 2024 order threatening Plaintiff Kaul with contempt if he did not dismiss K11-17, the K11-17 Defendants did on March 18, 2024 publish the order to the docket of the E.D.N.C. (D.E. 72).

**214.** I admit that the order required Plaintiff Kaul to dismiss K11-17 by March 29, 2024 or be held in contempt.

**215.** I admit I know the March 18, 2024 filing of the order on the docket of the E.D.N.C. was immediately brought to the attention of the district judge.

**216.** I admit I believed that Plaintiff Kaul would dismiss K11-17, having experienced the dismissal of K11-14 based on the K11-7 injunction.

**217.** I admit I was wrong.

**218.** I admit that on March 25, 2024, Plaintiff Kaul filed suit (K11-18) against me in the E.D.N.C.

**219.** I admit I know the case was ultimately assigned to the Chief Judge who was already adjudicating K11-17.

**220.** I admit I did not deny any of the allegations/facts in K11-18.

**221.** I admit I know that my non-denial of the facts did, pursuant to Rule 8(b)(6) cause them to become admitted for all purposes.

**222.** I admit I know that K11-18 was dismissed with prejudice on April 8, 2024.

**223.** I admit I know that Plaintiff Kaul filed a NOTICE OF APPEAL on May 9, 2024 in the U.S.C.A. for the Fourth Circuit.

**224.** I admit I know the U.S.C.A., for the Fourth Circuit issued an 'INFOERMAL BRIEFING ORDER' on May 9, 2024.

**225.** I admit I know that on May 15, 2024, Plaintiff Kaul filed a 'PETITIONER REQUEST PURSUANT TO FEDERAL RULE OF EVIDENCE 201, FOR THE COURT TO TAKE JUDICIAL NOTICE OF FACTS ADMITTED IN PROCEEDINGS WITH A DIRECT CONNECTION TO THE ISSUES ON APPEAL'.

**226.** I admit I know that the basis for the admitted facts pertained to, amongst other things Rule **"8(b)(6) of the F.R.C.P."** (U.S.C.A.4 Appeal: 24-1417 Doc:4-1)

**227.** I admit I know that the facts deemed to be admitted by the U.S.C.A. for the Fourth Circuit were all the facts from all of **The Kaul Cases** in which none of the Defendants had denied any of the facts.

**228.** I admit I know that the facts deemed to be admitted by the U.S.C.A. for the Fourth Circuit were all the facts from all of **The Kaul Cases** in which the non-denial of all of the facts did, pursuant to Rule 8(b)(6) cause the facts to become admitted for all purposes.

**229.** I admit I know that Plaintiff Kaul's May 15, 2024 submission included a copy of every Complaint from all of **The Kaul Cases**, and that the submission was three hundred and three (303) pages.

**230.** I admit I did not file any objection to Plaintiff Kaul's May 15, 2024 submission as to admitted facts pursuant to Rule 8(b)(6).

**231.** I admit the law deems my non-objection as an admission of the procedural/substantive substance of the May 15, 2024 submission.

**232.** I admit I know that on May 29, 2024, Plaintiff Kaul filed his 'INFORMAL OPENING BRIEF' (U.S.C.A.4 Appeal: 24-1417 Doc:9-1).

**233.** I admit I know that within the 'INFORMAL OPENING BRIEF' Plaintiff Kaul raised facts related to my perpetration of a bribery related quid pro quo scheme in K11-7.

**234.** I admit I have read the 'INFORMAL OPENING BRIEF'

**235**. I admit that one of the statements, of which my non-denial did cause admittance, is: **"Respondent [Defendant Oetken] continued to fail to provide any evidence/fact that he had not participated in a quid pro quo bribery scheme with Defendants, and in fact did not even submit or have submitted a statement/affidavit that he had not used his bench in the S.D.N.Y. to perpetrate a bribery based "pattern of racketeering" in K11-7 or any other cases in which he had been involved."**

**236.** I admit the truth of this statement.

**237.** I admit I filed no response to Plaintiff Kaul's 'INFORMAL OPENING BRIEF' because the truth of the facts within K11-18 had been proven and admitted consequent to my non-denial of the facts, the non-denial of which did, pursuant to Rule 8(b)(6) cause them to become admitted for all purposes.

**238.** I admit I did not deny the facts in K11-18, as I have not denied them in K11-23 because I am guilty of the charges levied in both cases.

**239.** I admit I had every opportunity to deny the facts in K11-18, but did not.

**240.** I admit I knew/know that in willfully failing to deny the facts in K11-18, I did admit the facts for all purposes.

**241.** I admit I know that in K11-17 on June 14, 2024, the district judge who dismissed K11-18 did, after having entered an order of discovery on March 13, 2024 in full knowledge of my September 12, 2022 injunction in K11-7, did dismiss K11-17 based on the injunction.

**242.** I admit that the district judge in K11-17 was harassed and intimidated into dismissing a case in which he, in his independent judicial authority/judgment had admitted on November 20, 2023 and entered an order of discovery on March 13, 2024 in full knowledge of the injunction.

**243.** I admit that when the K11-17 Defendants informed me of the March 13, 2024 discovery order in K11-17, I recognized the immense risk of Plaintiff Kaul exposing my crimes not just in K11-7, but those I have committed since my appointment to the federal bench in 2011.

**244.** I admit that if discovery proceeded in K11-17, Plaintiff Kaul would expose my long-standing bribery related criminal activities.

**245.** I admit I know that such an exposure would cause my removal from the federal bench and subject me to criminal proceedings.

**246.** I admit I know that in having K11-14 and K11-17 dismissed I did continue to perpetuate an almost twenty (20) year-long conspiracy against Plaintiff Kaul and a twelve (12) year-long injury to his life/liberty/property/reputation and violation of his human/civil/constitutional rights.

**247.** I admit I knew/know that my perpetuation of this conspiracy and rights violations were purposed to cause the elimination of Plaintiff Kaul.

**248.** I admit that my intention in seeking to cause the elimination of Plaintiff Kaul pertained to my fear that his continued prosecution of **The Kaul Cases** would expose my crimes and those of **The Kaul Cases** Defendants.

**249.** I admit that as Plaintiff Kaul proceeded to file K11-14 and K11-17, **The Kaul Cases** Defendants became increasingly agitated and aggressive in their threats to expose me if I did not follow their orders and have Plaintiff Kaul held in contempt and jailed.

**250.** I admit that with these threats I became fearful for my career and life.

**251.** I admit that on or about August 26, 2024 I became aware that Plaintiff Kaul had filed K11-20 in the United States District Court for the Southern District of Texas.

**252.** I admit I know that on August 30, 2024, the Court entered an 'ORDER FOR CONFERENCE AND DISCLOSURE OF INTERESTED PARTIES' (D.E. 4).

**253.** I admit that on September 16, 2024 the K11-20 Defendant Federation State Medical Boards sent me a letter requesting I order Plaintiff Kaul to dismiss K11-20 under threat of contempt of court (K11-7: D.E. 174).

**254.** I admit that in K11-7 on September 13, 2022 the Clerk of the Court closed the case.

**255.** I admit that no order was ever issued by the Clerk of the Court that re-opened the case.

**256.** I admit that in the absence of any order from the Clerk of the Court re-opening the case, the case has remained closed since September 13, 2022.

**257.** I admit that the continued closure of the case since September 13, 2022 does render all filings in the closed case null and void for all intents and purposes.

**258.** I admit that in recognizing the fact that the case was closed and in not wanting to again expose myself to a lawsuit as Plaintiff Kaul had filed on March 25, 2024 in K11-17 and which was now before the U.S.C.A. for the Fourth Circuit, I hesitated in a manner I had not in K11-17 in deciding to threaten Plaintiff Kaul with contempt if he did not dismiss K11-20.

**259.** I admit that my degree of hesitation and fear had become compounded by the risk of having my crimes exposed by the co-conspirator K11-7/K11-20 Defendants and or the U.S.C.A. for the Fourth Circuit.

**260.** I admit I found myself 'backed into a corner' in which I had no option but to obey the order of the K11-20 Defendants to issue an order threatening Plaintiff Kaul with contempt if he did not dismiss K11-20.

**261.** I admit that if Plaintiff Kaul pursued discovery in K11-20, he would fully expose my crimes and those of persons who aided and abetted the crimes.

**262.** I admit that on October 2, 2024 under immense duress I issued an order that threatened Plaintiff Kaul with contempt if he did not dismiss K11-20 by October 16, 2024.

**263.** I admit I was convinced Plaintiff Kaul would dismiss K11-20, and that my crimes and those of my co-conspirators would be concealed.

**264.** I admit that on October 9, 2024, Plaintiff Kaul filed K11-23, in which I was and am charged of, amongst other things, the crimes of bribery/public corruption and the conversion of my court at the S.D.N.Y. into a **"racketeering enterprise".**

**265.** I admit I know that on October 9, 2024, in K11-20, the Court issued a 'SCHEDULING ORDER'

**266.** I admit that I was served with a copy of K11-23 on October 16, 2024 at approximately 9:30 am EST in my courtroom at the S.D.N.Y. by a security officer employed by the United States District Court.

DATED: JANUARY 6, 2025

_____
RICHARD ARJUN KAUL, MD

# CERTIFICATE OF SERVICE

I certify under penalty of perjury that a copy of the **FIRST SUBMISSION OF ADMISSIONS OF**

**MATERIAL AND UNDISPUTED FACT PURSUANT TO RULE 8(b)(6) AS TO DEFENDANT JAMES**

**PAUL OETKEN** was emailed to Defendants' counsel on January 6, 2025.

DATED: JANUARY 6, 2025

_____
RICHARD ARJUN KAUL, MD

# APPENDIX R

# CURRICULUM VITAE

RICHARD KAUL, M.D.

111 Wanaque Avenue
Pompton Lakes, NJ  07442

Office:  973-248-8818
Cell:  347-838-0943
RKaul@njsrlaserspine.com

Date of Birth: 5 November 1964

## EDUCATION:

**1983-1988**:    The Royal Free Hospital School of Medicine, London University, London, England. (Rowland Hill Street, Hampstead, London, NW3. Tel- 011442077940500).

**1988-1989:**    Surgical House Officer, Lister Hospital, Stevenage, Hertfordshire, England. (Preceptor: Keith Giles, M.D.) (Contact Clare Randall, Medical Staffing, Corey's Mill Lane, Stevenage, Hertfordshire, SG1 4AB. Tel- 011441438314333).

**1989-1989:**    Medical House Officer, Academic Unit of Medicine, Royal Free Hospital, London, England. (Preceptor: Professor Neil Macintyre M.D.) (Contact Kerry Dolan, Center for Hepatology, Upper 3rd floor, Rowland Hill Street, NW3 2PF. Tel- 011442077940500).

**1989-1990:**    Surgical Intern, Catholic Medical Center, Queens, New York. (Preceptor: Walter Pizzi, M.D.) (Contact Rita Raio, Department of Surgery, 88-25 153rd Street, Suite 1L, Jamaica, Queens, NY, 11432. Tel-718-558 7216).

**1990-1991:**    Surgical Intern, Nassau County Medical Center, East Meadow, New York. (Preceptor: James Evans, M.D.) (Contact Ann Marksteiner, 8th floor, Resident Resource Officer, 2201 Hempstead Turnpike, East Meadow, NY, 11554. Tel-516-572 6273).

**1991-1992**:    PGY-2 Surgery Resident, Booth Memorial Medical Center, Queens, New York. (Preceptor: Jameson Chassin, M.D.) (Contact Donna DeChirico, The New York Hospital of Queens, 5645 Main Street, Flushing, NY, 11355. Tel-718 670 1120).

**1992-1995:**    Anesthesiology Residency, Albert Einstein- Montefiore Medical Center, Bronx, New York. (Preceptor: Albert Saubermann, M.D.) (Contact Department of Anesthesiology, 4th floor.  Tel 718-920 4316).

**1995-1996:**    Pain Fellowship, Department of Anesthetics, Bristol Royal Infirmary, Bristol, England. (Preceptor: Robert Johnson M.D.)  (Contact Tel-011441179230000).

## PROFESSIONAL APPOINTMENTS:

**March 2007 – Current:**  Private Practitioner, New Jersey Spine & Rehabilitation, Pompton Lakes, New Jersey.

**April 2010 – February 2011:**  Attending in Interventional Pain and Minimally Invasive Spine, North Jersey Surgery Center, Englewood Cliffs, New Jersey.

**April 2007 – October 2010:**  Director of Outpatient Spine Surgery, The Bergen Passaic Ambulatory Surgery Center, Clifton, New Jersey.

**May 2007 – December 2007:**  Attending in Interventional Pain and Minimally Invasive Spine, Pain & Surgery Ambulatory Center, Wyckoff, New Jersey.

**November 2006 – March 2007:**  Medical Director of The North Jersey Center for Surgery, Newton, New Jersey.

**September 2004 – March 2007:**  Medical Director of Market Street Surgical Center, Saddle Brook, New Jersey.

**June 2004 – May 2007:**  Attending in Interventional Pain and Minimally Invasive Spine, The North Jersey Center for Surgery, Newton, New Jersey.

**June 2004 – March 2007:**  Private Practitioner in Interventional Pain and Minimally Invasive Spine, Saddle Brook, New Jersey.

**October 2002 – December 2003:** Attending, Pain Management Center, St. Clare's Hospital, Denville and Dover, New Jersey.

**February 2002 – August 2002:**  Attending Anesthesiologist and Director of Pain Services, Columbus Hospital, Newark, New Jersey.

**October 2001 – December 2001:**  Attending Anesthesiologist, Hackensack University Medical Center, Hackensack, New Jersey. (Contact Dr. Mark Schlesinger, Chairman Dept. of Anesthesiology. Tel 201 996 2419).

**January 1997 – January 2001:**  Attending, The Regency Clinic, London, England. (Contact 27 Welbeck Street, London W1M 7PG, England. Tel-011448454583589)

**September 1996 – December 1996:**  Attending in charge of pain clinic, Macclesfield General Hospital, Macclesfield, Chesire, England. (Contact Tel-011441625421000).

## CERTICATION/LICENSURE:

**2006**    Member of The American Society of Interventional Pain Physicians.
**2004**    Completion of visiting fellowship in Minimally Invasive Spine Surgery, Wooridul Spine Hospital, Seoul, Korea.
**2004**    Member of The American Academy of Minimally Invasive Spinal Medicine and Surgery.
**2004**    Diplomate of the American Board of Interventional Pain Management.
**1996**    Diplomate of American Board of Anesthesiology.
**1996**    Medical License, State of New Jersey: MA 63281.
**1992**    F.L.E.X

**1989**   E.C.F.M.G.
**1988**   MB.BS (London University).


## CREDENTIALS AND CERTIFICATES:

North American Spine Society – Evaluation & Treatment of Adult Spinal Deformity: Hands-On Course.  March 16 – 17, 2012.  Burr Ridge, IL. Certificate of Participation.

Beckers ASC 18th Annual Ambulatory Surgery Centers Conference.  Improving Profitability and Business and Legal Issues.  Featured Speaker:  Orthopedics and Spine in ASC's – Key Trends and Ideas.  October 28, 2011.  Chicago, IL.

The Philipinno-American Medical Conference – The Future of Outpatient Spine Surgery.  Featured Speaker.  September 24, 2011.  Atlantic City, NJ.

AOSpine Live Tissue Training – The Prevention and Management of Complications in Spine Access Surgery.  September 17, 2011. Strasbourg, France.  Certificate of Participation and Completion.

SI-Bone – iFuse Implant System Surgeon Training Program. May 21, 2011. Jamesburg, NJ. Certificate of Completion.

LDR – Anterior Stand-alone Clinical Solutions utilizing VerteBRIDGE Technology.  A hands-on cadaver skills lab.  May 13, 2011.  Las Vegas, NV.

The 3rd Annual ASC Review Seminar.  April 27, 2011.  Somerset, NJ.

Utilizing Urine Drug Screens Appropriately sponsored by Avee Laboratories.  March 15, 2011.  East Hanover, NJ.  Certificate of Attendance.

Spine Arthoplasty Society. The Second Annual Meeting of the International Society for the Advancement of Spine Surgery – Middle East Chapter (SASME). February 3 – 5, 2011.  Movenpick Dead Sea, Jordan.

20th Annual Dr. Tom Lowe Spine Symposium:  The Surgical Management of Spinal Disorders.  January 14 – 17, 2011.  Beaver Creek, CO.  Certificate of Participation.

Weill Cornell Medical College.  Indications and Controversies:  Minimally Invasive Spinal Surgery and Navigation.  Hands-on Symposium.  December 2 – 4, 2010.  New York, NY.  Certificate of Participation.

2010 Annual Meeting of the Society for Minimally Invasive Spine Surgery.  November 5 – 7, 2010.  Miami, FL.  Certificate of Participation.

Informed - Cultural Competency Update for the Physician.  October 12, 2010.  Certificate of Completion.

X-Spine - Advances in Interspinous and Transfacet Fixation: A Hands-On Cadaver Course.  August 27, 2010.  Henderson, NV.

American Society of Interventional Pain Physicians Webinar – Urine Drug Screen Testing Compliance conducted on July 15, 2010.

Columbia University College of Physicians & Surgeons – 19th Annual Course & Symposium, Basic & Advanced Techniques in Electrodiagnostic Medicine.  June 16 – 17, 2010.  New York, NY.  Certificate of Participation.

Dubai Spine Masters:  Interventional and Pain Management Techniques.  May 26 – 27, 2010.  Dubai, UAE.  Certificate of Participation.

Dubai Spine Masters:  Minimally Invasive Surgical Strategies.  May 23 – 25, 2010.  Dubai, UAE.  Certificate of Participation.

10th Annual Global Symposium on Motion Preservation Technology. April 27 – 30, 2010.  New Orleans, LA.  Certificate of Participation.

American Society of Interventional Pain Physicians Webinar – Evidence-Based Interventional Techniques: An Algorithmic Approach To Keeping It Simple, Safe and Successful conducted on March 30, 2010.  Certificate of Participation.

Spine Arthroplasty Society.  February 18, 2010.  Certificate of Membership.

North American Spine Society – 24th Annual Meeting.  November 11 – 14, 2009.  San Francisco, CA.  Certificate of Completion.

North American Spine Society – 24th Annual Meeting Technique Workshop: Interbody Fusion Technologies.  November 10, 2009.  San Francisco, CA.  Certificate of Completion.

2009 Annual Meeting of the Society for Minimally Invasive Spine Surgery.  Oct. 9 – 12, 2009.  Las Vegas, NV.  Certificate of Participation.

North American Spine Society - Spine Across The Sea 2009.  July 26 – 30, 2009.  Maui, Hawaii. Certificate of Completion.

21st Annual International Bethesda Spine Workshop: Thoraco-Lumbar Course.  April 19-20, 2009.  Certificate of Participation.

13th Annual International Argospine Symposium.  January 29-30, 2009.  Paris, France. Certificate of Attendance.

SRH Klinikum Karlsbad-Langensteinbach gGmbH.  Akademisches Lehrkrankenhaus der Universität Heidelberg.  Guttmannstrasse 1,  76307 Karlsbad,  Germany.  January 26-28, 2009. Visiting doctor, rounds with Dr. Robert Melcher.

University of California, San Diego School of Medicine.  2008 Annual Meeting of the Society for Minimally Invasive Spine Surgery.  November 13-15, 2008.  Henderson, NV.  Physician Certificate of Credit.

North American Spine Society – 23rd Annual Meeting.  October 14-18, 2008.  Toronto, Canada. Certificate of Completion.

North American Spine Society – 23rd Annual Meeting Technique Workshop:  Interbody Fusion Technologies.  October 14, 2008.  Toronto, Canada.  Certificate of Completion.

Cleveland Clinic Foundation Center for Continuing Education – Spine Review – July 16-22, 2008.  Cleveland, OH.  Certification of Participation.

Columbia University College of Physicians & Surgeons – Basic & Advanced Techniques in Electrodiagnostic Medicine. June 11-12, 2008. New York, NY. Certificate of Participation.

North American Spine Society – Minimally Invasive Spine Surgery: A Hands-on Course. June 6-7, 2008. Spine Masters Institute. Burr Ridge, IL. Certificate of Participation.

Interventional Spine. PERPOS Surgical Training Program. February 15, 2008. Clifton, NJ. Certificate of Recognition.

Spineology Physician Instructor at Bergen Passaic Ambulatory Surgery Center. Didactic and Hands-on Cadaver Implantation of OptiMesh Surgical Mesh System. February 15, 2008. Clifton, NJ.

Cedar-Sinai Institute for Spinal Disorders - 7th Annual Symposium on Current Concepts in Spinal Disorders. February 1-2, 2008. Las Vegas, NV. Certificate of Participation.

Saint Louis University School of Medicine – The 1st CSRS Hands-On Cadaver Course. Cervical Spine Decompression & Stabilization Techniques. January 18-19, 2008. Certificate of Participation.

Saint Louis University School of Medicine - The 1st CSRS Cervical Spine Decompression & Stabilization. January 18-19, 2008. Certificate of Attendance.

Medtronic Midas Rex Institute – Instruction in advanced high speed instrumentation for surgeons. St. Louis, MO. January 17, 2008. Certificate of Attendance.

Spine Conference Case Presenter – Lenox Hill Hospital, NY. December 13, 2007.

Weill Cornell Medical College, NY – Minimally Invasive Spinal Surgery and Navigation. November 30 – December 1, 2007. Certificate of Attendance.

University of California, San Diego School of Medicine – Minimally Invasive Surgery of the Spine 2007. November 16-17, 2007. Physician Certificate of Credit.

North American Spine Society – 22nd Annual Meeting. Austin, TX. October 23-27, 2007. Certificate of Completion.

North American Spine Society – Interbody Fusion Technologies. Austin, TX. October 23, 2007. Certificate of Completion.

North American Spine Society - Motion Stabilization: A Hands-On Course. May 18-19, 2007. Spine Masters Institute. Burr Ridge, IL. Certificate of Participation.

19th Annual International Bethesda Spine Workshop: Thoraco-Lumbar Course. May 6-7, 2007. Certificate of Participation.

19th Annual International Bethesda Spine Workshop: Cervical Course. May 4-5, 2007. Certificate of Participation.

AOSpine North America Challenges and Complications in Complex Spine Surgery Symposium. San Francisco, CA. April 28-29, 2007. Certificate of Participation.

North American Spine Society – NASS Spring Break 2007: Back to the Future: Straight Spines, Straight Talk. March 14-17, 2007. Certificate of Attendance.

MinSurg Biomechanical Innovations – TruFUSE Surgical Training. February 17, 2007. Certificate of Completion.

Surgeon Training Program for Atavi Minimally Invasive Posterior Cervical & Upper Thoracic Surgery conducted by Endius, Inc. September 9, 2006. Certificate of Attendance.

Zimmer Spine – Dynesys Dynamic-Stabilization Workshop at St. John's Health Center – Santa Monica, CA. July 21-22, 2006. Certificate of Attendance.

Zimmer Spine – Center of Excellence Program at St. Mary's Hospital – West Palm Beach, FL. June 1-2, 2006. Certificate of Attendance.

University of South Florida – Preservation of Motion in the Spine. April 5-8, 2006. Certificate of Completion.

North American Spine Society – NASS Spring Break: Back to the Evidence. March 8-11, 2006. Certificate of Completion.

The Royal College of Physicians & Surgeons of the United States of America. 5th Global Congress of Minimally Invasive Spinal Specialists. Laser Assisted Spinal Endoscopy, Nucleoplasty & Coblation, Percutaneous Cervical Discectomy, Vertebral Augmentation, Foraminal Decompression, Laser Facet Rhizotomy, Laser Sympathectomy, Epiduroscopy. December 15-18, 2005. Certificate of Attendance.

18th Annual Meeting of the International Intradiscal Therapy Society (IITS). May 25-28, 2005. Certificate of Participation.

Spineology Physician Instructor at Market Street Surgical Center.  Didactic and Hands-on Cadaver Implantation of OptiMesh Surgical Mesh System.  Saddle Brook, NJ.  May 7, 2005.

National University of Health Sciences – Lincoln College of Postprofessional, Graduate & Continuing Education. Manipulation Under Anesthesia. April 4, 2005. Certificate of Proficiency.

University of South Florida – Preservation of Motion in the Lumbar Spine. March 17-20, 2005. Certificate of Completion.

University of South Florida – Preservation of Motion in the Lumbar Spine Labs. March 18, 2005. Certificate of Completion.

North American Spine Society – Advanced Lumbar Spine Surgery: Minimally Invasive Surgery and Motion Preservation: A Hands-On Course. March 4-5, 2005. Certificate of Completion.

North American Spine Society – Cervical Fixation: A Hands-On Course. January 21-22, 2005. Certificate of Completion.

North American Spine Society – 19th Annual Meeting. October 27-30, 2004. Certificate of Attendance.

North American Spine Society – NASS 19th Annual Meeting Techniques Workshop: Minimally Invasive Spine Surgery: Decompression & Fusion/Implants. October 26, 2004. Certificate of Completion.

North American Spine Society – NASS 19th Annual Meeting Techniques Workshop: Percutaneous Vertebral Augmentation. October 26, 2004. Certificate of Completion.

The 11th Congress of the International Musculoskeletal Laser Society. May 12-15, 2004 in Seoul Korea. Certificate of Attendance.

Continuing Education, Inc. – Minimally Invasive Spine Update 2004. March 26-28, 2004. Certificate of Participation.

Continuing Education, Inc. – Fourth Global Congress: Minimally Invasive Spinal Surgery and Medicine. November 19-22, 2003. Certificate of Participation.

American Association of Medical Foot Specialists. Attended course: Problems in Wound Management. November 2, 2003.

American Society of Interventional Pain Physicians – Active Member since March 2002.


**ABSTRACTS:**

Kaul R.  Percutaneous Lumbar Fusions in the Outpatient Surgical Practice. 2nd Annual Meeting of the International Society for the Advancement of Spine Surgery Middle East Chapter (SASME). Feb. 4, 2011. Movenpick, Dead Sea, Jordan.

Datta S., Kaul R., Manchikanti L.  Letter to Editor:  Is there really a cause-effect relationship between steroid dose, pain management practices, joint injected (sacroiliac joint), and infection? Reg Anesth Pain Med. 2011 Jul-Aug; 36(4):410.

Datta S., Kaul R.  Outpatient Thoracic Endoscopic Discectomy (PETD) for Herniated Thoracic Disc with Thecal Sac Adhesions: Case Report and Review of Literature.


**PROCTORSHIPS:**

Amendia Education/Certification Proctorship.  December 3, 2011. Pompton Lakes, NJ.

Amendia Education/Certification Proctorship. October 8, 2011. Pompton Lakes, NJ.

Disc-FX Education/Certification Proctorship.  September 10, 2011.  Baldwin, NY.

Disc-FX Education/Certification Proctorship.  July 23, 2011. Newport Beach, CA.

Disc-FX Education/Certification Proctorship.  June 11, 2011. Dallas, TX.

Disc-FX Education/Certification Proctorship. April 30, 2011. Pompton Lakes, NJ.


**WEBINAR HOST/CASE PRESENTATIONS:**

Motion Sparing Devises as an Alternative to Fusion. Webinar Host. September 27, 2011.
        Grade 1/2 Spondylolisthesis. Case Presentation. September 27, 2011.
        Lumbar Herniated Disc and Junctional Syndrome. Case Presentation. September 27, 2011

Advanced Medical Techniques Designed to Compliment Chiropractic Care. Webinar Host. September 20, 2011.

Discography and the Silent MRI. Webinar Host. August 2, 2011.


**PHILANTHROPY:**

<u>The Spine Africa Project</u> – founded in August 2008.
The mission of The Spine Africa Project focuses on three objectives:  the treatment of those afflicted with spinal conditions, the education of local medical personnel, and social change.

- Jason Sendwe Hospital.  Lubumbashi, Democratic Republic of Congo. December 1 – 5, 2008.
- MyungSung Christian Medical Center. Addis Ababa, Ethiopia.  December 11 – 15, 2010.
- Panzi Hospital.  Bukavu, Democratic Republic of Congo.  August 20 – 25, 2011.
- Panzi Hospital.  Bukavu, Democratic Republic of Congo.  February 5 – 10, 2012

# APPENDIX S

Gmail - Personal/Steven Waldman, MD                    https://mail.google.com/mail/u/0/?ui=2&ik=4ff17f47e0&view...



Richard Kaul <drrichardkaul@gmail.com>

**Personal/Steven Waldman, MD**
1 message

Steven Waldman <spwmd.atlasspine@gmail.com>                 Sat, Oct 24, 2015 at 8:18 AM
To: drrichardkaul@gmail.com
Cc: Steven Waldman <spwmd.atlasspine@gmail.com>

Richard

You and I met a few times.  We have friends in common.  Probably
you have been misinformed about a few things.  First I want to tell
you that I feel really awful that the Neurosurgeons and Medical
Board have attacked you professionally and personally.
Revolutionaries often are met with great resistance even when they
are trying to do great and beneficial things.  I'm sorry that the
fascists in the Medical Board and state government have pulled your
license.  They are bullies and clearly politically motivated

I'm writing to you to inquire as to why you, of all people, would
attack me personally with rather vicious and untrue YouTube videos.
I have never attacked you in fact I admire you very much.  I dont
agree with everything you have done but that is a personal belief I
am entitled to.  But my professional opinions are really based upon
the great professional risk that you have taken (and unfortunately
are now paying for) in a very tough environment.  This is not
because of a specific lack of talent or training or knowledge and is
certainly not personal.

Now Richard, I want to make some things crystal clear to you as it
relates to your Youtube Video where you made some detailed and
untrue allegations about me professionally and personally:

1:  I have never said, published, written or done anything to you to
hurt you professionally.  I have never testified nor submitted
comments about you, or about your cause to any agencies or
professional bodies.  In fact I strongly support what you have done.

1 of 3                                                              2/15/16, 2:36 PM

## Richard Kaul

**From:** Robert Conroy [RConroy@drlaw.com]
**Sent:** Tuesday, May 22, 2012 4:31 PM
**To:** Richard Kaul
**Subject:** FW: I/M/O Richard Kaul, M.D.

**From:** Robert Conroy
**Sent:** Tuesday, May 22, 2012 3:40 PM
**To:** 'Doreen Hafner' (Doreen.Hafner@dol.lps.state.nj.us)
**Subject:** I/M/O Richard Kaul, M.D.

Please share this email with the powers that be.

I am not accusing you of bad faith but I believe that the Attorney General and the Acting Director of the Division of Consumer Affairs have not only acted in extreme bad faith in seeking to summarily suspend my client's CDS privileges but that have done so as part of a cheap piece of political theater and have made a mockery of my client's Due Process Rights. We believe their actions to have so prejudiced the administrative process that Dr. Kaul is unable to obtain a fair hearing. I have raised the improper merger of the investigatory, prosecutorial and adjudicatory functions in the Office of Attorney General before as a clearly unconstitutional practice. Apparently, this will give us the factual basis to establish once and for all that the Office of Attorney General cannot be trusted to conduct itself fairly and within the confines of the Constitution. Insofar as the Attorney General and the Acting Director of the Division of Consumer Affairs have made statements to the media that clearly reveal their personal animus toward my client and their pre-judgment of this matter, we call upon them to immediately recuse themselves from any and all future deliberations, etc., involving Dr. Kaul, and make themselves available to testify as required by a subpoena I will be issuing to compel their attendance at the hearing on this latest summary suspension. I must also warn them about engaging in any efforts to obstruct our client's attempt to receive a fair hearing or cover up their previous involvement. Lastly, we are presently considering federal action. Might I remind the powers that be that we have been successful in the past in obtaining a sizeable attorneys' fee award against the state in a Board matter; indeed, we are the only party in the history of our Republic to ever have the US Marshall seize a state's general revenue fund. Apparently, they want to afford us another opportunity to do so.

If cooler heads prevail, please have them contact me. Otherwise, I can assure them that this will ultimately not be judged their finest hour.

**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
tel: 908-704-8585
fax: 908-704-8899
email: conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in: New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

6/16/2012

-----------------------------------------------------------

This e-mail (including any attachments) is intended only for the exclusive use of the individual to whom it is addressed. The information contained hereinafter may be proprietary, confidential, privileged and exempt from disclosure under applicable law. If the reader of this e-mail is not the intended recipient or agent responsible for delivering the message to the intended recipient, the reader is hereby put on notice that any use, dissemination, distribution or copying of this communication is strictly prohibited. If the reader has received this communication in error, please immediately notify the sender by telephone (908-704-8585) or e-mail and delete all copies of this e-mail and any attachments. To ensure compliance with requirements imposed by Federal law, we inform you that (1) any advice, including but not limited to tax advice, contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the law; (2) any such advice is written in connection with the matters addressed; and (3) if you are not the original addressee of this communication, you should seek advice based on your particular circumstances from an independent advisor. The unauthorized disclosure or interception of e-mail is a federal crime. (See, 18 U.S.C. Section 2511(4). Thank you for your cooperation.

6/16/2012

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD ARJUN KAUL, MD | CIVIL ACTION NO. 2:16-cv-02364-KM-SCM |
| Plaintiff, | |
| v. | **CERTIFICATION OF JOHN ZERBINI** |
| CHRISTOPHER J. CHRISTIE, ESQ, et al., | |
| Defendants | |

Richard Arjun Kaul, MD
Propria Persona
120 Temple Terrace
Palisades Park, NJ 07650
201 989 2299

John Zerbini hereby certifies to the Court as follows:

1. I am forty-three (43) years old, a United States citizen and was a patient of Dr. Kaul from November 24, 2010 to July 21, 2011.

2. I make this statement in support of the claims that Dr. Richard Arjun Kaul has filed against the Defendants in the above matter.

3. In late July 2017 I spoke with Dr. Richard Kaul several times regarding various issues that pertain to the above matter. The following represents the essence of what was discussed. The information contained in this statement is a representation of the conversations that took place between March 2012 to late 2013, between myself, Dr. Kaufman and Deputy Attorney General, Doreen Hafner. Where the conversation is quoted verbatim it is marked in "". I have examined this record and signed it as

1

representative of what was said in the conversations. I have organized the conversations into 5 sections for ease of interpretation:

### (a) Report of conversations between Dr. Kaufman and myself

I had several conversations with Dr. Kaufman in which he expressed his opinion of Dr. Kaul and also his intention to destroy Dr. Kaul's medical career. Dr. Kaufman frequently directed these opinions to me, in front of the nurses who assisted him and usually after he had performed procedures on my spine.

Dr. Kaufman was not interested in the care I had received from Dr. Kaul, but was more preoccupied with how he was planning to have Dr. Kaul's license revoked. It was obvious to me that he had no concern for my welfare, as all of the time we spent together from March 2012 to November 2012, he devoted to telling me and others how he was going to destroy Dr. Kaul. It was, to say the least, extremely unprofessional and rather disturbing.

These conversations occurred mainly in a curtained consulting room in the pain management lab, at Overlook Hospital New Jersey. The curtains of my cubicle were not always drawn, and the area was an open space, in which at any one time, there were a least fourteen other people, comprised of patients and staff. I would always sit in a cardiac chair, and Dr. Kaufman's comments were loud enough for all patients and nurses to have clearly heard what was being said.

Dr. Kaufman 'ranted' about Dr. Kaul, on numerous occasions. I felt that Dr. Kaufman was bragging about his actions towards Dr. Kaul. He made it clear that he had instigated proceedings against Dr. Kaul and said that he and "a few other doctors" were going after Dr. Kaul. I was not aware of the names of the other doctors.

The first time that Dr. Kaufman discussed these things with me was in April 2012.

Dr. Kaufman seemed to have some kind of vendetta against Dr. Kaul, and made comments to the effect that he was going to destroy Dr. Kaul's medical career, his reputation, and make sure he never worked again as a doctor. He stated that he was going to make sure Dr. Kaul was ostracized, and that he and a group of five other doctors had been working together since at least 2011, to make sure Dr. Kaul's medical license was revoked. He mentioned that they were

2

going to have articles and stories published, that caused permanent damage to Dr. Kaul's
reputation, so that he would never be able to find work. Dr. Kaufman told me, "Dr. Kaul is a
criminal", and that he [Kaufman] had instigated the plan to have Dr. Kaul's license revoked. His
venomous conduct led me to believe that that he would not stop until he had achieved those
ends.

I recall that Kaufman said that he had found something about Dr. Kaul that really pissed him off
which is why he acted in this way. Kaufman said, "Dr. Kaul has no business being a doctor" and
"he has no business practicing medicine". He told me that he would make sure Dr. Kaul never
practiced medicine again.

During my conversations with Dr. Kaul I told him that I could not understand why Dr. Kaufman
had such hatred towards him. I had never witnessed such venom, and he [Kaufman] seemed to
have the small man angry syndrome. Kaufman is about five foot six inches, and one hundred
and forty pounds.

Dr. Kaufman ranted about Dr. Kaul, in this way, at about two thirds of our consultations. I
consulted with Dr. Kaufman every six weeks over period of one year, from March 2012 to late
2012.

The comments that Kaufman made about Dr. Kaul were made directly to me, and frequently in
the presence of other staff and patients. My recollection of these comments was so vivid that I
even remember the clothes I was wearing at each consultation, and on one occasion it involved
a particularly bright stripped collared shirt.

In my opinion there was clear evidence for defamation of character, as when Dr. Kaufman was
ranting, there were approximately 14 other people within earshot.

I told Dr. Kaul, during our conversations, that Dr. Kaufman "went after you (Dr. Kaul) like fury".
"he was on fire."

I recounted how, in my earlier conversations with Dr. Kaufman, he said, "Check up on this guy
(Dr. Kaul) on the internet and you will see that I and five other doctors have already taken
action against him". When I went home I checked the internet and found what Dr. Kaufman
had said, as well as the name of several other doctors who were involved.

3

During one of my conversations with Dr. Kaul, I told him, "I left Kaufman but I think he would tell you that he left me". I described to Dr. Kaul how Dr. Kaufman would not return my calls, when I telephoned his office, because my pain pump was not working, and I was in severe pain. This happened on multiple occasions. On one occasion, as a result of not having received a response from Dr. Kaufman after one week, and being in severe pain, I went to see my family physician. I subsequently told Dr. Kaufman that I had consulted with another doctor, and initially he said "no problem". However, 3 months later he became angry and told me that I had "violated his trust" and that he would no longer treat me. He started screaming at me, and I felt humiliated and began to cry. I pleaded with him not to suddenly stop prescribing my medications, but he didn't seem to care, and became very cold and callous. This was in November 2012. In fact, his uncaring attitude had caused me on several prior occasions to ask him, with tears in my eyes, "Why do you hate me?". It seemed to me, that his hostility, was a consequence of the fact that I had been under the care of Dr. Kaul, as I noticed he had a different attitude with other patients. I told Dr. Kaufman that I had never been spoken to by any of my treating physicians, in the derogatory manner in which he publicly berated me. After having been abandoned by Dr. Kaufman, I attempted to find another physician to manage my pain. However, it proved very difficult, because of the complicated nature of my medical conditions. However, Kaufman threatened to contact my internal medicine doctor, and any future pain management doctor, and tell them I had violated an agreement with him. Dr. Kaufman would then call me and berate me on the phone for "violating his trust". I eventually went to see Dr. Sukdeb Datta.

### (b) My comments regarding my perception of the relationship between Dr. Kaufman and Deputy Attorney General, Doreen Hafner

During my conversation with Dr. Kaul I commented that "he [Kaufman] was "very chummy with that prosecutor". I observed that Dr. Kaufman's relationship with Doreen Hafner was "weirdly close" and that "it was really weird, moochy coochy, strange." I noted that Dr. Kaufman called the Deputy Attorney General by her first name, and on one occasion he told me that was meeting her for lunch. I observed that Dr. Kaufman was oddly "chummy" with Hafner, in a manner that seemed strange for a physician and deputy attorney general.

4

### (c) My recollections of my meetings with Doreen Hafner

I recollect Dr. Kaufman saying on several occasions, "I'm going to see her [Hafner] later today or to have lunch with her".

I recollect at my first meeting with Hafner, she had two female investigators with her. The meeting occurred at my attorney's office. They inspected my back and how well I was able to walk. After this first meeting, Hafner contacted me directly, and our communications from that point did not involve my attorney. She told me in the first interview that "they were going to take make sure that we who were hurt will be taken care of". However, Hafner honored none of the promises she made, and after I testified took no further interest in my welfare. Both my wife and I felt that she exploited me, and lied to me to get me to testify against Dr. Kaul. I believe that Hafner told me that Dr. Kaul had a "$14 million condo in New York", and that she said she was going to take it. She told me Dr. Kaul had two Aston Martins, and that she was going to take them as well.

Hafner stated that Dr. Kaul had committed Medicaid and Medicare fraud, and asked me what insurance company had paid him for the procedure he performed on me. I told her that I had no insurance, and that Dr. Kaul had provided his services and that of his facility for free. I told her that he never asked me for a dime. I also told her that he had been able to get the device company, Medtronic, to provide the spinal cord stimulator free of charge. I asked Hafner that if Dr. Kaul had committed the crime she described, whether his passport had been confiscated. She responded, "I can't comment on that". I thought it was bizarre that Hafner was readily telling me about crimes Dr. Kaul was supposed to have committed, but then refused to answer a simple question about the information she so willingly divulged. I believe she was trying to manipulate and exploit me, in order to have me testify against Dr. Kaul.

I believe that Hafner went into great detail about a case in London that occurred in 1999, in which a patient suffered a cardiac arrest at the end of a dental procedure. She told me that Dr. Kaul fled the country before the authorities had completed their investigation, and had been a fugitive. I asked her that if this was the case, then why had he not been extradited back to

5

England. Again, her response was, "I can't comment on that", which I found to be as equally bizarre as her previous response. I asked her again why they had not confiscated his passport, and she once again responded with, "I can't comment on that". At this point in the proceedings, we communicated directly, without any involvement from my attorney, and Hafner would contact me directly. The things that Hafner was telling me about Dr. Kaul did not make any sense. I said to her, "If he is a criminal here from England and still on the streets, why wouldn't you arrest him?". Again her response was, "I can't comment on that".

I believe it was Hafner who told me that Dr. Kaul had been paid $300,000 by Medtronic to find volunteers, for the use of spinal cord stimulators in the treatment of angina. This, as I found out from Dr. Kaul during one of our conversations, was a lie. I explained to Hafner that I could not believe Dr. Kaul had committed Medicare fraud. I told her that he used his own money to establish a charity that helped people in Africa, and she told me that the charity was just a front, and that Dr. Kaul was "trying to line his pockets".

I believe that Hafner lied to me about Dr. Kaul, and about wanting to help me with my lawsuit, to make sure that I testified against Dr. Kaul. She told me that if I testified against Dr. Kaul, it would help me with my lawsuit, "especially if Dr. Kaul had been stripped of his license to practice medicine". Hafner also told me that because Dr. Kaufman was a pain management expert for the state, it would help my case. I feel that Hafner exploited my situation to serve her own purpose, which was to take away Dr. Kaul's livelihood, and destroy his reputation.

### (d) My opinion regarding the professional competence of Dr. Kaufman

My opinion of Dr. Kaufman is that he is an extremely unprofessional individual, a terrible doctor, and a man that seems to have nothing but hatred in his heart. He could not contain his anger towards Dr. Kaul, and I have never witnessed the outrageous public displays of unprofessionalism, that I had the misfortune to do so, with him. On one occasion he became so angry, his face turned red. I told Dr. Kaul, "He [Dr. Kaufman] screwed me up so badly that I wanted to sue him". Dr. Kaufman had installed a pain pump which did not work, and despite me repeatedly telling him that I was not getting any pain relief, he kept telling me the pump was working. He did not know to program the pump, and always had a representative from

6

Medtronic to do it for him. On a number of occasions, he had to stab me thirteen times in the stomach to find the entry point in the pump. He did this to me without any local anesthesia, which was extremely painful. He never checked to see if there were any blockages in the catheter in my spine. The pain kept on increasing, and Dr. Kaufman did nothing, and never returned my calls. When I did see him the only thing he did was to increase the infusion rate of the medication, which did not reduce the pain. Eventually I went to another doctor, who used fluoroscopy and intravenous hydration, and was able to diagnose that the catheter tip was crushed. This was the reason that the medication was not getting into my spine. Dr. Kaufman failed to perform this simple test, which caused me to remain in agony from May 2012 to August 2013, at which point the intrathecal pump was re-inserted by another physician. I told Dr. Kaul that Dr. Kaufman, "thinks he is hot shit but he didn't ever check what was wrong". Throughout the months of excruciating pain, Dr. Kaufman was very bad at responding to my calls, and on multiple occasions, because the pain was so severe, I was rushed to Overlook Hospital. I was experiencing such extreme pain and was shaking uncontrollably, with profuse sweating, all of which exacerbated my angina. I thought I was going to have a stroke or massive heart attack, as I was already in heart failure. When I was admitted to the hospital on each occasion, the staff were unable to contact Dr. Kaufman for several days. These was the episodes that caused me to find another doctor.

### (e) Comments made by Dr. Kaufman regarding Dr. Kaul, during the hearing in the office of administrative law, in April 2013.

On or about April 17, 2013 I testified against Dr. Kaul in the proceedings in the office of administrative law. I was driven to the hearing by an armed female agent from the Attorney General's office, who made sure her badge was exposed. While I was sitting outside the hearing room, with the 'special' agent, who did not leave my side for one moment, Dr. Kaufman came out of the hearing room. He looked very agitated and made the following comments:

(1) "Kaul is sitting there, pretending he cannot afford to hire an attorney"
(2) "Kaul is wearing a suit that is worn out with trousers that are frayed at the bottom as if he is poor and no money to buy a decent suit".

7

(3) "Kaul is trying to pretend that he has no money"

The 'special' agent and the court security guard heard Kaufman's outburst.

I feel like I was exploited by Doreen Hafner and Dr. Kaufman, with lies that were intended to have me testify against Dr. Kaul. My clinical care with Dr. Kaufman was terrible, and he is a despicable human being.

I support Dr. Kaul in his quest for justice, and I hope, as do many of his patients, that he returns to the practice of medicine, and that those who caused him harm are severely punished.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

Dated: August 6, 2017

John Zerbini

8

I feel like I was exploited by Doreen Hafner and Dr. Kaufman, with lies that were intended to have me testify against Dr. Kaul. My clinical care with Dr. Kaufman was terrible, and he is a despicable human being.

I support Dr. Kaul in his quest for justice, and I hope, as do many of his patients, that he returns to the practice of medicine, and that those who caused him harm are severely punished.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

Dated: August 6, 2017

John Zerbini

8

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| RICHARD ARJUN KAUL, MD | CIVIL ACTION NO. 2:16-cv-02364-KM-SCM |
| Plaintiff, | |
| v. | CERTIFICATION OF KENNETH SABO |
| CHRISTOPHER J. CHRISTIE, ESQ, et al., | |
| Defendants | |

Richard Arjun Kaul, MD
Propria Persona
120 Temple Terrace
Palisades Park, NJ 07650
201 989 2299

Kenneth Sabo hereby certifies to the Court as follows:

1. I am (insert age), a United States citizen, a US Veteran, and was a patient of Dr. Kaul
   from August 23, 2010 to June 1, 2012.

2. I make this statement in support of the claims that Dr. Richard Arjun Kaul has filed
   against the Defendants in the above matter.

3. On --- I initially consulted with Dr. Kaul, after having witnessed a segment on Channel 12
   News, in which he and a sixteen-year-old gymnast, whose spinal deformity he corrected,
   were both interviewed. I was impressed with what I saw, and made an appointment to
   see Dr. Kaul.

4. I initially consulted with Dr. Kaul on August 23, 2010, and he ordered a series of tests to
   diagnose the cause of the pain in my neck and lower back. Based on the results of these

Ken                                    157043140103              p.3

tests, he implemented a series of spinal injections, which provided temporary pain relief. However, due to the persistence of the pain, he performed minimally invasive spine surgery on my neck and lower back. The surgeries were successful in reducing my pain, and improving my ability to carry out my normal activities of daily living. I was treated with compassion, respect and received excellent care, from Dr. Kaul and his staff. The facility at which the operations were performed was modern, efficient, well organized and professionally operated, and on the days that I was at the NJSR Surgical Center, I often heard other patients express high opinions of Dr. Kaul. Both his patients and his staff expressed immense respect for his abilities, and this was evident to me from the professional, yet friendly environment, that I experienced while under the care of Dr. Kaul.

5. On --- I came to learn that his New Jersey medical license had been suspended, and that I would no longer be able to treat with him. This caused me great disappointment, and since then, I have been unable to find a physician that provides the high level care I received from Dr. Kaul

6. On --- I received a phone call from an individual, who identified herself as Doreen Hafner, a New Jersey deputy attorney general. Ms. Hafner explained that she was investigating Dr. Kaul and that she wanted to interview me, because Dr. Kaul had performed procedures on my spine. I agreed to an interview, and on --- Ms. Hafner and – of her associates came to my house.

7. The interview lasted approximately forty-five minutes and during the interview the following exchanges occurred:

(a) Ms. Hafner requested that I testify against Dr. Kaul – I refused, and explained to her that I held Dr. Kaul in the highest regard, that he had reduced my pain, and improved the quality of my life. I told her that I believed his surgery had been successful, and that I was very disappointed when he left.

(b) Ms. Hafner attempted to characterize Dr. Kaul as dishonest, by stating that on his website he described himself as a board certified minimally invasive spine surgeon, and that he was not – I explained that I decided to consult with Dr. Kaul after having seen his

Ken                                                    157043140103              p.4

interview with Dr. Derek DaSilva on Channel 12 News, and was very impressed with how
he had helped a sixteen-year old gymnast return to gymnastics. I told her that I found
Dr. Kaul to be very forthright, an opinion that I heard from many of his patients.

(c) Ms. Hafner asked me if I knew that Dr. Kaul had been arrested in London and charged
with manslaughter, and she described in detail the events that had occurred in a dental
clinic – I explained that although I didn't know these details, it did not change the fact
that I was treated well by Dr. Kaul, and that his procedures reduced my pain, and
improved my quality of life. I told her that everybody I spoke to about Dr. Kaul,
described him as phenomenal.

(d) Ms. Hafner stated that the attorney general wanted to revoke Dr. Kaul's license. I asked
why they would want to do such a thing, and I suggested that it should just be
suspended for six months, as he had dedicated his whole life to his career. Ms. Hafner's
response were words to the effect that suspension was not an option, and "what if he
hurts someone". I told her that I had heard nothing but good things from other patients
about Dr. Kaul

8. After the interview Ms. Hafner telephoned me approximately six times, and on each
occasion attempted to have me testify against Dr. Kaul, and on each occasion I refused.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of
the foregoing statements made by me are willfully false, I am subject to punishment

Dated: July 12, 2017                          _____
                                              Kenneth (place middle initial) Sabo

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| RICHARD ARJUN KAUL, MD | CIVIL ACTION NO. 2:16-cv-02364-KM-SCM |
| Plaintiff, | |
| v. | **CERTIFICATION OF KATHLEEN CALABRESE** |
| CHRISTOPHER J. CHRISTIE, ESQ, et al., | |
| Defendants | |

Richard Arjun Kaul, MD
Propria Persona
120 Temple Terrace
Palisades Park, NJ 07650
201 989 2299

Kathleen Calabrese hereby certifies to the Court as follows:

1. I am *66,* a United States citizen and was patient of Dr. Kaul from 2003 to 2012.

2. I make this statement in support of the claims that Dr. Richard Arjun Kaul has filed against the Defendants in the above matter.

3. In April 2012, when Dr. Kaul's medical license was suspended, it caused immense hardship to me, my family and many of Dr. Kaul's patients, with whom I had become acquainted since 2003.

4. I had several conversations with Dr. Kaul shortly after the widely publicized suspension, as to real reason for the action taken against his license, and it was during one of these conversations that I offered to make some enquiries.

5. I ascertained that a group of doctors and politicians conspired and colluded to have Dr. Kaul's license revoked. I had witnessed on a number of occasions, while waiting in Dr. Kaul's office reception area, conversations between other patients, in which they described how other physicians regularly slandered Dr. Kaul.

6. I explained the situation to my brother, who subsequently spoke with an acquaintance of his, who had knowledge about the circumstances surrounding the suspension. This individual talked with my brother on the condition of anonymity, due to his concerns about possible retaliation from the Christie administration.

7. In approximately May/June 2012 my brother related to me a conversation he had with his acquaintance, during which the acquaintance made the following comment in regards to the suspension of Dr. Kaul's license:

*"I think it is terrible what they are doing to Dr. Kaul"*

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: September 18, 2017

Kathleen Calabrese

Nanette m Leggett
Nanette m Leggett

NANETTE M. LEGGETT
MY COMMISSION # GG 065047
EXPIRES: April 21, 2021
Bonded Thru Notary Public Underwriters

9/21/2017

RICHARD ARJUN KAUL, MD
440c SOMERSET DRIVE
PEARL RIVER,NY 10965
201 989 2299

COURT
NEW JERSEY
RECEIVED

2018 SEP 27 P 3: 23

RICHARD ARJUN KAUL, MD

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

v.

**KAUL v CHRISTIE: 18-CV-08086**

CHRISTOPHER J. CHRISTIE, ESQ et als.,

NOTICE TO TAKE ORAL DEPOSITION

TO: All Counsel of Record/Parties:

PLEASE TAKE NOTICE THAT pursuant to F.R.C.P. 30(a)(1), the testimony of Third Party Witness, Arnold Erwin Feldman, MD, will be taken by deposition upon oral examination before Plaintiff Kaul, a person authorized pursuant to F.R.C.P 30(a)(1) to obtain such information:

DATE: October 18, 2018

TIME: 10:00 a.m.

PLACE: 1860 Beach Boulevard
         Biloxi, Mississippi 39531

DEPONENT: Arnold Erwin Feldman, MD

By:_____

Richard Arjun Kaul, MD

Dated: September 21, 2018

cc: All Parties via e-mail + ECF.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

COURT
NEW JERSEY
RECEIVED

... ... ... P 5: 23

---

RICHARD ARJUN KAUL, MD

Plaintiff,

v.

CHRISTOPHER J. CHRISTIE, ESQ, et al.,

Defendants

CIVIL ACTION NO. 2:16-CV-02364-KM-SCM

CERTIFICATION OF ARNOLD E. FELDMAN

---

RICHARD ARJUN KAUL, MD
PROPRIA PERSONA
440c SOMERSET DRIVE
PEARL RIVER, NY 10965

Arnold Feldman, MD, hereby certifies to the Court as follows:

1. I am 63 years of age, a United States citizen and am a board-certified anesthesiologist with subspecialty training in interventional pain and minimally invasive spine surgery.

2. I graduated from the Medical College of Pennsylvania in June 1980, and underwent residency training at Thomas Jefferson University Hospital University Hospital (June 1980-June 1981) and Harvard Medical School, Department of Anesthesia (July 1982 July 1983).

3. From 1984 to 2016 I undertook over one hundred and twenty (120) CME hands-on cadaver training courses and eighteen (18) mini-fellowships in minimally invasive spine surgery.

4. From 1999 to 2016 I performed approximately on thousand (1000) minimally invasive spine surgeries.

1

` ` `COURT
` ` `NEW JERSEY

5. I make this statement in support of the claims that Dr. Richard Arjun Kaul has filed against the Defendants in the above matter.  `2018 SEP 27  P 5: 23`

6. In late October 2017 I commenced a series of discourses with Dr. Kaul during which we exchanged information relevant to the facts and circumstances of the events, surrounding the revocation of Dr. Kaul's New Jersey medical license. The following is a summary of the pertinent points of our conversations:

## Incident in Arizona + Commencement of Conspiracy

**In 2006** I attended a minimally invasive spine surgery conference in Phoenix, Arizona, which to the best of my recollection, was also attended by Dr. Kaul. There were approximately five hundred (500) attendees at the meeting, and one of the course directors was Dr. Anthony Yeung, a general orthopedic surgeon who began performing endoscopic discectomies in 2002. Dr. Yeung is the owner and medical director of the Desert Institute and Spine Center, an outpatient facility in Phoenix, at which he and his associates perform minimally invasive discectomies and fusions. It was at this meeting that I first met Dr. Kaul, and to the best of my recollection it was his presence that prompted Dr. Yeung to make the following statement to a group of approximately five (5) physicians:

*"There is a doctor in New Jersey, Richard Kaul, who is performing fusions, but they are going to get him."*

I clearly remember that I was standing slightly behind and to the left of Dr. Yeung, because just after he made this comment, he invited the five physicians to his house, and then turned around and saw me, at which point he said, "You can come too Arnold". My wife and I attended the event, at which we did not see Dr. Kaul, but we observed Dr. Yeung promoting his surgical skills to his guests, and inviting physicians, a number of whom were interventional pain practitioners, to attend endoscopic spine workshops at his outpatient facility. At that time, Dr. Yeung seemed very enthusiastic about training interventional pain physicians, and did indeed train many. However, in approximately 2008 he stopped training interventional pain physicians unless they were accompanied by a neurosurgeon or orthopedic surgeon. I believe he came under pressure from neurosurgical/orthopedic members of the North American Spine Society. I know that Dr. Gabriel Jasper, a New Jersey physician, was one of the individuals he trained Dr. Jasper, himself, then became an instructor for Joimax, a German company that specializes in endoscopic spine surgery, and to the best of my knowledge has trained many physicians at his outpatient facility in Toms River, New Jersey.

2

I received my initial training in the technique from orthopedic surgeon, Dr. Joseph Rauchwerk, who also trained Dr. Kaul. In addition I attended approximately --- hands-on cadaver training courses in the US and Europe, at which I met many trainee neurosurgeons and orthopedic surgeons.

I do not believe that Dr. Yeung was involved in the scheme to sabotage Dr. Kaul's practice, but he seemed particularly informed about the situation in New Jersey.

## Incident in Illinois + Spine Turf Wars

In 2017 I was contacted by the owner of an outpatient surgical center in Chicago, Illinois, who informed me that he had just purchased equipment to perform minimally invasive spine surgery, and requested that I teach the technique to an interventional pain physician on staff at his center. I agreed and spent two days at the facility, during which I educated the nurses, surgical technicians and the physician on how to prepare the equipment and perform the procedure. The physician successfully performed two (2) cases under my guidance. Approximately three (3) months later the owner requested my assistance with another case, and when I attended the center I met with an orthopedic surgeon who wanted to learn the technique. The owner instructed me not to inform the orthopedic surgeon that I had trained the interventional pain physician. I believe this owner was aware of the professional *'turf wars'* that existed in minimally invasive spine surgery, and was probably concerned that if the orthopedic surgeon knew about the interventional pain physician, he would stop operating at the facility. I also believe that because of the pressure applied by the neurosurgical/orthopedic members of the North American Spine Society, the issue of the *'turf wars'* had become well known within the non-physician health care community.

## Incident in Louisiana + Neurosurgical Racketeers

In approximately 2002 I established an interventional pain and minimally invasive spine surgery practice in Louisiana, and in 2006 I opened an outpatient surgical center, which became one of the busiest facilities in the region. A number of my local competitors, one of whom was the president of the medical board, began attacking my practice in approximately 2012, through slanderous comments to patients and other physicians. The president of the medical board, John Burdine, MD, also happened to be the president of the Louisiana chapter of the American Society of Interventional Pain, and had several offices within a ten-mile radius of my surgical

3

center. We competed within the same patient community, and I believe that he spearheaded the scheme that resulted in the suspension of my license in 2016.

As a consequence of the suspension, I hired a local neurosurgeon to continue providing care to my patients, and it was through my interactions with this individual that I came to know that a number of neurosurgeons had conspired with Burdine, to destroy my career and livelihood. I specifically remember that this individual told me, *"You think Burdine is your main enemy. I am telling you that the neurosurgeons are behind this"* She also described how many of the deaths and complications caused by the neurosurgeons were covered up, and never made known to the public. All of the deaths had occurred at hospitals.

However, due to personal commitments the female neurosurgeon became unable to continue providing care, and I hired a male neurosurgeon from Mississippi. In late 2016 this individual performed a minimally invasive laminectomy. The case proceeded without event and the patient was discharged, but several days later she went to the ER because she was experiencing some pain. The ER doctor called the local neurosurgeons who operated on the patient in the absence of any clinical indication, and found nothing to explain the patient's symptoms. These individuals filed a complaint with the medical board against the Mississippi surgeon, who is originally from Maine, and the board initiated an investigation, which caused him to stop working with me.

### Incident in Germany + Market Manipulation + Extortion by North American Spine Society (NASS) of Global Spine Market + German Medical Device Company.

On January 5, 2018 I contacted a surgical representative from Joimax, to enquire whether his company would be interested in purchasing my minimally invasive spine surgery equipment. During our conversation I asked him how his business was developing in the United States, and if the company was still training interventional pain physicians. He informed me that in early 2017 certain members of NASS had told Joimax that they wanted the company to stop training interventional pain physicians anywhere in the world. The company perceived this as a commercial threat, in that if they did not appear to comply, then NASS would instruct its neurosurgical/orthopedic members not to use the Joimax system. As a consequence the company divided its educational corporation into two departments, in which the interventional pain physicians were trained separately from the neurosurgeons/orthopedic surgeons. The company was also forced to restructure its website, to conceal the fact that it had reorganized its corporate educational configuration. The communications from these NASS members were unofficial ones, that were 'off the record', but were made at a time (2016 to 2017) that I understand coincided with their Defendant status in this matter.

4

The American Society of Interventional Pain Physicians is currently training it members how to perform minimally invasive spine surgery, and one of the teachers is Dr. Frank Falco, a past-president of the society. It is my understanding that in 2012, Dr. Falco spent several days observing Dr. Kaul perform minimally invasive cervical and lumbar fusions at his surgical center in Pompton Lakes, New Jersey.

## Conclusion

Dr. Kaul, like myself, was one of the first physicians to become involved in the development of minimally invasive spine surgery in the United States. I have read some of his legal submissions, in which he accurately describes the critical role of Fluoroscopic Guidance and Interpretation (FGI) in the evolution and practice of the minimally invasive technique. The skills required for FGI are the skills that interventional pain physicians acquire through their early training in the use of the fluoroscope for the delivery of intra-spinal medications, and it is this expertise that explains why they are more competent than neurosurgeons/orthopedic surgeons, in performing minimally invasive spine surgery.

Dr. Kaul, like myself, was a victim of professional jealousy, that manifested itself through a corrupt medical board, that like many in the United States, flagrantly violate the due process rights of physicians.

I believe that this case will cause a fundamental, and long over-due reconfiguration of the mechanism of physician regulation, which will actually benefit the public and the profession of medicine. No evidence exists that the current system has ever protected or indeed protects the public. The medical board system in America has unfortunately operated for too long (1960 to 2018) without supervision, and has become a collection of 'rogue' and decidedly despotic agencies that do not protect the public, but covet and abuse their regulatory power, for personal, economic and political reasons. These agencies must either be dismantled or placed under a federal supervision program, that is transparent to the public, and reports annually to the federal government, the medical profession and most importantly the PUBLIC.

I hope this certification, and my opinion regarding physician regulation, provide the Court with information that it deems helpful in its evaluation of the above case.

I thank you for your consideration.

5

Dated: September 22, 2018

_____
Arnold E. Feldman, MD

6

COPY
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

505 E. Airport Drive
Baton Rouge, LA 70806
Phone (225) 201-0950

114 Jefferson Davis Blvd   5: 23
Natchez, MS 39120
Phone (601) 442-5382

# Arnold E. Feldman, M.D.

**Education**

**Department of Anesthesia of the Harvard Medical School**          Boston, MA
25 Shattuck Street
Boston, Ma 02115
617-495-1000

Residency
July 1981-July 1983

**Thomas Jefferson University Hospital**          Philadelphia, PA
111 So 11ᵗʰ Street
Philadelphia, Pa 19107
215-955-6000
Internship-Internal Medicine
June 1980-June 1981

**Medical College of Pennsylvania**          Philadelphia, PA
3300 Henry Ave
Philadelphia, Pa 19129
215-842-6000
Medical Degree
September 1976-June 1980

**Colgate University**          Hamilton, NY
13 Oak Drive
Hamilton, NY
315-228-1000
Bachelor of Arts (Cum Laude)
September 1972-June 1976

**Board/Academy
Certifications**

American Board of Anesthesiology, 1987

American Academy of Pain Management, Diplomate, 1990

**Professional
Experience**

**Southwest Mississippi Anesthesia, PA, INC
DBA/ The Feldman Institute**
Baton Rouge, LA
Director of Interventional Pain Medicine
Interventional Pain Management Specialist
2001-Present

**First Choice Surgery Center of Baton Rouge, LLC**
Baton Rouge, LA
Director of Ambulatory Surgery Center
Interventional Pain Management Specialist
2001-Present

**Southwest Mississippi Anesthesia, PA, INC**
Natchez, MS
Director of Interventional Pain Medicine
Interventional Pain Management Specialist
1986-Present

**First Choice Health, Inc**
Natchez, MS
Director of Ambulatory Surgery Center
Interventional Pain Management Specialist
1996-Present

**Natchez Regional Medical Center**
Natchez, MS

Chief of Staff

1993-1994

DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2018 SEP 27 P 5: 23

**Natchez Regional Medical Center**

Natchez, MS

Board of Trustees

1993-1994

**Adams County Correctional Facility**

Natchez, MS

Physician

1986-2005

**Adams County Mississippi**

Natchez, MS

Deputy Coroner

1986-Present

**Mobile Infirmary Medical Center**

Mobile, AL

Staff Anesthesiologist

1983-1986

**Special
Training/Preceptorship**

**First Choice Surgery Center of Baton Rouge, LLC**

Lumbar Discoscopic Endoscopic Discectomy

2/15/2004 to 11/14/2005

Preceptor: Joseph Rauchwerk, MD

**Kyphon Balloon Kyphoplasty Certification**

Orlando, Fl

August 2006

### AASMISMS 19th Fellowship – John Chiu, MD

New Innovations and Advances in Endoscopic Minimally Invasive Spine Surgery

Thousand Oaks, Ca

February 2007

### Holmium:YAG Lasers for Medicine

Clinical Applications and Safety Related to Minimally Invasive Spine Surgery

March 2007

### MaxMore Surgical Technique Introduction Workshop

In cooperation with Alpha Klinik

Munich, Germany

November 9-10, 2007

### Carl Zeiss Surgical – Spinal Microsurgery 9

Posterior Approaches to the Lumbar Spine

Munich, Germany

February 2008

### TESSYS – Joimax Medical Solutions

Transforminal Endoscopic Spine System

Oceanside, NY

May 17, 2008

### 1ST World Conference of Minimally Invasive Spine Surgery & Techniques

Honolulu, HI

June 4-7, 2008

### MinSurg Biomechanical Innovations

TruFUSE Surgical Training

New Orleans, La

June 28, 2008

### Society for Minimally Invasive Surgery of the Spine Annual Meeting 2008

Las Vegas, NV
November 13-15, 2008

**MILD Training Lab -- Vertos Medical**

Minimally Invasive Lumbar Decompression devices for the treatment of
Lumbar Spinal Stenosis
Baton Rouge, La
December 20, 2008

**North American Spine Society -- Skin to Skin Series**

**Minimally Invasive Surgery**

April 2-4, 2009

**International Intradiscal Therapy Society**

22nd Annual Conference
Phoenix, Az
May 2009

**International Society for Minimal Intervention in Spinal Surgery**

International 28th Course for Percutaneous Endoscopic Spinal Surgery and
Complementary Minimal Invasive Techniques
Zurich, Switzerland
January 28-29, 2010

**The Ultrasound Guided Regional Anesthesia Workshop 2010**

Brent House Conference Center Ochsner Medical Center
New Orleans, La
April 10, 2010

**Urine Drug Screen Testing Compliance**

American Society of Interventional Pain Physicians
July 15, 2010

**Clinical Faculty**

**Disc-FX Workshop Clinical Faculty**
**First Choice Surgery Center of Baton Rouge, LLC**
October 20, 2007

**Disc-FX Workshop Clinical Faculty**
**First Choice Surgery Center of Baton Rouge, LLC**
March 15, 2008

**Disc-Fx Workshop Clinical Faculty**
**Live Surgery Transmission**
**First Choice Surgery Center of Baton Rouge, LLC**
April 12, 2008

**Joimax Endoscopic Spine System Workshop Faculty**
**Anatomy/Cadaver Workshop**
**Long Island, NY**
May 17, 2008

**Joimax Endoscopic Spine System Workshop Faculty**
**Anatomy/Cadaver Workshop**
**Long Island, NY**
September 5-6, 2008

**Spine Surgery from Tradition to the Future**
**Dresden, Germany**
October 2-4, 2008

**Disc-FX Endoscopic Spine System Workshop Faculty**
**Elliquence Innovative Medical Solutions, Anatomy/Cadaver Workshop**
**Long Island, NY**
November 8, 2008

**Disc-FX Endoscopic Spine System Workshop Faculty - Webcast**
**Elliquence Innovative Medical Solutions, Anatomy/Cadaver Workshop**
**Long Island, NY**
March 7, 2009

**maxMorespine Transforminal Endoscopic Spine Workshop**

July 25, 2009

**SpineNow, LLC/maxMorespine Transforminal Endoscopic Spine Workshop**

First Choice Surgery Center of Baton Rouge

Baton Rouge, La

March 26, 2010

**2ND World Congress of Minimally Invasive Spine Surgery & Techniques**

**and**

**23rd International Intradiscal Therapy Society Annual Conference**

Las Vegas, NV

June 1 – 4, 2010

**SpineNow, LLC/maxMorespine Transforminal Endoscopic Spine Workshop**

Specialty Surgery Center

Sparta, NJ

June 18, 2010

**Special**
**Appointment**

State of Mississippi, Tort Claims Board Advisory Council, Member

**Professional**
**Associations**

North American Spine Society

American Medical Association

Louisiana State Medical Association

East Baton Rouge Parish Medical Society

Mississippi State Medical Association

American Society of Anesthesiologists

Louisiana Society of Anesthesiology

Mississippi Society of Anesthesiology

American Academy of Pain Management

American Academy of Pain Medicine

American Pain Society

American Society of Interventional Pain Physicians

Society for Pain Practice Management

Mississippi Pain Society

American Society of Regional Anesthesia

International Spinal Injection Society

International Intradiscal Therapy Society

American Society of Addiction Medicine



## Scientific Presentations

"Facilitating Medial Cannula Placement for Central Disc Herniations and Spinal Stenosis". International Intradiscal Society 19th Annual Meeting. Phoenix, Az April 5-7, 2006

"Disc-FX – nonendoscopic radiofrequency disc ablation/decompression/nucleotomy", International Society for Minimal Interventional in Spinal Surgery Zurich, Switzerland January 25-26, 2007

"Early Clinical Experience with THESSYS™ in the US", Workshop, International Intradiscal Therapy Society, 20th Annual Meeting Albi, Toulouse, France June 19-23, 2007

"Disc-FX – Nonendoscopic Radiofrequency Disc Ablation, Decompression and Nucleotomy – First Experiences", International Intradiscal Therapy Society, 20th Annual Meeting Albi, Toulouse, France June 19-23, 2007

## Special Interest

- Medical Consultant – Ellman Innovations – Surgical Instrumentation
- Medical Consultant – Richard Wolf Medical Instruments Corporation

Endoscopic Spine Division
- Clinical Investigator – Medtronic Corporation implant project for extensive experience in catheter and pump implant for pain control. Over 1000 cases.
- COLA's LabUniversity – Completion Lab Director Course 11-

    19-2010

1

# 'The Solomon Critique 2'
## PDF page 1 to 949
## Analysis: PDF page 1-161
## Exhibits: PDF page 162-949

# Summary of the analytical process of the production of '<u>The Solomon Critique 2</u>', and the fraudulent Strategies + Acts + Omissions of state actors involved in the illegally conducted administrative proceedings.

A  critical analysis based on the following evidence:

1. The opinion of K2 defendant, Solomon, regarding the testimony of K1/K2 defendant Przybylski.

2. The trial transcript of K1/K2 defendant, Przybylski, regarding his testimony about the clinical notes evidence, the standard of care pertaining to minimally invasive spine surgery (April 10 + 15 + 16 + 17 + May 6, 2013), and his verbal exchanges with K2 defendant and NJ deputy attorney, Doreen Hafner + K2 defendant and NJ administrative law judge, Jay Howard Solomon.

From April 9, 2013 to June 28, 2013, there was conducted a hearing in the New Jersey Office of Administrative Law, the purpose of which was to illegally revoke Kaul's medical license. The proceeding was a massive fraud, orchestrated with criminal intent by K2 defendant Christopher J. Christie. The proceeding was polluted with perjury + evidential omissions + misrepresentations + falsifications + gross mischaracterizations. On January 17, 2918, Kaul submitted a document entitled '<u>The Solomon Critique</u>' (16-CV-02364: D.E.225), in which he proved that in a period from April 9 to December 13 2013, K2 defendants Solomon + K1/K2 defendants Przybylski + Kaufman collectively committed two hundred and seventy-eight (278) separate instances of perjury + evidential omissions + misrepresentations + gross mischaracterizations. However, in response to a sur-reply filed  on December 6, 2018 by Defendant Heary (<u>Kaul v Christie: 16-CV-02364: D.E. 290 Page ID6774</u>), in which he mischaracterizes '<u>The Solomon Critique</u>' as "**Plaintiff's own commentary on the legal proceedings**.", Kaul performed an in-depth comparative analysis of the trial transcript and clinical evidence with the opinion of K2 defendant Solomon (December 13, 2013). This analysis focused on witness Przybylski + and state actors, and  K2 defendants, Hafner + Solomon, and irrefutably and unequivocally proves the pervasiveness of the perjury + evidential omissions + falsifications + misrepresentations that occurred in the administrative board proceedings. K2 defendant Solomon, in his fraudulent opinion had found all of Kaul's fifteen (15) witnesses to be

10

not-credible, but found all of Hafner's witnesses to be credible. This analysis, 'The Solomon Critique 2', focuses entirely on Defendant Przybylski and it proves that he, in conjunction with K2 defendants Hafner + Solomon **collectively committed two hundred and twenty-two (222) separate instances of perjury + evidential omissions + falsifications + misrepresentations**. K2 defendant Solomon based his opinion on a record that Kaul has since proven to be one replete with perjury + evidential omissions + fabrications + falsifications + misrepresentations. A massive fraud. 'The Solomon Critique 2' is based on the evidence of the State of New Jersey, and is conclusive proof of the claims asserted in K1 + K2. The defendants know the seriousness of their crimes, and they know they have no defense against this evidence, which is why their only defense has been the "**commentary**" defense. The defendants know they are in a lot of trouble.

The administrative board proceeding involved testimony from twenty-eight (28) witnesses, and Kaul has identified how K2 defendants Hafner + Solomon committed the same illegal pattern of Evidence Tampering with the testimony of all of the witnesses, including Przybylski. The overarching purpose of the fraud was to ensure Solomon's opinion excluded evidence that undermined Hafner's fraudulent case, included evidence that undermined Kaul's case, excluded evidence that supported Kaul's case and included evidence that supported Hafner's case. In many instances Przybylsi perjured himself to manufacture evidence that supported Hafner's case, and undermined Kaul's case, and in other instances Solomon fabricated evidence when none existed to support Hafner's case.

### Fraudulent Strategies + Acts + Omissions

The overall strategy utilized by the defendants and the patients was to misrepresent and or omit testimony that either undermined the case of K2 Defendant, Hafner, or supported that of Plaintiff Kaul. The four main tactics used were: **(i)** omission of evidence harmful to Hafner, but helpful to Kaul; **(ii)** fabrication/falsification of evidence by K2 Defendant Solomon, that undermined Kaul's case and supported Hafner's case; **(iii)** misrepresentation of trial testimony and submitted evidence; **(iv)** witness perjury and the facilitation of perjury by defendants Hafner + Solomon.

Below are defined the illegal premeditated acts committed between K2 defendants Hafner + Solomon and K1/K2 defendant Przybylski , and the tactics + predicate acts that they used to convert the New Jersey Office of Administrative Law into a racketeering enterprise, in

11

furtherance of their scheme to have Kaul's license illegally revoked.

1. K2 defendant Hafner encouraged patients to **lie** under oath about their symptoms, and fabricate phantom symptoms, in order to buttress her fraudulent case. She provided them with specific examples of what to say about the care they received from Kaul. For example she told them to **lie** that Kaul had not informed of the risks associated with the procedures. She told them to **fabricate** symptoms of pain and disability. Hafner told the patients that if they lied about their symptoms, Kaul's license would be revoked, which in conjunction with all of the negative publicity, would result in them receiving large sums of money from his insurance carrier. Many of these patients and their lawyers, did in fact receive monies consequent to their fraudulent claims. These lies are detailed in 'The Solomon Critique' (16-CV-02364: D.E. 225).

2. K2 defendant Hafner conspired and colluded with K1/K2 defendant Przybylski to **omit** testifying about information in the clinical notes evidence that supported Kaul's case and undermined Hafner's case: 59a(3) + 59a(5) + 59a(7) + 59a(9) + 94a + 99a + 109a + 110a(4) + 123a + 130a + 135a

3. K2 defendant Hafner conspired and colluded with K1/K2 defendant Przybylski to commit **perjury** and **lie** that Kaul had "**grossly deviated**" from a supposed standard of care: 110b(1) + 110b(2)

4. K2 defendant Solomon **omitted** Przybylski's testimony + clinical notes evidence that undermined Hafner's fraudulent case: 23a + 24a + 26a + 28a + 33a + 36a + 37a + 39a + 41a + 42a(2) + 43a + 44a + 49a + 50a + 52a(1) + 52a(3) + 53a + 56a+ 57a(4) + 57a(5) + 57a(6) + 57a(7) + 59a(1) + 59a(3) + 59a(5) + 59a(7) + 59a(8) + 59a(9) + 68a + 69a + 70a + 72a + 73a + 75a + 77a + 79a + 81a + 81c + 82a(1) + 82a(2) + 82a(3) + 83a(2) + 83a(3) + 86a + 90a + 91a + 92a(1) + 93a + 94a + 95a + 96a + 97a + 98a + 101a + 102a + 109a + 110a(4) + 110b(2) + 111b + 116a + 116b + 117a + 118a + 119a + 123a + 128a + 133a + 134a + 139a + 140a + 142a + 143a + 147a + 147b + 149b + 149c + 149d + 149e + 149f + 149g + 149h + 149i + 149j + 149k + 149l + 149m + 149n + 149o + 149p + 149q + 150a + 151a + 151b + 151c + 151d

5. K2 defendant Solomon **misrepresented** Przybylski's testimony + clinical notes evidence that undermined Hafner's fraudulent case: 9a + 10a + 15a + 36a + 40a + 42a(3) + 52a(1) + 58a + 61a + 63a + 66a + 67a + 68a + 74a + 81c + 82a + 83a(2) + 83a(3) + 88a

12

+ 92a + 92a(1) + 92a(2) + 93a + 96a + 99a + 102a + 110a(1) + 110a(3) + 110b + 127a + 134a + 138a + 139a + 147a

6. K2 defendant Solomon **falsified** Przybylski's testimony, in order to fabricate evidence in support of Hafner's fraudulent case: 96a + 149q

7. K1/K2 defendant Przybylski committed **perjury** about the clinical notes evidence and the standard of care: 15a + 22a + 24a + 25a + 33a + 37a + 40a + 52a(1) + 57a(4) + 62a + 79a + 79c + 81c + 82a(3) + 83a(3) + 86a + 90a + 91a + 92a(1) + 96a + 103a + 105a + 109a + 110a(3) + 110a(4) + 110b(2) + 115a + 118a + 121a(1) + 125a + 126a + 134a + 136a + 137a + 140a + 146a + 149q + 151a + 151b + 151d

8. K1/K2 defendant Przybylski **omitted** clinical notes evidence that supported Kaul's case and undermined Hafner's fraudulent case: 41a + 42a + 43a + 49a + 50 + 52a(1) + 53a + 56a + 59a(3) + 59a(5) + 59a(7) + 59a(9) + 69a + 77a + 90a + 94a + 99a + 101a + 109a + 110a(4) + 111a + 113a + 115a + 116a + 117a + 118a + 119a + 121a(2) + 123a + 126a + 130a + 132a + 133a + 135a + 136a + 140a + 143a + 146a

13

## Critical analysis of the perjury of Gregory Przybylski, MD and evidential misrepresentations of Jay Howard Solomon, Esq, and Doreen Hafner, Esq.

#### Gregory J. Przybylski, M.D.

*8. Gregory J. Przybylski, M.D., is a licensed physician in the state of New Jersey and a board-certified neurosurgeon. He has written extensively about the spine, and has hospital privileges at JFK Medical Center and Jersey Shore Medical Center. After graduating from medical school, he completed several years of training in spinal surgical techniques and has been appointed to faculty positions in neurosurgery. He has never had any negative actions against his license in his seventeen years as a neurosurgeon.*

8a Solomon failed to include the long malpractice history of the state's expert, yet emphasized his professional licensing history. This individual, a defendant in Kaul v Christie, has been sued on multiple occasions for medical negligence, one of which caused a female patient to become permanently incontinent: KAUL 001 (PDF1/749)

*9. Dr. Przybylski has performed an extensive amount of spinal fusions, minimally invasive surgeries, including decompression or fusion or a combination of both, averaging approximately 120 to 150 spinal surgeries a year. Over the past several years, he has devoted the majority of his practice to minimally invasive surgeries and percutaneous procedures, which he began around 2002.*

9a. Solomon misrepresented the trial record by falsely stating that Przybylski commenced performing minimally invasive spine surgery in 2002, **"Q. Now, we had a discourse during your voir dire where we talked about your training and experience, and I came up with, in your word, seminal date which was 2005, remember that, for minimally-invasive technology? A. I remember the discussion. I remember that I told you that I had started minimally-invasive surgery before that, but that became**

14

**the predominant part of my practice around that time.":** KAUL002–54:11-20
(PDF2/749) In voir dire, Przybylski stated that he was **"familiar with the standard of
care for the training and experience required of a physician who performs open
spinal fusions and minimally-invasive spinal fusions."**: KAUL003–56:20-23
(PDF3/749) but then admitted on cross-examination that there were no standards **"Q. So
as we sit here today, we know there is no standard by which individuals similarly
situated as you, Doctor, are guided with regard to the applicability or use of a
fusion, true? … A. I would agree.":** KAUL 004–37:2-21 (PDF4/749)

*10. When asked to describe the differences between percutaneous and open surgeries, he
responded that percutaneous are needle-based procedures while open surgery exposes the area of
the spine to be treated. For open surgery, the training for the physician is significantly different than
that for percutaneous procedures. In describing the differences between open spinal and minimally
invasive surgeries, he stated that in open surgery, the area to be treated is much more exposed
than in minimally invasive surgeries, the latter of which involves the insertion of a tube to conduct
the repair. In minimally invasive surgery, the physician's field of vision is limited since the procedure
is done through a tube. The physician must decide whether to perform an open or a minimally
invasive surgery, after obtaining a cogent medical history and reviewing diagnostic tests. Both such
surgeries are done in a hospital setting.*

10a. Solomon misrepresented the trial record by falsely stating that Przybylski asserted
that both percutaneous and minimally invasive spine surgeries are done in a hospital
setting. Przybylski refers only to minimally invasive spine surgery, **"Q. So just to
understand you correctly, the surgeries that you were doing, the minimally
invasive spinal surgery, they would have been done in a hospital setting; is that
correct? A. I would say. I cannot think of an exception where they were not, so I
would say yes, they were all done in a hospital setting. I cannot think of an
exception to that.":** KAUL005–88:13-20 (PDF5/749). The OAL Judge's pattern of willful
misrepresentation of the record was evident from the commencement of the
proceedings. On April 10, 2013 Przybylski stated in response to a question from
Solomon regarding what is the educational **"essence"** of a minimally invasive spine

15

specialist, *"If you look at the training and experience of neurological and orthopedic surgeons doing minimally invasive spine surgery, what they have done over an extensive period of training time then subsequently hands-on time is working from bigger exposures and gradually smaller and smaller exposures."*: KAUL006–93:19-25 (PDF6/749). Solomon then misrepresented, *"I thought you said that for minimally-invasive surgery, and that is why I want you to correct me if I'm wrong, is normally administered by a neurosurgeon or orthopedist."* KAUL007– 100:1-4 (PDF7/749). The purpose of this misrepresentation was to fortify Hafner's fraudulent argument, that because Kaul was not an orthopedist or neurosurgeon, he was not qualified to perform minimally invasive spine surgery.

*11. During his preliminary testimony, Dr. Przybylski produced a model of the lumbar spine and discussed its physiology, including facet joints and discs. He also demonstrated various surgical techniques, including fusion, designed to limit motion of the spine to advance healing.*

*12. Then he explained the differences between fusion and fixation. During a fusion, the process is to unite two bones disrupting a joint and pack the area with bone material to limit or prevent mobility. With fixation, wire, screws or rods, or a combination thereof, are used to immobilize the bones to allow for a fusion to occur.*

*13. Most spinal surgeries involve degenerative disc disorder where the disc dehydrates and becomes less of a shock absorber, resulting in pain. Various diagnostic tests are available, such as CT scans, MRIs and discograms, which assist the surgeon in determining the type of surgery needed. The importance of obtaining a cogent medical history and the use of diagnostic testing were taught in medical school, and became heightened during his residencies. He discussed various articles and publications concerning spinal surgeries that he had relied upon in rendering his report.*

*14. He mentioned that pain-management physicians consist of multidisciplines, such as radiologists, anesthesiologists, and internists trained to do percutaneous procedures (those procedures which*

16

*are needle-based). After his review of the curriculum vitae of respondent P-109(a), it was his opinion that respondent did not have the requisite training to perform spinal surgeries, either open or minimally invasive.*

*15. According to respondent's curriculum vitae, he was a surgical intern in 1989–1990 at Catholic Medical Center in New York. Dr. Przybylski opined that interns at such a hospital would have had very little responsibility to perform spinal procedures on their own. He also noted that in 1990– 1991, respondent was a surgical intern at Nassau County Medical Center in New York, where, again, Dr. Przybylski opined that there was limited training given to interns in performing surgical procedures on their own. Dr. Przybylski noted that in 1991–1992, respondent moved to Booth Memorial Medical Center in New York, a different medical center, where he likely would have had limited surgical experiences because he was newly transferred to that hospital. Respondent did complete a residency in anesthesiology at Albert Einstein–Montefiore Medical Center in New York during 1992–1995, during which he would not have had any exposure to spinal surgeries. This residency likely included training in epidurals, discographies, and needle-based procedures.*

15a. Solomon misrepresented the trial record by falsely stating that Przybylski, in describing Kaul's training, **"opined that interns at such a hospital would have had very little responsibility to perform spinal procedures on their own"**: KAUL008-220:3-19 (PDF8/7490). Przybylski made no such reference to spinal procedures. However, Przybylski's pattern of perjury, as with Solomon's pattern of evidential misrepresentation commenced early in the proceedings. On April 15, 2013 Przybylski testified that Kaul's off-label use of the Optimesh fusion device was a **"gross deviation"**: KAUL009-72:20-24 (PDF9/749), but then admitted on May 6, 2013 that he used devices in an off-label manner, **"Q. Well here is my question, that medical devices in the spine realm "off-label" are commonly used? ... Q. Give me an example of one medical device utilized in the confines of your spine practice off label. A. So up until, I believe it was last year, placement of lateral mass screws in cervical spine posteriorly was considered an off-label use."**: KAUL010-15:24-17:25 (PDF10/749).

*16. He further noted that in 1995–1996, respondent had a pain fellowship at the Department of Anesthetics at Bristol Royal Infirmary in Bristol, England. Here respondent would have received training in percutaneous procedures, not open or minimally invasive spinal fusion surgery.*

*17. Respondent also listed in his curriculum vitae his membership in 2006 in the American Society of Interventional Pain Physicians. Dr. Przybylski examined the website for this association and noted that it was open to doctors of different disciplines who sought to do interventional pain management, which treatment would have been limited to needle or percutaneous spinal procedures. In his curriculum vitae, respondent also listed the completion of a two-week fellowship in minimally invasive spine surgery at the Wooridul Hospital in Seoul, Korea, in 2004. In an excerpt from respondent's testimony before the Board on February 3, 2010 (P-98), respondent confirmed that his training in Korea was only for two weeks, a time period, according to Dr. Przybylski, that was totally insufficient for proper surgical training.*

*18. Dr. Przybylski added that a typical fellowship for minimally invasive surgery is approximately six to twelve months, which would involve performing procedures and caring for patients under the supervision of a monitor, an experienced physician. During the residency, the physician is eventually weaned from supervision and gradually performs surgeries on his or her own, with the monitor in attendance. Respondent also listed his membership in 2004 in the American Academy of Minimally Invasive Spinal Medicine and Surgery, which Dr. Przybylski mentioned is not recognized by the American Board of Medical Specialties. Membership in this organization is open to various physician disciplines, but membership by itself did not provide expertise in spinal surgery.*

*19. Respondent also mentioned that he is a diplomate of the American Board of Interventional Pain Management. Dr. Przybylski stated that this membership also involves physicians from various disciplines, such as physiatrists, neurologists and anesthesiologists, which leads to becoming a diplomate in percutaneous procedures, not minimally invasive ones.*

*20. He further commented that the continuing medical education (CME) courses taken by*

18

*respondent did not qualify him to perform open or minimally invasive surgeries. Attendance at these courses did not lead to surgical competence, but only satisfied CME requirements for licensure.*

*21. As to respondent's certificate from the North American Spine Association, Dr. Przybylski commented that this association included a broad spectrum of physicians. Even a non-physician who took the appropriate course or courses offered could obtain a certificate, which only certified attendance. The amount of time and breadth of study necessary to train for open or minimally invasive surgeries is much greater than merely attending CME courses.*

21a. Przybylski perjured himself when he criticized Kaul's CME training as being inadequate to perform minimally invasive spine surgery. Przybylski's CME training commenced in 2005, while Kaul's commenced in 2002. Przybylski obtained his training in minimally invasive spine surgery through CME courses, that began in 2005, **"Q. So your experience – the bulk of your experience in minimally-invasive is done – is – was absorbed by you through hands-on experience and CME classes, most of it subsequent to your fellowships and residencies, true? A. That's correct."**: KAUL011–67:6-17 (PDF11/749). Przybylski further agreed that his training in minimally invasive spine surgery was through CME courses. **"Q. The bulk of your -- it's true, is it not, that the bulk or significant portion of your training, experience in minimally-invasive spinal surgery and also now percutaneous, the bulk of it is related to your hands-on training secondary to taking CME classes; isn't that true? A. I would agree."**: KAUL012–74:15-21 (PDF12/749). However, Przybylski then stated that Kaul had grossly deviated from the standard of care because his training in minimally invasive spine surgery consisted of mini-fellowships and CME courses, **"Q. And based upon your conclusion or your finding that Dr. Kaul does not have the adequate training or credentials to perform open and minimally invasive spinal fusion surgeries, did he deviate from the generally accepted standard of medical practice by performing these surgeries. A. Yes."**: KAUL014–15:25-16:6 (PDF14/749). However, Przybylski, an individual who had provided expert testimony since 1996, **"Q. How long – when did you start**

19

**becoming an expert? A. I think the first time that I provided expert testimony, but likely as a treating physician and expert, was somewhere around 1996-1997.**": KAUL015a-b-21:22-22:2 (PDF15-16), knew that training does not determine the standard of care**, "The standards of medicine are how you practice the medicine, how you do the various steps in whatever you're doing."**: KAUL016a-b-(PDF17-18) (Judge Coburn on January 24, 2012 in Jarrell v Kaul). Similarly, Przybylski knew and admitted that no standards existed with regard to the performance of minimally invasive spinal fusions: KAUL004-37:2-21 (PDF4/749). Przbylski knowingly lied.

*22. He further opined that given respondent's lack of training, he would not have been granted hospital privileges for either open or minimally invasive surgeries, particularly at JFK Hospital, where Dr. Przybylski sits on a credentialing subcommittee. He would, however, have been given privileges as an anesthesiologist to perform percutaneous procedures.*

22a. Przybylski knowingly misrepresented the law, when he implied that hospital privileges were necessary to perform minimally invasive spine surgery, **"Q. Dr. Przybylski, in your experience on the credentialing work group for interventional pain management at JFK, would Dr. Kaul be given privileges at the hospital to perform spinal fusion surgery? A. In my experience no... Q. And does that hold true also for minimally invasive spinal fusions? A. That also holds true for minimally invasive spinal surgery fusion procedures.":** KAUL017-14:14-15:24 (PDF19/749). However, Przybylski admitted that factors not related to clinical concerns played a role in whether a hospital granted privileges, **"Q. Whatever the factors are that are considered by an individual hospital in order to credential a physician for a specific purpose, some of that has no relationship to medicine; isn't that true? A. I think generally shouldn't, but it can play a role."**: KAUL018-49:19-25 (PDF20/749). Solomon ignored the law, **"The licenses in New Jersey, I think the law is well-settled on this, are plenary, and the doctor can perform anything that a doctor can do. If while he's performing it he deviates that's a separate issue. But the idea that someone can walk in to court who happens to be an orthopedic**

20

Corey Johnson
113 Midland Place
Newark, NJ 07106

T: 973 207 0525

James Gonzalez
President
University Hospital
150 Bergen Street
Newark, NJ 07103

September 23 2013

Dear Mr.Gonzalez

I am writing to file a formal complaint against Dr.Andrew Kaufman for grossly unprofessional conduct on February 26th 2010 on the premises of UMDNJ in room E 178 between the hours of approximately 7.15am to 12pm and during which he verbally abused me immediately before I underwent a lumbar discogram.

Dr.Ira Goldstein initially referred me to Dr.Kaufman for a lumbar discogram which was to intended to assist in the accurate diagnosis of the lumbar discs that had been injured subsequent to a major accident at work in 2006. The severity of the pain and the possible benefit of a spinal fusion prompted Dr.Goldstein to recommend a lumbar discogram as a diagnostic tool.

My experience with Dr.Kaufman was horrific and I continue to have nightmares about what happened on February 26th 2010. The things he said and the almost brutal manner in which he behaved towards me have psychologically scarred me.

### CHRONOLOGY

I arrived at UMDNJ at 6am on 2/26/10 and was admitted through the front desk with instructions to go to room E-178 where I completed and signed further documents. At approximately 7.15am Dr. Kaufman walked into the room and made the following derogatory statements:

1. I can't believe this mother fucker is here
2. Are you really going to let me do this procedure to you?
3. You aren't shit and I am not going to help you with your legal case

His tone was threatening and I felt humiliated. I could not believe that a human let alone someone who is a physician, meant to heal, would make such abusive comments. I felt helpless and did not know where to look as he continued to rant and denigrate me in front of others. There were other people in the room and none of them asked him to stop. I had never felt this way before or been treated in such a humiliating way.

Dr.Kaufman then left the room and the nurse took me into the treatment area where I was given a patient gown and had an intravenous placed in my arm. I was then walked into the procedure room and Dr.Kaufman was standing in the opposite corner looking at me and continued to verbally attack me and made the following comments:

1. That mother fucker Richard Kaul is trying to take over the spine business and we are going to put a stop to it- I later worked out that he made this comment when he realized I had been under the care of Dr.Kaul since 2006 and who in my opinion had provided excellent care.

KAUL 056

2.   Are you sure you want me to do this. You know I am not going to help you with your legal case.

I did not respond to any of his comments and just felt very confused and scared that I was about to undergo a spinal procedure which could paralyse me by a man that had just been verbally hostile. I could not, at that time, work out why he (Kaufman) was being so aggressive but I later realized it was because of the fact that Dr.Richard Kaul had taken care of me and as I have since found out he (Kaufman) testified against Dr.Kaul in the case regarding his medical license.

I was instructed to lie face down on the operating table and as the anesthesiologist was applying the mask I could hear and see Kaufman screaming about how Kaul was taking their business and that they were going to stop him. None of this made any sense to me and I just kept on praying to God asking him for help. I was petrified and felt completely humiliated.

I remember waking up in the recovery room with no recollection at all of answering any questions about my pain level during the procedure, which I remember thinking was odd as I had been told before the procedure by Dr.Goldstein that I would be asked questions by Kaufman and the answers I gave were essential to making an accurate diagnosis. Still to this day I have no recollection of this happening during the procedure. I started to cry as I remembered the way Kaufman had talked to me and I wondered if it was because of my ethnicity. I was confused, scared and just wanted to leave the facility as quickly as possible.

The nurse removed the intravenous and I changed back into my own clothes and was driven home by my friend. I have had ongoing nightmares since this horrific incident and have received psychological counseling to help me deal with the feelings and terror I experience every day. In researching Kaufman I have come to know that many other patients have posted complaints about his abusive conduct and derogatory language towards patients and about other physicians.

About 1 week after the discogram I received from UMDNJ a patient satisfaction survey, which I completed and returned, and in which I made very clear my immense dissatisfaction and anger at the manner in which I had been treated. I have still not had a response to the survey I submitted in 2010 and would request that this be addressed.

UMDNJ is a very well respected hospital that does a lot for underserved communities in Newark but the abusive and shocking conduct of Dr.Kaufman on February 26 2010 in room E-178 left me with the impression that the hospital does not really care. I am sure my experience is not isolated and other patients have had to endure the same demeaning attacks.

I write this letter to bring your attention to an issue which has psychologically scarred me and which I would not wish on my worst enemy. I would therefore respectfully ask that a full and thorough investigation be carried out so that no patient will ever again have to endure such abuse.

I look forward to your prompt response.

Yours sincerely

Corey Johnson

Corey Johnson

cc. Andrew Kaufman, MD, University Medicine and Dentistry of New Jersey

9/23/2013

JACKELINE / TORALES
Commission # 2405621
Notary Public, State of New Jersey
My Commission Expires
March 14, 2016

KAUL 0569

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD ARJUN KAUL, MD | CIVIL ACTION: 20-CV-01612-TSC |
| Plaintiff | |
| v. | CERTIFICATION OF DINA M. KAUL |
| FEDERATION OF STATE MEDICAL BOARDS, ET AL | |
| Defendants. | |

RICHARD ARJUN KAUL, MD
440 c SOMERSET DRIVE
PEARL RIVER, NY 10965
862 881 9703
drrichardkaul@gmail.com

Dina M. Kaul hereby certifies to the Court as follows:

I am fifty-one (51) years of age, a United States citizen and the mother of the children of Richard Arjun Kaul, MD (**"Plaintiff"**).

I submit this affidavit in support of the claims and damages sought in the following cases:

K1-Kaul v Christie: 16-CV-02364
K2-Kaul v Christie: 18-CV-08086
K3-Kaul v Schumer: 19-CV-13477
K4-Kaul v Stolz: 18-CV-01489

1

K5-Kaul v Federation: 19-CV-3050

K6- State criminal indictment v Defendant Kaufman

K7-Kaul v Federation: 20-CV-01612

P1-Kaul/Patel v Allstate: 19-CV-08946

P2-Kaul/Patel v State of New Jersey/Crist: 19-CV-09232

A copy of this affidavit has been submitted into each of the above cases ('**The Kaul Cases**")

On October 9, 2020 I spoke with Richard Arjun Kaul regarding various issues that pertain to the above cases. The following represents this telephone conversation, which lasted approximately one hour,. The conversation has been organized into six (6) sections to facilitate interpretation.

## Section index:

A. Defendants' malicious violation of my maternal rights.

B. Foreclosure of home + Deprivation of child support.

C. Lawsuits + Bankruptcy.

D. Defendants burglaries of Bernardsville home + Attack on Plaintiff's Surgical Center.

E. Sheriffs.

F. Claim Evidence.

## A. Defendants' malicious violation of my maternal rights

1.    I am the mother of two children, a boy and a girl, aged 18 and 15.

2.    Both  my children and I have suffered immensely, and continue to suffer because of the Defendants criminal scheme, as described in the above cases.

3.    Our pain has been emotional, psychological and physical and is ongoing.

2

4.      I submit this affidavit as a single mother and a woman who has desperately struggled since 2012 to raise two young children in the face of the Defendants malicious, relentless vendetta to destroy the life and reputation of my ex-husband, the Plaintiff.

5.      The Plaintiff and I separated in 2005 and became divorced in 2009. He faithfully fulfilled all of his legal obligations under a property settlement agreement that we signed in 2005.

6.      I find it incomprehensible that the Defendants attacked my children and I in the most vicious manner, in a period that commenced in 2012.

7.      I also find it morally repugnant and reprehensible that the Defendants so perverted the process of justice, ethics and standards of basic human decency, in order to destroy my life, my children's lives and that of my ex-husband.

8.      I have the utmost respect and admiration for the Plaintiff in the manner in which he has prosecuted the Defendants in his pursuit of justice.

9.      To illustrate the character of the Defendants, mostly white privileged males, I make reference to the fact that I have worked as an administrator in the construction industry for twenty (20) years, and have never witnessed criminal conduct to the extent evident in the above cases.

10. I have dealt with teams of construction workers, mostly working class men, who are honest and would never do anything to intentionally harm women or children.

11. On several occasions I described the Defendants' crimes and their malicious scheme to intimidate, harass and attempt to destroy my life and that of my children.

3

12. On several occasion, these men described the Defendants misconduct as **"appalling"** and on one occasion, one individual described these men as **"heartless scumbags"**. He then went on to describe the manner in which he would have dealt with these individuals if they had attacked his family and children.

13. The Defendants violated my maternal rights, in that because of their relentless and vicious scheme, I was forced to fight just to survive, and was therefore deprived of time with my children. This is time that was so cruelly taken away from my children and I, time that I can NEVER get back.

14. To this day I cannot even begin to comprehend why these Defendants conspired to attack, and did attack my children and I. Even hardened criminals and members of the mafia have a code of conduct with regards to women and children.

15. The Defendants have stolen my sense of security and my children's sense of security. They do not feel safe at home or at school, because of the emotional, psychological and physical trauma that the Defendants have caused them. These individuals, wealthy, white and in positions of power, have stolen my children's childhood. Sometimes, when I think about the heinous crimes committed by the Defendants I want them to suffer, but I wish no harm on their wives or children, in the way that they did on my children and I.

16. To this day, I cannot fathom the evil that possessed the Defendants to commit the crimes they committed. I find it incomprehensible that it all stemmed from professional jealousy. If that is in fact the case, then the Defendants will need psychiatric help in jail.

17. I have read the affidavit of John Zerbini (K1-D.E. 205), and it sickens me, to know that Defendant Doreen Hafner, a deputy attorney general for the State of New Jersey, maliciously intended to destroy the lives and my children and I ( copy attached). I don't have the words to express how much pain she has caused me and

4

my innocent children, but I know justice will punish her and the other Defendants for the evil they perpetrated. I hope they rot in jail, so that no other mother and no more children will ever be subjected to the torture that my children and I have endured since 2012.

18. The facts detailed in this affidavit are just the 'tip of the iceberg'. There is so much more, but it is very painful at this time for me to talk about these atrocities, let alone write about them. It has taken me many years to develop the courage to submit this affidavit. I wanted to leave everything in the past, and not think about the agony to which my children and I were subjected by the Defendants, but the Plaintiff, the father of my our children, told me, "**that I must face the past, in order to find the future**".

19. The Plaintiff is a brilliant and courageous man. The Defendants are greedy bullies, cowards and abusers of innocent women and children. These individuals are despicable.

20. I am extremely angry about the immense and permanent injuries the Defendants have caused to my children and I, and for what. Because they were jealous of the Plaintiff's professional success. The Defendants have tormented my children and I since 2012, because they wanted to destroy him and everyone in his life. I imagine that these individuals sat down in a room, on many occasions, and planned every detail of their illegal scheme, including rackets intended to abuse the legal system in order to exact an inhumane degree of psychological pressure on the Plaintiff. The purpose of these rackets was to have the Plaintiff die, be jailed or flee the country. The Plaintiff has enormous mental fortitude, a profound hate of injustice, an indomitable will and an undying love for his children. He is a hero, who has publicly exposed the Defendants' as bullies, cowards and in all truth, individuals that deserve to be eliminated from society.

5

### B. Foreclosure of home + Deprivation of child support

21. In December 2003, the Plaintiff and I jointly purchased a home in Bernardsville, New Jersey, in which I invested the entirety of monies derived from the sale of my studio apartment in Manhattan.

22. From December 2003 to August 2016, I lived in the house with my two young children, who were aged thirteen (13) and nine (9) when we were evicted due to bank foreclosure.

23. The foreclosure of the Bernardsville house was a direct consequence of the Plaintiff's sudden inability to provide child and pay the mortgage These were a consequence of the immense economic hardship caused to the Plaintiff by the widely publicized suspension/revocation (2012/2014) of his New Jersey medical license.

24. As a consequence of the license suspension, I stopped receiving child support in March 2013.

25. As a consequence of the license suspension, the Plaintiff stopped paying the mortgage in April 2013.

26. As a consequence of the suspension, my children's education was abruptly interrupted and they were forced to leave the school in which they had studied since the ages of seven (7) and five (5). This event was extremely traumatic for them.

27. As a consequence of the foreclosure proceedings, and my lack of child support, I was forced to sell all possessions in the house. This sale occurred in June 2016, and resulted in the total loss of my possessions, my children's possessions and those possessions in the house that belonged to the Plaintiff.

6

28. As a consequence of not having received child support/alimony since March 2013, I was forced into a state of poverty, which caused me to file for personal bankruptcy on May 13, 2015.

29. As a consequence of my filing for personal bankruptcy, my financial credit score was reduced to less than 550, and upon the eviction of my children and I from our home, I was unable to secure a rental property. My children and I were forced into a state of homelessness and poverty.

30. As a consequence of the foreclosure and deprivation of child support, my children have suffered immense psychological, emotional and physical injuries that are ongoing.

### C. Lawsuits + Bankruptcy

31. On May 13, 2015, I was forced to file for personal bankruptcy due to multiple liens and judgments levied against my name.

32. The judgments and liens were a direct consequence of lawsuits filed against me and the Plaintiff by amongst others, Defendant Stein.

33. In March 2014, Defendant Stein attempted to have me and my two children evicted from our home.

34. I was forced to retain a lawyer, but because I had not received any child support/alimony since March 2013, I had no money and my retired parents used their pension to pay the legal fees.

35. In December 2003, the Plaintiff and I jointly purchased the house, and it remained in both of our names after our divorce in May 2011.

7

36. It is my understanding that in approximately late 2013, Defendant Stein misrepresented to the Morris County Court that the Plaintiff retained sole title of the house, in order to have the court enter an order of eviction.

37. Had an order of eviction been entered in 2014, my children and I would have been left destitute and homeless.

38. As a consequence of the suspension/revocation the Plaintiff, in late 2012, became unable to pay the school fees for our children.

39. In late 2012 the Plaintiff and I met with the school administrators to discuss our situation, in the hope that our children's departure from the school would not be sudden. To this effect my parents used monies from their pension.

40. However, in mid 2014, the school filed a lawsuit against the Plaintiff and I, in which it made false claims that we owed it money.

41. Neither the Plaintiff nor I had the money to defend the claims, and consequently, a default judgment was entered against both him and I.

42. It is my understanding that the school (Far Hills Country Day School) also filed a claim in the Chapter 11 bankruptcy proceedings (13-23366-DNJ) initiated by the Plaintiff's corporations on June 17, 2013. I have no knowledge as to whether the claim was paid.

43. It is my understanding that the school, consequent to the widely publicized suspension of the Plaintiffs license on June 13, 2012, entered into a series of communications with members of the administration of Defendant Christie/New Jersey Attorney General.

8

44. In the aforesaid communications the school administrators were informed that the FBI were investigating the Plaintiff, and that he would be indicted and convicted.

45. It is my understanding that as a consequence of these communications, the school decided to file a lawsuit, in the belief that the Plaintiff would either die, be jailed or leave the country.

46. It is my understanding that the school colluded and conspired with the aforesaid parties to file a lawsuit, with the intent and purpose of facilitating the illegal schemes the Plaintiff has detailed in his federal lawsuits ("**The Kaul Cases**").

47. It is my understanding that the conspiracy was purposed to destroy the Plaintiff's livelihood and reputation.

48. From April 2012 to late 2016, insurance companies (Allstate/Geico), banks and ex-patients named me as a defendant in multiple lawsuits they filed against the Plaintiff.

49. I had no money to defend the aforesaid claims and as a consequence multiple default judgments were entered against me. These detrimentally affected my credit score and made it impossible for my children and I to secure a rental property upon eviction, in 2016, from their childhood home.

50. As a consequence of the aforesaid judgments/liens/levies I was forced to file for chapter 7 bankruptcy on May 13, 2015.

51. As a consequence of the aforesaid judgments/liens/levies my personal bank account was 'frozen'.

52. On June 26, 2015 I attended a creditors meeting in Trenton, at which the trustee, Daniel M. Straffi, interviewed me.

9

53. I specifically remember that the majority of the questions pertained to personal and professional matters regarding the Plaintiff. Straffi repeatedly asked me why I had agreed to the terms of the Property Settlement Agreement that the Plaintiff and I signed in 2005.

54. It is my understanding that Defendant Stein, members of the administration of Defendant Christie and Office of the New Jersey Attorney General had conspired/colluded with Steffi to focus his questions on the property settlement agreement.

55. Straffi initially objected to my application to file for chapter 7 bankruptcy

56. It is my understanding that the purpose of these particular questions was an attempt to improperly facilitate the effort of Defendant Stein to have me and my children evicted from our home.

57. When I informed my lawyer as to what I believed was a bizarre line of questioning from Straffi, he failed to disclose that he too had been co-opted by members of the Office of the New Jersey Attorney General and the administration of Defendant Christie.

58. I was separated from the Plaintiff in 2005 and divorced in 2009.

59. I now believe that there existed from 2012 to 2016 a conspiracy by the Defendants to have the Plaintiff die, be jailed, deported and or destroy his reputation and livelihood.

10

## D. Defendants burglaries of Bernardsville home + attack on Plaintiff's surgical center

60. It is my understanding that in 2006 the Defendants commenced their scheme to have the Plaintiff's license revoked, and that on February 3 2010 Defendant New Jersey Board of Medical Examiners interviewed him about his practice of minimally invasive spine surgery.

61. In October 2010 my home was burgled, while my children and I were away from the house.

62. Upon returning to the house, I immediately noticed that the entire front door had been destroyed, that there were footprints throughout the house and that every room, including my children's bedrooms, had been ransacked. Cupboards had been emptied, draws flung to the floor, rugs pulled up and it was apparent that the intruders had attempted to access my computer. I filed a police report.

63. The burglary terrified my children, who at the time were aged eight (8) and six (6). My son began having difficulty sleeping at night and experienced frequent nightmares, from which he would wake in a state of panic. He also had difficulty concentrating at school and on his homework, as he believed there would another burglary.

64. In June 2013 there was indeed another burglary, that was conducted in the same manner as the previous one. However, on this occasion my computer was left abandoned in the hallway, and I believe that the intruders were in the house as I entered the cul-de-sac on which it was located. I filed a report with the police.

65. It is my understanding that this burglary coincided with an attack on the building in which the Plaintiff's surgical center was located, at 111 Wanaque Avenue, Pompton Lakes New Jersey. This was the NJSR Surgical Center.

11

66. It is my understanding that the building sustained enormous water damage from a fractured pipe. This occurred in June 2013, at a time when the Plaintiff was attending the medical license hearing in the New Jersey Office of Administrative Law (April 9, 2013 to June 28, 2013).

## E. Sheriffs

67. From April 2012 to mid 2016, just after the Plaintiff filed a RICO claim against the Defendants, armed Sheriffs officers frequently appeared at my home, to serve legal papers for the Plaintiff. This occurred on a monthly basis.

68. On each and every occasion I informed these individuals that the Plaintiff had not lived at the house since 2005, and almost every time the person insisted that he did.

69. On multiple occasions the individual screamed at me, while my children stood behind me in a state of utter panic. On a number of occasions my son asked me if I and or the Plaintiff, their father, were going to jail.

70. On a number of occasions the individual threw the papers into the hallway of my home. My children witnessed these acts.

71. These events stopped shortly after the Plaintiff commenced legal action against the Defendants.

## F. Claim Evidence

72. A family member of mine involved in the New Jersey healthcare sector, an individual with direct knowledge of the Defendants' crimes, has confirmed to me the truthfulness of the Plaintiff's claims.

12

73. The Defendants crimes have had an enormous impact on the lives of my children, that continues to this day, and I believe they should be held accountable for their malicious and criminal wrongdoing.

I certify that the above statements made by me are true. I am aware that if any of the above statements are willfully false, I will be subject to punishment.

Dated: November 9, 2020

Dina M. Kaul

13

RECEIVED
SDNY PRO SE OFFICE
2022 FEB 11 PM 1:46

www.drrichardkaul.com

**February 11, 2022**

Honorable J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

**Re: Kaul/Basch v ICE et al**
**21-CV-06992**
**K11-7**
**Interview of Defendant Christie's political colleague, Anthony Cappello**

Dear Judge Oetken,

We write this letter to respectfully request that in your adjudication of the Defendants'
motions, you consider the facts within the enclosed 'Statement'; facts that came into our
possession for the first time on February 7, 2022, and that we submit are relevant to claim
proof and defense dis-proof.

On February 4, 2022, I conducted a witnessed interview of a Mr. Anthony Cappello, an active
member of the New Jersey Republican Party, a close friend of Defendant Christie and the
brother of now deceased witness, Kathleen Calabrese, whose September 21, 2017 affidavit is in
evidence (K11-7: D.E. 5 Page 64 of 131): **"I explained the situation to my brother, who**
**subsequently spoke with an acquaintance of his, who had knowledge about the**
**circumstances surrounding the suspension. This individual talked with my brother on the**
**condition of anonymity, due to his concerns about possible retaliation from the Christie**
**administration".** Mr. Cappello is the brother referenced in the affidavit.

Mr. Cappello, a decades-long New Jersey political insider, was presented with various pieces of
evidence, and with his intimate knowledge of Defendant Christie, did unequivocally state that

the case was **"totally believable".** His statement undermines the Defendants

mischaracterizations of the case as **"vexatious … frivolous … meritless … abusive … harassing"**,

and we respectfully request this document's contents be incorporated into your consideration

of Defendants' motions.

Plaintiff Basch did not attend the interview, but shortly after it concluded, I communicated to

him its factual substance.

We thank you for your attention to this matter.



_____

RICHARD ARJUN KAUL, MD

_____

DAVID BASCH, MD

2

# Statement

1.     In 2003, Kathleen Calabrese ("**Kathleen**") was referred to me by Richard Boiardo, an orthopedic surgeon, who also happened to be the grandchild of Ruggerio Boiardo, aka Richie **"the Boot"** Boiardo, who was an Italian-American mobster in the Genovese crime family.

2.     I first met Boiardo in 2002, when we worked together at Columbus Hospital in Newark, New Jersey.

3.     In one of our early conversations, he told me that his father, also a member of the Genovese clan, had advised him to pursue medicine instead of a life in the mafia, but that in his opinion, the mafia tactics in medicine far surpassed anything he had witnessed in the Italian mafia.

4.     From 2003 to 2012 I provided care to Kathleen.

5.     In April 2012, with the highly publicized suspension of my license, Kathleen told me that she would ask her brother, who was a member of the New Jersey Republican Party, to inquire as to facts and circumstances surrounding the suspension.

6.     In approximately June 2012, Kathleen verbally informed me that her brother had spoken to a person in the New Jersey state government, who had direct knowledge of the facts and circumstances, but spoke on the condition of anonymity out of fear of retaliation from Defendant Christie, the then state governor.

7.     This person stated: **"I think it is terrible what they are doing to Dr. Kaul"**

8.     From 2012 to 2017, my requests to Kathleen for this person's identity were unsuccessful, as were my requests for her brother's contact information. She remained fearful of the consequences to her life, but did upon my continued plea provide an affidavit in September 2017, factually establishing certain content of her brother's communications with the then anonymous state government person.

9.      In 2017, Kathleen relocated to Florida with her husband; and the last time we spoke was late 2017, in which I once again asked for her brother's contact information and the state government person's identity. She remained fearful and did not provide the information.

10.     Kathleen and I became connected on Facebook in approximately 2015.

11.     On January 21 2022, her passing was announced on Facebook, and within the post was a comment from her brother, Tony Cappello (**"Cappello"),** who is the manager at Katz's Marina in Lake Hopatcong, New Jersey.

12.     On February 4, 2022, myself and Doreen Bettens, an acquaintance of Kathleen, drove to Katz's Marina to provide our condolences and talk with Cappello, but he did not appear to be in the marina office.

13.     I left a voicemail, with my name, number, and relation to Kathleen, and approximately two (2) hours later, I received a call from Cappello, during which I expressed my condolences, and during which he indicated having seen our car arrive at his office. I informed Cappello that we would return on February 5, 2022, as there was a matter I wanted to discuss with him face to face.

14.     At approximately 2 pm EST on February 5, 2022, myself, and Doreen Bettens, arrived at Katz's Marina.

15.     We entered the office, and introduced ourselves to Mr. Cappello, who was sitting behind a desk.

16.     Mr. Cappello appeared to be between 55 to 60 years old, has a shaved head, is 5'8'' and approximately 200 lbs.

17.     We sat down and a conversation commenced between me and Mr. Cappello, which lasted approximately twenty (20) minutes, and during which the following exchanges occurred:

4

a.      I first handed Cappello a copy of the affidavit of his recently deceased sister and asked him to review the statement, which he did.

b.      Cappello stated that he remembered me because in 2003 I had given my jet ski to a young man named Eric, who had worked for him at Katz's Marina, after Kathleen had informed me of Eric's dream to own one.

c.      Cappello, in stating that my gift changed Eric's life, appeared to be very familiar with his sister's personal and professional interactions with me, but kept nervously repeating that he had no recollection of Kathleen's affidavit.

d.      I then presented Cappello with copies of the affidavits of John Zerbini and Kenneth Sabo, which he proceeded to closely read.

e.      While reading Zerbini's affidavit, Cappello immediately recognized Defendant Kaufman's name, became flushed in the face, and repeated his name aloud, stating **"its Kaufman"**, without asking any questions about Kaufman or denying knowledge of Kaufman's involvement in the conspiracy.

f.      Without any further prompting, Cappello then stated that he and Defendant Christie had been friends for many years, through the state and national branches of the Republican Party, but that they had recently 'fallen out'.

g.      I asked Cappello the reason for the rift with Defendant Christie, but he provided no factual explanation, and instead asked me why I would be pursuing a politician whose career was over, and who, according to Cappello, did order the so called **"Bridgegate"** scandal.

h.      I told Cappello that the Defendants quid pro quo scheme involved them bribing Defendant Christie to have my license revoked.

i.      Cappello responded by stating that the scheme perpetrated against me by the Defendants was **"totally believable"**. He stated he was no longer active in New Jersey politics because it is **"so corrupt"**, but that he is involved nationally with the Republican Party.

j.      Cappello then stated that he remained in regular contact with Anthony Bucco, a Republican New Jersey state senator who is based in Morris County, New Jersey.

k.      I asked Cappello if he would be willing to testify under oath as to the statements he had just made.

l.      Cappello responded by stating his concern that his testimony might undermine the contents of Kathleen's affidavit, as he could had no clear recollection of the affidavit.

m.      Cappello is not a lawyer, but between becoming aware of my visit and the actual visit, there did pass more than twenty-four (24) hours, during which it appeared from his evasiveness that he had spoken with Defendant Christie.

n.      I asked Cappello if his brother would have any information, but he stated that his brother lives in Florida and they had not spoken in seventeen (17) years. However, a photo on Facebook shows them together with Kathleen in 2020.

o.      I concluded our conversation by asking Cappello to not only **"revisit your memory bank"** but to make further inquiries within the New Jersey Republican Party, to which he repeated that the only person with whom remains in contact is state senator, Anthony Bucco, and that he has no contact with any other persons.

p.      Doreen Bettens sat to my right and witnessed the entire exchange.


We certify that the above statements are true and accurate to the best of our knowledge, and that if it is proved we knowingly and willfully misrepresented the facts, then we will be subject to punishment.


Dated: February 11, 2022



_____
RICHARD ARJUN KAUL, MD

_____
DAVID BASCH, MD

cc: All Counsel via email
     All parties with a legal or other interest